# ORIGINAL ● ●

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg. Suite 401
Hagåtña, Guam 96910
Tel. No. (671) 472-6813

Attorneys for Defendants
M&F Fishing Co., Inc. & M/V KOORALE

**F I L E D**
DISTRICT COURT OF GUAM

FEB 1 9 2003

MARY L. M. MORAN
CLERK OF COURT

16

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| MEL DEBRUM, ) | CIVIL CASE NO. CIV03-00004 |
| ) | |
| Plaintiff, ) | |
| ) | **NOTICE OF MOTION; MOTION TO QUASH** |
| vs. ) | **RULE B ARREST OR SET AMOUNT OF** |
| ) | **SUBSTITUTE SECURITY IN AMOUNT** |
| M&F FISHING CO., INC., a corporation, in ) | **EQUAL TO VALUE OF PLAINITFF'S** |
| personam, and M/V KOORALE, her ) | **CLAIM FAIRLY STATED; MEMORANDUM** |
| engines, appurtenances, in rem, ) | **IN SUPPORT OF MOTION; EXHIBITS A-J;** |
| ) | **DECLARATION OF SERVICE** |
| Defendants. ) | |
| ) | |

### NOTICE OF MOTION

**NOTICE IS HEREBY GIVEN** that Defendants M&F Fishing Co., Inc. and M/V

KOORALE will move the Court to quash the Rule B arrest of the defendant vessel or, alternatively,

to determine the value of Plaintiff's claim, fairly stated, and set the amount of substitute security in

the form of a written undertaking or bond, which undertaking or bond shall become a defendant in

3150052.1.000901-00030

place of the defendant vessel. The Honorable Judge John S. Unpingco will hear the motion on the 24th day of February 2003 at 10:30 a.m., or as soon thereafter as Counsel may be heard.

DATED this 19th day of February 2003.

CARLSMITH BALL LLP

DAVID LEDGER
Attorneys for Defendants
M&F Fishing Co., Inc. and M/V Koorale

## MOTION

Defendants M&F Fishing Co., Inc. and M/V KOORALE, pursuant to Supplemental Admiralty Rules E (4)(f) and E(5) and Local Rules LAR C(1) and LAR E(9) hereby move the Court to quash the Rule B arrest of the defendant vessel or, alternatively, to determine the value of Plaintiff's claim, fairly stated, and set the amount of substitute security in the form of a written undertaking or bond, which undertaking or bond shall become a defendant in place of the defendant vessel. Sufficient grounds for granting this motion appear in the following Memorandum and Exhibits attached hereto.

DATED this 19th day of February 2003.

CARLSMITH BALL LLP

DAVID LEDGER
Attorneys for Defendants
M&F Fishing Co., Inc. and M/V Koorale

## MEMORANDUM IN SUPPORT OF MOTION

### I.    RULE B ATTACHMENT WAS UNLAWFULL

The Rule B arrest of the KOORALE was obtained in violation of Supp. Rule B and LAR B, both of which require Plaintiff to absolutely determine and prove to the Court that the defendant can not "be found within the district" for *in personam* service of process under Fed. R. Civ. P. 4(e). As demonstrated below, Plaintiff has not met this heavy burden. Accordingly, the Rule B arrest is wrongful and must be quashed.

Plaintiff obtained the instant Rule B arrest by pleading pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. An absolute prerequisite to Rule B arrest is that "the defendant is not found within the district." Supp. Rule B(1)(a). Plaintiff's counsel is required to attest to that fact under Supp. Rule B(1)(b).

LAR B. explains the requisite showing under Rule B that the defendant is not "found" within the district:

> The phrase "not found within the district" in Supplemental Rule B(1) means that, in an *in personam* action, the defendant cannot be served with the summons and complaint as provided in Federal Rule Civil Procedure 4(d).[1]

Pursuant to Fed. R. Civ. P. 30(b)(6), the deposition of M & F Fishing Co. Inc. was taken through Mr. Firmin Ferreira on January 30, 2003. At that time, Firmin Ferreira informed DeBrum's California counsel that he would be leaving to go to sea within days on the KOORALE

---

[1] The updating of the Federal Rules of Civil Procedure for 2002 appears to have changed the paragraph sequence of Rule 4 in such a way that that LAR B should refer to Fed. R. Civ. P. 4(e) rather than 4(d), Rule 4(d) now referring to waiver of service.

when the boat left American Samoa. (Deposition of F. Ferreira, **Exhibit "A"**, pgs 191-194). From American Somoa, the vessel motored for Guam to pick up its net at Casamar Guam. Therefore, DeBrum's counsel knew that Firmin Ferreira would be on the KOORALE when it arrived in Guam.

The Rule 30(b)(6) deposition of M & F Fishing Co. Inc., was taken through its president, Anthony Ferreira, on February 6, 2003. At the deposition, Anthony Ferreira was asked a series of questions about the corporate structure and officers of the corporation. In response, Anthony Ferreira specifically informed DeBrum's counsel that Firmin Ferreira was an owner of the corporation, and was vice president of the corporation. Deposition of Anthony Ferriera, pp. 14 and 22, attached as **Exhibit "B."** In the circumstances, the Defendant M&F Fishing could indeed be readily "found" - and served - within the District of Guam by way personal service on corporate officer Firmin Ferreira pursuant to Fed. R. Civ. P. 4(e). Accordingly, Rule B arrest was made in violation of both Rule B and LAR B. and must be quashed. 2

## II.    BACKGROUND FACTS OF ACCIDENT

The KOORALE is a 182-foot tuna purse seiner. She fishes out of Pago Pago, American Samoa, and sails with a crew of 19–22. The fish captain, Fermin Ferreira, is an M & F Fishing shareholder. His son, Anthony Ferreira is also a shareholder, and is the land-based manager of the operation. The F/V KOORALE is the sole asset of the company.

Mel Debrum is a 40-year-old fisherman, and citizen of the Marshall Islands. He worked as the assistant skiffman for the KOORALE for more than ten years before his accident.

---

2 As a provisional remedy with attendant constitutional limitations, Rule B arrest is subject to strict scrutiny and only the utmost level of compliance with the Rule will satisfy such review by the court. Here, Plaintiff has failed to satisfy the basic core requirement, and the Rule's built-in constitutional safeguard against wrongful arrest, that the defendant not be found in the district.

On 10 August 2000, the vessel set the net around a man-made "raft," used to attract tuna. Since the success of these sets depends on the absence of extraneous light, the KOORALE was setting just before sunrise, and operating with just her navigational lights. On such sets, crewmembers used flashlights to accomplish essential tasks. At the time of the set, the vessel's log states that the weather was "breezy and choppy." The master noted "moderate" weather with sea swell at one to one and one-half meters tall, with crests 100 meters apart. Additionally, there was a light chop reported.

DeBrum was, as usual, the KOORALE's assistant skiffman at the time of his accident. In that job, he worked in the vessel's 34-foot skiff during the initial stages of setting the net. After the skiff was lowered into the sea, it picked up one end of the mile long net and the KOORALE encircled the raft. The vessel's 'light boat,' a small powerboat outfitted with powerful lights, was inside the net, keeping the tuna's attention directed towards the raft and away from the seiner. When the KOORALE had come around full circle, the skiff delivered the bow oertza to the vessel, preventing the tuna from escaping. The KOORALE then hoisted the pursed net out of the water, gathering the fish.

Once the bow oertza is returned to the tuna seiner, DeBrum would (at some point) board the seiner to assist in stacking the seine net after it and the catch was brought aboard. Stacking the net, however, did not take place for the next 18 to 40 minutes, depending on how long the winchman takes in pursing the seine cable. Meanwhile, the skiff, a very powerful boat, tows the seiner away from the net, to keep it from running afoul of the net. If DeBrum boarded the seiner

after delivering the bow oertza, he would have an 18 to 45 minute break. If he stayed with the skiff, he would spend that 18 to 45 minutes working.

Fish captain, Fermin Ferreira left the choice of when to transfer from the skiff to the KOORALE to DeBrum and the skiffman. DeBrum had three means of transferring from the skiff to the seiner: The most common method was for him to jump or step from the bow of the skiff onto the starboard ladder, recessed into the vessel's side approximately at the forward end of the working deck. This method would allow him about a half an hour break from work. DeBrum could also elect to be picked up by the light boat; it left the raft as soon as the net was pursed, and could pass within feet of the skiff on the way to be hoisted aboard. Finally, DeBrum could ask that the seiner lower and send a speedboat to pick him up from the skiff. DeBrum's choice of method was to be based on his assessment of the prevailing sea conditions, as was in the best position to assess the conditions from within the skiff and the decision was based largely on prevailing weather conditions as appreciated by DeBrum.

That morning, DeBrum elected to transfer to the KOORALE by the first above stated method as he had done many hundreds of times over the last ten years - stepping from the skiff to the ladder immediately after the skiff delivered the bow oertza to the seiner. The skiffman, Jose Cruz, placed the squared-off bow of the skiff perpendicular to the starboard ladder, nudging up against the side of the seiner. DeBrum stepped from the bow of the skiff onto the ladder and began to climb. Unfortunately, however, he mistimed his jump, and the skiff rode up on the swell and pinned DeBrum's foot above the ankle between the seiner and the flat bow of the skiff, crushing it

DeBrum does not deny that it was his judgment call as to the timing to step from the

3150052.1.000901-00030                    6.

skiff to the ladder:

Q: When you stepped from the skiff to the ladder, did you try to make the step when the skiff was in the high position in the waves or the low position or somewhere in between or it didn't matter?

A: If I know there is a right time and then I grab the ladder.

DeBrum deposition, pg. 76.

Specifically, it is necessary that the assistant skiffman step to the ladder when the skiff is at the crest of any swell, so that he can be assured that the skiff would not ride up on the swell as he was ascending the ladder, and strike him. As the skiffman in the skiff with him recalled in a statement given a few days later:

Q: When the skiff is higher, he should have...?

A (Interpreter) He should have grabbed the rail.

A: (Jose in English) Is Correct. Is Correct. Is Correct.

Q: But this time he grabbed it when the boat was down and then it was on it's way back up and that's when he got pinned?

A: (Interpreter) Mmmmmh.

Q: Okay. And again, I know I asked this question before, but it is Mel's decision what time to jump, right?

A: ( Interpreter) Was that the moment when Mel thought about going up the boat, right, it wasn't yours?

A: (Jose in English) No, No. It's his decision. His decision.

A: (Interpreter) It's Mel's decision.

Statement of Pepe Cruz

The KOORALE immediately set out on a 30 plus hour run to Tawara (400 miles away), the closest port with a landing strip. The vessel made arrangements with the U.S. Air Force for a C-130 to fly from Japan, meet the vessel at Tawara and fly DeBrum to Honolulu. A launch met DeBrum outside of Tawara harbor, with a physician aboard. After he was checked out, the USAF C-130 flew him directly to Honolulu, Hawaii.

III.    LIABILITY

A.    Transfer By Ladder. There are three methods of transferring from the skiff to the seiner: the ladder; the light boat; or a speedboat. The defendant's experts Medina and Magellan combined, have seventy years of experience on tuna boats. Both opine that it is the usual and standard practice in the tuna fleet for the assistant skiff man to transfer in the manner DeBrum did here, and that the method is reasonably safe, when the assistant skiffman exercises proper judgment. **(Exhibit "C")**. The method and timing of the transfer were Debrum's to decide, based on his superior vantage point in the skiff and his ten years of experience. Id.

Plaintiff tries to explain his poor timing in stepping from the skiff to the KOORALE, by claiming that a certain speedboat hung on a davit in the vicinity of the ladder was in his way. He admits, however, that the speedboat was in the same position for the ten years he had worked on the KOORALE. Further, defendant's experts and several crew witnesses have pointed out that the speedboat could not have been a factor, given that the seas were not more than 4 to 6 feet, and the speedboat was more than 17 feet above the waterline.

3150052.1.000901-00030                          8.

B.    Marijuana Use.  On December 24, 2002, more than fifteen months after the lawsuit was filed, the plaintiff made the desperate allegation for the first time, that the ship's officers were using marijuana.  The plaintiff apparently has two friends who will back him up on this claim. The officers and other crewmembers adamantly deny the claim.

There is also a motion pending to dismiss this unfounded claim pursuant to Fed. R. Civ. P 37(c)(1), because it was not disclosed in discovery for more than fifteen months after DeBrum's lawsuit was filed on September 20, 2001.  For example, it was not disclosed in answers to interrogatories made by plaintiff on April 23, 2002, wherein plaintiff answered interrogatories asking plaintiff to state all facts supporting his claim based on unseaworthiness **(See Exhibit "D")**. It was not disclosed in six hours of plaintiff's deposition taken  on May 24, 2002.  It was not disclosed before or in the course of seven perpetuation depositions of crew in American Samoa  in August, 2002,  which crew could have rebutted the claim.  In fact, the claim was not made until December 24, 2003, after most of the defendants' other crewmember perpetuation depositions had been taken.  Based on such a dilatory and prejudicial failure to disclose, the claim is expected to be dismissed in Los Angeles, and should not  be considered here.

IV.    COMPARATIVE NEGLIGENCE

Defendant has substantial evidence to refute plaintiff's claims of negligence and unseaworthiness.  However, if liability is found, there is ample and irrefutable evidence of contributing negligence on DeBrum's part.  If the conditions were not conducive to transfer directly from the skiff to the ladder, it was DeBrum's responsibility to use his ten years of experience doing the assistant skiffman job, to choose to come in on the light boat, or otherwise

stay in the skiff. Further, having selected that method of coming aboard, it was incumbent on DeBrum to time the transfer to avoid injury. If liability is found, the evidence clearly would suggest a finding of comparative negligence at a minimum level of 50%.

V.    MEDICAL TREATMENT

DeBrum arrived in Honolulu on August 12, 2000. He was met by ambulance at the airport and taken to the emergency room at the Queen's Medical Center. He was attended by orthopedic surgeon Jay Marumoto M.D. While the injury occurred at the ankle, Dr. Marumoto had to amputate the leg approximately six inches below the knee, to ensure proper healing and stump formation.

On August 22, 2000, Marumoto discharged DeBrum from the hospital. DeBrum moved into the Manamana Apartments, on the hospital grounds. He began physical and psychiatric therapy. From August through October, 2000, DeBrum walked with crutches.

On August 28, September 6, September 20, and October 11, 2000, DeBrum saw Dr. Marumoto. Dr. Marumoto noted satisfactory progress and no complications each time. Dr. Marumoto prescribed a temporary prosthesis for DeBrum on October 12. The prosthesis was fitted shortly thereafter.

On November 6, 2000, DeBrum saw Dr. Marumoto again, who found that DeBrum was progressing well and his stump was well healed. Dr. Marumoto noted that DeBrum had some "shocking" pain distally, and showed a Tinel's sign, indicating an irritated nerve. Marumoto treated the Tinel's sign with a local anesthetic injection, continued to monitor DeBrum's intake of painkillers, and began him on prosthetic physical therapy. On November 29, 2000, Marumoto saw

DeBrum again. He noted good progress, and no Tinel's sign or focal tenderness. DeBrum continued with his physical therapy. DeBrum returned to his family and home in the Marshall Islands over the Christmas season, at the defendant's expense.

On January 22, 2001, DeBrum returned to Dr. Marumoto. DeBrum was still making good progress, but displayed a slight limp while he was walking with his prosthesis. His stump was healed, and there was no tenderness. That day, Dr. Marumoto prescribed a "final" prosthesis for DeBrum.

On February 21, 2001, Dr. Marumoto again examined DeBrum and found no tenderness or skin breakdown, and noted that DeBrum was walking smoothly on the temporary prosthesis. DeBrum continued to wait for his permanent prosthesis to be completed.

On March 21, 2001, DeBrum returned to see Dr. Marumoto with his new prosthesis. He complained that the prosthesis felt too long. Marumoto suggested further adjustments. He saw DeBrum again on April 4, 2001; the adjustment helped.

Dr. Marumoto's May 2, 2001 chart note reflects that "At this point in time, his symptoms are tolerable and I do not recommend any further interventions." Dr. Marumoto expounded on this statement at deposition: ". . . based on the severity or lack of significant severity of his symptoms, I didn't recommend doing anything else; pills, shots, therapy, prosthetic adjustment. Certainly not surgery." DeBrum continued to live at the Manamana Apartments, and received maintenance and prosthetic therapy through May 31, 2001. In early June, 2001, DeBrum left for the Marshall Islands, where he visited family through the beginning of August.

On August 7, 2001, DeBrum attended his final medical appointment with Dr. Marumoto. Dr. Marumoto found that DeBrum's condition since the May 2, 2001 exam had been "static," and did not schedule any further appointments. **(Exhibit "E")**.

More recently, in November of 2002, the defendant paid for a new, "high tech" third prosthesis. Plaintiff's San Diego doctor and prosthetist reported that plaintiff's pain would be lessened and he could lead a more "active" lifestyle with this new leg.

## V.  DAMAGES

### A.  Medical Prognosis and Capacities

The defendant in this case has retained as its medical expert, orthopedic surgeon, Dr. Douglas Smith. As can be seen from his very impressive curriculum vitae attached hereto as **Exhibit "F"**, Dr. Smith has spent his entire, distinguished career treating and researching leg amputations, and the prosthetic devices used by leg amputees. The plaintiff's treating and medical experts admit to having little or no such expertise as compared with Dr. Smith.

Dr. Smith's report of independent medical examination is attached as **Exhibit "G"**. As can be seen, Dr. Smith has documented the fact that DeBrum's stump is in good condition and health. Further, based on DeBrum's own, recorded self-report, DeBrum's residual symptoms are negligible, and far less than most below the knee amputees. As for potential and future activity, Dr. Smith opined that DeBrum "has the potential to be a very active amputee. He has a great residual limb, very healthy, good muscle and good balance. If motivated, he could walk long distances, run short distances, and lead an active lifestyle. He could do most labor jobs with modest modifications. In my opinion there is good potential that he could return to modified duty on a boat. He needs to

be given the motivation, and permission to excel. From everything I see in this history and physical exam, he can do it."

## B. Maintenance and Cure

The defendant provided DeBrum with maintenance from August 12, 2000, through May 31, 2001, and also for the week of August 7, 2001, when Dr. Marumoto discontinued active treatment. The maintenance paid totals approximately $75.00 per day. The defendant also maintained a separate personal accident protection policy through AIG, with $50,000 per occurrence limits. The proceeds of this policy were paid to DeBrum shortly before he was released from treatment, as an offset against the defendant's future maritime obligations, including maintenance and cure. The defendant is obviously far ahead of its obligations in paying maintenance and cure to DeBrum.

## C. Past and Future Loss of Earnings

Based on actual catch and earnings records, DeBrum would have earned $47,000 after tax fishing from the date of injury to the date of trial.

Dr. Marumoto released DeBrum from treatment nineteen months ago, after DeBrum successfully completed a course of jogging exercise in therapy. Notwithstanding this fortunate medical outcome, DeBrum admits that, to this date, he has never talked with anyone about the possibility of becoming re-employed in any capacity.

DeBrum has utterly failed to mitigate his earnings loss. In the nineteen months since maximum medical cure, DeBrum clearly could have mitigated his earnings loss by at least $22,000, leaving his real past-lost earnings at about $25,000.

3150052.1.000901-00030                    13.

Our experts credibly predict that DeBrum can return to gainful employment, and fully mitigate his lost fishing income within a few years. DeBrum will be 41 years old in May. Based on current statistical data compiled by our economist from the tuna fleet, our economist and vocational expert have stated a well founded opinion that it is statistically very unlikely that DeBrum would have fished more than about seven more years as a crewmember before he would have "retired" to shore side work. **(Exhibits "H" and "I")**.

The average earnings paid to Mr. DeBrum and his replacement over the last four years (1999 to present) is $19,270 per year. Id. Our economist did conservatively use this figure to project DeBrum's future loss in spite of indisputable evidence that the U.S. tuna fleet is being driven out of business by foreign vessels paying crewmembers less, and tuna prices being driven down by such lower cost competition. (Exhibit "H"). As for residual earnings capacity, the defendant's vocational rehabilitation expert has recommended that DeBrum undergo six to nine months of training to perform such simple jobs as bench repairer, bench assembler, bench painter or bench technician. (Exhibit "I") He would then be competitive for wages of $8.50 per hour, progressing over a period of four years to $12.00 per hour. As noted above, Dr. Smith has found DeBrum capable of far more physically challenging jobs.

Based on the above analysis and projections, the defendant's economist has calculated an earnings loss through January 2007. After that date DeBrum's after tax offset earnings are projected to exceed his after-tax but for the injury, mitigating his economic loss. The total loss of earnings from the injury to the mitigation date of January 2007 is $82,962.00. (See Exhibit "H").

D.      Found

Plaintiff also claims damages for loss of "found," the value of room and board aboard ship, including meals, beverages, laundry soap, etc. However, he has testified that he maintained and paid for a furnished apartment for he and his fiancé to live in during the five years lading up to his accident. Therefore, based on cases such as Alexandervich v. Gallagher Bros., 298 F.2d 918, 922 (2d. Cir 1961) as well as the opinion of our economist, plaintiff has not suffered an economic loss for the housing component of found. Based on a loss of the food benefit of $3,655 per year for up to twelve years, the found claim is generously estimated to be valued at $44,000. (Exhibit "H")

E.      Future Prosthetic Care

Plaintiff is also entitled to expected costs to replace his prostheses every four or so years, until death. According to Dr. Smith, DeBrum can be expected to need eight additional prostheses over his life, at a cost of $8,500.00 or so each. Based on these projected expenses, the cost of future prosthetic care and medical care is about $70,000.00. (Exhibit "G")

F.      Noneconomic Damages

Defendant has done a jury verdict search of cases tried to a jury in southern California (Los Angeles and San Diego) since 1985, where the plaintiff had a below knee amputation. **(Exhibit "J")**. The following are the general damages/non-economic jury awards that were found during that period, in that area:

Case 1:03-cv-00004    Document 18    Filed 02/19/2003    Page 15 of 118

| Plaintiff | Court | Year | Aggravating Factors | Amount |
|---|---|---|---|---|
| Henry | LA County Superior Court | 1985 | | 735,000 |
| Connolly | LA County Superior Court | 1988 | High Thigh Amputation | 452,182 |
| Garcia | LA County Superior Court | 1993 | | 109,000 |
| McGesiness | LA County Superior Court | 1993 | Whole Leg Amputation | 215,000 |
| Castello | San Diego County Superior Court | 2000 | Severely retarded and undergoing psychiatric care for injury | 1,000,000 |
| Perrine | Orange County Superior Court | 1993 | | 600,000 |
| Bonner | San Bernadino County Superior Court San Diego | 1993 | $418,000 in future medical | 1,368,571 |

The only two awards of $1,000,000 or more had significant aggravating factors involved, not present here. The plaintiff here is a forty-year-old foreigner form a country with a low cost of living relative to Los Angeles. Further, by all accounts of medical experts, DeBrum has had an extraordinarily good outcome from his below the knee amputation.

If the two highest awards with aggravating factors are not considered, the average award is $422,000. Even with the highest awards included, the average award is $635,000. Based on the foregoing analysis, DeBrum's general damages claim, fairly stated, should not

Case 1:03-cv-00004     Document 18     Filed 02/19/2003     Page 16 of 118

exceed $500,000.

## VI.    CONCLUSION

Rule B provides a heavy hammer with which a plaintiff can do significant damage to a shipowner based on a very minimal – *and ex parte* - showing. Accordingly, the party seeking such extraordinary relief has an obligation to tell the Court as much as it knows. Only then will the Court be able to make an informed decision regarding the appropriateness of the ex parte relief sought. When this action was filed on February 11, 2003 and the so-called "exigent" request for Rule B arrest presented to the Court, the plaintiff's counsel already knew, by way of having recently received specific information in a deposition of the defendant, that the vice president and part owner of *in personam* defendant M & F Fishing Co. Inc. would be arriving in the District of Guam with the ship. It is indeed compelling proof that the U.S. Marshall for the District of Guam was ready at the Casamar dock with arrest warrant in hand when KOORALE berthed with corporate officer Fermin Ferriera aboard. In other words, opposing counsel clearly knew where the KOORALE was headed, when she was due to arrive and, especially pertinent to this motion to quash Rule B arrest, that a corporate officer qualified to accept personal service of process under Fed. R. Civ. P. 4 was on board. Therefore, the defendant was known to be found in the District of Guam within the meaning of both Supp. Rule B and LAR B. As a result, the Rule B arrest was obtained through a want of candor and misuse of Rule B procedures, and must be vacated.

Alternatively, the evidence will allow for a defense verdict or, if liability is found, a reduction in any award for at least 50% based on comparative negligence.

3150052.1.000901-00030                17.

From a medical and physical capacities perspective, DeBrum has had an excellent result relative to most below knee amputees. He has no ongoing medical issues, he is largely without symptoms, and recommended activity levels will allow him to jog and work at most any labor job he wants to do. As demonstrated herein, and as plainly apparent from the Exhibits attached hereto, the above items of damages, fairly stated, total $697,000.

In the circumstances, M & F Fishing Co., Inc. respectfully requests the Court to QUASH AND VACATE the Rule B arrest. If not so vacated, M & F Fishing Co. Inc., alternatively asks the Court to order the release of M/V KOORALE upon the filing with this Court substitute security in the form of a bond in the amount of $700,000.

DATED this 19th day of February 2003.

CARLSMITH BALL LLP

DAVID LEDGER
Attorneys for Defendants
M&F Fishing Co., Inc. and M/V Koorale

24759 eb184104

# EXHIBIT "A"

# RULE 30(b)(6) DEPOSITION OF FIRMINO FERREIRA TAKEN ON 1-30-03

## *Page 1 to Page 197*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
## 1001 Bishop Street
## 2460 Pacific Tower
## Honolulu, HI  96813
## Phone:  (808) 524-2090
## FAX:  (808) 524-2596

### Page 189

(1) can that cause twists in the net, the bottom of the
(2) net?
(3)    A.  Nope.
(4)    Q.  Can that cause pockets of fish to occur in
(5) the net?
(6)    A.  No.
(7)    Q.  Mr. Banning was asking you earlier the
(8) orientation of the waves and the wind on the Koorale
(9) during a raft set.  Do you remember that?
(10)    A.  Uh-huh.
(11)    Q.  Try to say yes or no.
(12)    A.  Yes.  Yes.
(13)    Q.  During a raft set, when the skiff is put
(14) overboard, what is the orientation of the Koorale to
(15) the wind and the seas?
(16)    A.  It is on the port side.
(17)    Q.  Now, after that skiff is put overboard, is
(18) it the skiff that pulls the net around, or is it the
(19) Koorale?
(20)    A.  The skiff usually stays on the tows, so
(21) stays in position.
(22)    Q.  Does the Koorale move?
(23)    A.  Yes.
(24)    Q.  What motion does it make in the water?
(25)    A.  It goes to the left.

### Page 190

(1)    Q.  Same as to the port?
(2)    A.  Port, yeah.
(3)    Q.  And how far does it go to port?
(4)    A.  Until we turn around and it goes -- comes
(5) around and hits starboard.  We come around, swing and
(6) comes around, and goes to port, port, port.  And then
(7) comes around and goes back to starboard again.
(8)    Q.  So what pattern does the Koorale make in
(9) the water?
(10)    A.  A big circle.
(11)    Q.  And as the Koorale is turning to port and
(12) coming around in that circle, does the orientation of
(13) the vessel to the seas and the wind change?
(14)    A.  Yes.  Around a bit, come around.  Yes, of
(15) course it does.
(16)    Q.  Well, when the vessel turns 180 degrees,
(17) what side is the wind and the waves on?
(18)    A.  It would be on the starboard side.
(19)    Q.  So it starts on the port side; and then at
(20) 180 degrees, it is on the starboard?
(21)    A.  Yes, it has to.  You come around.
(22)    Q.  At the point that the setting of the net is
(23) complete, what is the orientation of the Koorale to
(24) the seas and the wind?
(25)    A.  We keep on the port side.

### Page 191

(1)    Q.  So that's the same as the way it started?
(2)    A.  That's right.  Correct.
(3)    Q.  Mr. Banning asked you about the command
(4) structure.  Are you, as the fish captain of the boat
(5) while at sea, above or below Captain Armstrong in the
(6) chain of command?
(7)    A.  Above and below?
(8)       They are always the highest.  As far as I
(9) could see it, that would be Jake.  The master would
(10) be the head.
(11)    Q.  So while at sea, you answer to him or he
(12) answers to you?
(13)    A.  If -- if I tell him to go someplace for
(14) fish, then I will tell him to do something.  But he
(15) is the master.  He is the head guy, really.  He is
(16) the paper man.  He is the big boss.  As far as Coast
(17) Guard, he's got the papers.  He is the main guy.
(18)    Q.  What are your plans during the next month?
(19)    A.  Try to get the boat out to go fishing.
(20)    Q.  And if that's the case, are you going to be
(21) available to receive and review the transcript of
(22) this deposition?
(23)    A.  I don't know.  I got ways.  There's people
(24) that could read it for me.
(25)    Q.  If you get the transcript, you are going to

### Page 192

(1) need someone to --
(2)    A.  To read it for me.
(3)    Q.  -- to read it for you?
(4)    A.  Uh-huh.
(5)    Q.  Are you going to be at sea?  While you are
(6) at sea, are you going to be available to read and
(7) correct your deposition?
(8)    A.  If there was somebody to read it, if I can
(9) trust them to read it right, you know, read it.
(10)    Q.  Are there deliveries made to the ship out
(11) at sea?
(12)    A.  No, no.
(13)    Q.  So you are not going to be in a position to
(14) get the transcript to have someone review it with
(15) you?
(16)    A.  No.  No.  No.  No.
(17)    Q.  And when will be the next time that you
(18) will be available to do that?
(19)    A.  When I come back in.
(20)    Q.  And lastly, during the sacking up, who is
(21) the crew member on board giving orders to the captain
(22) as to when to operate the winches on board?
(23)    A.  The winches?
(24)    Q.  Well, the winches, the single, the --
(25)    A.  It would be John.

