**Law Offices of**
**CUNLIFFE & COOK**
Suite 200
210 Archbishop F.C. Flores Street
Hagatna, Guam 96910
Telephone: (671) 472-1824
Facsimile: (671) 472-2422

Attorneys for Plaintiff
MEL DEBRUM



F I L E D
DISTRICT COURT OF GUAM
FEB 2 1 2003
MARY L. M. MORAN
CLERK OF COURT

23

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| MEL DEBRUM, | ADMIRALTY CIVIL NO. 03-00004 |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO** |
| v. | **DEFENDANTS' MOTION TO** |
| | **VACATE RULE B** |
| M&F FISHING CO., INC., a corporation, *in* | **ATTACHMENT AND FOR** |
| *personam*, and M/V KOORALE, her engines, | **RELEASE OF VESSEL ON** |
| tackle, apparel, furniture, and appurtenances, *in* | **POSTING OF ALTERNATE** |
| *rem*, | **SECURITY** |
| Defendants. | |

Plaintiff Mel DeBrum hereby submits his opposition to the Motion to Vacate

Attachment and for Posting of Alternate Security filed by Defendants F/V KOORALE

and M&F Fishing Company, Inc. (hereinafter "Defendants") as follows:

### I. INTRODUCTION

Plaintiff, Mel DeBrum, lost his leg in the service of the *in rem* Defendant F/V

KOORALE ("KOORALE") and the *in personam* Defendant M&F Fishing Company,

Inc. ("M&F"). At the time of his accident aboard the KOORALE, Plaintiff was a Jones

Act seaman. As such, Plaintiff has rights of action under the Jones Act, the doctrine of

unseaworthiness and the doctrine of maintenance and cure. It is a matter of black letter

law that his claims under the Jones Act are properly pled against the *in personam*

**ORIGINAL**

Defendant M&F. It is also clear, despite Defendants' argument herein, that M&F's contacts with Guam are and were essentially nonexistent and that, as a matter of law, the presence of Captain Fermin Ferreira (whose officer or managing agent status is questionable) does not constitute being "found" within the jurisdiction for the purposes of a Rule B attachment. It is equally well established that Plaintiff's unseaworthiness and maintenance and cure claims give rise to maritime liens against the KOORALE which support the uncontested Rule C arrest of the KOORALE.

At first the court may see the task of setting the amount of alternate security as daunting; to evaluate (and in essence adjudicate) the respective claims of the parties herein, and in the context of one expedited motion, determine the maximum amount of money to be made available to Plaintiff Mel DeBrum following judgment in the California action. However, when the court examines the legal authorities and policies behind the rules permitting the posting of alternate security, the court's task becomes quite easy to discharge. Specifically, the court's job is simply to give the defendant the chance to maintain the status quo (*vis-à-vis* security to satisfy claims) by lodging alternate (and comparable) security with the court in place and instead of its vessel. In so doing, the court must determine what security is necessary to maintain the status quo; in other words, to ensure that Plaintiff's maximum recovery will be covered up to the value of the vessel. If the "high-side" possible trial result exceeds the value of the vessel, the status quo can of course be maintained by posting a bond equal to the value of the vessel and no more. While this may in some cases leave the Plaintiff with inadequate security to satisfy his claims, it puts him in no worse position than he would be if the vessel were sold and its proceeds were utilized to secure any potential judgment.

Here, the court has seen the Defendants' view of the world. Not surprisingly, the Defendants argue this is a case of questionable liability, high comparative negligence and limited damages. The facts they share of course represent their best possible "spin" and are contested every step of the way by Plaintiff. However, the court's job under the well

2

established law is not to look to the low-side value of the case (the side which the Defendant will always emphasize), but to look to the high-side value; the only thing that makes any sense when we speak of security for a disputed and unliquidated claim such as this. To do this, the court must look to plaintiff's demand or claim "fairly stated." Indeed, the court's only obligation is to ensure that the claim is not fundamentally flawed or fanciful and to conduct a cursory review "behind" the pleadings.

Upon completing this legally mandated evaluation in the present case, the court will see that a reasonable high-side verdict in this case (which will be tried in Los Angeles beginning March 25th of this year) clearly exceeds the likely value of the F/V KOORALE. Not only does Plaintiff submit herewith his Rule 26 liability and economic damages reports, but as "proof positive" of the potential value of his case, he submits California jury verdicts on similar cases (verdicts Defendants somehow missed when conducting their search). These verdicts establish that even the average (*i.e.*, not high-side) results in single below-knee amputation cases involve awards in excess of $3,000,000 for general damages only. The "high-side" verdicts comfortably exceed the value of Defendant's vessel. This is not to say that the Plaintiff will recover this amount, or conversely, that the Defendant will not prevail on one or more of its defenses. Rather, this simply establishes that there is a reasonable possibility of such a result. As it now stands Plaintiff has security sufficient to cover at least that portion of a "high-side" judgment which is equal to the value of the Defendant's vessel and this status quo must be maintained if any "alternate" security is to be provided in place of the KOORALE.

## II.  SUMMARY OF RELEVANT FACTS

The following sets forth a general "thumb-nail" summary of the relevant facts in this case and the opinion testimony that will be presented at trial. Because the court's task involves only an evaluation of Plaintiff's *prima facia* case and his "claim," and not a full adjudication of the respective claims of the parties, Plaintiff has not made a full evidentiary submission. However, Plaintiff has forwarded all of the relevant deposition

3

transcripts and exhibits to Guam and this evidence (the evidence which would have to be considered if the court were forced to adjudicate disputed issues of fact to rule on the proper amount of security) will be available for the court's review at the time of the hearing if such an evidentiary "trial" is to be completed. As set forth by way of introduction, however, it is not the court's job to resolve conflicting arguments and weigh conflicting evidence, but simply to ensure that the status quo is maintained by retaining alternate security equal to or exceeding the high-side value of Plaintiff's case.

### A. Plaintiff and His Accident.

As set forth in Defendants' moving papers, on the date of his accident Plaintiff Mel DeBrum was a healthy 38 year old commercial fisherman who served aboard the F/V KOORALE until he suffered a career ending injury during the summer of 2000. Specifically, on or about August 10, 2000, while attempting to transfer from the skiff of the F/V KOORALE to the KOORALE, Plaintiff's leg was crushed between the skiff and the mother ship resulting shortly thereafter in a below the knee surgical amputation. As Plaintiff's surgeon described it, "it had been crushed. The skin and bone had been literally shelled off the bone. The bone themselves had been crushed and fractured and broken. The wound had been soiled, and the blood vessels and nerves at the site of the wound, which is basically around the ankle, had been severed, so the foot itself was without blood circulation and without nerve function." As Dr. Marumoto explained during his deposition taken on January 28th of this year, after the accident Mr. DeBrum's "foot essentially was hanging on by some rudimentary tendons." Relevant portions of Dr. Marumoto's deposition transcript are attached as Exhibit "K" to the Declaration of William L. Banning filed herewith.