Case 1:03-cv-00004    Document 18    Filed 02/19/2003    Page 21 of 118

## Page 193

[1]   Q.  In other words, the deck boss?

[2]   A.  Deck boss.

[3]   Q.  The deck boss is telling the skipper, then,
[4]  when to go up?

[5]   A.  Yeah, that's John.

[6]        MR. BANNING:  Objection.  Leading.

[7]        THE WITNESS:  That's John Alves —
[8]  Armstrong.

[9]  BY MR. WINDES:

[10]   Q.  John Armstrong?

[11]   A.  Not John Armstrong.  Jake, we call him.

[12]   Q.  Who is the person — what is the position
[13]  of the person giving orders for Captain Armstrong to
[14]  go up on the single?

[15]   A.  That would be John.

[16]   Q.  John who?

[17]   A.  John Alves.  John Alves.  Deck boss.

[18]        MR. WINDES:  Okay.  That's all I have.

[19]        MR. BANNING:  Do you want to offer the
[20]  same stipulation we had yesterday?  Send the
[21]  original — I think you could probably e-mail it to
[22]  the boat, and they could print it out on the boat.
[23]  However you want to do it.  But I guess send the
[24]  original to M&F Fishing, and then —

[25]        MR. WINDES:  In other words, to me,

## Page 194

[1]  the original to me?  And if I get a disk with it, I
[2]  may be able to get that e-mailed.

[3]        Can you receive e-mail on board?

[4]        THE WITNESS:  I don't know if it is
[5]  working or not.  You got to ask Anthony about that,
[6]  or Pepitas, yeah.  Right.

[7]        MR. WINDES:  Anyway, if I can e-mail
[8]  it and get it done, we will do that.  If I don't get
[9]  it, I will be asking the court for him to have an
[10]  opportunity to read it and correct it.

[11]        MR. BANNING:  You can ask her to
[12]  expedite it and e-mail it down to Samoa, and he can
[13]  read it down there.

[14]        But be that as it may, after the deposition
[15]  is read, corrected, and signed, the original will be
[16]  returned to my office, and I will make it available
[17]  for trial.  And if for any reason the original is not
[18]  available, I will stipulate that a copy can be used
[19]  for any purposes.

[20]        MR. WINDES:  I think the way we were
[21]  doing it, isn't it — I wasn't listening each time to
[22]  what you were telling the court reporter.  I thought
[23]  the original was going to the witness.

[24]        MR. BANNING:  To the witness.  After
[25]  he's read, corrected, and signed it, he returns it to

## Page 195

[1]  the court reporter.  Then it goes to me.

[2]        MR. WINDES:  Then goes to you.  So I
[3]  will get the original and maybe a floppy?

[4]        THE REPORTER:  If you order a copy,
[5]  you will get a floppy.  But with the original,
[6]  there's not one.

[7]        MR. WINDES:  Can you send me a floppy
[8]  so I can try and get it to Firmino Ferreira?

[9]        THE REPORTER:  Yes.  Yes.

[10]        MR. BANNING:  And then return it to me
[11]  so I can make it available for trial.  And if for
[12]  some reason it is lost, we can use a certified copy
[13]  as though it is an original.

[14]        And you will notify me of any changes as
[15]  soon as they are made, right?

[16]        THE REPORTER:  Yes.

[17]  (Whereupon, the deposition concluded at 3:54 p.m.)

[18]  ///

[19]  ///

[20]  ///

[21]  ///

[22]  ///

[23]  ///

[24]  ///

[25]  ///

## Page 196

[1]        I, FIRMINO FERREIRA, hereby certify that I
[2]  have read the foregoing typewritten pages 1 through
[3]  195, inclusive, and corrections, if any, were noted
[4]  by me, and the same is now a true and correct
[5]  transcript of my testimony.

[6]        DATED:  Honolulu, Hawaii,

[7]

[8]

[9]

[10]                    FIRMINO FERREIRA

[11]

[12]  Signed before me this
[13]  day of           , 2003.

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]  Case:  ALVES vs. M&F FISHING
      Civil No.: 02 CV 0174 JM(LAB)
[25]     Deposition Dated:  January 30, 2003
      Taken By:  Chari L. Possell