To make matters worse, after looking down and seeing his foot dangling from his crushed lower leg, and being carried by his crewmembers into the ship's galley plaintiff remained on the galley table aboard the vessel with only rudimentary painkillers available to him (with his foot and leg packed in ice) for days as the vessel steamed for port to

4

obtain medical attention. Plaintiff also over-heard his fellow crewmembers discussing making room in the ship's freezer should he die before reaching port.

There is no question that this injury occurred while Plaintiff was in the service of the vessel discharging his lawful and normal duties to the benefit of both Defendants herein. There is no allegation of wilful misconduct or any dispute that the accident in question occurred during normal fishing operations while Plaintiff was an employee of the *in personam* Defendant M&F and serving as a regular (and longtime) crewmember of the F/V KOORALE. Although the Defendants recently (in the context of the deposition testimony of Captain Ferreira) have adopted the argument that Mr. DeBrum was the one responsible for making the decision that resulted in his losing his leg (apparently in an attempt to take a coffee break before working on the net pile), suffice it to say that this version of the events is hotly contested by Plaintiff. Rather, Plaintiff, and each crewmember who no longer relies on the Defendant for his livelihood, have testified that Captain Ferreira was an almost tyrannical dictator of every detail aboard the vessel and specifically ordered Mr. DeBrum to board the vessel on the date and time of his accident. Indeed, the testimony is that just before Plaintiff's accident, when the skiff lost control in the rough seas and was slammed against the side of the KOORALE (with such force that it was felt by the navigator standing on the opposite side of the vessel - over 40 feet away), Captain Ferreira again, using his spot light as a signal, directed Mr. DeBrum to board the KOORALE notwithstanding the rough seas, darkness and the speed boat hanging above the ladder.[1] Ironically, the skiff operator, Mr. Cruz (whose garbled statement Defendants submitted in support of their motion) will testify at trial that the sea conditions were extremely rough, that the skiff never should have been used to attempt to make the transfer in question and that the operation in question was only carried out due to the persistent orders of the captain.

---

[1]/To the extent the court desires a full account of Plaintiff's accident and other basic facts of his case, his deposition transcripts (and changes thereto) have been lodged herewith as Exhibit "L" to the Declaration of William L. Banning.

## B. Plaintiff DeBrum's Work History and Earnings.

Prior to his accident, Plaintiff DeBrum was in perfect health and had served aboard the KOORALE for in excess of 10 years as a loyal deckhand. During this time frame his earnings averaged approximately $25,000 per year. Furthermore, Plaintiff had specific plans to advance to the position of Deck Boss; a position currently held by an individual who ranked below Mr. DeBrum on the date of his accident and a position that would have almost doubled his earnings. *See* a copy of the Rule 26 Report of Plaintiff's economic expert, Dr. Joyce Pickersgill, attached as Exhibit "A" to the Declaration of William L. Banning, filed herewith.

## C. Summary of Plaintiff's Claims Herein.

Plaintiff has asserted three claims, Jones Act Negligence, Unseaworthiness and Maintenance and Cure. He has alleged all three claims against the *in personam* Defendant M&F, and the unseaworthiness and maintenance and cure claims (both of which give rise to maritime liens and support *in rem* jurisdiction) against the *in rem* Defendant KOORALE. Plaintiff has asserted his *in personam* claims pursuant to Supplemental Admiralty Rule B and has attached the F/V KOORALE in support of such claims. He asserts his *in rem* claim pursuant to Supplemental Admiralty Rule C and has arrested (as compared to attached) the *in rem* Defendant in support of his maritime liens.

Plaintiff originally filed his *in rem* and *in personam* action in the United States District Court for the Central District of California. That case is set for trial on March 25th of this year in Los Angeles. The *in personam* Defendant has appeared in that action. The M/V KOORALE has not been found in that district as of this date and therefore has not been served.

## D. Plaintiff's Economic Damages.

Plaintiff is asserting a claim for economic damages including lost wages, lost found (*i.e.*, employment benefits) and for future medical expenses. Plaintiff has retained economic expert Dr. Joyce Pickersgill, who has been fully deposed and who has prepared

6

a Rule 26 Report outlining Plaintiff's probable economic losses. According to Dr. Pickersgill, Plaintiff's lost wages will range from a low of $380,000 to a high of $741,199. *See* the "Summary of Analysis" included in Dr. Pickersgill report, Exhibit "A" to the Declaration of William L. Banning. Dr. Pickersgill has also concluded that Plaintiff will lose $413,000 in fringe benefits and has calculated Plaintiff's probable future medical expenses (according to his doctor's testimony) at $136,000; for a probable economic loss (reduced to present value) of between $773,532 and $1,350,960.

**E. <u>Maintenance and Cure</u>:**

While serving aboard the KOORALE, Plaintiff received room and board aboard the vessel in the form of a fringe benefit. This included not only a room, but all-you-can-eat breakfasts, lunches and dinners and snacks between meals. The quality of the food aboard the F/V KOORALE was extremely good and included steaks, chicken and pork chops, vegetables, fresh bread, desserts, eggs, bacon and other foods cooked by a designated cook. Dr. Pickersgill has evaluated the costs of replicating such room and board in San Diego (where Plaintiff is receiving medical care) and has determined that it would cost $67 per day to replicate such benefits. *See* the Pickersgill report, Exhibit "A" to the Declaration of William L. Banning.

Plaintiff has not reached maximum cure for the injuries he sustained during the incident. Consequently, Plaintiff was and is entitled to receive maintenance equivalent to the amount necessary to replicate the room and board he enjoyed aboard the vessel (namely $67 a day) from the date he was discharged from the hospital to the present (namely for 925 days). At the above-referenced rate of $67 per day, this translates into a total maintenance obligation to Plaintiff of $61,975. Because the Defendants have only paid Plaintiff $4,880 in maintenance since the date of his accident, Plaintiff is entitled to an additional $56,095 in maintenance up to the date of this filing.

**F. <u>Plaintiff's General Damages</u>.**

Plaintiff, of course, also seeks compensation for his general damages (namely his

substantial physical and emotional pain and suffering) as a result of his injury, surgical leg amputation and resultant physical disability. In describing Plaintiff's injuries, Dr. Marumoto testified that Mr. DeBrum's injuries, which involved his leg being "crushed and torn" from his body and his flesh being "torn off the bone, what we call a degloving injury," would be classified as "extremely painful." *See* the Marumoto deposition, p.52, lines 1-7 and p.54, lines 1-15. Indeed, while Mr. DeBrum's stump is now almost fully healed (having gone through a long process of shrinking and stabilizing), one simply cannot overstate the dramatic life altering impact that one goes through when losing a limb.