Case 1:03-cv-00004     Document 18     Filed 02/19/2003     Page 22 of 118

# EXHIBIT "B"

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3
 4   MEL DEBRUM,                )    NO. 01-08403 DDP(SHx)
                                )
 5            Plaintiff,        )    30(B)(6) DEPOSITION OF
                                )
 6        vs.                   )    ANTHONY FERREIRA
                                )
 7   M & F FISHING CO., INC., a )    VOLUME I
     corporation, in personam,  )
 8   and F/V KOORALE, her engines)   (Pages 1 - 135)
     tackle, apparel, furniture, )
 9   and appurtenances, in rem, )
                                )
10            Defendants.       )
                                )
11   And Related Cross-Actions  )
                                )
12              WORKING COPY
13
14         TAKEN ON:   THURSDAY, FEBRUARY 6, 2003
15         TAKEN AT:   501 WEST BROADWAY, SUITE 2090
                       SAN DIEGO, CALIFORNIA
16
           REPORTER:   PAULA A. PYBURN
17                     CSR NUMBER 7304/RPR
18
19
20
21
22
23
24
25
```

Page 14

1   that.
2       What is your position with M & F Fishing,
3   Incorporated, the defendant in this matter?
4       A.  Manager.
5       Q.  How long have you been the manager of M & F?
6       A.  Since '95 or -6.
7       Q.  Are there other officers of M & F Fishing?
8       A.  Yes, there are.
9       Q.  Who are they?
10      A.  Fermin Ferreira.
11      Q.  What is his position?
12      A.  I believe he is vice president.
13      Q.  When did he become vice president?
14      A.  '95 or -6.
15      Q.  Has he ever been out of the position of vice
16  president?
17      A.  I don't know.
18      Q.  Who else are the officers?
19      A.  Daniel Noe.
20      Q.  What is his position?
21      A.  Chairman of the board.
22      Q.  How long has he held that position?
23      A.  Since '95 or -6, I believe.
24      Q.  Has he ever left that position?
25      A.  Not that I am aware of.

Page 15

1       Q.  Has he ever held any other positions?
2       A.  I believe he was treasurer.
3       Q.  When was he the treasurer?
4       A.  Pardon?
5       Q.  When was he the treasurer, Danny Noe -- strike
6   that.
7           When was Danny Noe treasurer of M & F Fishing?
8       A.  '95 or -6.
9       Q.  Did he become the treasurer -- strike that.
10          Was he always an officer of M & F Fishing?
11      A.  I don't know.
12      Q.  When did he become -- he became chairman of the
13  board in '95 or '96, you stated?
14      A.  (Witness nods head up and down.)
15      Q.  Has he held that position continuously up
16  through today?
17      A.  Yes.
18      Q.  Are there any other officers of M & F Fishing?
19          When I say "M & F Fishing," do you understand
20  that I am referring to the defendant, M & F Fishing,
21  Inc.?
22      A.  Yes.
23      Q.  Okay.  And --
24      A.  Fermin Ferreira.
25      Q.  Pardon?

Page 16

1       A.  You will have to repeat the people that you
2   asked me the question.
3       Q.  Sure.  What other officers besides Fermin
4   Ferreira and Daniel Noe does M & F Fishing have?
5       A.  None that I am aware of.
6       Q.  Has it ever had any other officers other than
7   Daniel Noe and Fermin Ferreira and yourself?
8       A.  I don't know.
9       Q.  Since the time you became manager of M & F
10  Fishing, has it had any other officers other than
11  yourself, Daniel Noe and Fermin Ferreira?
12      A.  No.
13      Q.  Since the time that you became manager in '95
14  or '96 of M & F Fishing, has Fermin Ferreira always been
15  an officer of M & F Fishing?
16      A.  Yes.
17      Q.  And since you became the manager in '95 or '96
18  of M & F Fishing, has Daniel Noe always been an officer
19  of M & F Fishing?
20      A.  Yes.
21      Q.  In -- strike that.
22          In August of 2000 did M & F Fishing have an
23  office in San Diego?
24      A.  We have a bookkeeper.
25      Q.  Who is that?

Page 17

1       A.  Melissa Jones.
2       Q.  How long has she been the bookkeeper for M & F?
3       A.  I don't know.
4       Q.  Since you became manager in 1995 or '96, has
5   she always been the bookkeeper for M & F Fishing?
6       A.  Yes.
7       Q.  And what is her address, her work address?
8       A.  1278 Scott Street, I believe.
9       Q.  San Diego?
10      A.  Yes.
11      Q.  Over in Point Loma?
12      A.  Yes.
13      Q.  In -- where is the principal place of business
14  of M & F Fishing currently, if it has one?
15      A.  Principal place, I'd say American Samoa,
16  Nevada.
17      Q.  Does M & F Fishing have an office in American
18  Samoa currently?
19      A.  The vessel.
20      Q.  Does M & F Fishing have an office in Nevada
21  currently?
22      A.  My briefcase.
23      Q.  What's your residence?
24          MR. WINDES:  Talking about him as a person?
25          MR. LOPEZ:  Yes, his residence.

5 (Pages 14 to 17)

**Page 22**

1  · Q.  And to the best of your knowledge, when was the
2  last time the number of shares held by each of these
3  three shareholders changed?
4  A.  Quite recently.
5  Q.  When you say "quite recently," how long ago?
6  A.  Again, you'd have to refer to Keith on that,
7  I'm not exactly sure.
8  Q.  Was it during the last six months?
9  A.  You'd have to refer to Keith, Keith could tell
10  you the specifics.
11  Q.  Are the shares owned approximately the same as
12  what you told me in September of 2000?
13  A.  I believe that would be a fair statement.
14  Q.  And since -- strike that.
15  In August of 2000, at the time of Mel DeBrum's
16  accident, did the same three shareholders hold the
17  shares of -- strike that.
18  In August of 2000 when Mel's accident occurred,
19  were there any other shareholders other than yourself,
20  Fermin Ferreira and Danny Noe?
21  A.  No.
22  Q.  Were you on board the Koorale at the time of
23  Mel DeBrum's accident that is the subject of this
24  lawsuit?
25  A.  No.

**Page 23**

1  Q.  Do you have any personal knowledge of the
2  events that transpired on or about August 10th, 2000,
3  when Mel DeBrum had his accident?
4  A.  What I've heard.
5  Q.  But I am asking about your personal knowledge.
6  Do you have any personal knowledge of what transpired on
7  that date with regard to Mel DeBrum's accident?
8  A.  Are you asking -- can you ask the question
9  again?  I don't understand.
10  Q.  You didn't see the accident; right?
11  A.  No, I did not.
12  Q.  When was M & F first notified of the accident?
13  And when I say "notified," I mean shoreside M & F.
14  A.  Shoreside M & F.  Can you be more specific?
15  Q.  Sure.  Would there be anyone else other than
16  yourself on behalf of M & F who would have been notified
17  of Mr. DeBrum's accident that was not on board Koorale
18  at the time of the accident?
19  A.  Can you read that back to me one more time?
20  Q.  Sure.  Would there be anyone else other than
21  yourself on behalf of M & F who would have been notified
22  of Mr. DeBrum's accident?
23  A.  No.
24  Q.  When were you first notified of Mr. DeBrum's
25  accident, if you were?

**Page 24**

1  A.  I received a -- I was in Nevada; I received a
2  high-seas phone call from the ship.
3  Q.  What time did you receive that call?
4  A.  I want to say -- I don't remember, actually.
5  Q.  Was it morning, afternoon, evening?
6  A.  I don't remember.
7  Q.  Who called you?
8  A.  I believe the master.
9  Q.  What was the master's name?
10  A.  William Armstrong.
11  Q.  Before coming here today, have you reviewed any
12  documents to prepare for this deposition?
13  A.  No.
14  Q.  Before coming here today, have you reviewed any
15  of the depositions taken in this matter?
16  A.  Nope.
17  Q.  Before coming here today, have you reviewed any
18  of the statements taken in this matter?
19  A.  No.
20  Q.  Before coming here today, have you reviewed the
21  log at any time for the vessel for the day of the
22  accident?
23  A.  What log?
24  Q.  The vessel log, the bridge log?
25  A.  No.

**Page 25**

1  Q.  Have you reviewed any other logs for the vessel
2  with regard to Mr. DeBrum's accident?
3  A.  No.
4  Q.  Have you reviewed any of the accident reports
5  from the crew with regard to Mr. DeBrum's accident?
6  A.  I believe I saw an accident report from Mike
7  Krill, I think Arnold and Arnold, I can't be sure.
8  Q.  Who is the second person you said?
9  A.  Mike Krill or Arnold and Arnold.
10  Q.  Okay.
11  A.  I think they are the same entity.
12  Q.  But you're not sure if you ever saw that?
13  A.  I can't remember, John, it's been long time
14  ago.
15  Q.  That was my next question, when did you see
16  this document that might have been an accident report?
17  A.  John, I can't -- I can't recall.
18  Q.  Over a year ago?
19  A.  I'm not -- I don't know, John.
20  Q.  Do you remember anything from that accident
21  report or the document you thought might be an accident
22  report?
23  MR. WINDES:  Object to the form.
24  THE WITNESS:  Not really, John, no.
25  ///

7 (Pages 22 to 25)

# EXHIBIT "C"



### CAPT. HAROLD MEDINA
3126 VIA CALIENTE DEL SOL
JAMUL, CA. 91935
Home (619) 669-1063

Monday, December 23, 2002

## Resume Experience

Retained by various Law Firms as an expert witness on some 64 plus cases form 1983 to present, all clams associated to commercial tuna fishing vessels, relating to ship safety, seamanship and other related vessel operating conditions.

**1987-1989**

I was involved with the US Coast Guard as member of the Commercial Fishing Industry, Vessel Advisory Committee and one of thirteen members chosen from around the U.S. to be a member of this vessel safety committee, most all meetings were held in US Coast Guard building, Washing DC.  I was as a member of a Committee to Reducing Dolphin Mortality form Tuna Fishing, sponsored the National Research Council, Washington DC.

Port Captain for Campbell shipyard Inc. of San Diego and I would take all new vessels on two to three day shakedown cruse.

I worked with Inter-American Tropical Tuna Commission, to improve net design for porpoise mortality.

**1976 - 1984**

December of 1984 was my last trip tuna fishing on the vessel Caroline M and a carrying capacity of 1,000 tons fish

**1980-1983**

I was Captain and manager of the Ocean Pearl, caring capacity 1,000 tons

1



# CAPTAIN HAROLD MEDINA
### 3128 VIA CALIENTE DEL SOL
JAMUL, CA. 91935
Home (619) 669-1063

**Experience / Skills:**

I retired from the tuna fishing industry in 1984 after forty years of experience. Since retiring to the present time, I worked as an Expert Witness on some 60 plus cases. All clams associated with the commercial tuna fishing industry, relating to ship safety, seamanship and other related vessel operating conditions. From 1987 to 1989 I worked with the US Coast Guard as member of the Commercial Fishing Industry, Vessel Safety Advisory Committee and one of a thirteen members chosen from around the US to be a member of this vessel safety committee, meetings were held in US Coast Guard building, Washing DC. I also worked as a member of the Committee to Reducing Dolphin Mortality form Tuna Fishing, sponsored be National Research Council, Washington DC. I worked as Port Captain for Campbell Shipyard Ind., of San Diego. I would Captain all new vessels on the two to three day shakedown cruse. I also worked with Inter-American Tropical Tuna Commission, to improve net design for porpoise mortality.

At the age of 21, I became Fish Captain of the bait boat Alphecca. In nineteen fifty nine, I received my US Coast Guard Masters license for 2000 gross tons. I was president of the American Tuna Boat Association two times, also served for six plus years on the board of directors. I am the inventor of Medina small mesh, porpoise safety panel. I have always been my own navigator and deck boss and during any major problems in the engine room, I would work with the engineer on all major repairs. At one time, I was going to sit for my chief engineer's license, but did not take the time to do it.

I spent 18 months in the Merchant Marine as an Able Body Seaman. I have worked in the tuna industry, starting with the pole fishing 1947 and changing to the purse seine fishing in 1960. I have made many changes in the purse seine fishing methods. My lives work has been totally involve around the sea and the fishing industry. I have been a part owner in two vessels, managed four vessels and Captain, navigator and deck boss on five vessels. These vessels had a range of 128 feet in length and 280 tons caring capacity to 275 feet in length and 1800 tons caring capacity.

My hourly rate is $200.00

*Capt. Harold Medina*
Capt Harold Medina (Ret.)

**1976 -1978**

I was Captain and manager of the Zapata Discoverer, caring capacity 1,800 tons and after leaving the Discoverer, I made other trips on the Kerri M.

**1969 - 1980**

I was 45% owner of the Kerri M, with 780-ton carrying capacity and was Manager, Captain, navigator, and deck boss.

**1963 - 1969**

Part owner of the 280-ton capacity (purse seine) Alphecca also manager, Captain, navigator, and deck boss.

**1947 - 1969**

Part owner of 280 ton capacity (Pole fishing for tuna) Alphecca, Captain and managed it.

**1946 - 1947**
I was a crewmember aboard the Bernadette, 350-tone capacity pole fishing tuna boat, made three trips

**1945 - 1946**
I served in the Merchant Marine as Abel Body seaman for 18 months.

Education, I am a graduate of Point Loma High School, San Diego Ca.

*Other related*

1948 at age 21, I was made Fish Captain of the bait boat Alphecca and in 1959 received my US Coast Guard Masters license for 2000 gross tons.

I was president of the American Tuna Boat Association twice and served for six plus years on the board of directors. I invented the Medina small mesh, and porpoise safety panel.

I was always my own navigator and deck boss and during any major problems in the engine room, I would work with the engineer on all major repairs and at one time I was going to sit for my chief engineers license, but didn't take the time to do this.

While the Tacoma Boat Building Co. was building the Kerri M., I spent eight months in the shipyard to supervise all construction.

2

## 1969

While building the Kerri M in Tacoma, I made changes in fishing equipment used today.

1) The hydraulic motors that move the large boom port and starboard I moved to the large boom, making for safer working conditions.

2) I install the first water stabilizer; it reduced the role of the vessel by 70%.

3) I had installed the first Waukesha Tail Shaft Bearing's, allowing the total tail shaft sealed in oil.

## 1971-  Medina Panel.

Changed the net mesh size from 4.25 inches to 2 inches in the back-down area of the net this helped to save many dolphins from drowning during the back down.  Before smaller mesh was installed many dolphins would drown during the back down by putting there beak through the 4.25 inch mesh and making it very hard to escape during the back down.

All vessels U.S. or foreign fishing for tuna associated with dolphins today are required to have the Medina safety panel installed if dolphin caught fish are to be delivered in the United States.

I installed the Medina Double cork-line in the back-down area and this would make the floats act as trap doors, making it easier for dolphins to get out of net.

1980 -  I built the first complete net of Hyperester, except for the bunch and it was made of nylon, this net sinks 2.72 times faster than nylon and strip for strip will fish deeper than nylon and get there faster.

My first trip made on a tuna-fishing vessel I was eight years old, during a summer school vacation, I made a summer trip each year, until graduating from high school.

All above is the total of my lives work.

Respectfully:

*Capt. Harold Medina*
Capt. Harold Medina

3

1



**CAPT. HAROLD MEDINA**
3128 VIA CALIENTE DEL SOL
JAMUL, CA. 91935
Home (619) 668-1053

December 22, 2002

LeGros, Buchanan & Paul
ATTN: Robert N. Windes, Esq.
2500 Columbia Center
7001 Fifth Avenue
Seattle, Washington 98104-7051

    Ref:   Mel DeBrum vs. M&F Fishing Co.

To Whom It May Concern:

*I have reviewed all depositions and recorded statements of all named below, this is my summary report of same.*


| | | |
|---|---|---|
| 1) | TILE SIAVAO | (Tile) Standing next to rail (admitted to some lying on statements) |
| 2) | MEL DeBRUM | PLAINTIFF, injured   (Mel) deposition of May 24, 2002 |
| 3) | OLO P'AE | ASSISTANT TOO DECK BOSS, did not see accident |
| 4) | ROBERT SILVA | CHIEF ENGINEER, (Bobby) did not see accident |
| 5) | WILLIAM C. ARMSTRONG | MASTER (Jake) did not see accident |
| 6) | EFREMIO CATUBAY | Worked on the bow, did not see accident |
| 7) | ERNIE REATE | COOK, did not see accident |
| 8) | LEOPOLDO STA. MARIA | Oiler, (Paul) did not see accident |

Of all listed above, only Mel DeBlum was in the position to describe the actual accident, none of the above were in the position to see the actual injury as it happened.

*Accident on August 10, 03 at about 5: 30 AM*

On this day, an early morning set was made around a drifting log, starting at about 5:30 AM, just before day-brake, and the skiff had transferred the end of the net to Koorale. After the net transfer was made the skiff came around to the starboard side to let Mel DeBlum transfer onto the vessel Koorale, and while Mel DeBlum, skiff assistant, was being transferred to the vessel, this accident occurred.

Mel DeBrum, on page 96 L-11 through Page 97 L-11, is describing the accident.

Two passes were made before the attempting to board the vessel, on the first approach the skiff bounced off from the vessel and a second try was made for the transfer of DeBrum to the vessel. Fermin, the Fish Captain, turned on the bright light and pointing to the ladder so it could be seen for the transfer, and after DeBrum had jumped, he had hold of the ladder, and was climbing the ladder the skiff came up and hit the ladder where DeBrum was standing and almost severing his right foot above the ankle, and at this point DeBrum asked for help from aboard the vessel and he was given same.

Page 76 L 5/18        Q        when you stepped from the skiff to the ladder, did you try to make the step when the skiff was in the high position in the waves or the low position or somewhere in-between or it didn't matter?
                      A        **If I know there is a right time and then I grab the ladder.**
                      Q        How do you know when it's the right time?
                      A        I don't know how to explain, but I know it is the right time, and that's the time I jump and grab the ladder

Page 82 L 19/21       Q        When you were going form the skiff to the ladder on the Koorale, did you wait until the skiff got next to the boat?
Page: 82 L 3/6        A        When the wave's going up or maybe going down, when it's right time, and then I will jump
        L16/23        Q        --what is the right time to jump?
                      A        when the boat is going down and thin I will jump
                      Q        why?
                      A        --because when the boat is going up and I will jump and then I will hit the speedboat, my head will be hitting the speedboat.

### *My opinion on all above*

### *Weather at time of injury*

The ships Master, William Armstrong stated that on the morning of the accident the weather was moderate, some rain squalls, wind 15 to 20 miles per hour, and sea chop two to three feet with a ground swell about six feet in the area. At time of accident, the waves were hitting the vessel off of the port stern as this is the ideal position to keep the boat while a set is being made.

Olo P'Ac, the assistant deck boss, stated that the boat rocked a little bit that morning, but not that much; it was very calm (P-25 / L-14)

Wind of 15 to 20 knots can be caused by the rain squalls in the area but does not mean the weather is rough. The seas can be calm with no wind one moment, and can have heavy wind and chop in the area as a rain squall passes and the seas will again be calm after the squall passes, a six foot swell is almost an everyday occurrence while at sea. The Koorale had some pitch and rolling

motion at the time of the injury but the weather was not rough, as weather described by the ships master, William Armstrong and Olo P'Ae the assistant deck boss.


## Injury to Mel DeBrum

Transferring from one vessel to the other while at sea can have some complications if the transferring procedure is not done in a proper manner. It is very important to observe the movement between the two boats or vessels and timing of the transfer, by jump, or step is very important. Each vessel has its own movement and each should be taken into account before making the transfer move.

As Mel DeBrum was being transferred from the skiff to the Koorale on the starboard side of the vessel, which at the time of the injury, was on the lee side of the weather, as stated by Captain Armstrong. The most important part of a transfer is the timing of the jump, and it should only be tried when the skiff is at the top of wave crest, because by the time the skiff goes down off the wave crest and back up to the same wave level, the person going up the ladder will be above the maximum height of skiff return, only if he got off of the skiff on the crest of the wave.

I believe that Mel DeBrum decision to board the Koorale by using his described method, was a significant factor to this injury, he had control of his boarding and made a bad decision on his timing to board the Koorale.

Captain Armstrong stated in his deposition that the Koorale would start its sets about twenty minutes before sunrise, which timing was computed from the ships almanac and this timing was used in making the morning set. When the Koorale made the set at the timing stated by Captain Armstrong, the Koorale starboard boarding area, at the time of the injury, was in twilight and the vessel ladder could be seen by DeBrum, as he approached to board the vessel, no lights were needed for boarding at this time.

I was sent to American Samoa to look at the Koorale to observe the area of injury. I took pictures of surrounding areas and measurements of the area surrounding the ladder and this included the height estimate from the sea water to the top of the uppermost rail on the date of the accident, distance between ladder rungs, width of the built-in ladder, height from the lower guard rail to the upper most rail, distance between each rung and the height of the skiff rail to water level.

I asked Fish Captain Fermin about the weather on the day of the accident and he told me that the weather was fare too moderate weather, which also the same estimate was given by Captain Armstrong for the day of the injury.

I have only reviewed what was sent to me as listed above and this is my opinion on all received

Respectfully,

Capt. Harold Medina
Caption Harold Medina

# EXHIBIT "D"

1    produce this information at the time designated by the court. Discovery is continuing.

2         INTERROGATORY NO. 17:    If you claim that defendants violated any statute,
3    ordinance, regulation, code or standard, please:

4         (a)    State the statute, ordinance, regulation, code or standard allegedly violated.

5         (b)    State all facts and identify all documents upon which you base your allegation
6                that a violation or violations occurred.

7         RESPONSE TO INTERROGATORY NO. 17:  Plaintiff objects that the total number
8    of Defendants' Interrogatories exceed the 25 interrogatory limit of Rule 33 of the Federal
9    Rules of Civil Procedure.  Plaintiff further objects to this Interrogatory in that it seeks
10   information that will be the subject of expert testimony in this matter to the extent it calls for
11   expert opinion.  Plaintiff reserves the right to supplement this Response following the
12   completion of the depositions, including expert depositions, in this matter.  Discovery is
13   continuing.

14        INTERROGATORY NO. 18:    Please state all facts and identify all documents
15   supporting your allegations that the F/V KOORALE was unseaworthy, and that defendants
16   were negligent.

17        RESPONSE TO INTERROGATORY NO. 18:  Plaintiff objects that the total number
18   of Defendants' Interrogatories exceed the 25 interrogatory limit of Rule 33 of the Federal
19   Rules of Civil Procedure.  Plaintiff further objects to this Interrogatory in that it seeks
20   information that will be the subject of expert testimony in this matter to the extent it calls for
21   expert opinion.  Plaintiff reserves the right to supplement this Response following the
22   completion of the depositions, including expert depositions, in this matter.  Without waiving
23   and subject to these objections, Plaintiff responds as follows: Among other things, in rough
24   seas, Defendants ordered the skiff driver to drop Plaintiff off at KOORALE in darkness
25   without sufficient lighting; Defendants ordered Plaintiff to debark from the skiff in rough
26   seas despite the lack of a safe manner in which to do so; Defendants used the skiff rather than
27   a speedboat to drop Plaintiff off at KOORALE; Defendants left a speedboat hanging over the
28   top of the ladder to which Plaintiff was required to grab hold of and which Plaintiff was

EXHIBIT A          3  16

1   required to climb; Defendants improperly made the set, requiring the skiff to get into position

2   to pull the vessel without due consideration for the safety of Plaintiff in debarking from the

3   skiff to the vessel.

4       INTERROGATORY NO. 19:  Please state all facts and identify all documents that

5   controvert paragraph 4 of M&F's "Further Answer, Including Affirmative Defenses", which

6   provides as follows:

7           4    Plaintiffs injuries and/or damages were caused by plaintiffs own fault,
            negligence, contributory negligence, comparative negligence and/or
8           assumption of the risk.

9       RESPONSE TO INTERROGATORY NO. 19: Plaintiff objects that the total number

10  of Defendants' Interrogatories exceed the 25 interrogatory limit of Rule 33 of the Federal

11  Rules of Civil Procedure.  Plaintiff further objects to this Interrogatory in that the burden is

12  on Defendants to prove their affirmative defenses, not on Plaintiff to controvert any such

13  affirmative defense.  Plaintiff further objects to the extent this Interrogatory seeks

14  information that will be the subject of expert testimony in this matter, and to the extent it

15  seeks attorney work product.  Plaintiff reserves the right to supplement this Response

16  following the completion of the depositions, including expert depositions, in this matter.

17  Without waiving and subject to these objections, Plaintiff responds as follows: Plaintiff's

18  injuries were not caused by plaintiffs own fault, negligence, contributory negligence,

19  comparative negligence and/or assumption of the risk.  Among other things, Defendants

20  made the decision to make a set in rough seas; Defendants made the decision to order the

21  skiff driver to drop Plaintiff at the vessel using the skiff; Defendants made the decision not to

22  use a speedboat to take Plaintiff from the skiff to the main vessel; Defendants failed to

23  provide proper lighting for the ladder; and Defendants left the speedboat hanging over the

24  ladder Plaintiff was required to grab hold of and climb. Discovery is continuing.

25      INTERROGATORY NO. 20:  Please state all facts and identify all documents that

26  support your allegations in your complaint that M&F has refused in bad faith to pay you

27  maintenance and cure:

28      RESPONSE TO INTERROGATORY NO. 20: Plaintiff objects that the total number

4   17

# EXHIBIT "E"

**JAY M. MARUMOTO M.D., INC.,**
ARTHROSCOPIC AND RECONSTRUCTIVE SURGERY
ORTHOPEDIC SURGERY AND SPORTS MEDICINE

THE QUEEN'S PHYSICIAN OFFICE BUILDING I
1388 LUSITANA STREET, SUITE 601
HONOLULU, HAWAII 96813-2492
TELEPHONE (808) 535-2201 FAX: (808) 538-3957

August 7, 2001

Arnold and Arnold
1188 Bishop Street, Suite 2011
Honolulu, Hawaii 96813

RE:            Debrum, Mel
Employer:      M and F Fishing
Date of Injury: August 10, 2000
Work Status:   Permanent disability.

**INTERIM REPORT:**

Mel returns after three months in the Marshall Islands. He states his condition has
remained static. He has occasional pain in his stump and uses oxycodone on an
occasional basis. He states he does not feel he is addicted to it.

**REVIEW OF SYSTEMS:** Is noncontributory.

**PHYSICAL EXAMINATION:** On examination, he is alert and non-distressed. His skin
has no discoloration. His stump reveals no pressure sores or ulcerations. He has no
significant dysesthesia to light touch. He has mild tenderness over his fibular head. He
has no tenderness over his tibia. His prosthesis is fitting well and he ambulates with a
smooth gait.

**IMPRESSION:**      RIGHT BELOW KNEE AMPUTATION, AUGUST 12, 2000.

**PLAN:** I reviewed the findings with Mel. His condition has stabilized. He needs no
further active treatment at this point in time other than adhering to his home exercise
program. He understands he needs to control his weight. His prosthesis will need a
replacement on a periodic basis depending on his use and abuse. I suspect it should
last him at least three to five years, and possibly up to ten years. If specific physical
capacities need to be delineated then I would recommend a functional capacity
evaluation at CHART. He can see me on an as needed basis.

Jay M. Marumoto, M.D.

JMM:ku      Tape Received: August 8, 2001        Date Trans: August 8, 2001

EXHIBIT F        EXHIBIT E



**JAY M. MARUMOTO M.D., INC.,**
ARTHROSCOPIC AND RECONSTRUCTIVE SURGERY
ORTHOPEDIC SURGERY AND SPORTS MEDICINE

THE QUEEN'S PHYSICIAN OFFICE BUILDING I
1380 LUSITANA STREET, SUITE 608
HONOLULU, HAWAII 96813-2492
TELEPHONE (808) 536-2261 FAX: (808) 538-3957

August 7, 2001

Arnold and Arnold
1188 Bishop Street, Suite 2011
Honolulu, Hawaii 96813

RE:              Debrum, Mel
Employer:        M and F Fishing
Date of Injury:  August 10, 2000
Work Status:     Permanent disability.

**INTERIM REPORT:**

Mel returns after three months in the Marshall Islands. He states his condition has remained static. He has occasional pain in his stump and uses oxycodone on an occasional basis. He states he does not feel he is addicted to it.

**REVIEW OF SYSTEMS:** Is noncontributory.

**PHYSICAL EXAMINATION:** On examination, he is alert and non-distressed. His skin has no discoloration. His stump reveals no pressure sores or ulcerations. He has no significant dysesthesia to light touch. He has mild tenderness over his fibular head. He has no tenderness over his tibia. His prosthesis is fitting well and he ambulates with a smooth gait.

**IMPRESSION:**     RIGHT BELOW KNEE AMPUTATION, AUGUST 12, 2000.

**PLAN:** I reviewed the findings with Mel. His condition has stabilized. He needs no further active treatment at this point in time other than adhering to his home exercise program. He understands he needs to control his weight. His prosthesis will need a replacement on a periodic basis depending on his use and abuse. I suspect it should last him at least three to five years, and possibly up to ten years. If specific physical capacities need to be delineated then I would recommend a functional capacity evaluation at CHART. He can see me on an as needed basis.

Jay M. Marumoto, M.D.

JMM:ku        Tape Received: August 8, 2001           Date Trans: August 8, 2001

EXHIBIT F

# EXHIBIT "F"

Curriculum Vitae – Updated:  July 2001

## Douglas George Smith, MD
### Associate Professor of Orthopaedic Surgery
### University of Washington
### Seattle, WA

**Personal Information:**

| | |
|---|---|
| Office Address: | Harborview Medical Center |
| | Department of Orthopaedic Surgery |
| | 325 9th Avenue, Box 359798 |
| | Seattle, WA 98104   Phone (206) 731-3267 |
| Born: | July 16, 1958;  Toledo, Ohio |
| Citizenship: | U.S.A. |
| Married: | Kathryn Ponto Smith, MD. |
| | Obstetrics and Gynecology |
| Children: | Christina Louise Smith |
| | Aliena Marie Smith |
| | Kevin Mathew Smith |

**Education:**

Undergraduate Education:
1976 – 1980
University of Notre Dame
Notre Dame, IN  46556
Degree:  B.S.  May, 1980
Awards:  Phi Beta Kappa, Graduated with Highest Honors

Medical Education:
1980 – 1984
University of Chicago – The Pritzker School of Medicine
5801 South Ellis Avenue
Chicago, IL  60637
Degree:  MD.   June, 1984
Teaching Experience:  Graduate Teaching Assistant - Clinical
Pathology for second year medical students.  1/84-6/84.

**Postgraduate Training:**

Intern
1984 – 1985
Loyola University Medical Center
Department of Surgery
Maywood, IL  60153

Resident:
1985 – 1989
Loyola University Medical Center
Department of Orthopaedics and Rehabilitation
Maywood, IL  60153
   Awards:  Seabury-Sofield Traveling Fellowship Award

Fellow:
1989 – 1990
Foot, Ankle and Amputation Surgery.