Given his injuries, Plaintiff's counsel anticipates that he will quite likely recover at least $3,000,000 in general damages in the California action. This is based on his counsel's substantial experience in the Southern California trial courts and on an extensive review of jury verdicts in similar cases which show that judgments for pain and suffering alone routinely exceeding this figure (quite often substantially so). This, of course, is not surprising considering the profound effect that a life-long loss of a limb has on a young individual such as Plaintiff DeBrum (twenty-five years from now Mr. DeBrum will wake and start another day without his right leg; unable to walk to the bathroom, run to help a child or to wear shorts or a swim suit without enduring uncomfortable stares). *See* the photograph of Mr. DeBrum in his current state attached hereto.

### G. Circumstances Mandating Arrest.

As mentioned above, this case has been in active litigation in the United States District Court for the Central District of California (before the Honorable Dean D. Pregerson) since September of 2001. During this time California counsel for Plaintiff have been undertaking efforts to determine what, if any, insurance is available to respond in the event that Plaintiff should obtain a judgment in his favor. However, throughout this time, Defendant M&F has refused to disclose critical information necessary to

8

evaluate the insurance available (such as policy limits applicable to Plaintiff's claim, the existence of any reservation of rights by either primary or excess underwriters or, of critical importance, whether or not the liability insurers for M&F intend to assert the "pay-to-be-paid" clause in the policy - arguing that it relieves underwriters of having to satisfy any judgment until M&F has actually paid the claim). A true and correct copy of the primary liability policy issued by Shipowners Mutual Protection and Indemnity Association (including the Standard Fishing Vessel Clauses and the "pay-to-be-paid" clause - paragraph 7) is attached as Exhibit "B" to the Declaration of William L. Banning filed herewith. Indeed, Defendants have refused to produce this information to Plaintiff notwithstanding the fact that they were ordered to produce this information to Plaintiff by Central District Court Magistrate Judge Stephen J. Hillman. A true and correct copy of Judge Hillman's order of February 10, 2003, is attached as Exhibit "C" to the Declaration of William L. Banning filed herewith. Furthermore, when Plaintiff sought financial information from M&F Fishing to allay his fears regarding the company's ability to "pay-to-be-paid," this information too was denied. *See* the Banning Declaration, ¶2.

Finally, when Plaintiff repeatedly inquired with counsel for M&F as to whether or not M&F's underwriters would post a bond in lieu of arrest, Plaintiff's written requests were ignored and Plaintiff's counsel were told verbally that the underwriters would not post a bond to avoid seizure of their client's vessel. *See* the Banning Declaration, ¶3. *See also* copies of relevant letters demanding security to avoid arrest dating back to October of 2002, Exhibit "D" to the Declaration of William L. Banning filed herewith. Consequently, Plaintiff was facing the disastrous possibility of being forced to trial only to obtain a judgment which he might not be able to collect due to P&I Club's intransigence. Not surprisingly, when Plaintiff learned that the F/V KOORALE was going to be arriving within the jurisdiction of a federal district, he had absolutely no choice but to undertake the burden of arresting Defendant's vessel.

9

## H. Negotiations Regarding Alternate Security Since Arrest.

Since the KOORALE has been arrested, Defendants' Guam counsel have raised

the possibility of posting alternate security for the release of the vessel. In response,

Plaintiff has agreed to waive any objection to Defendant obtaining release of the vessel

by posting security acceptable to Plaintiff, while reserving its right to seek a reduction in

security if it chooses to do so at a later time. Indeed, Plaintiff has already suggested that

he would agree to a slightly reduced bond if Defendants' underwriters would agree to

post the bond in the Central District of California, allowing this action to be stayed,

transferred or dismissed without prejudice pending trial in California. *See* the Banning

Declaration, ¶4. As this court is aware, that is the exact procedure which was utilized in

the matter of Costa v. F/V DANIELLA, Case No. 01-02115, an action handled in 2001

by Plaintiff's counsel herein (and Plaintiff's California counsel).

## I. Comparable California Jury Verdicts.

Defendants state in their moving papers that they have completed a review of

Southern California jury verdicts for single leg amputation cases. Not surprisingly,

Plaintiff has also conducted such a review. Quite surprisingly, however, is the fact that

the Defendants somehow missed (or tailored the scope of their search to intentionally

miss) the vast majority of the relevant verdicts and those which establish not the "rock

bottom" low-side value of Plaintiff's case, but its probable value; the value that the court

must consider to maintain the status quo. Again, while Plaintiff submits herewith and

summarizes below these mid-level verdict reports, if the court wishes to review all such

verdicts that Plaintiff has located, these too have been forwarded to Guam counsel and

will be available at the hearing of this matter.[1]

---

[1]/True and correct copies of the referenced verdicts are attached as Exhibit "D" to the Declaration of William L. Banning filed herewith.

Case 1:03-cv-00004    Document 26    Filed 02/21/2003    Page 10 of 29

| CASE NAME AND LOCATION | DATE | INJURIES | DAMAGES AWARDED | GENERAL DAMAGES AWARDED |
|---|---|---|---|---|
| *Bonner v. Mattson Trucking* (San Bernardino, California) | 3/1994 | "Traumatic amputation of the left leg below the knee plus soft tissue injury ..." | $4,910,974 | $3,910,204 |
| *Hilliard v. Los Angeles* (Los Angeles, California) | 9/20/96 | "Below the knee amputation of left leg." | $3,702,000 | $2,750,000 |
| *Thompson v. RPS, Inc.* (Los Angeles, California) | 6/1983 | "Below knee amputation" | $2,100,000 | no breakdown reported |
| *Renteria v. Custom Fiberglass* (Los Angeles, California) | 5/1999 | "Above knee amputation" | $2,500,000 | no breakdown reported |
| *Lagerborg v. Los Angeles County* (Los Angeles, California) | 3/1997 | "Below knee amputation" | $2,996,401 | $2,996,401 |
| *Montes v. Brown* (Los Angeles, California) | 5/1994 | "Below knee amputation with no other significant injuries." | $4,268,000 | no breakdown provided |
| *Dibene v. Waste Management, Inc.* (Los Angeles, California) | 4/1993 | "Below knee amputation" | $4,269,000 | no breakdown provided |
| *Reyes v. Weinberg* (Los Angeles, California) | 7/2000 | "Right leg amputation, cardiac contusion and post-traumatic stress disorder" | $4,900,000 | $3,000,000 |