Directed by:  Sigvard T. Hansen, MD, and Ernest M. Burgess, MD
Harborview Medical Center, The University of Washington,
and The Prosthetic Research Study.
Seattle, WA  98104

**Academic Appointments:**

| | |
|---|---|
| 1989 – 1990 | Acting Instructor in Orthopaedic Surgery |
| | University of Washington, Seattle, WA |
| 1990 – 1996 | Assistant Professor of Orthopaedic Surgery |
| | University of Washington, Seattle, WA |
| 1996 – Present | Associate Professor of Orthopaedic Surgery |
| | University of Washington, Seattle, WA |

## Hospital Appointments:

Harborview Medical Center                        July, 1989 - Present
University of Washington Medical Center           July, 1989 - Present
Seattle Veterans Administration Medical Center   July, 1989 - Present

## Honors and Awards:

Phi Beta Kappa:  University of Notre Dame, 1980.
Graduated with Highest Honors:  University of Notre Dame, May 1980.
Seabury-Sofield Fellowship Award:  Loyola Univ. Depart of Orthopaedic Surgery, 1989.
The Best Doctors in America - Seattle Area:
    Voted Amongst Top Doctors Chosen By Other Doctors - 1997 and 1998.
Royal College of Physicians and Surgeons of Canada - Visiting Professor in Medical Research Award
    Kingston, Ontario May, 2001

## Board Certification:

Diplomat of the National Board of Medical Examiners:  1985
Diplomat of the American Board of Orthopaedic Surgery:  1992
Re-certification - the American Board of Orthopaedic Surgery:  2001

## License To Practice Medicine:

Illinois         July 1984  to  July 1989
Indiana          July 1985  to  July 1989
Washington   July 1989  to  Present

## Medical Organizations:

American Academy of Orthopaedic Surgeons
American Orthopaedic Foot and Ankle Society
Orthopaedic Trauma Association
Orthopaedic Rehabilitation Association
Western Orthopaedic Association
International Society for Prosthetics and Orthotics
Washington State Medical Association

## National Responsibilities:

National Institute of Health, NCMRR Special Planning Committee Member, July 1992.
    "Advancing Technology/Enhancing Ability:  Prosthetic/Orthotic Research for the Twenty-First Century".
National Diabetes Advisory Board, Special Meeting on Lower Extremity Complications, September 20, 1993, Washington
    DC.  Invited Attendee.
American Academy of Orthopedic Surgeons - Committee on Rehabilitation and Prosthetics and Orthotics.  December
    1993 to February 2001. (Completed an extended six year term).
American Diabetes Association, Research Committee of the Foot Care Council:
    August 1995 -1999..
American Orthopaedic Foot and Ankle Society - Committee on Residency Training: 1998-present.
Orthopaedic Rehabilitation Association (An AAOS Society):  Board Member May 97 - May 99.
Orthopaedic Rehabilitation Association (An AAOS Society):  Board Member May 2000 - present

## Editorial Responsibilities:

Consultant Reviewer:  The Journal of Bone and Joint Surgery, Appointed Feb. 2000
Editorial Board: Journal of Rehabilitation, Research and Development; May 1999 to present
Book Reviews for Journal of Rehabilitation, Research and Development:  1997,1998.

Manuscript Reviews - Journal of Rehabilitation, Research and Development: 1993-98
Manuscript Reviews - Clinical Orthopaedics and Related Research:  1994.
Manuscript Reviews - Foot & Ankle International:  1996.
Manuscript Reviews - The Journal of the American Medical Association:  1997.
Manuscript Reviews - Journal of Bone and Joint Surgery:  5/99, 6/99
Manuscript Reviews - Drugs (Auckland New Zealand): 8/99

**Local Responsibilities:**
Trauma Council Member:  Harborview Medical Center, July 1990 - present.
Quality Assurance Officer: Department of Orthopaedic Surgery. Harborview Medical Center, July 1991 - present.
Medical Staff Quality Assurance Committee Member:
   Harborview Medical Center, Sept. 1991 - present.
Committee for Undergraduate Prosthetics and Orthotics
   University of Washington School of Medicine, July 1992 - present.
Subcommittee on Practice Policy and Managed Care
   University of Washington Physicians, January 1994 - 1996.
Search Committee: Head, Division of Prosthetics and Orthotics,
   Dept. of Rehabilitation Medicine.  March 1995 - June 1996.
Search Committee on Physician Recruitment - Department of Physical Medicine and Rehabilitation
   January - May 2001.

## NATIONAL GRANT REVIEWING RESPONSIBILITIES:
Veteran Administration - Rehabilitation, Research and Development – Grant Review Meeting May 21-22, 2001

## UNITED STATES PATENTS:
   Smith DG, Joseph AW, Boone DA, Borchers RE, Burgess EM: Gait Activity Monitor
   US PATENT NUMBER 5,485,402.  January 1996.

## MEDICAL DIRECTOR - AMPUTEE COALITION OF AMERICA
   The Amputee Coalition of America (ACA) is a national, non-profit amputee consumer educational organization representing people who have experienced amputation or are born with limb differences.  The ACA was incorporated in 1989 and is governed by a Board of Directors, the majority of whom are amputees.  The ACA operates on the strongly held principle that education enables individuals who have lost a limb to participate knowledgeably in decisions about their own care, services and outcomes.  To achieve their highest potential, people with limb loss must play the central role in decisions affecting their lives.  Only then can they fully embrace life and its limitless opportunities for self-fulfillment.  The ACA exists to provide this education.

## DIRECTOR - PROSTHETICS RESEARCH STUDY:
   Founded in 1964, Prosthetics Research Study ("PRS") has been fulfilling its mission of "Preserving the limb at risk. Advancing function for the amputee," for 36 years.  PRS' work continues to reduce the likelihood of amputation and to decrease the disability caused by amputation.  PRS research has improved care of the amputee, developed innovative techniques and devices, and made prosthetic limbs more functional, comfortable, life-like and affordable.
   PRS enjoys a highly productive team of surgeons, prosthetists, engineers and support staff focused on improving the rehabilitation of lower-extremity amputees through both surgery and prosthetics.  PRS developed and patented the first energy storing foot, a lightweight low-cost flexible ankle, an innovative alignment device, and created one of the first CAD/CAM systems for prosthetics.  PRS has received recognition for our work, including the U.S. Presidential Design Award and the U.S. National Rehabilitation Week Special Award for Achievement in Helping the Disabled.

Investigator:  1989 - 1992
Co-Principle Investigator:  1992 - 2000
Director and Principle Investigator:  August 2000 - Present

## Editor - Third Edition of the Atlas of Limb Prosthetics and Amputation Surgery
   This is the major textbook on these subjects.  Published by the AAOS
   Editors Douglas G. Smith, MD and John W Michael, CPO
      Editor emeritus - John Bowker
We have had initial meetings, Set the format, size, budget, estimated sales, marketing partners, timeline.  We have revised and set the table of contents, and appointed authors.  Publication date Feb 2004.

<u>GRADUATE SCHOOL EDUCATION/ INDIVIDUAL STUDY:</u>

<u>Ph.D. Dissertation Committee Member</u>
Michael del Aguila, M.S.   Epidemiology,   Univ. of Washington      1998

<u>Ph.D. Dissertation External Reviewer/Committee Member</u>
Juliana K Cyril, MPH     Epidemiology, Johns Hopkins University      present
Michael Dillon           "Biomechanical Modeling of Partial Foot Amputee Gait"
                         Queensland University of Technology, Australia - present
David A. Boone, MPH      Prosthetics     Polytechnic University, Hong Kong - present

<u>M.P.H. Thesis Committee Member</u>
David A. Boone      Epidemiology    1997
Joe LeMaster        Epidemiology    present

<u>Medical Study Research Advisor</u>
George Rhyneer      University of Washington  1992/3
Paul Horn           University of Washington  1993/4

<u>PEER-REVIEWED PUBLICATIONS:</u>

1. Goetz FW, <u>Smith DG</u>, Krickle SP:  The Effects of Prostaglandins, Phosphodiesterase Inhibitors, and Cyclic AMP on Ovulation of Brook Trout (Salvelinus fontinalis) Oocytes. GENERAL AND COMPARATIVE ENDOCRINOLOGY 48, 154-160, 1982.

2. <u>Smith DG</u>, Geist RW, Cooperman DR:  Microscopic Examination of a Naturally Occurring Epiphyseal Plate Fracture.  J. OF PEDIATRIC ORTHOPAEDICS:  5, 306-308, 1985.

3. Pinzur MS, <u>Smith DG</u>, Osterman H:  Salvage of "Failed" Below-knee Amputations with Total Contact Casting and Continued Weight Bearing.  ORTHOPAEDICS: Vol. 11, 437-439, 1988.

4. <u>Smith DG</u>, Behr JT, Hall RT, Dobozi WR:  Closed, Flexible Intramedullary Biopsy of Metastatic Carcinoma.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH:  Vol. 229, 162-164, April 1988.

5. Zimmerman NB, <u>Smith DG</u>, Pottenger LA, Cooperman DR:  Mechanical Disruption of Human Patellar Cartilage by Repetitive Loading In Vitro.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH:  Vol. 229, 302-307, April 1988.

6. Pinzur MS, <u>Smith DG</u>, Daluga D, Osterman H:  Selection of Patients for Through-knee Amputation.  THE J OF BONE AND JOINT SURGERY: Vol 70-A, No. 5, 746-750, June 1988.

7. Apel DM, <u>Smith DG</u>, Schwartz CM, Paprosky WG:  Threaded Cup Acetabuloplasty: Early Clinical Experience.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH:  Vol. 241, 183-189, April 1989.

8. Blevens AD, Light TR, Jablonsky WS, <u>Smith DG</u>, Patwardhan AG, Guay ME, Woo TS:  Radiocarpal Articular Contact Characteristics with Scaphoid Instability.  THE J OF HAND SURGERY:  Vol 14A, No. 5, 781-790, Sept. 1989.

9. Pinzur MS, Asselmeier M, <u>Smith DG</u>:  Dynamic Electromyography in Active and Limited Walking Below-Knee Amputees. ORTHOPAEDICS:  Vol. 14, No. 5, 535-8, May 1991.

10. <u>Smith DG</u>, Stuck RM, Ketner L, Sage RM, Pinzur MS:  Partial Calcanectomy for the Treatment of Large Ulceration of the Heel, and Calcaneal Osteomyelitis - An Amputation of the Back of the Foot. J OF BONE AND JOINT SURGERY:  Vol. 74-A, No. 4, 571-576, April 1992.

11. Pinzur MS, Gottshalk F, <u>Smith DG</u>, Shanfield S, deAndrade R, Osterman H, Roberts JR, Orlando-Crombleholme P, Larsen J, Rappazzini P, and Bockelman P:  Functional Outcome of Below-Knee Amputation in Peripheral Vascular Insufficiency - A Multicenter Review.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH:  Vol. 286, 247-249, Jan 1993.

Peer-Reviewed Publications. (Continued):

12. Benirschke SK, Melder I, Henley MB, Routt ML, Smith DG, Chapman JR, Swiontkowski MF:  Closed Interlocking Nailing of Femoral Shaft Fractures:  Assessment of Technical Complications and Functional Outcomes by Comparison of a Prospective Database with Retrospective Review:  J ORTHO TRAUMA, Vol. 7, 118-122, Mar 1993.

13. Manoli A, Smith DG, Hansen ST:  Scarred Muscle Excision for the Treatment of Established Ischemic Contracture of the Lower Extremity.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, Vol. 292, 309-314, July 1993.

14. Pinzur MS, Smith D, Tornow D, Meade K, Patwardhan A:  Gait Analysis of Dysvascular Below-Knee and Contralateral Through-Knee Bilateral Amputees:  A Preliminary Report.  ORTHOPAEDICS, Vol. 16, No. 8, 875-879, August 1993.

15. Sangeorzan BJ, Smith DG, Veith R, Hansen ST:  Triple Arthrodesis of Adult Foot Deformity Using Internal Fixation.  CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, Vol. 294, 299-307, Sept. 1993.

16. Boone DA, Burgess EM, Smith DG, and Harlan JS:  Automated Fabrication of Mobility Aids, Improving Custom Body Supports with the DVA/AFMA System:  REHABILITATION INTERNATIONAL, Vol. 1, p 59-65, October 1993.

17. Boone DA, Burgess EM, Smith DG, and Aulie AL:  The DVA/Seattle Prosthetic Limb System, User-Centered Design for Improved Mobility and Comfort.  REHABILITATION INTERNATIONAL, Vol. 1, p 124-128, October 1993.

18. Smith DG, Sangeorzan BJ, Hansen ST, Burgess EM:  Achilles Tendon Tenodesis to Prevent Heel Pad Migration in the Syme's Amputation.  FOOT AND ANKLE, Vol. 15, No. 1, 14-17, Jan 1994.

19. Elizaga AM, Smith DG, Sharar SR, Edwards WT, Hansen ST:  Continuous Regional Analgesia by Nerve Sheath Block Has No Effect on Postoperative Opioid Requirements and Phantom Limb Pain Following Amputation.  J OF REHABILITATION, RESEARCH AND DEVELOPMENT, Vol. 31, No. 3, 1994.

20. Smith DG, Horn P, Malchow D, Boone DA, Reiber GE, and Hansen ST:  Prosthetic History, Prosthetic Charges, and Functional Outcome of the Isolated, Traumatic Below-Knee Amputee.  J OF TRAUMA, February 1995.

21. Borchers RE, Boone DA, Joseph AW, Smith DG, Reiber GE:  Numerical Comparison of 3-D Shapes: Application to the Insensate Foot.  JOURNAL OF PROSTHETICS & ORTHOTICS, Vol. 7, No. 1, 29-34, Winter, 1995.

22. McNeely MJ, Boyko EJ, Ahroni JH, Stensel VL, Reiber GE, Smith DG, Pecoraro RE:  The Independent Contribution of Diabetic Neuropathy and Vasculopathy in Foot Ulceration:  How Great are the Risks?  DIABETES CARE, Vol. 18, No. 2, 216-9, Feb. 1995.

23. Pinzur MS, Smith DG, Osterman, H:  Syme Ankle Disarticulation in Peripheral Vascular Disease and Diabetic Foot Infection:  The One-Stage versus Two Stage Procedure.  FOOT AND ANKLE , Vol. 16, No. 3, 124-127, March 1995.

24. Smith DG, Boyko EJ, Ahroni JH, Stensel VL, Pecoraro RE:  Paradoxical Transcutaneous Oxygen Response to Cutaneous Warming of the Plantar Foot Surface:  A Caution for Interpretation of Plantar Foot TcPO2 Measurements.  FOOT AND ANKLE , Vol. 16, No. 12, 787-791, December 1995.

25. Mills WJ, Hanel D, Smith DG:  The Direct Lateral Approach to the Humerus.  J OF ORTHO TRAUMA, Vol. 10, No. 2, pp. 81-86, 1996.

26. Boyko EJ, Ahroni JH, Stensel VL, Smith DG, Pecoraro RE:  Predictors of Transcutaneous Oxygen Tension in the Lower Extremities of Diabetic Subjects.  DIABETIC MEDICINE, 13: 549-554, 1996.

Peer-Reviewed Publications. (Continued):

27. Boyko EJ, Ahroni JH, Smith DG, Davignon D: Increased Mortality Associated with Diabetic Foot Ulcer. DIABETIC MEDICINE, 13(11), 967-72, Nov. 1996.

28. Trautwein LC, Smith DG, Rivara FP: Pediatric Amputation Injuries: Etiology, Cost, and Outcome. J TRAUMA, Vol. 41, No 5, 831-37, Nov. 1996.

29. Reiber GE, Smith DG, Boone DA, del Aguila M, Borchers RE, Mathews D, Joseph AW, ColemaNassett KC, Burgess EM: Design and Pilot Testing of the DVA/Seattle Footwear System for Diabetic Patients with Foot Insensitivity. J OF REHABILITATION, RESEARCH AND DEVELOPMENT, Vol. 34, No 1, 1-8, 1997.

30. Bulger EM, Smith DG, Maier RV, Jurkovich GJ: Fat Embolism Syndrome: A 10-Year Review. ARCH SURG, 132: 435-439, 1997.

31. Joseph AW, Boone DA, Mathews DE, Laing LS, Smith DG: Lessons Learned from a Successful Experience in Technology Transfer. TECHNOLOGY AND DISABILITY, Vol. 7, 77-84, June 1997.

32. Smith DG, Barnes BC, Sands AK, Boyko EJ, and Ahroni JH: The Prevalence of Radiographic Foot Abnormalities in Patients With Diabetes. FOOT & ANKLE INTERNAT'L, Vol. 18, No 6, 342-346, June 1997.

33. Boyko EJ, Ahroni JH, Davignon D, Stensel V, Prigeon RL, and Smith DG: Diagnostic Utility of the History and Physical Examination for Peripheral Vascular Disease Among Patients with Diabetes Mellitus. J CLIN EPIDEMIOLOGY, Vol. 50, 6, 659-668, 1997.

34. Adler AI, Boyko EJ, Ahroni JH, Stensel V, Forsberg RC, Smith DG: Risk Factors for Diabetic Peripheral Sensory Neuropathy - Results of the Seattle Prospective Diabetic Foot Study. Diabetes Care, 20(7), p 1162-7, July 1997.

35. Legro MW, Reiber GE, Smith DG, del Aguila M, Larsen J, Boone DA: Development of the Prosthesis Evaluation Questionnaire - Lower Limb Amputees Evaluate their Prosthesis and their Prosthesis-Related Quality of Life. ARCH PHYS MED REHABIL, Vol. 79, 931-938, Aug 1998.

36. Coleman KL, Smith DG, Boone DA, Joseph AW, del Aguila MA: Step Activity Monitor: Long Term, Continuous Monitoring of Ambulatory Function. J OF REHABILITATION, RESEARCH AND DEVELOPMENT, Vol. 36 No. 1, p 8-18, January 1999.

37. Fotieo GG, Reiber GE, Carter JS, Smith DG: Diabetic Amputations in the VA: Are There Opportunities For Interventions? J OF REHABILITATION RESEARCH AND DEVELOPMENT Vol. 36 No. 1, p 55-59, January 1999.

38. Smith DG, Ehde DM, Legro MW, Reiber GE, del Aguila M, Boone DA: Pain and Sensations in the Phantom Limb, the Residual Limb, and the Back Reported by Persons with Lower Extremity Amputations. CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, Number 361, pg. 29-38, April 1999.

39. Ferguson JR, Smith DG: Socket Considerations for the Transtibial Amputee. CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, Number 361, pg. 76-84, April 1999.

40. Smith DG, Ferguson JR: Transtibial Amputations. CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, Number 361, pg. 108-115, April 1999.

41. Smith DG, Mills WJ, Steen RG, Williams DL: Levels of High Energy Phosphate in the Dorsal Foot Skin of Normal and Diabetic Adults: The Role of 31P Magnetic Resonance Spectroscopy and Direct Quantification with High Liquid Chromatography. FOOT AND ANKLE INTERNATIONAL, Vol. 20, Number 4, April 1999.

42. Reiber GE, Vileikyte L, Boyko EJ, delAguila M, Smith DG, Lavery LA, and Boulton AJM: Causal Pathways for Incident Lower Extremity Ulcer in Patients with Diabetes from Two Settings. DIABETES CARE, 22(1):157-62, Jan 1999.

## Peer-Reviewed Publications. (Continued):

43. Boyko EJ, Ahroni JH, Stensel V, Forsgreg R, Davignon DR, Smith DG: A Prospective Study of Risk Factors for Diabetic Foot Ulcer: The Seattle Diabetic Foot Study. DIABETES CARE, 22(7):1036-42, July 1999.

44. Adler AI, Boyko EJ, Ahroni JH, Smith DG: Lower-Extremity Amputation in Diabetes. The Independent Effects of Peripheral Vascular Disease, Sensory Neuropathy, and Foot Ulcers. DIABETES CARE, 22(7):1029-35, July 1999.

45. Legro MW, Reiber GE, del Aguila M, Ajax MJ, Boone DA, Larsen JA, Smith DG, and Sangeorzan BJ: Issues of Importance Reported by Persons with Lower Extremity Amputations and Prostheses. J OF REHABILITATION, RESEARCH AND DEVELOPMENT, 36(3):155-63, July 1999.

46. Russell GV, Smith DG: Minimally Invasive Treatment of Distal Femur Fractures, A Report of Technique. J OF TRAUMA, 47(4):799-801, October 1999.

47. Smith DG, Grujic L, Perkins QD, Hansen ST: Closed Femoral Shortening Following Symes Amputation - A Case Report and Discussion. ORTHOPAEDICS, Vol. 24, No. 3, 285-87, March 2001.

48. Ehde DM, Czerniecki JM, Smith DG, Campbell KM, Edwards WT, Jensen MP, Robinson LR: Chronic Phantom Sensations and Pain Following Lower Extremity Amputation. ARCHIVES OF PHYSICAL MEDICINE AND REHABILITATION, Vol 81, p 1039-44, August 2000.

49. Ehde DM, Smith DG, Czerniecki JM, Campbell KM, Malchow DM, Robinson LR: Back Pain as a Secondary Disability in Persons with Lower Limb Amputations. Submitted ACHIVES OF PHYSICAL MEDICINE AND REHABILITATION. May 1999, ACCEPTED June, 2000.

50. Jensen MP, Smith DG, Ehde DM, Robinson LR: Pain Site and the Effects of Amputation Pain: Further Clarification on the Meaning of Mild, Moderate, and Severe Pain. Submitted, J OF PAIN, July 2000, ACCEPTED September, 2000.

51. Smith DG: The Use of CAD/CAM Technology in Prosthetics and Orthotics - Current Clinical Models and a View to the Future. J OF REHABILITATION, RESEARCH & DEVELOPMENT. Vol 38, No 3, 327-334, May/June 2001.

52. Choudhury SR, Reiber GE, Pecoraro JA, Czerniecki JM, Smith DG, Sangeorzan BJ: Post Operative Management of Transtibial Amputations in VA Hospitals. Vol 38, No 3, 293-298, May/June 2001.

53. Reiber GE, Smith DG, Carter J, Fotieo G, Deery G, Sangeorzan JA, Lavery L, Pugh J, Peter-Riesch B, Assal JP, del Aguila M, Diehr P, Patrick DL, Boyko EJ: A Comparison of Diabetic Foot Ulcer Patients Managed in Veteran and Non-Veteran Health Care Settings. J OF REHABILITATION, RESEARCH & DEVELOPMENT. . Vol 38, No 3, 327-334, May/June 2001.

54. Mayfield JA, Caps MT, Boyko EJ, Ahroni JH, Smith DG: Relationship of Medial Arterial Calcinosis to Autonomic Neuropathy and Adverse Outcomes in a Diabetic Veteran Population. ACCEPTED/REVISIONS - J OF DIABETES AND ITS COMPLICATIONS. June 2001

## Other Scholarly Publications:

55. Smith DG: Partial Calcanectomy for Large Heel Ulceration or Calcaneal Osteomyelitis. UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS RESEARCH REPORT. p18, 1991.

56. Smith DG: Development of a Modern Prosthetic Limb System. UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS RESEARCH REPORT. p. 18-19, May 1991.

57. Smith DG, Boone DA, Harlan JS, Forsgren SM, Burgess EM: Automated Prosthetics Fabrication in the Developing World: The Experimental Prosthetics Center in Hanoi, Vietnam. LOYOLA UNIV. ORTHOPAEDIC JOURNAL, Vol. II, 49-60, May 1993.

58. Smith DG: Prosthetic History and Functional Outcome of the Traumatic Below-Knee Amputee. UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1993 RESEARCH REPORT. p. 20-21, May 1993.

59. Sangeorzan BJ, Smith DG, Veith R, Hansen ST:  Triple Arthrodesis Using Internal Fixation in Treatment of Adult Foot Disorders.  UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1994 RESEARCH REPORT.  p. 2-4, May 1994.

60. Smith DG:  Functional Outcome of Below-Knee Amputation in Peripheral Vascular Insufficiency - A Multicenter Review.  UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1994 RESEARCH REPORT.  p. 30-1, May 1994.

61. Smith WR, Swiontkowski MF, Veddar N, Trumble T, Sack J, Smith D, Herndon JH:  Lower Limb Replantation:  A Case Report.  THE PITTSBURGH ORTHOPAEDIC JOURNAL, Vol. 5, 37-9, July 1994.

62. Mills WJ, Smith DG, Hansen ST, Steen G, Williams D:  Investigation of High-Energy Phosphate Levels in Normal and Diabetic Skin.  UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1995 RESEARCH REPORT.  p. 38-39, May 1995.

63. Smith DG:  Amputee Athletes.  UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1996 RESEARCH REPORT.  p. 13-4, May 1996.

64. Smith DG:  Outcome Assessment in Prosthetics and Orthotics.  UNIV. OF WASHINGTON, DEPT. OF ORTHOPAEDICS 1997 RESEARCH REPORT.  p. 36-38, May 1997.

65. Reiber GE, Boone DA, Smith DG:  Diabetes Health Care Technology - Rehabilitation Advances in Prosthetic Manufacture.  World Health Organization Second International Conference on Health Technology in the Field of Diabetes.  Kyoto, Japan Nov. 1994, World Health Organization Press, 1998, Geneva.

## Manuscripts Submitted For Publication:

1. Reiber GE, Olerud J, Mayfield J, Smith DG, delAguila M:  Management of Diabetic Foot Ulcers.  Submitted TRENDS IN ENDOCRINOLOGY AND METABOLISM, revised 3/98.

2. Coleman KL, Boone DS, Borchers RE, Czerniecki JM, and Smith DG:  Effect of Trans-Tibial Prosthesis Pylon Flexibility on Ground Reaction Forces During Gait.  SUBMITTED PROSTHETICS AND ORTHOTICS INTERNATIONAL.  June 2000, revised March 2001.

3. Younger ASE, Reiber GE, Smith DG:  The Outcome of Diabetic Ulcers in the Weight Bearing Portion of the Foot.  Submitted DIABETES CARE.  July 2000.

## Publications In Process:

1. Reiber GE, Smith DG, Wallace C, Sullivan K, Hayes S, Vath C, Yu O, Maciejewski M, Heagerty P. Footwear used by individuals with diabetes and a history of foot ulcers.

2. Reiber GE, Smith DG, Wallace C, Sullivan K, Hayes S, Vath C, Maciejewski M, Yu O, Heagerty PJ. Clinical trial of footwear in patients with diabetes.

3. Wallace C, Reiber GE, Smith DG, Vath C, Sullivan K, Hayes S, Yu O. Falls in persons with diabetes and prior foot ulcers.

4. Reiber GE, Assal JP, Carter J, Deery G, Fotieo G, Lavery LH, Pugh J, Peter-Riesch B, Sangeorzan JA, Smith DG, del Aguila M, Diehr P, Cheadle A, Patrick D, Boyko E.  Diabetic foot ulcers: patient characteristics, treatment and outcomes.

5. Reiber GE, Assal JP, Carter J, Deery G, Fotieo G, Lavery LH, Pugh J, Peter-Riesch B, Sangeorzan JA, Smith DG, del Aguila M, Diehr P, Cheadle A, Patrick D, Boyko E. Diabetic foot ulcer treatment in the first 8 days -- how does it alter patient outcomes?

<u>Textbooks Edited:</u>

Third Edition of the Atlas of Limb Prosthetics and Amputation Surgery
Editors Douglas G. Smith, MD and John W Michael, CPO, Editor emeritus - John Bowker
    This is the major textbook on these subjects. Formerly published by Mosby, the AAOS has purchased the rights to the book and will publish the third edition.
We have had initial meetings, finalized the format, size, budget, estimated sales, marketing partners, timeline. We have revised and set the table of contents, and appointed authors. Publication date Feb 2004.

<u>Textbook Chapters:</u>

1. Fitting and Training The Bilateral Lower-Limb Amputee. Authors - *Douglas G. Smith*, Ernest M. Burgess, and Joseph H. Zettl. In <u>American Academy of Orthopaedic Surgeons: Atlas of Limb Prosthetics</u>. Pg. 599-622. Published Oct. 1992, Mosby.

2. Amputations and Prosthetics. Author - *Douglas G. Smith*. In <u>Orthopaedic Knowledge Update 4</u>. American Academy of Orthopaedic Surgeons: Pg. 259-273. Published Feb. 1993, AAOS.

3. Amputation Surgery, Author - *Douglas G. Smith*. In <u>Physical Medicine & Rehabilitation: State of the Art Reviews</u>- Vol. 8, No. 1, 41-60, Feb. 1994: Prosthetics, edited by Alberto Esquenazi. Published Feb. 1994, Hanely & Belfus, Inc. Medical Publishers.

4. Amputations, Authors - *Douglas G. Smith*, and Ernest M. Burgess. In <u>Current Orthopaedic Diagnosis and Treatment</u>, edited by Harry B. Skinner. Pg. 555-579. Published April 1995, Appleton-Lange, Norwalk, Connecticut.

5. Lower Extremity Foot Ulcers and Amputations in Diabetes, Authors – Gayle E. Reiber, Edward J. Boyko, and *Douglas G. Smith*. In <u>Diabetes in America</u>, 2nd Edition, Harris M (ed.), published by the Department of Health and Human Services. 1995, NIH No. 95-1468.

6. Principles in Partial Foot Amputations in the Diabetic, Author - *Douglas G. Smith*. In <u>Foot and Ankle Clinics</u>, edited by James Brodsky. Vol. 2, No 1, 171-86, published by W. B. Sanders, 1997.

7. Amputations and Prosthetic Replacement, Authors - Robert L. Romano, *Douglas G. Smith*, and Ernest M. Burgess. In <u>The Shoulder</u>, 2nd Edition, edited by Charles A. Rockwood and Frederick A. Matsen, published by WB Sanders, 1998

8. Principles of Partial Foot Amputation in the Diabetic, Author *Douglas G. Smith*. In <u>American Academy of Orthopaedic Surgeons: Instructional Course Lectures 48</u>. pg. 321-9, 1999, AAOS Press, Rosemont, IL.

9. Amputation Surgery in Peripheral Vascular Disease, Authors, Michael S. Pinzur, John H. Bowker, *Douglas G. Smith*, and Frank Gottschalk. In <u>American Academy of Orthopaedic Surgeons: Instructional Course Lectures 48</u>. pg. 687-91, 1999, AAOS Press, Rosemont, IL.

10. Amputations, Author - *Douglas G. Smith*. In <u>Current Orthopaedic Diagnosis and Treatment, 2nd Edition</u>, edited by Harry B. Skinner. Published June 2000, Appleton-Lange, Norwalk, Connecticut.

11. Amputation: Pre-Operative Assessment and Lower Extremity Surgical Techniques. In <u>Foot and Ankle Clinics</u>, edited by Kenneth H. Noll. To Be Published 2001 by W. B. Sanders.

### Funded Research Grants And Contracts

1. Orthopaedic Research and Education Foundation Grant - 1987:
   "Load Bearing Characteristics of the Normal Wrist and the Changes in Load Bearing Characteristics of the Wrist in Scaphoid Instability"
   Principal Investigator - Terry R. Light, MD.
   Co-Principal Investigator - Douglas G. Smith, MD.
   Funding - $13,750.

2. Veterans Administration Pilot Project Grant - 1991:
   "Phosphorus NMR Spectroscopy of Normal and Diabetic/Ischemic Skin"
   Principal Investigator - Douglas G. Smith, MD.
   Co-Investigator - R. Grant Steen, Ph.D.
   Funding - $40,347, Approved April 1991

3. Prosthetic Research Study: Clinical and Laboratory Study of Amputation Surgery and Rehabilitation. Veterans Administration Merit Review Contract - Funding 1990-93.
   Principal Investigator - Ernest M. Burgess, MD.
   Investigator - Douglas G. Smith, MD.

4. A Prospective Study of Risk Factors for Diabetic Foot Ulcers. VA RR&D Merit Review Project Number A318-3RA. 1990-93.
   Principal Investigator - Edward Boyko, MD, MPH, Roger Pecoraro, MD. (deceased)
   Co-Investigator - Douglas G. Smith, MD. (Joined Project in 1991)

5. A Phase I Randomized, Controlled Study of Platelet Derived Growth Factor (PDGF) in the Wound Healing of Standard Partial Thickness Wounds in Diabetic Skin. Investigational Study Grant, Sponsor - ZymoGenetics - 1991-93:
   Principal Investigator - John Olerud, MD.
   Co-Principal Investigator - Douglas G. Smith, MD.

6. Computer Assisted Development of Therapeutic Footwear for Diabetic Individuals with Insensitive Feet. (SIBCR-REI-03)
   Funding 1993-94: $46,589    Sponsor - NIKE
   Principal Investigators - Gayle E. Reiber, Douglas G. Smith, David A. Boone

7. Development of Foot Scanning Devices
   Funding 1994-95, $68,000: Sponsor - NIKE
   Principal Investigators - David A. Boone, Douglas G. Smith, Gayle E. Reiber

8. A Prospective Study of Risk Factors for Diabetic Foot Ulcers.
   Funding 1993-96: VA RR&D Merit Review Project Number A318-3RA.
   Principal Investigator - Edward J. Boyko, MD., MPH
   Co-Investigator - Douglas G. Smith, MD.

9. Assessment of the Effectiveness of Fabricated Insoles: A Pilot Project
   Funding 1995-6: $48,900, VA RR&D - Pilot Project Program.
   Principal Investigators - Gayle E. Reiber, Douglas G. Smith, David A. Boone

10. Prosthetics Research Foundation: Investigation into Prosthetics for the Developing World.
    Funding 1993-1996:
    Charitable Contributions, and US Government Aid to International Development
    Principal Investigator - Ernest M. Burgess, MD.
    Collaborator - Douglas G. Smith, MD.

11. "Prosthetic Research Study": Clinical and Laboratory Study of Amputation Surgery and Rehabilitation.
    Sponsor - Veterans Administration Merit Review Contract, RR&D.
    Funding 1993-96: $2,173,016.
    Co-Principal Investigators: Douglas G. Smith, MD.,
    David A. Boone, CP
    Gayle E. Reiber, Ph.D.

**Funded Research Grants And Contracts (continued):**

12. Outpatient Diabetic Ulcer Outcome Study.
    Funding: 1994-97, VA HSR&D # 92097. $467,850
    Principal Investigator - Gayle E. Reiber, Ph.D.
    Investigator - Douglas G. Smith, MD.

13. Quantification of Prosthetic Treatment Outcomes
    Dept. of Veterans Affairs, RR&D - A2122R,
    Funding: 4/1/97-3/31/98, $207,500
    Co-Principal Investigators: David A. Boone, CP, and Douglas G. Smith, MD..

14. Investigation of Dynamic Prosthetic Function: Flexibility
    Dept. of Veterans Affairs, RR&D - A2130R,
    Funding: 4/1/97-3/31/98, $131,205
    Co-Principal Investigators: David A. Boone, CP, and Douglas G. Smith, MD..

15. Development and Pilot Testing of Plantar Ulcer Healing Boot
    Dept. of Veterans Affairs, RR&D - A2120R,
    Funding: 4/1/97-3/31/98, $39,233
    Co-Principal Investigators: David A. Boone, CP, and Douglas G. Smith, MD..

16. The Influence of Neuropeptides on Wound Healing. National Institute of Health
    Principal Investigator - John Olerud, MD.; Co-Investigator - Douglas G. Smith, MD.
    The purpose of this project is to determine the influence of neuropeptides on cell migration and granulation tissue
    formation in small partial thickness wounds made on the dorsal foot of diabetic patients who have demonstrated an inability
    to heal leg ulcers normally.

17. Assessment of Total Hip Arthroplasty with Step Count Based Gait Analysis
    Funding: University of Washington Orthopaedics Dept. Grant, $5000
    Principal Investigators – Douglas G. Smith; John Clark; and Donald Erickson.

18. Clinical Trial of Footwear and Custom Insoles in Preventing Diabetic Foot Ulcerations
    Funding 4/1/97-3/31/00, VA RR&D - $551,409/yr
    Principal Investigators - Reiber GE, Smith, DG
    A three year randomized clinical trail to determine the extent to which study shoes, and study insoles will reduce the
    incidence of re-ulceration in diabetic individuals with a prior history of foot ulcer, and to determine the cost effectiveness of
    providing special footwear to these individuals.

19. Clinical Trial of Footwear (Arm 3) and Development of Footwear for Diabetic Women
    Funding 4/1/97-3/31/00, National Institutes of Health / NIDDK, $466,191
    Principal Investigators - Reiber GE, Smith, DG
    Funding for the third arm of the above trial, and the development of footwear for diabetic women.

20. Investigation of Amputation Pain
    Funding 4/1/97-3/31/00, 61-7645 NIH, $118,293
    Principal Investigator – Robinson LR, Investigator: Smith DG
    These three year projects (4/97 -4/00) are part of a Rehabilitation center grant investigating pain and disability. The
    amputation section has three projects: A randomized trial evaluating whether perioperative epidural anesthesia reduces the
    incidence and severity of phantom pain 2 years after amputation, a national survey of pain issues in amputees, and a
    randomized trial of mexiletine, amitriptyline, and placebo for the treatment of established phantom pain.

21. A Randomized Trial of Neurontin for the Treatment of Phantom Pain.
    Funding: $50,000          Robertson Donation to HMC for the Work of Douglas G. Smith
    Principal Investigators -Douglas G. Smith, MD, and LR Robinson, MD
    Enrollment begun December 1999.

## Funded Research Grants And Contracts (continued):

22. Salvage Versus Amputation Following Limb Threatening Injury.