In addition to these "mid-level" verdicts in the Los Angeles area, additional leg amputation cases were located throughout California and the United States, many with verdicts exceeding those set forth above. In fact, the average single leg amputation verdict nationwide exceeded the California average by approximately $1,000,000. *See* the Declaration of William L. Banning, ¶5 filed herewith. Some of the other verdicts which Plaintiff located include the following:

| LOCATION | DATE | VERDICT/SETTLEMENT |
|---|---|---|
| Oakland, California | December, 2001 | $5,913,387 |
| Orange County Superior Court | 2002 | $6,027,014 |
| Los Angeles, California | 1996 | $20,250,000 ($17,000,000 in non-economic damages) |
| Seattle, Washington | 2002 | $5,000,000 (settlement) |
| New York, New York | 1994 | $10,075,000 |
| New York, New York | 1996 | $17,825,000 |

11

In summary, Plaintiff has attempted to review all single below knee amputation jury verdicts in California. Plaintiff did not include the low value verdicts (typically involving the aged, recreational injuries suffered by minor plaintiffs and disease-related amputations), nor did he include the high-side verdicts (which typically involve extreme aggravating circumstances or appeared to represent the proverbial "run away" verdicts). However, by excluding these extremes, Plaintiff has determined that the average single below knee amputation general damage only jury verdict in California from 1984 to the present was for $3,000,000. *See* ¶6 of the Declaration of William L. Banning filed herewith.

In other words, notwithstanding the arguments of the parties as to what they believe they will convince a jury to award in this case, the above verdicts set forth what this type of case is actually worth in California and constitutes <u>irrefutable</u> evidence of the actual value of Plaintiff's claim "fairly stated." Indeed, assuming that Defendant's vessel is worth no more than $7,000,000 to $8,000,000, this data establishes that it is quite possible that Plaintiff could obtain a verdict which will leave him with inadequate security even if the full value of the vessel were posted herein or the vessel were sold and all sale proceeds were retained to secure Plaintiff's ultimate judgment, if any.

## III. <u>LEGAL ARGUMENT</u>
### A. <u>The Arrest and Attachment of The KOORALE Is Fully Supported by the Controlling Maritime Law</u>

#### 1. <u>Plaintiff's Claims Give Rise To Valid Maritime Liens and Fully Support the Arrest of The KOORALE</u>

A Rule C arrest is proper when the Plaintiff has a valid maritime lien. Supplemental Admiralty Rule C(1)(a). Federal statute provides that torts arising from the operation of vessels give rise to maritime liens. 46 U.S.C. §31301(5)(B). It is also black letter law that a breach of the duty to pay maintenance and cure gives rise to a tort lien for damages. <u>Cortes v. Baltimore Insular Line</u>, 387 U.S. 367 (1932). Plaintiff is suing *in*

*rem* for both a maritime tort (unseaworthiness) and for maintenance and cure. As such, assuming a valid unseaworthiness or maintenance and cure claim, Plaintiff has a valid maritime lien and has properly arrested the F/V KOORALE pursuant to Supplemental Admiralty Rule C. Defendant has, essentially, conceded this point (as compared to its arguments regarding the attachment of the vessel pursuant to Supplemental Admiralty Rule B).

### (a) Plaintiff's Unseaworthiness Claim.

The doctrine of unseaworthiness is extremely broad and even the most minor defects in a vessel's equipment, crew or operating methodology can render the vessel "unseaworthy" and give rise to a maritime lien enforceable by arrest pursuant to Rule C. For example, the failure of a piece of the ship's gear under normal operating conditions will render the vessel unseaworthy. Havens v. F/T POLAR MIST, 996 F.2d 215 (9th Cir. 1993); Lee v. Pacific Far East Line, Inc., 566 F.2d 65 (9th Cir. 1977). Any improper or unreasonably dangerous method of operation also constitutes unseaworthiness (so long as it is not an isolated act of negligence). Morales v. City of Galveston, 370 U.S. 165 (1962); Vargas v. McNamara, 608 F.2d 15 (1st Cir. 1979); Alaska SS Co. v. Garcia, 378 F.2d 153 (9th Cir. 1967). Misuse of otherwise safe equipment by an incompetent crew constitutes unseaworthiness. Waldren v. Moore-McCormick Lines, Inc., 386 U.S. 724 (1967). An inadequate, incompetent or poorly trained crew has also been found to be a "condition" giving rise to unseaworthiness liability. *See, e.g.*, Hogg v. Yorkmar, 434 F.Supp. 715 (D.Md. 1977). Finally, unseaworthiness can be the per se result of a regulatory violation. *See, e.g.*, Smith v. Trans-World Drilling Co., 77 F.2d 157, 162 (5th Cir. 1985); Phipps v. SS Santa Maria, 418 F.2d 615, 616-617 (5th Cir. 1969).

In the present case, there is substantial evidentiary support for Plaintiff's unseaworthiness claim. For example, Plaintiff intends to prove at the time of trial that both the KOORALE's fish captain, Mr. Fermin Ferreira, and Coast Guard Master, William Armstrong, were not only chronic marijuana users, but were in fact under the

13

influence of marijuana on the date of Plaintiff's accident. This fact was only recently discovered and will be testified to by multiple crewmembers, business associates of the Captain and members of the Captain's family. Not only does this constitute an unseaworthy condition under the cases relating to incompetent or improper crewmembers, but such intoxication constitutes a direct violation of Coast Guard regulations.

In addition to the above-referenced evidence of an unfit crew and a statutory violation giving rise to unseaworthiness *per se*, the evidence also establishes that the KOORALE utilized a series of unseaworthy practices in transferring crewmembers from its skiff to the mother ship; commonly and routinely carrying out this operation out under rough conditions and poor lighting. Furthermore, the evidence will establish that the ladder which Plaintiff was forced to utilize on the date in question was obstructed by a speed boat hanging over the vessel's side which also will support a finding of unseaworthiness. Indeed, most recently, the Defendant's captain has testified (albeit incredibly) that he had no involvement whatsoever in directing the operation in question or even in ensuring that operations were being carried out safely. Obviously having a captain in charge of a vessel who does not take steps to ensure that the vessel's operations are carried out in a safe manner constitutes an unseaworthy condition. For a further detailed discussion of the evidence supporting Plaintiff's unseaworthiness claim (and his maritime liens against the KOORALE), *see* the Rule 26 reports of Darren Correia, David L. Grant and T.R. Bongartz, Exhibits "E", "F" and "G" to the Declaration of William L. Banning filed herewith.