    Funding: National Institute of Health. Renewed 1999/00
    Principal Investigators - Ellen MacKenzie, Michael Bosse, and Marc Swiontkowski
    Site Co-Investigator - Douglas G. Smith, MD. 1993 - 97
    Site Investigator - Douglas G. Smith, MD 1997 - present.

23. Step Count Based Gait Analysis of Normal Children, and Children with Cerebral Palsy
    Funding: $10,000 from Children's Hospital Grant
    Principal Investigators - Kit Song, and Douglas G. Smith.

24. LEAP II     Salvage Versus Amputation Following Limb Threatening Injury.
    Funding: National Institute of Health. Renewed 1999/00
    Principal Investigators - Ellen MacKenzie, Michael Bosse, and Marc Swiontkowski
    Site Investigator - Douglas G. Smith, MD 1997 - present.
    Second round of funding, to complete five year follow up examination, and analysis of the individual originally enrolled in
    this eight site study.

25. Advanced Biofidelic Lower Extremity Prosthetic Research Program.
    Funding: NIH Grant 1 R01 HD 38933-01
    Primary Contractor: SPAARTA, SPARTA Subcontract 00-594 with PRS
    Subcontractor: Prosthetic Research Study, Douglas G. Smith and Jim Beck
    4 Year Subcontract Between SPARTA and PRS (2000-2004)-
    Year 1: $174, 200; Year 2: $ 74,680; Year 3: $108,051; Year 4: $185,188

26. Physicians Against Landmines. Project: Simplified Prosthetic Alignment System
    Funding: NIH; Primary Contractor William Kennedy Smith
    Subcontractor: Prosthetic Research Study, Jim Beck and Douglas G. Smith
        Funding 9/01 to 8/02:       $36,600

27. Gait Activity Monitor, Clinical Test Design and Pilot
    Funding: Small Business Administration - SBIR Phase I
    Principal Investigator; Kim Coleman, Investigator Douglas G. Smith
    Funding 9/00 through 3/01, $99,600.

28. Amputation Research and Writing
    Funding: $50,000      Robertson Donation to HMC for the Work of Douglas G. Smith, MD
    Principal Investigators - Douglas G. Smith, MD
    Gift Received 12/00/

## International Presentations:

1. **Smith DG:** Surgical Considerations in Amputee Management to Enhance Functional Outcome. The Citizen Initiative Conference on Rehabilitation, associated with the Goodwill Games. An International Exchange Conference for Soviet and American Physicians and Health Care Specialists. July 25, 1990, Seattle, WA.

2. **Smith DG:** Amputation Surgery, and Early Rehabilitation – Enhancing Function. Invited Lecture at the Vien-Duc Surgical Hospital. July 4, 1990, Hanoi, Vietnam.

3. **Smith DG:** Using Computer Assisted Design and Manufacturing Technology for Prosthetic Fabrication in the Developing World. Invited Lecture at the Research Institute of Traumatology and Orthopaedics. October 16, 1991, Tashkent, Uzbekistan USSR.

4. **Smith DG:** Limb Viability in Severe Trauma. Invited Symposium Paper presented at the Seventh World Congress of the International Society for Prosthetics and Orthotics. June 30, 1992, Chicago, IL. USA.

5. **Smith DG:** The Energy Consumption of the Above-Knee Amputee. Invited Symposium Paper presented at the Seventh World Congress of the International Society for Prosthetics and Orthotics. July 2, 1992, Chicago, IL. USA.

6. **Smith DG:** Indications for the Through-Knee Amputation. Invited Symposium Paper presented at the Seventh World Congress of the International Society for Prosthetics and Orthotics. July 2, 1992, Chicago, IL. USA.

7. **Smith DG:** Principle of Amputation Surgery: Techniques and Immediate Post-Operative Stump Care. Invited Symposium talk at the 63rd Annual Meeting of the Royal College of Physicians and Surgeons of Canada. Sept. 17, 1994, Toronto Canada.

8. Reiber GE, **Smith DG**, Boone DA: Rehabilitation. Second International Conference on Health Technology in the Field of Diabetes. Kyoto, Japan, Nov. 1994.

9. **Smith DG**, Pinzur MS, Osterman H: Syme's Amputation In Vascular Disease and Diabetic Foot Infection: Randomized Trial Of Performing Surgery In One Or Two Stages. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 3, 1995, Melbourne, Australia.

10. ColemnNesset KC, **Smith DG**, Joseph AW, Borchers RE, Boone DA, Macomber G: Gait Activity Monitor: A Device For Objectively Evaluating the Functional Outcome of Prosthetic, Orthotic, or Medical Treatment. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 3, 1995, Melbourne, Australia.

11. Boone DA, Borchers R, **Smith DG**: Computer Aided Design and Fabrication of Prostheses after Partial Calcanectomy: A Case Study. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 4, 1995, Melbourne, Australia.

12. **Smith DG**, Hattingh JH: Unique Hip Disarticulation For Infection - Functions as Trans-Femoral Amputation In Muscular Containing Silicon Suspension Socket. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 4, 1995, Melbourne, Australia.

13. **Smith DG**, Grujic L, Perkins QD, Hansen ST: Closed Femoral Shortening Following Syme's Amputation. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 4, 1995, Melbourne, Australia.

14. **Smith DG:** Knee Disarticulation Surgery. Instructional Course Lecture. Eighth World Congress of the International Society for Prosthetics and Orthotics. April 6, 1995, Melbourne, Australia.

15. **Smith DG:** Invited Keynote Lecture - Lower Extremity Amputation Surgery - State of the Art. First Mediterranean Congress of Physical Medicine and Rehabilitation, Herzliya, Israel, May 14, 1996.

## International Presentations (Continued):

16. Boone DA, Smith DG:  CAD/CAM and the Pedorthic management of the Diabetic Foot.  CAD/CAM Systems in Pedorthics, Prosthetics &Orthotics.  Clinical Perspectives and State f the Art.  Nuremberg, Germany.  May 4 and 5, 1997.

17. Smith DG:  Principles in Amputation Surgery - June 3, 1998
                    Upper Extremity Amputation Surgery - June 3, 1998
                    Lower Extremity Amputation Surgery - June 4, 1998
                    Immediate and Early Amputation Rehabilitation, Pain Issues - June 4, 1998
                    Outcome Assessment, Applications to Prosthetics - June 5, 1998
    Chinese-American Conference on Rehabilitation Medicine - Tai Yuan, Shanxi Province, China.  June 3-5, 1998.

18. Smith DG, and Hattingh JH:  The Use of Silicone Suspension Sleeves to Apply Skin Traction for Amputation Wounds Healing:  A Report of Two Cases.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  June 29, 1998, Amsterdam, The Netherlands.

19. Boone DA, Urban ND, Smith DG, Burgess EM, Mathews DE, and Coleman KL:  Use of CAD/CAM For Prosthetic Services in the Developing World.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  June 29, 1998, Amsterdam, The Netherlands.

20. Coleman KL, del Aguila MA, Boone DA, and Smith DG:  Self-Selected Walking Velocity as a Measure of Function: Relation to Real World Ambulatory Activity of Diabetics.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  June 30, 1998, Amsterdam, The Netherlands.

21. Smith DG, Ehde DM, Legro MW, Reiber GE, del Aguila M, Boone DA:  Pain and Sensations in the Phantom Limb, Residual Limb, and Back Reported by Persons with Lower Extremity Amputations.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  July 2, 1998, Amsterdam, The Netherlands.

22. Coleman KL, Boone DA, Smith DG, Mathews DE, Laing LS:  Functional Outcome Assessment Using Objective Measures of Patient Satisfaction and Gait Activity.  A Comparison of 2 Feet.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  July 2, 1998, Amsterdam, The Netherlands.

23. Smith DG, Coleman KL, Boone DA:  Improved Activity Following Elective Trans-Tibial Amputation for pain:  Outcome Assessment by Long-Term Activity Monitoring (A Case Report).  Ninth World Congress of the International Society for Prosthetics and Orthotics.  June 29, 1998, Amsterdam, The Netherlands.

24. Laing LS, Coleman KL, Smith DG, Boone DA, Legro MW:  Quantifying Multi-Dimensional Perspectives on a Change in Prosthetic Feet.  Ninth World Congress of the International Society for Prosthetics and Orthotics.  June 29, 1998, Amsterdam, The Netherlands

25. Smith DG:  Less Invasive Skeletal Stabilization.  The European and North American LISS Investigator and Study Group Meeting.  March 5-6, 1999. Zurich, Switzerland.

26. Smith DG:  Rehabilitation Challenges for the New Millennium Lecture - Amputation Surgery in the Lower Extremity and Rehab of the Amputee. Sept. 16, 1999, Winnipeg, Manitoba Canada

27. Smith DG:  Lower Extremity Amputations - Level Selection, Surgical Techniques, and Early Post-Operative Care. KEYNOTE ADDRESS, Ontario Association of Amputee Care Annual Conference 2001.  An Amputee Care Odyssey.  May 4, 2001 Kingston, Ontario Canada.

28. Smith DG, Assal M, Hattingh J:  Extended Posterior Flap Technique for Transtibial Amputation - An Early Report of Surgery and Prosthetic Fitting.  Tenth World Congress of the International Society for Prosthetics and Orthotics.  July 3, 2001, Glasgow, Scotland.

29. Smith DG, Ehde DM, Czernicki J, Robinson L:  A Survey of Amputation Etiology and Prosthetic Use Amongst Upper and Lower Extremity Amputees Living in the Pacific Northwest of America.  Tenth World Congress of the International Society for Prosthetics and Orthotics.  July 5, 2001, Glasgow, Scotland.

<u>International Presentations (Continued):</u>

30. <u>Smith DG</u>, Blaock RV:  A Unique Chopart Level Amputation and Utilization of an APO Style Partial Foot Prosthesis - A Case Report. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 4, 2001, Glasgow, Scotland.

31. Laing L, Coleman K, Boone D, <u>Smith DG</u>:  What is Important for Prosthetic Satisfaction. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 5, 2001, Glasgow, Scotland.

32. Beck J, Boone D, <u>Smith DG</u>:  Flexibility Preference of Trans-tibial Amputees. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 3, 2001, Glasgow, Scotland.

33. Coleman K, Boone D, <u>Smith DG</u>, Laing L, Mathews D:  Relative Influence of Changing the Prosthetic Foot versus the Socket/Suspension System on Ambulatory Activity and Patient Satisfaction. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 3, 2001, Glasgow, Scotland.

34. Coleman K, Boone D, <u>Smith DG</u>, Laing L, Mathews D, Czernicki F:  Cross-Over Trial Comparing Alpha Liner with Pelite Liner for Trans-Tibial Prostheses Using Amputatory Activity and Questionnaire Responses. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 4, 2001, Glasgow, Scotland.

35. Coleman K, Boone D, <u>Smith DG</u>, Laing L:  Distinctive Differences in Duration and Rate Profiles of Ambulation Between Populations with Trans-Tibial Amputation, with Diabetes, and without Impairment. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 5, 2001, Glasgow, Scotland.

36. Coleman K, Boone D, <u>Smith DG</u>, Laing L: Progress Following Elective Trans-Tibial Amputation - One Year of Continuous Ambulatory Monitoring.  A Case Study. Tenth World Congress of the International Society for Prosthetics and Orthotics. July 5, 2001, Glasgow, Scotland.


<u>Scientific Presentations To National Meetings:</u>

1. <u>Smith DG</u>, Pottenger LA, Zimmerman NB, Cooperman DR:  Fatigue Disruption of Human Patellar Cartilage By In Vitro Repetitive Loading.  Presented at the Thirty-first Annual Orthopaedic Research Society. Las Vegas, Nevada. January, 1985. Ortho. Trans. 9(2), 363-4; 1985.

2. <u>Smith DG</u>, Pinzur MS, Daluga D, Osterman H:  Through-knee Amputation in Peripheral Vascular Insufficiency.  Presented at the American Academy of Orthopaedic Surgeons, Atlanta, Georgia. February, 1988. Proceeding of the 55th Annual Meeting, American Academy of Orthopaedic Surgeons, pg. 122, 1988.

3. <u>Smith DG</u>, Pinzur MS, Stuck RM, Ketner L, Sage RM:  Partial Calcanectomy for Chronic Heel Ulceration, An Amputation of the Back of the Foot.  American Academy of Orthopaedic Surgeons 1991, Anaheim, CA.

4. <u>Smith DG</u>, Manoli A, Hansen ST:  Scarred Muscle Excision for the Treatment of Established Ischemic Contracture of the Lower Extremity.  American Orthopaedic Foot and Ankle Society.  July 1991, Boston MA.

5. <u>Smith DG</u>, Horn P, Malchow D, Boone DA, Hansen ST:  Prosthetic History and Functional Outcome of the Isolated, Traumatic Below-Knee Amputee.  American Academy of Orthopaedic Surgeons 1993, San Francisco, CA.

6. <u>Smith DG</u>, Boyko EJ, Ahroni JH, Davignon D, Stensel V, Pecoraro RE:  Prospective Evaluation of the Risk Factors for Foot Ulceration in Diabetes - Early Results.  American Orthopaedic Foot and Ankle Society.  Feb. 1994, New Orleans, LA.

7. <u>Smith DG</u>, Boone DA, Borchers RE, Joseph AW, Mathews DE, Boone I, Reiber GE, Burgess EM:  Evaluation of Five Methods Used to Quantify the External Geometry of the Foot.  American Orthopaedic Foot and Ankle Society.  Feb. 1994, New Orleans, LA.

8. <u>Smith DG</u>, Perkins QD:  Syme's Amputation Followed by Closed Femoral Shortening.  American Academy of Orthotists and Prosthetists       October 1994, Washington DC.

9. <u>Smith DG</u>:  Forefoot Fractures.  American Orthopaedic Foot and Ankle Society Feb. 1995, Orlando FL.

10. Smith DG, Coleman KL, Boone DA: Step Count Based Assessment of Gait Activity. Orthopaedic Rehabilitation Assoc., Annual Meeting, May 2, 1997, Nashville, TN

11. Smith DG, Coleman KL, del Aguila MA, Boone DA: Functional Ambulation of Geriatric Male Diabetics: Correlation of Step Count Based Gait Assessment with the SF-36. American Academy of Orthopaedic Surgeons, 65th Annual Meeting, March 20, 1998. Abstract published in Ortho Transactions, vol. 22, number 1, 98-99, pg. 66.

12. Smith DG, Ehde DM, Legro MW, Reiber GE, del Aguila M, Boone DA: Pain and Sensations in the Phantom Limb, the Residual Limb, and the Back Reported by Persons with Lower Extremity Amputations. Orthopaedic Rehabilitation Association, 9th Annual Meeting, Kohler, Wisconsin. May 8, 1998.

13. Smith DG: Upper Extremity Amputation Surgery and Prosthetics. Orthopaedic Rehabilitation Association Specialty Day, February 7, 1999, Anaheim, CA.

14. Smith DG: New Trauma Techniques, Submuscular Plating and Less Invasive Fracture Stabilization. Orthopaedic Rehabilitation Association, 9th Annual Meeting, Cleveland, Ohio. May 12, 2000.

15. Beck JC, Boone DA, Smith DG: Amputee Preference for Flexibility in Prosthetic Ankles. Presented by DG Smith. Orthopaedic Rehabilitation Association, 9th Annual Meeting, Cleveland, Ohio. May 12, 2000.

16. Coleman KL, Boone DA, Smith DG, Mathews DE, Laing LS: Functional Outcome Assessment Using Objective Measures Of Patient Satisfaction And Gait Activity: A Comparison Of Two Feet. Presented by DG Smith. Orthopaedic Rehabilitation Association, 9th Annual Meeting, Cleveland, Ohio. May 12, 2000.

17. Smith DG: Introduction to Submuscular Plating, the Submuscular use of the DCS in the Proximal/Distal Femur and Submuscular Plating of Pediatric Femur Fracture. Orthopaedic Rehabilitation Specialty Day. San Francisco, CA, March 3, 2001.

## Scientific Presentations To Regional Meetings:

1. Smith DG, Apel DM, Schwartz CM, Paprosky WG: Threaded Cup Acetabuloplasty: Early Clinical Experience. Presented at the 1989 Senior and Alumni Scientific Day, Loyola University Medical Center, May 1989, Maywood, IL.

2. Smith DG: Partial Calcanectomy for Chronic Heel Ulceration, An Amputation of the Back of the Foot. American College of Surgeons Washington State Chapter Regional Meeting, June 15, 1990, Blaine WA.

3. Smith DG: Automated Fabrication of Mobility Aids in Southeast Asia. Regional Meeting of the AO Traveling Fellows. May 26, 1992, Seattle, WA.

4. Smith DG: Implications of Automated Fabrication of Mobility Aids in Developing Countries. Regional Meeting of the North American Traveling Fellows. October 29, 1992, Seattle, WA.

5. Smith DG, Boone DA, Harlan JS, Forsgren SM, Burgess EM: Automated Prosthetics Fabrication in the Developing World: The Experimental Prosthetics Center in Hanoi, Vietnam. Presented at the 1993 Senior and Alumni Scientific Day, Loyola University Medical Center, May 1993, Chicago, IL.

6. Smith DG, Perkins QD: Syme's Amputation Followed by Closed Femoral Shortening. American Academy of Orthotists and Prosthetists NW Chapter Meeting, July 9, 1993, Seattle WA.

7. Smith DG, Johansen K: Refractory Heel Ulcers - Foot Salvage with Calcanectomy. Pacific Northwest Vascular Society. 12th Annual Meeting, Nov. 1994, Coeur D'Alene ID.

## Scientific Presentations Co-Authored:

1. Goetz FW, Smith DG: In Vitro Effects of Theophylline and Dibutyryl Adenosine 3'-5'-Cyclic Monophosphoric Acid on Spontaneous and Prostaglandin Induced Ovulation of Brook Trout (Salvelinus fontinalis) Oocytes. Bio. Reprod. 22 (suppl. 1), 114A, 1980.

2. Woo TS, Smith DG, Light TR, Patwardhan AG, Guay ME: Load Bearing Characteristics of the Normal Wrist and of the Wrist with Simulated Scaphoid Fracture. Presented at the Thirty-fourth Annual Orthopaedic Research Society, Atlanta, Georgia. February, 1988. Transactions of the 34th Annual Meeting of the Orthopaedic Research Society, Vol. 13, 255, 1988.

3. Blevens AD, Light TR, Jablonsky WR, Smith DG, Patwardhan AG, Guay ME, Woo TS: Radiocarpal Articular Contact Characteristics with Scaphoid Instability. Ortho. Trans. 13(1), 169, 1989.

4. Manoli A, Smith DG, Hansen ST: Scarred Muscle Excision for the Treatment of Established Ischemic Contracture of the Lower Extremity. American Academy of Orthopaedic Surgeons 1991, Anaheim, CA.

5. Sangeorzan BJ, Smith DG, Veith R, Hansen ST: Triple Arthrodesis of Adult Foot Deformity Using Internal Fixation. American Orthopaedic Foot and Ankle Society Annual Meeting 1991, Anaheim, CA.

6. Pinzur MS, Gottschalk F, Goldstone J, Smith DG, Kent H, deAndrade R: Below-Knee Amputation in Peripheral Vascular Insufficiency: Functional Outcome in a Multi-Center Review. Orthopaedic Rehabilitation Association 2nd Annual Meeting, Sept. 1991, Washington, D.C.

7. Kregor PJ, Routt ML, Smith DG, Robinson L, Benirschke SK: Neurologic Outcome in Patients with Orthopaedic Trauma Association Annual Meeting, Oct. 1992, Minneapolis, MN; and also presented at the American Academy of Orthopaedic Surgeons 1993, San Francisco, CA.

8. Selznick H, Agel J, Ott J, Henley M, Chapman J, Benirschke S, Smith D: The Effect of Cigarette Smoking on the Healing and Treatment of Open Tibia Fractures. Orthopaedic Trauma Ass. 9th Annual Meeting, Sept. 1993, New Orleans, LA.

9. Borchers R, Boone D, Smith D, Reiber G: A Quantitative Method for the Comparison of 3-D Foot Shapes. American Academy of Orthotists and Prosthetists 20th Annual Meeting and Scientific Symposium, 1994, Nashville, TN.

10. Joseph A, Borchers R, Smith D, Boone D: Gait Activity Monitor: A Device for Objective Evaluation of Prosthetic Function. American Academy of Orthotists & Prosthetists 20th Annual Meeting and Scientific Symposium, 1994, Nashville, TN.

11. Boone D, Joseph A, Smith D, Mathews D, Reiber G: Gait Analysis and Dynamic Alignment Training with Interactive Computer Video. American Academy of Orthotists & Prosthetists 20th Annual Meeting and Scientific Symposium, 1994, Nashville, TN.

12. Borchers R, Boone D, Smith D, Reiber G: CAD Improvements to the Design of Custom Orthotics and Footwear. American Academy of Orthotists & Prosthetists 20th Annual Meeting and Scientific Symposium, 1994, Nashville, TN.

13. Ahroni JH, Boyko EJ, Smith DG: Increased Mortality with Diabetic Foot Ulcers, The Seattle Diabetic Foot Study. 15th International Diabetes Federation Congress, Nov. 1994, Kobe, Japan.

14. Boone DA, Mathews D, Burgess EM, Smith DG: The PRS Above-Knee Prosthetic Socket Design for CAD/CAM. Journal of Proceedings American Academy of Orthotists & Prosthetists 21st Annual Meeting & Scientific Symposium, 1995, New Orleans, LA.

15. ColemaNesset KL, Smith DG, Joseph AJ, Boone DA, Macomber G: Gait Activity Monitor for Long-Term Measurement of Ambulatory Function. In: Langton A, ed. Proceedings of the RESNA '95 18th Annual Conference. Vancouver, B.C., Canada; RESNA Press, 168-179, 1995.

16. Joseph AW, Boone DA, Mathews DE, Smith DG: CAD/CAM for Prosthetics: Successful Technology Transfer. In: Langton A, ed. Proceedings of the RESNA '95 18th Annual Conference. Vancouver, B.C., Canada; RESNA Press, 1995.

17. Boone DA, Joseph AW, Mathews DE, Smith DG: Interactive Computer Video: A Training Tool for Dynamic Prosthetic Alignment. In: Langton A, ed. Proceedings of the RESNA'95 18th Annual Conference. Vancouver, BC, Canada; RESNA Press, 416-418, 1995

18. Barnes BC, Smith DG, Sands AK, Boyko EJ, and Ahroni JH: The Prevalence of Radiographic Foot Abnormalities in Patients With Diabetes. Presented at the American Academy of Orthopaedic Surgeons Annual Meeting, Feb. 1996, Atlanta, Georgia.

19. Reiber GE, Smith DG, Boone DA, del Aguila M: Design and Pilot Testing of the DVA/Seattle Footwear System for Diabetic Patients with Foot Insensitivity. Diabetes 1996, 45:284 A.

20. Legro M, Reiber GE, Smith DG, del Aguila MA, Larsen J, Boone DA: Development and Validation of a Questionnaire to Evaluate Quality of Life and Function in Amputees Using Lower Extremity Prostheses. Assoc. for Health Services Research, Chicago, IL 1997.

21. Olerud JE, Gibran NS, Haycox CL, Usui ML, Smith DG, Larsen JA, Ansel JC, Bunnett NW: Neutral Endopeptidase (NEP) Expression in Normal Human Skin and Select Disease States. Intern'l Dermatologic Society. May 1998. J. Inv Derm 110:655, 1998.

22. Ehde D, Czerniecki J, Smith D, Robinson L: Chronic Pain Following Lower Limb Amputation. Am Academy of Physical Medicine and Rehab., Seattle, WA  Nov 1998.

23. Ehde D, Smith DG, Czerniecki J, Campbell KM, Malchow DM, Robinson L: Back Pain as a Secondary Disability in Persons with Lower Limb Amputation. American Pain Society., Ft. Lauderdale FL, Oct 1999.

24. Younger A, Smith DG, Reiber GE. The outcome of diabetic foot ulcers in the weight bearing portion of the foot. American Academy of Orthopaedic Surgeons. February 4-8, 1999.

25. Wallace CM, Reiber GE, Vath C, Sullivan K, Hayes S, Onchee Y, Smith DG: Footwear Associated with Falls in Diabetic Individuals with a History of Foot Ulcers. American Diabetes Association, 60th Scientific Session, June 2000.

26. Younger A, Smith DG, Reiber GE. The outcome of diabetic ulcers in the weight bearing portion of the foot. Canadian Orthopaedic Society, July 2000.


## Movies, Sound Slide Programs, Exhibits, Etc.:

1. The VA/Seattle Prosthetic Limb System - Development and Early Results: Smith DG, Burgess EM, Boone DA, Harlan JS, and Aune AL. This scientific exhibit was presented at the 58th Annual Meeting of the AAOS, in Anaheim, CA.  March 7-11, 1991.

2. Prosthetics Research Study: Improving Function for the Amputee, Saving the Limb At Risk. Laing L, Boone DA, ColemaNessett, K, Smith DG: This scientific exhibit / booth was presented at the Eighth World Congress of the International Society for Prosthetics and Orthotics. April 2- 7, 1995, Melbourne, Australia.

3. Audio Digest® Orthopaedics - Traumatic Events, Pilon Fractures and Upper Extremity Amputations. Douglas G. Smith, MD., Vol. 19, Number 6, June 1996.

4. Prosthetics Research Study: Improving Function for the Amputee, Saving the Limb At Risk. Laing L, Boone DA, Beck J, ColemaNessett, K, Smith DG: This scientific exhibit / booth was presented at the Ninth World Congress of the International Society for Prosthetics and Orthotics. June 28 - July 3, 1998, Amsterdam, the Netherlands.

5. Ernest M Burgess: A Tribute. A Poster Presentation. Smith DG, Coleman KL, Boone DA, Mathews DE, Beck J, Laing LS. American Academy of Orthopaedic Surgeons 68th Annual Meeting. February 28 - March 4, 2001. San Francisco, CA

6. Prosthetics Research Study: Improving Function for the Amputee, Saving the Limb At Risk. Laing L, Boone DA, Beck J, Coleman K, Smith DG: This scientific exhibit / booth was presented at the Tenth World Congress of the International Society for Prosthetics and Orthotics. July 1 - July 6, 2001, Glasgow, Scotland

## AO/ASIF ORTHOPAEDIC TRAUMA COURSES ATTENDED:

Basic AO/ASIF Trauma Course: Toronto, Canada. 1986.
Advanced AO/ASIF Trauma Course: Davos, Switzerland. Dec. 1997.

**Human Subjects Training:**          University of Washington and Harborview Medical Center,
                                      Seattle, WA - August 9, 2000.

## Faculty Lectures At National/Regional Courses:

9/91        VA Regional Medical Education Course: Management of the Dysvascular Lower Extremity by the Amputee
            Clinic Team: Lecture - Amputation Surgery to Enhance Functional Outcome - Panel Member - Decision Making,
            Surgical Problems, Prosthetic Prescription, and Automated Fabrication of Mobility Aids.

4/92        Physical Medicine and Rehabilitation Review Course. Seattle, WA
            Lecture - Amputation Surgery

10/92       AO Residents Course. Seattle, WA

10/92       AO Operating Room Nurses Course. Seattle, WA

11/92       Orthopaedic Trauma Update. Spokane, WA
            Lecture - Pilon Fractures, Operative Treatment
            Lecture - Amputation vs. Limb Salvage: New Techniques and Aids for Decision Making

4/93        National VA - Amputee Clinic Team Training Course. Las Vegas NV
            Lecture - Present State of Amputation Surgery
            Assistant Leader - Physician Breakout Session, Amputation Surgery and Rehabilitation

4/93        Physical Medicine and Rehabilitation Review Course. Seattle, WA
            Lecture - Amputation Surgery

9/93        American Academy of Orthopaedics Surgeons Summer Institute - Foot/Ankle Section. New York, NY
            Table Instructor for surgical skills lab.

10/93       "Big Sky" Orthopaedic Trauma Update. Missoula, Montana
            Lecture - Pilon Fractures, Operative Treatment
            Lecture - Amputation vs. Limb Salvage: New Techniques and Aids for Decision Making

10/93       AOFAS Regional Review Course - "Treatment of the Foot and Ankle", Seattle, WA
            Assistant Course Chairman
            Lecture - Diabetes and Moderator for the Sunday morning session

4/94        Surgical Management and Rehabilitation of the Lower Extremity Amputee:
            Guest Faculty: University of Missouri and the Harry S. Truman VA Medical Center
            Lecture - Principles of Amputation Surgery Part I
            Lecture - Principles of Amputation Surgery Part II
            Lecture - Post Surgical Rigid Dress/Prosthesis
            Instructor - Rigid Dressing Skills Laboratory

5/94        National VA - Amputee Clinic Team Training Course. Las Vegas NV
            Lecture - Present State of Amputation Surgery
            Assistant Leader - Physician Breakout Session, Amputation Surgery and Rehabilitation

9/30/94        Anchorage Alaska - Orthopedic Trauma Update,
               Lecture - Pilon Fractures, Operative Treatment
               Lecture - Amputation vs. Limb Salvage: New Techniques and Aids for Decision Making

10/3/94        Fairbanks Alaska - Orthopaedic Trauma Update,
               Lecture - Pilon Fractures, Operative Treatment
               Lecture - Amputation vs. Limb Salvage: New Techniques and Aids for Decision Making

2/17/95        American Academy of Orthopaedic Surgeons / Instructional Course Lectures
               Course - Amputations and Prosthetics
               Lecture - Implementation of Modern Prosthetic Technology in the Developing World

2/18/95        American Academy of Orthopaedic Surgeons / Instructional Course Lectures
               Course - Amputations and Prosthetics
               Lecture - Upper Extremity Amputations

2/18/95        American Academy of Orthopaedic Surgeons / Instructional Course Lectures
               Course - The Diabetic Foot
               Lecture - Partial Foot Amputations

9/7/95         Rocky Mountain Rural Trauma Symposium, Missoula MT
               Lecture - Orthopaedic Injuries:  Improved Outcome by Appropriate Early Care

9/8/95         Rocky Mountain Rural Trauma Symposium, Missoula MT
               Lecture - Crush Injury Syndrome, Compartment Syndromes

9/8/95         Rocky Mountain Rural Trauma Symposium, Missoula MT
               Lecture - A to Z of Pelvic Fractures

10/28/95       AAOS Course, Chicago IL:  Lower Extremity Fractures, Soft Tissues are the Key
               Lecture - Tibial Pilon Fractures - ORIF with Plates is Best?

10/28/95       AAOS Course, Chicago IL:  Lower Extremity Fractures, Soft Tissues are the Key
               Lecture - Limb Salvage, Acute Amputations

10/29/95       AAOS Course, Chicago IL:  Lower Extremity Fractures, Soft Tissues are the Key
               Lecture - Talus Fractures

10/29/95       AAOS Course, Chicago IL:  Lower Extremity Fractures, Soft Tissues are the Key
               Live Video Demonstration - Cadaver Dissection, Surgical Approaches to the Talus

11/10/95       Yakima, WA - Orthopaedic Trauma Update,
               Lecture - Pilon Fractures, Operative Treatment
               Lecture - Upper Extremity Amputations

11/11/95       Spokane, WA - Orthopaedic Trauma Update,
               Lecture - Pilon Fractures, Operative Treatment
               Lecture - Upper Extremity Amputations

2/24/96        Atlanta Georgia        AAOS - Instruction Course # 240
               Diabetic Foot Course: Foot Amputation Surgery Lecture

2/24/96        Atlanta Georgia        AAOS - Instruction Course #323
               Amputation Course: Developing World Prosthetics

2/24/96        Atlanta Georgia        AAOS - Instruction Course #333
               Amputation Course:  Trans-Tibial Amputations Lecture

| 2/24/96 | Atlanta Georgia        AAOS - Instruction Course #333 |
|---|---|

Amputation Course: Trans-Tibial Amputations Lecture

3/18/96   Seattle, WA  Physical Medicine and Rehabilitation Nat'l Review Course.  Considerations in Lower Extremity
          Amputation Surgery

4/3/96    Seattle, WA - Swedish Hospital          Novacare Regional Course
          Upper Extremity Amputations

7/23/96   Las Vegas, NV
          Lower Extremity Amputations Surgery - State of the Art

9/26/96   Seattle, WA, Fred Hutch        General Surgery Pacific Northwest Regional CME
          Complex Extremity Trauma / Mangled Extremity Severity Score

9/27/96   Seattle, WA, NW Chapter of AAOP
          Step Count Based Gait Assessment - talk with David Boone

11/8/96   Seattle, WA, AO.  Advanced OR Personnel Course
          Treatment of Complex Distal Femoral Fractures

11/8/96   Seattle, WA, AO.  Advanced OR Personnel Course
          Antigrade and Retrograde IM nailing for Fixation of Extreme Distal Femoral Fractures

11/8/96   Seattle, WA.  AO - Advanced OR Personnel Course
          Table Instructor

11/9/96   Seattle, WA.  AO - Basic OR Personnel Course
          Internal Fixation of Foot and Ankle Fractures

11/9/96   Seattle, WA.  AO - Basic OR Personnel Course
          Table Instructor

2/1/97    San Francisco, CA.  AAOS - Instruction Course # 240
          Diabetic Foot Course: Foot Amputation Surgery Lecture

2/1/97    San Francisco, CA.  AAOS - Instruction Course #323
          Amputation Course: Trans-Tibial Amputation, What's New in Prosthetics

3/28/97   San Francisco, CA.  American Assoc. of Orthotists and Prosthetists, Annual Meeting
          Outcome Assessment in Prosthetics and Orthotics

5/2/97    Nashville, TN.  Orthopaedic Rehabilitation Assoc., Annual Meeting
          Step Count Based Assessment of Gait Activity

10/23/97  Missoula MT - Orthopaedic Trauma Update,
          Lecture - Talus Fractures
          Lecture - Trans-Tibial Amputations, and What's New in Prosthetics

3/20/98   New Orleans, LA.  AAOS - Instruction Course # 222
          Amputation Course: Trans-Tibial Amputation, What's New in Prosthetics

3/21/98   New Orleans, LA.  AAOS - Instruction Course # 373
          Diabetic Foot Course: Foot Amputation Surgery Lecture

5/8/98    Kohler, Wisconsin.  Ortho Rehab Assoc., Annual Meeting.
          Presenter:  Pain and Sensations in the Phantom Limb, the Residual Limb, and the Back Reported by Persons with
          Lower Extremity Amputations.
          Moderator:  Afternoon Session

5/3/01    Kingston, Ontario Canada.  Visiting Professor, Department of Rehabilitation, Resident Research Days.

5/3/01    Kingston, Ontario Canada.  Amputation Surgery - Upper and Lower Extremity Surgery and Prosthetics.
          Department of Orthopaedic Surgery, and Department of Rehabilitation.

5/11/01   Missoula, Montana.  Compartment Syndromes - Diagnosis and Treatment. Orthopaedic Trauma Update Course,
          Presented by the University of Washington and Harborview Medical Center.

7/3/01    Glasgow, Scotland.  Moderator.  Prosthetic Functional Outcome Session II. Tenth World Congress of the
          International Society for Prosthetics and Orthotics.  Scientific Session.

# EXHIBIT "G"

History, and Physical Exam
Consultation with Dr Ray Vance

Performed on 12/20/02 by Dr. Douglas G. Smith, MD


Patient: Mr. Mel Debrum
Chief Complaint: Right below the knee amputation.


Introduction: I introduced myself to Mr. Debrum, and described what I do in Seattle and for the
Amputee Coalition of America. I stated that I had been asked to do a history and physical exam