### (b) Plaintiff's Maintenance and Cure Claim.

A seaman who becomes ill or injured while in the service of his vessel is entitled to a *per diem* stipend for the cost of comparable food and lodging on land during the period of his convalescence, as well as payment for all medical expenses incurred. This is commonly known as "maintenance and cure." Maintenance and cure arises from the

14

context of the employment relationship between the seaman and his employer and does not depend on negligence or fault on the part of the vessel. It is an absolute duty of the shipowner. Vaughan v. Atkinson, 369 U.S. 527, 532 (1962). A seaman is entitled to receive maintenance and cure until he has achieved the maximum medical cure, (*i.e.*, until his condition is such that medical science can exact no possible further improvement for his condition). The employer has an affirmative duty to initiate an investigation concerning a seaman's need for maintenance and cure. This must be accomplished with reasonable diligence. Stewart v. S.S. Richmond, 214 F. Supp. 135 (E.D. La. 1963), app. dis., 326 F.2d 208 (5th Cir. 1964). "Maintenance" is a daily stipend due to a seaman during the period of his disability equivalent to the quality and value of food and lodging provided to him aboard the vessel. McWilliams v. Texaco, Inc., 781 F.2d 514, 1986 AMC 2471 (5th Cir. 1986); Springborn v. American Commercial Barge Co., 767 F.2d 89 (5th Cir. 1985).

Under the cases of Vaughn v. Atkinson, 369 U.S. 527 (1962) and Kopczynski v. The Jacqueline, 742 F. 2d 555 (9th Cir. 1984), a plaintiff is entitled to attorney's fees and costs for "wilful" *or* "arbitrary" refusal to pay maintenance and cure. Such wrongful conduct warranting attorneys' fees and costs can also be found where the employer conducted an "impermissibly lax" investigation of a claim to determine whether the claim should be paid. Breese v. AWI, Inc. 823 F. 2d 100 (5th 1987).

Mr. DeBrum can recover all attorneys' fees and costs under a "Lodestar theory" for work which related in whole or in part to the prosecution of the maintenance and cure claim. Such fees include the reasonable value of all fees not dedicated *solely* to prosecution of the Jones Act negligence and unseaworthiness claims. Williams v. Kingston Shipping Co. Inc., 925 F. 2d 721, 725-727 (4th Cir. 1991). By the end of trial, DeBrum will be making a claim for well over $200,000 in attorney's fees and costs (over $175,000 of which have already been incurred).

"Cure" is defined as the reasonable medical expenses for treatment until the seaman is fit for duty or until maximum cure is reached. <u>Vella v. Ford Motor Co.</u>, 421 U.S. 1, 5 (1975). All ambiguities as to maintenance and cure benefits are resolved in favor of the seaman. <u>Id</u>. Maximum cure is reached when there is no possibility of a betterment in the seaman's physical condition or function. <u>Crooks v. United States</u>, 459 F.2d 631, 633 (9th Cir. 1972); <u>Crociere v. Rose</u>, 939 F. Supp. 1538, 1558 (S.D. Fla. 1996); <u>Sefcik v. Ocean Pride Alaska, Inc.</u>, 844 F. Supp 1372, 1374 (D. Alaska 1993). If the seaman's condition is aggravated as a result of the owner's failure to provide proper care, the shipowner is liable, not only for the increased medical expenses and maintenance that may become necessary, but for <u>all</u> resulting tort damages. <u>Cortez v. Baltimore Insular Line</u>, 287 U.S. 367, 53 S.Ct. 173 (1932).

In the present instance, as discussed above, the Defendants have failed to meet their burden to pay an appropriate rate of maintenance, have failed to pay maintenance in a timely fashion and have denied curative treatment to Mr. DeBrum. These claims too give rise to a valid maritime lien against the KOORALE and support the Rule C arrest of the vessel.

**2. Plaintiff's Jones Act Claim Gives Rise to a Proper In Personam Claim Against Defendant M&F and the Rule B Attachment of The KOORALE.**

As with Plaintiff's *in rem* claims, his *in personam* claim (and his Rule B attachment) are fully supported by the facts and law. Not only does he have a valid Jones Act negligence claim giving rise to *in personam* liability on behalf of M&F, but M&F will almost certainly be found negligent *per se* as a result of the statutory violations relating to illegal drug use aboard the vessel by ship's officers. This will result not only in a finding of negligence *per se*, but a reversal of the burden of proof as to causation (in relation to the statutory violation) and a bar of <u>any</u> finding of comparative negligence as a matter of law. Finally, M&F is simply wrong that under the controlling law Captain Ferreira's presence aboard the vessel results in M&F being deemed to be "present" in this

16

district for the purpose of Rule B attachment. The mere fact that one corporate officer (an individual whose officer status is actually a disputed fact in this case) is subject to personal service in the district does <u>not</u> preclude Rule B attachment.

### (a)     <u>Jones Act Negligence</u>.

The courts have long held that seamen are "the wards of admiralty," and have liberally implemented their personal injury remedies to foster their protection. <u>Cortez v. Baltimore Insular Line, Inc.</u>, 287 U.S. 367, 377 (1932). Following this long-honored public policy in favor of seamen, the United States Congress in 1920 created the Jones Act negligence cause of action. Under the Jones Act, a plaintiff is not required to establish "legal cause", but need only show that the negligent act of a defendant contributed in the "<u>slightest degree</u>" to his injury or played "<u>any part, even the slightest</u>" in producing the injury for which damages are sought. <u>See</u>, <i>e.g.</i>, <u>Simeon v. T. Smith & Son, Inc.</u>, 852 F.2d 1421 (5th Cir. 1988). The seaman's burden of proving his Jones Act claim has been described as "featherweight". All that is required is a showing of the slightest negligence causing injury. <u>Comeaux v. T.L. James & Co., Inc.</u>, 702 F.2d 1023 (5th Cir. 1983). <u>See</u>, <i>e.g.</i>, <u>Ceja v. Mike Hooks Inc.</u>, 690 F.2d 1191 (5th Cir. 1982).

In the present instance, Plaintiff has numerous arguments in support of his Jones Act negligence claim and should have little trouble proving Jones Act negligence and causation. Again, the arguments and theories in support of Plaintiff's negligence claims are discussed in detail in the Rule 26 reports of his liability experts which have been submitted to the court for review as Exhibits "E", "F" and "G" to the Declaration of William L. Banning. The most obvious of these include either ordering the transfer under the prevailing conditions (rough weather, darkness and loss of skiff control capabilities) or failing to supervise the operation in question or to ensure that operations were carried out in a safe manner, impeding Plaintiff's access to the ladder with the speed boat in question and consumption of illegal drugs while on duty. It also should be noted, that the jury will be instructed that the "plaintiff is not negligent simply because the plaintiff,

17

upon request or direction of the defendant, worked at a dangerous job, or in a dangerous place, or under dangerous conditions." Model Ninth Circuit Jury Instruction 9.5.