as part of the medical legal process. I ask his permission to do the history and physical exam,
and he said that is fine with him. Present in the room were a court reporter using a tape recorder,
a translator to speak Marshall-ese, and a representative of his law firm. I reminded him to stop
me or tell me if anything was painful or uncomfortable.

History: Mr. Debrum sustained a crushing injury to his right foot in an accident on August 10th,
2000. He said that he was not able to get to a hospital right away, and it took a bit over two days
to get him to Honolulu. He was told he needed an amputation, and that the foot could not be
saved. He had a long, right below the knee amputation performed by Dr Jay M. Marumoto on
8/12/00. In reading the records – the amputation was done with excellent technique. Dr.
Marumoto did appropriately identify and mange of all five major nerves, he appropriately
contoured the bones, he used a posterior muscle myodesis, and obtained good skin coverage.

Mr. Debrum recalls no difficulties in healing after the amputation, no infections, and no post-
operative problems. He was fit with a provisional below-knee prosthesis (P#1) in October of
2000. The records show that this first prosthesis had a multi-axial ankle/foot, endoskeletal and
alignable construction, a dynamic pylon, and protective calf cover. This is very good, high-end
provisional prosthetic leg. Mr. Debrum recalls this prosthesis was used while the leg was
shrinking rapidly. He did not like this prosthesis much, because of fitting issues. This
dissatisfaction with this provisional leg is very normal, and for almost all amputees is due to the
difficulty seen with all first provisional legs - the residual limb keeps shrinking and the fit keeps
changing and deteriorating. It is a normal process and not due to the technology of the
provisional limb. He recalls no open sores, no ulcerations or wounds from this leg. He does
recall some red spots and tender (sore) areas, but no open sores. He says he had no blisters, and
no bleeding. This is a very normal postoperative course, and the fact that he had no major skin
blisters or ulcers is actually above average for this first stage of prosthetic fitting.

In February or March of 2001, a definitive prosthesis was ordered, fabricated and delivered.
This leg (P#2) did have exoskeletal construction, but included a dynamic response foot, the
Seattle foot. Given the hope of returning to a location with limited prosthetic service and an
active, rugged lifestyle – the choice of exoskeletal construction (while perceived to be low
technology) is actually a very reasonable choice and certainly meets the standard of care. He
recalls that he did rehabilitate with more physical therapy on this new leg (P#2). In early August

EXHIBIT G

of 2001, in examinations in Hawaii, he reported no problems, and the examination documents no problems on physical exam. He says that with longer distances he began to get distal tibial contact, pressure and pain. He also reports difficulty with suspension and that the leg felt like it would fall off. Both of these are signs that the volume of his residual limb continued to decrease as the amputation matured. He does not recall ever being offered a neoprene suspension sleeve for this prosthesis (P#2).

Now, he feels that his residual limb is not changing much in size overall, but does still notice a small variation between morning and as the day progresses. In the morning, the residual limb is a bit swollen and the fit of the prosthetic leg is tight. The overnight swelling resolves quickly in the morning after wearing the prosthesis, and the fit quickly loosens up. I reassured him that this is indeed quite normal. He again feels the new leg is much higher technology, likes the more secure suspension, and the feel of the foot especially on uneven ground. He has only used the leg for two days, and I am unable to tell if he really has experienced the difference, or if his perception of its "high technology action", because of what he has been told. He has been told the new leg (P#3) is much higher technology, and that the old leg (P#2) was very low technology.

Family History: He is not married now, and was not at the time of the accident. He has five children, and talks with them on the telephone. He says the relationship with his kids is good, and it does not seem to have changed with the amputation. He feels his kids understand. I asked him about his interaction with other amputees. He has no family history of any one else close to him who had an amputation. He did say that he saw a few folks back home with amputation, but did not know them well. He recalls their activity as being very limited, using wheelchair or crutches.

His own assessment of his "getting around" is good. He says there are things he used to do that he cannot, such as: standing for long hours, pulling, lifting, playing soccer, climbing coconut trees, walking of the beach. He uses no crutches or cane now, and says walking on flat surface is OK, but uphill, downhill and stairs are difficult. In trying to gauge whether his activity and function have reached a plateau, it is my sense is that his activity is still improving, and that he has not tried to do many of the higher activity things as of yet. He has not had "running training", except for the treadmill sessions in Hawaii, and he indicated that he would be interested in that.

ROS:
Sleeping – He says that he has no problems sleeping and that he sleeps well. I asked about bad memories and dreams. He says he does have recall of the accident, and some bad memories. Has not sought counseling, and does not want it now. I asked if he feels he needs it, he first indicated no with nodding, but then looked to the lawyer's representative, and said that he didn't know. It is interesting, that he looked at the lawyer representative many times before answering questions during my examination. He seemed very hesitant to answer some questions directly.

(Note: In the waiting room, I told everyone that what was explained to me and my understanding of the exam process was that the individuals present would be me, Mr. Debrum, the court reporter, and the translator. The woman from the law office said in no uncertain terms

that she was to be present "to be sure I did not ask anything I was not supposed to". This discussion happened in the waiting area to me and to Mr. Debrum, but not in front of the court reporter. There was definitely eye contact, body language, and silent communication between this woman and Mr. Debrum during my exam. There was hesitation in answering questions about activity, and future desire and goals.

ROS (continued): No other body systems injured or involved in the accident except for the leg. No cancers or tumors, no major illnesses or diseases.
No difficulty with eyes, no glasses, no contacts.
Ears – R earache is very recent, and a few days ago he sought treatment. He is on a medication for his R ear. He says that this is not related to his accident.
Mouth, tongue and throat – no issues or problems.
Head – No brain trauma, no memory changes, no cognitive or thinking difficulty. He relates no change in cognitive skills since his accident.
Neck: No issues or problems.
Upper extremities -- no issues or problems
Trunk, back, and waist – no issues except for weight gain. He says that he has gained weight since the injury. He now estimates that he weights a bit over 200 lbs. Dr Vance's office does not have a full body scale. Mr. Debrum says that his pant size has increased from waist of 36 before accident to a 38 waist now. He did not complain of any back issues.
Sexual Function: He states that he is able to have an erection, and that he can perform sexually. He comments that because of the missing leg, the position is different, and that now the woman now does the work. I tried very hard to not cause embarrassment here, and offered to have the ladies leave the room. He was fine with the questions, and I explained that sometimes after amputation, these things change so I needed to ask him about sexual function and sexual activity. He said he understood, and there were no problems.
Bowel and Bladder –He states that he has no urinary difficulty, and no change in bowel movements. He has occasional diarrhea but no change form before the injury.
Hips no problem or change since his injury.
Knees no problems or change since his injury, except where the old prosthesis (P#2) irritated the skin in the back of the knee. There have been no open areas, no skin breakdown or bleeding in this area, or on the residual limb.

Pain:
I asked him specifically about pain issues. His main complaint was with pain in the residual limb while wearing the old prosthesis (P#2) for long distances. He located the area of pain to the distal tibia area by pointing. He also had pain trying to bend the knee past ninety degrees, and he demonstrated the position he kept his leg in to avoid this pain. He feels much better with the new leg (P#3), does not have the pain at all, and can bend his knee much easier.
       I spent some time differentiating and trying to define the difference between phantom feeling and phantom pain. He has phantom feeling and occasional tingling in the residual limb. He has a few episodic phantom pains, but these do not happen very often and he does not describe these as severe. They last only a brief, momentary time, and disappear quickly. His overall description of pain problems is very minor compared to many amputees. He takes no pain medication for the amputation, although he is just started taking some medication for his

earache. I would rate his problem with amputation related pain, phantom pain and stump pain as much less than the average amputee. He is lucky not to have real trouble with pain issues.

## Physical Exam:

HEENT: normal head, eyes, ears nose and throat appearance. Cranial nerves are all intact and symmetric. I did not do a detailed fundoscopic eye or deep ear exam.

Neck: symmetric ROM and no pain, normal muscle tone.

Upper Extremities: Full ROM of shoulders, elbows, wrists, hands. Normal pulses, no sensory loss, no focal loss of motor function. 5/5 (normal) motor strength.

Back: While standing, his waist and pelvis are level. He demonstrated normal forward bending, extension, side-to-side bending and back rotation. His back muscles are very symmetric and are without abnormalities. His spine is straight. He has normal squatting to just past 90 degrees of knee flexion, and rises back to standing easily. He has normal reflexes, and exam demonstrated negative straight leg raising tests on the right and left sides. He has no evidence of low back pathology.

Lower Extremities:
Hips – full and symmetric ROM
Knees – full and symmetric ROM. Ligaments are stable on the right and the left. No effusion, no crepitance, no evidence of internal knee injury or pathology on the right or left. Old scar on left leg, patellar tendon area. He says this is not from this accident, and it was from an old accident.
Knee reflexes symmetric on the right and left. Popliteal area behind the knees is normal on the right and the left. There are no sign of cysts, scars or problems.

Left leg: normal and symmetric ankle foot and toe range of motion. Motor strength is 5/5 normal right and left. He is able to actively contract all muscles in sequence in the amputated leg when cued with the non-amputated leg. He was taught exercises in Hawaii, but does not currently exercise his amputated leg.

Lower Extremity neurologic exam is normal for an individual with a right below the knee amputation. No numbness, no focal motor weakness, normal reflexes.

Muscle measurements were made in the calves and thighs. Calf measurement made 10 cm below the joint line (which was marked lightly with ink, with his permission). R = 33 cm and L=45 cm. This is very normal for a transtibial amputee who uses a prosthesis.
Thighs: two measurements made on each leg: one 5 cm suprapatellar area, and one 15 cm supra patellar area. R= 47 cm; L= 47 cm; and R=63 cm, L= 62cm. These very symmetric thigh measurements are a good sign that he has no thigh atrophy, good knee strength, and that he has been active using the R and L legs. From this exam, I believe that he has been using a prosthesis on a regular basis. If he not been using a prosthesis on a regular basis, there would be evidence of thigh atrophy on the amputated side. He has no thigh atrophy.

Length Measurements: From proximal tibia (joint line) to sole of foot on the left = 44cm. On the right, from the proximal tibia (joint line) to end of the residual limb including muscle padding = 24 cm, and to the end of the bone = 22cm. He has a good 2 cm muscle pad, which is well above average.

Skin: There are no open sores, no blisters, no red spots, no folliculitis, no abrasion, no adherent areas, and no chronic changes. If the old prosthesis (P#2) had been causing major skin or fit issues – these would still be evident after wearing the new leg for only two days. There is no sign of any harmful effects from the first or second prosthesis. Likewise, he shows no sign of allergic skin reaction, or distal edema to the new elastomeric liner system.

Residual limb is very good and very healthy. Much better than the average below knee amputee. Very good bone contour, shape, muscle padding, and skin. No pain with movement between the tibia and fibula.

He has one area of tingling and occasional pain on the distal lateral aspect of his residual limb. This is the same area that was injected in Hawaii. He did not feel the injection solved the problem. He located the area, and neither he nor I can feel a lump or nodule. I explained to him what a neuroma was and what I was feeling for. While the end of the nerve does cause some tingling and occasional discomfort, there is no evidence of a palpable neuroma. There is no sign of anything that would require surgical revision or exploration.

Stance – level, good hip sway and balance. Squat – to more than 90 degrees of knee flexion, about 100 degrees of knee flexion on R and 120 degrees on left. This is as expected and is normal as the posterior rim of the prosthesis does prevent full knee flexion while wearing the leg. He can do single leg stance on both the right and the left legs. He exhibits good strength and balance.

Gait: Mr. Debrum's gait was observed by having him walk up and down the long hallway by Dr Ray Vance and myself. This gait observation was performed with Mr. Debrum walking in first the new prosthesis (P#3) and then in the old prosthesis (P#2). Mr. Debrum's gait is very symmetric and smooth. He uses no assistive device, no obvious limp, no major deviations, and he has no trandelenberg lurch. In the new prosthesis (P#3) he has a longer stride with the amputated side, which is normally seen with the Flex Feet – because of the longer and stiffer keel. While different, there is no evidence as to whether this is actually better or worse for the individual amputee and ends up being a personal preference. He can turn right and left easily, he can maneuver small barriers well. Mr. Debrum states that while it is difficult, he can go up and down hill, and do stairs. He believes this is improved with the new leg (P#3).

    His gait is well above average. He has the strong potential in my opinion to be even more active in the future, and to increase his endurance. This is not because of the technology of one leg versus the other, but is the normal progression of someone with a below the knee amputation with a good healthy residual limb, good muscles, strength and balance.

## Prosthetic Device Exam:

New Leg (P#3): Endoskeletal construction, total contact style socket, with re-enforced and padded patellar tendon bar. Very little, to no medial and lateral flare regions in this socket. While this style is the fad – there is no evidence that this is better or improves activity over the traditional patellar tendon bearing style socket of P#2. The socket of P#3 is made of black carbon fiber material. This material is very durable, but also very rigid, and can be difficult to modify. The new soft foam cover is not removable and not easy to replace. In my opinion this is not the system of choice for people in outdoor environment, or labor jobs. This cover will not hold up well on a boat or fishing environment. The cover prevented detailed exam of inside components. By feel and description this prosthesis utilizes a split toe flex low profile foot - flex walk style. His suspension is with the new elastomeric alpha style liner. Because of the length of Mr. Debrum's residual limb, he cannot use a standard locking pin system. He needs to use a rope and lanyard system with a screw in plug. This gives him good suspension, but takes considerably more time to don the prosthesis than the old system, and more effort. In direct observation of donning the new and the old legs – 1 minute for old, over 4 minutes for the new.

Old Leg (P#2): By the records, P#2 was made in Hawaii in February or March of 2001. It has exoskeletal construction, with a patellar tendon bearing (PRB) style socket with medial and lateral flair regions. He has a pelite foam liner, and used two socks for adequate fit (a 5 ply and a 3 ply). The prosthesis utilizes a suprapatellar strap suspension, and a Seattle dynamic response foot. He also has a waist belt for added suspension. The pelite liner has had some small modifications in the tibial flare regions. The modifications have, in my opinion not been fully optimized, and he could have had increased padding in the tibial flare regions and posteriorly. Suspension – Mr. Debrum really likes the feel of the new suspension (P#3) much better than this one (P#2). In questioning, he never was offered a neoprene suspension sleeve in attempts to improve the suspension of the old leg (P#2). The billing records confirm that this was indeed a Seattle foot, and light-weight exoskeletal construction with a distal end cushion.

Weight comparison. In hand held test comparing P#3 to P#2 – including the liner and socks – the new prosthesis (P#3) feels heavier than the old leg (P#2). Mr. Debrum did this simple test as well, and agreed that the new leg (P#3) feels heavier to him. Using the small package scale in the office – the old leg (P#2) is just under 5.5 lbs, and the new leg (P#3) is just over 5.5 lbs, almost 6 lbs.

## Consultation with Dr. Ray Vance did occur both before and after my history and physical exam, and during the gait analysis portion of the exam out in the hallway.

Before: Dr. Vance does a number of amputations every year but did not offer an approximate number. He said that amputation surgery is a small but real part of his practice. Most of the amputations that he performs are unfortunately are in elderly patients. He feels his knowledge of prosthetics is reasonable, but not very detailed. He works mostly with a prosthetist in the same medical complex as his Orthopaedic office. Dr Vance knows of Mr. Randy Mason, CP - but does not use his services regularly.

After: Dr. Vance and I discussed high technology versus appropriate technology issues. Dr. Vance was very interested in the technology differences between the two prosthetic legs and I discussed the details of the two legs. He stated that he does see many of the new elastomeric

suspension sleeves used in the San Diego area. He agrees they can sometimes be a problem to don and doff, and tear easily. Dr Vance does agree the soft covers do get stained, and are easily damaged. We discussed, and agreed that the exoskeletal systems can be more durable for many active and outdoor oriented individuals.

　　Gait: While Dr Vance did not participate in the majority of the H&P, he did observe the gait in old and new prosthesis. Dr Vance and I discussed and agreed that Mr. Debrum's gait is very symmetric and smooth. Mr. Debrum uses no assistive device such as crutches or a cane. He has no obvious limp, no major deviations, and no trandelenberg lurch.

**Impressions**

Mr. Debrum is doing very well following this injury and from the below knee amputation. There were no other injuries from this accident. His gait, muscle exam, and condition of his amputation site are all well above average.

Mr. Debrum's pain pattern, phantom feeling, phantom pain, residual limb pain and back pain are much less than for most below the knee amputees.

His residual limb is in very good condition, it is healthy, has no skin issues, and has good muscle and soft tissue padding. He has had a very well performed surgery and the limb is in great shape.

You ask me to comment if the supposed delay in going from P#2 to P#3 caused any harm – and the answer is absolutely no. The delay was appropriate to let the residual limb keep maturing and advance to a more permanent shape. Earlier fitting might well have resulted in the new leg (P#3) not fitting for very long. While P#2 was modified, it is still very functional, and could have been modified further. If Mr. Debrum had been in my clinic, the use of (P#2) would have been extended even further by adding increased tibial flare pads, and a posterior popliteal pad. His lack of good suspension with the patellar strap (still favored by many amputees) was never addressed with either a new strap or a neoprene suspension sleeve. The suspension of the old prosthesis (P#2) could have been improved, and can still be addressed if P#2 is to be converted to a spare leg or back-up device to P#3.

While P#3 is considered by many to be the highest technology – it is not necessarily the most appropriate technology for Mr. Debrum, especially if he desires to return to the Marshall Islands, to an active outdoor lifestyle or to labor type work. My impression during this exam – obtained by his comments and mannerisms - is that he has been convinced that the old leg (P#2) was old, worthless technology, and that the new leg (P#3) is light-years ahead. This is not the case at all. The new leg will not be exceptionally durable, especially with an outdoor lifestyle and outdoor work. The cover will deteriorate, and the socket can be difficult to modify should he gain or loose weight. The elastomeric sleeves he has are less durable than the neoprene suspension sleeve that could have been added to the old leg (P#2). Both styles of prosthetic legs could be made to fit and function quite well for many amputees. Mr. Debrum's ultimate activity level will come from within from his motivation, desires and drive. A high activity could be obtained either with P#2 or with P#3.

You asked me to give my assessment of Mr. Debrum's potential and future activity: I firmly believe that he has the potential to be a very active amputee. He has a great residual limb, very healthy, good muscle and good balance. If motivated, he could walk long distances, run short distances, and lead an active lifestyle. He could do most labor jobs with modest modifications. In my opinion there is good potential that he could return to modified duty on a boat. He needs to be given the motivation, and permission to excel. From everything I see in this history and physical exam, he can do it.

Finally, you asked my opinion about future prosthetic devices. Mr. Debrum has a very healthy and good residual limb. I estimate that he will need a new prosthetic limb on average every 4 years (3 to 5 year lifespan per limb), and the fair value of an appropriate prosthetic limb would be approximately $8500 in today's dollars.

*Douglas G. Smith, MD*

Douglas G. Smith, MD
Associate Professor of Orthopaedic Surgery
University of Washington

# EXHIBIT "H"

# BRUNO, MACK & BARCLAY

A PROFESSIONAL CORPORATION

CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS

## PATRICK F. KENNEDY, PH.D.
Shareholder

**Professional Responsibilities:**

Provides research, consultation and opinions in business and dispute contexts including discovery assistance, causation analysis, damage quantification analysis, and testimony. Engagements also include economic impact reports, budget / program review, and financial analysis for public and private entities.

**Employment Experience:**

Bruno Mack & Barclay - (1996 - present)
International Securities Group, Inc. - Director of Economic Research (1995 - 1996)
Board of Governors of the Federal Reserve System, Washington, D.C. - Economist (1992 - 1995)

**Education and Certifications:**

Stanford University, Doctorate in Economics:

Awarded Stanford University Fellowship, Bradley Foundation Dissertation Fellowship, and Outstanding Teaching Award.

University of California, San Diego, Bachelor of Arts in Economics:

Summa Cum Laude graduate. Recipient of various awards including UC Regents Scholarship, Muir College Valedictorian, Phi Beta Kappa, and the Seymour E. Harris Economics Award.

Recipient of the Federal Reserve Board's Cash Award Merit Program for economic analysis conducted for Vice-Chairman Alan Blinder.

**Membership in Professional Associations:**

American Economic Association
National Association for Business Economics
National Association of Forensic Economics
Registered Securities Representative and Registered Principal (NASD Series 7, 24 and 63 – currently inactive)

**San Diego Office**
402 West Broadway, Ninth Floor, San Diego, California 92101-3542
Phone: 619 687-0001    Fax: 619 687-0002

**Orange County Office**
4 Hutton Centre Drive, Suite 675, Santa Ana, CA 92707
Phone: 714 662-0800    Fax: 714 662-0801

www.bmbconsult.com

## I.     INTRODUCTION

1.     I was retained by counsel for M & F Fishing Company, Inc. and the M/V Koorale to evaluate Mr. de Brum's claimed economic loss associated with his injury aboard the M/V Koorale on August 10, 2000.  The purpose of this report is to disclose my expert opinions regarding Mr. de Brum's economic loss to the parties and the Court in accordance with Federal Court Rule 26(a)(2)(B).  This report summarizes my economic loss opinion at this time, however, I expect to review Plaintiff's damages expert's economic loss report and, if necessary, file a rebuttal economic loss report. I am informed that additional information will become available, including the second volume of Mr. de Brum's deposition testimony. I therefore may make adjustments, where necessary, to the conclusions that follow.

## II.     QUALIFICATIONS AND TESTIMONY

2.     I am an economist and Shareholder with Bruno, Mack and Barclay, a certified public accounting and economic consulting firm providing general accounting, tax and various economic consulting services, including consultations to parties involved in litigation matters. I hold a bachelor's degree in Economics from the University of California, San Diego and a Doctorate in Economics from Stanford University.  Attached as Exhibit "A" is my curriculum vitae which summarizes my educational and professional background.  My rate for analysis and testimony is $240 per hour.

3.     I have provided qualified expert testimony regarding economic loss in Federal Court, the United States Court of Claims, and in San Diego, Orange, Riverside, San Bernardino, Los Angeles, and Alameda County Superior Courts.  Attached at Exhibit "B" is a list of my deposition, arbitration and trial testimony since January 1, 1997.  I have performed numerous

economic loss calculations in commercial and personal loss contexts. Specifically, I have
calculated economic losses in a number of matters involving claims related to maritime personal
injuries, including injuries on tuna boats.

**III.    Documents Reviewed and Relied Upon:**

4.    In connection with my continuing review and analysis I have obtained materials
and information summarized at the attached Exhibit "C".

**IV.    Economic Loss Analysis—Loss of Earnings:**

5.    Based on the information provided to me at this time, I have determined that Mr.
de Brum's past and future economic loss expressed in present cash value is approximately
$88,903 to $104,096. A summary of my analysis is attached at Exhibit "D."

**Earnings basis:**

6.    As a skiffman/assistant skiffman Mr. de Brum was paid $6 per ton of fish
delivered to the cannery less rejects, small fish and contractually provided "boat tons". His "but-
for" earnings from the date of injury to present are best represented by actual crew tons and the
actual rate per ton he would have been paid for trips fished by the M/V Koorale. Mr. de Brum's
expected future earnings but-for his injury were based on $6 per ton paid on 3,750 tons per year
(approximately 4.3 trips per year at 874 paid tons per trip, based on my analysis of catch and
payroll data for the M/V Koorale). At $6 per ton, Mr. de Brum's projected future annual
earnings as a skiffman would be $22,500.

7.    Annual earnings of $22,500 are consistent with a simple average of Mr. de
Brum's past earnings, and the earnings he would have had if he had fished every trip on the M/V

-2-

Koorale since his injury. However, projected annual earnings of $22,500 would overstate Mr. de Brum's expected future earnings if his earnings were based on the past 4 year period during which U.S. tuna seiners in the Western Pacific faced a significant decline in industry conditions.

8.    If tuna prices were to drop to levels observed in 1999 and 2000, the average rate per ton would likely fall and the "boat tons" deduction would rise, lowering Mr. de Brum's projected future earnings. For example, from 1999 through 2001 the skiffman position on the M/V Koorale was paid an average of approximately $16,234 per year. From 1999 through present, had Mr. de Brum fished on every trip, he would have been paid an average of approximately $19,270 per year.

9.    In addition to a loss of earnings, I included a loss of $850 per trip for the food that Mr. de Brum would have been provided while he was at sea. I based the amount of his food benefit on the actual annual galley expenses incurred by the M/V Koorale for the fiscal years ended September 30, 2000, 2001 and 2002. I also included a lost benefit of employer contributions to the Marshall Islands Social Security Administration that would have been made by the M/V Koorale on Mr. de Brum's behalf.

Offset earnings:

10.    Mr. de Brum's projected earnings but-for the injury were reduced by his projected future offset earnings. His future offset earnings were based on the opinions of Ed Workman, Ph.D., the vocational rehabilitation expert retained by the Defendant. I am informed by Dr. Workman that Plaintiff currently claims he will stay in San Diego, California following the resolution of this litigation.

11.    Following vocational rehabilitation for one year at an estimated cost of $12,500, Mr. de Brum is projected to be able to earn approximately $17,680 per year plus benefits as a

bench technician or in bench assembly repair and manufacturing, per Dr. Workman. Over 4 years, his earnings are projected to increase to $24,960 per year plus benefits.

Tax Adjustment:

12.    I reduced Mr. de Brum's but-for earnings by Marshall Islands Social Security Administration taxes. I have relied upon the opinions of Mark Hunsaker, CPA/ABV, CBA, concerning the appropriate tax rates to apply. I have also calculated Mr. de Brum's economic loss assuming that he was responsible for Marshall Islands wage and salary taxes. Mr. de Brum's projected offset earnings in San Diego were reduced for estimated United States Federal, State of California, FICA and Medicare taxes.

Period of loss:

13.    Dr. Workman's opinion is that Mr. de Brum's worklife as a tuna fisherman would likely have ended approximately six years after his injury, at which time he would have pursued alternative employment. I have calculated Mr. de Brum's economic loss through January 2007, a date consistent with Dr. Workman's opinion regarding reduced worklife and the approximate date that Mr. de Brum's after-tax offset earnings would exceed his after-tax earnings but-for the injury, mitigating his economic loss.

14.    If Mr. de Brum is not subject to Marshall Islands wage and salary taxes, his tax-adjusted offset earnings do not exceed his tax-adjusted but-for earnings until approximately 2012. To quantify the effect of the small, continuing loss of earnings and benefits beyond his expected worklife, I extended the loss period until May 2012, when Mr. de Brum turns age 50. The net economic effect of extending the loss until that date is to increase Mr. de Brum's loss by approximately $2,684.

15.    The period of Mr. de Brum's economic loss is determined, in part, by the date at

-4-

1    which his offset earnings exceed his but-for earnings.  However, Dr. Workman's opinion,

2    analysis of the age-profile for tuna fisherman on United States purse seiners in the Western

3    Pacific, and worker age-profile and life expectancy data for the Republic of the Marshall Islands

4    (RMI) support a shorter worklife for Mr. de Brum than the statistical worklife expectancy of an

5    average US worker.

7    Net Discount Rate:

9        16.    I applied a tax-adjusted net discount rate of 4 percent to reduce projected future