### (b) **M&F's Violation of Safety Statutes Will Result in Negligence *per se* and The Striking of Any Comparative Negligence Defense.**

#### (i) **Violation of Safety Statutes Amounts to Negligence *per se*.**

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply ... ." Id. The relevant statutes governing personal injury suits by railway employees incorporated into the Jones Act are found in the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§51-60. Kopczynski v. The Jacqueline, 742 F.2d 555, 559 (9th Cir. 1984), cert. denied, 471 U.S. 1136 (1985); Nygaard v. Peter Pan Seafoods, Inc., 701 F.2d 77, 79 (9th Cir. 1983). Under the Jones Act and FELA, a violation of any safety statute or regulation will result in a finding of negligence *per se*.

The necessary elements for a Jones Act negligence *per se* claim are (1) a violation of any safety statute intended to protect seamen, (2) plaintiff's membership in the class of intended beneficiaries of the regulations and (3) causation. Kernan v. American Dredging Co., 355 U.S. 426 (1958); Reyes v. Vantage S.S. Co., Inc., 558 F.2d 238, 242-44 (5th Cir.1977) (Reyes I), modified, 609 F.2d 140 (1980) (Reyes II); Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir.1985); Jones v. Spentonbush-Red Star Co., 155 F.3d 587 (2nd Cir. 1998). Furthermore, and of critical importance to the third element of the negligence per se rule, such a safety violation shifts the burden of proof on causation to the party responsible for the violation. The PENNSYLVANIA, 86 U.S. (19 Wall.) 125, 136 (1873); Reyes v. Vantage S.S. Co., 609 F.2d 140, 144-45 (5th Cir.1980);

18

In Re Seaboard Shipping Corp., 449 F.2d 132 (2nd Cir. 1971); Mathes v. The Clipper Fleet, 774 F.2d 980, 981-982 (9th Cir. 1985); Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 736 (9th Cir.1969); States Steamship Co. v. Permanente Steamship Corp., 231 F.2d 82, 86 (9th Cir.1956); The Denali, 105 F.2d 413, 418 (9th Cir.1939), cert. denied, 311 U.S. 687 (1940); The Princess Sophia, 61 F.2d 339, 347 (9th Cir.1932). The Supreme Court has explained that the type of regulation violated is "irrelevant so long as the violation played any part in causing the injury." Reyes II, 609 F.2d. at 143, citing, Kernan v. American Dredging Co., 355 U.S. 426 (1958). See also, Neal v. Saga Shipping Co., 407 F.2d 481 (5th Cir. 1969).

### (ii) Causation Is Presumed and M&F Cannot Overcome That Presumption.

The Jones Act imposes, in all cases, an extremely lenient causation standard (known as "feather weight causation") by not requiring that a negligent act be the sole cause of the injury, or even a substantial or proximate cause, but only that it contributes in the slightest degree to the injury. Simeon v. T. Smith & Son, Inc., 852 F.2d 1421 (5th Cir. 1988); Smith, 772 F.2d 157. However, in the statutory violation context, not only does the statutory violator have to overcome the featherweight causation element of the Jones Act, but the "impossible" to meet burden of the Pennsylvania Rule, that is that causation is presumed when there is a violation of a safety statute or regulation and, thereafter, the burden shifts to the defendant to overcome that presumption. Reyes II, 609 F.2d at 144; The Pennsylvania, 86 U.S. [19 Wall.] 125, 136 (1873); In Re Seaboard Shipping Corp., 449 F.2d 132 (2nd Cir. 1971); Mathes, 774 F.2d at 981. See also, Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 736 (9th Cir.1969); States Steamship Co. v. Permanente Steamship Corp., 231 F.2d 82, 86 (9th Cir.1956); The Denali, 105 F.2d 413 (9th Cir.1939), cert. denied, 311 U.S. 687 (1940); The Princess Sophia, 61 F.2d 339, 346-347 (9th Cir.1932) [the burden "is frequently extremely

difficult, if not impossible, for the violator to discharge, in the nature of things; therein lies the true penalty."].

In Seaboard, the Second Circuit applied the Pennsylvania Rule to a man-overboard incident. The court stated that despite the fact that there was no evidence that violations of life raft stowage and loading statutes by the ship contributed to the deaths of the seaman in question, it found in favor of the decedents by shifting the burden of proof to the shipowner to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Seaboard, 449 F.2d at 136, citing The Pennsylvania, 86 U.S. at 136 [emphasis added].[1] Similarly, the Fifth Circuit in Reyes II explained that combining the featherweight standard of causation in a Jones Act case with the presumption of causation under the Pennsylvania Rule meant that the shipowner "must show that the ship's inaction and regulatory violations could not have been even a contributing cause of Reyes's death." Id. at 145. In the case of Waterman Steamship Corporation v. Gay Cottons, 414 F.2d 724 (9th Cir. 1969), the Ninth Circuit, in reversing the district court, cited to the rule in statutory violation cases that "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been" a cause and explained that this "burden is frequently extremely difficult, if not impossible, for the violator to discharge." Waterman, 414 F.2d at 736. The court explained that there were various ways that the defective equipment "might" have played a role in the loss and thus ruled that the trial court's finding that the stranding was "not caused by the ship's failure" constituted clear error. Id. at 737.

Here, as mentioned above, there is direct eyewitness testimony that the captain and navigator of the F/V KOORALE were not only chronic marijuana users, but in fact had smoked marijuana approximately five to six hours prior to Plaintiff's accident.

---

[1]/In an attempt to avoid this "impossible" burden, Seaboard argued that the Pennsylvania Rule applied only in collision cases, not to personal injury cases such as Mr. DeBrum's. However, the Court rejected this argument out of hand citing to Kernan and The Denali.

Furthermore, Plaintiff has retained a toxicology expert, one Dr. Thomas Bruff, who will testify as to the probable effects of such chronic marijuana use on the officers of the KOORALE. A true and correct copy of Dr. Bruff's Rule 26 Report is attached as Exhibit "H" to the Declaration of William L. Banning filed herewith. Again, if Plaintiff is successful in proving that these agents of the Defendant were under the influence of illegal drugs on the date in question, a fact which constitutes a violation of Coast Guard safety regulations, this will trigger the above-referenced legal principle resulting in (1) a finding of negligence *per se*, (2) an obligation being imposed on the Defendant to rebut presumed causation and to prove that such a violation could not have been a cause of Plaintiff's accident, no matter how slight, and (3) a bar to any application of the comparative negligence defense to this case.