10   losses to present cash value.  I arrived at a net discount rate of 4 percent by comparing average

11   yields on intermediate term treasury yields to average historical wage growth, inflation, wage

12   and interest rate data, and importantly, by conducting specific analysis of trends in tuna

13   fisherman earnings and industry trends for U.S. purse seiners.

15   Republic of the Marshall Islands:

17       17.    I am informed that Mr. de Brum originally testified that it was his intention to

18   return to the Republic of the Marshall Islands to live.  It is likely that there is a cost of living

19   difference on items such as food, clothing, rent, utilities, etc. between the RMI and San Diego,

20   California that will need to be addressed if Mr. de Brum returns to the RMI.  I am currently

21   researching these economic differences and am awaiting responses from several sources in the

22   RMI. If necessary, I will supplement my report as the relevant information becomes available.

24       18.    Additional relevant information on the RMI includes workforce and population

25   statistics.  The RMI Census reveals significant differences between the age-profile of the United

26   States workforce age-profile and of the RMI workforce age-profile.  For example, male workers

27   age 50 and over comprise nearly 30% of the male US workforce while only comprising 12% of

28   the male RMI workforce.  Additionally, male workers age 55 and over comprise 18% of the male

-5-

US workforce and only 5.6% of the male RMI workforce. Male workers age 60 and over comprise less than 2% of the male RMI workforce. According to the World Fact Book 202, the average male life expectancy from birth is 64.35 in the RMI, approximately 9.5 years shorter than the average male life expectancy in the United States. It is also relevant that RMI Social Security benefits are available at age 55.

V.    Conclusion:

19.    If Mr. de Brum remains in San Diego his economic loss is between $88,903 and $104,096 with the range determined by whether or not Marshall Islands wage and salary taxes apply.

I declare under penalty of perjury under the law of the United States of America and the Territory of American Samoa that the foregoing is true and correct to the best of my belief and that this report was signed on December 23, 2002 at Oakhurst, California.

BRUNO, MACK & BARCLAY

Patrick F. Kennedy, Ph.D.

EXHIBIT A

# De Brum v. F/V Koorale
## Summary of Economic Loss
### As of January 1, 2003

| | Without Marshall Islands Wage and Salary Tax | | With Marshall Islands Wage and Salary Tax |
| --- | --- | --- | --- |
| | Loss Ends Age 50 | Loss Ends 01/01/07 | |
| **Past** | | | |
| Loss of Earnings and Benefits | $ 47,442 | $ 47,442 | $ 43,363 |
| Less: Offset Earnings and Benefits | N/A | N/A | N/A |
| **Total Past Loss** | 47,442 | 47,442 | 43,363 |
| **Future** | | | |
| Loss of Earnings and Benefits | $ 198,467 | $ 93,948 | $ 85,518 |
| Vocational Rehabilitation Cost | 12,500 | 12,500 | 12,500 |
| Less: Offset Earnings and Benefits | (154,313) | (52,478) | (52,478) |
| **Total Future Loss** | 56,654 | 53,970 | 45,540 |
| **TOTAL POTENTIAL ECONOMIC LOSS** | $ 104,096 | $ 101,412 | $ 88,903 |

# De Brum v. F/V Koorale
## Census Data

### Mel de Brum

|  | Date | Age | Years |
|---|---|---|---|
| Date of Birth | 05/13/62 | | |
| Date of Incident | 08/10/00 | 38.25 | |
| Date of Valuation | 01/01/03 | 40.64 | 2.39 |

|  | To Date | To Age | As of DOV |
|---|---|---|---|
| Statistical Life Expectancy | 12/04/38 | 76.56 | 35.92 |
| Statistical Worklife Expectancy | 04/25/19 | 56.95 | 16.31 |
| Expected Worklife Per Dr. Workman | 08/10/06 | 44.25 | 3.61 |
| Age 50 | 05/13/12 | 50.00 | 9.36 |

### Calculations:

| Age | | 40.00 | 41.00 | 40.64 |
|---|---|---|---|---|
| LE[1] | B2-2 | 36.50 | 35.60 | 35.92 |
| WLE[2] - Richards (Less Than High School) | B3-2 | 16.40 | 15.70 | 15.95 |
| WLE[3] - Millimet (Less Than High School) | B3-4 | 16.589 | 15.880 | 16.14 |
| WLE[4] - Ciecka (Less Than High School) | B3-8 | 17.29 | 16.58 | 16.84 |
| | | | Average WLE: | 16.31 |
| WLE[5] (Less Than High School) | B3-11 | 18.10 | 17.30 | 17.59 |

### Sources:

[1] Vital and Health Statistics from the Center for Disease Control and Prevention / National Center for Health Statistics, United States Life Tables, 1999, Vol. 50, No. 6.

Estimated worklife expectancy with less than high school (Depo 6.21):

[2] Richards, Estimating Worklife Expectancies, By Sex, Race, Hispanic Origin, and Education, 1999.

[3] Millimet, Estimating Worklife Expectancy: An Econometric Approach, By Gender and Education, 2001.

[4] Ciecka, Worklife Expectancy of Active Workers, By Gender, Race, and Education, 1999-00.

[5] U.S. Department of Labor, Bureau of Labor Statistics, Bulletin 2254, February 1986, Worklife Estimates.

**De Bruin v. F/V Koorale**
Schedule 1A: Loss of Earnings and Benefits in the Marshall Islands - No Wage and Salary Tax
DOV: 01/01/03

| Period | Years | Rate per Ton | Tons | Earnings | MISSA/MIHF Taxes | After-Tax Earnings | MISSA Benefits | Food Benefit | Total After-Tax Compensation | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|
| **Past** | | | | | | | | | | |
| 09/17/00 - 11/17/00 | 0.00 - 0.17 | $ 6.00 | 582 | $ 3,492 | 8.5% | $ 3,195 | $ 175 | $ 850 | $ 4,220 | $ 4,220 |
| 02/28/01 - 05/06/01 | 0.00 - 0.18 | 6.00 | 950 | 5,700 | 9.5% | 5,225 | 350 | 850 | 6,425 | 6,425 |
| 05/17/01 - 08/01/01 | 0.00 - 0.21 | 6.00 | 900 | 5,400 | 9.5% | 4,925 | 350 | 850 | 6,125 | 6,125 |
| 10/10/01 - 10/10/01 | 0.00 - 0.00 | 6.00 | 842 | 5,052 | 9.5% | 4,577 | 350 | 850 | 5,777 | 5,777 |
| 11/10/01 - 01/11/02 | 0.00 - 0.17 | 6.00 | 900 | 5,400 | 10.5% | 4,875 | 350 | 850 | 6,075 | 6,075 |
| 01/29/02 - 04/20/02 | 0.00 - 0.22 | 6.00 | 920 | 5,520 | 10.5% | 4,995 | 350 | 850 | 6,195 | 6,195 |
| 06/07/02 - 06/07/02 | 0.00 - 0.00 | 6.00 | 900 | 5,400 | | 5,400 | - | 850 | 6,250 | 6,250 |
| 08/24/02 - 08/24/02 | 0.00 - 0.00 | 6.00 | 950 | 5,700 | 10.5% | 5,175 | 350 | 850 | 6,375 | 6,375 |
| **TOTAL PAST** | | | | | | | | | | $ 47,442 |
| **Future** | | | | | | | | | | |
| 01/01/03 - 08/10/06 | 0.00 - 3.61 | $ 6.00 | 3,750 | $ 22,500 | 10.5% | $ 20,400 | $1,400 | $3,655 | $ 25,455 | $ 85,434 |
| **TOTAL FUTURE - To 6 Years from Date of Incident** | | | | | | | | | | $ 85,434 |
| 08/10/06 - 01/01/07 | 3.61 - 4.00 | $ 6.00 | 3,750 | $ 22,500 | 10.5% | $ 20,400 | $1,400 | $3,655 | $ 25,455 | $ 8,514 |
| **TOTAL FUTURE - To 01/01/07** | | | | | | | | | | $ 93,948 |
| 01/01/07 - 05/13/12 | 4.00 - 9.36 | $ 6.00 | 3,750 | $ 22,500 | 10.5% | $ 20,400 | $1,400 | $3,655 | $ 25,455 | $ 104,519 |
| **TOTAL FUTURE - To Age 50** | | | | | | | | | | $ 198,467 |

Paid tons per year: 3,750  Average trips per year: 4.3  Food benefit per trip: $ 850  Annual $ 25,455  NDR 4.00%

**Notes:**

MISSA employer contribution of 3% of first $3,000 of earnings per quarter in 2000 and 7% of first $5,000 of earnings per quarter in 2001 through 2002 (H29-1 through H29-9) and per Mr. Hunsaker report pg. 2.

Food benefit is equal to $850 per trip, or $3,655 per year with 4.3 trips per year in future periods.

Estimate retirement date from fishing to be 5 to 7 years from the date of injury, or 08/10/06, per Dr. Workman.

# De Br...a v. F/V Koorale
## Schedule II: Future Offset Earnings and Benefits in the United States
DOV:     01/01/03

**Future**

| Period | Years | Annual Earnings | Tax Rate | After-Tax Earnings | Fringe Benefits | Total After-Tax Earnings | Present Value |
|---|---|---|---|---|---|---|---|
| 01/01/03 - 01/01/04 | 0.00 - 1.00 | | | | | | |
| 01/01/04 - 01/01/05 | 1.00 - 2.00 | $ 17,680 | 17.00% | $ 14,674 | $ 2,298 | $ 16,972 | $  16,206 |
| 01/01/05 - 01/01/06 | 2.00 - 3.00 | 19,834 | 18.00% | 16,264 | 2,578 | 18,842 | 17,46 |
| 01/01/06 - 08/10/06 | 3.00 - 3.61 | 22,250 | 19.00% | 18,023 | 2,893 | 20,916 | 11,542 |
| TOTAL FUTURE - To 6 Years from Date of Incident | | | | | | | $  45,209 |
| 08/10/06 - 01/01/07 | 3.61 - 4.00 | $ 22,250 | 19.00% | $ 18,023 | $ 2,893 | $ 20,916 | $  7,269 |
| TOTAL FUTURE - To 01/01/07 | | | | | | | $  52,478 |
| 01/01/07 - 05/13/12 | 4.00 - 9.36 | $ 24,960 | 20.00% | $ 19,968 | $ 3,245 | $ 23,213 | $ 101,835 |
| TOTAL FUTURE - To Age 50 | | | | | | | $ 154,313 |

NDR
3.00%
Annual

Notes:

Eligible to start vocational rehabilitation as of the date of valuation, or 01/01/03, per Dr. Workman.

Total cost for one year of vocational rehabilitation is $10,000 to $15,000 per Dr. Workman. Estimate cost of $12,500.

Estimate Plaintiff returns to work as of 01/01/04 at $8.50 per hour for 2,080 hours per year and increasing to $12.00 per hour for 2,080 hours per year over 4 years as a bench technician or in bench assembly repair and manufacturing per Dr. Workman.

Fringe benefits of medical and FICA per Dr. Workman. Use 13% fringe benefits (B1-2).

**De Bruin v. F/V Koorale**

Schedule III: Determination of Tax Rates

DOV:     01/01/03

*Loss of Earnings*

| Year | Earnings Basis | Wage and Salary Taxes | Wage and Salary Tax Rate | MISSA MIHF |
|------|------|------|------|------|
| 2000 | $ 16,512 | $ 1,565 | 9.48% | 8.50% |
| 2001 | 16,152 | 1,522 | 9.42% | 9.50% |
| 2002 | 22,020 | 2,226 | 10.11% | 10.50% |
| Future | 22,500 | 2,284 | 10.15% | 10.50% |

*Offset Earnings*

| Year | Earnings Basis | Federal Taxes | Federal Tax Rate | State Taxes | State Tax Rate | FICA Medicare | Total Tax Rate | USE |
|------|------|------|------|------|------|------|------|------|
| 2004 | 17,680 | $ 1,534 | 8.68% | $ 179 | 1.01% | 7.65% | 17.34% | 17.00% |
| 2005 | 19,834 | 1,856 | 9.36% | 267 | 1.35% | 7.65% | 18.35% | 18.00% |
| 2006 | 22,250 | 2,224 | 10.00% | 363 | 1.63% | 7.65% | 19.28% | 19.00% |
| 2007 | 24,960 | 2,629 | 10.53% | 481 | 1.93% | 7.65% | 20.11% | 20.00% |

# De Brum v. F/V Koorale
## Analysis of Tons Paid

| | Year | Trip | Tons Paid |
|---|---|---|---|
| | 1995 | 1 | |
| | 1995 | 2 | |
| | 1995 | 3 | |
| E3 | 1996 | 1 | 950 |
| E4-1, E4-4 | 1996 | 2 | 960 |
| E5-1, E5-2 | 1996 | 3 | 1000 |
| E6-1, E6-2 | 1996 | 4 | 1000 |
| E7-1, E7-2 | 1996 | 5 | 500 |
| E8-1, E8-2 | 1997 | 1 | 950 |
| E9 | 1997 | 2 | 1000 |
| E10-1, E10-2 | 1997 | 3 | 1000 |
| E11-1, E11-2, E11-3 | 1997 | 4 | 508 |
| E30-26, E30-27 | 1998 | 1 | 970 |
| E12-1, E12-2 | 1998 | 2 | 950 |
| E13-1, E13-2, E13-3 | 1998 | 3 | 1097 |
| E14-1, E14-2, E14-3 | 1998 | 4 | 1062.46 |
| E15 | 1998 | 5 | 1000 |
| E16-1, E16-2, E16-3 | 1998 | 6 | 775 |
| E17 | 1998 | 7 | 700 |
| E18-1, E18-2, E18-3 | 1999 | 1 | 918 |
| E19 | 1999 | 2 | 875 |
| E20-1 - E20-4 | 1999 | 3 | 880 |
| E21-1, E21-2 | 2000 | 1 | 800 |
| E22 | 2000 | 2 | 610 |
| E23-1, E23-2 | 2000 | 3 | 760 |
| E24 | 2000 | 4 | 581.8 |
| E25-1, E25-2 | 2001 | 1 | 950 |
| E26, E30-1 | 2001 | 2 | 900 |
| E27-1, E27-2, E30-5 | 2001 | 3 | 842 |
| E30-1 | 2002 | 1 | 900 |
| E28, E30-1, E30-13 | 2002 | 2 | 920 |
| E30-1, E30-14 | 2002 | 3 | 900 |
| E30-1, E30-15 | 2002 | 4 | 950 |

| 1995 - 08/02 | | 33 | Number of Trips |
|---|---|---|---|
| | | 4.3 | Average per Year (7.67 Years) |

| 1996 - 08/02 | 1999 - 08/02 | |
|---|---|---|
| 26,209 | 11,787 | Tons Paid |
| 3,929 | 3,212 | Average Tons Paid / Year (6.67 years) |
| 874 | 842 | Average per Trip |
| 4.3 | 4.3 | Projected Trips per Year |
| 874 | 842 | Projected Tons Paid per Trip |
| 3,758 | 3,621 | Projected Tons Paid per Year |

USE:   3,750

# SUPPLEMENTAL DAMAGES REPORT OF PATRICK F. KENNEDY

### I.     Introduction:

1.     I was retained by counsel for M & F Fishing Company, Inc. and the F/V Koorale to evaluate Mr. de Brum's claimed economic loss associated with his injury aboard the F/V Koorale on August 10, 2000. This report supplements my opinions set forth in my December 23, 2002 and January 23, 2003 damages reports. This report incorporates the disclosures set forth in my December 23, 2002 report.  If additional relevant information becomes available I may make adjustments, where necessary, to the conclusions that follow.

### II.     Documents Reviewed and Relied Upon:

2.     Since the filing of my previous damages reports, Mark Hunsaker provided me with additional information concerning the appropriate tax adjustment that should be applied to Mr. de Brum's projected but-for earnings.  Attached at Exhibit "A" is a summary of Mr. Hunsaker's findings concerning that issue.

### III.     Economic Loss Analysis—Loss of Earnings:

3.     Attached at Exhibit "B" is my analysis of Mr. de Brum's economic loss assuming that he would have continued to work as a tuna fisherman in American Samoa and would have been taxed as an American Samoan resident, even though he was a citizen of the Republic of the Marshall Islands (the "RMI"). I have relied upon Mark Hunsaker as the basis for this assumption. If Mr. de Brum remains in San Diego following the conclusion of this litigation his projected economic loss is $82,962. In this alternative Mr. de Brum's tax-adjusted offset earnings and benefits are projected to exceed his tax-adjusted but-for earnings and benefits by

1    approximately January 2007. His projected loss of earnings therefore ends at that time.

2

3       4.     Assuming, in the alternative, that Mr. de Brum will return to the RMI following

4    the conclusion of this litigation, his economic loss is between $110,543 and $221,915. The

5    range of loss is determined by his expected retirement as a tuna fisherman.

6

7       I declare under penalty of perjury under the law of the United States of America and the

8    Territory of American Samoa that the foregoing is true and correct to the best of my belief and

9    that this report was signed on February 7, 2003 at San Diego, California.

10

11    MACK | BARCLAY, Inc.

12

13

14    Patrick F. Kennedy, Ph.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# De Brum v. F/V Koorale
## Summary of Economic Loss - Returns to Work in the Marshall Islands
As of January 1, 2003

| Loss Ends: | | Age 55 | | Age 50 | | Expected Retirement per Dr. Workman (Age 44.25) |
|---|---|---|---|---|---|---|
| **Past** | | | | | | |
| Loss of Earnings and Benefits | $ | 41,357 | $ | 41,357 | $ | 41,357 |
| Less: Offset Earnings and Benefits | | N/A | | N/A | | N/A |
| **Total Past Loss** | | 41,357 | | 41,357 | | 41,357 |
| **Future** | | | | | | |
| Loss of Earnings and Benefits | $ | 241,175 | $ | 172,346 | $ | 74,190 |
| Vocational Rehabilitation Cost | | 12,500 | | 12,500 | | 12,500 |
| Less: Offset Earnings and Benefits | | (73,117) | | (50,194) | | (17,504) |
| **Total Future Loss** | | 180,558 | | 134,652 | | 69,186 |
| **TOTAL POTENTIAL ECONOMIC LOSS** | $ | 221,915 | $ | 176,009 | $ | 110,543 |

# De Brum v. F/V Koorale
## Summary of Economic Loss - Returns to Work in San Diego
### As of January 1, 2003

|                                      | Loss Ends: | 01/01/07 |
|--------------------------------------|------------|----------|
| **Past**                             |            |          |
| Loss of Earnings and Benefits        | $          | 41,357   |
| Less: Offset Earnings and Benefits   |            | N/A      |
| **Total Past Loss**                  |            | 41,357   |
| **Future**                           |            |          |
| Loss of Earnings and Benefits        | $          | 81,583   |
| Vocational Rehabilitation Cost       |            | 12,500   |
| Less: Offset Earnings and Benefits   |            | (52,478) |
| **Total Future Loss**                |            | 41,605   |
| **TOTAL POTENTIAL ECONOMIC LOSS**    | $          | 82,962   |

# De Brum v. F/V Koorale

Schedule I: Loss of Earnings and Benefits Adjusted for American Samoan and United States Social Security Taxes

DOV:  01/01/03

| Period | Years | Rate per Ton | Tons | Earnings | Taxes | After-Tax Earnings | Food Benefit | Total After-Tax Compensation | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| **Past** | | | | | | | | | |
| 09/17/00 - 11/17/00 | 0.00 - 0.17 | $ 6.00 | 582 | $ 3,492 | 16.0% | $ 2,933 | $ 850 | $ 3,783 | $ 3,783 |
| 02/28/01 - 05/06/01 | 0.00 - 0.18 | 6.00 | 950 | 5,700 | 16.0% | 4,788 | 850 | 5,638 | 5,638 |
| 05/17/01 - 08/01/01 | 0.00 - 0.21 | 6.00 | 900 | 5,400 | 16.0% | 4,536 | 850 | 5,386 | 5,386 |
| 08/08/01 - 10/10/01 | 0.00 - 0.17 | 6.00 | 842 | 5,052 | 16.0% | 4,244 | 850 | 5,094 | 5,094 |
| 11/10/01 - 01/11/02 | 0.00 - 0.17 | 6.00 | 900 | 5,400 | 18.0% | 4,428 | 850 | 5,278 | 5,278 |
| 01/29/02 - 04/20/02 | 0.00 - 0.22 | 6.00 | 920 | 5,520 | 18.0% | 4,526 | 850 | 5,376 | 5,376 |
| 06/07/02 - 06/27/02 | 0.00 - 0.05 | 6.00 | 900 | 5,400 | 18.0% | 4,428 | 850 | 5,278 | 5,278 |
| 07/11/02 - 08/24/02 | 0.00 - 0.12 | 6.00 | 950 | 5,700 | 18.0% | 4,674 | 850 | 5,524 | 5,524 |
| **TOTAL PAST** | | | | | | | | | **$ 41,357** |
| **Future** | | | | | | | | | |
| 01/01/03 - 08/10/06 | 0.00 - 3.61 | $ 6.00 | 3,750 | $ 22,500 | 18.0% | $ 18,450 | $3,655 | $ 22,105 | $ 74,190 |
| TOTAL FUTURE - To 6 Years from Date of Incident | | | | | | | | | $ 74,190 |
| 08/10/06 - 01/01/07 | 3.61 - 4.00 | $ 6.00 | 3,750 | $ 22,500 | 18.0% | $ 18,450 | $3,655 | $ 22,105 | $ 7,393 |
| TOTAL FUTURE - To 01/01/07 | | | | | | | | | $ 81,583 |
| 01/01/07 - 05/13/12 | 4.00 - 9.36 | $ 6.00 | 3,750 | $ 22,500 | 18.0% | $ 18,450 | $3,655 | $ 22,105 | $ 90,763 |
| TOTAL FUTURE - To Age 50 | | | | | | | | | $ 172,346 |
| 05/13/12 - 05/13/17 | 9.36 - 14.36 | $ 6.00 | 3,750 | $ 22,500 | 18.0% | $ 18,450 | $3,655 | $ 22,105 | $ 68,829 |
| TOTAL FUTURE - To Age 55 | | | | | | | | | $ 241,175 |

Paid tons per year:  3,750    Average trips per year:  4.3    $ 850    Annual    NDR 4.00%

Notes:

MISSA employer contribution of 5% of first $5,000 of earnings per quarter in 2000 and 7% of first $5,000 of earnings per quarter in 2001 through 2002 (E29-1 through E29-9) and per Mr. Hunsaker report pg. 2.

Food benefit is equal to $850 per trip, or $3,655 per year with 4.3 trips per year in future periods.

Estimate retirement date from fishing to be 5 to 7 years from the date of injury, or 08/10/06, per Dr. Workman.

**De Brum v. F/V Koorale**

Schedule II: Future Offset Earnings and Benefits in the Marshall Islands – With Wage and Salary Tax

DOV:    01/01/03

| Period | Years | Earnings | Wage and Salary Taxes | MISSA/ MIHF Taxes | After-Tax Earnings | MISSA Benefits | Total After-Tax Compensation | Present Value |
|---|---|---|---|---|---|---|---|---|
| **Future** | | | | | | | | |
| 01/01/03 - 01/01/04 | 0.00 - 1.00 | | | | | | | |
| 01/01/04 - 08/10/06 | 1.00 - 3.61 | $ 8,320 | 8.00% | 10.50% | $ 6,780 | $ 582 | $ 7,362 | $ 17,504 |
| **TOTAL FUTURE - To 6 Years from Date of Incident** | | | | | | | | $ 17,504 |
| 08/10/06 - 01/01/07 | 3.61 - 4.00 | $ 8,320 | 8.00% | 10.50% | $ 6,780 | $ 582 | $ 7,362 | $ 2,462 |
| **TOTAL FUTURE - To 01/01/07** | | | | | | | | $ 19,966 |
| 01/01/07 - 05/13/12 | 4.00 - 9.36 | $ 8,320 | 8.00% | 10.50% | $ 6,780 | $ 582 | $ 7,362 | $ 30,228 |
| **TOTAL FUTURE - To Age 50** | | | | | | | | $ 50,194 |
| 05/13/12 - 05/13/17 | 9.36 - 14.36 | $ 8,320 | 8.00% | 10.50% | $ 6,780 | $ 582 | $ 7,362 | $ 22,923 |
| **TOTAL FUTURE - To Age 55** | | | | | | | | $ 73,117 |

Notes:

Eligible to start vocational rehabilitation as of the date of valuation, or 01/01/03, per Dr. Workman.

Total cost for one year of vocational rehabilitation is $10,000 to $15,000 per Dr. Workman. Estimate cost of $12,500 (Workman 12/18/02 p. 10).

Estimate earnings of $4.00 per hour for 2,080 hours per year, or $8,320 per year, after vocational rehabilitation, or 01/01/04,
per Dr. Workman (Workman 12/18/02 p. 9 and 01/20/03 p. 3)

Wage and salary tax is equal to 8% of the first $10,400 of annual earnings and 12% thereafter (Hunsaker report p. 2).

MISSA employer contribution of 7% of first $5,000 of earnings per quarter (Hunsaker report p. 2).

|  | NDR |
|---|---|
| Annual | 4.00% |

De Bruun v. F/V Koorale
Schedule III:  Future Offset Earnings and Benefits in the United States
DOV:      01/01/03

| Period | Years | Annual Earnings | Tax Rate | After-Tax Earnings | Fringe Benefits | Total After-Tax Earnings | Present Value |
|---|---|---|---|---|---|---|---|
| **Future** | | | | | | | |
| 01/01/03 - 01/01/04 | 0.00 - 1.00 | | | | | | |
| 01/01/04 - 01/01/05 | 1.00 - 2.00 | $ 17,680 | 17.00% | $ 14,674 | $ 2,298 | $ 16,972 | $ 16,206 |
| 01/01/05 - 01/01/06 | 2.00 - 3.00 | 19,834 | 18.00% | 16,264 | 2,578 | 18,842 | 17,461 |
| 01/01/06 - 08/10/06 | 3.00 - 3.61 | 22,250 | 19.00% | 18,023 | 2,893 | 20,916 | 11,542 |
| **TOTAL FUTURE - To 6 Years from Date of Incident** | | | | | | | $ 45,209 |
| 08/10/06 - 01/01/07 | 3.61 - 4.00 | $ 22,250 | 19.00% | $ 18,023 | $ 2,893 | $ 20,916 | $ 7,269 |
| **TOTAL FUTURE - To 01/01/07** | | | | | | | $ 52,478 |

Notes:

Eligible to start vocational rehabilitation as of the date of valuation, or 01/01/03, per Dr. Workman.
Total cost for one year of vocational rehabilitation is $10,000 to $15,000 per Dr. Workman. Estimate cost of $12,500.
Estimate Plaintiff returns to work as of 01/01/04 at $8.50 per hour for 2,080 hours per year and increasing to $12.00 per hour
for 2,080 hours per year over 4 years as a bench technician or in beach assembly repair and manufacturing per Dr. Workman.
Fringe benefits of medical and FICA per Dr. Workman. Use 13% fringe benefits (B1-2).

Annual

NDR
3.00%

# De Brum v. F/V Koorale

Schedule IV: Determination of Tax Rates – Loss of Earnings

DOV:    01/01/03

*Loss of Earnings*

| Year | Earnings Basis | American Samoa Taxes | Tax Rate | FICA and Medicare Tax Rate | Total Tax Rate | Use |
|------|------|------|------|------|------|------|
| 2000 | $ 16,512 | $ 1,399 | 8.47% | 7.45% | 15.92% | 16.00% |
| 2001 | 16,152 | 1,346 | 8.33% | 7.45% | 15.78% | 16.00% |
| 2002 | 22,020 | 2,224 | 10.10% | 7.45% | 17.55% | 18.00% |
| Future | 22,500 | 2,299 | 10.22% | 7.45% | 17.67% | 18.00% |

# EXHIBIT "I"

☐ 1044 Calle Recodo, Suite B
San Clemente, CA 92673
(949) 492-6260
(800) 648-4189
Fax (949) 492-9563

☐ 970 West 17th Street, Suite A
Santa Ana, CA 92706
(714) 550-1271
(800) 649-3860
Fax (714) 835-5571



Web site: www.workmanmolina.com
E-mail: van@workmanmolina.com

## VOCATIONAL REHABILITATION EVALUATION
### December 18, 2002

**CLIENT:** Mel DeBrum

**DATE OF INJURY:** 8/10/00

**CASE NAME:** DeBrum v. M&F Fishing Co., Inc.

**CASE NUMBER:** 10638

**EVALUATION OBJECTIVES:** The following evaluation is to address Mr. DeBrum's pre and post 8/10/00 vocational futures.

**SOURCE OF INFORMATION:** Documents from the following sources were reviewed in connection with the Vocational Rehabilitation Evaluation that follows: DeBrum, Mel (Deposition, 5/24/02); Harborside Seiner Service; Honolulu Orthopedic Supply; Interrogatories and Responses; Documents; Marumoto, Jay, M.D., Orthopedic Surgery; Mason, Randy, Certified Prosthetist/Johnson's Orthopedic; Queen's Medical Center; Richely, Richard, M.D., Orthopedic Surgery; Smith, Douglas, M.D., Orthopaedic Surgery.

In addition to the above, an interview was held with Mr. DeBrum in the offices of Workman Molina in San Clemente, California on December 17, 2002, from approximately 10:37 a.m. to 11:40 a.m. Present during the interview was a representative of Mr. DeBrum's attorney's office, Zeca Rodrigues, and a Marshallese-English interpreter Rick Graham. There was a court reporter at the interview. No other recording were made. Ms. Rodrigues made several corrections during the interview that resulted in what apparently is the current position of Mr. DeBrum and the interpretation was felt to be correct.

**BACKGROUND INFORMATION:** Mr. DeBrum was a 38 year old commercial tuna fisherman from Micronesia, who suffered a work-related crush injury to his right foot on August 10, 2000.

Medical records indicate that on DOI, Mr. DeBrum was working aboard the fishing vessel Koorale. He was transferring from a skiff to the Koorale when his foot was crushed

1

between the fishing boat and a skiff boat. He suffered a severe crush injury to the foot with a large open wound. He was 2 days at sea, then taken to Kiribut, then to Micronesia, then flown to Honolulu and transported to Queen's Medical Center on 8/12/00. On 8/12/00, he underwent surgery by Dr. Marumoto for a right below-the-knee amputation. He was discharged on 8/22/00.

He continued follow-up care with Dr. Marumoto and obtained a prosthesis. Per most recent exam on 8/7/01, Mr. DeBrum had just returned from spending 3 months in the Marshall Islands. Per exam, his prosthesis was fitting well and he ambulated with a smooth gait. His condition had stabilized and he needed no further active treatment. His work status was permanent disability.

In 8/01, Mr. DeBrum came to San Diego. On 9/14/01, he was seen by Dr. Richely, Orthopedic Surgery, who recommended a new prosthesis. He was seen by Randy Mason, Certified Prosthetist/Johnson's Orthopedic, who also recommended a new prosthesis.

Mr. DeBrum reports he has not worked since DOI.

## REHABILITATION FACTORS

**AGE:** 40    [38]          **DATE OF BIRTH:** 5/13/62 Marshall Islands
                             His citizenship is the Marshall Islands.

**RESIDENCE:**  3235 32nd Street, San Diego, CA.  Since 8/01, Mr. DeBrum states he has been sharing this two bedroom apartment with 3 or more individuals who also have injuries.

Mr. DeBrum reports at DOI, he was living aboard the fishing vessel KOORALE and had been since 1989, with one year away in 1991. While in port, and since 1996, he would at times reside in Pago Pago, American Samoa between voyages, where he shared a one bedroom flat with his fiancee Feiloica Niupili (aka Ina). As a result of his injuries on DOI, he was transported to Honolulu, Hawaii where he lived at Mana Mana Apartments from 8/00 - 8/01; his rent was paid by the insurance company and he was given $20 per day for food and other essentials. He stayed for a short period in Majuro, Marshall Islands during his recovery. He then moved to San Diego, California.

**FAMILY:**  Mr. DeBrum  born on Ebeye Island, Marshall Islands, and grew up there. He got married in 1984 and had 5 children. He was divorced in 1991 and his children lived with their mother in Guam. Last year, his 2 youngest children came to live with him in the Marshall Islands. After he came to live in the United States in 8/01, his 2 children went to live with his sister in Majuro. Mr. DeBrum has a girlfriend that lives in Western Samoa;

2

since 1996, after he was working he would go and stay with her.   She was working as a waitress.

**INCOME:** Mr. DeBrum reports he has not been paid Maintenance since 5/2/01. Mr. DeBrum has requested that Maintenance be paid at the rate of $55 per day. Currently, his attorney's are paying for his rent and taking care of his food, they also apparently give his $600 per month.

**TRANSPORTATION:** Mr. DeBrum indicates that on the date of his December 17, 2002 interview, he was driven to the interview by a designated driver.  He states currently he does not have a driver's license.  He did report that prior to his accident of August 10, 2000 he had a driver's license and that he drove before the accident.  He relates that he drove in any location he was at including the Marshall Islands and American Samoa.  He states he did not own a car.

Mr. DeBrum states that currently he is transported by a designated driver to his medical and legal appointments, that he occasionally rides the bus, but does not ride the trolley, however.

**EDUCATION:**   Mr. DeBrum's educational records indicate that between 1967 and 1975 he attended Ebeye Elementary School, Ebeye, Kwajland, Marshall Islands; in 1976 he attended Marshall Islands High School, Majuro, Marshall Islands and dropped out of that program after completing his Freshman year.  He relates that his education to that point was both in Marshallese and English.  He states that approximately half of his courses were in Marshallese and half in English.   He reports that he was out of school for approximately one year and then returned to the Seventh Day Adventist High School and completed his education through the 12th grade.  He states he did not secure a diploma but did secure a certificate of completion.  He relates that in the Seventh Day Adventist School all of his classes were in English.  None were in Marshallese.

Per his deposition, an English-Marshallese interpreter is present.  However, none of his medical records list an English-Marshallese interpreter present, and per his 8/12/00 Admission Screening Record at Queen's Medical Center (Honolulu, HI) Mr.  DeBrum appears to list that he understands and can read English and does not list another language preference.

At the time of the December 17, 2002 interview, Mr. DeBrum insisted upon using a English-Marshallese interpreter for all communications.

**VOCATIONAL REHABILITATION:** Mr. DeBrum states that he has seen a vocational rehabilitation counselor apparently for medical/legal purposes.  When asked if he had thought of some type of work that he would like to do with his leg the way it currently is, he

3

stated he is aware there is probably some kind of work that he can do, but that he has not thought of what it is at this date.

## WORK HISTORY:

| | |
|---|---|
| 1989 - 8/10/00 | **Deckhand (tuna fishing boat).** Harborside Seiner Service. F/V KOORALE (tuna boat). Mr. DeBrum estimates he made 50 trips during a 10 year period. At the 12/17/02 Vocational Rehabilitation Interview, Mr. DeBrum relates that he could not remember how many trips he had taken in the eight moths prior to his accident of August 10, 2000. Mr. DeBrum states that he was a general Deckhand doing whatever was required of him aboard the ship. He reports that he had no specialties as a tuna fisherman. |

Per Statement of Earnings aboard the KOORALE, pay rate was $6 per ton. Appears to have the following earnings:

|      |          |                   |
|------|----------|-------------------|
| 2000 | $13,020  | (through 8/24/00) |
| 1999 | $16,038  |                   |
| 1998 | $33,507  |                   |
| 1997 | $20,748  |                   |
| 1996 | $26,460  |                   |

| | |
|---|---|
| 1988 | Mr. DeBrum reports he did not work for something less than a year during this period of time. |
| 1987 - 1988 | A.U. Fishing Company (Marshall Islands). He states that he worked for this company a second time for approximately one year, building small fiberglass boats. Pay rate was $3.50 per hour. He then quit work again. |
| 1987 | Mr. DeBrum reports he did not work for three to four months during this timeframe. |
| 1986 - 1987 | A.U. Fishing Company. They were making fiberglass, building boats. His job was building boats, he would cut wood and measure parts they needed for the boats and put fiberglass on the boats. He worked there for three to four years. His pay was $3.50 per hour. He worked 40 hours per week. He quit that job because he got tired of working with boats. |
| 1987 | **Carpenter.** CIP. The company was building the Majuro, Marshall Island Hospital. He did all kinds of work such as plumbing, building the walls. He worked there two plus years. He was paid $1.50 per |

4

hour, and worked 40 hours per week. He left when the hospital was finished and the contract was over.

Prior to 1987          No employment. He was supported by his parents.


## MEDICAL:

### Hospitalizations:

**Queen's Medical Center (Honolulu, HI).** Admitted 8/12/00; discharged 8/22/00.
1.  History.
    a.  38 year old commercial fisherman from Micronesia. He injured his right foot 2 days ago when his foot got crushed between the fishing boat and a skiff boat which was bringing nets in. He suffered a severe crush injury to the foot with a large open wound. He was taken to a nearby island in Micronesia and then flown to Honolulu and transported to Queen's Medical Center on 8/12/00. Mr. DeBrum also reports he feels weak and has some left elbow pain.
    b.  No past medical history. No current medications.
2.  8/12/00 consultation by Dr. Choi. Upon admission, he had a very large open wound extending from the dorsum of the ankle across to the forefoot medially beyond the medial malleolus proximally and all the way around the heel. The dorsalis pedis artery is visible in the wound. The posterior tibial artery was disrupted. The foot is entirely insensate. There is a large amount of exposed bone. There is a very large and comminuted calcaneus fracture. Impression: severe open fracture with open wound of the right hindfoot and neurovascular disruption. It appears the foot is not viable. The skeletal injury would not be reconstructible. Also, the bottom of the foot in insensate. The fractures have been open for 48 hours and the foot0 is dysvascular. Recommends a below-the-knee amputation.
3.  8/12/00 surgery by Dr. Marumoto: right below knee amputation.
4.  8/19/00 Rehabilitation Services Discharge Summary. Discharge status:
    a.  Independent: grooming; feeding; upper extremity dressing; bed mobility; supine - sit; sitting balance.
    b.  Modified Independent: lower extremity dressing; toilet transfer; bath transfer; car transfer; sit - stand; standing balance; gait - flat surface.
    c.  Using crutches.

5