## (c)  Rule B Attachment is Appropriate in this Case and Defendant M&F Cannot Be Found in this District.

Unlike a Rule C arrest, a Rule B attachment can be used even where plaintiff has no maritime lien. The Rule B attachment requires only an admiralty claim (such as a Jones Act negligence claim). The law is also well established that Rule B attachments can be used as a means of obtaining security for litigation or arbitration pending in other venues. The use of Rule B to obtain security for foreign actions has been approved again and again, including in the Ninth Circuit. See, e.g., Transport Caribe, S.A. v. M/V FEDER TRADER, 860 F.2d 637 (5th Cir. 1988) [staying Rule B action and permitting admiralty court to retain jurisdiction pending arbitration to resolve matters in dispute]; Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627 (9th Cir. 1982) [permitting arrest for security purposes in the context of a choice of forum clause]; Sumikin Transport v. M/V ROSE KNOT, 1988 AMC 1588 (W.D. Wa. 1988) [following similar logic in context of arbitration clause].

Finally, Defendant is simply wrong that the presence of Mr. Fermin Ferreira aboard the F/V KOORALE prevents Rule B Attachment. Rather, even assuming that Captain Ferreira is an officer of M&F sufficient to accept service of process, to avoid attachment the defendant must be found within the district both in terms of service of process and personal jurisdiction. Labanca v. Ostermunchner, 664 F.2d 65 (5th Cir. 1981); Seawind Compania v. Crescent Line, Inc., 320 F.2d 580 (2d Cir. 1963); State of Oregon v. Tug Go Getter, 398 F.2d 873 (9th Cir. 1968). Furthermore, it is black letter law that proper service alone does not establish personal jurisdiction. The defendant must still have the requisite minimum contacts with the foreign state. Greenspun v. Dell E. Webb Corp., 634 F.2d 1204, 1207 (9th Cir. 1980). In the present instance, Plaintiff is unaware of any contacts with this district which would give rise to general or specific jurisdiction. Finally, there is also a legal question as to whether service on a transient agent or corporate representative constitutes proper service on the entity itself. See, e.g., Burnham v. Superior Court, 495 U.S. 604, 610 (1990).[2]

Additionally, the allegation that the Plaintiff had been advised that the vessel was heading for Guam is simply untrue. Rather, both Defendant and its California counsel directly misrepresented where the vessel was headed; going so far as to state in open court that the vessel was sailing for New Zealand having suffered damage while leaving American Samoa. In fact, it was the extent of this "show" put on by Defendants and their counsel that led Plaintiff to investigate whether in fact the vessel might be heading for a port, such as Guam, within a federal district. See the Declaration of William L. Banning, ¶7.

B.    M&F Must Post Security Sufficient to Secure Plaintiff's Claim "Fairly Stated," All Custodial Expenses and Other Costs and All Accrued Interest.

---

[2]/Indeed, there is a real question as to whether Mr. Ferreira is an officer of M&F Fishing. Specifically in his deposition in this case conducted on January 17, 2003, he stated that he did not know if he was an officer of the company, that he thought that his son was the President, and that "they [the company lawyers] may have put me as an officer." Similarly, in a separate action where Mr. Ferreira was deposed and he was asked if he was a company officer, he responded "no, just fish captain."

Plaintiff does not dispute the fact that the release of the KOORALE may be obtained by posting an adequate bond to cover Plaintiff's claim. However, M&F's argument as to its view of the case and the value of Plaintiff's claim misses the point of what is required to obtain the release of a vessel on posting of security. Specifically, the law does not allow the defendant to have a mini-trial or summary adjudication of the plaintiff's claims in an attempt to reduce security, but simply allows the court to evaluate plaintiff's claim "fairly stated," including looking behind the pleadings if necessary. The goal, of course, is to allow the defendant's revenue producing asset (the vessel) to sail, leaving, in essence, identical security behind to protect the plaintiff. Here, if the court looks to Plaintiff's prayer for relief, the basic allegations and circumstances of his injury and claims and/or verdicts in comparable cases, it becomes abundantly clear that Defendants' proposed security in the amount of $700,000 is nothing short of preposterous. To allow the posting of such minimal security would not be anywhere close to a fair "alternate" to the F/V KOORALE herself. Rather, because of the seriousness of Plaintiff's injuries and the realistic possibility that a jury verdict in his favor could exceed the value of the KOORALE (see the jury verdicts summarized above), unless the KOORALE is worth a figure somewhere "north" of $7 to $10 million, it is inconceivable that a bond for the full value of the vessel would not be required in this case.

It is well established that a party may obtain the release of a vessel under arrest or attachment pursuant to Supplemental Admiralty Rule E(5)(a) by posting security sufficient to cover the value of Plaintiff's claim "fairly stated," accrued interest and custodial costs. As a general rule, in carrying out this undertaking, the Court is not bound by the monetary allegations in the complaint, but may look behind the complaint to ascertain the amount actually in controversy, including considering affidavits as to the amount of Plaintiff's claim "fairly stated." See, e.g., 20th-Century Fox Film Corp. v. M/V SHIP AGENCIES, INC., 992 F.Supp. 1429, 1431 (M.D. Fla. 1997); Angad v. M/V

23

FAREAST TRADER, 1989 W.L. A.M.C. 2721 (S.D. Tex. 1989). In carrying out this evaluation, the duty of the Court is to determine the amount of the claim, not to evaluate liability issues and whether or not the Plaintiff will ultimately prevail. See, 20th-Century Fox Film Corp., 992 F.Supp. at 1433-34. Furthermore, while Defendant is entitled to a post-arrest hearing, such hearing is not intended to resolve the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant and/or to address the posting of alternate security. Salazar v. Atlantic Sun, 881 F.2d 73 (3d Cir. 1989).

Furthermore, because any recovery is ultimately limited to the bond (the lien being erased from the vessel upon release and transferred to said security), it is necessary for the court to err on the high-side when setting the bond. 20th-Century Fox Film Corp., 992 F.Supp. at 1434. See also, 7A Moore's Federal Practice, 2d Ed., ¶E.13[2]. As stated in 20th-Century, this analysis is made "[w]ithout prejudging who will ultimately prevail." 992 F.Supp. at 1432-1433. As the court concluded, "[w]ithout prejudging who will ultimately prevail, plaintiff's claim appears arguable; thus, the [amount of the claim] is 'fairly stated.'" Id. As the court explained:

> The court is not making any determination as to whether plaintiff will ultimately prevail on the merits of his claim or, if so, the amount of any judgment, matters to be resolved by the parties through arbitration or by future proceedings in this court. Moreover, in setting the amount of this bond, the court is mindful that any ultimate recovery against the arrest itself is limited to the amount of the bond; therefore, it is prudent to err on the high side."

20th-Century, 992 F.Supp. at 1433-34.