## Physician's Statements:

**Marumoto, Jay, M.D., Orthopedic Surgery.** 8/7/01. Mr. DeBrum spent 3 months in the Marshall Islands and reports his condition has remained static. He has occasional pain in his stump and uses Oxycodone on an occasional basis. Per exam, his prosthesis is fitting well and he ambulates with a smooth gait. His condition has stabilized. He needs no further active treatment at this time other than adhering to his home exercise program. He needs to control his weight. His prosthesis will need a replacement on a periodic basis depending on his use and abuse, anticipates it will last him 3-5 years and possibly up to 10 years. He can seen Dr. Marumoto on an as needed basis. His work status was permanent disability.

**Richley, Richard, M.D., Orthopedic Surgery.** 9/14/01. Evaluation of right leg amputation. Per exam, Mr. DeBrum ambulated with an antalgic limp gait with his heavy prosthesis. Right amputated leg has a 12" stump. He has mild nerve tenderness without evidence of neuroma. Skin is intact. X-rays of right leg show a BK amputation with amputation bone endings stable. X-rays of low back were normal. Dr. Richley states Mr. DeBrum is post-op BK amputation and the surgical procedure was adequate for his BK amputation. He has a very long, 12 inch stump. However, Dr. Richley thinks the prosthesis is inadequate and could be modified to accommodate his lifestyle and activities. He is not permanent and stationary. He was also seen by Randy Mason, certified prosthetist at Johnson Orthopedics. In Dr. Richley's and Mr. Mason's opinions, a functional prosthesis could be manufactured, which would be much lighter, more functional, and avoid further complications of gait deformities and back pain and allow him a better lifestyle.

**Smith, Douglas, M.D., Orthopaedic Surgery.** 8/11/02 report. Review of records.
1. Recommends to proceed with authorization of prosthetic fitting.
2. Believes that the Medicare rate has become the national standard. Recommends they negotiate the fee with the Prosthetist, and feels that Medicare plus 10% is fair.
3. The elastomeric liners can provided a more secure suspension.
4. Optimally, Mr. DeBrum would be given a trial of different feet. If he chooses the split toe Veri-Flex foot, it would be reasonable.
5. Recommends getting a statement from Mr. DeBrum, also signed by the prosthetist, that Mr. DeBrum has been educated on the options and choices and that he has chosen what is to be fabricated.
6. Recommends that the new prosthesis addresses the distal tibial contact and pain with more than just a "jelly" elastomeric liner.

6

**Most Recent Medical Report:** Smith, Douglas, M.D., Orthopaedic Surgery. 8/11/02 report. Review of records.

**Subjective Medical Reports:** Mr. DeBrum at the time of the December 17, 2002 interview indicates that his major medical difficulty centers around his amputated right leg. He relates that the stump is sore at times particularly with substantial walking. He states he is having no problems with any open wounds or blisters in the stump area at this time. He further reports that he wears his prosthesis all the time when he's out of the house and that he's capable of wearing it for all day. He states that when he's at home he often does not wear the prosthesis and uses crutches to get around instead.

In addition to the above, Mr. DeBrum reports that he is currently in the process of securing a new lighter weight prosthesis and states the prosthesis is being fitted now and he expects to be able to wear it on a full-time basis in the very near future.

Mr. DeBrum also reports that he is getting no physical therapy at this time and he's not taking any medications at this time.

Mr. DeBrum relates that he's independent in all activities of daily living, that he is capable of walking approximately three blocks without increasing the pain in his stump substantially.

He was noted to walk with a limp on the right, classified with this evaluator as something more than mild; to be able to sit and stand, particularly to use the arms of the chairs in doing so. Did not appear to walk in a guarded manner and appeared to be relatively comfortable with his use of the prosthetic device.

**Equipment:** Per records of Randy Mason, Certified Prosthetist/Johnson's Orthopedic. Per 8/23/01, Mr. DeBrum's current prosthesis is an Exoskeleton PTB with a supra patellar cuff, waist belt, S.A.C.H. foot and pelite liner. Mr. Mason recommends to fit him with an Endoskeletal, ultra lite PTB prosthesis with flex foot and silicone suction locking liners (2). This is followed by a prescription by Dr. Richley for: Right Endoskeletal Transtibial Prosthesis, ultra lite construction, silicone suction locking liners, split toe flex foot, test socket fitting. 8/31/01 price quote: $12,845.70. Per 2/1/02 exam, Mr. DeBrum's current prosthesis is an exoskeletal PTB, with a Pelite liner and Kinglsey SACH Foot; suspension is provided by a supra patellar cuff with an ancillary waist belt.

**SOCIAL:** Mr. DeBrum states at this time he watches a lot of TV, gets out occasionally and occasionally visits with friends that he has in the San Diego area. He reports no family members in this area.

7

**APPEARANCE:** Mr. DeBrum was seen in the offices of Workman Molina on December 17, 2002. He was noted to be wearing short pants, the prosthetic on his right leg being obvious. He was noted to walk with a limp on the right, sit and stand adequately, but to use the arms of the chair when arising. He sat for something over an hour with no apparent difficulties. He was noted to walk in a general non-guarded manner and appeared to be somewhat comfortable with his use of the prosthetic device. He was not using any other assistive device when seen.

The interpreter was used throughout the interview with Mr. DeBrum volunteering little or no use of English. His answers appeared to be generally appropriate with the questions asked. He was judged to be something approaching normal IQ with his stated educational background, with the exception of his language usage.

He was cooperative throughout the interviewing process.

It should be noted that when Mr. DeBrum was asked through the interpreter what the date of his accident was (the first question asked of him), there was an extensive exchange between he and the interpreter. The interpreter finally responding that Mr. DeBrum had indicated I should ask his attorney. After his attorney representative related to Mr. DeBrum in English only that it was okay to answer questions, he then reported the date of his accident and answered all other questions.

**FUTURE PLANS:** When asked what he was planning on doing when his litigation and medical treatment in San Diego were over, he stated he would first return to the Marshall Islands, possibly for several months to visit with family and friends. Second, he would probably return to Western Samoa and get married to his current fiancé , and three, that he would return to the San Diego area for follow-up medical care. He explained the medical facilities in the Marshall Islands are not readily available or as skilled as he has found them here in San Diego.

## CONCLUSIONS

At the time of the August 10, 2000 accident Mr. DeBrum was 38 years old and working as a deckhand on a tuna fishing boat with the home port of American Samoa. There is nothing in the records to indicate that he had any plans to change his occupation in the near future. Based on this information it was most likely, without the accident of August 10, 2000, Mr. DeBrum would have continued to work as a tuna fisherman with earnings reflective of his past earnings. I will defer to an economist to calculate such earnings and project those into the future. Mr. DeBrum's worklife expectancy was likely to be influenced dramatically by the type of work he was doing. The job of deckhand in tuna fishing is a tremendously, physically demanding occupation and, in the majority of cases, there is also a substantially shortened worklife expectancy in that kind of work. This is based on the

8

physical demands of the work on the body over time and the aging process. Based on work done by the accounting firm of Arnold and Arnold showing a worklife expectancy for tuna fisherman of 39.25 years, and my own experience in working with a rather substantial number of tuna fishermen over the years, combined with Mr. DeBrum's apparent lack of pre-injury medical difficulties, it would be anticipated that he had a life expectancy as a seaman on tuna boats of between 5 and 7 years assuming no accident of August 10, 2002. Certainly, being a deckhand on a tuna boat is not usually a job for an individual older than Mr. DeBrum's projected worklife expectancy of 43 to 45. In addition to the above, Mr. DeBrum (without the 8/10/00 accident), after the above time as a fisherman would have most likely returned to work in the Marshall Islands doing work at $3 - $5 per hour for the rest of his worklife expectancy. That expectancy would have been equal to that of a male without a high school education. Again I will defer to an economist to calculate how the above worklife expectancy and the past earnings translate into a future earnings capacity for Mr. DeBrum, assuming no accident of August 10, 2000.

Since the accident of August 10, 2000 and to date, Mr. DeBrum has not been able to engage in work activities due to his ongoing medical condition, particularly around attempts to secure an appropriate prosthetic device. At the time of my December 17, 2002 meeting with him, he was anticipating securing his new prosthesis within a relatively short period of time. Based on such information, it would be my assumption that he was capable of engaging in some type of vocational rehabilitation activities soon thereafter. Mr. DeBrum would obviously benefit from some form of vocational rehabilitation to provide him with a skill or semi skill that he could use in a work situation with his current physical limitation. Specifically, he appears to be limited to the kind of work that could be performed from a bench or sitting position with little, or certainly a limited amount of, walking necessary. Mr. DeBrum has indicated the ability to learn a variety of work tasks, ranging from those of a carpenter to those of a seaman on a tuna boat.

Further, even though his interview with me took place with an interpreter present, I would point out the following:

1. English is the official language of the Marshall Islands.

2. His education was primarily in English. Certainly the last three or four years of his education was totally in English.

3. He worked on American tuna boats where the captain would have spoken English primarily.

4. He now lives in San Diego where the primary language, again, is English.

9

5.   Further, and most important, it is not apparent that he used an interpreter during his medical evaluation or prosthetic evaluations. For example, on the 8/12/00 Admission Screening Record at Queen's Medical Center (Honolulu, HI), Mr. DeBrum listed that he understands and can read English and he did not list another language preference.

If he was comfortable enough to have his medical condition explained in English, I believe he has enough English to undertake vocations in English. His refusal to converse in English, even off the records, in light of the above factors, is of some concern.

Certainly the above factors would lead one to believe that he would have the abilities in English adequate enough to engage in some form of vocational rehabilitation training. Vocational rehabilitation in the private sector would have a value of $10,000 to $15,000, which would include such aspects as evaluation, job training, and job placement activities. It is to be expected that such vocational rehabilitation would require somewhere between 6 and 9 months of training and/or job placement. Mr. DeBrum's eventual entry-level earnings capacity would most likely be $8.50 per hour, progressing over a period of four years to approximately $12 an hour. He would be expected to work 2,080 hours for a normal work year and have benefits seen in the manufacturing industry. Examples of specific jobs would include bench test technician, bench repairer or assembler, quality control person, bench painter and the like.

In an appropriate job situation, there is no reason to expect Mr. DeBrum's current worklife expectancy to be other than that of a normal male without a high school education.

Based on Mr. DeBrum's behaviors during this interview, it is recommended that any vocational rehabilitation efforts not start until the current litigation issues have been resolved.

*E.L. Workman*

E.L. Workman, Ed.D.
Certified Case Manager
Certified Rehabilitation Counselor

10

# EXHIBIT "J"

### 231 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1985 JURY VERDICTS WEEKLY

## VIRGIL HENRY vs SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT

Case No. C-320-396

July 3, 1985

TOPIC: PEDESTRIAN-BUS ACCIDENT

RESULT: PLAINTIFF VERDICT $750,000.

INJURY: Plaintiff's doctor testified that he suffered the traumatic amputation of his leg eight inches below the knee, plus a post-traumatic stress disorder. The plaintiff returned to work five months after the accident.

SPECIALS: Medical $9,000. Wage Loss $6,000.

STATE: California

COURT: Los Angeles County Superior Court

JUDGE: Hon. Bonnie Lee Martin

PLAINTIFF COUNSEL: Michael J. Piuze, Beverly Hills

DEFENDANT COUNSEL: Kegel, Tobin and Hamrick, Los Angeles, by Robert S. Hamrick

POLL: 11-1

SUMMARY: October 23, 1979 at about 4:30 P.M. plaintiff, a 37 year old student and part-time truck unloader living in Watts, was injured in an accident involving the defendant's bus at the intersection of Wilmington and 103rd Streets in Watts.

Plaintiff contended that he was leaning against the defendant's bus waiting for the passengers to disembark; that the bus driver closed the door in his face and drove off; and that the plaintiff then lost balance and fell under the rear wheels of the bus.

There were no witnesses to corroborate the plaintiff's version of the accident.

Defendant contended that the plaintiff was running after the bus as it pulled away from the bus stop; and that the plaintiff was pounding on the side of the bus to get the driver's attention when he fell.

Four witnesses on the bus testified for the defendant. Two police officers and a fireman testified that the plaintiff told them that he was running after th bus and slipped.

Plaintiff attorney did not submit a specific figure to the jury.

Defendant attorney asked the jury for a defendant verdict, but if liability found to award $50,000 with a reduction for comparative negligence.

Jury out one day after a day trial.

P-EXPERTS: Antoine Roberts M.D. (Orthopedist) Inglewood; Ronald J. Davidson M.D. (Psychiatrist) Beverly Hills

D-EXPERTS: Raymond Hughes (Reconstruction) Long Beach

POST TRIAL MOTION: Motion for new trial not made.

ISSUE: VOLUME 29, NUMBER 39

166 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1988 JURY
VERDICTS WEEKLY

MICHAEL   CONNOLLY   vs   SOUTHERN
CALIFORNIA RAPID TRANSIT DISTRICT AND
THOMAS HARPER.

Case No. C 460-738

June 1, 1988

TOPIC: BUS RAN OVER PLAINTIFF'S LEG

RESULT: PLAINTIFF VERDICT $651,318.58, BUT
THE JURY FOUND THE PLAINTIFF 50%
NEGLIGENT AND REDUCED THE VERDICT TO
$325,659.29.

INJURY: Dr. Schmitter testified that the plaintiff's
suffered a serious degloving injury to the right leg,
necessitating a high-thigh amputation nine days later,
with a subsequent revision surgery; and that the plaintiff
was a sympathy patient who had nowhere to go, thus
necessitating lengthy stays in VA hospitals.

SPECIALS: Medical $198,818.

STATE: California

COURT: Los Angeles County Superior Court

JUDGE: Hon. Joel Rudolf

PLAINTIFF COUNSEL: Vistas and Greer, Los Angeles,
by John R. Fletcher and Frederick J. Mohun

DEFENDANT COUNSEL: Ramsey, Hogan and
Holmberg, Los Angeles, by Jerry A. Ramsey

POLL: 12-0

SUMMARY: March 14, 1983 at about 8:00 P.M.
plaintiff, 57 years old, was allegedly injured when the
defendant Transit District's bus, operated by defendant
Harper, ran over his leg at the intersection of Sunset
Boulevard and Gower Street in Hollywood.

Plaintiff contended that he ran after the defendants'
stopped bus, which had discharged passengers and
closed its doors; that he pounded on the front door while
standing in the street; and that the defendant driver
pulled away from the curb, knocking him down and
running over his right leg.

The plaintiff admitted having consumed eight drinks
before the accident.

Defendants contended that their bus was not involved, as
no SCRTD bus passed through the subject intersection at
the time of the alleged accident; that the defendant driver
did not see the plaintiff and did not know that any
accident had occurred; and that none of the passengers
on the crowded bus alerted the driver to any accident.

The only witness to the subject accident claimed that he
was riding a second SCRTD bus behind the first bus; and
that the plaintiff was drunk.  This witness was not
available to testify because of a subsequent felony
conviction; the prison authorities would not transport
him for trial.

This witness was impeached by an SCRTD investigator,
who testified that if the witness boarded the bus in front
of his place of work, as he had stated, he was never
closer than one mile to the accident scene and then rode
in the opposite direction rather than passing the accident
scene.

Plaintiff attorney asked the jury to award $1,500,000.
Jury out three days after a five-day trial.

P-EXPERTS: Eric D. Schmitter M.D. (Orthopedist) Los
Angeles

POST TRIAL MOTION: Motion for new trial not made.

SETTLEMENT TALKS: Demand $350,000 C.C.P.,
reduced to $100,000 before trial. No Offer.

ISSUE: VOLUME 33, NUMBER 2

157 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1993 JURY VERDICTS WEEKLY

MARCOS GARCIA v. HAUCH MEDICAL GROUP

Case No. KC 008-628

July 26, 1993

TOPIC: MEDICAL MALPRACTICE (FAILURE TO MONITOR)

RESULT: PLAINTIFF VERDICT $234,835. (Negligence) (Causation)

INJURY: Plaintiff underwent a below-the-knee amputation of the left leg.

SPECIALS: Medical to date $16,000. Future medical $60,000. Wage loss approximately $50,000.

STATE: California

COURT: Los Angeles County Superior Court

JUDGE: Hon. Burton Bach

PLAINTIFF COUNSEL: Mark A. Burke, Bellevue, Washington

DEFENDANT COUNSEL: Freeburg, Judy, Macchiagodena and Nettels, Pasadena, by Richard B. Castle

POLL: (Negligence) 9-3; (Causation) 10-2

SUMMARY: In January of 1991, plaintiff, a 55-year-old maintenance worker from Pomona, developed a bacterial infection in his left foot and was treated for six weeks on an out-patient basis at defendant's medical clinic in Pomona. Plaintiff was a diabetic with severe atherosclerosis in the legs. He was hospitalized in February of 1991 and in December of 1991 underwent a below-the-knee amputation of the leg.
Plaintiff contended that, given the vascular compromise of his pre-existing conditions, physicians at defendant's medical clinic fell below the standard of care by not hospitalizing him sooner and monitoring his infection more carefully.
Defendant contended that it acted within the standard of care; and that the amputation was inevitable, given plaintiff's pre-existing conditions.
Plaintiff attorney did not submit a specific figure to the jury.
Jury out two days after a twelve-day trial.

P-EXPERTS: Stuart R. Weiss, M.D. (Endocrinologist/Internist) San Diego; Ronald M. Schilling, M.D. (Physical Medicine) Santa Ana; David T. Barker, Ph.D. (Economist) Monrovia

D-EXPERTS: Dan C. Bird, M.D. (Internist) Sherman Oaks

POST TRIAL MOTION: Motion for new trial not made.

SETTLEMENT TALKS: Demand $250,000. No offer.

ISSUE: VOLUME 37, NUMBER 50

107 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1993 JURY
VERDICTS WEEKLY

HENRY MCGUINNESS v. G. KARLIN MICHELSON,
M.D..

Case No. SWC 95316

March 12, 1993

TOPIC: MEDICAL MALPRACTICE (NEGLIGENT
TREATMENT)

RESULT: PLAINTIFF VERDICT $19,314 (economic
damages).    PLAINTIFF VERDICT $215,000 (non-
economic damages).   TOTAL AWARD $234,314, but
the jury found plaintiff 49% negligent and reduced the
award to $119,500. Polls were 11-1 on liability, 10-2 on
causation, and 12-0 on damages.

INJURY: Plaintiff developed chronic osteomyelitis
secondary to a fracture of the left ankle and eventually
underwent amputation of the lower left leg.

SPECIALS: Covered by collateral sources.

STATE: California

COURT: Los Angeles County Superior Court

JUDGE: Hon. Robert J. Higa

PLAINTIFF COUNSEL: Girardi and Keese, Los
Angeles, by James G. O'Callahan

DEFENDANT COUNSEL: Bonne, Jones, Bridges,
Mueller, O'Keefe and Nichols, Los Angeles, by
Alexander B.T. Cobb

POLL: 11-1; 10-2; 12-0

SUMMARY: In November of 1987, plaintiff, a 61-year-
old unemployed waiter, suffered a complex ankle
fracture while in the course and scope of his employment
as a casual laborer.    Defendant, an orthopedist,
performed open reduction and internal fixation with a
plate and screws.  Plaintiff developed osteomyelitis in
February of 1988.
Plaintiff contended that defendant's negligence resulted
in the onset of osteomyelitis.
Defendant contended that plaintiff caused the condition
by failing to follow doctor's orders with regard to caring
for the cast and not bearing weight on the ankle; and that
the ensuing amputation was unnecessary and against the
advice of subsequent treating physicians.
Plaintiff attorney asked the jury to award approximately
$750,000, with a finding of no more than 25%
contributory negligence.
Jury out two and one-half days after a four-day trial.

P-EXPERTS: Stewart L. Shanfield, M.D. (Orthopedist)
Fullerton

D-EXPERTS: Chadwick F. Smith, M.D. (Orthopedist)
Los Angeles

POST TRIAL MOTION: Motion for new trial made by
defendant--denied.

SETTLEMENT TALKS: Demand $30,000, with an
indication of less. No offer before trial.

ISSUE: VOLUME 37, NUMBER 28

Jury Verdict Weekly (California) Copyright 2000 JURY VERDICTS WEEKLY

DANIEL M. CASTILLO, JR., AN INCOMPETENT ADULT BY AND THROUGH HIS GUARDIAN AD LITEM, MARIA CASTILLO v. SAN DIEGO TRANSIT CORPORATION AND ALFONSO ROGERS

Case No. 728790

December 20, 2000

TOPIC: PEDESTRIAN/BUS: CROSSING STREET AT FOUR-WAY STOP SIGN

RESULT: $2,120,000 total; $1,120,000 economic, $1,000,000 noneconomic. Note: Plaintiff reports that Daniel Castillo was held to be incapable of contributory negligence due to the severity of his mental retardation. Reductions or additions to the verdict have yet to be determined.

INJURY: Crushed lower left leg, post-traumatic stress disorder.
Treatment: Below-the-knee amputation, follow-up orthopedic care, psychological care.
Residual: Prosthetic device on left leg, continued psychological problems, necessity for living assistance.

SPECIALS: Medical to date $118,000. Future medical $1,000,000. Future wage loss None.

STATE: California

COURT: San Diego County Superior Court

JUDGE: Hon. Sheridan Reed (San Diego)

PLAINTIFF COUNSEL: Nicholas A. Boylan (Law Offices of Nicholas A. Boylan) San Diego (619) 696-6344; David L. Speckman (Speckman & Associates) San Diego (619) 696-5151

DEFENDANT COUNSEL: Mark T. Brisebois (Law Offices of Mark T. Brisebois) San Diego (619) 230-8790

SUMMARY: March 10, 1998, plaintiff, a 19-year-old developmentally disabled student of the San Diego Unified School District (SDUSD) METRO Program, was walking southbound across the intersection of Sampson Street and Logan Avenue in the City of Logan Heights. Defendant Alfonso Rogers, a bus driver for defendant San Diego Transit Corporation (SDTC), was westbound on Logan. As Rogers crossed the four-way stop sign controlled intersection, his bus struck the plaintiff on the west side of the intersection. Plaintiff's lower left leg became pinned under the front driver-side tire for 25 - 30 minutes. Upon extraction, he was rushed to UCSD Medical Center, where he underwent a below-the-knee amputation. Plaintiff then brought suit against SDUSD, SDTC and Alfonso Rogers. Plaintiff settled with SDUSD for $850,000 before trial. The District was then held to be immune from liability following this settlement with the plaintiff and no evidence of the District's actions were allowed during the trial.
Plaintiff contended that Alfonso Rodgers failed to yield the right-of-way to the pedestrian plaintiff. Rogers' attention was drawn to the bus stop he was pulling into on the southeast corner of Sampson and Logan. He failed to take any precautions to avoid hitting the plaintiff.
Defendants contended the plaintiff ran across the street at such an angle and speed, that Alfonso Rodgers had no opportunity to avoid hitting him. SDUSD, or others, were comparatively negligent for allowing the plaintiff to be left unaccompanied on the day of the accident.

P-EXPERTS: Gene Dossett, M.D. (Orthopedic Surgeon) San Diego; Loren O'Connor, Ph.D. (School Psychologist) San Juan Capistrano; Dean C. Delis, Ph.D. (Neuropsychologist) San Diego; Carl R. Englund, Ph.D. (Human Factors/Forensic) Carlsbad; John S. Fabian (Bus Accident Reconstructionist) New York City; Doreen Casuto (Rehabilitation Nurse) San Diego; Roberta Spoon, C.P.A. (Economist) San Diego; Edward R. Cababa (Accident Reconstructionist) Yorba Linda; Glee Shaddock (Special Education Teacher) San Diego; Mark A. Gomez, Ph.D. (Biomechanics) San Diego; Justin J. Norton (Prosthetic/Rehabilitation) San Diego

D-EXPERTS: William Lukavski, M.D. (Orthopedic Surgeon) La Mesa; Katherine DiFrancesca, Ph.D. (Psychologist) San Diego; Ernest Klein (Accident Reconstruction) Newport Beach; Fred McFarlane

## JURY VERDICTS WEEKLY (CALIFORNIA)

(Vocational Rehabilitation) San Diego; Linda Olzack
(Life Care Planner) Napa; Laura Fuchs (Economist) San
Diego

MISCELLANEOUS: Insurance Carrier: Self-Insured
Trial Time: 5 Weeks Deliberation Time: 6 days

SETTLEMENT TALKS: Demand $1,199,000 CCP 998.
Offer $100,000 CCP 998.

ISSUE: VOLUME 45, NUMBER 4

192 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1993 JURY VERDICTS WEEKLY

REX PERRINE v. CLARK EQUIPMENT COMPANY; AND GENERAL AUTO LEASING

Case No. 60-38-04

November 24, 1993

TOPIC: PRODUCT LIABILITY (DEFECTIVE FORKLIFT)

RESULT: PLAINTIFF VERDICT $200,000 (economic damages). PLAINTIFF VERDICT $600,000 (noneconomic damages). TOTAL AWARD $800,000, but the jury apportioned liability 10% to plaintiff, 18% to his coworker, and 72% to Clark Equipment Company, reducing the award to $568,000.

INJURY: Plaintiff suffered crushing injuries to the left foot and ankle that resulted in an amputation of the left leg below the knee.

SPECIALS: Medical to date $110,000. Future medical $34,000+. Plaintiff remains on company payroll.

STATE: California

COURT: Orange County Superior Court

JUDGE: Hon. Nancy W. Stock

PLAINTIFF COUNSEL: John Scott Matthew, Sherman Oaks, by Rex W. Jacobs

DEFENDANT COUNSEL: Millard, Stack and Stevens, Los Angeles, by Thomas S. Pilchowski—for Clark; Robert Legate, Laguna Hills—for General Auto

POLL: 9-3

SUMMARY: November 16, 1988, plaintiff, a 68-year-old lumber yard worker, was checking the invoice numbers on a stack of lumber at his place of work in Santa Ana. A coworker was operating a 15,000-pound capacity Clark diesel forklift nearby. The coworker reversed to back up in a large arc and ran over plaintiff's foot and ankle. Defendant General Auto Leasing was the prior owner of the forklift; it had leased and then sold the forklift to plaintiff's employer.

Plaintiff contended that the subject forklift was not equipped with any back-up warning devices such as alarms or flashing lights; that it had no rearview mirrors; and that under the second prong of Barker v. Lull these design defects caused plaintiff's injury. The burden of proof then shifted to defendants to show that the design benefits outweighed the hazards.

Defendant Clark Equipment Company contended that the forklift as manufactured was safe for all intended uses.

Defendant General Auto Leasing settled on the first day of trial for $7,500.

Plaintiff attorney asked the jury to award specials plus $500,000 to $1 million in general damages.

Jury out two days after an eight-day trial.

P-EXPERTS: Jashir S. Mann, M.D. (Orthopedist) Anaheim/Whittier; Martin J. Siegel (Mechanical Engineer) Los Angeles; Steven Batterman, Ph.D. (Design Engineer) Pennsylvania

D-EXPERTS: Walter Girardi (Safety Design/Materials Handling) Galesburg, Michigan; Robert Braun (Forklifts) Dana Point

POST TRIAL MOTION: Motion for new trial and JNOV made by defendant Clark—denied.

SETTLEMENT TALKS: Demand $600,000, with willingness to take $250,000, but this was not conveyed in light of no offer.

ISSUE: VOLUME 38, NUMBER 18


196 of 237 DOCUMENTS

Jury Verdict Weekly (California) Copyright 1993 JURY
VERDICTS WEEKLY

ROBERT M. BONNER ET AL. v. ARTHUR ALLAN
CHASKIN; MICHAEL CHESNBY DBA MATTSON
TRUCKING; STATE OF CALIFORNIA; AND
COUNTY OF SAN BERNARDINO ET AL.

Case No. RCV 00330

November 1, 1993

TOPIC: JEEP/TRUCK HEAD-ON COLLISION --
DANGEROUS ROADWAY

RESULT: PLAINTIFF VERDICT $1,002,770
(economic damages). PLAINTIFF VERDICT
$3,910,204 (noneconomic damages). The verdicts were
reduced to $951,745 for economic damages and
$1,368,571 in noneconomic damages, including an offset
for the prior settlement, pursuant to an apportionment of
negligence 35% to the state and 65% to defendant driver.
Polls were 9-3 that the roadway was in a dangerous
condition; 11-1 that the accident was foreseeable; 12-0
on causation; and 11-1 on apportionment of liability.

INJURY: Dr. Rice testified that plaintiff suffered a
traumatic amputation of the left leg below the knee plus
soft tissue injuries to the right leg.

SPECIALS: Medical to date $232,000. Future medical
$418,000. Wage loss to date $151,400. Future wage
loss $280,400.

STATE: California

COURT: San Bernardino County Superior Court

JUDGE: Hon. Paul M. Bryant, Jr.

PLAINTIFF COUNSEL: Voorhies and Kramer, Los
Angeles, by Richard C. Voorhies and R. Brian Kramer

DEFENDANT COUNSEL: Ruffolo, Vidor, Danielson
and Harral, Los Angeles, by Robert B. Schoenburg and
Laurie E. Dods--for state

POLL: 9-3; 11-1; 12-0; 11-1

SUMMARY: July 27, 1988, at about 11:05 a.m.,
plaintiff, a 49-year-old resident of Apple Valley, was
injured when his Jeep collided head-on with a delivery
truck driven by defendant Arthur Chaskin, in the course
and scope of his employment with defendant Mattson
Trucking, on a mountainous stretch of State Route 173 in
San Bernardino County. Defendant driver went into a
locked skid on a curve posted with an advisory sign for
20 miles per hour and a curve warning sign. The
approach to the curve had a 55-mile-per-hour speed limit
and defendant driver entered the curve at approximately
45 miles per hour.

Plaintiff contended that defendant state maintained the
subject roadway in a dangerous condition; that the curve
warning sign and speed advisory sign were inadequate
and too close to the curve; that defendant driver's
excessive speed and inattention were due to the
inadequacy of the signs; and that there was a substantial
accident history at the curve, as evidenced by crashes
and skid marks.

Defendant state contended that the sole cause of the
accident was the excessive speed and inattention of
defendant driver, who deliberately failed to reduce his
speed as advised by the signs.

Defendant driver and his employer settled before trial for
$250,000 policy limits.

Plaintiff attorneys asked the jury to award $5 million to
$10 million.

Defendant attorneys asked the jury for a defendant
verdict, but if liability found to award approximately $1
million.

Jury out two days after a five-week trial.

P-EXPERTS: Samuel H. Rice, M.D. (Orthopedist) Apple
Valley; Harry J. Krueper (Reconstruction) San
Bernardino; R. Wade Allen (Reconstruction/Human
Factors) Hawthorne; Gerald Hibdon (Prosthetist) Apple
Valley; Raymond G. Schultz, Ph.D. (Economist) San
Marino

D-EXPERTS: Gary L. Painter, M.D. (Orthopedist)
Riverside; Gene Bruno (Rehabilitation) Garden Grove;
Kenneth C. Berner (Traffic Engineer) Livermore;
Clayton Campbell (Reconstruction) Livermore; Ted
Vavoulis (Economist) Los Angeles

Page 82

## JURY VERDICTS WEEKLY (CALIFORNIA)

POST TRIAL MOTION: Motion for new trial made by defendant state—denied.

SETTLEMENT TALKS: Demand $1.5 million, according to plaintiff attorneys. Demand $2 million, according to defendant attorneys. Offer $20,000, according to plaintiff attorneys. No offer, according to defendant attorneys.

ISSUE: VOLUME 38, NUMBER 12

## DECLARATION OF SERVICE

I, David Ledger, hereby declare, under the penalty of perjury of the laws of the United States, that on the 19th day of February 2003, I will cause to be served via hand delivery a true and correct copy of **NOTICE OF MOTION; MOTION TO QUASH RULE B ARREST OR SET AMOUNT OF SUBSTITUTE SECURITY; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A-J; DECLARATION OF SERVICE** upon Plaintiff's Counsel of record as follows:

> Jeffrey A. Cook, Esq.
> Law Offices of Cunliffe & Cook, P.C.
> Suite 200
> 210 Archbishop F.C. Flores Street
> Hagåtña, Guam 96910

Dated this 19th day of February 2003.

DAVID LEDGER