Indeed, pursuant to 28 U.S.C. 2464, "whenever a warrant of arrest or other process in rem is issued in any admiralty case, the United States marshal shall stay the execution of such process, or discharge the property arrested if the process has been levied, on receiving from the respondent or claimant of the property a bond or stipulation in double

24

the amount claimed by the libelant ... ." [Emphasis added.] According to the Advisory's Committee notes on Rule E(5), 28 U.S.C. §2464 was incorporated by reference into the Supplemental Admiralty Rules. See also, Su v. M/V SOUTHERN ASTER, 767 F.Supp. 205, 208 (D. Ore. 1990) [setting bond at two times the amount of plaintiff's claim "fairly stated" to protect plaintiff]; Folkstone Maritime Ltd. v. CSX Transportation, Inc., 1989 A.M.C. 862 (N.D. Ill. 1988) [setting bond in the amount of value of the vessel since it was less than plaintiff's claim fairly stated once "doubled under subsection (i)"].

## C. Plaintiff's Security Demand is Fully Supported by the Factual Allegations in this Case.

Defendant's moving papers conclude that the reasonable bond for the release of the vessel KOORALE would be $700,000. This figure, however, is not based on looking at Plaintiff's claim "fairly stated," but on what Defendant purportedly hopes to be able to prove at the time of trial. While it, of course, is Defendants' prerogative to analyze this claim as it deems fit, Defendants' proposed "alternate" security ignores the court's role at this juncture in the proceedings.

Here, the court must look at the Plaintiff's prayer and carry out an evaluation of the evidence sufficient to conclude that the security sought is actually appropriate given the nature of Plaintiff's claim (i.e., should he prevail on that claim). In the present instance, there is no dispute that Mr. DeBrum suffered a horrific injury. Furthermore, Plaintiff has submitted substantial evidence in support of his opposition (consisting of his own deposition testimony, photographs, the reports of his experts, etc.). Not only does this showing go far beyond what is required by the rules, but, while limited by the short notice on this motion, plaintiff is also prepared to submit whatever form of evidentiary showing the court may order.

Again, this is a case which includes theories which, if successful, will result in a finding of negligence per se and a legal preclusion to the application of any comparative

negligence (if Defendant is to believed that there is evidence to support such a defense). Finally, Plaintiff has submitted numerous jury verdicts from Southern California (which Defendant conveniently failed to locate) which show that the mid-level value of cases such as this in California range from between $3 and $4 million. Furthermore, Plaintiff has submitted jury verdicts establishing that cases such as this can sometimes result in verdicts being rendered for much greater sums. Consequently, in carrying out a meaningful evaluation of the security which needs to be posted as a viable alternative to maintaining the KOORALE under arrest (or having her sold), it cannot realistically be said that such security can be for less than the value of the KOORALE.[3]

Finally, while M&F and its underwriters have refused to provide critical insurance information to Plaintiff, have refused to acknowledge that the "pay-to-be-paid" clause will not be asserted and have ignored Plaintiff's demands for alternate security, there is no dispute that M&F is fully insured and that the insurance company has the capacity to post the necessary bond if it chooses to stand behind M&F. Furthermore, based on prior experience, such a bond can probably be obtained for approximately $35,000 for a full year's coverage.[4] Furthermore, because this matter is set for trial in approximately one month, a bond could be obtained for considerably less than the full annual premium referenced above. Thus, the hardship placed upon the Defendant and its underwriters is not that of bankrupting M&F Fishing or putting its primary revenue producing asset out of commission, but rather simply the cost of posting of a bond to cover any ultimate judgment that may be entered. Conversely, the burden on Plaintiff DeBrum if he loses the security currently in place in the form of the KOORALE is very significant indeed.

---

[3]/Although no formal valuation survey has yet been carried out, we understand that the KOORALE is insured for $8,000,000 and probably has a fair market value of between $7 and $8 million. While Plaintiff is willing to accept security equal to his prayer for relief in his complaint (in the amount of $6,350,960), if Defendants contend in good faith that the KOORALE is worth less than this amount, the court should simply order an appraisal by an independent third-party appraiser to establish what this figure should be.

[4]/See a true and correct copy of the Ship Release Bond posted in the Costa matter indicating an annual premium of $35,400, Exhibit "H" to the Declaration of William L. Banning.

26

### III.  CONCLUSION

Plaintiff's claims give rise to valid maritime liens and in personam claims which support attachment pursuant to Supplemental Admiralty Rule B and arrest pursuant to Supplemental Admiralty Rule C.  Defendant has little or no contacts with this district and as such cannot be "found" within the meaning of Rule B.  There is no support whatsoever to vacate the Rule B Attachment (particularly since the vessel is already under arrest pursuant to Rule C and no argument to vacate the arrest).

While Plaintiff has no objection whatsoever to the posting of alternate security either in this district or in the Central District of California, there is no serious argument that the bond in question could be for less than the fair market value of the F/V KOORALE (estimated to be between $7 and $8 million).  While it is indeed possible that Plaintiff will not recover a figure of this magnitude at trial, it falls within the reasonable high-end range of verdicts in cases such as this and Plaintiff is entitled to have comparable security posted to maintain the status quo if the KOORALE is to be released.  Finally, there is no indication whatsoever that M&F's underwriters could not easily obtain and post the bond in question and no reason whatsoever to risk penalizing Plaintiff by allowing the vessel to sail without the posting of security equal to the value of the vessel.  Plaintiff has already stated that he will accept security in the amount of his prayer for relief (namely $6,350,960) and will agree to an appraisal of the vessel if the Defendants contend that this figure exceeds the fair market value of their vessel.

DATED:  February 21, 2003.

**CUNLIFFE & COOK**
A Professional Corporation

By: _____

JEFFREY A. COOK, ESQ.
Attorneys for Plaintiff, MEL DEBRUM

JAC:cgb/Civil-TEMP/Banning Koorale-B-0163.1/opp1



## CERTIFICATE OF SERVICE

I, **JEFFREY A. COOK**, hereby certify that on February 21, 2003, I caused to be sent by personal service or by facsimile, a copy of the foregoing to the offices of counsel of record as follows:

1. Plaintiff's Opposition to Defendants' Motion to Vacate Rule B Attachment and for Release of Vessel on Posting of Alternate Security; and

2. Declaration of William L. Banning in Support of Plaintiff's Opposition to Defendants' Motion to Vacate Rule B Attachment and for Release of Vessel on Posting of Alternate Security;

David P. Ledger, Esq.
**CARLSMITH BALL LLP**
Suite 401, Bank of Hawaii Building
134 West Soledad Avenue
Hagåtña, GU 96910
Tel: (671) 472-6813
Facsimile: (671) 477-4375
Temporary Facsimile: 472-2307

Dated this 21st day of February 2003.

**CUNLIFFE & COOK**
A Professional Corporation
Attorneys for Plaintiff MEL DEBRUM

By: _____
JEFFREY A. COOK, ESQ.

JAC:cgb
Civil-Temp/Banning-Koorale-B-0163.1/Crt Srvc1