**Law Offices of**
**CUNLIFFE & COOK**
Suite 200
210 Archbishop F.C. Flores Street
Hagåtña, GU  96910
Telephone:  (671) 472-1824
Telefax:  (671) 472-2422

Attorneys for Plaintiff MEL DEBRUM

F I L E D
DISTRICT COURT OF GUAM

FEB 2 1 2003

MARY L. M. MORAN
CLERK OF COURT

24

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| MEL DEBRUM, | ADMIRALTY CIVIL NO. 03-00004 |
| Plaintiff, | **DECLARATION OF WILLIAM L.** |
| | **BANNING IN SUPPORT OF** |
| vs. | **PLAINTIFF'S OPPOSITION TO** |
| | **DEFENDANTS' MOTION TO** |
| M&F FISHING CO., INC., a corporation, *in* | **VACATE RULE B ATTACHMENT** |
| *personam,* and M/V KOORALE, her engines, | **AND FOR RELEASE OF VESSEL ON** |
| tackle, apparel, furniture, and | **POSTING OF ALTERNATE** |
| appurtenances, *in rem,* | **SECURITY** |
| Defendants. | |

I, William L. Banning, declare:

1.      I am a partner in the firm of Banning Micklow Bull & Lopez LLP, Plaintiff Mel DeBrum's counsel of record in the underlying California action entitled "Mel DeBrum v. M&F Fishing, Inc. a corporation, *in personam,* and M/V KOORALE, her engines, tackle, apparel, furniture, and appurtenances, *in rem,* filed in the United States District Court for the Central District of California, Case No. 01-08403 DDP (SHx).

2.      This case has been in active litigation in the United States District Court for the Central District of California (before the Honorable Dean D. Pregerson) since September of 2001.  During this time our firm has been undertaking efforts to determine what, if any, insurance is available to respond in the event that Plaintiff should obtain a judgment in his favor.  However, throughout this time, Defendant M&F has refused to produce critical information necessary to evaluate the insurance available (such as

policy limits applicable to Plaintiff's claim, the existence of any reservation of rights by either primary or excess underwriters and, of critical importance, whether or not the liability insurers for M&F intend to assert the "pay-to-be-paid" clause in the policy arguing that it relieves underwriters of having to satisfy any judgment until M&F has actually paid the claim). Indeed, Defendants have refused to produce this information to Plaintiff notwithstanding the fact that they were ordered to produce this information by Central District Court Magistrate Judge Stephen J. Hillman. Furthermore, when Plaintiff sought financial information from M&F Fishing to allay his fears regarding the company's ability to "pay-to-be-paid," this information too was denied.

3. When Plaintiff repeatedly inquired with counsel for M&F as to whether or not M&F underwriters would post a bond in lieu of arrest, Plaintiff's written requests were ignored and Plaintiff's counsel were told verbally that the underwriters would not post a bond to avoid arrest.

4. Since the KOORALE has been arrested, Defendants' Guam counsel have raised the possibility of posting alternate security for the release of the vessel. In response Plaintiff has already agreed to waive any objection to Defendant obtaining release of the vessel by posting security acceptable to Plaintiff, but reserving its right to seek a reduction in security if it chose to do so at a later time. Indeed, Plaintiff has already suggested that he would agree to a slightly reduced bond if Defendants' underwriters would agree to post the bond in the Central District of California, allowing this action to be stayed, transferred or dismissed without prejudice pending trial in California.

5. In addition to the "mid-level" verdicts located from the Los Angeles area, additional leg amputation cases were located throughout California and the United States, many with verdicts exceeding Los Angeles verdicts. In fact, the average single leg

amputation verdict value nationwide exceeded the Los Angles average by approximately $1,000,000.

6.    Plaintiff has attempted to review all single amputation jury verdicts in California. Plaintiff did not include the low value verdicts (typically involving the aged, recreational injuries suffered by minor plaintiffs and disease-related amputations), nor did he include the high-side verdicts (which typically involved extreme aggravating circumstances or appeared to represent the proverbial "run away" verdicts). However, by excluding these extremes, Plaintiff has determined that the average single below knee amputation general damage jury verdict in California from 1984 to the present is $3,000,000.

7.    The allegation that the Plaintiff had been advised that the vessel was heading for Guam is simply untrue. Rather, both Defendant and its California counsel directly misrepresented where the vessel was headed, going so far as to state in open court that the vessel was sailing for New Zealand having suffered damage while leaving American Samoa. In fact, it was the extent of this "show" put on by Defendants and their counsel that led Plaintiff to investigate whether in fact the vessel might be heading for a U.S. District Court port.

8.    Attached hereto and marked as Exhibit "A" is a true and correct copy of the Rule 26 Report of Plaintiff's economic expert, Dr. Joyce Pickersgill.

9.    Attached hereto and marked as Exhibit "B" is a true and correct copy of the primary policy issued by Shipowners Mutual Protection and Indemnity Association (including the Standard Fishing Vessel Clauses and the "pay-to-be-paid" clause - paragraph 7).

10.    Attached hereto and marked as Exhibit "C" is a true and correct copy of Judge Hillman's order of February 10, 2003.

11. Attached hereto and marked as Exhibit "D" are true and correct copies of the letters to counsel for M&F demanding security to avoid arrest.

12. Attached hereto and marked as Exhibit "E" is a true and correct copy of the California jury verdicts referenced in Plaintiff's opposition filed herewith.

13. Attached hereto and marked as Exhibit "F" is a true and correct copy of the Rule 26 Report of Plaintiff's liability expert, Darren Correia.

14. Attached hereto and marked as Exhibit "G" is a true and correct copy of the Rule 26 Report of Plaintiff's liability expert, David L. Grant.

15. Attached hereto and marked as Exhibit "H" is a true and correct copy of the Rule 26 Report of Plaintiff's liability expert, T.R. Bongartz.

16. Attached hereto and marked as Exhibit "I" is a true and correct copy of the Rule 26 Report of Plaintiff's toxicology expert, Dr. Thomas Bruff's.

17. Attached hereto and marked as Exhibit "J" is a true and correct copy of the Ship Release Bond posted in the Costa matter indicating an annual premium of $35,400.

18. Attached hereto and marked as Exhibit "K" are true and correct copies of certain excerpts of the deposition of Dr. Jay Marumoto.

19. Attached hereto and marked as Exhibit "L" are true and correct copies of Volumes I and II of the deposition of Mel DeBrum and copies of the changes thereto.

///

///

///

///

///

///

I declare under penalty of perjury under the laws of the United States that the

foregoing declaration is true and correct, and that this declaration was executed this 19th

day of February, 2003, in San Diego, California.

William L. Banning

# EXHIBIT "A"

ORIGINAL

Exhibit

A

# FORMUZIS, PICKERSGILL & HUNT, INC.

## ECONOMIC CONSULTANTS

**PROFESSIONAL STAFF**
PETER FORMUZIS
JOYCE PICKERSGILL
TAMORAH HUNT
TIMOTHY J. LANNING
MARILYN J. BOSTICK
JOHN D. ROBINSON
SANDRA K. LOEHR
JOSEPH R. STACK. C.P.A.

2000 E. FOURTH STREET, SUITE 200
SANTA ANA, CALIFORNIA 92705

TELEPHONE: (714) 542-8853
FAX: (714) 836-6910
E-MAIL: MAILBOX@FPANDH.COM

OFFICE ADMINISTRATOR
PATRICIA L. VAWTER

## JOYCE PICKERSGILL, PH.D.

### EMPLOYMENT

Economist and Principal in Formuzis, Pickersgill & Hunt, Inc.

Professor of Economics Emeritus, California State University, Fullerton

### EDUCATION

B.A., Economics:  Magna Cum Laude, Smith College, 1963

M.A., Economics:  University of Washington, 1965

Ph.D., Economics: University of Washington, 1966

### EXPERIENCE

Economic Consultant, Formuzis, Pickersgill & Hunt, Inc., 1982 - Present

Professor of Economics, California State University, Fullerton, 1974 - 1992

Chair of the Department of Economics, California State University, Fullerton, 1976 - 1982

Graduate Coordinator, Department of Economics, California State University, Fullerton,
1972 - 1976

Associate Professor of Economics, California State University, Fullerton,
September 1970 - 1974

Assistant Professor of Economics, California State University, Fullerton,
September 1966 - 1970

Pre-Doctoral Associate, Department of Economics, University of Washington,
January 1965 - June 1965

Teaching Assistant, Department of Economics, University of Washington,
September 1963 - January 1965

SUITE 17

## HONORS AND AWARDS

Phi Beta Kappa, Smith College, 1963

Teaching Fellowship, University of Washington, 1963 - 1965

National Science Foundation Research Fellowship, Summer 1965

Research Institute, University of Washington, Ford Foundation Dissertation Fellowship, 1965 - 1966

Outstanding Professor Award, School of Business Administration and Economics, California State University, Fullerton, 1980

Outstanding Faculty Member Award, Alumnae Association, California State University, Fullerton, 1981

Outstanding Professor Award, California State University, Fullerton, 1982

## PROFESSIONAL ASSOCIATIONS

American Economic Association

Association for Comparative Economic Studies

National Association of Forensic Economists

Western Economic Association

## PUBLICATIONS

Book:

Contemporary Economic Systems: A Comparative View, (Gary Pickersgill, co-author), West Publishing Co., 2nd edition, 1985.

Published Papers

"Hyperinflation and Monetary Reform in the Soviet Union, 1921 - 1926," Journal of Political Economy, October 1968.

"The Long-Run Demand Function for Money in the Soviet Union," Journal of Money, Credit and Banking, February 1970.

Report on the Role of Women in the California State Universities and Colleges, CSUF Academic Senate, 1973.

501-18

"Soviet Household Saving Behavior," Review of Economics and Statistics, May 1976.

"Financial Planning in the Soviet Union," in Judith Thornton (ed.), Planning in the Soviet-Type System, Cambridge University Press, 1976.

"Soviet Inflation," Soviet Union, Vol. 4, Part 2, Spring 1977.

"Aggregate Economic Problems in Soviet-Type Economies," (James Millar, co-author), ACES Bulletin, Spring 1978.

"Soviet Household Saving: A Cross-Section Study of Soviet Emigrant Families," (Gur Ofer, co-author) Quarterly Journal of Economics, August 1980.

"Financial Crisis in the Soviet Union: A Comment", Soviet Studies, October 1980.

"Recent Evidence on Soviet Household Saving Behavior", Review of Economics and Statistics, November 1980.

"The Political Economy of Soviet Inflation", in Heinrich Vogler, ed., Wirtschaftsprobleme Ost Europas Inder-Analyse, State Institute for Eastern and International Studies, West Germany, 1982.

"The Determinants of Household Savings in the USSR", in Franco Modigliani and David Hemmings (eds.), Saving and Wealth, Macmillan, 1983.

"The Present Value of Economic Loss: A Readers Guide to Jones & Laughlin v. Pfeifer," (Peter Formuzis, co-author), Trial, February 1985.

"Converting Present Value Awards Into Periodic Payments", (Peter Formuzis, co-author), Journal of Forensic Economics, August 1989.

"Median Years to Retirement and Worklife Expectancy for the Civilian U.S. Population", (Tamorah Hunt & Herbert Rutemiller, co-authors), Journal of Forensic Economics, Volume X, Number 2, Spring/Summer 1997.

"Median Years to Retirement," (Tamorah Hunt & Herbert Rutemiller, co-authors), in Life and Worklife Expectancies, Hugh Richards, M.S. and Jon R. Abele, Esq., Lawyers & Judges Publishing Company, Inc., 1999.

19
501-48

### FORMUZIS, PICKERSGILL & HUNT, INC.
### SUMMARY OF THE ANALYSIS
### ECONOMIC LOSSES SUSTAINED BY
### MEL DE BRUM

**I. PRESENT VALUE OF THE FUTURE ECONOMIC LOSS**                ( 08/10/2000 - 08/31/2038 )

|  | OPTION 1: SEAMAN | OPTION 2: DECK BOSS |
|---|---|---|
| **A. UNIMPAIRED EARNING CAPACITY** | | |
| 1. WAGES/SALARY | $380,349 | $741,199 |
| 2. HEALTH BENEFITS | 34,430 | 34,430 |
| 3. ROOM & BOARD | 379,153 | 379,153 |
| LESS MAINTENANCE RECEIVED | (7,380) | (7,380) |

|  | OPTION A: CALIFORNIA | OPTION B: MARSHALL ISLANDS |
|---|---|---|
| **B. OFFSET EARNING CAPACITY** | | |
| 1. WAGES/SALARY | (226,421) | (57,152) |

**C. CARE COSTS**                                    135,630

| | OPTION 1A: $898,761 | OPTION 1B: $858,030 | OPTION 2A: $1,057,611 | OPTION 2B: $1,216,880 |
|---|---|---|---|---|
| **II. TOTAL ECONOMIC LOSS** | | | | |
| COMPOUND INTEREST @ 1 YEAR T-BILL RATE ( 08/10/2000 - 02/01/2003) | $76,771 | $94,320 | $116,531 | $134,080 |
| **III. TOTAL ECONOMIC LOSS PLUS INTEREST** | $773,532 | $950,360 | $1,174,142 | $1,350,960 |

JOYCE PICKERSGILL, PhD
January 22, 2003



EXHIBIT
502
Pickersgill

**FORMUZIS, PICKERSGILL & HUNT, INC.**
PERSONAL INJURY
ANALYSIS REGARDING THE ECONOMIC LOSS OF
MEL DE BRUM

PAGE 2

08/10/2000

PRESENT VALUE START DATE

     05/13/1962

     DATE OF BIRTH

     08/10/2000

     DATE OF INJURY

     AGE AT DATE OF INJURY    38.2    YEARS

     EDUCATION LEVEL      HIGH SCHOOL GRADUATE

[1]   RETIREMENT AGE      61.8    YEARS IN   02/29/2024
     REMAINING YEARS TO RETIREMENT    23.5    YEARS

[2]   AGE AT NORMAL LIFE EXPECTANCY (MALE)    76.3    YEARS IN   08/31/2038
     YEARS TO NORMAL LIFE EXPECTANCY    38.0    YEARS

FOOTNOTE

[1] HUNT, PICKERSGILL AND RUTEMILLER, "RECENT TRENDS IN MEDIAN YEARS TO RETIREMENT AND WORKLIFE EXPECTANCY FOR THE CIVILIAN U.S. POPULATION." JOURNAL OF FORENSIC ECONOMICS, FORTHCOMING VOLUME XIV, NUMBER 3, FALL 2001.

[2] U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, NATIONAL CENTER FOR HEALTH STATISTICS, "NATIONAL VITAL STATISTICS REPORTS." UNITED STATES LIFE TABLES, 1998.

**NIEL DE BRUM**
**EMPLOYMENT DATA**

### EARNINGS HISTORY:

| YEAR | EARNINGS |
|------|----------|
| 1996 | $28,460 |
| 1997 | $20,748 |
| 1998 | $33,507 |
| 1999 | $16,038 |
| 2000 | $13,020 |

AVERAGE 1996 - 1999:     $24,188

DATE OF INJURY:          08/10/2000

EMPLOYMENT PRIOR TO DATE OF INJURY:

| | |
|---|---|
| EMPLOYER: | KOORALE |
| POSITION: | SEAMAN |
| DATE OF HIRE: | Jan-1989 |
| FINAL RATE OF PAY: | $6 PER TON |
| PROMOTION POSSIBILITIES: | DECK BOSS (2 - 3 YEARS)<br>$12 - $13 PER TON |
| BENEFITS: | MEDICAL, ROOM & BOARD |

EMPLOYMENT SINCE DATE OF INJURY:     NONE

562-3

**MEL DE BRUM**
**EARNINGS INFORMATION**

| TRIP | EARNINGS | PAID TONS | CATCH TONS | % OF PAID TO CATCH TONS | TRIPS PER YEAR |
|---|---|---|---|---|---|
| 1,1996 | $5,700 | 950 | 1,036 | 91.7% | |
| 2,1996 | $5,760 | 960 | 1,034 | 92.9% | |
| 3,1996 | $6,000 | 1,000 | 829 | 120.6% | |
| 4,1996 | $6,000 | 1,000 | 1,018 | 98.2% | |
| 5,1996 | $3,000 | 500 | 614 | 81.4% | |
| | $26,460 | 4,410 | 4,531 | 97.3% | 5.00 |
| | | | | | |
| 1,1997 | $5,700 | 950 | 1,000 | 95.0% | |
| 2,1997 | $6,000 | 1,000 | 1,023 | 97.8% | |
| 3,1997 | $6,000 | 1,000 | 1,096 | 91.2% | |
| 4,1997 | $2,700 | 450 | 517 | 87.0% | |
| 4,1997 | $348 | 58 | | | |
| | $20,748 | 3,458 | 3,636 | 85.1% | 4.00 |
| | | | | | |
| 2,1998 | $5,700 | 950 | 1,038 | 91.5% | |
| 3,1998 | $6,000 | 1,000 | 1,119 | 89.3% | |
| 3,1998 | $582 | 97 | | | |
| 4,1998 | $6,000 | 1,000 | 1,103 | 90.6% | |
| 4,1998 | $375 | 62 | | | |
| 5,1998 | $6,000 | 1,000 | 1,106 | 90.4% | |
| 6,1998 | $4,650 | 775 | 1,064 | 72.8% | |
| 7,1998 | $4,200 | 700 | 1,025 | 68.3% | |
| | $33,507 | 5,584 | 6,456 | 86.5% | 6.00 |
| | | | | | |
| 1,1999 | $5,508 | 918 | 926 | 99.1% | |
| 2,1999 | $5,250 | 875 | 1,024 | 85.4% | |
| 3,1999 | $600 | 100 | 352 | 28.4% | |
| 3,1999 | $4,680 | 780 | 838 | 93.1% | |
| | $16,038 | 2,673 | 3,140 | 85.1% | 3.00 |
| | | | | | |
| 1,2000 | $4,800 | 800 | 1,067 | 75.0% | |
| 2,2000 | $3,650 | 810 | 927 | 65.8% | |
| 3,2000 | $4,560 | 760 | 1,077 | 70.6% | |
| 4,2000 | $4,469 | 745 | 1,054 | 70.7% | |
| | $17,489 | 2,915 | 4,124 | 70.7% | 4.00 |
| | | | | | |
| 1,2001 | $5,700 | 950 | 1,144 | 83.1% | |
| 2,2001 | $5,400 | 900 | 1,091 | 82.5% | |
| 3,2001 | $5,052 | 842 | 1,051 | 80.1% | |
| | $16,152 | 2,692 | 3,286 | 81.8% | 3.00 |
| | | | | | |
| 1,2002 | $5,400 | 900 | 1,044 | 86.2% | |
| 2,2002 | $5,520 | 920 | | | |
| 3,2002 | $5,400 | 900 | | | |
| 4,2002 | $5,700 | 950 | | | |
| | $22,020 | 3,670 | 4,050 [2] | 90.6% | 4.00 |
| | | | | | |
| AVERAGE 1996 - 2002: | $21,773 | 3,628 | 4,175 | 86.8% | 4.14 |
| AVERAGE 1998 - 2002: | $21,041 | 3,507 | 4,211 | 83.0% | 4.00 |

FOOTNOTES.

[1] 0.707 x 1.054
[2] PER BERNARDINO REPORT

5024

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 13 of 234

P.07

**MEL DE BRUM**
**UNIMPAIRED EARNING CAPACITY**

MR. DE BRUM'S UNIMPAIRED EARNING CAPACITY WAS CALCULATED USING THE FOLLOWING TWO OPTIONS.

OPTION 1 IS CALCULATED BEGINNING ON AUGUST 10, 2000 USING THE KOORALE'S ACTUAL PAID TONS MULTIPLIED BY MR. DE BRUM'S PER TON RATE AT THE TIME OF HIS INJURY. BEGINNING IN JANUARY 1, 2003, MR. DE BRUM'S UNIMPAIRED EARNING CAPACITY WAS PLACED AT $21,600 PER YEAR. THIS FIGURE REFLECTS THE AVERAGE OF THE EARNINGS OF SEAMEN ON THE KOORALE FOR THE YEARS 1996 THROUGH 2002, ASSUMING THAT MR. DE BRUM WOULD HAVE REMAINED ON THE KOORALE.

OPTION 2 IS CALCULATED ASSUMING THAT MR. DE BRUM WOULD HAVE BEEN PROMOTED TO DECK BOSS AFTER TWO TO THREE YEARS EARNING BETWEEN $12.00 AND $13.00 PER TON.

USING THIS INFORMATION, MR. DE BRUM'S UNIMPAIRED EARNING CAPACITY BEGINNING ON AUGUST 10, 2000 WAS CALCULATED USING THE KOORALE'S ACTUAL PAID TONS MULTIPLIED BY MR. DE BRUM'S PER TON RATE AT THE TIME OF HIS INJURY. BEGINNING IN JANUARY 1, 2003, MR. DE BRUM'S UNIMPAIRED EARNING CAPACITY WAS PLACED AT $21,600 PER YEAR. THIS FIGURE REFLECTS THE AVERAGE OF THE EARNINGS OF SEAMEN ON THE KOORALE FOR THE YEARS 1996 THROUGH 2002, ASSUMING THAT MR. DE BRUM WOULD HAVE REMAINED ON THE KOORALE. THIS FIGURE WAS INCREASED TO $45,000 PER YEAR BEGINNING ON MARCH 1, 2003 USING THE RATIO OF THE SEAMAN RATE OF $5.00 PER TON AND THE MID-POINT OF THE EARNINGS RANGE ABOVE FOR DECK BOSS.

PAGE 6 OF THIS REPORT PRESENTS HISTORICAL DATA ON CATCH TONS FOR THE KOORALE AND THE WESTERN FLEET. OVER THE PERIOD 1995 THROUGH 2002, EXCLUDING 2000, THE FLEET CATCH EXCEEDED THE KOORALE CATCH BY 18 PERCENT. IF MR. DE BRUM HAD TRANSFERRED TO A BOAT WITH THE FLEET AVERAGE AND CONTINUED TO BE PAID $6.00 PER TON, HIS EARNINGS WOULD HAVE BEEN 18 PERCENT HIGHER.

**1. PRESENT VALUE OF THE UNIMPAIRED EARNING CAPACITY**

NET DISCOUNT RATE:          2.5% [1]

NUMBER OF MONTHS:           282

| OPTION 1: SEAMAN TIME PERIOD | | RATE PER TON | PAID TONS | ANNUAL EARNINGS | MONTHLY EARNINGS | PRESENT VALUE |
|---|---|---|---|---|---|---|
| 08/10/2000 | - 12/31/2000 | $6.00 | 745 | $17,880 | $1,490 | |
| 01/01/2001 | - 12/31/2001 | $6.00 | 2,692 | $16,152 | $1,346 | |
| 01/01/2002 | - 12/31/2002 | $6.00 | 3,670 | $22,020 | $1,835 | |
| 01/01/2003 | - 02/29/2024 | $6.00 | 3,600 | $21,600 | $1,800 | $380,349 |

| OPTION 2: DECKBOSS TIME PERIOD | | RATE PER TON | PAID TONS BASIS | ANNUAL EARNINGS | MONTHLY EARNINGS | PRESENT VALUE |
|---|---|---|---|---|---|---|
| 08/10/2000 | - 12/31/2000 | $6.00 | 745 | $17,880 | $1,490 | |
| 01/01/2001 | - 12/31/2001 | $6.00 | 2,692 | $16,152 | $1,346 | |
| 01/01/2002 | - 12/31/2002 | $6.00 | 3,670 | $22,020 | $1,835 | |
| 01/01/2003 | - 02/28/2003 | $6.00 | 3,600 | $21,600 | $1,800 | |
| 03/01/2003 | - 02/29/2024 | $12.50 | 3,600 | $45,000 | $3,750 | $741,199 |

FOOTNOTE:

[1] THE NET DISCOUNT RATE IS THE ANTICIPATED SPREAD BETWEEN THE RATE OF RETURN ON INVESTMENTS AND THE RATE OF INCREASE IN COMPENSATION THE RATE OF RETURN ON INVESTMENTS IS BASED UPON A MIX OF SHORT AND MEDIUM-TERM U.S. GOVERNMENT SECURITIES. RATES OF RETURN ARE REPORTED IN THE "ECONOMIC REPORT OF THE PRESIDENT," 2002 AND THE BOARD OF GOVERNORS, FEDERAL RESERVE BANK. COMPENSATION GROWTH IS BASED ON THE U.S. DEPARTMENT OF COMMERCE, BUREAU OF ECONOMIC ANALYSIS, "SURVEY OF CURRENT BUSINESS" AVERAGE EARNINGS FOR THE CATEGORY AGRICULTURE, FORESTRY & FISHERIES.

SUB-5

PAGE 6

MEL DE BRUM
HISTORICAL CATCH

| YEAR | KOORALE CATCH TONS | WESTERN PACIFIC FLEET [1] | | |
|------|---------|---------|---------|---------|
| | | CATCH TONS | # OF VESSELS | CATCH PER VESSEL |
| 1996 | 4,531 | 163,965 | 33 | 4,969 |
| 1997 | 3,636 | 166,890 | 33 | 5,057 |
| 1998 | 6,456 | 169,325 | 33 | 5,131 |
| 1999 | 3,140 | 179,770 | 37 | 4,859 |
| 2000 | 4,124 | | | |
| 2001 | 3,286 | 141,560 | 26 | 5,445 |
| 2002 | 4,050 | 108,075 | 26 | 4,157 |
| AVERAGE 1996-2002 (EXCL. 2000): | 4,183 | | | 4,936 |

PERCENTAGE OF FLEET TO KOORALE CATCH TONS:      118.0%

FOOTNOTE    [1]  BERNARDINO TUNA FLEETS REPORT.

5U2-6

**MEL DE BRUM**
**UNIMPAIRED HEALTH BENEFIT**

THE EMPLOYEE BENEFITS FOR BOTH .THE UNIMPAIRED EMPLOYMENT OPTIONS WERE CALCULATED USING AVERAGE EMPLOYER CONTRIBUTIONS TO EMPLOYEE BENEFITS FOR ALL INDUSTRIES IN 2000. [1]

THE AVERAGE EMPLOYER CONTRIBUTION TO HEALTH BENEFITS IN 2000 WAS 8.9 PERCENT OF EARNINGS. THE ANNUAL DOLLARS PER EMPLOYEE SPENT OF MEDICAL INSURANCE PREMIUMS FOR ALL INDUSTRIES WAS $3,002. USING THIS INFORMATION. MR. DE BRUM'S HEALTH BENEFIT WAS CALCULATED USING 8.9 PERCENT OF HIS EARNINGS AS A SEAMAN.

1. PRESENT VALUE OF THE FUTURE HEALTH BENEFIT

NET DISCOUNT RATE:          2.5% [2]

NUMBER OF MONTHS:           282.6

| TIME PERIOD | ANNUAL COST | MONTHLY COST |
|---|---|---|
| 08/10/2000 - 02/29/2024 | $1,920 | $160 |

PRESENT VALUE:          $34,430

FOOTNOTES.
[1] U. S. CHAMBER OF COMMERCE. "EMPLOYEE BENEFITS 2001 EDITION," TABLES 1 & 18: EMPLOYEE BENEFITS AS PERCENT OF PAYROLL, BY TYPE OF BENEFIT
[2] THE NET DISCOUNT RATE IS THE ANTICIPATED SPREAD BETWEEN THE RATE OF RETURN ON INVESTMENTS AND THE RATE OF INCREASE IN COMPENSATION. THE RATE OF RETURN ON INVESTMENTS IS BASED UPON A MIX OF SHORT AND MEDIUM-TERM U.S. GOVERNMENT SECURITIES. RATES OF RETURN ARE REPORTED IN THE "ECONOMIC REPORT OF THE PRESIDENT." 2/2002 AND THE BOARD OF GOVERNORS, FEDERAL RESERVE BANK  COMPENSATION GROWTH IS BASED ON THE HOURLY COMPENSATION SERIES PUBLISHED BY THE U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

508-7

PAGE 8

**MEL DE BRUM**
**ROOM AND BOARD**

MR. DE BRUM WAS PROVIDED ROOM AND BOARD WHILE ON EACH FISHING TRIP. IT WAS REPORTED THAT THERE WAS A 15 DAY PERIOD BETWEEN TRIPS AND THE KOORLAE AVERAGED 4.0 TRIPS PER YEAR FOR THE PERIOD 1996 THROUGH 2002. BASED UPON RESEARCH CONDUCTED TO DATE. THE VALUE OF THE ROOM AND BOARD PROVIDED WAS ESTIMATED AT $67 PER DAY.

USING THE ABOVE INFORMATION, MR. DE BRUM'S ROOM AND BOARD WAS CALCULATED BEGINNING ON AUGUST 10, 2000 USING $20,435 PER YEAR. THIS FIGURE WAS CALCULATED BY DIVIDING 365 DAYS PER YEAR BY THE AVERAGE NUMBER OF TRIPS. THE RESULTING FIGURE WAS REDUCED BY THE 15 DAYS BETWEEN TRIPS AND MULTIPLIED BY THE AVERAGE NUMBER OF TRIPS PER YEAR. THE AVERAGE NUMBER OF DAYS WAS MULTIPLIED BY THE DAILY RATE GIVEN. I.E.: [(365 ÷ 4.0) - 15] x 4.0 = 305

A REDUCTION WAS INCLUDED FOR THE $7,360 MAINTENANCE MR. DE BRUM RECEIVED FROM 9/1/00 THROUGH 5/2/01.

1. PRESENT VALUE OF THE FUTURE ROOM AND BOARD

NET DISCOUNT RATE:          2.5% [1]

NUMBER OF MONTHS:           282.6

| TIME PERIOD | DAILY RATE | AVERAGE # OF DAYS | ANNUAL AMOUNT | MONTHLY AMOUNT |
|---|---|---|---|---|
| 08/10/2000 - 02/29/2024 | $67 | 305 | $20,435 | $1,703 |

PRESENT VALUE:          $378,153

FOOTNOTE:

[1] THE NET DISCOUNT RATE IS THE ANTICIPATED SPREAD BETWEEN THE RATE OF RETURN ON INVESTMENTS AND THE RATE OF INFLATION. THE RATE OF RETURN ON INVESTMENTS IS BASED UPON A MIX OF SHORT AND MEDIUM-TERM U.S. GOVERNMENT SECURITIES. RATES OF RETURN ARE REPORTED IN THE "ECONOMIC REPORT OF THE PRESIDENT," 2/2002 AND THE BOARD OF GOVERNORS, FEDERAL RESERVE BANK. INFLATION IS BASED ON THE CONSUMER PRICE INDEX PUBLISHED BY THE U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

502-8

**MEL DE BRUM**
**OFFSET EARNINGS**

MR. DE BRUM'S OFFSET EARNING CAPACITY WAS CALCULATED USING THE FOLLOWING TWO OPTIONS.

OPTION A IS CALCULATED BEGINNING ON JUNE 1, 2003, USING $14,040 PER YEAR. THIS FIGURE REFLECTS THE MINIMUM WAGE IN CALIFORNIA OF $6.75 PER HOUR MULTIPLIED BY 2,080 HOURS PER YEAR.

OPTION B IS CALCULATED BEGINNING ON JUNE 1, 2003, USING $4,160 PER YEAR. THIS FIGURE REFLECTS THE MINIMUM WAGE FOR THE MARSHALL ISLANDS OF $2.00 PER HOUR MULTIPLIED BY 2,080 HOURS PER YEAR.

1. PRESENT VALUE OF THE FUTURE EARNING CAPACITY

**OPTION A: CALIFORNIA**
NET DISCOUNT RATE:              2.0% [1]

| | NUMBER OF MONTHS: 282.6 | ANNUAL EARNINGS | MONTHLY EARNINGS | PRESENT VALUE |
|---|---|---|---|---|
| TIME PERIOD | | $0 | $0 | |
| 08/10/2000 - 05/31/2003 | | $14,040 | $1,170 | $226,421 |
| 06/01/2003 - 02/29/2024 | | | | |

**OPTION B: MARSHALL ISLANDS**
NET DISCOUNT RATE:              2.0% [1]

| | NUMBER OF MONTHS: 282.6 | ANNUAL EARNINGS | MONTHLY EARNINGS | PRESENT VALUE |
|---|---|---|---|---|
| TIME PERIOD | | $0 | $0 | |
| 08/10/2000 - 05/31/2003 | | $4,160 | $347 | $67,162 |
| 08/01/2003 - 02/29/2024 | | | | |

FOOTNOTE.
[1] THE NET DISCOUNT RATE IS THE ANTICIPATED SPREAD BETWEEN THE RATE OF RETURN ON INVESTMENTS AND THE RATE OF INCREASE IN COMPENSATION. THE RATE OF RETURN ON INVESTMENTS IS BASED UPON A MIX OF SHORT AND MEDIUM-TERM U.S. GOVERNMENT SECURITIES. RATES OF RETURN ARE REPORTED IN THE "ECONOMIC REPORT OF THE PRESIDENT," 2002 AND THE BOARD OF GOVERNORS, FEDERAL RESERVE BANK. COMPENSATION GROWTH IS BASED ON THE HOURLY COMPENSATION SERIES PUBLISHED BY THE U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS

S02-9

MEL DE BRUM
PROSTHETIC COSTS

ACCORDING TO INFORMATION PROVIDED, THE FOLLOWING PROSTHETIC COSTS WILL BE REQUIRED IN
THE FUTURE.

THE PRESENT VALUES OF THE FUTURE CARE COSTS ARE CALCULATED USING NET DISCOUNT RATES
BETWEEN 1.0 AND 2.5 PERCENT.[1]

THE NET DISCOUNT RATE IS INDICATED BY D.

| DESCRIPTION | TIME PERIOD | ANNUAL AMOUNT | MONTHLY AMOUNT | PRESENT VALUE |
|---|---|---|---|---|
| 1. FOLLOW UP VISITS D = 1.0% | 12/01/2002 - 08/31/2038 | $1,000 | $83 | $29,975 |
| 2. REPLACEMENT OF PROSTHESIS, D = 2.5% | 12/01/2002 - 08/31/2038 | $3,568 | $297 | 84,719 |
|  | PLUS ONE TIME COST NOW. |  |  | 14,273 |
| 3. MEDICAL EXAMS D = 1.0% | 12/01/2002 - 08/31/2038 | $88 | $7 | 2,528 |
| 4. SUPPLIES D = 2.5% | 12/01/2002 - 08/31/2038 | $210 | $18 | 5,135 |
|  |  |  | PRESENT VALUE: | $136,630 |

FOOTNOTE.    [1]  THE NET DISCOUNT RATE IS THE ANTICIPATED SPREAD BETWEEN THE RATE OF RETURN ON INVESTMENTS AND THE RATE OF INCREASE IN COSTS AND
SERVICES. THE RATE OF RETURN ON INVESTMENTS IS BASED UPON A MIX OF SHORT AND MEDIUM-TERM U.S. GOVERNMENT SECURITIES. RATES OF
RETURN ARE REPORTED IN THE "ECONOMIC REPORT OF THE PRESIDENT." 2/1990 AND 2/2002. THE INCREASE IN THE COST OF MEDICAL CARE SERVICES
COMMODITIES IS BASED ON THE U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.  CONSUMER PRICE INDEXES FOR SELECTED EXPENDITURE
CLASSES, SERIES IDS CUUR0000SAM, CUUR0000SAM1, AND CUUR0000SAM2.  THE INCREASE IN THE COST OF NON-MEDICAL SERVICES IS BASED ON THE
HOURLY COMPENSATION SERIES PUBLISHED THE U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS.

**MEL DE BRUM**
**INTEREST CALCULATION**

|  | | | | TOTAL ECONOMIC LOSS $898,761 | | TOTAL ECONOMIC LOSS $856,030 | |
|---|---|---|---|---|---|---|---|
| **PERIOD** | | **# OF MONTHS** | **1-YEAR T-NOTE RATE** | **OPTION 1A: INTEREST** | | **OPTION 1B: INTEREST** | |
| 08/10/2000 - 08/31/2001 | | 12.7 | 6.18% | $45,572 | $742,333 | $55,989 | $912,019 |
| 09/01/2001 - 08/31/2002 | | 12.0 | 3.47% | $25,758 | $768,092 | $31,547 | $943,566 |
| 09/01/2002 - 01/31/2003 | | 5.0 | 1.70% * | $5,441 | $773,532 | $6,684 | $950,350 |
| | | | CUMULATIVE INTEREST: | $76,771 | | $94,320 | |

|  | | | | TOTAL ECONOMIC LOSS $1,057,811 | | TOTAL ECONOMIC LOSS $1,216,880 | |
|---|---|---|---|---|---|---|---|
| **PERIOD** | | **# OF MONTHS** | **1-YEAR T-NOTE RATE** | **OPTION 2A: INTEREST** | | **OPTION 2B: INTEREST** | |
| 08/10/2000 - 08/31/2001 | | 12.7 | 6.18% | $69,173 | $1,126,784 | $79,590 | $1,296,470 |
| 09/01/2001 - 08/31/2002 | | 12.0 | 3.47% | $39,099 | $1,165,883 | $44,988 | $1,341,458 |
| 09/01/2002 - 01/31/2003 | | 5.0 | 1.70% * | $8,258 | $1,174,142 | $9,502 | $1,350,960 |
| | | | CUMULATIVE INTEREST: | $116,531 | | $134,080 | |

* USED 3-MONTH TREASURY NOTE FOR JUNE 2002

5(2-11

# EXHIBIT "B"

Exhibit
B



# Shipowners

The Shipowners' Mutual Protection and
Indemnity Association (Luxembourg)

| | |
|---|---|
| **Certificate Number** | : 2 |
| **Dated** | : 24-May-2000 |
| **With effect from** | : 20-May-2000 |
| **Page Number** | : 1 |

## MUTUAL

## FIRST SCHEDULE

**Member**
14301 M & P FISHING CO

| Vessel No. Name | Entered Date | Vessel Flag | Type | Built | Entered Tons | Actual GT |
|---|---|---|---|---|---|---|
| 44465 KOORALE | 20-May-99 | USA | FSI | 1973 | 1500 | 1072 |

## SECOND SCHEDULE

The Terms and Conditions of the Insurance in respect of the said vessel or
vessels named in the First Schedule are those contained in the Rules of the
Association except to the extent that those Rules are modified by the Special
Terms set out below :-

### OPERATING LIMITS

Warranted that the vessel at all times shall trade within the
navigation limits as agreed by the Hull Underwriters, but in no event
shall the vessel exceed the following trading and navigation limits:

Pacific Ocean west of 150 deg. West.

### CONDITIONS

As per Rules, but limited to US$5,000,000 each incident.

### WARRANTIES

Warranted classed or surveyed in accordance with statutory regulations

### CREW (SEAMEN) DECLARATION

| No. of Crew up to | Type of Operation | Period of Operation |
|---|---|---|
| 20 Crew per vessel | Tuna Saining | 12 months |

All crew covered under a separate Personal Accident policy for minimum
limits:-

| | Capital sum | Medical expenses & Repatriation |
|---|---|---|
| Captain | US$100,000 | US$75,000 |

SEAPAC



**Shipowners**

The Shipowners' Mutual Protection and
Indemnity Association (Luxembourg)

| | |
|---|---|
| Certificate Number | : 2 |
| Dated | : 24-May-2000 |
| With effect from | : 30-May-2000 |
| Page Number | : 2 |

## WARRANTIES (continued):

| | | |
|---|---|---|
| Officers | US$ 75,000 | US$75,000 |
| Other crew | US$ 50,000 | US$50,000 |

**SUBJECT TO**
Standard Fishing Vessel Clauses (revised 01/97) (as attached).
Cancelling Returns Only, notwithstanding the provisions of Rule 55.

**EXCLUDING**
Liability for 1/4th of the collision liability - Rule 2 Section 7A.
Claims arising from the use of helicopters whilst rotors in motion.
Pollution - Rule 2 section 9.
Pollution fines - Rule 2 section 19C.

**DEDUCTIBLES**            **REDACTED**
        each incident.

**INFORMATION**
Reference to Association Rules means those Rules which apply as at the
date of the incident giving rise to any claim.

It is noted that the terms of entry are not prejudiced by any crew members
who dive to check the net for mammals etc provided they are crew members
whose duties involve such diving and are qualified to dive. (The exclusion
in the Rules relates to professional or commercial divers and would not
exclude vessel crew being required to dive incidental and necessary to the
vessel operation).

When the helicopter pilot is working as a deckhand and not as a helicopter
pilot he is covered as a crewman hereunder.

CERTIFICATE OF ENTRY relating to vessel or vessels specified in the First
Schedule, entered for insurance in the Association in accordance with the
particulars set out in the First Schedule and upon the terms and conditions of
the rules for the time being in force, except to the extent that those terms
and conditions are modified by the special terms set out in the Second
Schedule.

For the Shipowners' Mutual Protection & Indemnity Association (Luxembourg)

Signed _____

For the Shipowners' Protection Limited as Managers

004    ▼ ▼ ▼ ...    SEAPAC    9691629002 XVI 12:80 IHI  00/11/80



# STANDARD FISHING VESSEL CLAUSES

1. **ENTRY SUBJECT TO ASSOCIATION'S RULES**
   The Member's entry is subject to the terms and conditions contained in the Rules of The Shipowners' Mutual Protection & Indemnity Association (Luxembourg) (hereafter the "Association"). The Association's Rules shall control the terms and conditions of the entry, except to the extent that these Rules are modified by these Standard Fishing Vessel Clauses. Where the Association's Rules are modified by these Standard Fishing Vessel Clauses, these clauses shall apply.

2. **INSURED MEMBER**
   The Insured Member is as declared on the first page of the certificate of Entry.

3. **ADDITIONAL CREW**
   The Member warrants the maximum complement of crew to be the number declared to the Association at the inception of this P&I entry. Additional crew to the complement of crew declared at the inception of this P&I entry MUST be declared to the Association within fifteen (15) days after employment on board the insured vessel. An additional premium will be payable for such additional crew. Any failure to declare additional crew within fifteen (15) days of their employment shall materially alter this risk and shall entitle the Association to declare this P&I entry void from the time of the additional crew's actual employment on the vessel.

4. **ATTACHMENT, TERMINATION OR CANCELLATION**
   Unless specifically stated in the Certificate of entry, entries will attach, terminate or be cancelled from noon local time on the day stated.

5. **DEDUCTIBLE**
   Upon the occurrence of any claim, and as a strict condition precedent to any right of recovery hereunder, the member shall promptly forward to the Association payment, or evidence of satisfaction of payment, of the Member's deductible. The Member shall not be entitled to a credit against the applicable deductible for payments made by any collateral source, including the Alaska Fishermen's Fund or other insurance in effect.

6. **LIMIT OF COVER**
   It is understood that the Member's right of recovery in respect of loss, damage, costs, fees, expenses and/or claims arising out of or in consequence of any one occurrence is limited, in the aggregate, to such amount as is recorded on the Certificate of Entry.

7. **CLAIM PAYMENTS**
   It is a condition precedent to a Member's right of recovery from the funds of the Association that the Member shall first have incurred and paid any liabilities, costs and expenses in accordance with the Rules; but the Association, at its sole discretion, shall be at liberty to make payment of losses directly to a crewmember or other third party involved, and the receipt by such crewmember or other third party shall constitute a full discharge of the Association's liability herein save for any additional disbursement actually made by the Member and covered in accordance with Certificate of Entry, subject always to any applicable deductible.

8. **MISREPRESENTATION**
   The contract of insurance afforded by the Association may be voided by the Association if the member or anyone acting on behalf of or in concert with the Member has concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the Member or anyone acting on behalf of or in concert with the Member touching any matter relating to the insurance or the subject thereof, whether in the application for, or placement of, insurance or in connection with any loss or claim by the Member.

9. **WARRANTY OF OWNERSHIP AND OPERATION**
   Unless otherwise declared in writing to, and accepted by, the Association, it is warranted that the insured vessel is both owned and operated by the named Member or bareboat chartered and operated by the named Member as declared in the Certificate of Entry, and such representation is a material fact relied upon by the Association in the placement and acceptance of the insurance.

10. **AFFILIATED COMPANY CLAUSE**
    Should a claim in respect whereof a Member named in the Certificate of Entry is insured by the Association be made or enforced through an affiliated, associated or subsidiary company of such Member, the Association shall, if so requested by the Member, indemnify such company against any loss which as a consequence thereof such company shall have incurred in that capacity provided always that nothing herein contained shall be construed as extending to any amount which would not have been recoverable from the Association by the insured Member had such claim been made or enforced against him. Once the Association has made full indemnification, it shall not be under any further liability and shall not make any further payment to any person or company whatsoever, including the Member, in respect of that claim.

11. **TERMINATION BY NOTICE AND CESSER OF INSURANCE**
    Notwithstanding Rule 44 the period of insurance of an insured vessel may be terminated by either the Member or the Association at any time prior to the renewal date by giving notice of not less than thirty (30) days, or the number of days required by applicable state law if greater, and the Member shall cease to be insured in respect of such vessel as though Rule 45.2F had applied.

12. **CANCELLATION**
    When a Member has failed to pay, either in whole or part, any premium due from him to the Association, the Association may give him notice of cancellation in writing notifying him of cancellation of the insurance in ten (10) days, or the number of days required by applicable state law if greater. If the Member fails to make payment in full on or before the specified cancellation date, the insurance of the Member in respect of any and all vessels entered in the Association shall be cancelled forthwith without further notice or formality and such cancellation shall be deemed to be in accordance with Rule 47.

13. **EARNED PREMIUM**
In the event of the vessel ceasing to be insured in accordance with Rule 45, earned premium shall be determined as follows:

(A) Vessel Charge
Earned premium for the vessel charge shall be calculated on a daily pro-rata basis.

(B) Crew Charge
Earned premiums for the crew charge shall be calculated on the basis of the monthly per-man charge for the number of months during which the insured vessel and its crew are engaged in fishing operations. Part of a month is to count as a full month.

(C) Total Loss
Upon the occurrence of the total loss of the Member's vessel, the annual premium (including both vessel charge and crew charge) shall be fully earned. If any portion of such annual premium shall be unpaid at the time of the total loss, then the Member shall immediately pay the full amount of the unpaid premium balance to the Association.

14. **OTHER EXCLUSIONS OR LIMITATIONS OF LIABILITY**
Notwithstanding anything contained herein or in the Association's Rules to the contrary, it is hereby understood and agreed that the insurance is subject to the following exclusions and the insurance shall not apply to, nor shall liability attach to the Association, directly or indirectly for, the following:

(A) Contractual Liability
There is no right of recovery in respect of any contractual liability, expressed or implied, of the Member except such liability as may arise for unearned wages, including "share of the catch", to the end of the single voyage or season during which the liability therefore arose or was incurred.

(B) Cargo
There is no right of recovery in respect of any liability in connection with cargo and/or catch.

(C) Fish and Gear Exclusion/Personal Effects Liability
There is no right of recovery in respect of any loss of and/or damage done to fish, bait, cargo, tackle, equipment on board (including engineer's tools), skiffs, nets or other types of fishing gear. In addition, there shall be no right of recovery by the Member in respect of liability for the loss of or damage to the personal effects of any one seaman in an amount greater than that representing the actual value of the lost or damaged personal effects which are essential to the performance of a seaman's duty at sea, subject always to the applicable deductible.

(D) Punitive Damages
There is no right of recovery in respect of any liability imposed on the Member as punitive or exemplary damages, howsoever described.

(E) Workers' Compensation and Similar Acts
There is no right of recovery in respect of any liability which may be imposed on the Member under the Longshore and Harbor Workers' Compensation Act and/or the workers' compensation, disability benefits or unemployment compensation law or any similar law of any state or nation.

(F) Illegal Trade Warranty
There is no right of recovery in respect of any charges, damages or loss in consequence of seizure or detention for or on account of any illicit or prohibited trade or activity including the employment of illegal immigrants, nor for the consequence of entering prohibited waters or engaging in any unlawful act or unlawful fishing. In any event, the Association shall have no liability to indemnify the Member or the Member against any fines or penalties resulting directly or indirectly from the failure, neglect or default of the Member or the Member's managing officers or agents to exercise the highest degree of diligence to prevent a violation of any laws or regulations.

(G) Pollution Liability in respect of vessels 300 gross tons or more.
There is no right of recovery in respect of any loss, damage, liability, fines, penalties or expense arising directly or indirectly from pollution or contamination by any substance whatsoever.

(H) Occupational Disease or Illness
There is no right of recovery in respect of any liability whatsoever nature of the Member, whether for damages, maintenance and cure, fines, penalties or funeral expenses, arising out of loss of life of, injury to, or illness of, any person due to occupational and/or industrial disease or illness contracted arising from the character of such person's present or prior employment, or incidental thereto, and whether or not such employment is in the service of the Member. There is no right of recovery of any costs of investigation and/or defence of any such occupational disease or illness claim or suit against the Member.

(I) Asbestos
Without prejudice to the generality of clause (H) above, there is no right of recovery in respect of any liability arising out of, caused by, or resulting from (i) asbestos, (ii) exposure to asbestos, (iii) the costs of abatement, mitigation, removal or disposal of asbestos from any vessel, good, product or structure.

(J) Employment Related Claims
There is no right of recovery in respect of any liability alleged against the Member by anyone for alleged unlawful acts, whether such acts are alleged to be intentional or otherwise, relating to employment or hiring discrimination or harassment of any nature whatsoever, or for alleged violations of the Americans with Disabilities Act. This exclusion includes, but is not limited to, allegations of sexual harassment and assault.

IMPORTANT: COPIES OF THE ASSOCIATION'S RULES ARE AVAILABLE AND SHOULD BE OBTAINED FROM YOUR INSURANCE BROKER.

Revised: 01/97
© Shipowners' Mutual Protection and Indemnity Association (Luxembourg)

# EXHIBIT "C"

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

### CIVIL MINUTES--GENERAL

Case No. 01-08403-DDP (SHx)                    Date February 10, 2003

Title Mel DeBrum v. M & F Fishing Co. Inc., et al.,

---

## DOCKET ENTRY

PRESENT:            Hon. STEPHEN J. HILLMAN, MAGISTRATE JUDGE

        Sandra Butler
        Deputy Clerk                    Tape No.

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

    N/A                                            N/A

PROCEEDINGS: (IN CHAMBERS)

    Ruling on Plaintiff's Financial and Insurance Information (Request #38):

    Following receipt of the supplemental briefs, the court rules as follows: defendants shall disclose, within 10 days, the amount of limits remaining in the primary policy; the existence of any reservation of rights by the primary or excess underwriters; the extent to which underwriters have paid for the defense to date (i.e. waived the pay-to-be-paid clause); and whether the underwriters have advised defendant whether they intend to assert the paid-to-be paid clause in the future.

    Although, undoubtedly, audited financial statements would be helpful to plaintiff in fashioning a settlement strategy, the court declines to order production of the financials, despite the fact that defendant has a pay-to-be paid policy. Fed. R. Civ. P. 26 (a)(1)(D) does not contemplate production of private financial information at this juncture.

ENTERED ON ICMS

FEB 11 2003

CV

Minute Order
February 10, 2003
Page 2
-------------------------------

      In light of the recent settlement of certain defenses, the court requests that
counsel file a joint statement within 5 days which sets forth with specificity the
remaining rulings which this court needs to make on defendant's Motion to Compel
(filed January 6th) and plaintiff's Motion to Compel (filed January 2nd).

    cc: Judge Pregerson
Judge Hillman
Parties of Record



1:      Name:       United States District Court
                    312 North Spring Street
                    Los Angeles, CA 90012
        Voice Phone: (213) 894-****


        Name:       William Banning
        Company:
                    501 W Broadway, Ste 2090,
        City/State: San Diego, CA 92101-8563
        Fax Number: 619-230-1350


# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA



# Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCIv.P*

*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

## Notes:

2:01-CV-09403 : MEL DEBRUM V. M & P FISHING CO


and time of transmission:        Tuesday, February 11, 2003 3:52:08 PM
nber of pages including this cover sheet:  03

# EXHIBIT "D"

Exhibit

D

# BANNING MICKLOW BULL & LOPEZ LLP
### ATTORNEYS AT LAW
Koll Center
501 West Broadway • Suite 2080
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
•
SAN FRANCISCO
•
AMERICAN SAMOA
•
LONDON

October 4, 2002

<u>Via Facsimile and U.S. Mail</u>

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800 .

Re:   *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
USDC CDCA Case No. 01-08403 DDP (SHx)
Our File No. 8128-001

Dear Gentlemen:

I write to memorialize my telephone conversation today with Mr. Windes regarding our demand that vessel interests post an insured bond in lieu of arrest of the vessel. As we discussed, we intend to arrest the vessel to secure Mr. DeBrum's claim if the vessel does not immediately appear in the above-captioned action and post an insured bond in the amount of $5,000,000. You stated that you would communicate our demand to the vessel's P & I insurer and respond at the earliest.

Please direct your communications concerning the bond directly to my attention at the above address.

Very truly yours,

BANNING MICKLOW
BULL & LOPEZ LLP

William L. Banning

cc:   Les Robertson, Esq.

```
********************
***   TX REPORT   ***
********************

TRANSMISSION OK

TX/RX NO                2584
CONNECTION TEL                    12084874828
SUBADDRESS
CONNECTION ID           LEGROS BUCHANAN
ST. TIME                10/04 16:28
USAGE T                 01'10
PGS. SENT               3
RESULT                  OK
```

# BANNING MICKLOW BULL & LOPEZ LLP
## ATTORNEYS AT LAW
Koll Center
501 West Broadway • Suite 2090
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
•
SAN FRANCISCO
•
AMERICAN SAMOA
•
LONDON

October 4, 2002

<u>Via Facsimile and U.S. Mail</u>

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800

Re:   *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
      USDC CDCA Case No. 01-08403 DDP (SHx)
      Our File No. 8128-001

Dear Gentlemen:

I write to memorialize my telephone conversation today with Mr. Windes regarding our demand that vessel interests post an insured bond in lieu of arrest of the vessel. As we discussed, we intend to arrest the vessel to secure Mr. DeBrum's claim if the vessel does not immediately appear in the above-captioned action and post an insured bond in the amount of $5,000,000. You stated that you would communicate our demand to the vessel's P & I insurer and respond at the earliest.

```
                    *******************************
               ***    MULTI TX/RX REPORT    ***
                    *******************************

TX/RX NO              2586
PGS.                     1
TX/RX INCOMPLETE      -----
TRANSACTION OK        (1)   15624377555
                      (2)   8851920

ERROR INFORMATION     -----
```

# BANNING MICKLOW BULL & LOPEZ LLP
## ATTORNEYS AT LAW
Koll Center
501 West Broadway · Suite 2090
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
·
SAN FRANCISCO
·
AMERICAN SAMOA
·
LONDON

October 4, 2002

<u>Via Facsimile and U.S. Mail</u>

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800

Re:   *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
      USDC CDCA Case No. 01-08403 DDP (SHx)
      Our File No. 8128-001

Dear Gentlemen:

I write to memorialize my telephone conversation today with Mr. Windes regarding our demand that vessel interests post an insured bond in lieu of arrest of the vessel. As we discussed, we intend to arrest the vessel to secure Mr. DeBrum's claim if the vessel does not immediately appear in the above-captioned action and post an insured bond in the amount of $5,000,000. You stated that you would communicate our demand to the vessel's P & I insurer and respond at the earliest.

Please direct your communications concerning the bond directly to my attention at the above address.

Very truly yours,

## BANNING MICKLOW BULL & LOPEZ LLP
### ATTORNEYS AT LAW
Koll Center
501 West Broadway • Suite 2090
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
•
SAN FRANCISCO
•
AMERICAN SAMOA
•
LONDON

October 11, 2002

<u>Via Facsimile and U.S. Mail</u>

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800

> Re:  *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
>      USDC CDCA Case No. 01-08403 DDP (SHx)
>      Our File No. 8128-001

Dear Gentlemen:

We wrote to you on October 4, 2002, advising that if vessel interests did not agree to appear herein on behalf of the vessel and file an insured bond in the amount of $5,000,000 or the policy limits, whichever is greater, that Mr. Debrum would have to arrest the vessel. We have received no response. If you do not respond in writing affirmatively to our demand by 5:00 p.m. on October 16, 2002, we will assume the vessel's protection and indemnity insurer has denied coverage for the bond. We understand the vessel owner is financially unable to file the necessary bond. If no appearance and bond are filed, then Mr. Debrum will have no recourse but to arrest and sell the vessel.

We await your response.

Very truly yours,

BANNING MICKLOW
BULL & LOPEZ LLP

William L. Banning

cc:  Les Robertson, Esq.

```
********************************
***    MULTI TX/RX REPORT    ***
********************************
```

| | | |
|---|---|---|
| TX/RX NO | 2648 | |
| PGS. | 1 | |
| TX/RX INCOMPLETE | ----- | |
| TRANSACTION OK | [ 18]12064674828 | LEGROS BUCHANAN |
| | (1)  15624377555 | |
| | (2)  6851920 | |
| ERROR INFORMATION | ----- | |

## BANNING MICKLOW BULL & LOPEZ LLP
### ATTORNEYS AT LAW
Koll Center
501 West Broadway • Suite 2080
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
•
SAN FRANCISCO
•
AMERICAN SAMOA
•
LONDON

October 11, 2002

<u>Via Facsimile and U.S. Mail</u>

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800

Re:   *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
USDC CDCA Case No. 01-08403 DDP (SHx)
Our File No. 8128-001

Dear Gentlemen:

We wrote to you on October 4, 2002, advising that if vessel interests did not agree to appear herein on behalf of the vessel and file an insured bond in the amount of $5,000,000 or the policy limits, whichever is greater, that Mr. Debrum would have to arrest the vessel. We have received no response. If you do not respond in writing affirmatively to our demand by 5:00 p.m. on October 16, 2002, we will assume the vessel's protection and indemnity insurer has denied coverage for the bond. We understand the vessel owner is financially unable to file the necessary bond. If no appearance and bond are filed, then Mr. Debrum will have no recourse but to arrest and sell the vessel.

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2649 |
| CONNECTION TEL | 14153999192 |
| SUBADDRESS | |
| CONNECTION ID | BMBL SF |
| ST. TIME | 10/11 19:05 |
| USAGE T | 00'42 |
| PGS. SENT | 1 |
| RESULT | OK |

## BANNING MICKLOW BULL & LOPEZ LLP
### ATTORNEYS AT LAW
Koll Center
501 West Broadway • Suite 2090
San Diego, California 92101-8563
(619) 230-0030
Telecopier (619) 230-1350
E-mail: info@banningmicklow.com

William L. Banning
Partner

E-mail: wbanning@
banningmicklow.com

SAN DIEGO
■
SAN FRANCISCO
■
AMERICAN SAMOA
■
LONDON

October 11, 2002

Via Facsimile and U.S. Mail

Robert N. Windes, Esq.
Le Gros Buchanan & Paul
701 Fifth Avenue, Suite 2500
Seattle, Washington 98104-7051

Erich P. Wise, Esq.
Flynn, Delich & Wise
One World Trade Center, Suite 1800
Long Beach, California 90831-1800

Re:   *Mel DeBrum v. M & F Fishing Co., Inc., F/V KOORALE*
USDC CDCA Case No. 01-08403 DDP (SHx)
Our File No. 8128-001

Dear Gentlemen:

We wrote to you on October 4, 2002, advising that if vessel interests did not agree to appear herein on behalf of the vessel and file an insured bond in the amount of $5,000,000 or the policy limits, whichever is greater, that Mr. Debrum would have to arrest the vessel. We have received no response. If you do not respond in writing affirmatively to our demand by 5:00 p.m. on October 16, 2002, we will assume the vessel's protection and indemnity insurer has denied coverage for the bond. We

# EXHIBIT "E"

Exhibit

E

# BANNING MICKLOW BULL & LOPEZ LLP

**ATTORNEYS AT LAW**

100 Spear Street • Suite 1850
San Francisco, California 94105-1528
(415) 399-9191
Telecopier (415) 399-9192
E-mail: info@banningmicklow.com

February 19, 2003

## FACSIMILE MESSAGE

| | |
|---|---|
| To: | Cunliffe & Cook |
| Attn: | Jeffrey Cook |
| Facsimile No: | 1-671-472-2422 |
| Telephone No: | 1-671-472-1824 |
| From: | Edward M. Bull III |
| Re: | DeBrum v. F/V KOORALE |
| Our File No: | 8128-001 |

**Your Ref. No:**

Hard Copy to Follow: ___ Yes ___ No

2 PAGE(S) INCLUDING THIS PAGE. OUR FACSIMILE NUMBER IS (415) 399-9192. IF THERE ARE ANY PROBLEMS RECEIVING THIS MESSAGE, PLEASE CALL US AT: (415) 399-9191.

**CONFIDENTIALITY NOTICE**

This Facsimile transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents.

**MESSAGE:**

JURY Verdicts

COPR. (C) 2003 LRP Publications

*1 TITLE: BONNER v. CHASKIN; CHESNEY D / B / A MATTSON
TRUCKING; STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO,
ET AL.
DOCKET-NUMBER: RCV 00330
COURT: Superior
STATE: San Bernardino County, California
DATE:
Incident: July, 1988
Filing:
Trial: November, 1993
APPEAL:
Was Appeal Filed:
Name of Person(s) Filing:
RANGE AMOUNT: $2,000,000 - $4,999,999
OUTCOME: Plaintiff Verdict
NON VERDICT AWARD: $4,912,974
TOTAL VERDICT: $4,912,974
JUDGE REDUCED AWARD TO:
VENUE CHANGE:
PRIMARY INJURY: Below **Knee Amputation**
SECONDARY INJURY:
PERMANENT PAIN:
PERMANENT SCARRING:
LIMITED MOTION:
BODILY IMPAIRMENT:
PERMANENT WEAKNESS:
INJURY TO DOMINANT HAND / ARM:
INTERNAL FIXATION:
NUMBER OF DAYS OF TREATMENT:
LIABILITY:
General: Truck accident
Specific: Head-on collision
PLAINTIFF:
Sex: Male

Age: 49
Race:
General Occupation: UNEMPLOYED
Occupational Field:
DECEDENT:
Sex:
Age:
Race:
Occupation:
Married:
Number of Minor Children:
Number of Adult Children:
Days of Conscious Survival:
Days of Unconscious Survival:
Funeral Expense:
Other Expenses:
DEFENDANT:
Type: Individual / Organization
Sex: Male
Organization Type:
Race:
General Occupation: General Laborer
Occupational Field: Transportation-Trucking and Warehousing
Insurance:
Policy Limit: $250,000
EXPERT-WITNESSES:
Plaintiff:


FINAL DEMAND: $1,500,000
FINAL OFFER:
HIGH / LOW AGREEMENT:
HIGH AMOUNT:
LOW AMOUNT:
CLAIMED PAST MEDICAL: $232,000
CLAIMED FUTURE MEDICAL: $418,000
CLAIMED PAST WAGE EXPENSE: $151,400
CLAIMED FUTURE WAGE EXPENSE: $280,400
FUTURE WAGE LOSS CLAIMED BY ECONOMIST:

Plaintiff's Economist:
Defendant's Economist:
DAMAGES:
Compensatory:
Past Medical:
Future Medical:
Past Wage:
Future Wage:
Pain and Suffering:
Other: $4,912,974
Total: $4,912,974
Punitive:
Hedonic:
Property:
Other:
Interest:
Loss of Services:
Loss of Services By:
INTRAFAMILY SUIT:
RES IPSA LOQUITUR:
DEFENDANT CONTENDED PLAINTIFF ASSUMED RISK:
DEFENDANT ADMITTED LIABILITY:
*2 COMPARATIVE NEGLIGENCE PERCENTAGE:
SMOKER:
ATTORNEY:
Plaintiff:
Defendant:
JUDGE: Paul M. Bryant, Jr.

TEXT:
A 49-year-old unemployed male suffered the traumatic **amputation** of the left
leg below the **knee** and soft tissue injuries to the right leg when his Jeep was
struck head-on by a truck owned by the co-defendant and operated by the male
defendant on a curve of a roadway maintained by the third-named defendant
state. The plaintiff contended that the defendant was negligent for operating his
vehicle at an excessive speed for conditions and that the third-named defendant
failed to post adequate warning signs to tell the defendant to reduce speed on the
curve. The plaintiff was unable to take a job as juvenile counselor for the sheriff's
department. The third-named defendant contended that the defendant's

ation
Trials Digest 2d 145
te as: 1996 WL 760598 (T.D.Cal.Jury))

Copyright (C) 2000 Trials Digest Publishing, Inc.

 TITLE:                        Hilliard vs. Los Angeles County Metropolitan
nsit Authority
IC:                           Vehicle Negligence; Motor Vehicle v. Pedestrian;
ase Type:
osswalk; Vehicle Negligence; Public Transportation
CKET-NUMBER:                  BC135849
NUE:
Court:                        Los Angeles County Superior Court/Downtown
ATE:                          California
AR:
Verdict/Judgment Date:        September 20, 1996
DGE:                          Ernest G. Williams
TORNEYS:
Plaintiff:                    Mark L. Dana, Law Offices of Mark L. Dana, Long
ach.
Defendant:                    John Nouskajian Jr., Nouskajian & Cranert, South
sadena.
MMARY:
Verdict/Judgment:             Plaintiff
Verdict/Judgment Amount:      $1,665,900
                  (Range: $1,000,000 - $1,999,999)
                  $952,000 economic and $2,750,000 non-economic reduced by 55
rcent comparative liability.
Trial Type:                   Jury
Trial Length:                 3 weeks.
Deliberations:                2 days.
Jury Poll:                    9-3.
PERTS:
Plaintiff:                    Kerry Berg, accident reconstructionist, Riverside.
               William Burger, human factors consultant, Los Angeles.
               John Fabian, bus operation/safety consultant, Albany, NY.
               Tamorah Hunt, economist, Formuzis, Pickersgill & Hunt, Santa
na, (714) 542-8853.
               Albert Rappaport, life care consultant/prosthetist, Santa
onica.
               Bert Thomas, orthopedic surgeon, Los Angeles.
               David Zakin, psychologist, Los Angeles.
Defendant:                    Timothy J. Reust, accident reconstructionist, Reust
nalysis, Newhall, (805) 255-2189.
               Anthony C. Stein, human factors consultant, Safety Research
ssociates, La Canada, (818) 952-1500.
EXT:

 CASE INFORMATION

          Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Trials Digest 2d 145
te as: 1996 WL 760598, *1 (T.D.Cal.Jury))

ACTS/CONTENTIONS
According to Plaintiff (Dana):
Plaintiff pedestrian was struck by a bus that was making a right-hand
turn and plaintiff was entering a crosswalk against the pedestrian
light. The plaintiff was Atsuko Hilliard, a 29-year-old loan officer.
The defendant was the Los Angeles County Metropolitan Transit
Authority. On May 9, 1995 plaintiff was crossing the street westbound
at 7th Street and Hope when he was struck by a bus that was making a
right-hand turn from westbound 7th onto northbound Hope. Plaintiff
had entered the crosswalk against the pedestrian light. Witnesses
described plaintiff as either walking fast, jogging or running.
Plaintiff claimed that he thought the bus was going straight, not
turning. The bus operator never saw plaintiff. Plaintiff brought this
*2 action based on negligence theories of recovery.

Plaintiff alleged that the driver was inattentive, failed to properly
scan the right side and failed to use direct viewing out the right
side windows or to properly use the right side convex mirror. 
Plaintiff also alleged that the right side convex mirror was too
small and was not in conformity in industry standards. Defendant
contended that plaintiff was negligent, that plaintiff entered the
intersection illegally and violated the statute Defendant further
contended that it had the right-of-way.

According to Defendant (Nouskajian Jr.):
Same as reported by plaintiff.

CLAIMED INJURIES
According to Plaintiff (Dana):
Below the knee amputation of left leg.

According to Defendant (Nouskajian Jr.):
Same as above.

CLAIMED DAMAGES
According to Plaintiff (Dana):
$47,000 past medical; $960,000 future medical (per plaintiff) or
$1,400,000 (per defendant).

According to Defendant (Nouskajian Jr.):
Same as above.

SETTLEMENT DISCUSSIONS
According to Plaintiff (Dana):
Demand: $2,999,999 (CCP 998). Offer: None.

According to Defendant (Nouskajian Jr.):
Same as above.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Trials Digest 2d 145
te as: 1996 WL 760598, *2 (T.D.Cal.Jury))

EXPERT TESTIMONY
According to Plaintiff (Dana):
Plaintiff's expert Fabian, a bus operations/safety consultant,
Plaintiff's expert Fabian, a bus operator training and instruction, bus safety
testified regarding bus operator training and instruction, bus safety
operations and industry standards of care. Plaintiff's expert
Rappaport, a life care consultant/prosthetist who was also an **amputee**
ski instructor, testified regarding the various prosthetic legs
necessary for different activities such as a basic walking leg, a
sport leg, a swim/shower leg and a ski leg.

COMMENTS
According to Plaintiff (Dana):
The verdict was reached approximately one year after the case was
filed.

1.Super., 1996
lliard vs. Los Angeles County Metropolitan Transit Authority
Trials Digest 2d 145, 1996 WL 760598 (T.D.Cal.Jury)
D OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

COPR. (C) 2003 LRP Publications

*1 TITLE: THOMPSON v. RPS, INC.
DOCKET-NUMBER: SW C 51073
COURT: Superior
STATE: Los Angeles County, California
DATE:
Incident: June, 1979
Filing:
Trial: June, 1983
APPEAL:
Was Appeal Filed:
Name of Person(s) Filing:
RANGE AMOUNT: $2,000,000 - $4,999,999
OUTCOME: Plaintiff Verdict
NON VERDICT AWARD: $2,100,000
TOTAL VERDICT: $2,100,000
JUDGE REDUCED AWARD TO:
VENUE CHANGE:
PRIMARY INJURY: Below **Knee Amputation**
SECONDARY INJURY:
PERMANENT PAIN:
PERMANENT SCARRING:
LIMITED MOTION:
BODILY IMPAIRMENT:
PERMANENT WEAKNESS:
INJURY TO DOMINANT HAND / ARM:
INTERNAL FIXATION:
NUMBER OF DAYS OF TREATMENT:
LIABILITY:
General: Employer negligence
Specific: Construction carpenter
PLAINTIFF:
Sex: Male
Age: 44
Race: Black

General Occupation: PARAPROFESSIONAL
Occupational Field: CONSTRUCTION-SPECIAL TRADE CONTRACTORS
DECEDENT:
Sex:
Age:
Race:
Occupation:
Married:
Number of Minor Children:
Number of Adult Children:
Days of Conscious Survival:
Days of Unconscious Survival:
Funeral Expense:
Other Expenses:
DEFENDANT:
Type:
EXPERT-WITNESSES:
Plaintiff:


FINAL DEMAND:
FINAL OFFER:
HIGH / LOW AGREEMENT:
HIGH AMOUNT:
LOW AMOUNT:
CLAIMED PAST MEDICAL:
CLAIMED FUTURE MEDICAL:
CLAIMED PAST WAGE EXPENSE:
CLAIMED FUTURE WAGE EXPENSE:
FUTURE WAGE LOSS CLAIMED BY ECONOMIST:
Plaintiff's Economist:
Defendant's Economist:
DAMAGES:
Compensatory:
Past Medical:
Future Medical:
Past Wage:
Future Wage:
Pain and Suffering:

Other: $2,100,000
Total: $2,100,000
Punitive:
Hedonic:
Property:
Other:
Interest:
Loss of Services:
Loss of Services By:
INTRAFAMILY SUIT:
RES IPSA LOQUITUR:
DEFENDANT CONTENDED PLAINTIFF ASSUMED RISK:
DEFENDANT ADMITTED LIABILITY:
COMPARATIVE NEGLIGENCE PERCENTAGE:
SMOKER:
ATTORNEY:
Plaintiff:
Defendant:
JUDGE:

TEXT:
A 44-year-old black male carpenter suffered a below the **knee** leg **amputation** after several tons of iron bars fell on him. The plaintiff argued that the defendant firm negligently overloaded the bars on the platform. Past Medical: $55,000. Past Wage: $25,000. Demand: $200,000. Offer: $175,000. Plaintiff Attorney: Olan & Friedman by Bennett Olan, Los Angeles, CA. Defense Attorney: Ruston & Nance by Robert Castlebury, Tustin, CA.
*2 THOMPSON v. RPS, INC.
JVR No. 46690, 1983 WL 248293 (LRP Jury)
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

COPR. (C) 2003 LRP Publications

*1* TITLE: RENTERIA v. CUSTOM FIBERGLASS MANUFACTURING CO.;;
CALVANCHE
DOCKET-NUMBER: NC021526
COURT:
STATE: Los Angeles County, California
DATE:
Incident: June, 1996
Filing: February, 1997
Trial: May, 1999
APPEAL:
Was Appeal Filed: Yes
Name of Person(s) Filing: Renteria
RANGE AMOUNT: $2,000,000 - $4,999,999
OUTCOME: Plaintiff Verdict
NON VERDICT AWARD:
TOTAL VERDICT: $2,500,000
JUDGE REDUCED AWARD TO:
VENUE CHANGE:
PRIMARY INJURY: Above **Knee Amputation**
SECONDARY INJURY:
PERMANENT PAIN:
PERMANENT SCARRING:
LIMITED MOTION:
BODILY IMPAIRMENT:
PERMANENT WEAKNESS:
INJURY TO DOMINANT HAND / ARM:
INTERNAL FIXATION:
NUMBER OF DAYS OF TREATMENT: 75
LIABILITY:
General: PRODUCTS LIABILITY
Specific: Camper
PLAINTIFF:
Sex: Male
Age: 200
Race:

General Occupation:
Occupational Field:
DECEDENT:
Sex:
Age:
Race:
Occupation:
Married:
Number of Minor Children:
Number of Adult Children:
Days of Conscious Survival:
Days of Unconscious Survival:
Funeral Expense:
Other Expenses:
DEFENDANT:
Type: Individual / Organization
Sex: Female
Organization Type:
Race:
General Occupation:
Occupational Field:
Insurance:
Policy Limit:
EXPERT-WITNESSES:
Plaintiff:


FINAL DEMAND:
FINAL OFFER:
HIGH / LOW AGREEMENT:
HIGH AMOUNT:
LOW AMOUNT:
CLAIMED PAST MEDICAL:
CLAIMED FUTURE MEDICAL:
CLAIMED PAST WAGE EXPENSE:
CLAIMED FUTURE WAGE EXPENSE:
FUTURE WAGE LOSS CLAIMED BY ECONOMIST:
Plaintiff's Economist:
Defendant's Economist:

DAMAGES:
Compensatory:
Past Medical:
Future Medical:
Past Wage:
Future Wage:
Pain and Suffering: $2,500,000
Other:
Total: $2,500,000
Punitive:
Hedonic:
Property:
Other:
Interest:
Loss of Services:
Loss of Services By:
INTRAFAMILY SUIT:
RES IPSA LOQUITUR:
DEFENDANT CONTENDED PLAINTIFF ASSUMED RISK:
DEFENDANT ADMITTED LIABILITY:
COMPARATIVE NEGLIGENCE PERCENTAGE: 5%
SMOKER:
ATTORNEY:
Plaintiff: James G O'Callahan, Los Angeles, CA
Defendant: John G. Tavetian, Torrance, CA
JUDGE: John W. Ouderkirk

FOR RELATED CASE LAW OPINIONS SEE:
2002 WL 472237


TEXT:
*2 A male suffered an above the right leg amputation when he was ejected from
the bed of an eastbound pickup truck as the camper shell, designed and
manufactured by the defendant, flew off the truck after the truck was struck
broadside by the female co-defendant's westbound vehicle on a public roadway.
The plaintiff contended that the defendant defectively designed and manufactured
the camper shell, that it failed to warn of the known dangerous condition and that
its product was unsafe for its intended use and purpose. The plaintiff further
contended that the co-defendant operated her vehicle in a negligent manner and

failed to yield the right-of-way. The defendants denied liability. The plaintiff was
found to be 5 percent comparatively negligent and his award was reduced
accordingly. A defense verdict was returned for the co-defendant.
RENTERIA v. CUSTOM FIBERGLASS MANUFACTURING CO.;;
CALVANCHE
JVR No. 403271, 1999 WL 33590334 (LRP Jury)
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

COPR. (C) 2003 LRP Publications

*1 TITLE: LAGERBORG v. LOS ANGELES COUNTY METROPOLITAN
TRANSIT AUTHORITY; WILKISON
DOCKET-NUMBER: BC 145 174
COURT: Superior
STATE: Los Angeles County, California
DATE:
Incident: December, 1995
Filing:
Trial: March, 1997
APPEAL:
Was Appeal Filed:
Name of Person(s) Filing:
RANGE AMOUNT: $2,000,000 - $4,999,999
OUTCOME: Plaintiff Verdict
NON VERDICT AWARD: $2,996,401
TOTAL VERDICT: $2,996,401
JUDGE REDUCED AWARD TO:
VENUE CHANGE:
PRIMARY INJURY: Below **Knee Amputation**
SECONDARY INJURY:
PERMANENT PAIN:
PERMANENT SCARRING:
LIMITED MOTION:
BODILY IMPAIRMENT:
PERMANENT WEAKNESS:
INJURY TO DOMINANT HAND / ARM:
INTERNAL FIXATION:
NUMBER OF DAYS OF TREATMENT:
LIABILITY:
General: Bicycle & vehicle
Specific: Sideswipe collision
PLAINTIFF:
Sex: Female
Age: 60

Race:
General Occupation: UNEMPLOYED
Occupational Field:
DECEDENT:
Sex:
Age:
Race:
Occupation:
Married:
Number of Minor Children:
Number of Adult Children:
Days of Conscious Survival:
Days of Unconscious Survival:
Funeral Expense:
Other Expenses:
DEFENDANT:
Type: Individual / Organization
Sex: Organization
Organization Type: Public Administration-Transportation
Race:
General Occupation:
Occupational Field:
Insurance:
Policy Limit:
EXPERT-WITNESSES:
Plaintiff:


FINAL DEMAND: $999,999
FINAL OFFER: $350,000
HIGH / LOW AGREEMENT:
HIGH AMOUNT:
LOW AMOUNT:
CLAIMED PAST MEDICAL: $140,000
CLAIMED FUTURE MEDICAL: $500,000
CLAIMED PAST WAGE EXPENSE:
CLAIMED FUTURE WAGE EXPENSE:
FUTURE WAGE LOSS CLAIMED BY ECONOMIST:
Plaintiff's Economist:

Defendant's Economist:
DAMAGES:
Compensatory:
Past Medical:
Future Medical:
Past Wage:
Future Wage:
Pain and Suffering:
Other: $2,996,401
Total: $2,996,401
Punitive:
Hedonic:
Property:
Other:
Interest:
Loss of Services:
Loss of Services By:
INTRAFAMILY SUIT:
RES IPSA LOQUITUR:
DEFENDANT CONTENDED PLAINTIFF ASSUMED RISK:
DEFENDANT ADMITTED LIABILITY:
COMPARATIVE NEGLIGENCE PERCENTAGE:
SMOKER:
ATTORNEY:
*2 Plaintiff:
Defendant:
JUDGE: George R. Xanthos

TEXT:
A 60-year-old retired female suffered the loss of her leg below the knee when her bicycle collided with the right side of the bus operated by the female co-defendant and owned by the defendant county transit authority. The plaintiff was riding her bicycle in the right lane when she struck a stick and lost control of the bicycle and fell or swerved to the left colliding with the bus. The plaintiff contended that the co-defendant was negligent for failing to move completely into the number one lane of traffic as she passed the plaintiff. The defendant contended that the plaintiff was negligent for failing to ride her bicycle as far to the right of her lane as the law required. The co-defendant was found 50 percent negligent and the defendant was found 50 percent negligent.

LAGERBORG v. LOS ANGELES COUNTY METROPOLITAN TRANSIT
AUTHORITY; WILKISON
JVR No. 197433, 1997 WL 293366 (LRP Jury)
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works



# MORE LAW.COM™

## Montes De Oca v. Brown



Cut when you order.

**Search Verdicts**
**Search Experts**
**Lawyer Listings**
**Court Reporters**
**Legal Resources**
  States
  National
  International
**Domain Registration**
**Contact MoreLaw**
**Advertising Info**
**About MoreLaw**



**Find A Person:**

[ Search ]

**Check Out This Great Product**



**From**

amazon.com

**Date:** 5/2/94

**Case Style:** Montes De Oca v. Brown

**Case Number:** EC012870

**Judge:** Unknown

**Court:** Superior Court, Los Angeles, California

**Plaintiff's Attorney:** Irwin R. "Rob" Miller, Oxnard, California

**Defendant's Attorney:** Unknown

**Description:** Personal injury, motorcycle v. truck accident - Below knee amputation with no other significant injuries.

**Verdict:** Jury Trial, Plaintiff's verdict for $4,268,000.00

**Plaintiff's Experts:** Unknown

**Defendant's Experts:** Unknown

**Comments:** None





Home | Add Verdict | Add Expert | Add Court Reporter | Add Lawyer
Verdict Corrections | Link Errors | Advertising | Editor

© 1996-2000 MoreLaw.Com, Inc.

COPR. (C) 2003 LRP Publications

*1 TITLE: DIBENE v. WASTE MANAGEMENT, INC.; CITY OF LOS ANGELES
DOCKET-NUMBER: NWC 029-341
COURT: Superior
STATE: Los Angeles County, California
DATE:
Incident: January, 1987
Filing:
Trial: March, 1993
APPEAL:
Was Appeal Filed:
Name of Person(s) Filing:
RANGE AMOUNT: $2,000,000 - $4,999,999
OUTCOME: Plaintiff Verdict
NON VERDICT AWARD: $4,269,000
TOTAL VERDICT: $4,269,000
JUDGE REDUCED AWARD TO:
VENUE CHANGE:
PRIMARY INJURY: Below **Knee Amputation**
SECONDARY INJURY:
PERMANENT PAIN:
PERMANENT SCARRING:
LIMITED MOTION:
BODILY IMPAIRMENT:
PERMANENT WEAKNESS:
INJURY TO DOMINANT HAND / ARM:
INTERNAL FIXATION:
NUMBER OF DAYS OF TREATMENT:
LIABILITY:
General: Truck accident
Specific: Turning collision
PLAINTIFF:
Sex: Male
Age: 29

Race:
General Occupation: GENERAL LABORER
Occupational Field: SERVICES-AMUSEMENT AND RECREATION
DECEDENT:
Sex:
Age:
Race:
Occupation:
Married:
Number of Minor Children:
Number of Adult Children:
Days of Conscious Survival:
Days of Unconscious Survival:
Funeral Expense:
Other Expenses:
DEFENDANT:
Type: Multiple Organizations
Sex: Organization
Organization Type: Services-Waste Management
Race:
General Occupation:
Occupational Field:
Insurance:
Policy Limit:
EXPERT-WITNESSES:
Plaintiff:


FINAL DEMAND: $2,099,000
FINAL OFFER: $1,100,000
HIGH / LOW AGREEMENT:
HIGH AMOUNT:
LOW AMOUNT:
CLAIMED PAST MEDICAL: $99,927
CLAIMED FUTURE MEDICAL: $1,252,000
CLAIMED PAST WAGE EXPENSE: $157,563
CLAIMED FUTURE WAGE EXPENSE: $703,904
FUTURE WAGE LOSS CLAIMED BY ECONOMIST:
Plaintiff's Economist:

Defendant's Economist:
DAMAGES:
Compensatory:
Past Medical:
Future Medical:
Past Wage:
Future Wage:
Pain and Suffering:
Other: $4,269,000
Total: $4,269,000
Punitive:
Hedonic:
Property:
Other:
Interest:
Loss of Services:
Loss of Services By:
INTRAFAMILY SUIT:
RES IPSA LOQUITUR:
DEFENDANT CONTENDED PLAINTIFF ASSUMED RISK:
DEFENDANT ADMITTED LIABILITY:
COMPARATIVE NEGLIGENCE PERCENTAGE:
SMOKER:
*2 ATTORNEY:
Plaintiff:
Defendant:
JUDGE: David M. Schacter

TEXT:
A 29-year-old male stagehand suffered a left **below-knee amputation** when his
motorcycle collided with the defendant waste management company's truck at an
intersection in the co-defendant city. The plaintiff contended that the defendant's
driver was negligent for cutting a curve, allowing a trailer that he was towing to
veer into the plaintiff's lane of travel. The plaintiff and the defendant contended
that the co-defendant was negligent for failing to safely maintain the roadway.
The defendant contended that the plaintiff was negligent for traveling at an
excessive rate of speed and for failing to remain in the proper lane of travel. The
award was against the defendant only.
DIBENE v. WASTE MANAGEMENT, INC.; CITY OF LOS ANGELES

JVR No. 114992, 1993 WL 423240 (LRP Jury)
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Copyright (C) 2001 Trials Digest Publishing, Inc.

**\*1 TITLE:** Reyes vs. Weinberg
**TOPIC:**
Synopsis: Pedestrian standing on corner is severely injured when cars collide in intersection
Case Type: Vehicle Negligence; Motor Vehicle v. Pedestrian; Miscellaneous; Vehicle Negligence; Intersection
**DOCKET-NUMBER:** SC057195
**VENUE:**
Court: Los Angeles County Superior Court/Santa Monica
**STATE:** California
**YEAR:**
Verdict/Judgment Date: July 5, 2000
**JUDGE:** James A. Albracht
**ATTORNEYS:**
Plaintiff: Robert B. Hutchinson, Hutchinson & Snider, Beverly Hills.
Defendant: John Bower, Bragg, Short, Serota & Kuluva, Los Angeles.
Stephen A. Lax, Schaffer & Lax, Los Angeles.
Kara A. Pape, McHale & Connor, Los Angeles.
**SUMMARY:**
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $4,900,000
(Range: $2,000,000 - $4,999,999)
$1,900,000 in economic damages and $3,000,000 in general damages.
Trial Type: Jury
Trial Length: 3 weeks.
Deliberations: 2 days.
Jury Poll: 11-1 liability; 12-0 damages.
**EXPERTS:**
Plaintiff: Richard H. Andersen, vocational rehabilitation consultant, Vector Inc., Westminster, (714) 898-5533.
Joel Aronowitz, plastic surgeon, Los Angeles, (213) 659-0705.
Robert A. Audell, orthopedic surgeon, Los Angeles, (310) 855-0751. Peter Formuzis Ph.D., economist,
Formuzis, Pickersgill & Hunt Inc., Santa Ana, (714) 542-8853.
Ira Frank, psychiatrist, Beverly Hills, (310) 888-8050.
Richard E. Grossman, mechanical/safety engineer, Product Safety Engineering, Woodland Hills, (818) 999-2516.
Phillip Levine, cardiologist.
Anne Meyer, physiatrist, Los Angeles.
Jeffrey Schaeffer, neuropsychologist, Los Angeles, (310) 855-1265.
Keith E. Vinnecour, prosthetist, Beverly Hills Prosthetics Orthotics Inc., Beverly Hills, (310) 657-3353.
Christopher Zarembinski, anesthesiologist/pain management physician, Los Angeles.
Defendant: Vincent Bruno, vocational rehabilitation consultant.
Eric Deyel, accident reconstructionist.
Martin Goldfarb, cardiologist/internist, Century City, (310) 553-2030. Thomas L. Hedge Jr., physiatrist,
Northridge Medical Center, Northridge, (818) 885-8533.
**\*2** Ted M. Kobayashi, accident reconstructionist, Boster, Kobayashi, Berner, Campbell & Hesler, Livermore,
(925) 447-6495.
Ted Vavoulis Ph.D., economist, Vavoulis & Associates Inc., Pasadena, (626) 796-7100.
Robert M. Wilson, orthopedic surgeon, Los Angeles, (310) 289-0249.
Lester M. Zackler, neuropsychiatrist, Sherman Oaks, (818) 789-8488.
**TEXT:**

```
CASE INFORMATION
FACTS/CONTENTIONS
According to Plaintiff:
A pedestrian standing on a corner was struck and severely injured
when defendants' cars collided in the intersection. The plaintiff was
Daniel Reyes, a 40-year-old mechanical engineer and designer working
for Mattel Inc. The defendants were Melissa Weinberg, a 20-year-old
student, and Earl Collins, a bus operator for the City of Santa
```

Monica. On Friday night, May 7, 1999, plaintiff was a pedestrian standing on the northwest corner of Wilshire and Barrington in Los Angeles. Defendants collided with each other in the intersection. As a result of the collision, Weinberg's vehicle was propelled up onto the sidewalk, striking plaintiff and driving him into a lamp post, resulting in the traumatic amputation of his right leg above the knee as well as other injuries.

**CLAIMED INJURIES**
According to Plaintiff:
Traumatic amputation, right leg; torn anterior cruciate ligament, left knee; cardiac contusion resulting in atrial fibrillation; post-traumatic stress disorder.

**CLAIMED DAMAGES**
According to Plaintiff:
$186,293 past medical; $1,342,000 future medical; $83,830 lost income; $672,000 loss of earning capacity; $10,000,000 general damages requested.

**SETTLEMENT DISCUSSIONS**
According to Plaintiff:
Demand: $9,500,000. Offer: $4,000,000 jointly offered. While the jury was deliberating, plaintiff settled with defendant Weinberg for $5,000,000.

**COMMENTS**
According to Plaintiff:
Federal Insurance (Chubb) was the insurer for Weinberg; Lancer Insurance Co. was the insurer for City of Santa Monica ($1 million). AIG was the excess carrier. The settlement with defendant Weinberg was determined to be in good faith and based on the jury verdict, was deemed to include $1,950,000 as economic damages and $3,050,000 as non-economic damages. The jury found defendant City of Santa Monica to be 70 percent at fault and defendant Weinberg to be 30 percent at fault, resulting in a recovery against the city of $2.1 million for economic damages, bringing the total recovery as a result of jury verdict and settlement to $7.1 million. Kara A. Pape and Stephen A. Lax represented defendants Earl Collins and City of Santa Monica. John Bower represented defendant Melissa Weinberg and cross-defendant Richard Weinberg.

Cal.Super.
Reyes vs. Weinberg
32 Trials Digest 3d 127, 2000 WL 1196315 (T.D.Cal.Jury)
END OF DOCUMENT

Copr. (C) West 2001 No Claim to Orig. U.S. Govt. Works

# EXHIBIT "F"

Exhibit F

1 | BANNING MICKLOW BULL & LOPEZ LLP
2 | William L. Banning, State Bar No. 75757
   | Edward M. Bull III, State Bar No. 141996
3 | John S. Lopez, State Bar No. 149291
   | 501 West Broadway, Suite 2090
   | San Diego, California 92101
4 | Telephone: (619) 230-0030
   | Facsimile: (619) 230-1350
5 |
6 | Attorneys for Plaintiff,
   | MEL DEBRUM
7 |
8 |            UNITED STATES DISTRICT COURT
9 |         FOR THE CENTRAL DISTRICT OF CALIFORNIA
10 |

11 | MEL DEBRUM                          ) Case No. 01-08403 DDP (SHx)
12 |                Plaintiff,           )
                                        ) PLAINTIFF'S FRCP RULE 26
13 | vs.                                 ) DISCLOSURE FOR EXPERT
                                        ) DARREN CORREIA
14 |                                     )
15 | M & F FISHING CO., INC., a corporation, )
    | *in personam*, and F/V KOORALE, her )
16 | engines, tackle, apparel, furniture, and )
    | appurtenances, *in rem*               )
17 |                Defendants.           )
18 | _____ )
19 |
20 |        Plaintiff hereby submits this Rule 26(a)(2)(B) disclosure with respect to expert
21 | witness Darren Correia.
22 |        <u>ASSUMPTIONS AND DEFINITIONS:</u>
23 |        For the purposes of this report, the term "Vessel" is defined: to refer to *M/V*
24 | *KOORALE.* The term "Accident" shall refer to the accident on board Vessel on or
25 | about August 10, 2000, wherein plaintiff was severely injured and lost his leg. The
26 | term "vessel owner" is defined: to include the named defendant(s) and its or their
27 | vessel operators, vessel managers, agents, employees, alter egos and independent
28 | contractors.

                                                                          1

1    Negligence is assumed to be the failure to use reasonable care. Reasonable
2  care is assumed to be the degree of care that reasonably prudent persons would use
3  under like circumstances to avoid injury to themselves or others. Negligence is
4  assumed to be the doing of something that a reasonably prudent person would not so
5  do, or the failure to do something that a reasonably prudent person would do, under
6  like circumstances. It is assumed that negligence is a "cause" of an injury or damage
7  if it played any part, no matter how small, in bringing about the injury or damage. In
8  my opinion, it is negligent to violate applicable laws, rules and regulations.

9    The term "unseaworthy or unseaworthiness" is assumed to be: A vessel
10  owner has an absolute duty to provide and maintain a seaworthy vessel. This duty
11  cannot be turned over to anyone else. A vessel is seaworthy if the vessel and all of its
12  parts and equipment and work methods are reasonably fit for their intended purpose
13  and it is operated by a crew reasonably adequate and competent for the work
14  assigned. A vessel owner has a duty to provided adequate safety equipment for the
15  vessel. A vessel owner has a duty to comply with all applicable laws, rules and
16  regulations. A vessel's unseaworthiness may arise from any number of
17  circumstances. For example, a vessel is unseaworthy if the vessel, or any of its parts
18  or equipment or work methods, is not reasonably fit for its intended purpose or if its
19  crew is not reasonably adequate or competent to perform the work assigned or if it
20  does not comply with all applicable laws, rules and regulations. It is assumed herein
21  that unseaworthiness is a cause of an accident if it played a substantial part in
22  bringing about injury or damage.

23    I.    PRIMARY OPINIONS.

24    1.    Opinion 1:  The vessel owner's negligence was a cause of the Accident.

25    2.    Opinion 2:  The unseaworthiness of the vessel was a cause of the
26  Accident.

27    3.    Opinion 3:  Plaintiff was not negligent at the time of the Accident.

28

2

## II.    SUMMARY OF BASIS AND REASONS FOR OPINIONS.

Opinion 1:   The transfer of a crewman from the big skiff to the main vessel in the open ocean is during a set customarily done by transer to a relatively light maneuverable speed boat or by means other than jumping from the big skiff. The big skiff is very difficult to control in even moderate seas. The big skiff is not rapidly responsive to rudder or throttle changes particularly in reverse. The skiff has a broad stern with a relatively high freeboard that is very susceptible to being pushed out of control of its operator by a following sea. At the time of Plaintiff accident there was no urgent need to transfer Plaintiff to the main vessel. Even in moderate seas ("approximately two to four feet") the main vessel and the skiff when in close proximity to each other will rapidly and dramatically yaw, pitch, roll, rise, fall, twist and turn in relation to each other. Such yawing, pitching, rolling, rising, falling, twisting and turning makes it an unreasonably dangerous work method to require a crewman to jump from the skiff to the main vessel in the open ocean even in moderate seas. It is a known unsafe practice in the U.S. fleet for a fish captain or master to order a crewman to jump from the skiff to the purse seiner during a set in the open ocean even in moderate seas. The risk of harm is very high because if the man is caught between the purse seiner and the skiff, death or dismemberment is very likely. There is no reason or utility that justifies exposing a crewmen such as Mr. DeBrum to death or dismemberment during a set on tuna by ordering that he jump directly from the skiff to the purse seiner in the open seas as opposed to an alternative method.

The use of any illegal drugs such as marijuana aboard the vessel is a violation of U.S. law and U.S.C.G. rules and regulations applicable to the vessel. The failure to report to the U.S.C.G. the Accident herein was a violation of U.S. law and U.S.C.G. rules and regulations applicable to the vessel. Further use of illegal drugs is negligence and creates an unseaworthy condition of the vessel and crew. Given the sea conditions at the time of the Accident, it is reasonable to infer that the fish captain

3

1   and or master were under the influence of marijuana as their actions and inactions

2   exposed Plaintiff to an open and obvious dangerous condition. The U.S.C.G. has a

3   zero tolerance policy for drugs such as marijuana aboard ship. U.S.C.G. regulations

4   establish the standards that apply for determining when an individual is under the

5   influence of alcohol or a dangerous drug while working aboard a U.S. flag vessel.  33

6   C.F.R. section 95.030(a) provides, in relevant part, that "[a]cceptable evidence of

7   when a vessel operator is under the influence of . . . a dangerous drug includes, but is

8   not limited to: ¶ (a) Personal observation of an individual's manner, disposition,

9   speech, muscular movement, general appearance, or behavior . . . ."  I understand that

10  there will be testimony at trial to the effect that the fish captain and the Master aboard

11  *F/V KOORALE* were habitual smokers of marijuana, had a "bong" aboard the vessel

12  that was used to smoke substantial amounts of marijuana, within 12 hours of the

13  Accident has smoked marijuana, at and about the time of the Incident, had watery red

14  eyes, slurred speech, smelled of marijuana, eradict behavior, and generally appeared

15  to be high. Based upon the foregoing I believe that the fish captain and master were

16  under the influence of a dangerous drug. As Master of a vessel on which these

17  conditions existed, under U.S.C.G. regulations, including 33 U.S.C. section 95.045, I

18  would have been required to prevent the fish captain, the Navigator, or any other

19  individual displaying these symptoms from working, as they could and likely would

20  endanger other members of the crew.

21          At the time of the Accident it was dark. The lighting was not reasonably fit for

22  the intended job that was required of Plaintiff. Obviously, the quick pointing of a

23  flash light on the ladder by Captain Ferriera would not provide reasonably fit lighting

24  to create a safe place for plaintiff to work. The quick pointing would actually inhibit

25  a persons ability to see in the dark. Compounding the negligence and

26  unseaworthiness at the time of the Accident, a speed boat was hanging over the ladder

27  on the starboard side of the vessel. The restricted ingress to the vessel by way of the

28  ladder and not only slowed Plaintiff's time to make the transfer evolution but

4

1 prevented him from jumping down from the skiff to the vessel when the skiff was at
2 the top of a swell.

3     Opinion 2: See Opinion 1.

4     Opinion 3: A crewman is not negligent simply because upon the request or
5 direction of a superior officer or crewman he worked at a dangerous job or in a
6 dangerous place or under dangerous conditions. At the time of the Accident, Plaintiff
7 was following the normal work methods and directions set out by Captain Ferreira.
8 Captain Ferreira was not only the captain but he was one of owners of the vessel.
9 Further, it appears that Captain Ferreira was somewhat of a tyrant and governed his
10 crew by threats and intimidation with the approval of the licensed master. If plaintiff
11 had complained about the work method employed or refused to follow orders he
12 could have potentially have been accused of mutiny or at the least fired. I have fished
13 in the Western Pacific as fish captain. Many of the crewmen such as plaintiff are very
14 unsophisticated and normally frightened of the fish captain. I have heard of persons
15 fired by tuna boats owners for even slight insubordination. There is no safe way to
16 jump from the skiff to the vessel under even moderate seas conditions. A crewman
17 may jump dozens and dozens of time without accident, but sooner or later an accident
18 will occur.

19     III.   <u>DATA AND INFORMATION CONSIDERED AND QUALIFICATIONS</u>

20     My skill, training and experience, including without limitation, those items set
21 forth in my résumé that is attached hereto as Exhibit "A" and incorporated here by
22 reference. I also served for many years as a fish captain aboard vessels very similar to
23 *F/V KOORALE.* I have been aboard *F/V KOORALE.* I personally set nets and
24 managed work methods on purse seine vessels similar to *F/V KOORALE* under
25 similar conditions and put safety first so that the crew would have a reasonably safe
26 place to work as required by the United States Coast Guard, U.S. maritime law and
27 common sense. My opinions are or will also based on the deposition testimony of:
28 Mel DeBrum, Tile Siavao, Ernie Reate, Vols I and II, Robert Silva, Olo P'ae,

5

1   Benjamin Berondo, Leopoldo "Paul" Sta. Maria, William Armstrong and Efremio

2   Catubay.  Further, my opinions are or will also based on the affidavits of Joao Alves

3   dated November 21, 2002, and Martinho Correira, dated November 30, 2002, filed in

4   the action entitled *Joao Alves v. F/V KOORALE,* High Court of American Samoa,

5   Case No.032-2002 and an interview with Joao Alves.  Further, my opinions are or

6   will also based on various trial exhibits of Plaintiffs and Defendants, including, but

7   not limited to the vessel diagrams drawn by witnesses, photographs of the vessel, the

8   illustration depicting the tuna fishing procedure, the Plaintiff's tuna boat model

9   exhibit.

10      IV.    COMPENSATION

11      I charge $150 per hour for deposition testimony, $150 per hour for trial

12   testimony and bill my costs on an at cost basis.

13      V.    PRIOR TESTIMONY IN LAST FOUR YEARS

14      I have never testified as an expert witness in any other case prior to this.

15      VI.    RESERVATION OF RIGHTS

16      I am advised by counsel for Plaintiff that discovery is ongoing in this case and

17   that Plaintiff's counsel are still awaiting production of certain materials from the

18   Defendants and/or other third parties and that further investigation may have to be

19   carried out by Plaintiff's counsel following receipt of such materials.  As such I

20   reserve my right to supplement this report with additional opinions (as well as the

21   basis of such opinions and the compilation of data relied upon, as well as trial

22   exhibits) if such additional data is produced to me.  A supplemental report will be

23   provided if and when any supplemental opinions are developed following receipt of

24   additional information.

25      In addition to the foregoing opinions, before trial I intend to review the

26   deposition testimony and reports of Defendants' experts.  It is expected I will

27   comment on the testimony and reports of these experts at trial.  Further there are

28   corollary or supplemental opinions and bases for the primary opinions I have that are

6

1   not expressly stated above for brevity sake which reinforce my main opinions and

2   bases therefore.

3

4   Dated: December 20, 2002

5                                   DARREN CORREIA

6

7   Dated:  December 23, 2002       BANNING MICKLOW
                                    BULL & LOPEZ LLP
8

9                                   By
10                                      William L. Banning
                                        Edward M. Bull III
11                                      John S. Lopez

12                                  Attorneys for Plaintiff
                                    MEL DEBRUM
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# EXHIBIT A

## Cover Letter - Resume

### Darren M. Correia
### 4031 Liggett Dr.
### San Diego, Calif. 92106
### Ph:(619) 226-3533 , Email: mtlshop@cox.net

I have worked in the commercial tuna fishing industry for almost 12 years. Within those 12 years, I have attended maritime classes and tested with the U.S. Coast Guard to become a merchant marine, along with completing further tests to obtain my Master/Mate's license, for which I served 7 of those years as a Navigator or Captain.

I have almost 10 years of experience with computers and telecommunications equipment.

I am currently a Ship's Agent for a customs broker / steamship agency in San Diego.

Regards,
Darren M. Correia

# Darren M. Correia

4031 Liggett Dr., San Diego, Calif.  92106
(619) 226-3533 [ Home Tel. ]
Email Address: mtlshop@cox.net

## SUMMARY OF EXPERIENCE:
- 12 years shipboard experience in the purse-seine tuna industry.
- 2 years in a management role for a Starkist Seafood subsidiary.
- 8 years operating heavy hydraulic and electrical machinery.
- Experience with managing multi-racial personnel.
- 1+ year as IT Admin, using W2K Server, NT4, SQL, IIS, PCAnywhere, WebTrends, McAfee, ActivePDF.
- 1+ year in the development of a proprietary CRM application for the commercial real estate industry.
- 8 years using MS Windows and PCs.
- Software experience includes: W2K Server, W2K Pro, NT4.0, Win98, Win95, 3.11, Dos, SQL, IIS, MSOffice 97/2000 (including Access & Publisher), Winfax, Eudora, Quickbooks, Systems Management Server 1.2, Webtrends, McAfee Virusscan, ACT 2000.

## EMPLOYMENT HISTORY:

2001 – present (Ship's Agent)
Paxton, Shreve & Hays, Inc. (Customs Broker / Steamship Agency)
Ship's agent in care of vessel documentation and representation.
Working in conjunction with the following government agencies to insure a safe and timely port call, in accordance to all applicable rules and regulations: U.S. Customs, Immigration and Naturalization Service, U.S. Department of Agriculture, U.S. Coast Guard and the Department of Fish and Game.

1999 – 2001 (IT/Support Admin)
REApplications (Commercial real estate software) & (Systran Software Corporation (Language translation software)
Supervisor of internal and client support. IT Administrator performing duties such as creating accounts, performing backups (NT & SQL data), monitoring network and creating performance reports. Data cleansing and migration with tools such as Excel and Access along with proprietary software.

1996 – 1998 (Captain / Master)
Caribbean Fishing Co. (Subsidiary of Starkist Seafoods)
As Port Manager, I managed the port operations for a fleet of 7 commercial fishing vessels, which included supplies, payroll, medical, refueling, cannery offloading, and vessel licensing,
A subsequent promotion, and completion of the maritime Masters program, led me to the management of a team of 18 crewmembers as the Captain of a 1,400 ton capacity commercial fishing vessel. I successfully managed all fishing operations, and operated and maintained all shipboard satellite and terrestrial-based communication, navigation, and information systems.

1992 – 1995 (Navigator / Mate)
Orivensa Fishing Co. and Caribbean Fishing Co.
As Navigator aboard an 1100 ton purse-seine tuna vessel, I served directly under the ship's Captain, and became proficient with the shipboard administrative management duties. This included the daily reporting of strategies, payroll, tonnage, inventory, and personnel, via the satellite-base shipboard-to-corporate LAN. I continued my internship towards my Captains/Masters license.

1987 – 1982 (Oiler / Seaman)
Pisces Fishing Co.
As Oiler/Seaman aboard a commercial tuna purse seiner, I performed duties necessary for every day shipboard operations. Which includes: standing watch, mechanical repair/maintenance, operating hydraulic and electrical machinery, driving speedboats upon high seas, stacking net, etc.

## EDUCATION:
- Several Maritime licenses for the operation, navigation and communication of sea going vessels. Licenses obtained through U.S.C.G. are Master/Mate of Steam or Motor Vessels of not more than 200 gross tons, and Mate of Uninspected Fishing Vessels of not more than 1600 gross tons.
- Certificate of training for maritime basic and advanced firefighting.
- Microsoft Certified Professional (MCP) status obtained while attending New Horizons Computer Learning Center.

References available on request.

# EXHIBIT "G"

Exhibit

G

1   BANNING MICKLOW BULL & LOPEZ LLP
    William L. Banning, State Bar No. 75757
2   Edward M. Bull III, State Bar No. 141996
    John S. Lopez, State Bar No. 149291
3   501 West Broadway, Suite 2090
    San Diego, California 92101
4   Telephone: (619) 230-0030
    Facsimile: (619) 230-1350
5
6   Attorneys for Plaintiff,
    MEL DEBRUM
7
8                    UNITED STATES DISTRICT COURT
9              FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11  MEL DEBRUM                        )   Case No. 01-08403 DDP (SHx)
12                Plaintiff,          )   PLAINTIFF'S FRCP RULE 26
                                      )   DISCLOSURE FOR EXPERT
13  vs.                               )   DAVID L. GRANT
                                      )
14                                    )
15  M & F FISHING CO., INC., a corporation, )
    *in personam*, and F/V KOORALE, her  )
16  engines, tackle, apparel, furniture, and )
    appurtenances, *in rem*            )
17                                    )
                  Defendants.          )
18  ─────────────────────────────────  )
19
20      Plaintiff hereby submits, attached hereto, the Rule 26(a)(2)(B) disclosure with
21  respect to expert witness David L. Grant.
22  Dated: _12/23/__
23                               BANNING MICKLOW
                                 BULL & LOPEZ LLP
24
25                               By_____
26                                  William L. Banning
                                    Edward M. Bull III
27                                  John S. Lopez

                                 Attorneys for Plaintiff
28                               MEL DEBRUM

                                                                            1

PLAINTIFF'S RULE 26 DISCLOSURE FOR EXPERT DAVID L. GRANT          Case No. 01-08403 DDP (SHx)

# Admiralty Marine Surveyors

920 N Avalon Boulevard. Wilmington, CA 90744
Telephone: (310) 835-7139  Fax: (310) 835-9161

20 December 2002

Edward M. Bull III, Esq.
Banning, Micklow, Bull & Lopez, LLP
501 West Broadway, Ste. 2090
San Diego, CA 92101

Subj: Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
Rule 26 (a)(2)(B) Expert Report

Dear Mr. Bull:

I have been consulting with your firm on the subject case and hereby prepare/submit this written letter report pursuant to Rule 26 (a)(2)(B).

The subject case involves a serious personal injury to Plaintiff Mel DeBrum, whose right foot/leg was severely crushed between KOORALE and KOORALE's skiff as DeBrum was in the process of boarding KOORALE from the skiff. DeBrum's injury occurred on 10 August 2000, during pre-dawn hours/darkness and in sea conditions/waves variously described as from four to seven-to-eight feet. As such the skiff was bounding up and down. DeBrum's boarding point was at a vertical ladder on the starboard side of KOORALE, immediately beneath a speedboat suspended in the davit (which restricted/limited DeBrum's head clearance during his boarding). DeBrum's injured foot could not be saved and it was amputated. The force of the impact, at the time of DeBrum's injury, of the skiff hitting the side of KOORALE was felt by the "Navigator" who was on the port bridge wing (up forward and on the opposite side from where the incident occurred).

Information made available, by you, for my review to gain an understanding of the facts of the case consists of the following:

FEB-19-2003 19:32     BANNING MICKLOW              415 399 9192   P.05/53

02/18/03 13:11 FAX 6192301350      BANNING MICKLOW        ← PAGE 01      ← ... ...

Dec-23-02 05:03P Admiralty Marine Surveyor 310 835 9161        P.04

# *Admiralty Marine Surveyors*

Edward M. Bull III, Esq.                        20 December 2002
Banning, Micklow, Bull & Lopez, LLP                      Page 2

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

1.   Mel DeBrum deposition transcript (Vol. I) and 24 May 2002
     corrections
2.   Tile Siavao deposition transcript
3.   Ernie Reate deposition transcript, Vols. I and II
4.   Robert Silva deposition transcript
5.   Qlo P'ae deposition transcript
6.   Benjamin Berondo deposition transcript
7.   Leopoldo "Paul" sta. Marie deposition transcript
8.   William Armstrong deposition transcript
9.   Efremio Catubay deposition transcript
10.  Jose Martinho Correia affidavit
11.  Joao Alves affidavit
12.  Corrections to Mel DeBrum deposition transcript
13.  Ernie Reate deposition transcript of 15 December 2001 re Thomas H.
     Houghton v. M & F Fishing, Inc.
14.  17 photos of KOORALE

In addition to review of the above materials I have researched/reviewed various
applicable regulations/references and the United States Coast Guard Vessel
Documentation database (available via the Internet).

My Curriculum Vitae is attached as Enclosure (1); it summarizes my
background as a former United States Coast Guard officer and current independent
marine surveyor/consultant. A list of maritime cases I have testified as an expert
in is attached as Enclosure (2). I have not authored any publications.

I am a retired U.S. Coast Guard officer, having served on Active Duty from
December 1962 through June 1984. My tours of duty in the Coast Guard included
Search and Rescue (S&R), aids to navigation assignments on buoy tenders; Coast
Guard patrol boat navigation and operations training, and merchant marine safety
vessel inspections and accident investigations. From 1974 to 1976 I was the
Senior Instructor of the Coast Guard's Pacific Area Traveling Training Team,
which visited each of the Coast Guard's small boat stations between San Diego,

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                                    20 December 2002
Banning, Micklow, Bull & Lopez, LLP                              Page 3

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

CA and Adak, AK to teach S&R operations, which included emphasis on vessel
boardings during inclement weather conditions. Sizes of the Coast Guard vessels
involved in this training were 180-feet and under. From 1976 to 1984 I was
assigned Coast Guard Commercial Vessels Safety duties (i.e., merchant vessel
inspections and casualty investigations).

     I am an independent marine surveyor and work as an associate of R & R
Marine Surveyors, LLC, dba Admiralty Marine Surveyors, 920 North Avalon
Blvd., Wilmington, CA 90744. I have been an independent marine surveyor
since 1984 and was owner of Admiralty Marine Surveyors, Inc., from 1986 to
2001, when I sold the business to R & R Marine Surveyors. I am a member of the
National Association of Marine Surveyors (NAMS) and have served three two-
year terms as the NAMS' South Pacific States Regional Vice-President. I am also
a member of the Society of Naval Architects and Marine Engineers (SNAME), the
American Society of Naval Engineers (ASNE), and the American Boating and
Yacht Council (ABYC).

     From 1986 through July 2001 I averaged conducting approximately 200
commercial vessel surveys per year, of which on average approximately 30 per
year have been on commercial fishing vessels. Since July 2001 I have surveyed
approximately 15 fishing vessels. Between my service in the Coast Guard and
work as a marine surveyor, I estimate I have performed inspection/survey work on
approximately 550 to 600 commercial fishing vessels. I estimate I have surveyed
approximately 30-40 purse seiner tuna boats similar to KOORALE.

     NAMS is the only independent entity recognized by the Coast Guard as
authorized to conduct fishing vessel safety examinations pursuant to the safety
requirements of Title 46, Code of Federal Regulations (CFR), Section 28, and
issue, on behalf of the Coast Guard, a Fishing Vessel Safety decal upon
completion of a satisfactory examination. I took/passed the test in 1992 and was
the first NAMS surveyor in the state of California authorized to conduct fishing
vessel safety examination and issue Coast Guard decals.

# *Admiralty Marine Surveyors*

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                  Page 4

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

<u>Vessel Description and Discussion of Applicable Regulations</u>

KOORALE is a 182-ft x 40.0-ft x 15.2-ft tuna purse seiner fishing vessel, constructed of steel in 1973 by Martinac Shipbuilding Corp., of Tacoma. WA and registered at 1,072 gross tons.[1]  KOORALE's Coast Guard Vessel Documentation Query (Enclosure (3)) reveals no current owner, document issuance and expiration dates of 13 January 1989 and 31 January 2002, and lists the previous owner as M&F Fishing.  Vessel documents are issued for 12-month periods.  Thus M&F Fishing, Inc., was owner of KOORALE as of the time of the last 12-month renewal of the Certificate of Documentation (in January 2001).  KOORALE, under the ownership of M&F Fishing, Inc., was a U.S. flagged vessel.

A U.S. flagged commercial vessel must be under the command of a U.S. citizen (Title 46, United States Code [USC], Section 12122(b)(6)), and self-propelled seagoing documented vessels of over 200 gross tons must be under the command of a licensed Master (46 CFR§15.805).  On board KOORALE at the time of DeBrum's 10 August 2000 injury, Fermin Ferreira  was the "Fish Captain" and ranking person on board (and owner), while William Armstrong  was the "Navigator" (licensed U.S. citizen Master).  Because of KOORALE's tonnage a Coast Guard licensed Chief Engineer (Robert Silva) was also required.

DeBrum's injury clearly/unmistakable meets the definition of a "serious marine incident" (46 CFR §4.03-2).  Not only is there a requirement of law that it be reported to the Coast Guard (46 CFR §4.05) for Coast Guard investigation, but as it was a "serious" incident mandatory chemical testing was required (46 CFR §4.06).

---

[1] *Gross tonnage is a figure representing a vessel's interior volume less exempt spaces (per the Admeasurement regulations of 46 CFR §69). A vessel's gross tonnage is frequently the benchmark by which applicable regulations are determined. Gross tonnage does not represent a vessel's weight/displacement or cargo carrying capacity.*

## Admiralty Marine Surveyors

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                          Page 5

Re:  Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
     Rule 26 (a)(2)(B) Expert Report

    The Coast Guard's Port State Information Exchange (PSIX) offers limited
information on vessels within the Coast Guard's database. Enclosure (4) is a
printout of KOORALE's Current Details, with Enclosures (5) and (6) being
Historical Details (information contained in the Archive Data link per the Coast
Guard's former computer system). The PSIX format consists of sections on vessel
particulars, vessel documents/certifications, and a summary of Coast Guard
contacts. Coast Guard contacts are listed by activity number in the Current Details
PSIX, but by case number in Historical Details. Those case numbers have two
letter prefixes which denote the type of case. The letters MI stand for Marine
Inspection; MC stands for Marine Casualty (meaning a marine casualty as defined
by 46 CFR §4.05).

    Obtaining specific information as to the details of a Coast Guard contact on
a case number or activity number would require the initiation of a Freedom of
Information Act (FOIA) request. However, PSIX data as it stands reveals the
following:

    1.    Case MC97011962 is a Coast Guard marine casualty investigation on
          an incident involving KOORALE which occurred on 23 July 1997.

    2.    Case MC97006435 is a Coast Guard marine casualty investigation on
          an incident involving KOORALE which occurred on 10 May 1997.

    3.    Case MC94018960 is a Coast Guard marine casualty investigation on
          an incident involving KOORALE which occurred on 07 September
          1994.

"ASOD" stands for American Samoa Overseas Detachment, which is a Coast
Guard detachment under the Coast Guard's Marine Safety Office in Honolulu, and
the Coast Guard office which conducted the three above-listed casualty
investigations. Note there is no case number or activity number for Deck Boss
Joao Alves' injury on board KOORALE which occurred on 16 October 1998, and

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                          20 December 2002
Banning, Micklow, Bull & Lopez, LLP                      Page 6

Re:  Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
     Rule 26 (a)(2)(B) Expert Report

no case number or activity number for DeBrum's injury on board KOORALE
which occurred on 10 August 2000.

## Preliminary Opinions and Comments

<u>Shipowner's Negligence was the Cause of DeBrum's Injury</u>

       Negligence is the failure to use or exercise reasonable care, with reasonable
care being that exercised by reasonably prudent persons. Had owners complied
with requirements of the law and reported the DeBrum injury to the Coast Guard,
the Coast Guard's investigation would have, among other things, ascertained
whether any acts of negligence caused or contributed to the cause of the incident.
The regulatory definition which would have been used (46 CFR §5.29) is as
follows:

> *Negligence* is the commission of an act which a reasonable and
> prudent person of the same station, under the same circumstances,
> would not commit, or the failure to perform an act which a reasonable
> and prudent person of the same station, under the same
> circumstances, would not fail to perform.

Certain relevant facts of the case are as follows.

1.    DeBrum, at the time of his injury, was the assistant skiffman. After
the net was set he was in the process of boarding KOORALE from the skiff per
instructions from his superiors.

2.    The skiff is powered by a Caterpillar 3408 diesel engine, estimated at
400-500 horsepower. Estimated weight of the skiff in excess of 20 tons.[2] In

---

[2] *Silva deposition, pgs. 62 and 75-77.*

FEB-19-2003 19:34    BANNING MICKLOW         415 399 9192    P.10/53
02/18/03 13:14 FAI 6192301480    BANNING MICKLOW        ...

Dec-23-02 05:05P Admiralty Marine Surveyor 310 835 9161    P.09

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                                    20 December 2002
Banning, Micklow, Bull & Lopez, LLP                        Page 7

Re:    Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
       Rule 26 (a)(2)(B) Expert Report

addition to being used to set nets, the skiff is also utilized to hold/control the
position of KOORALE.

3.    DeBrum, when returning from the skiff to KOORALE, was standing
in the front of the skiff as the skiff was nosed up to KOORALE. DeBrum
estimated waves at seven to eight feet. Armstrong estimated the ground swell at
four to six feet with a two to three foot wind shop. Winds were probably 20-25
knots in squalls and 15-20 without rain. Armstrong described swells and chop as
increasing during squally weather.[3] Motion of the skiff was such that, at the top of
the crest of a wave, the position where DeBrum was standing in the skiff was
higher than the KOORALE deck.[4] Siavao, before DeBrum's injury occurred, saw
swells breaking over the KOORALE deck.[5] [6]

4.    DeBrum's boarding point on KOORALE was at the starboard vertical
ladder. The opening, or gap, between the mast stays inside the railing at the
adjacent sides of the ladder is approximately 30-inches.

5.    A KOORALE speedboat was in the davit located proximate to the
starboard ladder, and the speedboat's presence limited vertical deck clearance
above the ladder. Siavao, who was behind the railing at the time of DeBrum's
boarding injury, stands 5'6" tall and testified he could not stand straight up under
the speedboat and had to stand low/crouch over.[7] DeBrum, where standing on the

---

[3] *Armstrong deposition, pgs. 14 and 52.*

[4] *DeBrum deposition, pg. 93. Siavao deposition, pg. 134.*

[5] *Siavao deposition, pg. 81.*

[6] *DeBrum also testified "There were times when the waves were coming over the decks and
the Captain would order the net set out." (Change 94 to Corrections to Deposition of Mel
DeBrum.)*

[7] *Siavao deposition, pgs. 34 and 35.*

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                         Page 8

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

skiff when the skiff was coming off the crest of a wave, had to bend his head down
to avoid hitting the speedboat.[8]

    7.    Upon approach to KOORALE the skiff hit KOORALE because of big
waves, with DeBrum not that time jumping and the skiff being turned around for a
second approach.[9]

    8.    Ferreira shined a light from the skiff to the ladder signaling DeBrum
to board KOORALE. By the time DeBrum boarded Ferreira had turned the light
off.[10]   DeBrum, however, needed light to climb the ladder as he could not see.[11]

    9.    When DeBrum jumped from the skiff to the ladder the skiff was
coming down, and DeBrum was bending over so as to not hit his head on the
speed boat.[12]  DeBrum (once on KOORALE) knew he had to be quick. His left
foot was on deck and when in the process of pulling his right foot up it was hit by
the skiff.[13]

    10.   A speedboat (such as the one in the davit above the starboard ladder
boarding area where DeBrum's injury occurred) could have been used in lieu of
the skiff to get DeBrum back to KOORALE.[14]   Speedboats are most of the time
used daily and can be dropped to the water and raised in a short time/way less than

---

[8] *DeBrum deposition, pg. 93.*

[9] *DeBrum deposition, pg. 96.*

[10] *DeBrum deposition, pgs. 97-97 and 100. Siavao deposition, pgs. 48 and 49.*

[11] *DeBrum deposition, pg. 101.*

[12] *DeBrum deposition, pg. 102.*

[13] *DeBrum deposition, pg. 97*

[14] *Armstrong deposition, pg. 30.*

## Admiralty Marine Surveyors

Edward M. Bull III, Esq.                                      20 December 2002
Banning, Micklow, Bull & Lopez, LLP                            Page 9

Re:    Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
       Rule 26 (a)(2)(B) Expert Report

a minute. A speedboat driver would have been available to pick up DeBrum on
10 August 2000, and normal procedure (to transfer the assistant skiffman from the
skiff to KOORALE) is to use a speedboat if conditions are rough.[15]

       11.    There was no Coast Guard investigation of DeBrum's 10 August
2000 injury. Armstrong's calling the Coast Guard to report DeBrum's injury and
solicit medical advice does not constitute KOORALE's having reported the injury
as a marine casualty pursuant to 46 CFR §4.05. As such there was no Coast Guard
investigation of DeBrum's injury. There also was no chemical testing performed,
despite legal requirements that such testing be performed. While for all reportable
casualties the "marine employer" has an obligation to determine, at least on the
basis of behavioral observation, whether there is any evidence of alcohol or drug
use by individuals directly involved (46 CFR §4.05-12), for serious incidents such
as DeBrum's injury the testing is mandatory (46 CFR §4.06).

       12.    Evidence in the case of Joao Alves vs. M/V KOORALE (regarding
Alves' reported injury of 16 October 1998) is that Ferreira and Armstrong were
chronic marijuana users.[16] I am advised there will be sworn testimony that the
KOORALE Fish Captain and Navigator were chronic users at the time of the
DeBrum injury and that within 24 hours of DeBrum's injury one or both of these
ship's officers were using marijuana.

_____

[15] *Silva deposition, pgs. 92-93, 110 and 111.*

[16] *Use of a controlled substance aboard KOORALE would constitute a violation of Coast
Guard regulations. For example, 46 CFR §16.201(Required Chemical Testing) specifies an
individual failing a test for dangerous drugs (which per 49 CFR §40.21(a) include marijuana) is
presumed to be a user. If the individual is the holder of a Coast Guard issued license or
merchant mariner's document positive results are required to be reported to the Coast Guard in
writing and that individual is subject to the revocation of his/her license/document under 46 CFR
§5. Also, a member of the crew who tests positive for a dangerous drug, whether licensed by the
Coast Guard or not, shall be denied employment and removed from the vessel and may not be
reemployed until the requirements of 46 CFR §16.370(d) and 46 CFR §5, if applicable, are met.*

# ⎰ldmiralty Marine Surveyors

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                        Page 10

Re:  Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
     Rule 26 (a)(2)(B) Expert Report

The negligence of the owners of KOORALE extends, among other things,
from use of the skiff in transferring DeBrum back to KOORALE on the morning
of 10 August 2000. While there might be argument as to how high seas were and
defining a limit between what was and what was not "rough" or extreme, evidence
of seas being rough can easily be concluded from swells washing over the deck of
KOORALE and the skiff, on the top of the crest of a wave, being at or above the
deck of KOORALE. Lighting was non-existent. DeBrum could have easily been
directed to remain on the skiff, in lieu of being directed to return to KOORALE
from the skiff, or KOORALE could easily have dispatched a speedboat. The skiff,
very heavy and far less responsive/maneuverable than a speedboat, was
nonetheless prone to severe motions of pitching and rolling in existing seas. Use
of the skiff was unsafe and unreasonably dangerous, and therefore negligent.[17]

## Further Negligence and the Unseaworthiness of KOORALE was a Cause of DeBrum's Injury

Ship owners/operators owe a duty to the crew to provide a safe and
seaworthy vessel, and are liable for any breach of the implied warranty of
seaworthiness which may cause an injury to a seaman. To be seaworthy a ship
(including its crew) must be reasonably safe to use and perform its assigned tasks.
An unreasonably dangerous method of operation amounts to unseaworthiness.
The owner has a duty to comply with all applicable laws, rules and regulations.

Some of the relevant facts of the case are as set forth above. In addition to
negligence as set forth above, the presence of the speedboat in the davit located
over DeBrum's reboarding location constituted a physical obstruction. The work
method employed and the obstruction (and possibly use of drugs) amount to
unseaworthiness and were a substantial factor causing DeBrum's injury. This also
constitutes further evidence of negligence.

---

[17] *The deposition of the skiffman, Jose Cruz, was not taken. Thus there is no evidence
regarding how the skiffman operated the skiff and assessed conditions. In addition to negligence
as just set forth, the actions and decision-making of the skiffman might well add to it.*

# *Admiralty Marine Surveyors*

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                  Page 11

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

        Evidence regarding decision-making on board KOORALE to not relocate
the speedboat (the aforesaid obstruction) at the time of DeBrum's boarding from
the skiff to KOORALE includes the following:

> Q:   And did you talk with anyone about that speedboat hanging over the
>      ladder on the starboard side on the day of the accident?
> A:   To the deck boss.
> Q:   And what did you tell the deck boss about the speedboat hanging over
>      the ladder on the starboard side?
> A:   I told him it should be removed.
> Q:   And why did you tell him it should be removed.
> A:   Because I know that that area should be cleared for the skiff when it
>      comes back.
>      *(P'ae deposition, pg. 26/line 22 to pg. 27/line 9.)*
>
> Q:   So did you tell the – did you tell the deck boss that the speedboat
>      should be moved before you guys started the set on the morning of
>      Mel's accident?
> A:   I told him that when we were on our way from Samoa. I told him that
>      halfway into our trip.     *(P'ae deposition, pg. 36/lines 12-16.)*
>
> Q:   Did you have a discussion with Olo (P'ae) about moving the
>      speedboat away from the starboard ladder?
> A:   Yes.
> Q:   And what did you discuss?
> A:   He say, "Better move the speedboat back because this is going to
>      happen sometime." Now it's already happened. *(Siavao deposition,
>      pg. 51, lines 6-12.)*

The decision made to not relocate the speedboat/remove the obstruction
constitutes unseaworthiness and negligence.  Further, the decision-making which
was made (directing DeBrum to reboard KOORALE in darkness during existing
sea conditions, with the skiff bounding and down and DeBrum having been unable

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.  
Banning, Micklow, Bull & Lopez, LLP

20 December 2002  
Page 12

Re: Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE  
Rule 26 (a)(2)(B) Expert Report

to transfer from the skiff to KOORALE on an earlier approach) is negligence and unseaworthiness by itself. However, it is even more negligence and unfit in light of there being evidence of marijuana use by Ferreira (whose deposition appears not to have been taken). Owners cannot "hide" behind what could be argued as unsanctioned actions by the crew as Ferreira was a co-owner.

Regarding use of the skiff in lieu of a speedboat to effect the transfer of DeBrum back to KOORALE on 10 August 2000, I believe skiff usage was both inappropriate and not in accordance with a reasonable industry standard of care, despite what might be a predictable argument by defendant M&F Fishing Co., Inc., and F/V KOORALE that use of the skiff comported with the reasonable and customary industry standard of care. Not only did Armstrong testify a speedboat could have been used to pick up DeBrum (reference footnote 14) but Armstrong, who as of the time of his (19 September 2002) deposition had been Master of the F/V JANINE under Fish Captain Jimmy Silva for 13 months, also testified to the JANINE customary practice:

Q: On the boats that you work on now, is the speedboat sent out in rough weather to pick up the assistant skiffman?  
A: Yeah. The speedboat brings the assistant skiffman to the boat.  
Q: In all the sets?  
A: Yeah. *(Armstrong deposition, pg. 93 lines 11-17.)*

It is also my opinion and belief owners were fully aware of requirements to report marine casualty injuries such as DeBrum's to the Coast Guard as previous marine casualties involving KOORALE had been reported to and investigated by the Coast Guard. Owners chose not to report the DeBrum injury to the Coast Guard, and the consequence was avoiding Coast Guard investigation which, if conducted, would have addressed issues such as drug use, negligence, and unseaworthiness.

///  
///

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                            20 December 2002
Banning, Micklow, Bull & Lopez, LLP                 Page 13

Re:  Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
     Rule 26 (a)(2)(B) Expert Report

## DeBrum was Not Negligent at the Time of His Injury

DeBrum, when transferring from the skiff to KOORALE at the time his
injury occurred, was following orders.

> Q:  ...did the captain ever tell you that you should not jump for the skiff
>     to the KOORALE unless you are – unless you feel that it is safe to do
>     so....
> A:  No.  The only thing I know is if the captain signaled to us by using
>     his bright light and pointed at us and to the ladder, that means they
>     have draft me right away.
> Q:  They have to what?
> A:  I mean they have to transfer me to the boat right away.
> Q:  Right away?
> A:  It's an order...If the captain said it's an order, you have to do it;
>     otherwise, you will lose your job.
>     *(DeBrum deposition, pg. 105/line 12 to 106/line 17.)*
>
> Q:  If Captain Ferreira gives an order, is a crewmember expected to
>     follow it?
> A:  Yes.  *(Armstrong deposition, pg. 87, lines 14-16.)*

DeBrum had no control over operation of the skiff and certainly no control
over environmental conditions.  Likewise he had no control over Captain Ferreira,
nor control over the obstruction posed by the speedboat being in the davit at
KOORALE's starboard ladder, nor whether (as is the case on JANINE) a
speedboat would be used to return him to KOORALE.  About the only thing
DeBrum did have control over was when to time his jump.

Over the course of my Coast Guard career and employment as an
independent marine surveyor I have conducted thousands of at sea vessel-to-vessel
boardings, hundreds of which have been in weather conditions similar to those
existing at the time of DeBrum's 10 August 2000 injury.  Under conditions as

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                             20 December 2002
Banning, Micklow, Bull & Lopez, LLP                         Page 14

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

existed the critical action of the person transferring is to time his/her jump when
the craft he/she is transferring from is at or just beginning to come down from the
crest, or top, of the wave. Unfortunately, DeBrum could not do this due to the
position of the speedboat.

        Contributory Negligence does not bar recovery in an unseaworthiness action
but, instead, is often taken into account as a mitigating factor by apportioning a
plaintiff's comparative negligence. In my opinion, DeBrum was not negligent.
Again, as mentioned above, DeBrum was prevented from transferring at the top of
the swell because of the speedboat placement. Note he actually accomplished the
transfer to KOORALE. He jumped across from the skiff and was holding
on/climbing up when hit by the skiff. DeBrum did not trip, slip, stumble, hesitate,
or otherwise by failing to act/move quickly put himself in harms way and
contribute to the cause of his injury. DeBrum was not negligent, not only due to
facts/circumstances of the case but also because he was following/carrying out
orders to return to KOORALE via the skiff. It is not negligent to follow orders.

                                ***

        I have not addressed above but did take note of characterizations of Captain
Ferreira and his management style being that of threats and intimidation. Ferreira
was demanding and tyrannical, and the culture was such that the crew complied
fully. It also needs to be understood DeBrum and virtually all the crew coveted
their jobs and would not risk losing their jobs by failing to comply with Ferreira's
orders. With unemployment and poverty high in the South Pacific, there is a high
supply of willing laborers and those with jobs work hard/do what they can/do what
they have to in order to keep their jobs.

        As dangerous as were conditions at the time of DeBrum's injury, it bears
mentioning in like seas a crewman might well jump dozens, or hundreds, of times
from the skiff to the mothership without incident. Armstrong  summed up what
has been an observation of mine for years:

# *Admiralty Marine Surveyors*

Edward M. Bull III, Esq.                              20 December 2002
Banning, Micklow, Bull & Lopez, LLP                  Page 15

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

> **"Okay. You know, the bottom line is it's a dangerous
> job. Any day it happens. You know, using good judgement
> or bad judgement, you know you can use bad judgement
> and not get hurt, you can use good judgement and get
> hurt."** *(Armstrong deposition, pg. 71, lines 10-14.)*

In the DeBrum case it was not DeBrum who is accountable for bad judgment but
rather owners and Captain Ferreira. The DeBrum case is not a case of the exercise
of good judgement and getting hurt, but rather bad judgement by the Captain or
Master resulting in DeBrum getting hurt.

As to what caused DeBrum's accident and what, if done differently, would
have prevented it, I believe at least the following:

1.    Given use of the skiff, had the speedboat in the davit not been present
      as an obstruction DeBrum's crossing from the skiff to KOORALE
      still would have been dangerous, but he would have had a straight
      and unobstructed path without having had to bend over to clear
      beneath the speedboat. Had the speedboat not been in the davit
      DeBrum's chances of safely transferring to KOORALE from the skiff
      would have been greater than they were.

2.    Given existing sea conditions, a speedboat should have been used
      (and this would have effectively removed the aforesaid obstruction),
      or DeBrum should have been directed to remain on the skiff (because
      there was no emergency).

***

I charge $100.00 per hour for survey and office work (such as time spent
reviewing documents and preparing this letter report) on litigation consultation
matters, and $200.00 per hour for deposition and court room testimony. Expenses
are billed at cost and work involving travel is billed portal-to-portal.

# Admiralty Marine Surveyors

Edward M. Bull III, Esq.                          20 December 2002
Banning, Micklow, Bull & Lopez, LLP               Page 16

Re:   Mel DeBrum v. M&F Fishing Co., Inc., and F/V KOORALE
      Rule 26 (a)(2)(B) Expert Report

    You have advised discovery is ongoing and that you are still awaiting
production of certain materials from Defendants and/or third parties. I therefore
reserve the right to supplement this report with additional opinions (as well as the
basis for same and compilation of data relied upon, as well as trial exhibits) if
additional data is produced to me and I am requested to prepare a supplemental
report. Also, I anticipate before trial being provided and reviewing the deposition
testimony and reports of Defendant's experts and expect I will comment on said
expert testimony at trial.

    Further, there are corollary or supplemental opinions and bases for the
primary opinions I have which, to keep this report from being longer, are not
expressly stated above which reinforce my main opinions and the bases for same.

    Please advise if you have any questions or need additional information.

                                         Very truly yours,

                                         D.L. GRANT

Encl:  1)   Curriculum Vitae (David L. Grant)
       2)   Maritime case expert witness testimony, David L. Grant
       3)   Coast Guard Vessel Documentation query, KOORALE
       4)   Coast Guard PSIX printout, KOORALE, Current Details
       5)   Coast Guard PSIX printout, KOORALE, Historical Details (Since
            1997)
       6)   Coast Guard PSIX printout, KOORALE, Historical Details (Prior to
            1997)

# TECHNICAL EXPERIENCE AND BACKGROUND BRIEF OF DAVID L. GRANT

**EDUCATION:**            15 years - see Enclosures 1 and 2.

**CERTIFICATIONS:**
a) National Association of Marine Surveyor (NAMS) Certified Surveyor: Yachts and Small Craft Surveyor, Hull and Machinery Surveyor. Hull and Machinery Surveyor of unlimited size vessels; Certificate No. 438-2-3.
b) Society of Marine Consultants. Certificate No 278.
c) American Welding Society: Certified Welding Inspector, AWS QC 1-78. Certificate No. 9051631.
d) NAMS and USCG Certified to inspect fishing vessels and issue USCG decals.

**MEMBERSHIPS:**
- Society of Naval Architect and Marine Engineers (SNAME)
- American Society of Naval Engineers (ASNE)
- American Welding Society (AWS)
- National Council of Fishing Vessel Safety and Insurance
- American Boating and Yacht Council (ABYC)
- Propeller Club of the United States
- Marine Underwriters of Southern California
- International Association of Marine Investigators, Inc. (IAMI)

Retired from USCG after almost 22 years service and advanced through 14 pay grades: enlisted, Warrant Officer and regular Officer ranks.

**DATE/PLACE OF BIRTH:**   August 6, 1944; New London. Connecticut

## PROFESSIONAL EXPERIENCE

July 2001 to Present      Marine Surveyor/Consultant for R & R Marine Surveyors, LLC, dba Admiralty Marine Surveyors

August 1987 to 2001       Owner of Admiralty Marine Surveyors, Inc. Principal Marine Surveyor of this company: a California Corporation, incorporated in August 1987 (corporation liquidated in 2002).

Enclosure 1

## PROFESSIONAL EXPERIENCE (con't):

| | |
|---|---|
| August 1987 to 1999 (con't) | Owner of Grant & Grant Enterprises. Ltd.. which provided Naval Architect and design services: a California Corporation: incorporated in May 1988 (corporation liquidated in 1999). |
| April 1984 to August 1987 | Purchased American Marine Surveyors in Long Beach. CA: incorporated under California law: owned 50% of the stock: sold company stock in August 1987. |
| January 1980 to April 1984 | U.S. Coast Guard Marine Inspector and Investigating Officer. U.S. Coast Guard Marine Inspection Office. Singapore. Resident U.S. Coast Guard Inspector at four shipyards: responsible for delivery of 16 new U.S. Flag MODU's on behalf of the U.S. Coast Guard. Conducted SOLAS, IMO. annual safety inspection drydock examination, etc. on U.S. Flag vessels and MODU's visiting Singapore. Coordinated inspections and inspectors to Far East areas: India, Indonesia. Brunei. Taiwan. Philippines. |
| December 1976 to January 1980 | U.S. Coast Guard Marine Inspector attached to Marine Inspection Office. Long Beach, California. Department Chief of New Construction/Conversion Department: responsible for the plans review, plans approval and on-site inspections of all vessels being built in Los Angeles/Long Beach U.S. Coast Guard Inspection zone. Unit Safety Officer and responsible for training newly assigned Marine Inspectors. |
| | During this period on various occasions. was assigned by U.S. Coast Guard Marine Safety Division. Washington D.C. to inspect MODU's in Chile. Brazil. North Sea area and Japan. |
| | Received three personal citations. |

rev 11/12/02              2

# PROFESSIONAL EXPERIENCE (con't):

May 1975 to
December 1976

Chief Instructor, Pacific Area Training Team. San Francisco. California: supervision of eight-man training team responsible for theoretical and practical instruction in shipboard fire fighting. damage control. navigation, engineering casualty control, towing and salvage procedures, boat handling and shore structure fire fighting at U.S. Coast Guard shore and floating units on West Coast. USA. Taught five of aforementioned subjects and scheduled all training.

Received second U.S. Coast Guard Achievement Medal (personal award) and Unit Commendation Ribbon.

May 1972 to
May 1975

Damage Control School Chief. U.S. Coast Guard Training Center, Governors Island. New York. Supervisor of ten instructors and eighty students. School consisted of a 16 week curriculum in welding. fiberglass repair, woodworking, fire fighting, pipe fitting, and safety. Rewrote entire curriculum in 1973. which is still the same today. Was a student in this school in 1963 and returned as School Chief.

Received U.S. Coast Guard Commendation Medal (personal award).

May 1970 to
May 1972

Shipboard Damage Controlman (Petty Officer First Class), U.S. Coast Guard Cutter BLACKTHORN. Mobile. Alabama. Specific duties were engineering watch officer, safety officer. vessel system maintenance. repair of Aids to Navigation. buoy crane operator, and fire fighter in charge.

April 1969 to
May 1970

Station Damage Controlman Petty Officer First Class), U.S. Coast Guard Loran Station. Iwo Jima. Volcano Islands. Duties - station maintenance. safety officer. fuel and water manager water was rainwater caught. chlorinated and tested). and fire fighting chief. This was an isolated tour of duty.

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 94 of 234

# PROFESSIONAL EXPERIENCE (con't):

**April 1969 to May 1970 (con't)** — Received the U.S. Coast Guard Achievement Medal (personal award) and U.S. Coast Guard Meritorious Unit Ribbon.

**March 1966 to April 1969** — Recruiting Officer (Officer in Charge), U.S. Coast Guard Recruiting Office. Fresno. California. Recruited young men and women for U.S. Coast Guard. duties included: Public speaking at high schools and colleges. administrative. supply, and administering "swearing in" oath.

**January 1965 to March 1966** — Station Damage Controlman Petty Officer Third Class, U.S. Coast Guard Loran Station. Yap. Marianas Islands. Station maintenance. water manager. heavy equipment operator (bulldozers. etc.) and engineering watch stander over four 16-cylinder generator sets for station electrical power. This was an isolated tour of duty.

**May 1963 to January 1965** — Shipboard Damage Controlman Petty Officer Third Class), U.S. Coast Guard Cutter McCULLOGH. Boston. Massachusetts. Duties were shipboard welding and repair. fire fighting, and engine room throttle and evaporator/boiler water stander.

**October 1962 to May 1963** — Recruit training, U.S. Coast Guard Training Center. Alameda, California and at Damage Control School. U.S. Coast Guard Training Center. Groton. Connecticut.

Sea Duty assignments permanent and temporary include:

| | |
|---|---|
| USCG Cutter MCCULLOUGH | 311' Weather Ship |
| USCG Cutter CACTUS | 180' Buoy Tender |
| USCG Cutter BLACKTHORN | 180' Buoy Tender |
| USCG Cutter EASTWIND | Icebreaker |

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 95 of 234

# EXHIBIT "H"

Exhibit

H

1   BANNING MICKLOW BULL & LOPEZ LLP
    William L. Banning, State Bar No. 75757
2   Edward M. Bull III, State Bar No. 141996
    John S. Lopez, State Bar No. 149291
3   501 West Broadway, Suite 2090
    San Diego, California 92101
4   Telephone: (619) 230-0030
    Facsimile: (619) 230-1350
5

6   Attorneys for Plaintiff,
    MEL DEBRUM
7

8                    UNITED STATES DISTRICT COURT
9
            FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10

11  MEL DEBRUM                        )    Case No. 01-08403 DDP (SHx)
12                  Plaintiff,        )    PLAINTIFF'S FRCP RULE 26
13                                    )    DISCLOSURE FOR EXPERT
    vs.                               )    T. R. BONGARTZ
14                                    )
15  M & F FISHING CO., INC., a corporation, )
    in personam, and F/V KOORALE, her )
16  engines, tackle, apparel, furniture, and )
    appurtenances, in rem            )
17                                    )
                    Defendants.       )
18  _____ )

19       Plaintiff hereby submits this Rule 26(a)(2)(B) disclosure with respect to expert

20  witness T.R. BONGARTZ. Discovery is not complete. Plaintiff reserves the right to

21  introduce or elicit corollary or supplemental opinions from Plaintiff's expert

22  witnesses, including Mr. BONGARTZ based, among other things, upon new

23  evidence discovered, the testimony of other experts during discovery and the

24  testimony of the experts at trial.

25       I.    ASSUMPTIONS AND DEFINITIONS:

26       For the purposes of this report, the term "Vessel" is defined: to refer to M/V

27  KOORALE. The term "Accident" shall refer to the accident on board Vessel on or

28  about August 10, 2000, wherein plaintiff was severely injured and lost his leg. The

                                                                              1

1  term "vessel owner" is defined:  to include the named defendant(s) and its or their
2  vessel operators, vessel managers, agents, employees, alter egos and independent
3  contractors.

4        Negligence is assumed to be the failure to use reasonable care.  Reasonable
5  care is assumed to be the degree of care that reasonably prudent persons would use
6  under like circumstances to avoid injury to themselves or others.  Negligence is
7  assumed to be the doing of something that a reasonably prudent person would not so
8  do, or the failure to do something that a reasonably prudent person would do, under
9  like circumstances.  It is assumed that negligence is a "cause" of an injury or damage
10  if it played any part, no matter how small, in bringing about the injury or damage.  In
11  my opinion, it is negligent to violate applicable laws, rules and regulations.

12        The term "unseaworthy or unseaworthiness" is assumed to be:  A vessel
13  owner has an absolute duty to provide and maintain a seaworthy vessel.  This duty
14  cannot be turned over to anyone else.  A vessel is seaworthy if the vessel and all of its
15  parts and equipment and work methods are reasonably fit for their intended purpose
16  and it is operated by a crew reasonably adequate and competent for the work
17  assigned.  A vessel owner has a duty to provided adequate safety equipment for the
18  vessel.  A vessel owner has a duty to comply with all applicable laws, rules and
19  regulations.  A vessel's unseaworthiness may arise from any number of
20  circumstances.  For example, a vessel is unseaworthy if the vessel, or any of its parts
21  or equipment or work methods, is not reasonably fit for its intended purpose or if its
22  crew is not reasonably adequate or competent to perform the work assigned or if it
23  does not comply with all applicable laws, rules and regulations.  It is assumed herein
24  that unseaworthiness is a cause of an accident if it played a substantial part in
25  bringing about injury or damage.

26        II.    PRIMARY OPINIONS

27        (1) the ship owner/employer was negligent and such negligence caused
28  Plaintiff's accident, (2) the M/V KOORALE was unseaworthy and said

2

PLAINTIFF'S RULE 26 DISCLOSURE FOR EXPERT T.R. BONGARTZ        Case No. 01-08403 DDP (SHx)

1   unseaworthiness was a substantial cause of Plaintiff's accident and (3) Plaintiff was
2   not himself negligent.

3        Plaintiff was injured (loss of right lower leg) while attempting to transfer from
4   the "Skiff" of the M/V KOORALE to the working deck of the M/V KOORALE in
5   seas four feet and up.  Mr. De Brum was required to "jump" from the "Skiff" and
6   grab a narrow ladder located in the side of the M/V KOORALE, climb the ladder and
7   then step over the ship's rail onto the deck.  However, there was a speedboat hanging
8   on davits above the ship's rail and ladder which blocked/prevented the plaintiff's
9   ability to jump from the skiff.  As ordered, Mr. DeBrum jumped from the Skiff to the
10  ladder and started climbing.  As he reached the ship's rail and stepped over with his
11  left leg, the high sea swell caused the Skiff to rise and hit the ship severing Mr.
12  DeBrum's right lower leg which was still on the outside of the ship.  The Captain of
13  the M/V KOORALE was utilizing an unreasonably dangerous procedure under the
14  circumstances.  Instead, he should have taken  precautions to avoid unnecessary risks
15  to the Plaintiff. These extra precautions should have included at least:

16       1.    Eliminate the unsafe procedure;

17       2.    Recover the Crewmember by a safer method; and

18       3.    Provide "clear" access to the ladder.

19       III.   SUMMARY OF BASIS AND REASONS FOR OPINION

20              A.    Eliminate the Unsafe Procedure:

21        There is no substitute for eliminating an unsafe procedure that can cause death
22  and or dismemberment to a worker/crewmember.  The concept of providing a safe
23  working environment for workers goes back to 1970 when Occupational, Safety and
24  Health Standards were adopted.  There was no reason to continue the unsafe practice
25  of jumping between vessels in even moderate seas when safer recovery procedures
26  were available and customarily used in the fleet.

27              B.    Recover the Crewmember by a Safer Method:

28        The crewmember could have remained on the Skiff and been recovered when

                                                                              3

1  the Skiff was recovered. The crewmember could have transferred to the "lightboat" or

2  a speedboat and then been recovered when that boat was recovered. These alternative

3  procedures would have constituted reasonably safe methods under the circumstances.

4          C.    <u>Provide "Clear" Access to the Ladder</u>:

5  If for some (unbelievable) reason the unsafe jump had to be made in moderate seas,

6  then clear access to the ladder should have been provided (i.e., remove the speedboat

7  from above the ladder) so that the crewmember could make the jump from the Skiff to

8  the ladder at the top of the swell.

9          D.    <u>Plaintiff Was Not Negligent</u>

10  At the time of the accident, Plaintiff was following the normal work methods and

11  directions set out by the Captain. Captain Ferreira was not only the captain and one

12  of owners of the vessel, it appears that Captain Ferreira was somewhat of a tyrant and

13  governed his crew by threats and intimidation. If plaintiff had complained about the

14  work method employed or refused to follow orders he could have been fired.

15  Furthermore, there was nothing that Plaintiff could do under the circumstances to

16  make the transfer safe.

17      IV.   <u>DATA AND INFORMATION CONSIDERED</u>.

18      My skill, training and experience, including without limitation, those items set

19  forth in my resume that is attached hereto as Exhibit "A" and incorporated here by

20  reference. My years of experience as an accident reconstructionist and my general

21  training in work place safety. My opinions are also based on the deposition testimony

22  of Plaintiff, Chief Engineer Robert Silva, Boat Captain William Armstrong, seaman

23  Tile Siavao, seaman Ernie Reate, seaman Benjamin Berondo, seaman Leopold "Paul"

24  Sta. Maria, seaman Efremio Catubay, seaman (and Deck Boss) Olo P'ae, my

25  inspection of the tuna vessel M/V KOORALE, various trial exhibits, including

26  various vessel diagrams drawn by witnesses (*see*, *e.g.*, Exhibits 1 and 2 to DeBrum's

27  Depo), photographs of the vessel (including Exhibit C, F through O, R and S to

28  various crew member Depos) the illustrations depicting the tuna fishing procedure

4

1  (Exhibit A to P'ae Depo), and a tuna boat model exhibit (Exhibit Q to Reate Depo).

2      V.    COMPENSATION

3      I charge $135 per hour for case work-up and $185 per hour for Deposition and

4  Trial. Both fees are billed on an hourly bases, portal to portal, plus my costs on an at

5  cost basis and State of Hawaii General Excise Tax of 4.16%.

6      VI.    PRIOR TESTIMONY IN LAST FOUR YEARS

7      *See* the summary of my trial, deposition and arbitration testimony attached

8  hereto as Exhibits "B", "C" and "D".

9      VII.    RESERVATION OF RIGHTS

10      I am advised by counsel for Plaintiff that discovery is ongoing in this case and

11  that Plaintiff's counsel are still awaiting production of certain materials from the

12  Defendants and/or other third parties and furthermore that further investigation may

13  have to be carried out by Plaintiff's counsel following receipt of such materials. As

14  such I reserve my right to supplement this report with additional opinions (as well as

15  the basis of such opinions and the compilation of data relied upon, as well as trial

16  exhibits) if such additional data is produced to me. A supplemental report will be

17  provided if and when any supplemental opinions are developed following receipt of

18  additional information.

19

20  DATED: December ___, 2002

21                                      T.R. Bongartz

22  DATED: December 23 2002            BANNING MICKLOW

23                                        BULL & LOPEZ LLP

24

25                                      By

26                                      William L. Banning

27                                      John S. Lopez

                                    Attorneys for Plaintiff

28                                      MEL DERRUM

5

1  inspection of the tuna vessel M/V KOORALE, various trial exhibits, including

2  various vessel diagrams drawn by witnesses (*see, e.g.*, Exhibits 1 and 2 to DeBrum's

3  Depo), photographs of the vessel (including Exhibit C, F through O, R and S to

4  various crew member Depos)  the illustrations depicting the tuna fishing procedure

5  (Exhibit A to P'ae Depo), and a tuna boat model exhibit (Exhibit Q to Reate Depo).

6    V.  **COMPENSATION**

7     I charge $135 per hour for case work-up and $185 per hour for Deposition and

8  Trial.  Both fees are billed on an hourly bases, portal to portal, plus my costs on an at

9  cost basis and State of Hawaii General Excise Tax of 4.16%.

10    VI. **PRIOR TESTIMONY IN LAST FOUR YEARS**

11     *See* the summary of my trial, deposition and arbitration testimony attached

12  hereto as Exhibits "B", "C" and "D".

13    VII. **RESERVATION OF RIGHTS**

14     I am advised by counsel for Plaintiff that discovery is ongoing in this case and

15  that Plaintiff's counsel are still awaiting production of certain materials from the

16  Defendants and/or other third parties and furthermore that further investigation may

17  have to be carried out by Plaintiff''s counsel following receipt of such materials. As

18  such I reserve my right to supplement this report with additional opinions (as well as

19  the basis of such opinions and the compilation of data relied upon, as well as trial

20  exhibits) if such additional data is produced to me. A supplemental report will be

21  provided if and when any supplemental opinions are developed following receipt of

22  additional information.

23

24  DATED: December **23** , 2002

25         T.R. Bongartz

26  DATED: December ___, 2002  **BANNING MICKLOW**

27         **BULL & LOPEZ LLP**

28

                    5

Case 1:03-cv-00004     Document 27     Filed 02/21/2003     Page 102 of 234

# Bongartz & Associates, Inc.

## Accident Reconstruction and Safety Services

4309 Palahinu Place, Honolulu, HI  96818   -   Phone (808) 422-4200   -   Fax (808) 422-1311

### BACKGROUND OF T.R. BONGARTZ (03-23-02)

* 31 years experience in Accident Reconstruction

* Nationally Certified Traffic Accident Reconstructionist   (ACTAR # 133).

* Nationally Certified XL Tribometrist (CXLT) -  International Safety Academy (ISA)

* National member of the American Society for Testing and Materials (ASTM) F-13
  Committee on Pedestrian/Walkway Safety and Footwear.

* Investigated approximately 1517 various types of accidents in Hawaii to include
  Marine accidents, Industrial accidents, Machine & Product Defects, Fires (vehicular,
  marine and structural), Construction Defects and "Code"Compliance.

    - Approximately 1052 vehicular type accidents including Automobiles, Pedestrians,
      Trucks, Vans, Motorcycles, Mopeds and Bicycles.

    - Approximately 400 Slip/Trip and Falls -  Wet Coefficient of Friction Testing.

* Safety Consultant - Inspected all the State Airports from 11/90 to 11/98.

* Has qualified and testified as an Expert Witness in Accident Reconstruction, pedestrian
  and vehicle occupant/rider Biomechanics/Kinematics as it pertains to the accident
  sequence, and Slip and Falls.

* Has testified over 47 times in State & Federal Court.

* Has testified over 72 times in Arbitration Hearings.

* Retained in criminal matters by both the Prosecution and Defense.

* His work is normally split approximately 50-50 between Plaintiff and Defense cases.

* Fees: Case work-up is billed @ $135.00 per hour.  Deposition, Arbitration and Trial
  Testimony is billed @ $185.00 per hour.  Both fees are billed on an hourly basis, portal
  to portal, plus normal expenses (photographs, parking, etc.) and State GE Tax.

# Bongartz & Associates, Inc.

## Accident Reconstruction and Safety Services

4309 Palahinu Place, Honolulu, HI  96818  -  Phone (808) 422-4200  -  Fax (808) 422-1311

### SPECIALTY SUMMARY OF T.R. BONGARTZ (09-21-02)

EDUCATION : B.S., Industrial Engineering (IED),  University of  Maryland                     1965

USAF Accident Investigation Course, University of Souther California          1976

o Slip and Falls        o Vehicle and Aeronautical Safety Systems
o Metallurgy           o Interview and Investigative Techniques

Industrial College of the Armed Services                                                       1977

M.A., Education, Northern Arizona University                                              1978

Additional
Training:

| | | |
|---|---|---|
| USAF Investigator and Lecturer in Ground and Vehicular Accidents | 1968-1985 | |
| Nationally Certified Traffic Accident Reconstructionist  (ACTAR #133) | | 1992 |
| Slip & Falls | LCC | 1993 |
| Electrical Safety | LCC | 1993 |
| Construction Safety | LCC | 1993 |
| DOSH Laws & Penalties | LCC | 1993 |
| Motorcycle Collision Seminar | NAPARS/MATAI | 1994 |
| International Symposium on Slip Resistance | NIST - ASTM | 1995 |
| Human Factors in Accident Reconstruction | NAPARS/NATARI | 1995 |
| Biomechanics of Injury From Collisions | NIFS | 1996 |
| High Speed Vehicle Impacts | MATAI/NAPARS | 1996 |
| Human & Environmental Factors | Lawyers &Judges | 2001 |
| Nationally Certified XL Tribometrist-International Safety Academy (ISA) | | 2001 |
| Rollovers  - Crash Testing | ARC & Collision Safety Inst. | 2002 |
| Event Data Recorders  - Crash Testing | NAPARS | 2002 |

MEMBER:

| | | |
|---|---|---|
| SAE | - Society of Automotive Engineers | 1988 |
| ASSE | - American Society of Safety Engineers | 1986 |
| NAPARS | - National Association of Professional Accident Reconstruction Specialists | |
| MATAI | - Maryland Association of Traffic Accident  Investigators | |
| ASTM | - American Society for Testing and Materials, Committee (F13) - | |
| | Pedestrian/Walkway Safety and Footwear | 1996 |
| ARC | - Accident Reconstruction Network | 2001 |
| ICBO | - International Conference of Building Officials   (UBC) | 2002 |

## SPECIALTY SUMMARY OF T.R. BONGARTZ (Cont'd)

EXPERIENCE : Chief Engineer, Bongartz & Associates, Inc.    1986- present

Inspect, analyze and present technical studies of accidents. Appear as an Expert Witness in litigation. Supervise reports of technical associates.

Chief of Safety, various Tactical Squadrons. In charge of all accident investigation, analysis and reports. Performed hands-on investigation of personnel, vehicular, installation and aircraft accidents. This included slip/trip and falls, mechanical parts, tire and operator failure.

Fifteen years of Safety Engineering in USAF. This included high level engineering duties in the Chief of Safety Office, Pacific Air Forces Command. It also included assignment to the Pacific Air Forces Command Inspector General Office as a Special Safety Representative. These duties included the responsibility of the investigation of accidents in the entire Far East area. This included all types of accidents involving ground vehicles, structures, aircraft, tires and missiles. Evaluation of building design, missile and explosive areas. Evaluation of all types of machine tools and work areas. Vehicle accident analysis included collision dynamics, seat belt strength and design analysis.

Safety consultant for the inspection of all the State Airports in Hawaii from November 1990 to November 1998.

Member of the American Society For Testing And Materials (ASTM) Committee F13 on Pedestrian/Walkway Safety and Footwear.

Advanced Open Water Scuba Diver.
Director - Underwater Salvage Operation.
Certified Visual Inspector of Scuba Cylinders.

Licensed U.S. Coast Guard Captain - Open Ocean Operator.

Commercial Aircraft Pilot, Instrument Rated, with over 4,500 hours of Jet flying time.

# EXHIBIT "I"

Exhibit

I

1 | BANNING MICKLOW BULL & LOPEZ LLP
William L. Banning, State Bar No. 75757
2 | Edward M. Bull III, State Bar No. 141996
John S. Lopez, State Bar No. 149291
3 | 501 West Broadway, Suite 2090
San Diego, California 92101
4 | Telephone: (619) 230-0030
Facsimile: (619) 230-1350
5 |
6 | Attorneys for Plaintiff,
MEL DEBRUM
7 |
8 |
UNITED STATES DISTRICT COURT
9 |
FOR THE CENTRAL DISTRICT OF CALIFORNIA
10 |
11 |
MEL DEBRUM                                    ) Case No. 01-08403 DDP (SHx)
12 |                                           )
          Plaintiff,                          ) PLAINTIFF'S FRCP RULE 26
13 |                                          ) DISCLOSURE FOR EXPERT
vs.                                           ) THOMAS C. BRUFF, M.D.,
14 |                                          ) M.H.P.
                                              )
15 | M & F FISHING CO., INC., a corporation,  )
in personam, and F/V KOORALE, her            )
16 | engines, tackle, apparel, furniture, and )
appurtenances, in rem                         )
17 |                                          )
          Defendants.                         )
18 |                                          )
_____
19 |
20 |        Plaintiff hereby submits this Rule 26(a)(2)(B) disclosure with respect to expert

21 | witness Thomas C. Bruff, M.D., M.P.H.

22 |        I.    ASSUMPTIONS AND DEFINITIONS.

23 |        For the purposes of this report, the term "Vessel" refers to M/V KOORALE.

24 | The term "Accident" shall refer to the accident on board Vessel on or about August

25 | 10, 2000, wherein plaintiff was severely injured and lost his leg. The term "vessel

26 | owner" is defined: to include the named defendant(s) and its or their vessel operators,

27 | vessel managers, agents, employees, alter egos and independent contractors.

28 |        Negligence is assumed to be the failure to use reasonable care. Reasonable

1

1 care is assumed to be the degree of care that reasonably prudent persons would use
2 under like circumstances to avoid injury to themselves or others. Negligence is
3 assumed to be the doing of something that a reasonably prudent person would not so
4 do, or the failure to do something that a reasonably prudent person would do, under
5 like circumstances. It is assumed that negligence is a "cause" of an injury or damage
6 if it played any part, no matter how small, in bringing about the injury or damage. In
7 my opinion, it is negligent to violate applicable laws, rules and regulations.

8 The term "unseaworthy or unseaworthiness" is assumed to be: A vessel owner
9 has an absolute duty to provide and maintain a seaworthy vessel. This duty cannot be
10 turned over to anyone else. A vessel is seaworthy if the vessel and all of its parts and
11 equipment and work methods are reasonably fit for their intended purpose and it is
12 operated by a crew reasonably adequate and competent for the work assigned. A
13 vessel owner has a duty to provided adequate safety equipment for the vessel. A
14 vessel owner has a duty to comply with all applicable laws, rules and regulations. A
15 vessel's unseaworthiness may arise from any number of circumstances. For example,
16 a vessel is unseaworthy if the vessel, or any of its parts or equipment or work
17 methods, is not reasonably fit for its intended purpose or if its crew is not reasonably
18 adequate or competent to perform the work assigned or if it does not comply with all
19 applicable laws, rules and regulations. It is assumed herein that unseaworthiness is a
20 cause of an accident if it played a substantial part in bringing about injury or damage.

21 II. PRIMARY OPINIONS.

22 Opinion 1: The use of marijuana by the fish captain and/or the vessel Master
23 within a twenty hour period before the accident would have negatively affected their
24 abilities to properly operate and/or direct the fishing operations on the vessel. If use
25 of marijuana by the fish captain and/or the Master within a 24-hour period prior to
26 plaintiff's accident is established, the use of marijuana would be a causative factor of
27 the Accident. Further, if use of marijuana by the fish captain and/or Master within a
28 24-hour period prior to plaintiff's accident is established, the user would be in an

2

1  unseaworthy condition.

2      <u>Opinion 2</u>:  Long term use of marijuana can result in long term negative

3  effects on the user, including deficits of neurocognitive functioning, including

4  impairment of memory and attention, time estimation, executive functioning,

5  psychomotor speed, and manual dexterity.  These deficits can worsen with increasing

6  years of cannabis use.  If long term use of marijuana by the fish captain and/or the

7  Master is established, the use of marijuana would be a causative factor of the

8  Accident.  Further, if long term use of marijuana by the fish captain and/or Master is

9  established, the user would be in an unseaworthy condition.

10     III.    <u>SUMMARY OF BASIS AND REASONS FOR OPINIONS</u>.

11     <u>Opinion 1</u>:  The effects of marijuana use are not confined to the period when

12 the user experiences the major psychoactive effects of marijuana use.  The period in

13 which the user experiences psychoactive effects of marijuana can last from two to

14 eight hours.  However, the neurocognitive effects of a single use of marijuana can last

15 up to twenty four hours.  The metabolites from marijuana use remain in the system of

16 the user from a few days for a single user, to a month for heavy user.

17     The use of any illegal drugs such as marijuana creates an unseaworthy

18 condition of the user.  U.S.C.G. regulations, including 33 United States Code of

19 Federal Regulations[1] section 95, establish that a seaman cannot be under the

20 influence of alcohol or a dangerous drug while working aboard a U.S. flag vessel.

21 Where it is established that a seaman is under influence of marijuana, that seaman

22 would not be approved as fit for duty and would be in an unseaworthy condition.

23 Where conditions suggest that a seaman has used marijuana in the previous 24-hour

24 period, he could not and would not be approved by me as fit for duty.    .

25     <u>Opinion 2</u>:  See Opinion 1.  Marijuana metabolites can remain in the human

26 body for weeks to months in long term users.  Long term use of marijuana can have

27 long term negative effects on the user's neurocognitive functioning, specifically,

28 _____

[1]    Hereinafter "C.F.R."

3

1  impairments of attention, memory, executive function, visual-spatial functioning, and

2  time estimation  occur in long-term cannabis users in an unintoxicated state.  Brain

3  imaging studies of long-term cannabis users have demonstrated changes in blood

4  flow, and metabolism in the frontal and cerebral regions of the brain.

5        IV.   DATA AND INFORMATION CONSIDERED, AND

6            QUALIFICATIONS.

7       My skill, training and experience, including without limitation, those items set

8  forth in my résumé that is attached hereto as Exhibit "A" and incorporated here by

9  reference.  My opinions are or will also based on the deposition testimony of:

10  Mel DeBrum, including corrections to that deposition, and the affidavits of Joao

11  Alves[2/], dated November 21, 2002, and Martinho Correira, dated November 30, 2002,

12  filed in the action entitled *Joao Alves v. F/V KOORALE*, High Court of American

13  Samoa, Case No.032-2002.  My opinions are or will also based on literature

14  regarding the use of marijuana, including without limitation, *Cognitive Functioning*

15  *of Long-Term Heavy Cannabis Users Seeking Treatment*, JAMA, vol. 287, No. 9, p.

16  1123, March 6, 2002; *Impaired Speed of Visual Information Processing in Marijuana*

17  *Intoxication*, Am. J. Psychiatry, p. 613, May 1981, 138:5; *The Residual Cognitive*

18  *Effects of Heavy Marijuana Use in College Students*, JAMA, vol. 275, No. 7, p. 521,

19  February 21, 1996; *$D_2$ receptors enable /$^9$-tetrahydrocannabinol induced memory*

20  *impairment and reduction of hippocampal extracellular acetylcholine concentration,*

21  British Journal of Pharmacology, vol. 130, p. 1201 (2000); *Dose-related*

22  *neurocognitive effects of marijuana use*, Neurology, vol. 59, p. 1337, November

23  2002; *Neuropsychological Performance in Long-Term Cannabis Users*, Arch Gen.

24  Psychiatry, vol. 58, p. 909, October 2001; *Marijuana Effects on Simulated Flying*

25  *Ability*, Am. J. Psychiatry, 133:4, p. 384, April 1976; *Effects of Smoking Marijuana*

26  *on Brain Perfusion and Cognition*, Neurophychopmarmacology, vol. 26, No. 6, p.

27

28  [2/]    Affidavit of Joao Alves in Opposition to Defendant's Motion to Dismiss or in the Alternative
to Obtain Release of Vessel

1 802 (2002); *Carry-Over Effects of Marijuana Intoxication on Aircraft Pilot*
2 *Performance: A Preliminary Report*, Am. J. Psychiatry, 142:11, p. 1325, November
3 1985; *Kaplan & Saddock's Comprehensive Textbook of Psychiatry*, Chapter 11.5,
4 *Cannabis-Related Disorders* (Lippincott Williams & Williams 2000); Lowison, ruiz,
5 Millman & Langrod, *Substance Abuse, a Comprehensive Textbook*, 3rd ed. (Williams
6 & Wilkins 1997); Galanter & Kleber, *Textbook of Substance Abuse Treatment*, 2nd ed.
7 (American Psychiatric Press 1999); *Patterns of Use and Psychopathology in Chronic*
8 *Marijuana Users*, Psychiatric Clinics of North America, vol. 9, No. 3, p. 533
9 (September 1986); *Testing Reckless Drivers for Cocaine and Marijuana*, The New
10 England Journal of Medicine, Vol. 331, No. 8, p. 518 (Aug. 1994); *Marijuana and*
11 *Actual Driving Performance Executive Summary*, National Highway Traffic Safety
12 Administration, November 1993; and other books and abstracts reviewed (see
13 attached). My opinions are or will also based on the various trial exhibits of Plaintiffs
14 and Defendants.

15      V.      COMPENSATION.

16      I charge $500 per hour for deposition testimony, with a one hour minimum.
17 Trial testimony is $1,800 per half day.

18      VI.     PRIOR TESTIMONY IN LAST FOUR YEARS

19      I have testified at trial as an expert witness approximately four times. I have
20 testified in deposition approximately twelve to sixteen times. Of the cases at which I
21 testified at trial, three of the cases were civil cases, and one a criminal matter. One
22 other case, which I understand was entitled *Virgin Fishing v. Garcia*, filed in 1999 or
23 2000, proceeded in U.S. district court for the Central District of California. In that
24 matter, I was retained by the party titled Garcia. Further information regarding these
25 cases will be provided when obtained.

26      VII.    RESERVATION OF RIGHTS.

27      I am advised by counsel for Plaintiff that discovery is ongoing in this case and
28 that Plaintiff's counsel are still awaiting production of certain materials from the

5

1  Defendants and/or other third parties and that further investigation may have to be
2  carried out by Plaintiff's counsel following receipt of such materials. As such I
3  reserve my right to supplement this report with additional opinions (as well as the
4  basis of such opinions and the compilation of data relied upon, as well as trial
5  exhibits) if such additional data is produced to me. A supplemental report will be
6  provided if and when any supplemental opinions are developed following receipt of
7  additional information.

8      In addition to the foregoing opinions, before trial I intend to review the
9  deposition testimony and reports of Defendants' experts. It is expected I will
10  comment on the testimony and reports of these experts at trial. Further there are
11  corollary or supplemental opinions and bases for the primary opinions I have that are
12  not expressly stated above for brevity sake which reinforce my main opinions and
13  bases therefore.

14

15  Dated: 12/23/02

16                          _Thomas C. Bruff_
17                          THOMAS C. BRUFF, M.D., M.PH.

18  Dated: _____       BANNING MICKLOW
19                          BULL & LOPEZ LLP
20

21  By_____
                            William L. Banning
22                          Edward M. Bull III
                            John S. Lopez
23
                            Attorneys for Plaintiff
24                          MEL DEBRUM

25

26

27

28

1   Defendants and/or other third parties and that further investigation may have to be

2   carried out by Plaintiff's counsel following receipt of such materials. As such I

3   reserve my right to supplement this report with additional opinions (as well as the

4   basis of such opinions and the compilation of data relied upon, as well as trial

5   exhibits) if such additional data is produced to me. A supplemental report will be

6   provided if and when any supplemental opinions are developed following receipt of

7   additional information.

8        In addition to the foregoing opinions, before trial I intend to review the

9   deposition testimony and reports of Defendants' experts. It is expected I will

10  comment on the testimony and reports of these experts at trial. Further there are

11  corollary or supplemental opinions and bases for the primary opinions I have that are

12  not expressly stated above for brevity sake which reinforce my main opinions and

13  bases therefore.

14

15  Dated: _____

16

17                              THOMAS C. BRUFF, M.D., M.P.H.

18  Dated: 12/23/02             BANNING MICKLOW
                                BULL & LOPEZ LLP
19

20                              By_____

21                                 William L. Banning
                                   Edward M. Bull III
22                                 John S. Lopez

23                              Attorneys for Plaintiff
                                MEL DEBRUM
24

25

26

27

28

                                                                        6

# THOMAS C. BRUFF, M.D., M.P.H.

### MEDICAL CONSULTING

## Thomas C. Bruff, M.D., M.P.H.
## Curriculum Vitae

### Education

| | |
|---|---|
| 1997 – 1999 | Post-Doctoral Fellow, Johns Hopkins School of Hygiene and Public Health. Baltimore, MD. |
| 1990 - 1994 | Medical Doctor, Tulane University School of Medicine. New Orleans, LA. |
| 1991 - 1994 | Master of Public Health, Occupational Medicine and Environmental Health. Tulane University School of Public Health and Tropical Medicine. New Orleans, LA. |
| 1987 - 1990 | Bachelor of Science, Biological Sciences, University of Southern California. Los Angeles, CA. |
| 1985 -1989 | Associate of Science, Physical Sciences, Long Beach City College. Long Beach, CA. |

### Residency Training

| | |
|---|---|
| 1998 – 1999 | Clinical Fellow, Department of Medicine, Resident Occupational Medicine, School of Hygiene and Public Health, Johns Hopkins University. Baltimore, MD. |
| 1994 - 1998 | Medical Center of Delaware Residency Programs, Internal Medicine and Pediatrics, Combined Residency Program at Medical Center of Delaware, A. I. DuPont Childrens Hospital, Wilmington, DE, and Thomas Jefferson University Medical Center, Philadelphia, PA. |

### Employment

| | |
|---|---|
| 2002 to the present. | Shelter Island Medical Group, Occupational and Internal Medicine Physician. San Diego, California. |
| 2001 to the present. | Presbyterian Intercommunity Hospital, Work Care Occupational Medicine Services. Whittier, California. |
| 2001 to the present. | Sharp Rees-Stealy Medical Group, Urgent Care Division. Providing Internal Medicine and Pediatric Services. San Diego, California. |
| 1999 to the present. | Medical Consulting; Internal Medicine, Occupational and Environmental Medicine Services. Los Angeles and San Diego Counties. |
| 1999 - 2001 | Assistant Clinical Professor of Medicine, University of California, San Diego (UCSD), Center for Occupational & Environmental Medicine. |
| 1999 - 2001 | Medical Director UCSD, Center for Occupational & Environmental Medicine Corporate & Leisure Travel Medicine Program. |
| 1995 - 2000 | Medical Center of Delaware Occupational Health Services, Consulting Physician, Wilmington, DE. |
| 1997 - 1999 | Medical Center of Delaware, Consulting Internist, Wilmington, DE. |

## Academic Appointment

    1999-to the present.   Clinical Assistant Professor of Medicine, University of California, San Diego.

## Certifications

Qualified Medical Evaluator - QME No. 923267
Internal Medicine - Board Certified, 1998.
Occupational Medicine - Board Certified, 1999.
Medical Toxicology - Board Eligible.
Pediatrics - Board Eligible.
California Medical License, Active, A69031.
Delaware Medical License, Active, C10004753.
Diplomat National Board of Medical Examiners, July 1, 1995.  Certificate Number 40070997.
Certificate in Risk Sciences and Public Policy, Johns Hopkins Risk Sciences
   and Health Policy Institute.
Federal Aviation Administration, Aviation Medical Examiner.
Advanced Cardiac Life Support.
Certificate of Recognition in Tropical Health, Tulane University School of Public Health
   and Tropical Medicine.
Certified Medical Review Officer, American Association of Medical Review Officers.
American Medical Association, Physician's Recognition Award in Continuing Medical Education, annually since 1997.

## Presentation, Publications, and Research

Human Sensory Reactions to Glutaraldehyde, work in progress.

Human Sensory Irritation Testing for Chloropicrin, work in progress.

Perception of Occupational Dusts from Boron-Containing Compounds, work in progress.

"Lead Poisoning, A Case Presentation and Literature Review" Occupational Medicine Grand Rounds, Division of Occupational Medicine, Johns Hopkins University.  May, 1999.

"Incidence and Prevalence of Flexor Tenosynovitis (Trigger Finger) in a Meat Packing Plant" Journal Presentation and Review for Division of Occupational Medicine, Johns Hopkins University School of Hygiene and Public Health.  October, 1998.

Bleeker, Margit L., M.D., Ph.D., Thomas C. Bruff, MD., M.P.H. Nerve Entrapment Chapter 47 in Occupational Medicine Secrets.  Hanley and Belfus, Philadelphia, 1998.

Medical Grand Rounds Clinical - Pathologic Correlation. Christiana Hospital.  January, 1998.

Binding Characteristics of Methylated DNA - Binding Protein. Tulane School of Medicine, Department of Biochemistry. 1990 -1992.

Effect of Microgravity Environment on Bone Composition.  Orthopedic Hospital, Los Angeles, CA, 1988-1989.

## Current Professional Society Memberships

- American College of Occupational and Environmental Medicine.
  American College of Physicians.
  American Academy of Pediatrics.
  American Medical Association.
  Human Factors and Ergonomics Society.
  American Academy of Clinical Toxicology.
  Society of Toxicology.
  American College of Preventive Medicine.

## Committee Assignments

| | |
|---|---|
| 2002 to the present. | Western Occupational and Environmental Medical Association, Legislative Committee. |
| 2002 to the present. | Western Occupational And Environmental Medical Association, Knowledge Network; providing advice to members in the area of toxicology and difficult diagnosis. |
| 1999-2001 | University of California, San Diego Employee Health Committee. |
| 1995-1998 | Medical Society of Delaware, Environmental and Public Health Committee Member. |

## Honors and Awards

National Research Service Award, Department of Health and Human Services, Public Health Service, and National Institutes of Health.

Delta Omega Public Health Honor Society, Tulane University School of Public Health and Tropical Medicine.

Certificate of Recognition for Excellence in Environmental Health Sciences, Tulane University School of Public Health and Tropical Medicine.

Phi Sigma Biological Research Honor Society, University of Southern California.

# EXHIBIT "J"

Exhibit

Scott T. Pratt, CASB No. 67192
John M. Whelan, CASB CASB No. 174928
KEESAL, YOUNG & LOGAN
A Professional Corporation
400 Oceangate
P.O. Box 1730
Long Beach, California 90801-1730
Telephone: (562) 436-2000
Facsimile: (562) 436-7416

Attorneys for F/V DANIELA

'FILED'

MAR 15 3 52 PM '01

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

---

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHONY PETER COSTA, By and Through His Personal Representative and Attorney-In-Fact PAUL COSTA, | IN ADMIRALTY |
| Plaintiff, | Case No. 01-02115 MMM (Ex) |
| Vs. | SHIP RELEASE BOND |
| Z No. 2 FISHING CO., INC., a corporation, *In personam*, and F/V DANIELA, her engines, tackle, apparel, furniture, and appurtenances, *In rem*, |  |
| Defendants. |  |

KNOW ALL MEN BY THESE PRESENTS, That we, Z NO. 2 FISHING COMPANY, INC.,

as principal and CONTINENTAL CASUALTY COMPANY, as surety, are held and firmly bound unto the

United States Marshal for the Central District of California, his successor and successors, for the benefit of

whom it may concern, in the sum of $6 million and no/100 dollars ($6,000,000.00) lawful money of the

United States of America, for the payment whereof to the said United States Marshal, his successor or

successors, for the benefit of whom it may concern, the said principal and the said surety bind themselves,

their successors and assigns, jointly, severally and firmly by these presents.

WHEREAS, a Complaint has been filed in the District Court of the United States for the Central

District of California by Costa against F/V DANIELA, in rem, in a certain action, etc., civil and maritime,

Clerk, U.S. District Court
Central District of California

**TERRY BAKER**

By _____ Deputy

numbered _____ on the Civil Docket of the said Court; Z NO. 2 FISHING COMPANY, INC. as

Principal and Continental Casualty Company as surety do hereby agree that, in the event of a final

judgment against the F/V DANIELA, *in rem*, after appeal if any, execution may issue against the goods,

chattels and lands of Principal and Surety up to the maximum sum of $6 million dollars ($6,000,000.00)

plus six (6%) percent per annum lawful money of the United States.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the said

principal shall abide by all orders of the Court, interlocutory or final, and pay to the plaintiff the amount

awarded to the plaintiff and against the said principal, as claimant of the F/V DANIELA, by the final

judgment rendered by this Court, or by any Appellate Court if an appeal intervenes, then this obligation

shall be void, otherwise the same shall remain in full force and virtue.

Witness our respective names and seals, hereunder affixed by us at the City of Los Angeles this

15th day of March, 2001.

<div style="margin-left:40%">

Z NO. 2 FISHING COMPANY, INC.


By: _____
    AGENT AND ATTORNEY-IN-FACT
    Duly Authorized

CONTINENTAL CASUALTY COMPANY

By: *Elizabeth Bashmakian*
Elizabeth Bashmakian ,ATTORNEY-IN-FACT

</div>

Bond # 929192317
Premium: $35,400 per annum

# POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

Know All Men By These Presents, That CONTINENTAL CASUALTY COMPANY, an Illinois corporation, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, a Connecticut corporation, AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a Pennsylvania corporation (herein collectively called "the CCC Surety Companies"), are duly organized and existing corporations having their principal offices in the City of Chicago, and State of Illinois, and that they do by virtue of the signature and seals herein affixed hereby make, constitute and appoint

    Marilyn M. Burd, Daniel Z. Mejam Jr., Paul S. Minaker, Ronald A. Gehr, Elizabeth Bashmakian, Doreen Green, Individually

of    Woodland Hills, California
their true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on their behalf bonds, undertakings and other obligatory instruments of similar nature

                        - in Unlimited Amounts -

and to bind them thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of their corporations, and all the acts of said Attorney, pursuant to the authority hereby given are hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Laws and Resolutions, printed on the reverse hereof, duly adopted, as indicated, by the Boards of Directors of the corporations.

In Witness Whereof, the CCC Surety Companies have caused these presents to be signed by their Group Vice President and their corporate seals to be hereto affixed on this    5th    day of      October    , 1999

CONTINENTAL CASUALTY COMPANY
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA

*Marvin J. Cashion*

Marvin J. Cashion         Group Vice President

State of Illinois, County of Cook, ss:
On this    5th    day of      October       1999 , before me personally came Marvin J. Cashion, to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Chicago, State of Illinois; that he is a Group Vice President of CONTINENTAL CASUALTY COMPANY, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA described in and which executed the above instrument; that he knows the seals of said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed pursuant to authority given by the Boards of Directors of said corporations and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said corporations.

"OFFICIAL SEAL"
DIANE FAULKNER
Notary Public, State of Illinois
My Commission Expires 9/17/01

*Diane Faulkner*

My Commission Expires September 17, 2001       Diane Faulkner       Notary Public

## CERTIFICATE

I, Mary A. Ribikawskis, Assistant Secretary of CONTINENTAL CASUALTY COMPANY, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA do hereby certify that the Power of Attorney herein above set forth is still in force, and further certify that the By-Law and Resolution of the Board of Directors of each corporation printed on the reverse hereof are still in force. In testimony whereof I have hereunto subscribed my name and affixed the seals of the said corporations this    15th    day of    March     2001

CONTINENTAL CASUALTY COMPANY
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA

*Mary A. Ribikawskis*

Mary A. Ribikawskis       Assistant Secretary

Rev.10/1/97)

## Authorizing By-Laws and Resolutions

**ADOPTED BY THE BOARD OF DIRECTORS OF CONTINENTAL CASUALTY COMPANY:**

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company,

"Article IX—Execution of Documents

Section 3. Appointment of Attorney-in-fact The Chairman of the Board of Directors, the President or any Executive, Senior or Group Vice President may, from time to time, appoint by written certificates attorneys-in-fact to act in behalf of the Company in the execution of policies of insurance, bonds, undertakings and other obligatory instruments of like nature. Such attorneys-in-fact, subject to the limitations set forth in their respective certificates of authority, shall have full power to bind the Company by their signature and execution of any such instruments and to attach the seal of the Company thereto. The Chairman of the Board of Directors, the President or any Executive, Senior or Group Vice President or the Board of Directors, may, at any time, revoke all power and authority previously given to any attorney-in-fact."

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company at a meeting duly called and held on the 17th day of February, 1993.

"Resolved, that the signature of the President or any Executive, Senior or Group Vice President and the seal of the Company may be affixed by facsimile on any power of attorney granted pursuant to Section 3 of Article IX of the By-Laws, and the signature of the Secretary or an Assistant Secretary and the seal of the Company may be affixed by facsimile to any certificate of any such power and any power or certificate bearing such facsimile signature and seal shall be valid and binding on the Company. Any such power so executed and sealed and certified by certificate so executed and sealed shall, with respect to any bond or undertaking to which it is attached, continue to be valid and binding on the Company."

**ADOPTED BY THE BOARD OF DIRECTORS OF AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA:**

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the Board of Directors of the Company.

"Article VI—Execution of Obligations and Appointment of Attorney-In-Fact

Section 2. Appointment of Attorney-in-fact. The Chairman of the Board of Directors, the President or any Executive, Senior or Group Vice President may, from time to time, appoint by written certificates attorneys-in-fact to act in behalf of the Company in the execution of policies of insurance, bonds, undertakings and other obligatory instruments of like nature. Such attorneys-in-fact, subject to the limitations set forth in their respective certificates of authority, shall have full power to bind the Company by their signature and execution of any such instruments and to attach the seal of the Company thereto. The President or any Executive, Senior or Group Vice President may at any time revoke all power and authority previously given to any attorney-in-fact."

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company at a meeting duly called and held on the 17th day of February, 1993.

"Resolved, that the signature of the President or any Executive, Senior or Group Vice President and the seal of the Company may be affixed by facsimile on any power of attorney granted pursuant to Section 2 of Article VI of the By-Laws, and the signature of the Secretary or an Assistant Secretary and the seal of the Company may be affixed by facsimile to any certificate of any such power and any power or certificate bearing such facsimile signature and seal shall be valid and binding on the Company. Any such power so executed and sealed and certified by certificate so executed and sealed shall, with respect to any bond or undertaking to which it is attached, continue to be valid and binding on the Company."

**ADOPTED BY THE BOARD OF DIRECTORS OF NATIONAL FIRE INSURANCE COMPANY OF HARTFORD:**

This Power of Attorney is made and executed pursuant to and by authority of the following Resolution duly adopted on February 17, 1993 by the Board of Directors of the Company.

"RESOLVED, That the President, an Executive Vice President, or any Senior or Group Vice President of the Corporation may, from time to time, appoint, by written certificates, Attorneys-in-Fact to act in behalf of the Corporation in the execution of policies of insurance, bonds, undertakings and other obligatory instruments of like nature. Such Attorney-in-Fact, subject to the limitations set forth in their respective certificates of authority, shall have full power to bind the Corporation by their signature and execution of any such instrument and to attach the seal of the Corporation thereto. The President, an Executive Vice President, any Senior or Group Vice President or the Board of Directors may at any time revoke all power and authority previously given to any Attorney-in-Fact."

This Power of Attorney is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of the Company at a meeting duly called and held on the 17th day of February, 1993.

"RESOLVED: That the signature of the President, an Executive Vice President or any Senior or Group Vice President and the seal of the Corporation may be affixed by facsimile on any power of attorney granted pursuant to the Resolution adopted by this Board of Directors on February 17, 1993 and the signature of a Secretary or an Assistant Secretary and the seal of the Corporation may be affixed by facsimile to any certificate of any such power, and any power or certificate bearing such facsimile signature and seal shall be valid and binding on the Corporation. Any such power so executed and sealed and certified by certificate so executed and sealed, shall, with respect to any bond or undertaking to which it is attached, continue to be valid and binding on the Corporation."

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On  March 15, 2001 _____ before me, <u>Maria Peña</u>, Notary Public, personally appeared <u>Elizabeth Bashmakian</u> personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

MARIA PENA
Commission # 1216383
Notary Public — California
Los Angeles County
My Comm. Expires Apr 16, 2003

Maria Peña

## PROOF OF SERVICE BY FAX AND OVERNIGHT MAIL

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over
the age of 18 and not a part to the within action; my business address is Keesal,
Young & Logan, 400 Oceangate, P. O. Box 1730, Long Beach, California 90801-1730.

On March 15, 2001, I served the foregoing documents described as **SHIP
RELEASE BOND** on the parties in this action by placing a true and correct copy
thereof enclosed in a sealed envelope addressed as follows:

Kurt Micklow
Bill Banning
BANNING MICKLOW BULL & LOPEZ LLP
501 West Broadway, Suite 2090
San Diego, CA 92101-8563
Fax: (619) 230-1350

~~XXXXX~~ **BY DHL:** I caused such envelope(s), fully prepaid on account, to be
placed within the custody of DHL Worldwide Express at Long Beach, California. I
am readily familiar with Keesal, Young & Logan's practice for collection and
processing of correspondence for overnight delivery and know that in the ordinary
course of Keesal, Young & Logan's business practice, the document described above
will be deposited in a box or other facility regularly maintained by DHL Worldwide
Express or delivered to an authorized courier or driver authorized by DHL
Worldwide Express to receive documents on the same date that it is placed at
Keesal, Young & Logan for collection.

~~XXXXX~~ **BY FACSIMILE:** I caused the above-referenced document(s) to be
transmitted to the above-named person(s) at the facsimile telephone number
exhibited therewith.  The facsimile machine I used complied with California Rules of
Court, Rule 2003 and the transmission was reported as complete and without error.
Pursuant to California Rules of Court, Rule 2006(d), I caused the machine to print a
transmission record of the transmission and the transmission report was properly
issued by the transmitting facsimile machine.

Pursuant to California Rules of Court, Rule 201, and the Local Rules of the
United States District Court, I certify that all originals and service copies (including
exhibits) of the papers referred to herein were produced and reproduced on paper
purchased as recycled, as defined by Section 42202 of the Public Resources Code.

Executed on March 15, 2001 at Long Beach California.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

I declare that I employed in the office of a member of the bar of this Court at
whose direction this service is made.

JANICE JACO

761155

# EXHIBIT "K"

Exhibit

DEPOSITION OF JAY MARUMOTO, M.D., TAKEN ON 01-28-03

*Page 1 to Page 89*

FEB - 7 2003

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
## 1001 Bishop Street
## 2460 Pacific Tower
## Honolulu, HI 96813
## Phone: (808) 524-2090
## FAX: (808) 524-2596

## Page 49

(1)  A  Well, no. But like I said, with a sprained

(2)  ankle, you can say, look, if you feel that way, see

(3)  'ya. All right? But with this, I'm not going to say

(4)  look, you're done. I'm going to say here's my door.

(5)  If you ever need me, knock. Here's my phone number.

(6)  Call.

(7)  Q  I understand.

(8)  A  I mean, it depends on the severity of the

(9)  condition.

(10)  Q  But based on your assessment of the condition

(11)  at that time, you didn't expect that you need further

(12)  active treatment?

(13)  A  Yeah. At that point, no further active

(14)  scheduled treatment for a follow-up appointment.

(15)  Basically, it's come see me as needed.

(16)  Q  Okay. You also said when you saw him that

(17)  last time, that he needs no further active treatment at

(18)  this point in time other than adhering to his home

(19)  exercise program.

(20)  What was the exercise program that you gave

(21)  to Mr. DeBrum?

(22)  A  It wasn't what I gave him. It was what was

(23)  delineated in the physical therapy.

(24)  Q  Did you have an understanding of what that

(25)  was?

## Page 50

(1)  A  Well, a general program, whatever they

(2)  outline, which would probably be knee exercises,

(3)  walking, some type of aerobic activity. Everybody is

(4)  different. A physical therapist will individualize it,

(5)  an individual's likes, needs, abilities.

(6)  Q  Okay. And August 7, 2001 was the last time

(7)  that you saw Mr. DeBrum?

(8)  A  According to the record, that's correct.

(9)  MR. WINDES: Thank you. I have no further

(10)  questions.

(11)  EXAMINATION

(12)  Q  (BY MR. BANNING): Doctor, would you please

(13)  look at your surgical report from the operation

(14)  performed on Mr. DeBrum? Do you have that there?

(15)  A  Yes.

(16)  Q  Were X-rays taken of Mr. DeBrum before you

(17)  operated on him?

(18)  A  Yes.

(19)  Q  Where are those X-rays?

(20)  A  Probably at Queen's.

(21)  Q  Do you have a present recollection of

(22)  Mr. DeBrum's leg when it first came in your presence

(23)  with Mr. DeBrum?

(24)  A  Just from what I can get on the --

(25)  Q  Refreshing your recollection from your

## Page 51

(1)  records, what was the condition of his leg when you

(2)  first saw it?

(3)  A  It was unsalvageable. It was horrible.

(4)  Q  What was wrong with it?

(5)  A  It had been crushed. The skin had been

(6)  literally shelled off of the bone. The bones

(7)  themselves had been crushed and fractured and broken.

(8)  The wound had been soiled, and the blood vessels and

(9)  nerves at the site of the wound, which is basically

(10)  around the ankle, had been severed, so that the foot

(11)  itself was without blood circulation and without nerve

(12)  function.

(13)  Q  What nerves are there in the area where

(14)  Mr. DeBrum's leg was crushed?

(15)  A  Posterior tibial nerve. You have the

(16)  superficial perineal nerve, the deep perineal nerve.

(17)  You have other skin nerves. You have seral nerve,

(18)  saphenous nerve.

(19)  Q  And what happened to those nerves during the

(20)  accident?

(21)  A  Well, they were all severed.

(22)  Q  Crushed and severed?

(23)  A  Uh-huh.

(24)  Q  Is that a yes?

(25)  A  That's a yes.

## Page 52

(1)  Q  And what kind of pain does that send to the

(2)  person who is having their leg crushed and severed?

(3)  MR. WINDES: Objection to form. Lack of

(4)  foundation.

(5)  Q  (BY MR. BANNING): You can answer.

(6)  A  In most cases, that's an extremely painful

(7)  condition.

(8)  Q  What sort of medication was Mr. DeBrum on

(9)  when you first saw him?

(10)  A  I don't recall.

(11)  Q  Can you tell from your records what kind of

(12)  medication he was on?

(13)  A  Not from my records. Not at the point that I

(14)  saw him in the hospital.

(15)  Q  I saw mention in the record somewhere that

(16)  because of the length of time between the accident and

(17)  the time he got to you, that you determined and your

(18)  colleague determined that the leg was unsalvageable.

(19)  Do you recall that?

(20)  A  Yes.

(21)  Q  So then you made a determination at the

(22)  consultation with a colleague that amputation would

(23)  have to be performed?

(24)  A  Yes.

(25)  Q  Exactly what part of the leg was still

Case 1:03-cv-00004   Document 27   Filed 02/21/2003   Page 128 of 234

## Page 53

(1) connected to Mr. -- the leg and ankle was still
(2) connected to Mr. DeBrum's upper leg and ankle when you
(3) saw it?
(4)    A   Can you repeat the question?
(5)    Q   When you first saw Mr. DeBrum's leg in its
(6) crushed condition --
(7)    A   Uh-huh.
(8)    Q   -- what part was still connecting his ankle
(9) and lower leg to his upper leg?
(10)   MR. WINDES:  Object to the form, and lack of
(11) foundation. The witness has already testified he
(12) doesn't have a present recollection.
(13)   THE WITNESS:  Well, actually, my -- the record
(14) states that the foot essentially was hanging on by some
(15) rudimentary tendons.
(16)   Q   (BY MR. BANNING):  Does that refresh your
(17) recollection of the condition when you saw it?
(18)   A   You guys are going into --
(19)   Q   I'm sorry?
(20)   A   You guys nitpick on all these words, I'm not
(21) sure if -- basically, I can visualize this injury.
(22) Yes, I can visualize the injury, and in my head, based
(23) on my description, I can visualize the injury.
(24)   Q   Well, describe it for us, please. What did
(25) you see?

## Page 54

(1)    A   You have a foot with a traumatic wound as
(2) opposed to a surgical wound, okay? So the skin is not
(3) precisely cut. It's crushed and torn. Not only is it
(4) torn, but it's torn off of the bone, what we call a
(5) degloving injury. Okay?
(6)    Q   So that means that the actual tissue and the
(7) skin, the nerves, the blood vessels are actually just
(8) pulled off --
(9)    A   Yeah.
(10)   Q   -- the bone.
(11)   A   They were torn.
(12)   Q   Torn off the bone.
(13)   A   Yeah. Severed, because they're
(14) discontinuous, but they're not severed by a knife.
(15) They were torn off. Okay? So imagine a piece of paper
(16) that you cut very nicely versus a piece of paper that
(17) you tear. So it was torn. It was torn
(18) circumferentially around the ankle, okay? And the
(19) bones underneath it were fractured, they were crushed.
(20) And part of those tissues were that the nerves, the
(21) main nerves and the blood vessels that are necessary
(22) for any function of the foot, and the foot was not
(23) completely separate because there were still some
(24) tendons holding it there.
(25)   Q   And what is a tendon, for a lay person?

## Page 55

(1)    A   A tendon is like a string, and the muscles in
(2) the leg are attached to those things. And you have
(3) lots of muscles and lots of tendons, and those are what
(4) pull your foot and your toes individually or in concert
(5) to work, and that they're very, very -- they're very
(6) strong. They're fibrous. So that's why they were able
(7) to survive this injury, to a point.
(8)    Q   So then what surgery did you perform on
(9) Mr. DeBrum?
(10)   A   A below-knee amputation.
(11)   Q   Describe exactly how that procedure took
(12) place.
(13)   A   Well, we have to go above the zone of injury,
(14) okay? You need to get into good, viable, healthy,
(15) uninfected tissue, okay?
(16)   Q   So how many inches above the zone of injury
(17) did you cut on Mr. DeBrum's leg?
(18)   A   Ballpark figure, maybe six inches.
(19)   Q   So what do you do? After getting him set for
(20) the operation, you put him on the table and you
(21) determine what the proper place to cut is, and that's
(22) when you start your surgery?
(23)   A   Yeah. That's a simplified way of putting it,
(24) yes.
(25)   Q   So then you actually take the scalpel and you

## Page 56

(1) actually cut into good tissue that is there in
(2) Mr. DeBrum's leg?
(3)    A   Yes.
(4)    Q   And why did you do that? I mean, for a lay
(5) person, because the jury is not going to know, but why
(6) do you do that? Why do you do that?
(7)    MR. WINDES:  Well --
(8)    Q   (BY MR. BANNING):  You can answer the
(9) question.
(10)   MR. WINDES:  It's irrelevant. The witness has
(11) already indicated that Mr. DeBrum was not conscious at
(12) the time, and it's inflammatory.
(13)   Q   (BY MR. BANNING):  I just want to know why
(14) you cut into the good tissue.
(15)   A   Because you want good healthy tissue to heal.
(16)   Q   You want to make sure that you stop the
(17) damage at the point where you're cutting in, so you
(18) could make a stump?
(19)   A   I think that's a fair statement.
(20)   Q   And the idea is that you want to get into
(21) healthy tissue so that when you make the stump, that it
(22) will heal properly and you won't have continuing
(23) problems where you have to go back and keep cutting
(24) away his leg?
(25)   A   Yeah, optimize his outcome.

                                                                    TOTAL P.04

# EXHIBIT "L"

Exhibit

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MEL DeBRUM, AN INDIVIDUAL,          )
                                   )
                                   )
              PLAINTIFF,           )
                                   )
vs.                                ) CASE No.
                                   ) 01-08403 DDP (SHX)
M & F FISHING COMPANY, INC., A     )
CORPORATION, IN PERSONAM, AND      )
F/V KOORALE, HER ENGINES,          )
TACKLE, APPAREL, FURNITURE, AND    )
APPURTENANCES, IN REM,             )
                                   )
              DEFENDANTS.          )
                                   )
                                   )
AND RELATED CROSS-ACTION.          )
_____    )

RECEIVED

JUN 1 2 2002

BY:_____

DEPOSITION OF MEL DeBRUM

VOLUME I

SAN DIEGO, CALIFORNIA

MAY 24, 2002

BONNIE G. BREEN, CSR, INC.

Certificate No. 5582



≡C≡
CANEDY
COURT REPORTING • SINCE 1988
800.590.1800 • FAX 800.590.1880

SAN DIEGO • ORANGE COUNTY • LOS ANGELES • SAN FRANCISCO

**A**

ability 27:25
able 5:10,13 101:10
about 6:2 12:12,17
  12:25 13:2 14:4
  17:8,9,21 18:1
  21:8,9,24 22:5,7
  22:19,20 23:3,5
  23:11,20 24:6,9
  26:25 27:14,25
  31:15 32:5 33:18
  36:11,14 38:19
  39:2,19 44:6 46:1
  53:5,23 54:21,24
  62:18 63:15 67:6
  68:18,22 70:5
  79:24 86:13 89:1
  89:5,11,21 92:16
  97:22,24 99:3,10
  99:13 106:9 110:6
  111:20
above 44:25 52:3
absolutely 79:2
accident 29:13 30:5
  35:17 40:4 43:5
  43:10 52:10 55:4
  55:15,22 56:1,5,9
  56:13 91:7,17,20
  91:25 92:18 93:13
  93:14 94:24 95:2
  95:5,10,13 99:24
  100:6,10,12
accurate 38:20
  70:24
accurately 23:14
  70:21
act 4:6
action 113:17,18
add 51:12 70:21
address 4:11
adjourned 112:16
Adventist 6:9
advise 68:17
after 8:9,12,19
  12:10,14 14:2,14
  23:21 27:14,16
  28:24 29:2,6,9
  30:21,21,22 31:8
  31:18 40:1,7
  57:16 60:24 61:9
  79:11 100:18,24
  101:6 103:9
again 7:7 11:9,19
  12:18 13:9 15:8
  17:12 18:25 19:1

19:10 20:14 23:15
  29:1,4,11 31:25
  35:4 36:25 51:24
  55:24 57:14 61:21
  64:2 68:1,2 70:12
  72:10 74:24 75:20
  75:21 76:24 78:14
  81:17 84:6 85:20
  88:14 91:10,11
  93:24,24 94:18
  101:5 103:24
  104:16 105:12
  107:4 108:2,12,14
age 4:20 5:15
ago 14:24 19:12
  23:11 27:3 111:1
agree 40:19 59:20
  68:8 72:23 89:21
  91:2 110:23
agreeing 68:10,15
agrees 68:15
ahead 33:21 35:20
  45:12 46:9 48:7
  50:13 52:21 59:7
  60:8 61:8 62:25
  65:5 74:13,14,23
  75:9 82:23 85:13
  85:21 86:17 87:14
  89:9 91:9 95:4
  98:3 108:20
allotted 111:15
allowed 19:5,13
almost 13:4
alongside 50:3
already 25:22,25
  26:19 79:15
always 30:1 38:17
  41:21 45:24 46:12
  46:14 50:19 51:15
  51:18,20 81:19
  83:25 103:16,17
  103:25 104:6
ambiguous 35:19
  42:23 43:24 53:13
  54:6 58:1,17 59:7
  62:24 63:13 66:7
  66:15 68:6 69:6
  74:12,22 76:23
  80:2 82:22 83:11
  84:19 86:16 87:14
  88:16 89:9 90:15
  91:19 92:7 95:3
  98:12 99:1 101:23
  102:4,13 103:1,13
  104:5,20 105:16

106:13,21 107:3,8
  108:6 109:10,16
  110:1
among 11:13
amputated 27:14
amputation 20:8
angel 47:5
another 10:5 40:7
  47:24 72:25 77:23
  78:16 88:11
answer 23:14 29:11
  64:9,24 66:1
  67:13 68:10,22
  69:9,10 70:2,2,9
  70:20,21 71:13,23
  72:13,16,24 73:2
  74:3 77:10,10,14
  77:22 78:9 79:1,1
  79:3,8,8,9,18,18
  80:19 82:6 83:3
  85:3,11,12,18,18
  89:9,12 91:23
  93:19,21 96:6
  103:10 104:14
  108:2,13,17 109:5
  109:8
answered 4:13 35:6
  83:12 88:3 109:3
answering 72:24
  85:14
answers 70:15 71:4
  71:4,6,7,12 77:22
  78:11 80:20,22
anybody 38:24
anymore 42:6
anyone 24:4,8 27:3
  39:6 93:12 95:1,9
  105:6
anyplace 71:18
anything 18:13,16
  22:19 23:2,4,18
  35:15 47:13 61:2
  65:14 77:16 79:5
  94:22 95:1,9
anyway 47:14
  68:14 71:6 106:5
anywhere 18:12
apartment 4:12
  26:1 27:12,13
apartments 30:10
APPAREL 1:10
appears 79:9 87:7
appreciate 112:11
approximate 52:19
approximately

15:12 39:2,20
  53:10,21 90:11
  92:5
APPURTENAN...
  1:11
area 53:12 70:3
  86:1
around 7:9 12:8,8,9
  69:23 96:14
arrow 48:13 49:1
  50:23 54:15,16
arrows 49:11
artist 47:20 48:9
asked 23:11 35:6
  47:13 65:3,21
  67:21,24 81:8
  83:12 109:3
  110:22
asking 5:21,22
  18:25 23:15 53:2
  64:16,24,25 65:18
  67:7 70:25 75:18
  81:2,3 108:14
  110:2
asks 73:7
assigned 42:15
assistant 38:10,11
  38:14,17 39:3,9
  39:11,24 40:24,25
  41:6,11 42:8,14
  57:3,22 59:25
  60:25 61:11,20
  62:14,21 66:5,11
  68:3 69:3 73:14
  74:9,18 75:11
  76:1 79:23 80:9
  94:21
assume 64:21
assumes 27:2 37:13
  106:6
assuming 21:19
  54:18
attach 89:2
attend 6:10,13,16
attention 79:16
attorney 65:21,23
attorneys 24:15,17
  24:18,21 25:2
  26:2 34:1
attorney's 68:10
attorney-client
  47:9
August 17:14 23:23
  26:24
available 60:12

Avenue 2:9
aware 74:8
away 45:1 99:10
  105:21,25 106:1
a.m 4:2 97:22 99:3
A.U 10:8,17 11:2
  11:17,21 12:2,10
  13:8

**B**

B 3:4
babysitting 13:17
  13:19
back 5:13 12:14
  14:3 23:10 28:20
  28:21,22,25 29:12
  29:21 30:20 32:25
  33:10 34:18,22,22
  38:15,25 41:7
  48:9 50:10 52:7
  53:1 61:1,19,25
  65:23 67:12 69:21
  70:12 71:1,3,18
  72:17 73:4 91:1,1
  96:4 105:11
  107:12 108:9
background 75:25
bad 41:8,12,18,21
  41:22,24 42:16,20
  42:21 43:3 81:2
  97:4 106:9 107:23
badgering 64:6
Banning 2:3,6 15:1
  15:6 17:3,15 19:7
  21:19 22:25 25:18
  27:2 28:3 33:20
  35:6,19 37:13,20
  38:19,24 40:17
beautiful 86:4
became 40:8,22
become 39:16
  55:13
becomes 22:17
  23:12,16
before 7:23 8:11
  13:15 20:13,16
  21:25 22:3,8,17
  23:12,16 24:1
  27:9 35:3,17
  37:23 56:1,13
  65:7 74:3 93:13
  94:5,9,17,18,23
  95:2,5,10 97:18
  101:16 109:6
  111:21 112:4
  113:9

begin 80:23
beginning 98:11,14
behind 89:19 90:10
being 22:1 35:16
40:2 44:17 51:15
64:12 67:24 70:20
73:9 94:21 100:11
belief 112:19
believe 41:4 52:11
69:23 99:18
104:23
belong 44:9
belongs 44:8
bend 93:10
bending 102:6
bent 93:2
Berman 41:15
best 43:25 46:3
47:23 90:19 94:2
112:19
Besunday 40:11,16
better 19:1 35:12
35:14 48:10 70:1
90:16
between 7:6,8,12
29:14 38:16,21
39:2,9,20 52:14
53:11 64:21
103:11
big 10:22 31:14,15
60:21 88:8 92:3
92:16,20,22 95:21
95:22 96:13,16
105:1
bird 47:2
birds 45:1
bird's 46:19
bit 5:12,14 29:5
34:4 69:21,22
97:9
blocks 22:5,7
blood 97:11
boat 13:3,13,14
36:23 37:5,8,10
42:18,19 44:15,23
44:23,24 45:11,17
45:20,22 46:6,15
46:20 47:21,25
49:4,9,13,17,18
49:20,22,24 50:5
50:6,11,24,25
51:4,6,7,14 53:3
53:14,16 54:12
57:13,23 58:12
61:1,4,5 63:6

71:19,23 72:9
80:4 81:6,7,10,11
81:16 83:16,22,23
84:22,25 86:14,22
86:25 87:3,4,5,8
88:8,9,10,14,25
89:2,5 90:3,12,20
90:23 91:4,6
92:14,15,15,19,21
92:24 93:1,3,11
95:22 96:2,12,13
96:14,15,16,16,20
99:7,8,13,14,18
99:18,19,20 102:6
103:22 104:10,12
105:2,2,6,24
106:24 107:24,25
108:1,1 109:24
110:6,8,8,11,13
112:13
boats 10:6,12,12,13
10:15,16 12:4,24
13:1 43:19,22,23
44:2,9,10,13,15
44:19,22 84:23
boat's 83:21
body 102:2
Bonnie 1:18 113:4
113:24
born 4:16,19 7:22
8:10
boss 11:15,17,21
12:18 41:8 110:7
both 11:6,10 52:18
62:2 78:3
bothering 35:16
bottom 53:6,18
86:14,22 87:3,4,5
87:7,11,12,17
88:5,14,25 89:5
90:2,12 104:7
bow 53:24,25 54:4
54:7,13
break 28:3 110:20
111:2
breakfast 99:4,5
Breen 1:18 113:4
113:24
bright 60:22 95:22
95:25 96:20
105:19 107:15
brighter 99:9
bring 62:1 92:25,25
93:9 106:24

107:12,23,24
Broadway 2:3
brothers 8:2,3
brought 17:17
71:18,23 92:13
95:19,21 96:12,19
BUCHANAN 2:8
build 13:3
building 8:23 9:6
9:11 10:6,12,12
10:13 12:24,25
13:1
bulbs 99:6
BULL 2:3
businessman 11:16
butt 89:20
B-o-w 54:1

<hr>

## C

C 2:1
cables 62:2
California 1:4,16
2:4 4:1 24:6
113:1,22
call 13:2 38:8 40:15
55:5 81:15
called 13:3,14 38:9
38:9
calls 17:3 19:7
37:14 95:14
calm 53:9,15 54:4
54:18,19
came 12:14 14:3,24
14:25 15:17,24
16:21 17:14,25
23:22 24:3 25:22
26:18,24 27:4,9
28:20,22,25 30:19
31:19 32:19,20,23
38:15 56:3,4
61:25,25 62:1
canamarow 13:3
captain 41:8,12,14
41:18 42:20,22
58:6,8,19 59:15
59:17 60:15,21
61:14 62:11,23
66:9 85:5 95:22
99:13 100:17,21
105:3,6,10,13,19
106:3,15 107:18
108:3,25
captains 84:24
care 20:7 24:17,19
carefully 89:13
Carla 28:8,14

carpenter 8:23
9:12 11:5
carpentry 9:9
carried 18:18 19:2
carry 18:14
case 1:8 65:1 77:20
Catamaran 13:6,7
cause 113:8
Center 2:8
CENTRAL 1:4
certainly 71:2
82:16
Certificate 1:18
113:5,25
Certified 113:4
certify 113:5,15
change 12:20 22:11
22:13 40:1 41:5
71:4,6,13
changed 40:3 41:10
changes 111:14,16
charge 61:14
105:10 110:6
charts 46:20
check 61:12,17
child 7:21 8:9,12
16:15
children 14:19,21
15:15,24 16:1,7
16:10,13,18 28:6
31:9,17,22 32:3
32:10,13 33:9,16
33:22
children's 32:8
CIP 9:5,16,24
circumstances
82:15
citizenship 16:24
city 22:8 112:22
clarification 70:4
99:17
clarified 71:9
clarify 23:10 47:7
52:16 70:8
clean 79:12
clear 51:14 53:8
56:11 66:19 72:7
79:4 90:1
clearer 60:23
client 64:21 69:24
72:20 78:5 80:21
clients 26:14
client's 85:11,12
climb 97:2 101:10
101:15,18

climbing 97:3
close 13:11
closer 112:13
code 71:7 111:12
111:15
coffees 99:4
Columbia 2:8
come 15:19 16:18
16:20 17:10,13,15
17:22 61:7 68:11
78:19 84:23
102:10
comes 58:12 63:4
66:12
comfortable 93:25
coming 16:9 24:12
50:7,9 68:3 77:3
93:4,5 95:16
comment 77:19
79:4
company 1:9 9:4,6
10:5,7,8,25 11:3
11:13 12:2,11,15
compare 20:21
complete 20:4,5,7
70:16 111:3
completed 70:15
complies 48:2 50:6
86:7
computer-aided
113:12
conclusion 17:4
19:8 37:14
confident 81:4
confusing 85:2 88:7
98:3
confusion 23:13
71:25
connected 113:17
consider 108:15
consistent 104:23
contains 113:13
contemplate 71:3
continue 31:9 36:9
66:2 93:21 101:15
110:23
continued 36:12
continuing 85:11
contract 9:25
convenience 69:16
conversation 64:8
64:10
conversations
47:13
Cookie 25:16 26:3

26:22
copies 112:7
copy 111:23,24
  112:4,6,9
CORPORATION
  1:9
correct 15:14 39:4
  69:4 80:8 112:19
corrected 111:24
corrections 71:6
  111:7,9
counsel 64:4,7
  66:23 67:4 68:12
  87:6,25 110:22
  111:16 113:19
counsel's 72:16
count 56:25 57:17
  57:19
country 16:24 17:1
  17:7,10,13,20
  19:6,14,16 26:24
County 113:3,21
couple 14:14 19:12
  96:5
course 86:3 111:6
court 1:3 66:20
  68:19 84:7 111:11
covers 82:16
crew 38:2,3 44:25
CROSS-ACTION
  1:13
crow's 59:19,20
CSR 1:18 113:24
Cutting 10:14

**D**

D 3:1
dark 59:11,14
  102:15,18,22
date 56:19
daughter 16:8
davit 46:10,12 49:4
  49:5,6,17,18
  50:11,17 51:15
  86:2 112:14
davits 46:7,14
  49:13,25
dawn 97:16,18
day 6:9 7:4 43:14
  45:7,9 56:22,25
  69:12 91:6,17
  98:17 112:20
  113:21
days 9:19 56:24
  57:1,2 75:22
  80:20 111:5

DDP 1:8
DeBRUM 1:6,15
  4:3,7,10,16 77:2
  111:5,13 112:17
  112:24
decide 63:7,22
  76:14,21
decided 16:22
  106:11
decides 66:4 69:3
decision 106:19
deck 44:17,19
  45:20,23,23 52:15
  52:20 53:11,21
  58:12 86:12,15,20
  87:12 93:6 97:6
  105:10 110:7,7
deems 111:7
DEFENDANT 2:7
DEFENDANTS
  1:12
degree 69:25,25
deposition 1:15
  68:13 73:10
  111:14,21,22
  112:5,16,18 113:6
  113:9,10,13
depth 58:20
describe 95:12
  103:21
described 90:19
DESCRIPTION
  3:5
design 88:8
detail 95:13
determination 78:5
determine 63:11
Diego 1:16 2:4 4:1
  5:22 27:9,22
  113:3,21
different 5:6,6 13:1
  16:17,17 17:6
  49:12 55:16,20
  60:5 63:3 68:12
  70:17 79:19
differently 65:14
difficulty 66:25
dinner 25:1
directions 49:12
  62:9
disagree 66:23
discussion 18:23
  23:6 64:20 71:21
  96:9
disinterested

113:16
distance 21:1,2
  52:14,19 53:11,22
  54:3,14 71:19
  87:11 90:8,11
distracted 68:18
DISTRICT 1:3,4
divorce 13:25
doctor 22:21
document 17:19
documentation
  18:4
documents 17:7,9
  17:22,23
doing 22:19 23:2,4
  23:4,18,19 31:6
  36:2,14 39:14
  42:3,13 43:25
  46:3 48:5 111:2
dollar 9:19
done 73:23,25 74:5
  78:23 79:19 93:19
  111:15
down 21:2 23:14
  46:19 47:1 50:9
  72:2,4 80:5,6 83:5
  83:9,16 84:1
  87:12 93:2,10,15
  99:5 102:9,10,11
  102:24 103:8,9,9
  103:18,22 104:1,7
  104:19
draft 105:21
draw 46:18,25 47:1
  47:21,25 48:22
  50:5,23 88:6,13
drawing 3:6,7
  46:21 54:9 85:25
  112:12
drawings 85:24
drawn 49:1 51:16
  54:12
drinking 99:4
driver 38:9
drivers 18:2
drives 37:8
driving 37:16
drop 6:6 95:23 96:2
  99:5 107:24
duly 4:4,5 113:7
during 14:4 19:1
  39:6,23 42:21
  61:11 93:12 94:15
  95:2,10 100:12
duties 111:12

**E**

E 2:1,1 3:1,4
each 62:19 64:19
  67:9 94:20
earlier 111:15
early 97:17,19,19
eat 24:25
Ebeye 4:17,24,25
  5:15
edification 47:15
education 6:7 8:20
eight 4:25 92:9,12
either 16:16 47:20
  64:13 110:23
elementary 4:24
end 29:22 50:7,7,8
engine 61:16
engines 1:10 61:13
  61:17,18
English 4:14,14 5:5
  5:8,11,13 7:3
  11:16 40:18 48:19
  67:2,4 68:13,14
  69:25 70:2,3
  71:14,17,22 78:4
  81:5,9,19,25
English-Marshal...
  4:6
enough 55:3 70:13
  110:23
entire 71:1
entitled 67:8,17
equipment 22:22
ESQ 2:5,6,10
estimate 92:5,20
even 13:11 21:2
  79:2
ever 8:19 19:2
  36:14 58:15,22
  59:5 65:15 105:6
  105:13 106:11,19
  107:2,6,14,18
  108:3,25 109:14
  109:24 110:13,16
every 21:14,15,16
  31:12 56:25 57:19
  57:20 58:19 64:20
  84:15 107:15
  109:20,21
everyone 67:1
everything 20:4
  47:21 67:5 109:17
evidence 37:14
  106:7
ex 30:8

exactly 15:19 20:12
  20:15,21 47:21
  104:23
EXAMINATION
  3:2 4:7
example 18:18
  67:20 77:2 88:24
except 18:16 67:4
Excuse 18:22
EXH 54:10 112:15
Exhibit 54:9
  112:12
expect 20:18 34:8
  35:17,25 36:8
  70:23
expecting 33:6
experience 73:12
  73:14
experienced 57:5
explain 47:19 53:18
  65:12 72:7,19
  75:19 76:16,18
  93:3 108:18
explained 64:13
explaining 63:15
explanation 64:13
  77:23
extent 78:23
ex-wife 14:22 15:10
  15:16 16:11,16
  32:14
eye 46:19

**F**

F 1:9 42:1
fact 65:10
facts 27:2 37:13
  106:6
fair 67:22 112:3
family 8:5 13:17
  29:15,16 31:19
  36:21
far 21:12,18 22:3
  38:25 44:25 87:5
  101:18 102:11,24
  103:2,5,5,9
faster 69:18
fatigue 111:1
fault 85:21
feel 22:9,10 105:14
feeling 93:18
feels 70:1
feet 12:25 34:18
  53:23 54:23 58:23
  59:6 77:4 80:9
  86:13,13 89:5,21

92:9,12
**Ferman** 41:16
  96:20 97:1 105:10
  106:23,24 107:15
  110:10
**Ferman's** 109:6
**Ferreira** 41:14
  42:22 58:6,8
few 23:11 94:23
**fiberglass** 10:6,15
  11:6
**Fifth** 2:9
figure 6:12
final 5:22
find 26:1
fine 48:6 68:21
  70:6,19 79:15
  111:4,10
finish 6:20 20:17
  85:12
finished 9:25 10:1
  20:10 74:1,2
  80:23,24 85:13,17
first 4:4 7:21 8:9,22
  15:2,7 17:15
  23:22 24:3 26:24
  27:4 34:17 36:16
  36:22 37:2,16
  38:13 43:14 45:18
  46:15 47:19 51:3
  54:8 65:7 96:14
  105:12 113:6
fish 35:18 36:10,11
  36:13 45:1,4,8
  53:14 56:25 99:14
  99:15
**fisherman** 37:24
  99:21
**fishermen** 35:22
**fishing** 1:9 3:6 10:8
  12:2,10 13:13,13
  35:22,25 36:12,16
  36:20 56:24 95:20
  98:2,16,24
five 16:13 20:25
  95:2,5,10
fix 20:8,20 35:8
fixing 61:4
flashlight 59:18,22
  60:1,3,14,21,22
  100:5
flashlights 59:15
  60:6,12
flat 21:19 53:9
floating 53:10,10

**floor** 86:18,20 87:5
  87:12
**fluent** 4:14 67:2,4
**fluently** 70:17
**focus** 78:24
**follow** 112:2
**follow-up** 74:17
food 24:16,22 31:3
foods 25:3
foot 97:6 101:20,20
foregoing 112:18
  113:6,8,12
forget 85:22 87:10
forgets 75:5
form 19:1
forth 9:11 31:3
  72:18
forward 50:17
  51:15 67:18 79:13
  111:16
forwarded 111:13
foul 41:9 42:1,1,3,7
  42:14,16 43:1
  106:9
foundation 52:5,25
  54:5 62:24 63:14
  64:1 66:8,16 68:7
  69:6 74:13,22
  75:16 76:9,23
  80:3 82:23 83:11
  84:4,20 86:17
  87:14 88:17 89:8
  89:23 90:6,14
  91:9 98:13 103:20
  104:4,21 105:17
  106:7,14,22 107:9
  108:7 109:4
four 10:20 12:12
  22:5,7 32:13,23
  39:2,10 80:9
  97:10
**Frank** 28:8
**Friday** 69:16
from 16:25 18:4
  24:4,11 29:7,9
  30:3,20 31:19
  32:2,19,20,22
  40:4,9 41:5,11
  43:14 46:15,19
  48:3 49:1 50:7,8,9
  52:19 53:6,21
  54:3 55:5 57:12
  57:16 59:13,18
  62:3,21 63:22
  66:5 68:5 69:3

71:19 72:9 73:15
74:6,9,18 75:12
76:3,5 77:4 79:24
80:10 81:6,10,11
81:15,16,23,25
86:12,15,18,20
87:4,7,11 89:20
90:10,11 92:14,21
99:10 100:17
102:8,25 103:5,6
103:25 104:9,11
104:17 105:2,3,13
109:23 110:8,8,9
110:9,14,16,17,24
110:24 111:1
front 50:10 52:6
  63:6 66:12
frustrating 85:1
full 4:8 53:14 73:2
function 72:16,17
**FURNITURE** 1:10
further 8:19 113:15
future 34:16
**F/V** 1:10

---
**G**
---

**G** 1:18 113:4,24
gave 25:2 34:1
  70:10
general 67:4
generally 72:12
gets 61:19 78:25
  79:1,1
getting 21:7,14,15
  21:16,17 22:5,8
  62:14 68:18 80:20
girl 30:9,12
girlfriend 33:3,16
give 25:2 47:14
  62:8 70:17 72:21
  72:25 74:3,4,5
  77:2 79:9 80:21
  93:20 111:16
  112:7
given 64:4 70:20
giving 8:3 77:13
  79:7
glad 69:15
go 4:22,23 5:1 7:13
  7:17,18 13:7
  19:19 20:4,13,19
  23:10 28:20 30:22
  31:22 32:3 33:20
  35:19 41:7 45:12
  46:8 47:6,8 48:7

50:12 52:21 59:7
60:7 61:8 62:25
65:5 67:12,18
69:14,15,16,18
70:11 71:1 73:4
74:6,13,14,22
75:9 78:15 79:13
82:23 85:13,21
86:17 87:14 89:2
89:9 91:9 95:4
98:3 99:15 104:6
108:20 111:21,25
goal 36:13,17,18,19
goes 103:8,8
going 8:11 23:13
  31:17,22 32:3
  36:11 45:12 46:4
  47:22 49:9,11
  50:1 51:18 52:24
  63:12 64:8,22
  69:14,22 70:23,23
  71:5 74:21 75:22
  78:4,16 80:4,5,6
  80:23,25 81:23
  82:3,5,16,19 83:4
  83:5,8,9,16,21
  84:1 88:6 92:14
  92:24 95:23 99:8
  102:9 103:18,21
  104:1,19 108:14
  110:24 111:3
gone 102:11,25
good 4:15 55:3
  67:20 110:23
gotten 14:14
government 18:5
  24:4,5,8 27:25
grab 76:12,18
grade 6:3,4,18,20
grades 4:25
grew 4:19
**Guam** 14:13 15:11
  15:12,16 28:23
  29:2,6,22 31:8,19
  32:6,20,25 33:7
  33:14
guard 35:14
guess 24:20 38:20
  54:17 87:7
guy 99:13
guys 46:20 75:19

---
**H**
---

**H** 3:4
half 21:3,4,5,6,6,9
  21:21,24,25 99:10

hand 74:4 113:21
handle 111:8
**Hang** 47:6 78:19
hanging 7:9 12:8
  87:8
happen 20:13,15
  68:2 107:14
happened 52:10
  95:13,17 96:11
  99:24 101:21
happening 70:22
happens 75:5
**Hard** 46:22
having 4:4,5 64:9
  64:10 99:4,5
**Hawaii** 27:4,4,10
  27:11,16,25
**Hawaiian** 27:24
head 83:23 89:1,1,3
  90:3,11,23 91:1,1
  93:2,10 102:6
  104:11,12 111:1
headache 111:1
hear 79:12 91:22
  103:9
hearing 67:6
hears 68:14
heavy 70:20,22,24
  35:3,9
height 58:20 89:1
  92:8,16,24
heights 58:5
help 17:11,15
helped 17:10
her 1:10 14:23 30:9
  30:13,15,20,22,25
  31:2,9,10,12,15
  111:12
hereunto 113:20
high 74:10,19 76:7
  80:1 86:12,14
  87:20 90:20 91:17
  92:1,5
higher 86:22 87:1
  87:17,21 88:14,18
  88:20,22 89:6
  93:6
highest 58:8,15
him 14:14,24,25
  15:2,4,5 19:9
  25:25 31:20 35:16
  40:15,24 41:2,22
  42:20 43:3 46:21
  47:8,13 55:5
  57:21 59:1 62:9

63:15,18 64:3,6
64:14 65:7,17,18
65:20 66:18 67:24
68:8 70:1,10,25
72:7,8,9,20 75:1,3
75:7,7,18 79:10
79:15 85:15,17
93:20 94:21
105:11 108:12
112:10
**hire** 9:13
**hired** 40:7
**hit** 83:22 88:25
90:23 93:1,2,10
93:18,18 96:13,15
96:16,16,21 97:8
97:9 101:16,24
102:2,6 104:11
**hitting** 83:23
104:10
**hold** 96:25
**home** 19:19,21 20:4
20:13,19 25:13
**Honolulu** 32:20,22
**hook** 50:8,9,10 62:1
**hope** 68:1
**hospital** 8:24 9:7
9:25 31:18,19
**hour** 9:19,20 12:22
21:3,4,5,6,6,9
**hours** 9:22,23
10:23,24
**house** 25:11 48:1,2
59:18
**huh** 71:23
**hundred** 34:6
**hurt** 94:15
**hypothetical** 63:13
64:1 66:8,16 68:7
69:5 74:22 75:16
76:10,22 80:3
82:23 83:11 84:4
84:20 87:13 88:17
89:8 90:6,14
98:13 103:20
104:4,21 106:7,14
106:22 107:9
108:7 109:4

**I**

**idea** 14:17 26:18
67:20
**identification** 18:7
18:11,14,19 19:2
54:10 112:15
**immigration** 26:25

27:3
**impossible** 76:25
**improper** 67:15
**inaccurate** 71:13
**Inc** 1:9,18 113:24
**incomplete** 63:13
63:25 66:8,15
68:7 69:5 74:21
75:15 76:10,22
80:3 82:23 83:10
84:4,20 87:13
88:17 89:8 90:6
90:14 98:13
103:20 104:4,21
106:7,14,22 107:9
108:7 109:4
**incumbent** 70:10
70:11
**indicated** 67:2,3
87:8
**indicates** 64:10,12
**indication** 64:5
**INDIVIDUAL** 1:6
**injured** 94:5
**injuries** 26:6
**injury** 27:16 94:17
94:18 111:1
**inside** 101:20
**inspect** 61:16
**insurance** 24:22
**intentional** 83:22
**interested** 113:16
**interesting** 6:23
**interpret** 64:23,24
65:11,17,19 66:1
72:22
**interpretation**
69:24 77:21
**interpreted** 37:18
45:14 65:23 77:8
83:2
**interpreter** 2:11
4:5,6 5:21 6:12
9:1 11:8,18 15:5
19:9 24:20 26:9
31:24 36:24 37:6
37:9,12,17 43:7
45:2 48:7 49:14
52:16 53:25 54:7
55:17,24 56:15
63:15 64:21,23
65:2,5,11,18,25
69:7,10 71:10,25
72:4,7 73:9,21
75:18 77:6,12,25

78:10 81:21,22
82:25 85:1,7,15
85:19 93:23 94:2
94:12 96:8,24
98:4,6 99:19,21
**interrupt** 66:24
**in-between** 76:8
90:8
**island** 4:17 5:2,15
8:23 11:1 16:25
18:21 19:3,25
**Islands** 20:1,16
31:16,21,23 32:2
32:4 33:5,10 34:7
34:12,14,20

**J**

**Jean** 11:22
**Jim** 11:24,24 12:18
**job** 7:23 8:7,9,12
8:13,22 10:4,11
10:13 11:2 12:5,7
12:13,20 13:12
34:11,16,23,24,25
35:4 36:2,6 37:7
37:23 39:6,24
42:19 57:10 60:24
61:15,20 62:5
106:17
**jobs** 8:15 37:25
38:8 61:4,5
**JOHN** 2:5
**Joran** 2:12 4:5
**judge** 66:21
**jump** 71:20,20
76:17 80:14 81:11
81:12,13,14,18,20
81:21,22,25 82:8
82:12 83:5,6,14
83:17,22 84:1,15
84:17,25 92:14,19
92:21 96:14,17,23
96:24,25 100:20
104:12,18 105:2,7
105:8,13 106:5,8
106:12,20 107:2,6
107:11,18 108:5,8
108:16 109:9
110:17
**jumped** 92:18
100:15 101:8
102:8,12,17,24
103:17,25 104:9
104:11,17
**jumping** 82:4,7,15
84:12 103:22

110:19
**June** 113:21
**just** 7:9 9:13 15:1
17:25 19:4 22:20
23:2,4,4 33:8
36:11 46:3 51:14
53:3,10 56:3,17
59:1 64:14,15,22
65:12,22,25 67:5
67:18,24 73:7
74:4,14 76:25
79:8,10,17 80:20
85:3,8 90:1 93:20
94:1 101:5
**J-e-a-n** 11:23

**K**

**keep** 46:4 64:6 73:3
80:20 108:14
**kept** 44:16 45:20
45:24 46:6,12
50:19 51:3,6,12
51:15,20
**kids** 7:11 13:18,19
13:20 19:19 31:10
32:5,6,23
**kind** 9:10 13:1 34:9
34:11,16,16,25,25
44:10 64:22 70:3
**kinds** 37:25,25 42:1
**knew** 55:10 70:9
**know** 13:2 14:16
15:22 17:8,9,21
17:25 19:5,11,13
21:20 26:12 34:9
34:10,15,15,21,25
36:10 37:15 38:24
40:13 41:2 46:25
47:1,4,5,19,20
48:19 52:2 53:18
54:17,18,21,24
55:2,7,13 56:19
57:7 58:3,18,18
62:19 64:18,19
67:8,17,23 68:15
69:7 73:22 76:11
76:16,17,18 77:20
78:18 79:13 83:3
84:16,18 86:21
87:15 89:16,24
90:7,16 92:11
94:14 97:3,21,23
98:3 100:4,8
101:19 102:14
104:10 105:18
**knowledge** 112:19

**knows** 56:18 64:18
80:24
**Koorale** 1:10 13:14
13:14,16 14:2
28:20,22,25 29:3
29:7,10,12,22,25
30:1,4,20 36:2
37:23 38:14,15
39:4,18,21 43:4
43:10,13,14,17,17
43:20 44:7,8,9,12
44:14,20 45:10,17
45:18,21 46:18,21
53:8 55:9,21 56:3
56:6,14 57:13,16
57:25 58:16,22
59:5,10 61:3,10
61:16,19,22 62:5
62:6,22 63:4 66:4
66:6,13 68:4,5
69:2,4 73:15,16
74:10,19 75:12
76:2,2 77:3,4
79:23,25 80:11
81:15,24 82:20,21
93:6 95:1,9,17,20
95:22 99:11 103:7
104:1,18 105:14
109:25 110:9,10
110:14,17

**L**

**lacks** 52:5 54:5
62:24 63:14 64:1
66:8,16 68:7 69:6
74:13,22 75:16
76:9,22 80:2
82:22 83:11 84:3
84:20 86:17 87:14
88:17 89:8,22
90:6,14 91:8
98:13 103:20
104:4,20 105:17
106:7,14,22 107:8
108:7 109:4
**ladder** 48:16,17,23
48:24 51:23,25
52:9 63:8,10,22
69:4 75:13 76:3,6
76:12,18 79:24
80:10 81:24 82:1
82:3,20 86:1,8
95:23 96:1,2,3,18
96:21,22,24 97:1
100:11,15,16,18
100:20,22,23,24

101:6,8,11,15
102:8 103:17
104:1,11,17
105:20 107:11,16
108:4 109:1
110:18
**language** 5:3,5
11:12,15 41:9
42:1,2,3,7,14,16
43:1 70:16 106:9
**languages** 5:6
**large** 31:14
**last** 6:1 11:25 14:7
14:18 15:17,21,22
15:23 16:18 17:14
18:18 19:1,12
23:23,25 25:17
26:25 28:15 29:19
33:17 46:16 51:7
51:11 56:6 57:15
65:2 81:8 94:5,14
94:18,23 96:5
**late** 42:15,17,19,19
99:23
**later** 66:21 71:3,4
**lawsuit** 20:10
**lawyer** 17:11 26:15
**lawyers** 17:18 34:1
**laying** 93:15
**leaking** 61:12
**learn** 9:12
**leave** 5:15 6:5,22
9:24 12:2 13:8
**left** 4:21 6:25 9:18
10:21,25 11:2,3
12:3 14:13 15:14
28:23 29:22 32:19
32:22 43:17 97:5
97:6 101:14
**leg** 20:8,17,18,20
20:21 21:7 22:22
27:15 34:18,22
35:8,12,14 93:18
93:18 94:15 97:5
97:7,9 101:25
102:2
**legal** 17:3 19:7
37:14
**LeGROS** 2:8
**legs** 21:13 35:15
93:17
**Less** 13:11
**let** 7:7 11:8 15:8
23:10 41:10 46:4
47:15,19 51:24

53:1 56:15 61:6
72:21 74:17,24
75:1,25 78:18,19
81:17 87:24,25
88:3 97:13 103:24
105:12
**letter** 10:9,9
**let's** 50:23 54:8
66:2,19 67:17,18
68:1 69:16 70:17
74:5 77:2 78:14
78:15,24 79:13,21
85:24 88:13 90:1
94:17 104:16
**license** 18:2
**life** 35:5 36:17,18
99:7,8,12,14,14
99:18
**lift** 35:3 36:5,7
**lifting** 35:9
**light** 44:23 95:22
95:25 96:21 97:1
97:1,2 99:5,11,18
99:19,20 100:11
100:16,17,19,21
100:25 101:6,10
102:22 105:19
106:4 107:16,19
108:3,4,25 109:1
**lights** 99:9,12,12
101:9
**like** 13:5 14:23
17:21 19:24 21:8
34:17 35:3,21
40:20 42:1 43:1,2
44:25 45:8 57:4
71:16,17,19 75:17
88:2 89:2 93:9,24
93:25 99:2 101:8
102:5,14 106:23
107:10,22,22
109:5
**limping** 22:14
**line** 23:8 53:16,16
53:17,18 54:25
84:9,10 89:14
90:17 91:13,23
96:6,7 104:14
108:10 110:4
**listen** 69:14 70:2
78:2 79:17 89:12
89:12
**listening** 75:4 77:6
77:10,12,14,19
78:1,1,6,11,13

**literal** 69:24 70:14
72:6 77:21
**literally** 65:25
72:12,13
**little** 5:12,14 29:4
34:4 37:11 69:18
69:21,22 84:8
97:9 110:20
**live** 4:18 5:17,19
14:3,21 15:10,19
16:10,18,22 17:7
17:13 27:11 28:21
28:25 29:3,8,14
29:24 30:17 31:22
32:4,12
**lived** 14:7,18,24,25
15:2,4,12,15,17
26:17,20 29:19
30:1,15,20 32:13
32:25
**lives** 25:13 29:9
**living** 8:1 16:15
29:3 30:4 32:11
32:16,18 33:3
**loaded** 53:3
**log** 98:7
**long** 4:18 5:19 9:16
10:17,18 12:10,16
13:10 17:2 20:25
21:1 22:17 23:11
23:15,16,26 17,20
26:22 27:13,19
30:15 35:17 36:8
36:11 39:17 40:25
41:2 43:12 45:9
45:10,15 55:6,8
78:2,12 94:5,7,18
100:18 101:6
**longer** 22:22,23
23:21
**look** 34:13,19,24
58:20 60:16 66:21
76:21 80:14,17
82:6,6 84:15,16
112:6
**looked** 19:16,20
**looking** 8:7,9,12
34:23 35:4,21
46:19 47:1 54:14
83:4
**looks** 13:5 89:21
**Lopez** 2:3,5 17:15
18:21 41:16 42:9
42:23 43:6,24
44:1 45:3,12 46:1

46:8,20 47:6,11
47:14 48:16 49:22
50:1,12,20 51:8
51:11,17 52:4,21
52:24 53:2,5,13
54:5,17 55:22
56:8,17 57:6 58:1
58:10,17,25 59:7
59:20 60:7 62:23
63:12,17,24 64:7
64:20 65:4,10,17
65:19 66:7,15,18
66:23 67:3,14,16
67:22 68:6,12,21
69:5,9,14,21 70:7
70:13,25 71:5
72:1,5,11,23 73:6
73:18,22,25 74:12
74:21 75:1,6,15
76:9,15,22 77:5,9
77:14,18 78:8,15
78:18 79:5,17
80:2,15,18,21
81:12 82:6,12,22
83:1,10,15,20
84:3,11,19 85:3,6
85:9,13,17,21
86:3,5,24 87:6,13
87:19,25 88:10,16
88:23 89:7,11,15
89:22 90:5,13,21
90:25 91:8,12,14
91:19 92:2,7
93:16,19 94:1
95:3,14,18 96:23
98:3,5,7,12,17,19
98:22 99:1,7,17
99:25 100:7 101:1
101:23 102:4,13
102:19 103:1,13
103:19 104:3,13
104:20 105:16
106:6,13,21 107:3
107:8 108:6,11,16
108:19,21 109:3
109:10,16 110:1,3
111:3,11 112:1,7
**lose** 79:10 106:16
**lost** 34:10 35:2
**lot** 21:16,17 35:16
36:20 37:24 45:8
**love** 36:19
**low** 74:11,20 76:7
80:1
**lower** 53:16 87:18

**88**:15

## M

**M** 1:9
**mad** 42:20
**made** 9:1 41:22
56:14 73:19,21
78:7 79:10,11
**main** 71:19 81:6,11
**Majuro** 5:2,18,19
8:23 29:15 32:9
32:19,20,21,22,24
33:1,8,13
**make** 6:23 17:17
35:12 36:20,21
52:22 55:14 56:6
56:11 60:23 61:12
67:10 69:18 71:6
74:6 76:6 78:8,11
80:25 90:1 93:20
99:9 106:19 111:7
111:14
**making** 10:5 66:25
111:9
**Malaysian** 18:20
**man** 55:5
**manage** 42:2
**many** 6:16 9:22
10:19,23 16:10
36:12 38:2 43:4
51:25 52:3,10
55:16,20 56:1,6
56:13,24,25 57:2
57:12,15 72:8
101:18 107:21
**mark** 54:9 112:12
**marked** 54:10
112:15
**marriage** 14:4
**married** 6:24 7:1
7:19,20 8:6 13:21
14:15,16
**marry** 30:13
**Marshall** 5:2 8:23
11:1 16:25 18:21
19:3,24 20:1,16
31:16,21,23 32:2
32:4 33:5,10 34:7
34:11,14,20
**Marshallese** 5:5
11:14,15 16:25
64:12 70:4 75:19
77:17,24 78:4
94:13
**matter** 76:8 82:5
**may** 1:17 4:1 70:1

| | | | | |
|---|---|---|---|---|
| 72:14,20 111:13 | 101:1 102:19 | **necessary** 111:7 | 91:8,14,19 92:7 | 61:9 62:4,11 |
| **maybe** 10:20 26:21 | 103:19 104:3,21 | **need** 46:21 47:8 | 95:3,18 98:12 | 63:21 65:5,13 |
| 26:23 27:6 45:7 | **mistake** 9:1 73:19 | 64:23 74:13 77:21 | 99:25 100:7 101:1 | 66:4 73:2,8 74:2 |
| 72:2,24 75:25 | 73:21 | 88:13 101:10 | 101:23 102:4,13 | 79:20 80:8,8 |
| 80:9 83:5 88:13 | **mixed** 27:5 | 108:2 111:2 | 102:19 103:1,13 | 81:14,17 83:8,25 |
| 89:24 | **mom** 16:17 32:18 | **needed** 10:15 | 103:19 104:3 | 85:24 86:1,2,10 |
| **mean** 6:23 20:7 | 32:23,25 | **needs** 61:13 70:3 | 105:16 106:6,13 | 87:4,4 88:5 91:17 |
| 29:16 55:22 56:8 | **moment** 34:15 | **nest** 59:19,20 | 106:21 107:3 | 91:25 94:13 95:12 |
| 70:25 72:15 77:20 | **Monday** 110:24 | **net** 38:1,6,17 57:25 | 108:6,22 109:3,10 | 97:13 98:6 102:24 |
| 77:24 81:5,6,9,11 | **money** 8:3 24:11 | 58:6,9,12,16,20 | 109:16 110:1 | 112:11 |
| 87:20,23 104:6 | 25:1,3 31:10,12 | 58:23 59:5,10,14 | **objections** 66:18,20 | **old** 6:1 16:1,4,4,7,8 |
| 105:24 | 31:15,15 33:17,23 | 60:24 61:9 99:16 | 66:25 67:8 68:10 | 16:9 |
| **means** 88:8 96:1,8 | 33:25 34:1 36:20 | **nets** 55:1 61:5 | 68:14,18,19,22 | **oldest** 7:22 16:8 |
| 105:20 107:16 | 36:21 | **never** 7:23 8:13 | 75:4,6,9 76:15 | **once** 107:12 108:13 |
| **meant** 15:4 81:17 | **month** 25:7 26:21 | 24:2 36:10 40:3 | 77:5 79:9,11 81:1 | **one** 4:24 6:17 7:22 |
| **measure** 10:14 | 27:3 | 55:1 107:22 109:8 | 83:10,15,20 84:11 | 12:21 13:2 15:25 |
| 90:10 | **months** 12:12,14 | **nevertheless** 82:15 | 86:24 87:19 88:23 | 16:2,3,4,4,5,5 |
| **measurement** 53:6 | 14:14 18:18 19:1 | **new** 22:22 30:8,11 | 89:11,15 90:21 | 20:22 25:16,16,17 |
| 90:17 | 26:23 33:17 111:1 | **next** 5:17 10:4 12:7 | 92:2 | 27:20 28:13 32:6 |
| **medical** 20:7 | **more** 20:18 41:3 | 12:13 13:8,12 | **observation** 78:7,8 | 33:7,8,12 40:9 |
| **medically** 20:12 | 43:9 45:7 54:23 | 27:21 61:24 82:21 | **obvious** 56:11 | 41:8 43:9,11,15 |
| **meet** 25:21,23 | 58:5,23 59:6 | 111:21 | **obviously** 70:9 | 44:12 45:7 47:24 |
| 27:24 32:20 49:12 | 85:18,24 93:8 | **night** 21:13,14 | 82:14 | 49:10,10,15,15 |
| **Mel** 1:6,15 4:3,10 | 96:19 | **nobody** 105:2,10 | **occur** 55:15 56:5 | 50:7 52:6,6 55:5 |
| 64:2 71:9 72:1,14 | **morning** 21:15 | **nonresponsive** 79:3 | **occurred** 65:15 | 55:14 56:4,19,20 |
| 72:23 82:7 85:24 | 95:20 97:17,19,20 | 79:6 | 93:14 | 60:15,16,17,17,21 |
| 93:20 112:17,24 | 97:25 98:1,25 | **normal** 68:17 69:2 | **October** 16:9 | 67:3 71:17 72:19 |
| **member** 38:3 | 99:2,3 | **normally** 60:12,18 | **odd** 81:3 | 72:24 82:11 84:22 |
| **members** 38:2 | **most** 5:8 11:14 | 80:11 104:17 | **off** 13:10 18:23 | 96:19 99:12,12 |
| **memory** 47:23 | 84:21 97:24 | **Notes** 72:5 | 21:14 23:6 29:9 | 109:11 110:10 |
| **met** 24:4 25:25 | **mother** 16:17 | **nothing** 17:9,21 | 46:16 47:6,8,15 | 111:5 |
| **MICKLOW** 2:3 | **motor** 86:14,22 | 18:1,13 19:4 | 62:5,14 69:16 | **ones** 32:7 |
| **Mid** 37:19 | 88:10 | 23:20 35:2 41:23 | 70:1 71:21 77:3 | **only** 11:15 16:21 |
| **middle** 13:4 39:16 | **mouth** 107:23 | 42:4,4 85:5 113:8 | 78:15 95:23 96:9 | 18:8 39:9,11,21 |
| 49:21 80:5,6 | **move** 25:24 33:6,10 | **notice** 4:13 14:13 | 97:1,1,2 99:11 | 43:2,11,15 44:12 |
| **might** 16:5 77:20 | **moved** 29:6 | **numb** 97:9 | 100:21 101:9 | 56:4 62:12 72:20 |
| **mile** 21:21,21,24,25 | **moving** 33:9 53:10 | **Number** 3:5 4:12 | 107:24 108:1,1 | 84:22,23 99:12 |
| 99:10 | **much** 25:4 31:2,11 | | **office** 111:13 | 105:18 110:19 |
| **mind** 81:14 | 31:13 34:5 36:5 | **O** | **often** 25:6 31:11 | 111:19 |
| **mine** 60:15 | 88:22 90:7 93:1,8 | **object** 35:19 45:12 | 45:6 | **onto** 62:5 63:7 |
| **minute** 47:6,7,15 | 95:12 | 50:1 52:24 53:13 | **Oh** 14:24 25:22 | 100:15 101:6 |
| 67:22 69:17 73:18 | **myself** 25:14 36:17 | 63:12 74:21 | 32:21 45:12 89:1 | **opened** 107:23 |
| 77:9 78:15,19 | 38:10 | 104:20 108:20,21 | **oil** 61:12 | **operations** 98:24 |
| 80:15 | | **objection** 17:3 19:7 | **oils** 61:17 | **opportunity** 71:5 |
| **minutes** 21:2,8 | **N** | 33:20 37:13 42:9 | **okay** 7:19 8:13 13:8 | 111:21,23 |
| 22:19,20 23:3,5 | **N** 2:1,10 3:1 | 42:23 43:24 46:8 | 19:23 22:7 23:22 | **order** 105:3 106:2 |
| 23:11,20,20,21,21 | **name** 4:8 10:7 | 50:12,20 51:8,11 | 29:24 30:23 32:18 | 106:16 |
| 47:14 94:23 95:2 | 11:25 28:15 40:10 | 52:4,21,22 54:5 | 32:22 37:6,12,17 | **original** 111:12,18 |
| 95:5,10 | 40:14 | 56:8 58:1,10,17 | 38:1,21 39:8 40:1 | 112:10 |
| **miss** 107:10 | **named** 25:16 | 60:7 62:23,23 | 41:5 43:4 44:13 | **other** 6:7 16:3,5,7 |
| **missed** 23:1 24:20 | 113:10 | 63:24 66:7 67:6 | 48:3,13,23 49:3 | 16:15 18:14,19 |
| 29:4 | **names** 25:15 28:7 | 67:11,12 68:6 | 49:13,20 50:23 | 19:2,24 20:21,22 |
| **misspeak** 38:19 | **narrative** 95:14 | 69:5 74:6,12 | 51:10 53:4 54:12 | 22:14,16 25:14,15 |
| **misstates** 63:24,25 | **navigators** 110:7 | 75:15 76:9 79:16 | 55:3 57:24 58:22 | 25:16 26:14 28:13 |
| 84:3 89:7 90:5,13 | **near** 90:3 | 84:19 87:13 88:16 | 59:5,10 60:17,20 | |
| | **necessarily** 86:5 | 89:7,22 90:5,13 | | |

30:6 32:5 33:7,14
36:14 43:19,22,23
44:2,2,9,13,15,19
44:22 50:7,8 61:4
61:5 62:19 71:20
87:3 94:20 97:6
109:5 110:16,17
112:12
**otherwise** 42:22
70:22 106:16
**ought** 78:7
**out** 6:6,12 25:12
31:19 36:20 56:24
58:13,20 67:18
68:11 69:17 70:11
71:8 99:16 110:25
111:9
**outcome** 113:17
**outside** 47:25 59:11
70:5 97:14 101:20
**over** 26:18 27:4
32:6,8 34:9,11
35:1 49:10 54:25
72:10,10,10 78:2
99:15 107:12
**own** 47:15
**owner** 26:8,11

---
**P**

**P** 2:1,1
**page** 3:2,5 84:9,10
96:6,7 110:4
**paid** 9:20 31:3
**pain** 21:14 22:9,10
**painful** 20:23 21:1
21:22 22:6,8
**pains** 21:7,17
**paper** 17:9 72:4
**paperworks** 17:22
**parents** 8:8,16
29:17
**part** 71:7 81:8 86:7
111:22 112:5
**particular** 43:12
71:8
**particularly** 67:1
**parties** 113:18
**partner** 66:17 69:8
89:10
**partners** 25:14,15
26:3
**parts** 10:14 70:14
**passport** 17:25
18:8,9,15,16,20
19:3,4
**past** 19:14

**PAUL** 2:8
**pay** 8:1 9:18 10:21
12:22 24:14,16
25:1,3,8,10 26:13
30:23 31:2 79:16
**paychecks** 31:14
**paying** 24:15,22,22
**penalty** 112:17
**pending** 85:6,9
**people** 25:21 26:14
27:25 109:12,21
**Pepe** 55:5,6 56:1
94:6,15,19,22,23
100:5
**perfect** 86:5
**period** 39:6
**perjury** 112:17
**permanent** 46:1
**person** 15:3,7 37:8
40:9 55:10 78:3
113:16
**personal** 47:15
**PERSONAM** 1:9
**Peru** 40:9 55:5
**Peruvian** 40:13
**phrased** 64:15
**physical** 36:3
**pick** 62:3
**picking** 110:8
**picture** 87:10
**pictures** 46:21
87:24
**place** 12:15 19:24
25:24 27:21 30:6
45:24 46:14 51:20
54:4 96:14 113:10
**PLAINTIFF** 1:7
2:2
**plan** 19:21 20:3,9
34:19
**planning** 33:9 35:4
**plans** 34:13
**playing** 93:24
**please** 4:8 26:9
54:9 84:7 108:9
112:10
**plumbing** 9:10
**plus** 9:17 35:22,23
41:4 53:23
**point** 24:20 49:13
52:15 59:17 70:11
74:10,11,19,20
80:1,1 87:24
108:3,4,25 109:1
**pointed** 89:21

90:25 95:25 96:1
96:21 105:20
107:16
**pointing** 48:23 87:6
95:23 102:22
**politics** 17:8
**port** 14:3 28:20,25
53:9,15
**position** 37:7,15
76:7,7
**possible** 82:16
95:13
**pounds** 20:25 36:7
**prefer** 111:20
**pregnant** 8:7
**pretty** 81:3,4
**previously** 4:5
**Prince** 25:17,18,19
25:22,23,24 26:3
26:17
**prior** 55:22 56:9
63:24,25 70:21
84:3 89:7 90:5,13
101:1 102:19
103:19 104:3,21
104:24
**privileged** 47:10
**problem** 21:10,12
21:16,18 22:1,4
22:18 23:12,17
57:9,11 69:22
72:11 73:5,22
76:1 77:22,25
79:4,13 111:19
112:8
**problems** 52:18
**procedure** 69:2
**process** 78:5
**program** 9:14
**property** 26:8,11
**proportional** 47:22
**proposal** 78:17
**prosthesis** 20:24
**pull** 101:21
**pulled** 97:7
**pulling** 97:6
**put** 9:14 10:15
21:15,16 48:1,13
49:2,13 54:15
57:21,23 62:2
75:6 97:5
**P-r-i-n-c-e** 25:18
**p.m** 112:16

---
**Q**

**question** 4:13 5:22

7:7 11:8,18 17:6
17:12 18:17,17,25
20:14 23:7,11,15
24:25 29:1,4
31:25 35:7 36:25
37:18 44:1,4,11
45:13,14 52:23
54:6 55:18,24
56:15 58:2 59:1,2
61:6 63:3,18 64:3
64:9,11,12,15,23
65:2,4,7,8,12,12
65:21,24 66:1
67:10,13,23,24
68:16,16,23 69:11
71:11,24 72:9,12
72:14,17 73:7,8
73:23 74:1,2,3,5
74:17,25 75:1,2,5
75:8,20,21,23
77:8,11,19,23
78:11,25 79:7,8
79:10,11,12,17,18
79:19 80:5,22,24
81:1 83:1,2 84:5,9
85:6,9,16,19,22
87:11 88:2 89:12
89:12,13,14 91:10
91:12,13 98:23
101:5 103:24
108:9,10,11,12
110:3,4
**questions** 11:4
63:19 66:24 70:2
70:12 72:16 73:20
77:7,13,15 78:1,6
78:12,13 81:2,4
84:8 88:1 97:14
**quick** 97:3
**Quickly** 100:24
**quit** 12:5 13:9
**quote/unquote**
37:15

---
**R**

**R** 2:1
**radio** 62:20 99:13
**raft** 98:5,6,9,22
99:9,9,10,15
**rail** 86:2,10,12,23
87:1,18,18,21
88:15,18,20,25
89:2,6,18,19 90:2
90:12,23
**railing** 87:9
**raining** 95:20

**range** 57:24 82:16
**rather** 74:11
**read** 23:3,8 84:9
89:14 91:13,23
96:6 104:14 108:9
108:10 110:4
112:18
**reading** 96:4
**ready** 58:19 71:2
**really** 4:15 17:8,21
34:21 36:13 41:2
52:2 54:20,20,24
55:2,7 57:7 60:22
72:15 87:15 89:16
97:4,4 101:19
102:14,15,18,21
**reask** 23:13 65:4
68:16 81:1
**reasked** 65:13
**reason** 6:25 12:3
16:21 19:20 24:21
41:7 42:5 43:2
88:7
**recalls** 70:20
**receive** 24:11
**Recess** 28:4 47:17
69:20 78:21
110:21
**record** 4:9 15:1
18:23 22:25 23:6
23:8,10 47:7,8
69:17 71:21 73:2
78:15 87:6 90:25
96:9 104:24
113:13
**recording** 93:24
**records** 38:25
**referring** 20:5
**reflect** 104:24
**refuse** 107:2,6,18
109:2,6,11
**refused** 107:22
108:5 109:8,14
**reinterpreted**
75:23
**reiterated** 108:22
**related** 1:13 113:17
**relation** 47:23
**relationship** 29:23
**released** 108:3
**relevance** 33:20
**relieved** 111:12
**REM** 1:11
**remainder** 73:10
**remarried** 14:10

remarry 14:12
remember 9:2 10:3
  16:2,2 26:21
  40:10 56:9 58:22
  65:8 67:13 94:22
  101:19
rent 24:14,15 25:8
  26:13 30:23 31:3
rental 24:22
reparte 64:22
repeat 11:8,18
  17:12 20:14 26:9
  29:1,4 31:24
  36:24 55:24 57:14
  61:8,21 75:7 84:5
  85:19 91:11 107:4
repeating 84:8
rephrase 55:17
  59:2 61:6 63:18
  63:21 64:3 65:9
  65:23 68:16 73:8
  74:24,25 75:2
  85:15
rephrased 64:15
reported 61:13
  113:10
reporter 84:7
  111:11 113:5
representation
  86:6
required 36:5
reread 67:24 75:1
  79:11 91:12 110:3
rereading 108:11
reserve 111:6
residual 110:25
respective 113:18
response 104:13
responsive 108:3
  108:14,15
rest 11:4
restaurant 31:7
resting 13:24
retain 111:17
return 20:1,16
  31:16,17 32:2
  33:5 34:7,19
returned 29:7
  31:21 59:13
returning 19:21
  20:3 61:3,10,15
returns 61:22 62:4
review 111:6,13
ridiculous 79:2
  80:19,20,22

right 7:24 8:14,17
  14:25 18:5,10
  20:20 21:10 23:19
  23:23,24 27:14,17
  28:21 34:21 35:1
  35:15 36:3 37:17
  38:11,12 39:11,15
  44:7 45:22 48:3
  48:14,15,24 49:7
  49:19,25 50:3,6
  50:17 51:1,2,16
  53:4 56:10 57:21
  62:6 63:23 67:14
  68:1 76:11,14,17
  76:21 79:21 83:5
  83:14 84:2 86:8,8
  86:11,25 89:19,20
  90:4,12,20,22,23
  97:7,13 98:11,16
  98:23,25 100:25
  101:20 102:18,21
  103:18 105:21,25
  106:1 109:9 111:6
ROBERT 2:10
room 70:6
rope 86:2 100:20
  100:22
rough 58:24 106:12
  111:23,24 112:4,5
  112:7
row 64:18
rule 67:4 74:8
run 35:1,9
Ryle 28:10
R-a-n-k 28:9
R-y-l-e 28:12

          S
S 2:1 3:4
safe 63:9,11,23
  74:15 75:17 84:16
  84:18,21,23,24
  105:7,15 109:2
safely 62:22 75:14
safer 73:15
safety 74:8
sailors 105:9
sake 37:4
same 12:15,15,21
  12:23 23:15 28:15
  43:16 45:17,24
  46:12,14 51:20,21
  70:10,12 72:9
  75:8 76:15 77:5
  81:14 83:10,15,20
  84:11 86:24 87:19

88:23 89:1,15
90:21 91:14 92:2
92:24 93:24 101:5
Samoa 29:9,9
  30:18
Samoan 30:9,12
San 1:16 2:4 4:1
  5:22 27:9,22
  113:3,21
saw 58:15
saying 8:8 27:7
  41:9 42:16,20,21
  52:9 59:21 63:16
  66:17 67:9 68:15
  69:8 72:2 78:22
  78:23 79:5 80:16
  83:25 85:7,8
  88:10 89:10 92:23
  94:1 98:19 99:18
  108:23
says 17:19 70:13
  103:5
scale 86:3,4
scheduled 69:15
school 4:22,24 5:1
  6:1,5,9,10,13,16
  6:22,24,25 7:13
  7:17,18 28:17
  45:1,2,3,4,8
schooling 8:20
schools 4:22 5:3
sea 58:5
seagulls 44:25 45:1
seas 57:24 58:8,15
  58:23 59:6 91:18
  92:1
Seattle 2:9
second 66:19 96:1
  96:20 112:5
seconds 93:12,14
  97:10
security 35:14
see 34:17 36:19
  41:10 54:13 59:5
  59:14,16 60:6,13
  60:18 63:9,23
  67:18 68:9 69:17
  70:18 79:13 86:1
  86:1 97:10 101:14
seeing 58:22
seem 57:5 108:3
seems 93:25
seen 65:15 72:20
  109:21
send 31:12,15 34:4

sending 33:23
sent 31:10 33:16
sentence 72:21,22
  72:24,25 73:1
  78:12 93:20
sentences 96:5
separate 111:8
set 38:1,6,17 56:20
  56:22 57:16,25
  58:6,9,12,16,19
  58:23 59:5,10
  60:24 61:9 98:11
  98:14 99:16
  113:20
sets 55:16,20 56:6
  56:13,16,17,18
setting 59:13 111:4
seven 52:11,12,13
  92:9,11
Seventh 6:9 7:3
She'll 16:8
shined 100:11
ship 13:13 71:20,20
short 28:3
shorthand 113:4,11
showing 112:13
shut 97:1,2 100:21
  101:9
SHX 1:8
Sic 28:8
side 22:15,16 44:3
  44:3 45:22 48:3,5
  54:25 95:16
sides 13:3,4
signal 73:25 74:4
signaled 105:19
Signed 112:20
signing 111:17
silly 79:3,6
simple 54:12
since 6:8 24:11
  30:16 55:11 64:11
  67:1
sister 33:4
sit 21:2 71:3 88:24
  88:24 89:1,18,18
  89:19,19 90:2,22
sitting 53:3 64:8
situation 47:10
size 12:24
skiff 37:4,11,16
  38:1,2,3,4,5,16
  43:6,7,9,12,15,16
  44:6,16 53:24
  54:13 55:1 57:13

57:16,20,21 59:13
61:3,6,9,15,16,19
61:22 62:1,1,3,4,5
62:15,22 63:4,22
66:5,12,12 68:3,5
69:3 71:18,19,22
72:9 73:15 74:9
74:10,18,19 75:12
76:3,5,6 77:3,4,4
79:24 80:1,4,10
81:6,10,10,11,15
81:16,23,25 82:3
82:19,20 84:1,24
86:1 92:14,15,18
92:21,23,25 93:4
93:5,9 95:16
96:13,15 101:16
102:2,8,9,10,11
102:25 103:8,18
103:25 104:1,6,10
104:17,19 105:14
110:9,14,17,17
skiffman 36:23
  37:3,7 38:9,9,10
  38:11,11,14,17
  39:3,9,12,15,16
  39:17,21,24 40:2
  40:5,7,7,8,22,25
  41:5,6,7,11,11,12
  41:19,20 42:5,8
  42:14,18 43:6
  55:4,6,8,11,13,16
  55:20 56:2,3 57:3
  57:3,5,23 59:25
  60:3,14,25 61:1
  61:11,20 62:8,12
  62:14,15,21 66:5
  66:11 68:2,3 69:3
  73:12,14 74:9,18
  75:11 76:1 79:23
  80:9 92:13 95:19
  106:24 107:12
skiffs 43:4 44:6
skip 63:19
skipper 37:9,10,11
slightest 64:5
sling 50:7,9
small 12:25 37:5
  44:13,15 96:16
some 11:3 23:13
  35:21 36:14 39:15
  42:15 58:11 64:22
  69:25,25 70:3,20
  75:25 76:20 80:8
  80:24 81:3 82:14

85:24 97:13 110:16,25
**somebody** 14:14
**someone** 66:13 68:4 82:10
**something** 35:10 40:20 45:7 47:7 62:9 64:5 70:21 72:5 78:19 93:18 93:18,25 111:5
**sometime** 59:10
**sometimes** 18:14 31:14 34:6 39:23 62:15,19 107:20
**somewhere** 76:8 103:11
**sorry** 5:21 7:7 9:1 14:25 25:2 37:21 68:2 73:12 85:21 91:5 92:17 97:5
**sort** 64:6
**sorts** 62:18
**source** 24:11
**speak** 5:13 15:2,6 67:2,3 94:12
**speakers** 107:25
**speaking** 70:16 72:1 93:23
**speaks** 68:13 69:25 78:3
**speculation** 56:8 57:6 58:10 86:16 89:22 91:8 99:25 100:7
**speed** 44:23,24 45:10,17,20 46:6 49:4,9,13,17,18 49:20,22,24 50:5 50:6,11,23,25 51:6,14 83:22,23 84:23 87:8,12,17 88:9,14,25 89:2,5 90:3,20,23 91:6 92:15,19,21,24 93:1,2,11 102:6 104:12 109:24 110:6,7,9,11,13 112:13
**spell** 28:11 40:12 40:13 48:18,20
**spoke** 11:12 27:3
**stairs** 48:11,14,16 51:23 53:6
**stand** 22:17,22 23:12,16,21 54:4

**97:10**
**standing** 22:20 23:2,5,18,19 63:4 93:5 101:22,24 102:3,5
**stands** 71:8
**start** 7:11 21:7 22:5 22:10,14 34:23 35:9 36:16 42:16 95:16 98:2,2,16 98:20,24 99:4 111:9
**started** 8:7,9 28:19 37:16 38:22 41:20 43:16 45:18 55:12 93:17 98:8
**starting** 21:14
**starts** 22:1,8 42:20
**state** 4:8 24:5 112:22 113:1
**States** 1:3 17:22 20:9 23:23 24:1,2 24:3,5,12 27:24 28:1
**stay** 16:20 17:1 19:19 27:25 30:22 33:13,14,15,15 47:15,16
**stayed** 27:19 30:7 32:24 33:1
**staying** 8:2 12:8,8 13:17 14:23 16:17 20:9 24:6,9 30:8,9 33:4
**step** 63:7,22 66:14 68:5 69:3 73:15 74:9,18 75:12 76:6 77:3 80:11 81:13,14,18
**stepped** 57:16 76:5 101:6
**stepping** 62:21 76:2 82:4
**steps** 51:25,25 52:3 52:10,12,13,20 53:12 59:14,16 60:6,16,18,23 66:5 101:18
**still** 12:22 13:21 14:21 16:10 23:19 32:16 33:1,22 53:2,3 54:18 71:25 101:20 110:25
**Stipulate** 111:11

**stop** 6:23 40:2 72:21 75:3 97:13 100:19 101:7
**stopped** 100:25
**storage** 46:2
**story** 79:19
**straight** 20:22 21:3 21:3,10 81:4 101:22 102:3
**straighten** 69:17
**street** 4:12 21:25,25 22:3
**strength** 34:10,17 35:2
**strike** 51:23 73:13
**string** 50:9
**studying** 6:24
**stuff** 37:24,25
**suggestion** 64:6
**Suite** 2:3
**summer** 15:22,23
**sunlight** 97:14
**supply** 25:2
**support** 30:25 31:9 36:20
**supported** 8:8,16
**supporting** 8:5,6 8:11
**supposed** 15:6 67:12
**sure** 61:12 82:11 90:1 93:20
**surface** 21:19
**suspicious** 61:13
**swear** 112:17
**sworn** 4:4,6 113:7
**symptoms** 110:25

**T**

**T** 3:4
**TACKLE** 1:10
**take** 21:13 24:19 28:3 42:18 48:9 61:1 63:10 84:23 96:1 105:3 110:9 110:20
**taken** 23:14 113:9
**takes** 53:5
**taking** 24:17
**talk** 11:15 43:3 62:18,19 78:19 93:12 94:6,18 105:10 110:5,10
**talked** 24:8 70:5 94:15,20
**talking** 13:2 14:4

32:5 33:18 41:8 41:21 44:6 46:1 53:5 62:12,16 67:6 73:3,3,4 78:2 111:20
**tape** 90:17
**tapping** 91:1
**taught** 5:4,11 7:3
**teach** 5:8
**teachers** 5:6,8,10
**telephone** 25:10
**tell** 14:14 26:25 54:8 59:1 62:9 65:7,10,22 66:13 68:4 79:18 84:24 88:5 92:16 105:7 105:11,13 106:24
**telling** 64:14 65:17
**tells** 106:3
**ten** 15:12
**tenth** 6:18,20
**term** 56:17 82:8,10
**testify** 113:7
**testimony** 63:25,25 84:3 89:8 90:6,14 101:2 102:20 103:20 104:4,22 104:24
**Thank** 83:8 88:21 88:22
**their** 28:7 32:18,25 113:18
**thing** 50:3 69:18 71:8 105:18 111:8
**things** 13:4 21:14 21:17 42:13 47:23 62:18 70:17 72:19 76:20 105:11
**think** 15:3 22:25 36:11,14 38:21 44:3 61:7 65:14 67:16 70:11 78:18 79:7,8 80:22 105:7 106:4 112:3 112:7
**thought** 23:1 29:19 32:10 56:10 60:11 71:9,12 107:6
**Thousands** 57:18
**three** 10:20 12:12 12:14 25:14,15 26:14 39:19,21,23 40:1,6 60:5,11 64:17 97:10
**through** 4:4,25

9:14 23:8 71:1,10 78:4 81:22 84:10 89:14 91:13 96:7 104:14 108:10 110:4 111:21 113:11
**throw** 57:20
**time** 8:4 10:18 12:16 13:8 14:5,7 14:18 18:19 19:1 20:23 21:16 23:25 24:3 29:25 35:5 36:22 37:2 38:13 40:4 41:21 42:10 43:5,10 45:15 46:8,15,15 50:2 50:12,20 51:3,7,8 51:12,17 52:4,24 53:22 55:2,3,15 56:4 57:19,21,22 58:19 60:7 61:11 63:9,10,11 64:19 64:20 65:2 67:9 69:3 70:1 72:8 74:5 76:11,14,17 76:17,21 79:25 80:11,14,17,25 83:5,14 84:15,21 84:22,23 91:20,25 92:13,17 93:21 94:14,15,20 95:21 96:1,19,20,25 97:2,7,14,21,24 98:2,8 99:3 100:5 100:10,20 101:3 101:21,24 103:12 104:9,12 107:11 107:15 109:20,21 110:5 111:14 113:9
**timed** 83:25
**times** 38:21 56:1 57:12,15,18 58:11 64:17 72:8 107:21
**timing** 27:5 84:12
**tired** 12:3 13:9 84:8
**title** 10:25 11:1
**today** 71:12 111:4 112:8
**together** 29:21 62:3
**told** 9:13 22:21 36:16 61:18 79:15 107:11 109:14,17 109:22
**tomorrow** 69:13,15

**top** 48:4 53:6 87:9
88:15 89:6 90:3
90:10,12 92:23,24
93:5 102:25 103:6
103:7,9
**total** 16:13
**totally** 67:15 91:2
**track** 34:18,22
**training** 6:7 9:14
**transcribed** 113:11
**transcript** 70:23
71:1 111:7,14,17
112:4 113:13
**transcription**
113:12
**transfer** 79:24,25
81:6,10,13,15
96:2,18,21,23
105:24 106:3,4
109:25 110:13
**transferred** 57:12
**transferring** 80:10
81:16 82:4,17
106:11
**translate** 52:21
66:1,18 67:5,10
68:24 72:25 73:4
74:2,13 75:7
77:10 82:24 85:3
85:10 93:16 94:1
108:12
**translated** 52:23
71:12 72:13,13
78:25 79:1,2
**translates** 67:11
73:1
**translating** 15:3,7
78:9,10
**translation** 61:7
64:9,9 65:1 66:25
67:1,17 72:6
80:18 93:22
**translations** 70:14
**translator** 67:5,10
67:11,13 72:2,17
72:21,25 73:1
77:24 85:11
**translator's** 37:4
**treat** 42:22
**tried** 75:13 96:19
**trip** 55:11,14 56:7
56:14
**trips** 29:7 30:20
31:12
**true** 15:13 27:7

103:24 104:16
112:19 113:13
**truth** 113:7,7,8
**try** 22:15 50:5
51:24 68:1 69:23
70:18 72:24 73:2
74:18 75:4 76:6
78:14 79:16,21,25
80:11 88:3,13
94:2,17 96:4 97:5
97:5 104:16
105:12
**trying** 6:12 47:22
75:12 78:24 80:21
82:8,10 85:10
101:21 102:10
103:12
**Tuesday** 69:15
110:24
**tuna** 36:23 57:13
**turn** 22:14 96:20
97:1 99:11
**turned** 96:13
107:15
**turns** 96:17
**two** 5:3 9:17 13:1,3
13:3 14:24,25
15:17,19,24,25
16:12,18 21:2
26:23 31:17,22
32:3,10,18,19,24
32:25 33:1,13,14
38:7,8 41:3 45:7
47:14 49:10,11
50:7,9 70:17
93:20 97:10 111:5
**type** 9:9 34:8,24
35:12 36:14 42:13
44:2
**types** 43:19 44:2

---
U
---

**U** 10:9
**Uh-huh** 48:12 49:8
**uncomfortable**
21:17
**under** 82:14 111:12
112:17
**underneath** 99:14
**understand** 5:10
27:7 35:7 41:10
44:1 45:13 54:6
58:2,25 59:1,3
61:21 63:17 64:2
64:5,11,11,13,14
65:8,13,15,20,20

65:22 67:7 68:22
69:11 72:14 73:6
73:7 75:4,8 79:7
82:7,7 112:1
**understanding**
49:14 70:16
111:24
**understands** 69:24
**understood** 44:4
70:13
**United** 1:3 17:22
20:9 23:23 24:1,2
24:3,5,12 27:24
28:1
**unless** 105:14,14
112:5
**unloaded** 53:3
**unsafe** 106:4,12
107:7
**until** 4:20 8:9,13,16
14:23 15:16,17
20:10,17 28:21
29:13,13 30:4,4,5
35:22,22 40:4
46:15 82:20
108:14
**use** 5:6 41:22 42:7
45:8 60:18 81:18
81:19 82:8,10,12
107:25 110:7,10
110:13,16
**used** 35:3 38:1,16
42:3,13 44:17,24
45:6,18 51:15
59:15 60,6,16
73:9 82:13 109:24
**using** 41:24 93:25
105:19
**usually** 31:12 36:7
41:8 49:24 53:15
53:19 54:25 55:1
55:1 57:20,23
58:12 59:14,15,17
59:19 60:1,5
61:10 62:5,8 63:5
66:4 68:4 76:2
84:15,16 86:15
98:1,18,20 99:13
110:5

---
V
---

**vague** 35:19 42:9,9
42:23 43:24 46:8
50:1,12,20 51:8
51:11,17 52:4
53:13 54:5 58:1

58:17 59:7 60:7
62:23 63:13 66:7
66:15 68:6 69:6
74:12,22 76:23
80:2 82:22 83:11
84:19 86:16 87:14
88:16 89:9 90:15
91:19 92:7 95:3
98:12 99:1 101:23
102:4,13 103:1,13
104:5,20 105:16
106:13,21 107:3,8
108:6 109:10,16
110:1
**valid** 78:6
**very** 20:22,22 21:1
36:3 54:12 72:7
87:12 106:23
**vessel** 3:6
**vessels** 44:3
**Vicente** 40:17,20
40:22 41:1
**view** 46:19
**visit** 31:19 32:24
**volume** 1:15 111:6
**vs** 1:8

---
W
---

**wait** 21:7 34:22
66:13,19 67:22
68:4 73:18 77:9
80:15 82:20
106:20
**waiting** 20:12,15
20:17
**waitress** 31:7
**wake** 99:2,3
**walk** 20:22,25 21:1
21:3,3,6,9,10,12
21:18,21,24,25
22:3,7,11,13,15
22:23 23:16,20
**walking** 22:20 23:3
23:5
**wallet** 18:12,13
**walls** 9:11
**want** 19:9,19 20:1
20:20 24:25 33:13
34:21,24 35:13
36:13 42:5 47:6
48:3 65:20 70:8
70:22 71:13 74:4
79:6 81:18 85:11
85:18,25,25 93:20
108:12 111:8,17
**wanted** 16:20,22

75:20,20 94:12
106:20
**wants** 33:14 37:15
67:16,23 69:7
70:21 71:3
**Washington** 2:9
**wasn't** 19:12 27:5
44:17 73:24
102:21 104:13
**watch** 80:17
**water** 52:3,14,17
52:19 53:2,9,9,11
53:15,15,17,19,21
54:3,14,18,19
58:12 62:3 103:18
104:19
**wave** 74:10,11,20
74:20 83:8,9 92:8
93:4 97:4 102:9
**waves** 76:7 80:1,9
84:1 92:3,6,11,16
92:20,22 93:9
95:21 96:13,13
103:17,25 104:2
104:18 105:2
**wave's** 83:4
**way** 23:3 47:21
51:18,21 57:9
78:23,24 80:24
82:6 93:23 104:16
110:16 113:16
**ways** 75:13 82:16
**weather** 58:24 97:4
**week** 9:22 10:23,24
110:24,24 111:16
**weight** 35:3 36:5
**weights** 22:15 35:9
**well** 15:15 34:16
42:22 49:24 56:3
56:9,19 70:8,25
72:14 89:18
102:17
**went** 4:24 6:1 10:5
13:13,16,24 14:2
27:4,16,21 29:2
29:12,21 31:8
**were** 4:16 5:3,10,13
6:1,3 7:3 8:3,5,11
9:20 10:5,6 12:16
12:24,25 13:10,21
14:23 27:1,9,13
29:3,15,21 32:18
32:23 36:2,5,22
37:2 38:13,17
39:3,11,14,21

40:4,25 41:11
42:3,7,13,17 43:4
44:13,16,19 46:14
47:23,25 51:7,25
52:3,10 57:3 58:5
58:5 59:6 60:12
64:25 70:14,14,15
71:12,12 73:23
74:17 75:11,12,13
76:1 79:23,24
81:16 82:19 88:10
91:18 92:1,6,11
93:5 94:5 95:20
100:18,24 101:22
103:12,17,25
104:18 112:4
**West** 2:3
**Western** 30:18
**we'll** 56:11 64:18
74:6 79:12 80:20
111:16 112:12
**we're** 36:11 44:6
53:15 54:25 64:8
64:10 70:25
**wheel** 48:2 59:18
**wheelhouse** 48:1
**whereof** 113:20
**while** 61:2
**whole** 82:16 113:7
**wife** 8:6 13:23,25
14:3,8 28:21 29:2
29:6,18,19 30:8
30:11 31:8 32:17
**WILLIAM** 2:6
**Willy** 25:16 26:3,20
**winch** 48:25 49:2,2
**Windes** 2:10 3:3
5:25 6:15 9:3
11:11,20 15:8,9
17:5 18:22,24
19:15 21:23 23:7
23:9 24:24 25:20
26:10 27:6,8 28:5
32:1 33:24 35:11
35:24 37:1,4,7,10
37:22 38:23 39:1
40:19,21 41:17
42:12,25 43:8,25
44:5 45:5,16 46:3
46:5,11,23 47:9
47:12,18 48:5,8
48:17,21 49:16,23
50:4,14,22 51:10
51:13,19 52:8,18
53:1,4,7,20 54:1,2

54:8,11,19,22
55:19,23,25 56:10
56:12,21 57:8
58:4,14,21 59:4,9
59:24 60:10 62:25
63:2,20 64:4,17
64:25 65:6,14
66:3,10,19,24
67:9,15,19,25
68:9,17,24 69:1
69:12,19 70:5,8
70:19 71:2,11,15
72:19 73:3,11,19
73:24 74:7,16
75:3,10,22,24
76:13,19,25 77:1
77:16 78:3,14,16
78:22 79:15,21,22
80:7,16,19 81:2,8
81:13,23 82:2,10
82:14,18 83:7,13
83:18,24 84:7,13
85:10,22,23 86:4
86:9,16,19 87:2
87:10,16,22 88:2
88:4,12,19 89:4
89:17,25 90:9,18
91:2,3,16,21,24
92:4,10 94:4,16
95:6,15 96:4,10
97:12 98:10,15,18
98:20,23 99:22
100:2,9 101:4
102:1,7,16,23
103:3,15,23 104:8
104:15,23 105:5
105:22 106:10,18
107:1,5,13 108:9
108:13,17,20,22
108:24 109:7,13
109:19 110:12,20
110:22 111:10,19
112:3,9
**Wintha** 2:12 4:5
**witness** 5:24 6:14
9:2 11:10 19:11
21:21 23:12,15
24:21 25:19 33:22
35:8,21 37:19,21
40:18 42:11,24
45:4,15 46:10,22
48:2,18,19 49:15
50:3,6,21 51:9,18
52:6 53:14 54:20
56:19 57:7 58:3

58:11,18 59:3,8
59:22 60:9 63:1
63:19 64:4 66:2,9
66:17 67:2,12
68:8,9,13,14,17
68:20,25 70:9
71:10,14,22 74:15
74:24 75:17 76:11
76:16,24 79:3
80:4,16 81:5,9,19
81:22,25 83:3,16
83:21 84:5,12,21
85:5 86:7,7,18,25
87:15,20 88:18,24
89:10,16,24 90:7
90:16,22,25 91:10
91:15,20 92:3,8
93:17 94:14 95:5
95:19 96:25 98:8
98:14 99:2,8,20
100:1,8 101:3,24
102:5,14,21 103:2
103:14,21 104:6,9
105:1,18 106:8,15
106:23 107:4,10
108:8 109:5,11,17
110:2,5 112:13
113:6,14,20
**witnesses** 66:22
**woman** 30:9
**women** 33:18
**wonder** 46:18
**wonderful** 69:19
**wood** 11:7
**woods** 10:14
**word** 48:22,23 49:2
50:25 78:25,25,25
79:1 81:18 82:12
93:24
**words** 41:9,12,18
41:21,22,25 42:1
42:16,21,21 43:3
48:23 87:3 106:9
107:23 109:6,11
**work** 7:10,12,14,15
7:25 9:4,10,16
10:17 11:6 12:10
13:10,15,16,23,24
14:2 19:5,12,12
19:13,14,16,20
26:4 28:22 30:21
31:4 34:8,9,13,19
35:13,25 36:15
39:15,17 41:20
42:15 44:2 62:2

69:23 109:23
110:25 111:4
**worked** 7:23 12:14
28:24 29:12 41:2
43:9,14,19 44:13
55:8,14
**worker** 105:9
**workers** 11:13,14
**working** 7:11 12:3
28:19 29:25 30:1
31:5,7 35:9 44:3,3
84:22 98:9
**works** 42:21 44:6
61:18 67:18 70:18
72:12 109:12
**worry** 68:18,22
89:11
**worse** 67:1
**wouldn't** 82:15
104:10,11
**wrap** 98:4
**write** 47:5 48:14,22
48:22 49:9 50:25
72:4
**write/draw** 46:22
**writing** 72:2
**written** 48:23

---
**X**
---
**X** 3:1,4

---
**Y**
---
**yacht** 13:5
**yachts** 12:25
**Yeah** 81:13
**year** 5:23 6:13,17
9:2 10:3 12:17
13:11,11,15 14:16
15:17,21 16:19
23:23 26:25 27:14
27:20 41:4
**years** 4:21 6:16
9:17 10:19,20,20
11:4 14:24 15:13
16:4,4,8,9 19:12
35:22,25 36:12
39:2,10,19,21,23
40:1,6 41:3 57:15
81:3
**yell** 107:11,23,25
**youngest** 15:25

---
**S**
---
**$1.50** 9:19,20
**$3.50** 10:22
**$600** 25:8,12 34:3

---
**0**
---
**01-08403** 1:8

---
**1**
---
**1** 3:6 4:12 54:9,10
**10** 53:23 58:23 59:6
**10th** 113:21
**109** 110:4
**11** 16:6
**11:30** 4:2
**112** 3:7
**12** 4:21 16:5 57:15
104:14
**13** 4:21 5:15 16:3,4
**15** 16:5
**16** 16:2,4,5
**17** 23:8
**18** 6:2 16:8,9
**1976** 7:8,12
**1979** 7:6
**1983** 7:6,8,12,19
8:19
**1987** 7:22,23 8:13
8:16,25
**1989** 5:24 10:2
**1990** 38:16,19 39:3
**1991** 28:21,22
29:14,20 31:8
38:15
**1992** 29:24 30:3
**1994** 38:16 39:3,14
39:20 40:4
**1996** 30:19
**1997** 30:19 39:20
40:8
**1998** 30:19
**1999** 29:14 30:3

---
**2**
---
**2** 3:7 54:23 84:10
108:10 112:12,15
**20** 12:25 22:19,20
23:3,5,20,20,21
23:21 77:4 81:3
91:23
**200** 36:7
**2000** 30:5
**2002** 1:17 4:1
112:21 113:21
**2090** 2:3
**24** 1:17 4:1 23:8
110:4
**25** 84:9 96:6 110:4
**2500** 2:8

**3**

3 86:13,13 89:5,21
  96:7
3,000 31:15
3.50 12:22
30 21:8 93:12,14
300 36:7
32nd 4:12
3735 4:12

**4**

4 3:3
4:00 97:22,23,24
  98:1,16,21 99:3
4:24 112:16
4:30 99:13
40 9:23 10:24

**5**

5 89:14 108:10
5:30 99:23 100:1
501 2:3
54 3:6
5582 1:18 113:5,25

**6**

6 18:18 19:1 33:17
  89:14 91:13
600 25:5,6

**7**

7 91:13
70 6:11
701 2:9

**8**

80 35:22,25
80s 35:22
83 6:14
84 7:20 37:19,20
  84:9
85 84:10

**9**

9 104:14
9th 6:4
90 6:11 37:19 38:23
91 14:1,9,20 15:14
  29:12,21 38:22,23
92101 2:4
94 37:21 39:16 40:6
95 40:6 96:6
96 30:16 40:6 96:7
98104-7051 2:9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

```
MEL DeBRUM, AN INDIVIDUAL,      )
                                )
          PLAINTIFF,            )
                                )
vs.                            ) CASE No.
                                ) 01-08403 DDP (SHX)
M & F FISHING COMPANY, INC., A )
CORPORATION, IN PERSONAM, AND  )
F/V KOORALE, HER ENGINES,      )
TACKLE, APPAREL, FURNITURE, AND )
APPURTENANCES, IN REM,         )
                                )
          DEFENDANTS.          )
                                )
AND RELATED CROSS-ACTION.       )
```

DEPOSITION OF MEL DeBRUM
VOLUME I
SAN DIEGO, CALIFORNIA
MAY 24, 2002

BONNIE G. BREEN, CSR, INC.
Certificate No. 5582

---

APPEARANCES

FOR THE PLAINTIFF:
   BANNING, MICKLOW, BULL & LOPEZ
   501 West Broadway, Suite 2090
   San Diego, California 92101
   BY: JOHN LOPEZ, ESQ.
    - And -
   BY: WILLIAM BANNING, ESQ.

FOR THE DEFENDANT:
   LeGROS, BUCHANAN & PAUL
   2500 Columbia Center
   701 Fifth Avenue
   Seattle, Washington 98104-7051

   BY: ROBERT N. WINDES, ESQ.

THE INTERPRETER:

   WINTHA JORAN

---

INDEX

EXAMINATION BY           PAGE
   Mr. Windes        4

EXHIBITS

NUMBER     DESCRIPTION      PAGE
1       Drawing of fishing vessel    54
2       Drawing          112

---

SAN DIEGO, CALIFORNIA, MAY 24, 2002
   11:30 A.M.
   MEL DeBRUM,
having been first duly sworn through the interpreter, Wintha Joran having been previously duly sworn to act as English-Marshallese interpreter.

EXAMINATION BY MR. DeBRUM:

Q  Would you please state your full name for the record.

A  Mel DeBrum.

Q  What is your address now?

A  3735 32nd Street, Apartment Number 1.

Q  I notice that you answered that question in English. How fluent are you in English?

A  Not really good.

Q  What — where were you born, Mr. DeBrum?

A  Ebeye Island.

Q  How long did you live there?

A  He was born there and he grew up there.

Q  Until what age?

A  When I left, 12 or 13 years.

Q  And what school did you go to or what schools did you go to?

A  He went to elementary school in Ebeye, one through eight grades in Ebeye.

**Page 5**

1   Q   Then where did you go to school?
2   A   Majuro, Marshall Island.
3   Q   And those two schools, what language were you
4 taught in?
5   A   Marshallese language and also English.
6   Q   Different teachers use different languages?
7   A   Yes.
8   Q   Did most of the teachers teach you in English?
9   A   Yes.
10   Q   And were you able to understand your teachers
11 that taught you in English?
12   A   Yes, little bit.
13   Q   Were you able to speak back to them in English?
14   A   Little bit.
15   Q   Did you leave Ebeye island at age 13?
16   A   Yes.
17   Q   Where did you live next?
18   A   Majuro.
19   Q   How long did you live in Majuro?
20   A   For--
21      THE INTERPRETER: I'm sorry. I'm asking. He
22 said final. He's in San Diego. I'm asking a question
23 what year.
24      THE WITNESS: 1989.
25 BY MR. WINDES:

**Page 6**

1   Q   How old were you when you last went to school?
2   A   About 18.
3   Q   What grade were you in?
4   A   9th grade.
5   Q   Why did you leave school then?
6   A   Drop out.
7   Q   Have you had any other education or training
8 since then?
9   A   Seventh Day Adventist School.
10   Q   When did you attend that school?
11   A   '90. '70.
12      THE INTERPRETER: He's trying to figure out
13 which year he attend that school.
14      THE WITNESS: '83.
15 BY MR. WINDES:
16   Q   How many years did you attend that school?
17   A   One year.
18   Q   Was that tenth grade?
19   A   Yes.
20   Q   Did you finish tenth grade?
21   A   No.
22   Q   Why did you leave school there?
23   A   Couldn't make it. I mean stop interesting and
24 studying school. He got married.
25   Q   The reason that you left school was that you

**Page 7**

1 got married?
2   A   Yes.
3   Q   And were you taught in English at the Seventh
4 Day?
5   A   Yes.
6   Q   What did you do between 1979 and 1983? I'm
7 sorry. Let me ask the question again.
8      What did you do between 1976 and 1983?
9   A   He was just hanging around.
10   Q   Did you work?
11   A   When I got kids, I start working.
12   Q   But between 1976 and 1983, you didn't work or
13 go to school?
14   A   Yes, I did not work.
15   Q   Yes, you did not work?
16   A   Yes.
17   Q   And did you not go to school?
18   A   Yes, did not go to school.
19   Q   Okay. And then you got married in 1983?
20   A   '84, he got married.
21   Q   When did you have your first child?
22   A   My oldest one is -- was born 1987.
23   Q   So before 1987, you never worked at any job; is
24 that right?
25   A   Yes, no work.

**Page 8**

1   Q   How did you pay for your living?
2   A   I was staying with my brothers.
3   Q   And your brothers were giving you money at that
4 time?
5   A   They were supporting us, his family. When they
6 supporting us when I got married and when my wife got
7 pregnant and I started to looking for a job.
8   Q   Are you saying that your parents supported you
9 until you started looking for a job after your first child
10 was born?
11   A   They were supporting us before I was going to
12 have my child, and then I was looking for a job after that.
13   Q   Okay. But until 1987, you never had a job,
14 right?
15   A   No jobs.
16   Q   And until 1987, your parents supported you; is
17 is that right?
18   A   Yes.
19   Q   After 1983, did you ever have any further
20 education or schooling?
21   A   No.
22   Q   What was the first job that you had?
23   A   Carpenter building the Majuro, Marshall Island
24 Hospital.
25   Q   And that was in 1987?

```
 1        THE INTERPRETER: Sorry. I made a mistake.
 2        THE WITNESS: Couldn't remember what year.
 3   BY MR. WINDES:
 4    Q    And what company did you work for?
 5    A    CIP.
 6    Q    And that was the company that was building the
 7   hospital?
 8    A    Yes.
 9    Q    What type of carpentry did you do there?
10    A    With all kind of work, such as plumbing,
11   building the walls and so forth.
12    Q    How did you learn to be a carpenter?
13    A    When they hire us, they just told us what to do.
14    Q    Did they put you through a training program?
15    A    No.
16    Q    How long did you work at CIP?
17    A    Two years plus.
18    Q    And when you left there, what was your pay?
19    A    Those days, we get dollar -- $1.50 an hour.
20    Q    So you were paid there it was $1.50 an hour?
21    A    Yes.
22    Q    How many hours a week?
23    A    40 hours.
24    Q    Why did you leave CIP?
25    A    Hospital was finished and the contract was
                                                          9
```

```
 1   finished.
 2    Q    And that was in 1989?
 3    A    I couldn't remember the year.
 4    Q    What was the next job you had?
 5    A    I went to another company. They were making
 6   fiberglass. They were building boats.
 7    Q    What was the name of the company?
 8    A    A.U. Fishing Company.
 9    Q    Is that the letter A and the letter U?
10    A    Yes.
11    Q    What was your job there?
12    A    Building boats. Building boats.
13    Q    What was your job in building the boats?
14    A    Cutting woods and measure the whatever parts
15   they needed for the boats and they put fiberglass on the
16   boats.
17    Q    And how long did you work at A.U.?
18    A    For long time.
19    Q    For how many years?
20    A    Maybe four years, three years.
21    Q    What was your pay when you left?
22    A    It was big. It was $3.50.
23    Q    How many hours a week?
24    A    40 hours a week.
25    Q    What was your title when you left the company?
                                                         10
```

```
 1    A    In the Marshall Island, they don't have title.
 2    Q    What was your job when you left A.U.?
 3    A    He said when he left that company, he took some
 4   years to rest, but that's not the questions.
 5        Carpenter.
 6    Q    And did you work with both fiberglass and
 7   wood?
 8        THE INTERPRETER: Let me repeat my question
 9   again.
10        THE WITNESS: Both.
11   BY MR. WINDES:
12    Q    And what was the language that was spoke with
13   that company among the workers?
14    A    Most of the workers are all Marshallese, and we
15   talk our language, Marshallese. But only our boss is the
16   English businessman.
17    Q    Who was your boss at A.U.?
18        THE INTERPRETER: Would you repeat the question
19   again.
20   BY MR. WINDES:
21    Q    Who was your boss at A.U.?
22    A    Jean.
23    Q    J-e-a-n?
24    A    Jim. Jim.
25    Q    And his last name?
                                                         11
```

```
 1    A    Couldn't. No.
 2    Q    Why did you leave A.U. Fishing Company?
 3    A    The reason why I left, I got tired of working
 4   with boats.
 5    Q    So you quit that job?
 6    A    Yes.
 7    Q    And what was your next job?
 8    A    Staying around. Staying around. Hanging
 9   around.
10    Q    How long did you not work after A.U. Fishing
11   Company?
12    A    About three, four months.
13    Q    And then what was your next job?
14    A    After three months, I came back and worked at
15   the same place, same company.
16    Q    And how long were you there that time?
17    A    About a year.
18    Q    Was Jim your boss again?
19    A    Yes.
20    Q    Did your job change?
21    A    No. Same one.
22    Q    And your pay was still 3.50 an hour?
23    A    Same.
24    Q    What size boats were you building?
25    A    About 20 feet. We were building small yachts.
                                                         12
```

Two different kind of boats they are building. I don't
know which one he's talking about. They call them
"canamarow." Two sides. They build a boat called two
sides, but it has got things in the middle and almost
looks like a yacht.

Q   Catamaran?
A   Catamaran. There you go.
Q   Okay. Why did you leave A.U. the next time?
A   I get tired and I quit again.
Q   How long were you off work then?
A   Not even close to a year. Less than a year.
Q   What was your next job?
A   Fishing. Said he went to a boat, ship, fishing
boat Koorale, called Koorale.
Q   Why did you not work for the year before that
you went to work on the Koorale?
A   I was staying with family and babysitting these
kids.
Q   Babysitting whose kids?
A   His kids.
Q   And were you still married then?
A   Yes.
Q   Does your wife work?
A   She went to work, and I was resting.
Q   When did you divorce your wife?

13

MR. BANNING: Just for the record, when you say
he lived with him, you have got to speak in the first
person when you are translating. I think what you said
was they lived with him and what you meant was.
THE INTERPRETER: Him.
MR. BANNING: You are supposed to speak in the
first person because you are translating.
MR. WINDES: Let me ask it again.
BY MR. WINDES:
Q   Where does your ex-wife live now?
A   Guam.
Q   And she has lived in Guam for approximately ten
years. Is that true?
A   That is correct. When she left, it was '91.
Q   And all of your children lived there, as well,
in Guam with your ex-wife until now or not?
A   Yes. Until last year, two of them came, lived
with me.
Q   And when exactly did two of them come to live
with you?
A   Last year.
Q   I know. But last summer or?
A   Last summer, yes.
Q   And which two children came then?
A   Two youngest one.

15

A   '91.
Q   After you went to work on the Koorale, did you
live with your wife when you came back to port?
A   Are you talking about during our marriage or?
Q   Any time.
A   Yes.
Q   When is the last time you lived with your
wife?
A   '91.
Q   Is she remarried?
A   Yes.
Q   When did she remarry?
A   I did not notice. When she left to Guam, and
after a couple months, somebody tell him that she's gotten
married.
Q   Do you know what year she got married?
A   I have no idea.
Q   When is the last time you lived with your
children?
A   '91.
Q   And so your children still live with your
ex-wife?
A   Yes. They were staying with her until, like
two years ago, they came and lived with him. Oh, I'm
sorry. Two of them came and lived with him right now.

14

Q   How old are those children now?
A   If I can remember, if I can remember, one is 16
and the other one is 13.
Q   One is 16 years old and one is 13 years old?
A   One might be 15 or 16 or the other one is 12 or
11.
Q   How old are your other children?
A   My oldest daughter is 18 years old. She'll be
18 years old this coming October.
Q   And how many children still live with your
ex-wife?
A   Two.
Q   And you have a total of five children?
A   Yes.
Q   And where is the other child that is not living
with either you or your ex-wife?
A   Different mom. Staying with a different mother.
Q   Why did two children come to live with you last
year?
A   They wanted to come and stay with me.
Q   That's the only reason that they came, was that
they decided they wanted to live with you?
A   Yes.
Q   What is your citizenship, what country?
A   I'm Marshallese, from the Marshall Island.

16

Q   How is it that you can stay in this country as
long as you have?
      MR. BANNING: Objection; calls for a legal
conclusion.
BY MR. WINDES:
Q   I will ask a different question. What
documents do you have to live in this country?
A   I'm not really know about the politics. I
don't know nothing about the paper and documents.
Q   Who helped you come to this country? Did a
lawyer help you?
A   Can you repeat your question again.
Q   When did you first come to this country to live?
A   I came here last August.
Q   And did Mr. Banning or Mr. Lopez help you come
here?
A   They brought me here and make them as my
lawyers.
Q   Do you have any document on you that says that
you can be in this country?
A   Like I said, I don't know really nothing about
documents and paperworks to come to the United States.
Q   Do you have any documents that say that you can
be here?
A   I came with my passport, but I just don't know

17

again in better form this time, during the last 6 months,
have you ever carried with you any identification other
than your Marshall Island passport?
A   Nothing, just passport.
Q   Do you know if you are allowed to work in this
country?
      MR. BANNING: Objection; calls for a legal
conclusion.
      THE INTERPRETER: You want me to ask him
again?
      THE WITNESS: I don't know, because I haven't
work here last couple years ago, I wasn't work here.
He said I don't know if I'm allowed to work
here because I did not work in the past in this country.
BY MR. WINDES:
Q   Have you looked for work in this country?
A   No.
Q   Why not?
A   Because I want to go home, stay with my kids.
Q   So the reason that you haven't looked for work
is that you plan on returning home?
A   Yes.
Q   Okay.
A   There is no other place like the Marshall
Island.

19

nothing about it.
Q   Do you have a drivers license?
A   No.
Q   Do you have any documentation from the
government with you right now?
A   No.
Q   Do you have any identification with you?
A   Only my passport.
Q   Do you have your passport here?
A   I don't have it right now.
Q   So you have no identification on you in your
wallet or anywhere on you now?
A   Nothing. I don't have anything in my wallet.
Q   Do you sometimes carry identification other
than the passport?
A   I don't anything except my passport.
Q   That's not the question. The question is: In
the last 6 months, for example, have you carried any
identification with you at any time other than your
Malaysian passport?
      MR. LOPEZ: Marshall Island.
      MR. WINDES: Excuse me.
      (Discussion off the record.)
BY MR. WINDES:
Q   I will ask it again. So asking the question

18

Q   So you want to return to the Marshall Islands?
A   Yes.
Q   When do you plan on returning?
A   If everything is complete, then I will go home.
Q   When you say complete, what are you referring
to?
A   When I said complete, I mean medical care and
fix his amputation leg.
Q   Do you plan on staying in the United States
until the lawsuit is finished?
A   No.
Q   What exactly are you waiting for medically to
happen before you go home?
A   Can you repeat that question again.
Q   Yes. Exactly what are you waiting to happen
before you return to the Marshall Islands?
A   I'm waiting until they finish my leg.
Q   What more do you expect them to do to your leg
so that you can go home?
A   My leg is too heavy, and I want to fix it right
exactly where I can compare it to the other leg. The
other one is very, very heavy, and he can't walk straight
all the time and it's painful.
Q   The prosthesis is the heavy —
A   Yes. It is five pounds, and if I walk long

20

1  distance, it's very painful, and I can't -- if I walk long
2  distance, I have to sit down for minutes or two, not even
3  half hour, can't walk straight. He cannot walk straight
4  half hour.
5  Q   For a half hour?
6  A   For a half hour, he cannot walk half hour. And
7  when the pains start getting into my leg, I have to wait
8  about like 30 minutes.
9  Q   So you can walk about a half an hour without a
10  problem and then you can't walk straight; is that right?
11  A   No, I cannot.
12  Q   How far can you walk without a problem?
13  A   He said: My legs at night when they take the
14  things off and it starting getting pain every night and
15  every morning when I put it on, it's getting -- he said
16  he's getting a lot of problem with every time he put the
17  things on, he getting a lot of pains and uncomfortable.
18  Q   How far can you walk without a problem?
19  MR. BANNING: You are assuming a flat surface,
20  you know.
21  THE WITNESS: I cannot walk half a mile or a mile
22  because it's painful.
23  BY MR. WINDES:
24  Q   But you can walk about a half a mile on the
25  street. Can you walk a half a mile on the street before

21

1  it starts being a problem?
2  A   No.
3  Q   How far can you walk on the street before it is
4  a problem?
5  A   About four blocks, then it start getting
6  painful.
7  Q   Okay. You can walk for about four blocks in
8  the city before it starts getting painful?
9  A   Yes, and then I can feel the pain.
10  Q   And when you start to feel the pain, does that
11  change how you walk?
12  A   Yes.
13  Q   How does it change how you walk?
14  A   Start limping. He had to turn it to the other
15  side and then walk, try to get all the weights on the
16  other side.
17  Q   How long can you stand before it becomes a
18  problem?
19  A   About 20 minutes. If I'm not doing anything,
20  just standing there or when I'm walking, about 20 minutes.
21  Q   And has the doctor told you that if you get
22  this new equipment for your leg that you can stand longer
23  and walk longer?
24  A   Yes.
25  MR. BANNING: For the record, I think you

22

1  missed a "not" there. I thought he said, "If I'm not
2  doing anything, just standing there or when I'm not
3  walking, about 20 minutes." And the way I read it is you
4  say: If I'm not doing any -- just doing anything -- just
5  standing there or when I am walking, about 20 minutes.
6  (Discussion off the record.)
7  MR. WINDES: I will ask the question.
8  (Record read line 17 through 24.)
9  BY MR. WINDES:
10  Q   Let me go back on the record and clarify. The
11  question I asked a few minutes ago about how long the
12  witness can stand before it becomes a problem, we are now
13  going to reask because there is some confusion as to
14  whether or not the answer was accurately taken down. So
15  asking the witness again the same question, how long can
16  you walk -- how long can you stand before it becomes a
17  problem?
18  A   If I'm not doing anything but I'm standing up
19  right there and -- if I'm standing still and I'm not doing
20  nothing, about 20 minutes. But if I walk 20 minutes,
21  after 20 minutes, I cannot stand longer than 20 minutes.
22  Q   Okay. You said that you first came to the
23  United States in August of last year; is that right?
24  A   That's right.
25  Q   When is the last time you had been in the

23

1  United States before that?
2  A   I never been here, United States. This is the
3  first time I came to the United States.
4  Q   Have you met with anyone from the government of
5  the United States or the government of the State of
6  California about your staying here?
7  A   No.
8  Q   Have you talked to anyone in the government
9  about your staying here?
10  A   No.
11  Q   Do you receive money from any source since
12  coming to the United States?
13  A   No.
14  Q   How do you pay your rent?
15  A   My attorneys are paying for the rent.
16  Q   How do you pay for your food?
17  A   My attorneys taking care of those, too.
18  Q   How do you -- how do you have your attorneys
19  take care of that?
20  THE INTERPRETER: I guess he missed my point.
21  THE WITNESS: The reason why my attorneys are
22  paying my food and rental, because insurance is not paying
23  for all this.
24  BY MR. WINDES:
25  Q   That's not my question. When you want to eat

24

**Page 25**

1  dinner, how do you get the money to pay for it?
2     A   My attorneys give me supply.  Sorry.  They gave
3  me a money so I can pay for the foods.
4     Q   How much do you get?
5     A   600.
6     Q   You get 600 how often?
7     A   A month.
8     Q   Do you also pay the rent with that $600?
9     A   No.
10    Q   Do you — how do you pay for the telephone in
11 your house?
12    A   Out of the $600.
13    Q   Who lives with you at your home now?
14    A   Myself and three other partners.
15    Q   What are the names of the three other partners?
16    A   One named Cookie, the other one Willy, and the
17 last one is Prince.
18       MR. BANNING:  Prince, P-r-i-n-c-e.
19       THE WITNESS:  Prince.
20 BY MR. WINDES:
21    Q   How did you meet these people?
22    A   Oh, when I come here, Prince was there already.
23    Q   How did you meet Prince?
24    A   When you move into that place, Prince was there
25 already.  That's how he met him.

**Page 26**

1     Q   How did you find this apartment?
2     A   My attorneys.
3     Q   Do your partners, Cookie, Willy and Prince —
4  do they work?
5     A   No.
6     Q   Do they have injuries?
7     A   Yes.
8     Q   Who is the owner of the property?
9        THE INTERPRETER:  Would you repeat that, please.
10 BY MR. WINDES:
11    Q   Who is the owner of the property?
12    A   I don't know.
13    Q   Who do you — you don't pay the rent.
14       Are these other three people clients of your
15 lawyer?
16    A   Yes.
17    Q   And how long has Prince lived there?
18    A   I have no idea, because when I came over there,
19 he was there already.
20    Q   How long has Willy lived there?
21    A   If I can remember, maybe a month.
22    Q   And Cookie, how long has he been there?
23    A   Maybe two months now.
24    Q   When you first came to the country in August of
25 last year, what did you tell immigration about why you

**Page 27**

1  were here?
2        MR. BANNING:  That assumes facts, that he
3  spoke to anyone in immigration.  A month ago, he was in
4  Hawaii.  He went first to Hawaii and then he came over
5  here.  So it wasn't — you got the timing mixed up.
6        MR. WINDES:  When did you — that's maybe
7  true.  I understand what you are saying.
8  BY MR. WINDES:
9     Q   Before you came to San Diego, where were you?
10    A   Hawaii.
11    Q   And where did you live in Hawaii?
12    A   Apartment.
13    Q   And how long were you there in that apartment?
14    A   About a year.  Right after, they amputated his
15 leg.
16    Q   And after your injury, you went to Hawaii,
17 right?
18    A   Yes.
19    Q   Then you stayed there for how long?
20    A   One year.
21    Q   And then the next place that you went was here
22 to San Diego?
23    A   Yes.
24    Q   Did you meet with any United States or Hawaiian
25 or government people in Hawaii about your ability to stay

**Page 28**

1  in the United States?
2     A   No.
3        MR. BANNING:  Can we take a short break.
4        (Recess.)
5  BY MR. WINDES:
6     Q   What are your children that are here — what
7  are their names?
8     A   Frank (Sic.) and Carla.
9     Q   R-a-n-k?
10    A   Ryle.
11    Q   How do you spell —
12    A   R-y-l-e.
13    Q   And the other one is who?
14    A   Carla.
15    Q   And the same last name as you?
16    A   Yes.
17    Q   Are they in school?
18    A   Yes.
19    Q   Now, you said that when you started working on
20 the Koorale, whenever you came back to port, you would go
21 back and live with your wife, right, until 1991?
22    A   In 1991 when I came back to work for Koorale,
23 she left to Guam.
24    Q   And then after that when you worked on the
25 Koorale and you came back to port, where did you live?

Case 1:03-cv-00004     Document 27     Filed 02/21/2003     Page 151 of 234

1    A    Repeat that question again.
2    Q    After your wife went to Guam, where did you
3  live when you were not living on the Koorale?
4    A    Repeat the question again. I missed a little
5  bit of it.
6    Q    After your wife moved to Guam, when you
7  returned from your trips on the Koorale, where did you
8  live?
9    A    Samoa. He lives in Samoa after he got off from
10  Koorale.
11    Q    What's the answer again?
12    A    He said '91, he went back to Koorale and worked
13  until he get his -- until I get my accident.
14    Q    Between 1991 and 1999, where did you live?
15    A    We were -- I was with my family in Majuro.
16    Q    When you say your family, do you mean your
17  parents?
18    A    My wife.
19    Q    I thought you last lived with your wife in
20  1991?
21    A    When we were together in '91 when I went back
22  to Koorale, she left to Guam. That's the end of our
23  relationship.
24    Q    Okay. So where did you live in 1992?
25    A    I'm working with Koorale at that time.

29

1    A    Yes.
2    Q    How much did you pay her?
3    A    I paid for the rent and food and so forth.
4    Q    Did she work?
5    A    Yes, she was working.
6    Q    Doing what?
7    A    Working in the restaurant as a waitress.
8    Q    After 1991 when your wife went to Guam, did you
9  continue to support her or the children?
10    A    Yes, I sent money to the kids to her.
11    Q    How much? How often?
12    A    Every trips, usually send money to her.
13    Q    How much?
14    A    Sometimes when my paychecks, it's large or big,
15  I will send her money, big money, about 3,000.
16    Q    When you return to the Marshall Islands, are
17  your two children going to return with you?
18    A    Yes. When I was in the hospital, after I got
19  out of the hospital, the family came from Guam to visit
20  him.
21    Q    When you returned to the Marshall Islands, are
22  your two children going to go with you and live with you
23  in the Marshall Islands?
24        THE INTERPRETER:  Would you repeat that
25  question again.

31

1    Q    So you always lived on the Koorale?
2    A    Yes.
3    Q    From 1992 to 1999?
4    A    Until -- I was living with Koorale until I got
5  my accident, until 2000.
6    Q    And you didn't have any other place that you
7  stayed?
8    A    When I was staying with my ex -- my new wife is
9  Samoan girl, woman, that's where he was staying at, in her
10  apartments.
11    Q    Do you have a new wife?
12    A    Yes, I have a Samoan girl.
13    Q    Did you marry her?
14    A    No.
15    Q    How long have you lived with her?
16    A    Since '96.
17    Q    And where does she live?
18    A    Western Samoa.
19    Q    And in 1996 and 1997 and 1998, when you came
20  back from trips on the Koorale, you lived with her?
21    A    Yes. After -- when I was working, after I work
22  and I go stay with her after.
23    Q    Okay. Did you pay rent there?
24    A    Yes.
25    Q    Did you support her?

30

1  BY MR. WINDES:
2    Q    When you return to the Marshall Islands from
3  here, are your two children going to go with you to the
4  Marshall Islands and live with you there?
5    A    Other -- are you talking about my kids, the
6  kids over here with me or the one in Guam?
7    Q    The ones that are here.
8    A    I don't have any children's over here. They
9  are in Majuro.
10    Q    I thought that you had two children that are
11  living here now?
12    A    No, they don't live with me here.
13    Q    You have four children that lived with your
14  ex-wife?
15    A    Yes.
16    Q    And then are they all still living with your
17  wife?
18    A    Okay. Two that were living with their mom and
19  two they came to Majuro with me. When I left from
20  Honolulu to Majuro, they came from Guam to meet me in
21  Majuro. Oh, no.
22        Okay. When I had left from Honolulu to Majuro,
23  four of the kids, they were with mom, and they came to
24  Majuro to visit with me. Two of them stayed with me, and
25  two lived with their mom back to Guam.

32

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 152 of 234

1    Q   Are the two that stayed in Majuro still there?

2    A   Yes.

3    Q   Living with your girlfriend?

4    A   No.  They are staying with my sister.

5    Q   When you return to the Marshall Islands, are

6  you expecting them to move in with you?

7    A   Other -- the one in Guam or all of them or the

8  one just in Majuro?

9    Q   Are you planning on any of the children moving

10  in with you when you move back to Marshall Islands?

11    A   Yes.

12    Q   Which one?

13    A   If those two in Majuro want to stay with me,

14  they will stay with me.  If other two in Guam wants to

15  stay with me, they will stay with me.

16    Q   Have you sent your girlfriend or your children

17  any money in the last 6 months?

18    A   Which women are you talking about?

19    Q   Any of them.

20    MR. BANNING:  Objection; relevance, but go

21  ahead.

22    THE WITNESS:  Yes, the children, I'm still

23  sending them money.

24  BY MR. WINDES:

25    Q   Where do you get the money?

33

1  will do over there because, right now, I can't run.  I

2  can't.  I lost my strength, and I can't do nothing.  I

3  can't lift any heavy weight, not like before I used to.

4    Q   Are you planning on looking for a job again any

5  time in your life?

6    MR. BANNING:  Asked and answered.  You

7  understand the question?

8    THE WITNESS:  Yes.  If they fix my leg and I

9  can start working, lifting heavy weights, if I can run or

10  do something.

11  BY MR. WINDES:

12    Q   If they can make your leg better, what type of

13  work do you want to do?

14    A   I can be a security guard if my leg is better.

15  But, right now, I cannot do anything with my legs because

16  it is being bothering him a lot.

17    Q   Before the accident, how long did you expect

18  that you would fish?

19    MR. BANNING:  Object; vague and ambiguous.  Go

20  ahead.

21    THE WITNESS:  I'm looking at like some of the

22  fishermen are fishing until 80s or until plus, 80 years or

23  plus.

24  BY MR. WINDES:

25    Q   Did you expect to work for 80 years in fishing?

35

1    A   The money, the lawyers, my attorneys gave it to

2  me.

3    Q   The $600?

4    A   Yes.  I send them a little bit.

5    Q   How much?

6    A   Sometimes hundred.

7    Q   When you return to the Marshall Islands, what

8  type of work do you expect to do?

9    A   I don't know what kind of work I will do over

10  there because I lost all my strength, and I don't know

11  what kind of job I will do over there in the Marshall

12  Islands.

13    Q   Do you have plans to look for work in the

14  Marshall Islands?

15    A   At the moment, I don't know.  I don't know what

16  kind -- well, what kind of job I will do in the future,

17  but first I would like to see if they can get my strength

18  back on track and my feet and my leg.

19    Q   Do you plan to look for work when you return to

20  the Marshall Islands?

21    A   Right now, I don't really know, but I want to

22  wait for my leg to get back to -- back to on track so I

23  can start looking for a job.

24    Q   What type of job do you want to look for?

25    A   I don't know what kind -- what kind of job I

34

1    A   Yes.

2    Q   The job that you were doing on the Koorale is

3  very physical, right?

4    A   Yes.

5    Q   How much weight were you required to lift in

6  that job?

7    A   I usually lift 200 or 300 pounds.

8    Q   And how long did you expect that you could

9  continue to do that?

10    A   I don't know because when we fish, we never

11  think about how long we're going to fish.  We just

12  continued fishing for so many years.  And I -- that's my

13  goal and I really want to fish.

14    Q   Did you ever think about doing some other type

15  of work?

16    A   No.  When -- when I first start fishing, I told

17  myself that that's my goal and my life.

18    Q   What is "my goal and my life"?

19    A   When I see it, it's my goal, because I love

20  fishing and I make a lot of money out of it, and I support

21  my family with all the money I make.

22    Q   When is the first time that you were a

23  skiffman on a tuna boat?

24    THE INTERPRETER:  Would you repeat that

25  question again.

36

BY MR. WINDES:
Q   When is the first time that you were a skiffman?
MR. WINDES:  For the translator's sake, a skiff is a small boat.
THE INTERPRETER: Okay.
MR. WINDES:  A Skiffman is a job position that is the person that drives the boat.
THE INTERPRETER: Skipper?
MR. WINDES:  Not the skipper of the boat, the skipper of the little skiff.
THE INTERPRETER: Okay.
MR. BANNING:  Objection; assumes facts not in evidence and calls for a legal conclusion as to what a, quote/unquote, a position is. He wants to know when you first started driving the skiff.
THE INTERPRETER: Right. Okay.
(Question interpreted.)
THE WITNESS: Mid '90 – '84.
MR. BANNING: '84?
THE WITNESS: '94. I'm sorry.
BY MR. WINDES:
Q   Before that, what was your job on the Koorale?
A   We do a lot of stuff. If you are a fisherman, you do all kinds of stuff, all kinds of jobs.

37

Q   Okay. When a skiff is used to set the net, how many crew members are on the skiff?
A   A crew member on a skiff.
Q   On the skiff.
A   On the skiff.
Q   When the net is set.
A   Two.
Q   What do you call the two jobs?
A   Skiffman called the driver, called skiffman, myself, and assistant skiffman.
Q   So skiffman and assistant skiffman, right?
A   Right.
Q   And when is the first time that you were an assistant skiffman for the Koorale?
A   When I came back in 1991 to Koorale.
Q   Between 1990 and 1994 when the skiff was used to set the net, were you always the assistant skiffman?
A   Yes.
MR. BANNING:  Did you misspeak about 1990 or was that intentional? I guess it is accurate. It is between those times. So it is okay. But I think he said he started in '91.
MR. WINDES:  He said '90 or '91.
MR. BANNING:  I don't know if anybody has got the records back that far.

38

BY MR. WINDES:
Q   So for about four years between approximately 1990 and 1994, you were the assistant skiffman for the Koorale; is that correct?
A   Yes.
Q   Did anyone else do that job during that period?
A   No.
Q   Okay.
A   I was only the assistant skiffman between those four years.
Q   Right. And you were the only assistant skiffman?
A   Yes.
Q   And then, in 1994, you say that you were doing some work as the skiffman, right?
A   In the middle of '94, I become a skiffman.
Q   How long did you work as the skiffman for the Koorale?
A   About three years.
Q   And between 1994 and 1997, for approximately three years, you were the only skiffman on the Koorale?
A   Yes.
Q   During those three years, did you sometimes do the assistant skiffman job?
A   No.

39

Q   Okay. How did that change after three years? Did you stop being the skiffman?
A   No, never changed.
Q   From 1994 until the time of your accident, were you the skiffman?
A   For those three years, '94, '95 and '96, I was a skiffman. After that, they hired another skiffman.
Q   Who became the skiffman in 1997?
A   One person from Peru.
Q   Do you remember his name?
A   Besunday.
Q   How do you spell that?
A   I don't know how to spell it. It is a Peruvian name.
Q   What did you call him?
A   Besunday.
MR. BANNING:  Is it Vicente.
THE WITNESS: (In English.) Yes.
MR. WINDES:  Why don't we all agree it is something like Vicente.
BY MR. WINDES:
Q   When Vicente became the skiffman, what did you do?
A   I was the assistant for him.
Q   For how long were you the assistant skiffman

40

Case 1:03-cv-00004   Document 27   Filed 02/21/2003   Page 154 of 234

1  for Vicente?

2  A  I don't really know how long I worked for him.

3  Q  More than two years?

4  A  I believe it was a year plus.

5  Q  Okay. Why did you change from skiffman to

6  assistant skiffman?

7  A  The reason why I didn't go back to skiffman,

8  because one of the boss, the captain, usually talking bad

9  words, saying foul language.

10  Q  Let me see if I understand this. You changed

11  from skiffman to assistant skiffman because, when you were

12  skiffman, the captain said bad words?

13  A  Yes.

14  Q  Captain Ferreira?

15  A  Berman.

16  MR. LOPEZ: Ferman.

17  BY MR. WINDES:

18  Q  When did the captain say bad words to you as

19  skiffman?

20  A  When I started to work as a skiffman, that's

21  the time he always talking bad words.

22  Q  What did you do that made him use bad words?

23  A  Nothing.

24  Q  What would he say to you when he was using bad

25  words?

                                41

1  A  Foul language like F words, all kinds of foul

2  language he can manage.

3  Q  What were you doing when he used foul language?

4  A  Nothing. I don't -- nothing. That's why the

5  reason why I'm not -- I don't want to be a skiffman

6  anymore.

7  Q  Did he use foul language to you when you were

8  the assistant skiffman?

9  MR. LOPEZ: Objection; vague, vague as to

10  time.

11  THE WITNESS: Yes.

12  BY MR. WINDES:

13  Q  What type of things were you doing when he used

14  foul language to you as assistant skiffman?

15  A  If I'm late for some work he assigned me for,

16  and then he start saying bad words or foul language.

17  Q  If you were late?

18  A  If -- if the skiffman take me to a boat and

19  it's late, then if he late to job on boat, then the

20  captain got mad at him, and then he starts saying bad

21  words. And during our works, he also saying a bad words.

22  Q  Did Captain Ferreira treat you well otherwise?

23  MR. LOPEZ: Objection; vague, ambiguous.

24  THE WITNESS: Yes.

25  BY MR. WINDES:

                                42

1  Q  But you didn't like his foul language?

2  A  Yes. That's only the reason I don't like with

3  him, is talk with bad words.

4  Q  Okay. How many skiffs were on the Koorale at

5  the time of the accident?

6  MR. LOPEZ: Did you ask skiffman or skiff?

7  THE INTERPRETER: Skiff.

8  BY MR. WINDES:

9  Q  Was there more than one skiff that worked with

10  the Koorale at the time of the accident?

11  A  There was only one.

12  Q  How long had that particular skiff been with

13  the Koorale?

14  A  From the first day I worked with Koorale, that

15  was only one skiff.

16  Q  But it was the same skiff when you started at

17  Koorale as when you left the Koorale?

18  A  Yes.

19  Q  What other types of boats worked with the

20  Koorale?

21  A  No.

22  Q  No other boats?

23  A  No other boats.

24  MR. LOPEZ: Objection; vague and ambiguous.

25  MR. WINDES: Doing the best I can.

                                43

1  MR. LOPEZ: I understand. The question what

2  other type of boats work with, what other types of

3  vessels working side by side? Working on? I don't think

4  he understood your question.

5  BY MR. WINDES:

6  Q  We're talking about skiffs. The skiff works

7  with the Koorale, right?

8  A  Yes, belongs to Koorale.

9  Q  What other boats belong to the Koorale?

10  A  What kind of boats?

11  Q  That's my question.

12  A  Only one Koorale by itself.

13  Q  Okay. Were there other small boats that worked

14  with the Koorale?

15  A  No, no other boat, small boats.

16  Q  Were there any — was the skiff kept on the

17  deck when it wasn't being used?

18  A  Yes.

19  Q  Were there other boats on the deck of the

20  Koorale?

21  A  Yes.

22  Q  What other boats?

23  A  Speed boat, light boat.

24  Q  And what was the speed boat used for?

25  A  For the crew above seagulls and all, like far

                                44

CANEDY COURT REPORTING 1-800-590-1800

1 away, the seagulls, the birds, school fish.
2     THE INTERPRETER: School?
3     MR. LOPEZ: School.
4     THE WITNESS: School fish.
5 BY MR. WINDES:
6     **Q**   **How often was it used?**
7     A   Something maybe as more than one or two a day.
8 If there is a lot of school fish, like we can use it all
9 day long.
10     **Q**   **And how long did the Koorale have that speed**
11 **boat?**
12     MR. LOPEZ: I'm going to object. Oh, go ahead
13 if you understand the question.
14     (Question interpreted.)
15     ·THE WITNESS: Long time.
16 BY MR. WINDES:
17     **Q**   **Was it the same speed boat that the Koorale**
18 **used when you first started with the Koorale?**
19     A   Yes.
20     **Q**   **And where was the speed boat kept on the deck**
21 **of the Koorale?**
22     A   It's on the right side of the boat on the
23 deck. On the deck.
24     **Q**   **Was it always kept in the same place?**
25     A · Yes.

45

1 don't know how to draw. How you say, looking down as a
2 bird or?
3     **Q**   Yes.
4     A   I don't know how to do it because I'm not an
5 angel, you know, so I don't write.
6     MR. LOPEZ: Hang on a minute. I want to go off
7 the record for a minute. I have got to clarify something
8 with him. I need to go off record.
9     MR. WINDES: Is this an attorney-client
10 privileged situation?
11     MR. LOPEZ: It is.
12     MR. WINDES: It can't be, because I haven't
13 asked him anything to do with your conversations.
14     MR. LOPEZ: Give me two minutes, anyway, for my
15 own personal edification. Let me stay off for a minute.
16 He can stay in here.
17     (Recess.)
18 BY MR. WINDES:
19     **Q**   **First of all, let me explain. I know that you**
20 **are not an artist. I'm not either. I know you can't**
21 **draw the boat exactly the way it was, and everything isn't**
22 **going to be proportional. But what I'm trying to do is**
23 **get your best memory of where things were in relation to**
24 **one another.**
25     **So if you were to draw the outside of the boat**

47

1     MR. LOPEZ: Are you talking about permanent
2 storage?
3     ·MR. WINDES: I'm doing the best I can. Just
4 let me.keep going.
5 BY MR. WINDES:
6     **Q** · **What was the speed boat kept on? Did it have**
7 **davits or —**
8     MR. LOPEZ: Objection; vague as to time. Go
9 ahead.
10     THE WITNESS: Yes, on davit.
11 BY MR. WINDES:
12     **Q**   **Was it always kept on the same davit?**
13     A   Yes.
14     **Q**   **And were those davits always in the same place**
15 **from the first time you got on the boat until the time**
16 **that you last got off?**
17     A   Yes.
18     **Q**   **I wonder if you could draw for me the Koorale**
19 **looking down on it from a bird's eye view.**
20     MR. LOPEZ: You guys have charts of this boat.
21 You don't need him drawing pictures of the Koorale.
22     THE WITNESS: Hard for me to write/draw.
23 BY MR. WINDES:
24     **Q**   **Why?**
25     A   Because I don't know how to draw. I can't. I

46

1 and then put the house, the wheelhouse.
2     A   (Witness complies.) That's the wheel house
3 right there. Okay. Do you want them from the side or the
4 top?
5     MR. WINDES: He's doing the side. That's
6 fine.
7     THE INTERPRETER: Go ahead.
8 BY MR. WINDES:
9     **Q**   **I take it back. You are an artist. You are**
10 **better than me.**
11     **Now, is this the stairs here?**
12     A   Yes. Uh-huh.
13     **Q**   **Okay. So if — I will put an arrow here. Then**
14 **you would write stairs. Right?**
15     A   Right.
16     MR. LOPEZ: Stairs or ladder.
17     MR. WINDES: Ladder.
18     THE WITNESS: How you spell it?
19     (The witness in English.) I don't know how to
20 spell it.
21 BY MR. WINDES:
22     **Q**   **I will write the word. You draw. I will write**
23 **words. Okay? I have written the word ladder pointing to**
24 **the ladder, right?**
25     A   That's the winch.

48

1  Q   Now, I have drawn the arrow from what you said
2  was the winch, and now I have put the word winch there.
3  Okay?
4  A   That's the speed boat davit.
5  Q   Davit?
6  A   Yes, davit.
7  Q   Right here?
8  A   Yes. Uh-huh.
9  Q   I'm going to write speed boat.
10  A   Two of them, one here and one over here.
11  Q   So the -- there are arrows going in two
12  different directions and they meet here. And, at that
13  point, I will put speed boat davits. Okay?
14     THE INTERPRETER: I'm not understanding.
15     THE WITNESS: One here and one here.
16  BY MR. WINDES:
17  Q   Yes. This is a speed boat davit and this is a
18  speed boat davit?
19  A   That's right.
20  Q   Okay. Now, where is the speed boat?
21  A   In the middle, here.
22     MR. LOPEZ: Which speed boat?
23  BY MR. WINDES:
24  Q   Well, there is usually a speed boat on these
25  davits, right?

49

1     MR. LOPEZ: I'm going to object, vague as to
2  time.
3     THE WITNESS: It is right alongside this thing.
4  BY MR. WINDES:
5  Q   Could you try to draw the speed boat.
6  A   (Witness complies.) Speed boat is right here,
7  and two sling from the end, and the other one end, coming
8  from the other end, and it is on the hook. And there is a
9  hook coming down, and there are two string -- sling from
10  the hook to the front and to the back.
11  Q   So the speed boat would be on this davit?
12     MR. LOPEZ: Objection; vague as to time. Go
13  ahead.
14  BY MR. WINDES:
15  Q   Yes?
16  A   Yes.
17  Q   So that is the forward davit, right?
18  A   Yes.
19  Q   Was it always kept there?
20     MR. LOPEZ: Objection; vague as to time.
21     THE WITNESS: Yes.
22  BY MR. WINDES:
23  Q   Okay. Then let's draw an arrow to the speed
24  boat.
25     And I will write the word speed boat. It's

50

1  this here, right?
2  A   Right. Yes.
3  Q   That was where it was kept the first time you
4  got on the boat?
5  A   Yes.
6  Q   And it was also where the speed boat was kept
7  the last time you were on the boat?
8     MR. LOPEZ: Objection; vague as to time.
9     THE WITNESS: Yes.
10     MR. WINDES: Okay.
11     MR. LOPEZ: That last objection was vague as to
12  "kept." You can add "as to time."
13  BY MR. WINDES:
14  Q   Just to be clear, when the speed boat was not
15  being used, it was always kept on the forward davit where
16  you have drawn it; is that right?
17     MR. LOPEZ: Vague as to time.
18     THE WITNESS: Yes, is always going this way.
19  BY MR. WINDES:
20  Q   So it was always kept the same place and the
21  same way?
22  A   Yes.
23  Q   Now, the stairs -- the ladder -- strike that.
24  Let me try it again.
25     The steps in the ladder, how many steps were

51

1  there?
2  A   I don't really know.
3  Q   How many steps were there above the water?
4     MR. LOPEZ: Objection; vague as to time and
5  lacks foundation.
6     THE WITNESS: One in the front and one in the
7  back.
8  BY MR. WINDES:
9  Q   What I'm saying is: On this ladder where your
10  accident happened, how many steps were there?
11  A   I believe it's seven.
12  Q   Seven steps?
13  A   Seven steps.
14  Q   And what was the distance between the water and
15  the deck at that point?
16     THE INTERPRETER: Can you clarify me on that.
17  What is water?
18     MR. WINDES: You both had problems with it.
19  What was the approximate distance from the water to the
20  deck at the steps?
21     MR. LOPEZ: Objection. Go ahead. Translate.
22  Then I will make my objection.
23     (Question translated.)
24     MR. LOPEZ: I'm going to object as to time and
25  as to foundation.

52

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 157 of 234

MR. WINDES: Let me back up then.

MR. LOPEZ: You are asking in still water, the boat just sitting still, unloaded or loaded or what?

MR. WINDES: Yes. Okay. All right.

MR. LOPEZ: Are you talking about if he takes a measurement from the bottom of the stairs to the top?

BY MR. WINDES:

Q I will clear it up for you. When the Koorale was in port or calm water, the water was flat and it was floating, not moving, but just floating, approximately what was the distance between the water and the deck in the area of the steps?

MR. LOPEZ: Object; vague and ambiguous.

THE WITNESS: If the boat is full of fish and we're at the port and the water is calm, the water usually at the line, where the boat is at, the lower line, and that's where the water is at. There is a line at the bottom. I don't know how you explain. There is a line the water usually had.

BY MR. WINDES:

Q From the water to the deck, approximately what is that distance at that time?

A About 10 feet plus.

Q And the skiff at the bow?

THE INTERPRETER: What is bow?

53

MR. WINDES: B-o-w.

BY MR. WINDES:

Q What is the distance from the water when it is calm to the place where you stand on the bow?

MR. LOPEZ: Objection; lacks foundation, vague and ambiguous. Do you understand the question?

THE INTERPRETER: What is bow?

MR. WINDES: Tell your what, first of all, let's mark this drawing as Exhibit 1, please.

(EXH. 1 was marked for identification.)

BY MR. WINDES:

Q Okay. I have drawn a very simple boat here. If this is the skiff and you see we have a bow here, and then we have water here, I'm looking for this distance where I have put the arrow.

A To the arrow.

MR. LOPEZ: If you know. Don't guess. If you know. You are assuming calm water still?

MR. WINDES: Yes, calm water.

THE WITNESS: I'm not really -- I don't really know about it.

BY MR. WINDES:

Q Is it more than 2 feet?

A I don't really know about, because I'm not usually on that side over there. When we're on the line

54

and we never usually -- the skiff, usually on the nets all the time. I don't really know.

Q Okay. Good enough. Now, at the time of your accident, who was the skiffman?

A One man, we call him Pepe from Peru.

Q How long had Pepe been the skiffman?

A I don't really know.

Q How long had he worked as the skiffman on the Koorale?

A He was a knew person.

Q Had he been the skiffman since the trip started?

A When he become a skiffman, all I know is he worked with us as when we make one trip and that's the time the accident occur.

Q How many different sets did he do as skiffman?

THE INTERPRETER: Would you rephrase that question.

BY MR. WINDES:

Q How many different sets did he do as skiffman on the Koorale?

MR. LOPEZ: You mean prior to the accident?

MR. WINDES: Yes.

THE INTERPRETER: Repeat that question again.

BY MR. WINDES:

55

Q Before the accident, how many times was Pepe the skiffman?

A Well, he just came Koorale as a skiffman. There was only one time. And then he came and when the accident was occur.

Q How many sets did the Koorale make on that last trip?

MR. LOPEZ: Objection; speculation. You mean prior to his accident? Remember -- well --

MR. WINDES: All right. That is a thought that was obvious, but we'll make it clear.

BY MR. WINDES:

Q Before the accident, how many sets had the Koorale made on that trip?

THE INTERPRETER: Let me ask a question. What is sets?

MR. LOPEZ: Just say sets. It's a term. He knows what sets is.

THE WITNESS: I don't know. Well, one date, one set.

BY MR. WINDES:

Q One day, one set?

A Yes.

Q How many days had you been out fishing?

A Every day, we fish. So we don't count how many

56

1· days.
2    Q    Had there been many days that he was the
3 skiffman and you were the assistant skiffman?
4    A    Like I said, yes. Yes.
5    Q    And did he seem to be an experienced skiffman?
6        MR. LOPEZ: Speculation.
7        THE WITNESS: I don't really know.
8 BY MR. WINDES:
9    Q    Did you have any problem with the way he did
10 his job?
11    A    No, no problem.
12    Q    How many times have you transferred from a
13 skiff to the Koorale tuna boat?
14    A    What? Can you repeat that again?
15    Q    Yes. How many times in the last 12 years have
16 you stepped from the skiff to the Koorale after a set?
17    A    I couldn't count.
18    Q    Thousands of times?
19    A    I -- I can't count, because every time they
20 usually throw me on the skiff. He couldn't because every
21 time they put him on the skiff, right?
22        If -- all the time when I was -- as assistant
23 skiffman, they usually put me on the boat.
24    Q    Okay. What was the range of seas that the
25 Koorale would set the net in?

                                                    57

1        MR. LOPEZ: Objection; vague and ambiguous. If
2 you understand the question.
3        THE WITNESS: I don't know.
4 BY MR. WINDES:
5    Q    Were there sea heights that were more than
6 Captain Ferreira would set the net in?
7    A    Yes.
8    Q    What was the highest seas that Captain Ferreira
9 would set the net in?
10        MR. LOPEZ: Objection; speculation.
11        THE WITNESS: There is some times when the
12 boat, water comes on the deck, and the net usually set
13 out.
14 BY MR. WINDES:
15    Q    What is the highest seas that you ever saw the
16 Koorale set the net in?
17        MR. LOPEZ: Objection; vague and ambiguous.
18        THE WITNESS: I don't know. I don't know,
19 because every time when the captain said get ready to set
20 out the net, we don't look at the height or the depth.
21 BY MR. WINDES:
22    Q    Okay. Do you remember ever seeing the Koorale
23 set the net in seas more than 10 feet?
24    A    Is that rough weather or?
25        MR. LOPEZ: If you don't understand the

                                                    58

1 question. Just tell him you don't understand the
2 question. He can rephrase it.
3        THE WITNESS: I don't understand.
4 BY MR. WINDES:
5    Q    Okay. Did you ever see the Koorale set a net
6 in seas that were more than 10 feet?
7        MR. LOPEZ: Vague and ambiguous. Go ahead.
8        THE WITNESS: No. No.
9 BY MR. WINDES:
10    Q    Okay. Did the Koorale sometime set the net
11 when it was dark outside?
12    A    Yes.
13    Q    And when the skiff returned from setting the
14 net when it was dark, how did you usually see the steps?
15    A    The captain usually used flashlights so we can
16 see the steps.
17    Q    So usually the captain would point the
18 flashlight from the wheel house?
19    A    No. Usually at the crow's nest.
20        MR. LOPEZ: Can we agree it is crow's nest he's
21 saying.
22        THE WITNESS: Also, I have a flashlight with
23 me.
24 BY MR. WINDES:
25    Q    When you are the assistant skiffman, you

                                                    59

1 usually have a flashlight with you?
2    A    Yes.
3    Q    Does the skiffman also have a flashlight?
4    A    Yes.
5    Q    So there are usually three different
6 flashlights that can be used for you to see the steps?
7        MR. LOPEZ: Objection; vague as to time. Go
8 ahead.
9        THE WITNESS: No.
10 BY MR. WINDES:
11    Q    Which -- I thought that you said that all three
12 of those flashlights were normally available for you to
13 see?
14    A    The skiffman has one flashlight, and I have
15 mine, and the captain has his one. So the one I had is
16 the one I used to look at the steps.
17    Q    Okay. The one that you had is the one that you
18 would normally use to see the steps?
19    A    Yes.
20    Q    Okay.
21    A    And the captain has one big flashlight, and
22 that is really bright, and that's with my flashlight that
23 can make the clearer the steps.
24    Q    After the net is set, what is your job as the
25 assistant skiffman?

                                                    60

1    A    The skiffman take me back to the boat.
2    Q    And what do you do, if anything, while the
3  skiff is returning to the Koorale?
4    A    Do other jobs on the boat such as fixing the
5  nets and other jobs on the boat.
6    Q    On the skiff? Let me rephrase the question. I
7  think the translation didn't come —
8    A    Go ahead. Repeat.
9    Q    Okay. After the net is set and the skiff is
10  returning to the Koorale, what do you do usually as the
11  assistant skiffman during that time?
12    A    Check the oil to make sure there is no leaking
13  in the engines, any suspicious that needs to be reported
14  to the captain or whoever is in charge.
15    Q    So your job when the skiff is returning to the
16  Koorale is to inspect the engine on the skiff?
17    A    Yes. Yes, check on the oils and engines and
18  whatever they told me to do, works on engines.
19    Q    When the skiff gets back to the Koorale, what
20  is your job as assistant skiffman?
21    A    I don't understand. Can you repeat it again.
22    Q    When the skiff returns to the Koorale —
23    A    Yes.
24    Q    — what do you do next?
25    A    Came back and took me — came and took me so

61

1    THE WITNESS: What —
2  BY MR. WINDES:
3    Q    I will ask a different question. When the
4  skiff comes up to the Koorale, where are you standing
5  usually?
6    A    In the front of the boat.
7    Q    And how do you decide when to step onto the
8  ladder?
9    A    When I see if there is a safe time to get on
10  the ladder, then that's the time I take it.
11    Q    How do you determine whether it's a safe time?
12    MR. LOPEZ: I'm going to object. This is all
13  incomplete hypothetical, vague and ambiguous, also, and
14  lacks foundation.
15    THE INTERPRETER: I was explaining to him about
16  what he was saying.
17    MR. LOPEZ: If you don't understand the
18  question, ask him to rephrase it.
19    THE WITNESS: Can we skip these questions?
20  BY MR. WINDES:
21    Q    No, but we can rephrase it. Okay. You said
22  that you decide to step from the skiff to the ladder when
23  you see that it's safe, right?
24    MR. LOPEZ: Objection; misstates prior
25  testimony. Misstates prior testimony, incomplete

63

1  they can hook the skiff, bring up the skiff. He came and
2  took me so we both can work on the — put all the cables
3  together so he can pick up the skiff from the water.
4    Q    Okay. Now, when the skiff returns to the
5  Koorale, your job usually was to get off of the skiff onto
6  the Koorale, right?
7    A    Yes.
8    Q    And would you usually give the skiffman any
9  directions or tell him something?
10    A    No.
11    Q    Okay.
12    A    Only the captain is talking to the skiffman,
13  not me.
14    Q    When the assistant skiffman is getting off of
15  the skiff, sometimes the captain and the skiffman are
16  talking?
17    A    Yes.
18    Q    What sorts of things did they talk about?
19    A    I don't know. Sometimes they talk each other
20  on the radio.
21    Q    Now, as the assistant skiffman stepping from
22  the skiff to the Koorale, how do you do that safely?
23    MR. LOPEZ: Objection. Objection; vague and
24  ambiguous and lacks foundation.
25    MR. WINDES: Go ahead.

62

1  hypothetical, lacks foundation.
2    Mel, again, if you don't understand the
3  question, ask him to rephrase it.
4    MR. WINDES: Counsel, the witness has not given
5  the slightest indication he doesn't understand something.
6  You keep sort of badgering him with a suggestion.
7    MR. LOPEZ: Counsel, that is not it. He's
8  sitting there. There is a conversation going on. We're
9  not having a translation, answer, translation, question.
10  We're having a conversation, which indicates to me he
11  doesn't understand the question. Since I don't understand
12  Marshallese, it indicates that the question is being
13  explained. I don't understand the explanation either.
14  I'm just telling him, if he doesn't understand the
15  question as you phrased it, just ask it be rephrased.
16  That's all I'm asking.
17    MR. WINDES: Why don't we say it three times in
18  a row, and then we'll know he knows that and he doesn't
19  have to know each time.
20    MR. LOPEZ: Every time there is a discussion
21  between the interpreter and my client, I have to assume
22  that there is some kind of a reparte going on. I just
23  need the interpreter to interpret the question and
24  interpret the answer. That's all I'm asking.
25    MR. WINDES: That's not what you were asking.

64

1· But in any case, where are we with the translation?
2· THE INTERPRETER: The question last time you
3· asked --
4· MR. LOPEZ: Reask the question.
5· THE INTERPRETER: Okay. Go ahead.
6· BY MR. WINDES:
7· **Q   Tell him first, before I ask the question, to**
8· **remember that if he doesn't understand the question to ask**
9· **to rephrase it.**
10· MR. LOPEZ: In fact, I will tell you this.
11· Don't ask the interpreter, and you can interpret this, to
12· explain the question to you. Just ask that the question
13· be reasked if you don't understand it. Okay?
14· MR. WINDES: I don't think anything differently
15· has ever occurred that I have seen. So do you understand
16· that?
17· MR. LOPEZ: Interpret what I'm telling him.
18· THE INTERPRETER: I'm asking him.
19· MR. LOPEZ: You didn't interpret what I said.
20· I want him to understand, if he doesn't understand the
21· question as it is asked by the attorney, then he should
22· just tell you "I don't understand." Then that will be
23· interpreted back, and then the attorney can rephrase the
24· question.
25· I ask that the interpreter just literally

65

1 translation all the worse, particularly since as everyone
2 has indicated this witness can speak fluent English.
3 MR. LOPEZ: No one has indicated he can speak
4 fluent English, except you, counsel. As a general rule,
5 the translator does translate everything. If he's just
6 hearing all I'm talking about is an objection, he can
7 understand that. He's asking what did I say. He's
8 entitled to know what my objections are.
9 MR. WINDES: You are saying each time I ask a
10 question, then the translator translate it, then you make
11 an objection, then the translator translates your
12 objection. Then the witness is supposed to go back and
13 remember what the translator said and answer the question?
14 MR. LOPEZ: Right.
15 MR. WINDES: That is totally improper.
16 MR. LOPEZ: I don't think so. If he wants to
17 know what I said, he's entitled to the translation. Let's
18 just see how this works out and let's go forward.
19 BY MR. WINDES:
20 **Q   Here's a good example. Do you have any idea**
21 **what was asked?**
22 MR. LOPEZ: Wait a minute. That is not a fair
23 question, because what he said was he wants to know what
24 was being asked. Just reread the question to him.
25 BY MR. WINDES:

67

1 interpret the question and translate the answer.
2 THE WITNESS: Let's continue.
3 BY MR. WINDES:
4 **Q   Okay. Usually on the Koorale, who decides when**
5 **the assistant skiffman steps from the skiff to the**
6 **Koorale?**
7 MR. LOPEZ: Objection; vague and ambiguous,
8 lacks foundation, incomplete hypothetical.
9 THE WITNESS: The captain.
10 BY MR. WINDES:
11 **Q   So if you are the assistant skiffman and you**
12 **are on the front of the skiff and the skiff comes up to**
13 **the Koorale, do you wait for someone to tell you when you**
14 **should step?**
15 MR. LOPEZ: Vague and ambiguous, incomplete
16 hypothetical, lacks foundation.
17 THE WITNESS: What my partner saying?
18 MR. LOPEZ: Translate the objections for him.
19 MR. WINDES: Wait a second. Let's be clear on
20 that because the objections are there for the court. They
21 are for a judge to look at later. They are not for
22 witnesses.
23 MR. LOPEZ: I disagree, counsel.
24 MR. WINDES: To interrupt my questions with a
25 translation of objections is making the difficulty of this

66

1 **Q   All right. Let's try it again and hope that**
2 **doesn't happen again. When you are the skiffman, sorry,**
3 **the assistant skiffman on the skiff that is coming up to**
4 **the Koorale, do you usually wait for someone to tell you**
5 **when to step from the skiff to the Koorale?**
6 MR. LOPEZ: Objection; vague and ambiguous,
7 lacks foundation, incomplete hypothetical.
8 THE WITNESS: I agree with him.
9 MR. WINDES: See? So now we have a witness
10 agreeing with the attorney's objections, and the answer
11 doesn't come out.
12 MR. LOPEZ: Counsel, this is no different than
13 if a deposition is in English and the witness speaks
14 English and the witness hears objections anyway. If he's
15 saying he agrees with me, I don't know what he's agreeing
16 with, but rephrase the question or reask the question.
17 MR. WINDES: It is normal to advise a witness
18 who is getting distracted by objections don't worry about
19 the objections, they are there for the court, not for the
20 witness.
21 MR. LOPEZ: That is fine. We can do it. Don't
22 worry about the objections. Answer if you understand the
23 question.
24 MR. WINDES: Would you translate that.
25 THE WITNESS: I don't.

68

CANEDY COURT REPORTING 1-800-590-1800

BY MR. WINDES:

Q   In the normal procedure on the Koorale, the assistant skiffman decides the time to step from the skiff to the Koorale ladder, correct?

MR. LOPEZ: Objection; incomplete hypothetical, lacks foundation, vague and ambiguous.

THE INTERPRETER: He wants to know what my partner is saying.

MR. LOPEZ: You can answer.

THE INTERPRETER: He said: I cannot answer if I don't understand what the question is.

MR. WINDES: We can do this all day. I have tomorrow, too.

MR. LOPEZ: Listen, I'm not going to go tomorrow. I will be glad to go Tuesday. We scheduled this on Friday for your convenience. Let's go off the record for a minute and see if we can straighten out this thing and make it go a little faster.

MR. WINDES: That would be wonderful.

(Recess.)

MR. LOPEZ: Back on. We have a little bit of a — we have got a little bit of a problem we are going to try to work around here. We do not believe that there has been a literal interpretation. The client understands English to some degree and speaks it to some degree and

69

feels that, at this time, we may be better off to have him answer, listen to the questions in English, answer in English, and if there is an area where he needs some kind of clarification, we can do that in Marshallese.

MR. WINDES: We talked about that outside the room, and that is fine with me.

MR. WINDES: We did.

MR. WINDES: I do want to clarify, as well, that obviously if a witness knew an answer was not the same as what he gave, then it was incumbent on him to point that out. I don't think it is incumbent on me to go back and ask all the same questions again.

MR. LOPEZ: If he understood enough and he says there were not literal translations or there were parts of his answers that were not completed but — or not complete, but understanding a language and speaking it fluently are two different things. But I say let's give this a try and see how this works.

MR. WINDES: Fine. But, in the meantime, if there is some answer that he recalls not being given accurately or he wants to add something to a prior answer, then I want it happening now, because, otherwise, I'm going to have a transcript that I'm going to expect to be accurate.

MR. LOPEZ: Well, I mean, we're asking him to

70

go back through an entire transcript here.

MR. WINDES: I'm certainly not ready to do that later because he wants to sit back and contemplate his answers and change his answers later.

MR. LOPEZ: He's going to have the opportunity to change his answers, anyway, or make any corrections to his answers as part of the code.

Is there any particular thing that stands out, Mel, that you thought had to be clarified?

THE WITNESS: (Through the interpreter.) Yes.

MR. WINDES: The question is: Are there any answers that were translated today that you thought were inaccurate and you want to change your answer now?

THE WITNESS: (In English.) Yes.

BY MR. WINDES:

Q   Like what?

A   (In English.) Like the one you said was anyplace I can -- when the skiff brought me back into the main boat, and is there any like distance from the skiff I can jump ship, jump to the other ship.

(Discussion off the record.)

THE WITNESS: (In English.) When the skiff brought me to the boat, huh? Your answer? Your question.

THE INTERPRETER: Still confusion.

71

MR. LOPEZ: As Mel is speaking, if the translator is writing down what he's saying, maybe we can get —

THE INTERPRETER: Write down on a paper?

MR. LOPEZ: Notes to yourself or something as a literal translation.

THE INTERPRETER: Very clear, I explain to him so many times, and when is the time for him to say get from the skiff to the boat, I ask him the same question over and over and over again.

MR. LOPEZ: The problem we have got is that, as it generally works, the question should be literally translated, the answer literally translated. And I understand that Mel may ask a question of you, "Well, what's that mean," but that is really not -- that's not your function to answer those questions. It is counsel's function to ask the question and the translator, back and forth.

MR. WINDES: One of the things to explain to your client that I may have seen him do is that you only give a sentence, and then you stop and let the translator interpret the sentence.

MR. LOPEZ: Yes, I agree. Mel, when you are answering, try and answer maybe one sentence, the translator will translate that sentence, then give another

72

**Page 73**

1  sentence, the translator translates it so you can get the
2  full answer on the record. Okay? Can we try that?
3      MR. WINDES: When you keep talking and talking
4  and talking, he's got to go back and translate it, and
5  that's the problem.
6      MR. LOPEZ: If you don't understand his
7  question as he asks it, just say, "I don't understand the
8  question. Can you rephrase." Okay?
9      (The interpreter is being used for
10     the remainder of the deposition.)
11 BY MR. WINDES:
12  Q   In your experience as skiffman -- I'm sorry.
13 Strike that.
14     In your experience as assistant skiffman on the
15 Koorale, is it safer to step from the skiff to the
16 Koorale --
17  A  No.
18     MR. LOPEZ: Wait a minute.
19     MR. WINDES: Now we made a mistake here with
20 questions.
21     THE INTERPRETER: We made a mistake here.
22     MR. LOPEZ: Here is our problem. I don't know
23 you were done with your question.
24     MR. WINDES: I wasn't.
25     MR. LOPEZ: How do you signal you are done with

73

**Page 74**

1  your question? He's got to be finished with your
2  question. Okay? Translate this. He has to be finished
3  with his question before you give your answer. And then
4  just, if you want, we can give a hand signal that you are
5  done with your question. Let's do that. Give me time to
6  make whatever objection I have, and we'll go from there.
7  BY MR. WINDES:
8   Q   Are you aware of a safety rule that the
9  assistant skiffman should step from the skiff to the
10 Koorale when the skiff is at the high point in the wave
11 rather than the low point in the wave?
12     MR. LOPEZ: Objection; vague and ambiguous,
13 lacks foundation. Go ahead. You don't need to translate
14 that. Just go ahead.
15     THE WITNESS: It's not safe.
16 BY MR. WINDES:
17  Q   Let me ask a follow-up question. When you were
18 assistant skiffman, did you try to step from the skiff to
19 the Koorale when the skiff was at the high point in the
20 wave or the low point in the wave?
21     MR. LOPEZ: I'm going to object; incomplete
22 hypothetical, lacks foundation, vague and ambiguous. Go
23 ahead.
24     THE WITNESS: Say it again or let me rephrase the
25 question. Rephrase.

74

**Page 75**

1      MR. LOPEZ: Let him ask the question or reread
2  the question. Don't rephrase it.
3      MR. WINDES: Would you ask him to stop
4  listening to your objections and try to understand,
5  because that is what happens. He forgets my question.
6      MR. LOPEZ: I've got to put my objections in.
7  I didn't have him translate it. Have him repeat the
8  question if he doesn't understand. I will say: Same
9  objections. We can go ahead.
10 BY MR. WINDES:
11  Q   When you were assistant skiffman for the
12 Koorale and you were trying to step from the skiff to the
13 ladder, what were the ways that you tried to do that
14 safely?
15     MR. LOPEZ: Objection; incomplete
16 hypothetical, lacks foundation.
17     THE WITNESS: Like I say, there is no safe.
18     THE INTERPRETER: I'm asking him to say it in
19 Marshallese. So I can explain it all to you guys, he
20 wanted me to ask the question again. He wanted me to ask
21 the question again.
22     MR. WINDES: This is going to be days.
23     (Question reinterpreted.)
24 BY MR. WINDES:
25  Q   Let me get some background here. Maybe this is

75

**Page 76**

1  the problem. When you were assistant skiffman on the
2  Koorale, did you usually get to the Koorale by stepping
3  from the skiff to the ladder?
4   A  Yes.
5   Q   When you did that, stepped from the skiff to
6  the ladder, did you try to make the step when the skiff
7  was in the high position in the waves or the low position
8  or somewhere in-between or it didn't matter?
9      MR. LOPEZ: Objection; lacks foundation,
10 incomplete hypothetical.
11     THE WITNESS: If I know there is a right time
12 and then I grab the ladder.
13 BY MR. WINDES:
14  Q   How do you decide when it's the right time?
15     MR. LOPEZ: Same objections.
16     THE WITNESS: I don't know how to explain, but
17 I know it is the right time, and that's the time I jump
18 and grab the ladder. I don't know how to explain it.
19 BY MR. WINDES:
20  Q   What are some of the things that you would
21 look for to decide that it was the right time?
22     MR. LOPEZ: Incomplete hypothetical, lacks
23 foundation, vague and ambiguous.
24     THE WITNESS: Say that again.
25     MR. WINDES: This is just impossible.

76

BY MR. WINDES:

Q   Let's give an example. Mr. DeBrum, when the skiff is coming to the Koorale, would you step off the skiff when the skiff was 20 feet from the Koorale?

MR. LOPEZ: Same objections.

THE INTERPRETER: He's not listening to the questions.

(Question interpreted.)

MR. LOPEZ: Wait a minute. Why didn't he translate the answer? Was his answer, "He's not listening to the question"?

THE INTERPRETER: He's not listening to the questions. I'm giving –

MR. LOPEZ: Was his answer, "He's not listening to the questions"?

MR. WINDES: He didn't say anything in Marshallese.

MR. LOPEZ: Yes, he did. Yes, he did. Then we had a comment that he's not listening to the question. That might be the case. I mean I don't know, but I need – we should have a literal interpretation of his answers. If there is a problem with the answer, then you get to ask another question, but not an explanation as to what you mean by the translator in Marshallese.

THE INTERPRETER: The problem is, he's not

77

listening to the questions. He's not listening to it. As long as you are talking over there, he won't listen.

MR. WINDES: This is a person that speaks both English and Marshallese. If he's going through this process with your client and his determination is he's not listening to the questions, then that's a valid observation that ought to be made.

MR. LOPEZ: Then he can make the observation, but he's not translating the answer.

THE INTERPRETER: I am translating the answers. He's not listening to the question. If I make a sentence long, he won't get the questions. He's not listening to the questions.

MR. WINDES: Let's try it again.

MR. LOPEZ: Let's go off the record a minute.

MR. WINDES: Are you going to have another proposal?

MR. LOPEZ: I don't know. Let me think of something. Hang on a minute. Come here. Let me talk to you.

(Recess.)

MR. WINDES: I'm not saying you haven't, but I'm saying to the extent we haven't done it this way, let's focus on trying to do it this way, which is that word for word the question gets translated and then word

78

for word the answer gets translated. And the answer gets translated even if it is absolutely a ridiculous, nonresponsive, silly answer. That is the witness' problem, not yours to comment on it or clear it up.

MR. LOPEZ: I'm not saying anything he said has been nonresponsive or silly, but that's what I want. If you think he doesn't understand the question, he's giving an answer that you think doesn't answer the question, just give the answer. Also, if it appears that the objections have made him lose the question, then we just ask that the question be reread after the objections are made. Then we'll have the question, he can hear it clean. I don't know if that is a problem. Let's go forward and see if we have to do that.

MR. WINDES: Fine. You have already told him that you should try to not pay attention to the objection.

MR. LOPEZ: Just listen to the question and answer the question. And if I tell you not to answer a question, that is a different story, but I haven't done that. Okay?

MR. WINDES: All right. Let's try it.

BY MR. WINDES:

Q   You were assistant skiffman on the Koorale, and you were about to transfer from the skiff to the ladder on the Koorale. Would you try to time the transfer so that

79

the skiff was at a high point or a low point in the waves?

MR. LOPEZ: Vague and ambiguous, lacks foundation, incomplete hypothetical.

THE WITNESS: It's the boat, the skiff going up or going down or the middle, that's his question? Is it going up and down or the middle?

BY MR. WINDES:

Q   Okay. Correct. Okay. When there is some waves maybe four feet and you as the assistant skiffman are transferring from the skiff to the ladder on the Koorale, would you normally try to time your step?

A   I don't.

Q   You didn't do that?

A   I don't have a time to look at it, so I jump.

MR. LOPEZ: Wait a minute.

MR. WINDES: Now we have the witness saying that he didn't have a watch to look at the time now?

MR. LOPEZ: The translation.

MR. WINDES: We have a ridiculous answer and we'll just keep getting ridiculous answers for days.

MR. LOPEZ: The client is not trying to give you ridiculous answers. I don't think your question was finished, to begin with, but we are going to have to have some way so he knows your question is finished. Then we are going to have to have time for me to make my

80

objections. Reask the question.

MR. WINDES: I'm not asking bad questions. I've been asking them for 20 some odd years. I'm pretty confident these are pretty straight questions.

THE WITNESS: (In English.) What do you mean transfer from the skiff to the boat is mean, to the main boat or what?

MR. WINDES: What's the last part you asked?

THE WITNESS: (In English.) What do you mean by when the skiff -- transfer from skiff to the boat? That mean jump from the skiff to the main boat?

MR. LOPEZ: Jump.

MR. WINDES: Yeah. Jump, step, transfer are all the same in my mind. Okay? If you step or you jump from the skiff to the Koorale, I call that a transfer. So you were transferring from the skiff to the boat. That's what I meant. Okay? Now let me ask it again. Do you want to use the word jump or step?

THE WITNESS: (In English.) We always use jump.

THE INTERPRETER: Jump.

THE WITNESS: (Through the interpreter.) Jump.

MR. WINDES: When you are going from the skiff to the ladder of the Koorale.

THE WITNESS: (In English.) Jump from the skiff

81

to the ladder.

BY MR. WINDES:

Q    If you are going from the skiff to the ladder, you are jumping, stepping, transferring, it doesn't matter. You are going, aren't you?

MR. LOPEZ: Look. Look. Answer it the way you understand it. Mel, if you understand it as jumping, say when I jump, whatever. But he's trying to use a term here.

MR. WINDES: Someone is trying to use a term. I'm not sure which one.

MR. LOPEZ: Use the word jump. That's what he used.

MR. WINDES: Obviously, under some circumstances, you wouldn't be jumping, but, nevertheless, certainly "going" covers the whole range of possible ways of transferring.

BY MR. WINDES:

Q    When you were going from the skiff to the ladder on the Koorale, did you wait until the skiff got next to the Koorale?

MR. LOPEZ: Vague and ambiguous, lacks foundation, incomplete hypothetical. Go ahead. Translate.

THE INTERPRETER: Yours or his?

82

MR. LOPEZ: His question.

(Question interpreted.)

THE WITNESS: I don't know how to answer this, but I'm looking at the -- when the wave's going up or maybe going down, when it's right time to jump, and then I will jump.

BY MR. WINDES:

Q    Okay. Thank you. When the wave is going up or the wave is going down --

MR. LOPEZ: Same objections; incomplete hypothetical, lacks foundation, vague and ambiguous, also asked and answered.

BY MR. WINDES:

Q    -- which is the right time to jump?

MR. LOPEZ: Same objections.

THE WITNESS: When the boat is going down and then I will jump.

BY MR. WINDES:

Q    Why?

MR. LOPEZ: Same objections.

THE WITNESS: Because when the boat's going up and I will jump and then I will hit with the speed boat, my head will be hitting the speed boat.

BY MR. WINDES:

Q    Okay. So you are saying that you always timed

83

your jump so that the skiff was going down in the waves; is that right?

MR. LOPEZ: Misstates prior testimony, lacks foundation, incomplete hypothetical.

THE WITNESS: Can you repeat the question again?

MR. WINDES: No. Court reporter, please. I'm a little tired of repeating questions.

(Question read page 84, line 25, through page 85, line 2.)

MR. LOPEZ: Same objections.

THE WITNESS: I'm not timing my jumping.

BY MR. WINDES:

Q    Why not?

A    Every time I jump, I usually look at the -- I usually look at it. If I know that it is not safe, then I will not jump.

Q    How do you know if it is safe or not?

MR. LOPEZ: Objection; vague and ambiguous, lacks foundation, incomplete hypothetical.

THE WITNESS: There is no safe time most of the time when I'm working in the boat. The only one -- the only safe time when the speed boats come and take me from the skiff and when the captains tell when it's safe to jump to the boat.

84

1    THE INTERPRETER: It's frustrating, but it's
2  confusing.
3    MR. LOPEZ: Just translate his answer, that is
4  all.
5    THE WITNESS: Captain didn't say nothing.
6    MR. LOPEZ: No question pending.
7    THE INTERPRETER: Whatever he was saying I was
8  just saying.
9    MR. LOPEZ: No question pending.
10    MR. WINDES: He's trying to translate your
11  client's continuing answer. You don't want the translator
12  to finish your client's answer?
13    MR. LOPEZ: If he's not finished, go ahead, if
14  you are answering.
15    THE INTERPRETER: Can I ask him to rephrase his
16  question.
17    MR. LOPEZ: Ask him if he's finished with his
18  answer or do you want to answer more.
19    THE INTERPRETER: Can you repeat the question
20  again.
21    MR. LOPEZ: I'm sorry. My fault. Go ahead.
22    MR. WINDES: I forget the question.
23  BY MR. WINDES:
24    Q   Let's do some more drawings, Mel. Okay. Here
25  is what I want to do. I want to get a drawing of this

85

1    higher than the rail?
2  BY MR. WINDES:
3    Q   Yes. Is the bottom of boat — in other words,
4  this is the bottom of the boat. Okay? Okay? From the
5  bottom of the boat to the floor, how far was that?
6    MR. LOPEZ: For the record, counsel is pointing
7  from what appears to be the bottom, I guess this is the
8  speed boat hanging, to what has been indicated to be the
9  top of railing.
10    MR. WINDES: Forget the picture. Here is the
11  question: What was the distance from the bottom of the
12  speed boat, very bottom, down to the deck or the floor?
13    MR. LOPEZ: Objection; incomplete hypothetical,
14  lacks foundation, vague and ambiguous. Go ahead.
15    THE WITNESS: I don't really know.
16  BY MR. WINDES:
17    Q   Was the bottom of the speed boat higher than
18  the rail or lower than the rail?
19    MR. LOPEZ: Same objections.
20    THE WITNESS: What do you mean by high, that
21  is higher than the rail or?
22  BY MR. WINDES:
23    Q   Yes, that's what I mean.
24    A   Let me point at the pictures.
25    MR. LOPEZ: No. No. Let counsel ask the

87

1  area, okay, so that we see the ladder and we see the skiff
2  and the davit and the rail and the rope. Okay?
3    MR. LOPEZ: Of course this is not to scale.
4    MR. WINDES: Not to scale, not beautiful.
5    MR. LOPEZ: Not necessarily a perfect
6  representation.
7    THE WITNESS: (Witness complies.) This part
8  right here, all these right here. Ladder?
9  BY MR. WINDES:
10    Q   Okay. Was there a rail?
11    A   Right here.
12    Q   How high was the rail from the deck?
13    A   About 3 feet, 3 feet.
14    Q   And how high was the bottom of the motor boat
15  from the deck usually?
16    MR. WINDES: Vague and ambiguous, speculation,
17  lacks foundation. Go ahead.
18    THE WITNESS: From the floor or which?
19  BY MR. WINDES:
20    Q   From the deck or floor.
21    A   I don't know.
22    Q   Was the bottom of the motor boat higher than
23  the rail?
24    MR. LOPEZ: Same objections.
25    THE WITNESS: This boat right here, is it

86

1  questions.
2    MR. WINDES: Yes, I would like my question be
3  answered. Let me try it.
4  BY MR. WINDES:
5    Q   Was the bottom of the boat — okay. Tell you
6  what, I'm going to draw it.
7    A   The reason it's confusing, when you say boat,
8  that means the boat design, big boat.
9    Q   I said speed boat.
10    MR. LOPEZ: You were saying motor boat, which
11  is another --
12  BY MR. WINDES:
13    Q   Then maybe I don't need to draw it. Let's try
14  it again. Was the bottom of the speed boat higher or
15  lower than the top of the rail?
16    MR. LOPEZ: Objection; vague and ambiguous,
17  lacks foundation, incomplete hypothetical.
18    THE WITNESS: That's higher than the rail.
19  BY MR. WINDES:
20    Q   Higher than the rail?
21    A   Thank you.
22    Q   Thank you. How much higher?
23    MR. LOPEZ: Same objections.
24    THE WITNESS: If I sit. For example, if I sit
25  on the rail, the bottom of the speed boat will hit my

88

1 head, about the same height on my head. Oh, when I sit on
2 the rail, when I go like this, the speed boat will attach
3 to my head.
4 BY MR. WINDES:
5     Q  So the bottom of the speed boat is about 3 feet
6 higher than the top of the rail?
7     MR. LOPEZ: Objection; misstates prior
8 testimony, lacks foundation, incomplete hypothetical,
9 vague and ambiguous. Go ahead. You can answer.
10     THE WITNESS: What is my partner saying?
11     MR. LOPEZ: Don't worry about the objections.
12 Listen to the question and answer the question, but listen
13 to his question carefully.
14     (Question read line 5 through 6.)
15     MR. LOPEZ: Same objections.
16     THE WITNESS: I am not -- I don't really know.
17 BY MR. WINDES:
18     Q  Well when you sit on the rail, you sit with
19 your behind, right? When you sit on the rail, you sit
20 with your butt, right? And from here to here where you
21 pointed is, you would agree, it looks about 3 feet?
22     MR. LOPEZ: Objection; speculation, lacks
23 foundation.
24     THE WITNESS: Maybe. I don't know.
25 BY MR. WINDES:

89

1     Q  Then let's just make sure that it is clear.
2 You said that when you would sit on the rail, the bottom
3 of the speed boat would be near the top of your head,
4 right?
5     MR. LOPEZ: Objection; misstates his prior
6 testimony, lacks foundation, incomplete hypothetical.
7     THE WITNESS: Yes, but I don't know how much
8 distance in-between.
9 BY MR. WINDES:
10     Q  But if we measure from your behind to the top
11 of your head, that is approximately the distance from the
12 bottom of the boat to the top of the rail, right?
13     MR. LOPEZ: Objection; misstates prior
14 testimony, lacks foundation, incomplete hypothetical,
15 vague and ambiguous.
16     THE WITNESS: I don't know. It's better if we
17 have a tape line or measurement.
18 BY MR. WINDES:
19     Q  Now, you have described as best you can how
20 high the speed boat was, right?
21     MR. LOPEZ: Same objections.
22     THE WITNESS: That's right. That's when we sit
23 on the rail and the speed boat will be hit our head right
24 here.
25     MR. LOPEZ: For the record, the witness pointed

90

1 to the back of his head and tapping the back of his head.
2     MR. WINDES: I totally agree with you.
3 BY MR. WINDES:
4     Q  And that was -- was that where the boat was --
5 I'm sorry.
6     Was that where the speed boat was on the day of
7 your accident?
8     MR. LOPEZ: Objection; speculation, lacks
9 foundation. Go ahead.
10     THE WITNESS: What's the question again? Can
11 you repeat it again.
12     MR. LOPEZ: Reread the question.
13     (Question read line 6 through 7.)
14     MR. LOPEZ: Same objection.
15     THE WITNESS: Yes.
16 BY MR. WINDES:
17     Q  Okay. On the day of your accident, how high
18 were the seas?
19     MR. LOPEZ: Objection; vague and ambiguous.
20     THE WITNESS: Is that the time I was accident?
21 BY MR. WINDES:
22     Q  I didn't hear you.
23     (Answer read line 20.)
24 BY MR. WINDES:
25     Q  Okay. Yes. At the time of your accident, how

91

1 high were the seas?
2     MR. LOPEZ: Same objections.
3     THE WITNESS: It was big waves.
4 BY MR. WINDES:
5     Q  Can you estimate approximately how high the
6 waves were?
7     MR. LOPEZ: Objection; vague and ambiguous.
8     THE WITNESS: Is that the height of the wave?
9 Seven to eight feet.
10 BY MR. WINDES:
11     Q  How do you know that the waves were seven to
12 eight feet?
13     A  Because the time that skiffman brought me to
14 the boat, when the skiff is going up, I can jump from the
15 skiff to the boat, to the speed boat, that's how I can
16 tell about how big, how height of the waves.
17     Q  Sorry. You said that at the time of the
18 accident, if you jumped when the skiff was up, you could
19 jump into the speed boat?
20     A  Because the big waves, I can -- I can estimate
21 that I can jump from the skiff to the speed boat because
22 of the big waves.
23     Q  Are you saying that the top of the skiff was
24 going up to the same height as the top of the speed boat?
25     A  No. It can bring up the skiff and then bring

92

1  it up, and that's how much hit the speed boat, and then I
2  can bent my head down so it won't hit with the speed
3  boat. That's how I can explain it.
4  Q  When the skiff was coming up in the wave, was
5  the top of the skiff where you were standing coming up
6  higher than the deck of the Koorale?
7  A  Yes.
8  Q  How much more?
9  A  Like I said, when the waves bring up the skiff,
10  I have to bend down, because I will hit my head with the
11  speed boat.
12  Q  Did you talk to anyone during the 30 seconds or
13  so before your accident?
14  A  30 seconds? When that accident occurred, I was
15  laying down.
16      MR. LOPEZ: Translate what he said.
17      THE WITNESS: When they had my legs, I started
18  feeling as something hit my leg, something hit my leg.
19      MR. LOPEZ: Are you done with your answer? I
20  just want to make sure. Mel, give him a sentence or two
21  at a time, and then continue your answer so he can get a
22  translation.
23      THE INTERPRETER: The way he's speaking, it is
24  like a playing a recording again and again, same word
25  using. It seems like he's not comfortable with something.

93

1      MR. LOPEZ: Just translate what he's saying.
2      THE INTERPRETER: I will try my best to do
3  that.
4  BY MR. WINDES:
5  Q  How long before you were injured did you last
6  talk to Pepe?
7  A  How long?
8  Q  Yes.
9  A  Before?
10  Q  Yes.
11  A  Can you —
12      THE INTERPRETER: He wanted me to speak in
13  Marshallese. Okay.
14      THE WITNESS: I don't know. The last time I
15  talked with Pepe is during the time when I got my leg hurt.
16  BY MR. WINDES:
17  Q  We said before the injury. Let's try it
18  again. How long before the injury did you last talk to
19  Pepe?
20  A  We talked to each other all the time, as I was
21  being assistant for him.
22  Q  Do you remember anything that Pepe said to you
23  or you said to Pepe in the last few minutes before the
24  accident?
25  A  No.

94

1  Q  Did anyone on the Koorale say anything to you
2  during the five minutes or so before the accident?
3      MR. LOPEZ: Objection; vague and ambiguous as
4  to say, but go ahead.
5      THE WITNESS: Five minutes before my accident?
6  BY MR. WINDES:
7  Q  Yes.
8  A  No.
9  Q  Did you say anything to anyone on the Koorale
10  during the five minutes before the accident?
11  A  No.
12  Q  Okay. Now, would you describe to me in as much
13  detail as possible how the accident happened.
14      MR. LOPEZ: Calls for a narrative.
15  BY MR. WINDES:
16  Q  And start with the skiff coming up to the side
17  of the Koorale. What did you do and what happened?
18      MR. LOPEZ: Objection.
19      THE WITNESS: When the skiffman brought me to
20  the Koorale, that morning we were fishing, it was raining
21  and it was big waves. When at the time he brought me to
22  the boat or Koorale, the captain had a big bright light
23  pointing at the ladder where they was going to drop me off
24  at.
25      He pointed his bright light to us and then

95

1  pointed it second time to the ladder. That means take me
2  to the boat and drop me at the ladder or transfer me to
3  the ladder.
4      MR. WINDES: Could you try reading that back,
5  the last couple of sentences.
6      (Answer read page 95, line 25,
7      through page 96, line 3.)
8      THE INTERPRETER: "That means."
9      (Discussion off the record.)
10  BY MR. WINDES:
11  Q  Then what happened?
12  A  When he brought me to the boat because of the
13  waves, big waves, the skiff hit the boat and it turned the
14  boat around, and I didn't jump in the first place.
15  Q  Skiff hit what boat?
16  A  The small boat hit the big boat and hit it and
17  it turns. And that's why I didn't jump. I didn't
18  transfer to the ladder.
19      And then we tried one more time. He brought me
20  second time to the boat. Ferman, he turn on the bright
21  light and hit or pointed to the ladder so I can transfer
22  to the ladder.
23      MR. LOPEZ: Transfer or jump?
24      THE INTERPRETER: Jump to the ladder.
25      THE WITNESS: At the time I jump, hold the

96

1  ladder, Ferman shut off the light. He turn off the light
2  and shut off the light. And then I climb up. When time I
3  was climbing, I know that I have to be quick, because the
4  wave was really -- the weather was really bad. And when I
5  try my left leg - I'm sorry. When I try my -- when I put
6  my left foot on the deck and I was pulling up the other,
7  my right leg, when I pulled it up, that's the time they
8  hit it.
9      When they hit my leg, it was numb a little bit,
10  but two or three seconds or four, when I stand up, I see
11  all the blood.
12  BY MR. WINDES:
13    Q   Okay. All right. Stop. Let me ask you some
14  questions. Was there sunlight outside at the time?
15    A   No.
16    Q   It was not dawn yet?
17    A   It was early in the morning.
18    Q   Before dawn?
19    A   It was early in the morning, early in the
20  morning.
21    Q   Do you know what time it was?
22    A   About 4:00 a.m.
23    Q   How do you know it was 4:00?
24    A   Because most of the time, we do it about 4:00
25  in the morning.

97

1    Q   Usually do what at 4:00 in the morning?
2    A   Start -- that's the time we start fishing.
3      MR. LOPEZ: Go ahead. I know it's confusing.
4      THE INTERPRETER: He said in a wrap.
5      MR. LOPEZ: In a raft.
6      THE INTERPRETER: Raft. Okay.
7      MR. LOPEZ: On a log.
8      THE WITNESS: That's the time that we started
9  working in a raft.
10  BY MR. WINDES:
11    Q   That's at the beginning of the set, right?
12      MR. LOPEZ: Objection; vague and ambiguous,
13  lacks foundation, incomplete hypothetical.
14      THE WITNESS: In the beginning of set what?
15  BY MR. WINDES:
16    Q   You start fishing at 4:00, right?
17      MR. LOPEZ: On that day?
18      MR. WINDES: He said usually.
19      MR. LOPEZ: He's saying --
20      MR. WINDES: No. He said: Usually we start at
21  4:00.
22      MR. LOPEZ: On a raft.
23      MR. WINDES: Right. And I said -- the question
24  is: That's when you would start fishing operations in the
25  morning, right?

98

1      MR. LOPEZ: Vague and ambiguous.
2      THE WITNESS: We wake up in the morning, like
3  about 4:00 a.m. in the morning, as to time they wake us
4  up. Then we start having our breakfast, drinking coffees
5  and having breakfast. And then they drop down the light
6  bulbs.
7      MR. LOPEZ: Life boat.
8      THE WITNESS: Life boat. And then going to the
9  raft to make it brighter or get the lights for the raft.
10  And then we get away from the raft about a half mile and
11  then turn the light off at Koorale and there is no
12  lights. The only one has lights is the one, the life
13  boat. And about 4:30, the captain usually radio the guy
14  at the life boat if there is a fish underneath the life
15  raft. If there is a fish, then we go over there and then
16  set out the net.
17      MR. LOPEZ: Can I get a clarification here.
18  He's saying life boat, and I believe it is a light boat.
19      THE INTERPRETER: Light boat?
20      THE WITNESS: Light boat.
21      THE INTERPRETER: I'm not a fisherman.
22  BY MR. WINDES:
23    Q   Could it have been as late as 5:30 when your
24  accident happened?
25      MR. LOPEZ: Objection; speculation.

99

1      THE WITNESS: 5:30 is that you said?
2  BY MR. WINDES:
3    Q   Yes.
4    A   I don't know.
5    Q   Did Pepe have his flashlight on at the time of
6  the accident?
7      MR. LOPEZ: Objection; speculation.
8      THE WITNESS: I don't know.
9  BY MR. WINDES:
10    Q   At the time of your accident, was there any
11  light that was being shined on the ladder?
12    A   Is that during my accident?
13    Q   Yes.
14    A   No.
15    Q   When you jumped onto the ladder, was there
16  light on the ladder?
17    A   Yes, the light from the captain.
18    Q   And how long after you were on the ladder did
19  the light stop?
20    A   By the time I jump to the rope ladder, the
21  captain shut off the light.
22    Q   Rope ladder?
23    A   Ladder.
24    Q   Quickly after you were on the ladder is when
25  the light stopped; is that right?

100

**101**

1    MR. LOPEZ: Objection; misstates prior
2    testimony.
3          THE WITNESS: What was the time?
4    BY MR. WINDES:
5    Q   I will just ask the same question again. How
6    long after you stepped onto the ladder did the light
7    stop?
8    A   Like I said, when I jumped to the ladder, the
9    lights shut off.
10   Q   Did you need the light to be able to climb up
11   the ladder?
12   A   Yes.
13   Q   Why?
14   A   Because I can't -- so I can see.
15   Q   Did you continue or did you climb up the ladder
16   before the skiff hit you?
17   A   Yes.
18   Q   How far -- how many steps did you climb?
19   A   I don't really remember. I know that my left
20   foot is inside and my right foot is still outside. I was
21   trying to pull it up when the time happened.
22   Q   And were you standing straight up?
23         MR. LOPEZ: Objection; vague and ambiguous.
24         THE WITNESS: Standing time when they hit my
25   leg?

**102**

1    BY MR. WINDES:
2    Q   When the skiff hit your leg, was your body
3    standing straight up?
4          MR. LOPEZ: Objection; vague and ambiguous.
5          THE WITNESS: I'm not standing. Like I said, I
6    was bending so the speed boat won't hit my head.
7    BY MR. WINDES:
8    Q   When you jumped from the skiff to the ladder,
9    was the skiff going up or down in the wave?
10   A   The skiff is trying to come down.
11   Q   How far down had the skiff gone when you
12   jumped?
13         MR. LOPEZ: Objection; vague and ambiguous.
14         THE WITNESS: I don't really know. Like I
15   said, it was really dark.
16   BY MR. WINDES:
17   Q   Well, you said that, when you jumped, it was
18   not really dark, right?
19         MR. LOPEZ: Objection; misstates his prior
20   testimony.
21         THE WITNESS: That's right. It wasn't really
22   dark because the light was pointing at us.
23   BY MR. WINDES:
24   Q   Okay. So when you jumped, how far down had the
25   skiff gone from the top?

**103**

1    MR. LOPEZ: Objection; vague and ambiguous.
2          THE WITNESS: How far?
3    BY MR. WINDES:
4    Q   Yes.
5    A   Far. He says what far from the?
6    Q   Yes, from the top.
7    A   Where? Is that top of the Koorale or?
8    Q   The skiff goes up and it goes down, up and
9    down, up. Now, how far down after the top? I didn't hear
10   the answer?
11   A   Somewhere between.
12   Q   Were you trying to time it?
13         MR. LOPEZ: Objection; vague and ambiguous.
14         THE WITNESS: No.
15   BY MR. WINDES:
16   Q   Did you -- you said that you always -- when
17   there were waves, you always jumped to the ladder when the
18   skiff was going down in the water, right?
19         MR. LOPEZ: Objection; misstates his prior
20   testimony, lacks foundation, incomplete hypothetical.
21         THE WITNESS: How will you describe it, going
22   down when I'm jumping to the boat or?
23   BY MR. WINDES:
24   Q   Let me ask the question again. Is it true that
25   when there were waves, you always jumped from the skiff to

**104**

1    the ladder on the Koorale when the skiff was going down in
2    the waves?
3          MR. LOPEZ: Objection; misstates his prior
4    testimony, incomplete hypothetical, lacks foundation,
5    vague and ambiguous.
6          THE WITNESS: You mean by the skiff always go
7    down to the bottom?
8    MR. WINDES: No.
9          THE WITNESS: When the time I jumped from the
10   skiff to the boat, if I know that I wouldn't be hitting my
11   head -- when I jumped from the ladder I wouldn't hit my
12   head with the speed boat at the time of jump.
13         MR. LOPEZ: That wasn't the response.
14         (Answer read line 9 through 12.)
15   BY MR. WINDES:
16   Q   Let's try it again. Is it true that the way
17   that you normally jumped from the skiff to the ladder on
18   the Koorale when there were waves was to jump when the
19   skiff was going down in the water?
20         MR. LOPEZ: Object; vague and ambiguous, lacks
21   foundation, incomplete hypothetical, misstates prior
22   testimony.
23         MR. WINDES: I believe it is exactly consistent
24   with prior testimony and that the record will reflect
25   that.

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 170 of 234

THE WITNESS: I can say that if there is a big
waves, there is nobody can jump from boat to boat.
Because I have to take order from the captain, that's what
I have to do.
BY MR. WINDES:
Q   Did the captain or anyone else on the boat ever
tell you that if you didn't think that it was safe to jump
that you should not jump?
A   For us sailors or worker and whoever is on
charge on deck, Captain Ferman, there is nobody will talk
back to him when he tell you things to do.
Q   Let me try again. First of all, did the
captain ever tell you that you should not jump from the
skiff to the Koorale unless you are -- unless you feel
that it is safe to do it?
MR. LOPEZ: Objection; vague and ambiguous,
lacks foundation.
THE WITNESS: No. The only thing I know is if
the captain signaled to us by using his bright light and
pointed at us and to the ladder, that means they have
draft me right away.
BY MR. WINDES:
Q   They have to what?
A   I mean they have to transfer me to the boat
right away.

105

Q   Right away?
A   It's an order.
Q   And if the captain tells you to transfer with
light, but you think it is unsafe to transfer, then you
would jump anyway?
MR. LOPEZ: Objection; assumes facts not in
evidence, lacks foundation, incomplete hypothetical.
THE WITNESS: Yes. If I don't jump, then he
will say all the bad words and foul language about me.
BY MR. WINDES:
Q   Have you ever been transferring and decided
that it was too rough or too unsafe to jump?
MR. LOPEZ: Objection; vague and ambiguous,
lacks foundation, incomplete hypothetical.
THE WITNESS: If the captain said it's an
order, you have to do it; otherwise, you will lose your
job.
BY MR. WINDES:
Q   Did you ever make the decision that you would
not jump and that you wanted to wait?
MR. LOPEZ: Objection; vague and ambiguous,
lacks foundation, incomplete hypothetical.
THE WITNESS: Like I said, Ferman is very -- if
Ferman tell the skiffman to bring me to the boat, he has
to do it.

106

BY MR. WINDES:
Q   Did you ever refuse to jump?
MR. LOPEZ: Objection; vague and ambiguous.
THE WITNESS: Would you repeat it again.
BY MR. WINDES:
Q   Did you ever refuse to jump because you thought
it was unsafe to do so?
MR. LOPEZ: Vague and ambiguous, lacks
foundation, incomplete hypothetical.
THE WITNESS: Like I said, if I miss -- at the
time he told me to jump to the ladder, he would yell to
the skiffman to bring me back over there at once.
BY MR. WINDES:
Q   Did that ever happen?
A   Every time. If Ferman turned on his bright
light and pointed at us and to the ladder that means
that's it.
Q   Did you ever refuse to jump when the captain
did that with the light?
A   Sometimes.
Q   How many times?
A   I never refused, but like I say, like if I
opened my mouth, he will yell at me, bad words, or bring
me -- bring me to the boat and then drop me off at the
boat and then he will use the speakers to yell at me and

107

say get off the boat, get off the boat.
Q   I need to ask it again because the answer does
not seem responsive. Did the captain ever point the light
at you and then point the light at the ladder and then you
refused to jump?
MR. LOPEZ: Objection; vague and ambiguous,
lacks foundation, incomplete hypothetical.
THE WITNESS: I have to jump.
MR. WINDES: Read the question back, please.
(Question read line 2 through 5.)
MR. LOPEZ: Why is he rereading the question?
You want him to translate the question again?
MR. WINDES: I do because the answer was, once
again, not responsive. I'm going to keep asking until I
get what I consider to be responsive.
MR. LOPEZ: He said: I have to jump.
MR. WINDES: The answer has to be yes or no.
Then he can explain why.
MR. LOPEZ: Doesn't have to be yes or no.
MR. WINDES: Can I go ahead? You can object.
MR. LOPEZ: Then I object.
MR. WINDES: The objection is reiterated
without saying it.
BY MR. WINDES:
Q   Did the captain ever point the light at you and

108

Case 1:03-cv-00004     Document 27     Filed 02/21/2003     Page 171 of 234

1  point the light at the ladder and then you said no, I
2  refuse; it is not safe?
3          MR. LOPEZ: Objection; asked and answered,
4  incomplete hypothetical, lacks foundation.
5          THE WITNESS: Like I said my other answer
6  before, you can't refuse Ferman's words.
7  BY MR. WINDES:
8      Q   So the answer is you have never refused to
9  jump; is that right?
10         MR. LOPEZ: Objection; vague and ambiguous.
11         THE WITNESS: No one will refuse his words.
12  You have to do his works. Whatever he say, people do it.
13  BY MR. WINDES:
14     Q   Have you ever refused to do what he told you to
15  do?
16         MR. LOPEZ: Objection; vague and ambiguous.
17         THE WITNESS: No. Everything, he told me to do
18  it, I would do it.
19  BY MR. WINDES:
20     Q   Every time?
21     A   Every time. I have seen people, if they don't
22  his, whatever he told them to do, they will get released
23  from work.
24     Q   Did you ever ask that the speed boat be used to
25  transfer you to the Koorale?

                                                      109

---

1          MR. LOPEZ: Objection; vague and ambiguous.
2          THE WITNESS: Asking what?
3          MR. LOPEZ: Reread the question.
4          (Question read page 109, line 24 through 25.)
5          THE WITNESS: There is time we usually talk
6  about the speed boat, me and whoever is in charge of the
7  deck, deck boss, whoever, and navigators, to use the speed
8  boat from -- for picking us up from the boat to the
9  Koorale, take me from the speed -- from the skiff to the
10  Koorale, but there is no one will talk with Ferman to use
11  the speed boat.
12  BY MR. WINDES:
13     Q   Did you ever use the speed boat to transfer
14  from the skiff to the Koorale?
15     A   No.
16     Q   Did you ever use some other way to get from the
17  skiff to the Koorale other than to jump from the skiff to
18  the ladder?
19     A   No. No. No. It's only the jumping.
20         MR. WINDES: Can we take a little break.
21         (Recess.)
22         MR. WINDES: I have asked for and counsel has
23  been good enough to agree to continue this to either a
24  week from Monday or a week from Tuesday. We are going to
25  work that out. I have still got some residual symptoms,

                                                      110

---

1  headache and fatigue, from a head injury months ago. It
2  is doing it to me now and I need a break.
3          MR. LOPEZ: We are not going to complete
4  today. That is fine with me. I will work on setting up
5  something here for one of those two days. Mr. DeBrum will
6  of course reserve his right to review this volume of the
7  transcript and make any corrections he deems necessary.
8  Want to handle this in a separate thing so she can get it
9  out and he can start making corrections to it?
10         MR. WINDES: Fine with me.
11         MR. LOPEZ: Stipulate the court reporter be
12  relieved of her duties under the code, that the original
13  may be forwarded to my office. Mr. DeBrum will review and
14  make changes to his deposition transcript within the time
15  allotted by the code or earlier if we can get it done.
16  We'll forward any changes to counsel within give me a week
17  of his signing of the transcript. Want me to retain the
18  original?
19         MR. WINDES: The only problem I have with what
20  we are talking about is I would prefer he not have the
21  opportunity to go through the deposition before the next
22  part of the deposition. But I will not have that
23  opportunity, so if I can get a rough copy when you get a
24  rough copy with the understanding that it's not corrected,
25  I can go with that.

                                                      111

---

1          MR. LOPEZ: I don't understand. I don't
2  follow.
3          MR. WINDES: I don't think it would be fair if
4  you were to get a rough copy of the transcript before the
5  second part of the deposition unless I also got a rough
6  copy so I can look at it.
7          MR. LOPEZ: I think she can give rough copies
8  today. That is not a problem.
9          MR. WINDES: When you get a copy of the
10  original to him, if you could also please get it to me, I
11  appreciate it. Okay?
12         We'll mark as Exhibit 2 the other drawing the
13  witness did showing a closer up of the speed boat and the
14  davit.
15         (EXH. 2 was marked for identification.)
16         (The deposition was adjourned at 4:24 p.m.)
17         I, MEL DeBRUM, swear, under penalty of perjury,
18  that I have read the foregoing deposition, and that it is
19  true and correct, to the best of my knowledge and belief.
20  Signed on this      day of
21  2002, at          ,
22  (City)          (State)
23
24              MEL DeBRUM
25

                                                      112

---

CANEDY COURT REPORTING 1-800-590-1800

```
 1   State of California)
 2                     :
 3   County of San Diego)
 4          I, Bonnie G. Breen, a Certified Shorthand
 5   Reporter, Certificate No. 5582, do hereby certify that
 6   the witness in the foregoing deposition was by me first
 7   duly sworn to testify to the truth, the whole truth and
 8   nothing but the truth in the foregoing cause; that the
 9   deposition was then taken before me at the time and
10   place herein named; that said deposition was reported
11   by me in shorthand and then transcribed through
12   computer-aided transcription, and the foregoing
13   transcript contains a true record of the deposition of
14   said witness.
15          I do further certify that I am a
16   disinterested person and am in no way interested in the
17   outcome of this action or connected with or related to
18   any of the parties in this action or to their respective
19   counsel.
20          In witness whereof, I have hereunto set my
21   hand on this 10th day of June, 2002, at San Diego County,
22   California.
23
24   Bonnie G. Breen, CSR, Inc.
25   Certificate No. 5582
```

                                        113





1  BANNING MICKLOW BULL & LOPEZ LLP
   William L. Banning, State Bar No. 75757
2  John S. Lopez, State Bar No. 149291
   501 West Broadway, Suite 2090
3  San Diego, California 92101-8563
   Telephone:  (619) 230-0030
4  Facsimile:   (619) 230-1350

5  Attorneys for Plaintiff, Counterdefendant and
   Counterclaimant MEL DeBRUM

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  MEL DeBRUM, an individual,          )   IN ADMIRALTY

12             Plaintiff,               )   Case No.  01-08403 DDP (Shx)

13  vs.                                 )
                                        )   **CORRECTIONS TO**
14  M & F FISHING CO., INC., a          )   **DEPOSITION OF MEL DeBRUM**
    corporation, *in personam*, and F/V )   **OF MAY 24, 2002**
15  KOORALE, her engines, tackle, apparel, )
    furniture, and appurtenances, *in rem*, )
16                                      )
               Defendants.             )
17  _____ )
                                        )
18  M & F FISHING CO., INC., a          )
    corporation,                        )
19                                      )
               Counterclaimant,         )
20                                      )
    v.                                  )
21                                      )
    MEL DeBRUM,                         )
22                                      )
               Counterdefendant.        )
23  _____ )
                                        )
24  MEL DeBRUM,                         )
                                        )
25             Counterclaimant,         )
                                        )
26  vs.                                 )
                                        )
27  M & F FISHING CO., INC., a          )
    corporation,                        )
28                                      )
               Counterdefendant.        )
    _____ )

1    Attached hereto are the corrections to the Deposition of Mel DeBrum taken on

2  May 24, 2002.

3  Dated:  October 17, 2002                BANNING MICKLOW BULL & LOPEZ LLP

4

5                                          _____
                                           William L. Banning
6                                          John S. Lopez

7                                          Attorneys for Plaintiff, Counterdefendant and
                                           Counterclaimant MEL DeBRUM
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                                        2

# CERTIFICATE

I, THE UNDERSIGNED, DO HEREBYBY CERTIFY THAT I HAVE READ THE FOREGOING
DEPOSITION AND THAT, TO THE BEST OF MY KNOWLEDGE, SAID DEPOSITION IS TRUE AND
ACCURATE (WITH THE EXCEPTION OF THE FOLLOWING CHANGES LISTED BELOW):

| PAGE # | LINE # | EXPLANATION |
|--------|--------|-------------|
|        |        | SEE ATTACHED CORRECTIONS, PAGES 1 THROUGH 13, INCLUSIVE |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |
|        |        |             |

SIGNATURE

# Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| 1 | 4:19   A   He was born there and he grew up there. | "I" was born there and "I" grew up there. | The answer stated is not the answer given to the interpreter. . |
| 2 | 4:21   A   When I left, 12 or 13 years. | When I left I was 12 or 13 years old. | The answer stated is not the answer given to the interpreter. |
| 3 | 4:24   A   He went to elementary school in Ebeye, one 4:25 through eight grades in Ebeye. | I went from Kindergarten through sixth grade in Ebeye, then went to Majuro for seventh grade, then I came back to Ebeye for eigth grade. | The answer stated is not the answer given to the interpreter. |
| 4 | 5:24   THE WITNESS:   1989. | I lived in Majuro for about one year while I went to seventh grade, then I went back to Ebeye for eighth grade. | The question asked by the translator was different than the question stated. |
| 5 | 6: 2   A   About 18. | About 18 or 19 in Marshall Islands High School. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 6 | 6: 4   A   9th grade. | 11th grade in Marshall Islands High School. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 7 | 6:14   THE WITNESS:   '83. | 1983 to 1984 | The answer stated is not the answer given to the interpreter. |
| 8 | 6:19   A   Yes. | No. It was the 12th grade. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 9 | 6:21   A   No. | Yes. I completed 10th grade. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 10 | 6:23   A   Couldn't make it. I mean stop interesting and 6:24 studying school. He got married. | I never left Seventh Day Adventist High School. I graduated from that school. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 11 | 7: 2   A   Yes. | No. I didn't get married until 1988 | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 12 | 7: 9   A   He was just hanging around. | I was in school except for about two years | The answer stated is not the answer given |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | ** | when I was at home. | to the interpreter; I believe the question was also altered. |
| 13 | 7:18    A    Yes, did not go to school. | Yes, I did not work. I went to school most of that time. | The answer stated is not the answer given to the interpreter. |
| 14 | 7:20    A    '84, he got married. | In 1984 I started living with my ex-wife. | The answer stated is not the answer given to the interpreter. |
| 15 | 7:22    A    My oldest one is -- was born 1987. | My first child was born in February of 1985. | The answer stated is not the answer given to the interpreter. |
| 16 | 7:25    A    Yes, no work. | I did not work before my wife got pregnant with my first child. I went to work on a contract for building a new hospital on Majuro, just after graduating High School. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 17 | 8: 2    A    I was staying with my brothers. | I was working and living with my brother-in-law and my sister. | The answer stated is not the answer given to the interpreter. |
| 18 | 8: 5    A    They were supporting us, his family. When they 8: 6 supporting us when I got married and 8: 7 when my wife got 8: 7 pregnant and I started to looking for a job. | I was living with my brother-in-law and my sister. When I got married and my wife got pregnant, I went to work. | The answer stated is not the answer given to the interpreter. |
| 19 | 8:11    A    They were supporting us before I was going to 8:12 have my child, and then I was looking for a job after that. | No. We lived with my brother-in-law and sister when my wife got pregnant, and I was looking for a job. | The answer stated is not the answer given to the interpreter. |
| 20 | 8:15    A    No jobs. | I had no job until my wife got pregnant, but I was working in 1985, 1986 and 1987. | The answer stated is not the answer given to the interpreter. |
| 21 | 8:18    A    Yes. | No. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 22 | 8:21    A    No. | No. I had no further education after I graduated from Seventh Day Adventist high school in about 1984. | The answer stated is not the answer given to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| 23 | 9: 2  THE WITNESS:  Couldn't remember what year. | I believe the job at the hospital started in late 1984 or ealy 1985. | The answer stated is not the answer given to the interpreter. |
| 24 | 9:10  A  With all kind of work, such as plumbing, | Change to: "I did all kinds" of work | The answer stated is not the answer given to the interpreter. |
| 25 | 9:17  A  Two years plus. | Probably one year plus. | The answer stated is not the answer given to the interpreter. |
| 26 | 11:22  A  Jean. | Tim. | The answer stated is not the answer given to the interpreter. |
| 27 | 11:24  A  Jim. Jim. | Tim. | The answer stated is not the answer given to the interpreter. |
| 28 | 12: 1  A  Couldn't.  No | I don't know his last name. | The answer stated is not the answer given to the interpreter. |
| 29 | 12: 3  A  The reason why I left, I got tired of working 12: 4 with boats. | I didn't quit A.U. Fishing, but I left for a while to take a trip on a Catamaran. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 30 | 12:6  A  Yes. | Yes, but not until I went to work on Koorale. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 31 | 12: 8  A  Staying around.  Staying around.  Hanging 12: 9 around. | Fisherman on the Koorale. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 32 | 12:12  A  About three, four months. | I didn't stop working.  I worked right up to the time I left to get on Koorale.  But I worked a trip on a catamaran that took about two or three months. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 33 | 12:14  A  After three months, I came back and worked at 12:15 the same place, same company. | "three" is changed to "about two or three" | The answer stated is not the answer given to the interpreter. |
| 34 | 12:25  A  About 20 feet.  We were building small yachts. | First sentence should read: While I was working at A.U. Fishing Company, the boats we were building were about 20 feet. | The answer stated is not the answer given to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|-----|-----------|---------|--------|
| 35 | 13: 9   A   I get tired and I quit again. | I never quit A.U. Fishing Company until I went to work on Koorale. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 36 | 13:11   A   Not even close to a year. Less than a year. | I was never off work at A.U. Fishing Company. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 37 | 13:13   A   Fishing.  Said he went to a boat, ship, fishing 13:14 boat Koorale, called Koorale. | My next job after A.U. Fishing Company was as a fisherman on board Koorale. | The answer stated is not the answer given to the interpreter. |
| 38 | 13:17   A   I was staying with family and 13:18 kids. babysitting these | I didn't.  I was working all the time without lapse when I worked at A.U. Fishing Company. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 39 | 13:20   A   His kids. | I was not babysitting.  I was working. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 40 | 13:22   A   Yes. | I was married in 1988. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 41 | 13:24   A   She went to work, and I was resting. | My wife never worked, even after I went to work on Koorale. | The answer stated is not the answer given to the interpreter. |
| 42 | 14: 6   A   Yes. | Yes.  When I went to Majuro after we came into port, I lived with my wife. | The answer stated is not the answer given to the interpreter. |
| 43 | 14:11   A   Yes. | Yes.  I think so. | The answer stated is not the answer given to the interpreter. |
| 44 | 14:13   A   I did not notice.  When she left to Guam, and 14:14 after a couple months, somebody tell him that she's gotten 14:15 married. | Change: "she's gotten married" to "she is living with someone else." | The answer stated is not the answer given to the interpreter. |
| 45 | 19:11   THE WITNESS: I don't know, because I haven't 19:12 work here last couple years ago, I | I don't know if I'm allowed to work here because I did not work in the past in this country. | The answer stated is not the answer given to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | wasn't work here.<br>19:13     He said I don't know if I'm<br>allowed to work<br>19:14 here because I did not work in the<br>past in this country. | ** | ** |
| 46 | 19:19     A     Because I want to go home,<br>stay with my kids. | Because of my disability in my leg.  When<br>my leg is fixed, I want to go home to be with<br>my kids. | The answer stated is not the answer given<br>to the interpreter. |
| 47 | 22:19     A     About 20 minutes.  If I'm not<br>doing anything,<br>22:20 just standing there or when I'm<br>walking, about 20 minutes. | About 20 minutes.  If I'm not doing anything,<br>just standing there and not walking, about<br>20 minutes. | The answer stated is not the answer given<br>to the interpreter. |
| 48 | 23:18     A     If I'm not doing anything but<br>I'm standing up<br>23:19 right there and -- if I'm standing still<br>and I'm not doing<br>23:20 nothing, about 20 minutes.  But if I<br>walk 20 minutes,<br>23:21 after 20 minutes, I cannot stand<br>longer than 20 minutes. | If I'm not doing anything but I'm just<br>standing up, about 20 minutes.  I cannot<br>stand longer than 20 minutes. | The answer stated is not the answer given<br>to the interpreter. |
| 49 | 25:22     A     Oh, when I came here, Prince<br>was there already. | I knew Prince from fishing.  When I came to<br>the apartment, Prince was already there.<br>Mana Mana Apartments. | The answer stated is not the answer given<br>to the interpreter. |
| 50 | 27:12     A     Apartment. | The answer stated is not the answer given<br>to the interpreter. |  |
| 51 | 27:14     A     About a year.  Right after,<br>they amputated his<br>27:15 leg. | I was there about a year.  I moved in there<br>right after they amputated my leg. | The answer stated is not the answer given<br>to the interpreter. |
| 52 | 29:9     A     Samoa.  He lives in Samoa<br>after he got off from<br>29:10 Koorale. | I lived on board Koorale in American<br>Samoa. | The answer stated is not the answer given<br>to the interpreter. |
| 53 | 29:12     A     He said '91, he went back to<br>Koorale and worked<br>29:13 until he get his -- until I get my<br>accident. | I lived on board Koorale in American<br>Samoa.  In about 1996 I began staying<br>sometimes with my fiance in American<br>Samoa. | The answer stated is not the answer given<br>to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| 54 | 29:15    A    We were — I was with my family in Majuro. | I was on Koorale, fishing. When the boat was in port, I lived on the boat. In about 1996 I began staying sometimes with my fiance in American Samoa. | The answer stated is not the answer given to the interpreter. |
| 55 | 29:18    A    My wife. | My sister and brother in-law, Camilla Ingram and her husband. This is whom I am referring to when I say my family. | The answer stated is not the answer given to the interpreter. |
| 56 | 30:4    A    Until — I was living with Koorale until I got 30: 5 my accident, until 2000. | change "with Koorale" to "on Koorale" and "got my" to "had my" | The answer stated is not the answer given to the interpreter. |
| 57 | 30: 8    A    When I was staying with my ex — my new wife is 30: 9 Samoan girl, woman, that's where he was staying at, in her 30:10 apartments. | Sometimes when we were in port I would stay nights at my fiance's apartment. She is a Samoan girl. | The answer stated is not the answer given to the interpreter. |
| 58 | 30:12    A    Yes, I have a Samoan girl. | I have a Samoan girl who is going to be my wife. | The answer stated is not the answer given to the interpreter. |
| 59 | 30:21    A    Yes.  After — when I was working, after I work 30:22 and I go stay with her after. | Yes, I would work during the day on Koorale while it was in port, and after work I would go stay with her. | The answer stated is not the answer given to the interpreter. |
| 60 | 31:18    A    Yes.  When I was in the hospital, after I got 31:19 out of the hospital, the family came from Guam to visit 31:20 him. | visit "me" | The answer stated is not the answer given to the interpreter. |
| 61 | 34: 6    A    Sometimes hundred. | Sometimes one hundred dollars. | The answer stated is not the answer given to the interpreter. |
| 62 | 35: 1 will do over there because, right now, I can't run. I 35: 2 can't. I lost my strength, and I can't do nothing. I | Change "can't." to "can't walk very far or run" | The answer stated is not the answer given to the interpreter. |
| 63 | 35: 8        THE WITNESS:  Yes.  If they fix my leg and I | Change: After "if I can run" add "or walk without pain" | The answer stated is not the answer given to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | 35: 9 can start working, lifting heavy weights, if I can run or 35:10 do something. | ** | ** |
| 64 | 35:14   A   I can be a security guard if my leg is better. 35:15 But, right now, I cannot do anything with my legs because 35:16 it is being bothering him a lot. | I might be a security guard if my leg is better. But right now, I cannot do anything because my leg is bothering me a lot and causes me a lot of pain. | The answer stated is not the answer given to the interpreter. |
| 65 | 38: 9   A   Skiffman called the driver, called skiffman, 38:10 myself, and assistant skiffman. | The skiffman and the assistant skiffman. | The answer stated is not the answer given to the interpreter. |
| 66 | 38:18.   A   Yes. | | The answer stated is not the answer given to the interpreter. |
| 67 | 39: 5   A   Yes. | Yes, when I was there. | The answer stated is not the answer given to the interpreter. |
| 68 | 40: 3   A   No, never changed. | Yes, starting about 1991. | The answer stated is not the answer given to the interpreter. |
| 69 | 41:15   A   Berman. | "Fermin" | The answer stated is not the answer given to the interpreter. |
| 70 | 42:15   A   If I'm late for some work he assigned me for, 42:16 and then he start saying bad words or foul language. | If I'm late getting on board, he will start yelling bad words or foul language. | The answer stated is not the answer given to the interpreter. |
| 71 | 42:18   A   If -- if the skiffman take me to a boat and 42:19 It's late, then if he late to job on boat, then the 42:20 captain got mad at him, and then he starts saying bad 42:21 words.  And during our works, he also saying a bad words. | If the skiffman took me to the Koorale too slow, he would yell and curse because I was late getting on board Koorale. He would say I was late to my job on Koorale.  He would start yelling bad words.  Even while we were working he would be yelling bad words. | The answer stated is not the answer given to the interpreter. |
| 72 | 43:21   A   No. | Two speed boats and a light boat. | The answer stated is not the answer given to the interpreter, I believe the question was |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact | Text | Changes | Reason |
|---|---|---|---|---|
| ** | ** | ** | ** | also altered. |
| 73 | 43:23 | A     No other boats. | Yes. Two speed boats and a light boat. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 74 | 44: 8 | A     Yes, belongs to Koorale. | Yes.  The skiff belongs to Koorale. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 75 | 44:12 | A     Only one Koorale by itself. | Two speed boats and a light boat. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 76 | 44:15 | A     No, no other boat, small boats. | Yes.   There were other boats.   Two speedboats and a light boat.  These are smaller than the skiff. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 77 | 44:18 | A     Yes. | Yes, it was kept on the stern of Koorale. | The answer stated is not the answer given to the interpreter. |
| 78 | 45: 7 | A     Something maybe as more than one or two a day. 45: 8 If there is a lot of school fish, like we can use it all 45: 9 day long. | Sometimes maybe more than twice a day. If there is a lot of school fish, we can use it all day long. | The answer stated is not the answer given to the interpreter. |
| 79 | 44:23 | A     Speed boat, light boat. | Two speedboats and one lightboat. | The answer stated is not the answer given to the interpreter. |
| 80 | 45:19 | A     Yes. | Yes.  1 think Koorale had the same two speedboats. | The answer stated is not the answer given to the interpreter. |
| 81 | 44:25 | A      For the crew above seagulls and all, like far 45: 1 away, the seagulls, the birds, school fish. | The speedboats are used for circling the school of fish to keep them from escaping the net. | The answer stated is not the answer given to the interpreter. |
| 82 | 45:22 | A      It's on the right side of the boat on the 45:23 deck.  On the deck. | Change "deck" to "davit" | The answer stated is not the answer given to the interpreter. |
| 83 | 45:25 | A      Yes. | Yes, if a speedboat was being worked on or | The answer stated is not the answer given |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | ** | | |
| 84 | 46:10  THE WITNESS: Yes, on davit. | was kept off the davits, it was stored on the speedboat deck. Yes. The speedboats were sometimes kept on the speedboat davits. | to the interpreter. The answer stated is not the answer given to the interpreter. |
| 85 | 46:13  A  Yes. | Yes, the speedboats were kept on the same speedboat davits. | The answer stated is not the answer given to the interpreter. |
| 86 | 51:22  A  Yes. | Yes. While we were out fishing, a speedboat would usually be kept on the forward davit. | The answer stated is not the answer given to the interpreter. |
| 87 | 51:18  THE WITNESS: Yes, is always going this way. | Yes. When we were out fishing, a speedboat would usually be kept on the forward davit. | The answer stated is not the answer given to the interpreter. |
| 88 | 52: 6  THE WITNESS: One in the front and one in the 52: 7 back. | I don't know. | The answer stated is not the answer given to the interpreter. |
| 89 | 53:23  A  About 10 feet plus. | About 10 feet maybe, but I don't really know. | The answer stated is not the answer given to the interpreter. |
| 90 | 55:10  A  He was a knew person. | Change "knew" to "new" | The answer stated is not the answer given to the interpreter. |
| 91 | 55:13  A  When he become a skiffman, all I know is he 55:14 worked with us as when we make one trip and that's the 55:15 time the accident occur. | When he became the skiffman, all I know is he worked with us one trip before, and was the skiffman when the accident occurred. | The answer stated is not the answer given to the interpreter. |
| 92 | 56: 3  A  Well, he just came Koorale as a skiffman. 56: 4 There was only one time. And then he came and when the 56: 5 accident was occur. | Well, he came Koorale as the skiffman the trip before, and he was the skiffman when the accident occurred. | The answer stated is not the answer given to the interpreter. |
| 93 | 57:19  A  I -- I can't count, because every time they 57:20 usually throw me on the skiff. He | Change "He" to "I". Change "him" to "me" to the interpreter. | The answer stated is not the answer given to the interpreter. |

## Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | couldn't because every 57:21 time they put him on the skiff, right? 57:22         If -- all the time when I was -- as assistant 57:23 skiffman, they usually put me on the boat. | ** | ** |
| 94 | 58:11         THE WITNESS:  There is some times when the 58:12 boat, water comes on the deck, and the net usually set 58:13 out. | There were times when the waves were coming over the decks and the Captain would order the net set out. | The answer stated is not the answer given to the interpreter. |
| 95 | 59: 8         THE WITNESS:  No.  No. | I do not fully understand this question.  I do not know, depending on how you measure the waves.  I have seen the waves coming over the deck of Koorale when we made a set. | The answer stated is not the answer given to the interpreter; I believe the question was also altered. |
| 96 | 59:15         A       The captain usually used flashlights so we can 59:16 see the steps. | The Captain would usually shine his spotlight down so I could see the steps. | The answer stated is not the answer given to the interpreter. |
| 97 | 59:19         A       No.  Usually at the crow's nest. | No.  The Captain would usually be in the crow's nest. | The answer stated is not the answer given to the interpreter. |
| 98 | 60:14         A       The skiffman has one flashlight, and I have 60:15 mine, and the captain has his one. So the one I had is 60:16 the one I used to look at the steps. | The skiffman has one flashlight, and I have mine, and the captain has his spotlight.  The one I had is the one I used to check the engine. | The answer stated is not the answer given to the interpreter. |
| 99 | 60:19         A       Yes. | Yes, to shine on the steps as we approach, but not to jump and climb the steps. | The answer stated is not the answer given to the interpreter. |
| 100 | 60:21         A       And the captain has one big flashlight, and 60:22 that is really bright, and that's with my flashlight that 60:23 can make the clearer the steps. | And the Captain has a spotlight that is really bright, and he uses that to light the steps of the ladder. | The answer stated is not the answer given to the interpreter. |
| 101 | 61: 4         A       Do other jobs on the boat such | Do other jobs, like sometimes check the | The answer stated is not the answer given |

# Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| ** | as fixing the 61: 5 nets and other jobs on the boat. | engine on the skiff. The water gauge, the hydraulic oil, and things like that. | to the interpreter. |
| 102 | 61:17   A   Yes.   Yes, check on the oils and engines and 61:18 whatever they told me to do, works on engines. | Yes.  Check the oil on the engine and things like that. | The answer stated is not the answer given to the interpreter. |
| 103 | 62:19   A   I don't know.  Sometimes they talk each other 62:20 on the radio. | I don't' know.  Sometimes they talk to each other on the radio. | The answer stated is not the answer given to the interpreter. |
| 104 | 63: 9   A   When I see if there is a safe time to get on 63:10 the ladder, then that's the time I take it. | When I see if there is a right time to jump to the ladder, then that's the time I take it. | The answer stated is not the answer given to the interpreter. |
| 105 | 80:12   A   I don't. | I don't' look at a watch. | The answer stated is not the answer given to the interpreter. |
| 106 | 80:14   A   I don't have a time to look at it, so I jump. | I don't have a watch to look at when I jump. | The answer stated is not the answer given to the interpreter. |
| 107 | 84:12   I'm not timing my jumping. | I do not understand the question.  I am not looking at a watch. | The answer stated is not the answer given to the interpreter. |
| 108 | 84:15   A   Every time I jump, I usually look at the -- I 84:16 usually look at it.  If I know that it is not safe, then I 84:17 will not jump. | Change "safe" to "right" | The answer stated is not the answer given to the interpreter. |
| 109 | 85: 5   THE WITNESS:  Captain didn't say nothing. | The Captain didn't send the speedboat to pick me up. | The answer stated is not the answer given to the interpreter. |
| 110 | 92:16 tell about how big, how height of the waves. | Change "how height" to "the height" | The answer stated is not the answer given to the interpreter. |
| 111 | 93:17   THE WITNESS:  When they had my legs, I started 93:18 feeling as something hit my leg, something hit my leg. | When the skiff hit my leg, that's when I said something. | The answer stated is not the answer given to the interpreter. |

Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|-----|-----------|---------|--------|
| 112 | 96:16    A    The small boat hit the big boat and hit it and 96:17 it turns. And that's why I didn't jump. I didn't 96:18 transfer to the ladder. | The small boat hit the big boat and turned. That's why I couldn't jump. I didn't jump to the ladder. | The answer stated is not the answer given to the interpreter. |
| 113 | 96:19    And then we tried one more time. He brought me 96:20 second time to the boat. Ferman, he turn on the bright 96:21 light and hit or pointed to the ladder so I can transfer 96:22 to the ladder. | And then we tried one more time. He brought me a second time to the boat. Fermin turned on the spot light and he pointed to the ladder, which is an order to jump to the ladder. | The answer stated is not the answer given to the interpreter. |
| 114 | 98:8    THE WITNESS: That's the time that we started 98:9 working in a raft. | That's the time we started working on the raft set. | The answer stated is not the answer given to the interpreter. |
| 115 | 99:5 and having breakfast. And then they drop down the light 99:6 bulbs. | Change "light bulbs" to "Lightboat" | The answer stated is not the answer given to the interpreter. |
| 116 | 99:8    THE WITNESS: Life boat. And then going to the 99:9 raft to make it brighter or get the lights for the raft. 99:10 And then we get away from the raft about a half mile and 99:11 then turn the light off at Koorale and there is no 99:12 lights. The only one has lights is the one, the life 99:13 boat. And about 4:30, the captain usually radio the guy 99:14 at the life boat if there is a fish underneath the life 99:15 raft. If there is a fish, then we go over there and then 99:16 set out the net. | Light boat. The Light boat goes out to the raft to light up the raft. We are away from the raft about a half mile with the lights off on Koorale. The only one that has lights on is the light boat. At about 4:30, the captain usually radios the guy at 4:30, the light boat if there is fish underneath the raft. If there is fish, then we set out the net. | The answer stated is not the answer given to the interpreter. |

## Corrections to Deposition of Mel DeBrum, Taken May 24, 2002

| No. | Fact Text | Changes | Reason |
|---|---|---|---|
| 117 | 100:20    A    By the time I jump to the rope ladder, the<br>100:21 captain shut off the light. | By the time I jumped to the ladder, the Captain shut off his spotlight. | The answer stated is not the answer given to the interpreter. |
| 118 | 101:14    A    Because I can't -- so I can see. | Because I can't see, and there were big waves. | The answer stated is not the answer given to the interpreter. |
| 119 | 105:21 draft me right away. | Change "draft" to "drop" | The answer stated is not the answer given to the interpreter. |
| 120 | 107:20    A    Sometimes. | Sometimes I hesitated, but I never disobeyed orders. | The answer stated is not the answer given to the interpreter. |
| 121 | 107:22    A    I never refused, but like I say, like if I<br>107:23 opened my mouth, he will yell at me, bad words, or bring<br>107:24 me -- bring me to the boat and then drop me off at the<br>107:25 boat and then he will use the speakers to yell at me and<br>108: 1 say get off the boat, get off the boat. | In never refused.  Like I said, if I opened my mouth, the Captain will yell at me, and yell at the skiffman.  He would yell bad words, telling the skiffman to bring me to the boat and for me to jump.  He will yell through the P.A. to get me off the skiff. Get me off the skiff. | The answer stated is not the answer given to the interpreter. |
| 122 | 109:5        THE WITNESS:  Like I said my other answer<br>109: 6 before, you can't refuse Ferman's words. | "Ferman's" is "Fermin's" | The answer stated is not the answer given to the interpreter. |
| 123 | 109:21    A    Every time.  I have seen people, if they don't do what he told them to do,<br>109:22 his, whatever he told them to do, they will get released<br>109:23 from work. | Every time.  I have seen people, if they don't do what he told them to do, they were fired. | The answer stated is not the answer given to the interpreter. |

# VIDEOTAPED DEPOSITION OF MEL DEBRUM 1-09-03 DEBRUM VS. M & F FISHING CO.

## PETERSON & ASSOC. COURT REPORTING, INC.

### Page 1 to Page 116

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

PETERSON & ASSOCIATES COURT REPORTING, INC.
530 B STREET
Suite 350
San Diego, CA    92101-
Phone:   619-260-1069
FAX:   619-688-1733

JAN 1   2003

Exhibit

## Page 1

[ 1]          SUPERIOR COURT OF THE STATE OF CALIFORNIA
[ 2]             FOR THE CENTRAL DISTRICT OF CALIFORNIA
[ 3]  MEL DeBRUM. an individual.                    )
                                                    )
[ 4]          Plaintiff.                            )
                                                    )
[ 5]     vs.                                        )
                                                    )Case No.: 01-08403 ddp (Shx)
[ 6]  M & F FISHING CO.. INC.. a                    )
      corporation. in personam. and F/V            )
[ 7]  KOORALE. her engines. tackle.                 )
      apparel. furniture. and                       )
[ 8]  appurtenances. in rem.                         )
                                                    )
[ 9]          Defendants.                           )
                                                    )
[10]                                                )
      M & F FISHING CO.. INC.. a                    )
[11]  corporation.                                  )
                                                    )
[12]          Counterclaimant.                      )
                                                    )
[13]     vs.                                        )
                                                    )
[14]  MEL DeBRUM.                                   )
                                                    )
[15]          Counterdefendant.                     )
                                                    )
[16]                                                )
      MEL DeBRUM.                                   )
[17]                                                )
              Counterclaimant.                      )
[18]                                                )
         vs.                                        )
[19]                                                )
      M & F FISHING CO.. INC.. a                    )
[20]  corporation.                                  )
                                                    )
[21]          Counterdefendant.                     )
                                                    )
[22]
[23]          VIDEOTAPED DEPOSITION OF MEL DEBRUM
[24]             Volume I - Page 1 through 116
[25]                San Diego. California
[26]
[27]  REPORTED BY
[28]

## Page 3

[ 1]  APPEARANCES:
[ 2]
[ 3]          For the Plaintiff:
[ 4]             BANNING. MICKLOW. BULL & LOPEZ. LLP
                BY:  WILLIAM L. BANNING. ESQ.
[ 5]             501 West Broadway. Suite 2090
                San Diego. California  92101
[ 6]
[ 7]          For the Defendant M & F Fishing Co.. Inc.:
[ 8]             LEGROS. BUCHANAN & PAUL
                BY:  ROBERT N. WINDES. ESQ.
[ 9]             701 Fifth Avenue. Suite 2500
                Seattle. Washington  98104
[10]
[11]          For the Defendant Excess Underwriters:
[12]             ALCANTARA & ASSOCIATES. APC
                BY:  JAMES W. ALCANTARA. ESQ.
[13]             402 West Broadway. Suite 1170
                San Diego. California  92101
[14]
[15]          The Interpreter:
[16]             Rick Graham
                998 Mission Drive. Apartment 1
[17]             Costa Mesa. California  92626
[18]
[19]          Also present:  Terry Taylor. Videographer
                             Carrie Alik. Translator
[20]                         Firmino Ferreira
[21]
[22]
[23]
[24]
[25]
[26]
[27]
[28]

## Page 4

[ 1]                      I N D E X
[ 2]
      WITNESS:    MEL DEBRUM
[ 3]
[ 4]  EXAMINATION                                    PAGE.
[ 5]
      BY MR. WINDES                                    7
[ 6]
[ 7]                   E X H I B I T S
[ 8]  FOR DEFENDANTS:                               MARKED
[ 9]   3      Page 4 of Responses to                  14
              Interrogatories
[10]
[11]   4      Declaration of Mel DeBrum in support    34
              of Plaintiff's Motion for Summary
[12]          Judgment on Counterclaim
[13]   5      Two photographs                         85
[14]   6      Photographs                             90
[15]          QUESTION WITNESS INSTRUCTED NOT TO ANSWER
[16]                                               PAGE  LINE
[17]  Q.  And what did he tell you was the reason     39   17
          that he was coming to see you?
[18]
[19]  Q.  Did Mr. Lopez tell you that he wanted to    40    1
          represent you as his lawyer -- as your
[20]      lawyer?
[21]
[22]  Q.  Okay.  Mr. DeBrum. have you smoked          65   25
          marijuana in the last ten years?
[23]
[24]  Q.  Mr. DeBrum. did you smoke marijuana         67    9
          during the three years immediately prior
[25]      to your accident?
[26]
[27]  ///
[28]  ///

## Page 5

[1]   QUESTION WITNESS INSTRUCTED NOT TO ANSWER
[2]   PAGE LINE
[3]      Q.   Mr. DeBrum, if Firmin Ferreira was 69 1
[4]   willing, in the presence of your lawyer,
[5]   to have a drug test done in the next few
[6]   days, would you be willing to do the
[7]   same?
[8]
[9]   PORTIONS OF TRANSCRIPT REQUESTED MARKED BY COUNSEL
[10]  PAGE LINE
[11]  86 24
[12]  25 27
[13]  through
[14]  26 24
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
[26]
[27]
[28]

## Page 6

[1]      THE VIDEOGRAPHER:   Good morning.
[2]   This is the videotaped deposition of Mel DeBrum
[3]   taken at 530 C Street, Suite 350, San Diego, California
[4]   92101, on Thursday, January the 9th, 2003, in the matter
[5]   of Mel DeBrum versus M & F Fishing Company, et al.,
[6]   Case No. 01-08403 ddp in the United States District
[7]   Court of the District of California.
[8]   My name is Terry Taylor of Peterson &
[9]   Associates located at 530 B Street, Suite 350,
[10]  San Diego, California 92101.
[11]  Please be aware that the audio and video
[12]  recording will take place at all times during this
[13]  deposition unless counsel has specifically asked to go
[14]  off the record and they agree.
[15]  The deposition is now commencing at 9:28 a.m.
[16]  The court reporter today is Bridget
[17]  Mastrobattista of Peterson & Associates.
[18]  Would all persons present please identify
[19]  themselves, beginning with the witness, your name.
[20]     THE WITNESS:   Mel DeBrum.
[21]     THE INTERPRETER:   Rick Graham.
[22]     MR. BANNING:   William Banning for the
[23]  plaintiff.
[24]     MR. WINDES:   And Robert Windes for M & F
[25]  Fishing Co., Inc.
[26]     MR. FERREIRA:   Firmin Ferreira.
[27]     MR. ALCANTARA:   James Alcantara.
[28]     THE TRANSLATOR:   Carrie Allk.

## Page 7

[1]      THE VIDEOGRAPHER:   The court reporter will now
[2]   administer the oath to the witness.
[3]
[4]   RICK GRAHAM,
[5]   having been first duly sworn to translate from English
[6]   to Marshallese and Marshallese to English the testimony
[7]   of MEL DEBRUM:
[8]
[9]   MEL DEBRUM,
[10]  having been first duly sworn, testified through the
[11]  interpreter as follows:
[12]
[13]  EXAMINATION
[14]     BY MR. WINDES:
[15]     Q.   Ready?
[16]  Okay. Mr. DeBrum, where do you presently live?
[17]  What is your address?
[18]     A.   3735 32nd, Apartment 1, San Diego, California.
[19]     Q.   Is that the same apartment that you lived in
[20]  when you were giving your deposition last in this case?
[21]     A.   Yes.
[22]     Q.   And how much rent do you pay for that
[23]  apartment?
[24]     A.   I don't -- I don't know.
[25]     Q.   Do you pay the rent for the apartment?
[26]     A.   No.
[27]     Q.   Do you know who does pay the rent?
[28]     A.   My lawyer.

## Page 8

[1]      Q.   Do you have an agreement that you will repay
[2]   the lawyer for the cost of the apartment at a later
[3]   time?
[4]     A.   Yes.
[5]     Q.   And how much will you repay the lawyer -- or
[6]   how much will you pay your lawyer later for the cost of
[7]   the apartment?
[8]     A.   They will take it out of my money, whatever
[9]   amount they had given me.
[10]     Q.   Take it out of what money?
[11]     A.   If I get money from the insurance.
[12]     Q.   You mean if you get money in this lawsuit, they
[13]  will take it out of that money?
[14]     A.   Yes.
[15]     Q.   And what happens if you don't get money in this
[16]  lawsuit?
[17]     A.   I don't know.
[18]     Q.   Will you still have to repay the money?
[19]     A.   I don't know. If I don't get anything from the
[20]  insurance, I don't know what will become of it.
[21]     Q.   Move to strike as unresponsive.
[22]  I didn't ask you about insurance. The question
[23]  I have is, if you don't get any money in this lawsuit,
[24]  do you still have to repay the money for the rent?
[25]     MR. BANNING:   Objection. The witness has
[26]  answered the question. The second time you've asked
[27]  this question. He says he doesn't know. And that is a
[28]  responsive answer. And it -- again, it is just the

Case 1:03-cv-00004    Document 27    Filed 02/21/2003    Page 1 of 3

Page 5 to Page 8    800-649-6353 PETERSON & ASSOC. COURT REPORTING, INC.

## Page 9

[1]  first step towards harassment of the witness. Go ahead.
[2]  BY MR. WINDES:
[3]  Q.  Do you remember the question?
[4]  THE INTERPRETER:  Would you repeat it, please?
[5]  MR. WINDES:  Subject to the same objection
[6]  Mr. Banning made, the question is whether or not you
[7]  will have to repay the rent money if you don't get money
[8]  in the lawsuit?
[9]  THE INTERPRETER:  I'm sorry, I got kind of
[10]  confused whether you were asking -- you mean the rental
[11]  money or the insurance? What was it?
[12]  MR. WINDES:  Let me try the question again.
[13]  BY MR. WINDES:
[14]  Q.  Will you have to repay your lawyers for the
[15]  cost of the rent for your apartment if you don't get
[16]  money in the lawsuit?
[17]  MR. BANNING:  Same objection. The witness said
[18]  he doesn't know.
[19]  THE WITNESS:  No.
[20]  MR. WINDES:  I'm sorry, the answer is no?
[21]  THE INTERPRETER:  No.
[22]  MR. WINDES:  The answer is no?
[23]  THE INTERPRETER:  Yes.
[24]  BY MR. WINDES:
[25]  Q.  What income do you have now?
[26]  A.  I have some from my lawyer.
[27]  Q.  How much?
[28]  A.  600 a month.

## Page 10

[1]  Q.  So every month your lawyer pays you $600?
[2]  A.  Yes.
[3]  Q.  And what is that for?
[4]  A.  For food and all the necessities that I need.
[5]  Q.  And will you have to repay that money to your
[6]  lawyers later?
[7]  A.  Like I have said, if I have money, but if I
[8]  don't.
[9]  Q.  I'm sorry, I didn't understand the answer.
[10]  THE INTERPRETER:  Like I said earlier, if I
[11]  don't -- if I have money.
[12]  BY MR. WINDES:
[13]  Q.  In other words, if you get money in the
[14]  lawsuit.
[15]  A.  Then I will return it.
[16]  Q.  That you will -- that I will return. Is that
[17]  the answer?
[18]  THE INTERPRETER:  Yes.
[19]  BY MR. WINDES:
[20]  Q.  Who lives at the apartment with you,
[21]  Mr. DeBrum?
[22]  A.  Myself.
[23]  Q.  Does anyone else live in the apartment now?
[24]  A.  No.
[25]  Q.  When is the last time that someone else lived
[26]  in the apartment with you?
[27]  A.  Last November.
[28]  Q.  And who was that?

## Page 11

[1]  A.  Roberto.
[2]  Q.  Is that the first name?
[3]  A.  Yes.
[4]  Q.  What's the last name?
[5]  A.  Salina.
[6]  Q.  Is that a client of your lawyer?
[7]  THE INTERPRETER:  Repeat that.
[8]  BY MR. WINDES:
[9]  Q.  Is that a client of your lawyer?
[10]  A.  Yes.
[11]  Q.  And why did Roberto Salina leave the apartment?
[12]  MR. BANNING:  Objection; calls for speculation.
[13]  THE WITNESS:  He went back home.
[14]  BY MR. WINDES:
[15]  Q.  Where is his home?
[16]  A.  Panama.
[17]  Q.  Panama City or some other place in Panama?
[18]  A.  I don't know.
[19]  Q.  How many rooms are in the apartment?
[20]  A.  Two.
[21]  Q.  Two bedrooms or two rooms total?
[22]  A.  Two bedrooms.
[23]  Q.  And how many rooms total?
[24]  A.  Two.
[25]  Q.  The apartment has only two rooms in it?
[26]  A.  Yes.
[27]  Q.  Does it have a kitchen?
[28]  A.  Yes.

## Page 12

[1]  Q.  So isn't that three rooms, right?
[2]  A.  No.
[3]  Q.  The kitchen is in the bedroom?
[4]  A.  No.
[5]  Q.  Okay. Is the kitchen in the apartment?
[6]  A.  Yes.
[7]  Q.  So isn't that three rooms now?
[8]  A.  What do you mean? How do you define rooms?
[9]  When he's talking about rooms, this is one room. Next
[10]  door is another room and the kitchen is in another room,
[11]  but it's a living room.
[12]  Q.  All right. The apartment has two bedrooms,
[13]  right?
[14]  A.  Yes.
[15]  Q.  The apartment also has a kitchen, right?
[16]  A.  Yes.
[17]  Q.  Does it also have a living room?
[18]  A.  Kitchen and living room are together. But if
[19]  you are talking about rooms, this is a room. We call it
[20]  a room. But out there is not a room when it's a living
[21]  room.
[22]  Q.  Okay. And how many bathrooms does it have?
[23]  A.  One.
[24]  Q.  Have you had your own bedroom since you moved
[25]  into the apartment?
[26]  A.  Yes.
[27]  Q.  Where is your girlfriend Ina now?
[28]  A.  In the Western Samoa.

Page 13

[1]   Q.   Are you engaged to her now?
[2]   A.   Yes.
[3]   Q.   When did you become engaged?
[4]   A.   A long time ago.
[5]   Q.   Before your accident?
[6]   A.   Yes.
[7]   Q.   And she is still living in Western Samoa?
[8]   A.   Yes.
[9]   Q.   Do you send her money?
[10]  Q.   When? Now?
[11]  Q.   Yes.
[12]  A.   No.
[13]  Q.   Has she come to visit you in San Diego yet?
[14]  A.   No. Only when we first came here together.
[15]  Q.   Does she live in the same apartment that you
[16] and she lived in at the time of your accident?
[17]  A.   I don't understand. Could you repeat that
[18] again.
[19]  Q.   Does she live in the same apartment now that
[20] she and you lived in when your accident happened?
[21]  A.   No.
[22]  THE INTERPRETER:   Excuse me, could you repeat
[23] that again? I think I mistranslated that.
[24]  MR. WINDES:   Okay.
[25]  BY MR. WINDES:
[26]  Q.   Does Ina live in the same apartment now that
[27] you and Ina lived in when your accident happened?
[28]  A.   No.

Page 14

[1]   MR. WINDES:   Would you mark this as Exhibit 3,
[2] please.
[3]   (Defendants' Exhibit 3 was marked.)
[4]   BY MR. WINDES:
[5]   Q.   Showing you Exhibit 3 there. Could you take a
[6] look at that, and if – can you read that first
[7] paragraph on that page?
[8]   A.   Which one?
[9]   Q.   Beginning in the first line, it says,
[10] "Supplementing Plaintiff's previous response from
[11] approximately 1996 to 2000."
[12] Do you see that?
[13] Can you read that paragraph beginning with the
[14] word "supplementing?"
[15]  MR. BANNING:   Read it to himself you mean?
[16]  MR. WINDES:   Yeah.
[17]  THE WITNESS:   No, I can't.
[18]  BY MR. WINDES:
[19]  Q.   Okay. Would you –
[20]  A.   I can't read the shorted word.
[21]  Q.   I'm sorry. And I can't hear. I can't read
[22] what?
[23]  A.   I can't read the shorter word, the words that
[24] are short. But the bigger term, the longer spelling
[25] terms, I can't.
[26]  MR. WINDES:   Would you translate, then,
[27] beginning with the word "supplementing" down to the end
[28] of that paragraph?

Page 15

[1]   THE INTERPRETER:   Where do I end?
[2]   MR. WINDES:   Right here at the bottom of the
[3] paragraph.
[4]   (Interpreter reading document to witness.)
[5]   THE INTERPRETER:   What does that flat
[6] constitute?
[7]   MR. ALCANTARA:   Apartment.
[8]   MR. WINDES:   Apartment.
[9]   MR. BANNING:   For the record, there's no
[10] question pending, so I think what Mr. Windes wants you
[11] to do is just translate that literally, and then he was
[12] going to ask a question of Mel afterwards. Just
[13] translate it to him.
[14]  THE INTERPRETER:   All right. So what do you
[15] want me to do?
[16]  MR. BANNING:   So just finish translating it,
[17] and then if Mel has any questions, whatever he says,
[18] just translate so we know what he is saying.
[19]  THE INTERPRETER:   Okay.
[20]  MR. BANNING:   I mean if he asks a question,
[21] then translate that so Mr. Windes know what it is that
[22] Mel is questioning.
[23]  (Interpreter reading document to witness.)
[24]  THE INTERPRETER:   That's it.
[25]  BY MR. WINDES:
[26]  Q.   Okay. Now, these – this is an answer that
[27] your lawyer gave us for you. Do you agree with what you
[28] read here?

Page 16

[1]   MR. BANNING:   Objection. You haven't even put
[2] before him the question that it's responding to. So
[3] it's vague and ambiguous and impossible to answer. You
[4] can't state what context the answer is in. Why don't
[5] you give him the question and ask him, you know, if this
[6] is a responsive answer?
[7]   BY MR. WINDES:
[8]   Q.   Did you review this answer here before?
[9]   A.   Yes.
[10]  Q.   Do you know which apartment it refers to?
[11]  A.   Yes. It's talking about the one when we were
[12] in Samoa.
[13]  Q.   It's the apartment that you and Ina shared
[14] between 1996 and 2000, right?
[15]  A.   Yes.
[16]  Q.   Okay. And it says that the rent was 250 to
[17] $300 per month?
[18]  A.   Yes.
[19]  Q.   Now, do I understand that you paid that amount
[20] each month for the rent?
[21]  A.   Yes.
[22]  Q.   Okay. For those four years?
[23]  A.   Yes.
[24]  Q.   Okay. And then you also contributed $500 every
[25] trip for food and incidentals it says, right?
[26]  A.   Yes.
[27]  Q.   When you say "every trip," what do you mean?
[28] Every trip on the KOORALE?

## Page 17

[1]  A.  Every trip that I'm leaving to go fishing.

[2]  Q.  Okay. So if I understand, you would pay or you

[3]  would give money to Ina $500 each time when you were

[4]  leaving on the KOORALE?

[5]  A.  Yes.

[6]  Q.  And would she use that $500 to pay for your

[7]  meals that you had when you were at the apartment?

[8]  A.  Sometime when I get back, she already paid part

[9]  of the rent.

[10]  Q.  Okay. But you would pay the rent for each

[11]  month and then $500 on top of that for food and

[12]  incidentals; is that right?

[13]  A.  I give her $500 just in case I don't get back

[14]  in time to pay for rent so that money will apply toward

[15]  that, whatever necessity is needed.

[16]  Q.  Okay. So she could use the $500 for rent if

[17]  you were not back in time; is that right?

[18]  A.  Yes.

[19]  Q.  Okay. But when you came back, would you make

[20]  sure that you had paid the money for the rent?

[21]  A.  Yes.

[22]  Q.  Okay. And the answer refers to laundry costs

[23]  of 30 to $40 per month? Whose laundry costs?

[24]  A.  Both of them.

[25]  Q.  For both of them?

[26]  A.  Both of us.

[27]  Q.  Would you pay that also?

[28]  A.  Yes.

## Page 18

[1]  Q.  With your money?

[2]  A.  Yes.

[3]  Q.  And the telephone bill of 30 to $40 per month,

[4]  would you pay that also with your own money?

[5]  A.  Yes.

[6]  Q.  Okay. I understand you have a new prosthesis

[7]  now?

[8]  A.  Yes.

[9]  Q.  Is it better for you than the last prosthesis?

[10]  A.  Yeah, it's good. It's a lot better than the

[11]  one before.

[12]  Q.  In what ways?

[13]  A.  The first one I feel soreness with it, but the

[14]  one that I have now I can walk. I mean -- I can get

[15]  around really for a long time before I can feel the

[16]  soreness.

[17]  Q.  How long?

[18]  A.  How long what?

[19]  Q.  How long can you walk with the new prothesis

[20]  before you feel soreness?

[21]  A.  I can walk three blocks now before I can feel

[22]  the pain.

[23]  Q.  Are there other ways that the new prosthesis is

[24]  better?

[25]  A.  Yes.

[26]  Q.  What ways?

[27]  A.  Now I can stand and shake my leg. The first

[28]  one, when I tried to shake my leg, it would come off.

## Page 19

[1]  The other one I used to use suspenders to hold it in

[2]  place.

[3]  Q.  Okay. Are there other ways that the prosthesis

[4]  is better?

[5]  A.  Yes. I can walk on uneven floor. It's more

[6]  flexible.

[7]  Q.  Could you explain what you mean by flexible?

[8]  A.  Yeah. When you would step on an uneven floor

[9]  where the floor is, you can -- the flexibility, you

[10]  can -- is good for him. He can walk.

[11]  Q.  You're saying he.

[12]  A.  I.

[13]  Q.  You need to use I. Let's start over again.

[14]  The question is: Could you explain what you

[15]  mean by flexible.

[16]  A.  The first leg I couldn't walk on an uneven

[17]  floor. But with this one, I can walk comfortably and

[18]  easily. But it's nothing compared to what God has given

[19]  me before that I used to walk on.

[20]  Q.  Could you give me an example of an uneven floor

[21]  that you're talking about?

[22]  A.  Uneven floor is applied to where my foot can

[23]  comfortably stand, whereas the first one that I had, I

[24]  couldn't flex it or bend it on an uneven floor. But

[25]  with this one, even when the floor is not equal, I can

[26]  still bend my knees around and accommodate the floor --

[27]  oh, not my knees but my ankle.

[28]  Q.  What about your ankle? Could you explain what

## Page 20

[1]  you mean by your ankle, not your knee?

[2]  THE INTERPRETER:  Shall I explain off the

[3]  record or --

[4]  MR. WINDES:  No, I think we better stick with

[5]  exactly what he said.

[6]  THE INTERPRETER:  Repeat that again?

[7]  MR. WINDES:  What are you saying that you do

[8]  with your ankle, not your knee?

[9]  THE WITNESS:  Okay. I was talking about my

[10]  ankle, not my knees.

[11]  THE INTERPRETER:  It was I who said the knees,

[12]  but not the ankle.

[13]  BY MR. WINDES:

[14]  Q.  Okay. What do you do normally during the day

[15]  in the last month?

[16]  A.  Stay home and watch T.V. I'm not doing therapy

[17]  with this new prosthesis.

[18]  Q.  You're not doing therapy?

[19]  A.  No, I'm not.

[20]  Q.  Has your doctor suggested that you should do

[21]  some therapy?

[22]  A.  Yes.

[23]  Also, the insurance people --

[24]  THE INTERPRETER:  But there is bad word thing

[25]  because now he's talking about something that we did

[26]  before whereas I don't think he's supposed to be.

[27]  MR. WINDES:  First of all, let me move to

[28]  strike as nonresponsive. I'm not asking about insurance

Page 21

[1] people. I'm asking – here's my question.
[2]     BY MR. WINDES:
[3]     Q.   Has your doctor suggested to you that you
[4] should do some sort of therapy now?
[5]     A.   Yes. However, he cannot treat me because I
[6] don't have insurance.
[7]     Q.   What doctor has told you that you should go to
[8] therapy?
[9]     THE INTERPRETER:   Can I ask him a question to
[10] better understand the right question to him?
[11]     MR. WINDES:   I'm sorry. You don't understand
[12] my question or you don't understand his answer?
[13]     THE INTERPRETER:   Well, if I translate exactly
[14] what you're saying, then it won't make sense to him.
[15]     MR. WINDES:   Okay. What do you want to ask?
[16]     THE WITNESS:   The gentleman that suggested that
[17] he need to have his therapy to look at his foot is the
[18] one that installed the leg, not the doctor.
[19]     BY MR. WINDES:
[20]     Q.   So that's Mr. Mason?
[21]     A.   I forgot his name. Randy?
[22]     Q.   Randy Mason; is that right?
[23]     A.   Yeah.
[24]     Q.   Okay. And Randy Mason is the one who told you
[25] that you should have some therapy; is that right?
[26]     A.   Yes.
[27]     Q.   When did he tell you that?
[28]     A.   The first time that I installed the prosthesis.

Page 23

[1]     A.   Last month when I went over to take an
[2] assessment of my prosthesis.
[3]     Q.   The new prothesis?
[4]     A.   Yes.
[5]     Q.   Who did you see?
[6]     A.   Mr. Randy.
[7]     Q.   Randy Mason is not a doctor, right?
[8]     A.   I call him doctor because he's installing my
[9] leg.
[10]     Q.   Okay. When is the last time you saw a doctor
[11] other than Randy Mason?
[12]     MR. BANNING:   And you mean for treatment as
[13] opposed to the defense exam by Dr. Smith?
[14]     MR. WINDES:   Yes.
[15]     MR. BANNING:   You can translate that.
[16]     MR. WINDES:   Let me reask the question now that
[17] you said that.
[18]     BY MR. WINDES:
[19]     Q.   You saw a Dr. Smith, Doug Smith, right?
[20]     A.   Which one is Dr. Smith?
[21]     Q.   The doctor that we asked you to see.
[22]     A.   There were two people. I don't know which one.
[23]     Q.   I tried to make it clearer; it's not.
[24]     THE INTERPRETER:   Let's try another way.
[25]     BY MR. WINDES:
[26]     Q.   How many doctors have you seen in the last
[27] year?
[28]     A.   Only Dr. Richley.

Page 22

[1]     Q.   When was that?
[2]     A.   I forgot what month was that.
[3]     Q.   Was it December?
[4]     A.   No. I really forgot what month that I actually
[5] put the prosthesis on.
[6]     Q.   The new prosthesis, you don't remember which
[7] month you put that on first; is that right?
[8]     A.   I forgot what month was that.
[9]     Q.   Did Mr. Mason explain what type of therapy he
[10] was suggesting for you?
[11]     A.   On treadmill and those.
[12]     Q.   Treadmill and what?
[13]     A.   Those. Treadmill and – treadmill and bicycle
[14] and sort of exercises.
[15]     Q.   When is the last time you saw Dr. Richley?
[16]     A.   I really don't understand. I don't know. That
[17] was a long time.
[18]     Q.   Have you seen him after you got the new
[19] prosthesis?
[20]     A.   No, I have not.
[21]     Q.   How long before you got the new prosthesis was
[22] the last time you saw him, approximately?
[23]     A.   See who?
[24]     Q.   Your doctor.
[25]     A.   Dr. – are you talking about Dr. Richley?
[26]     Q.   Yes.
[27]     A.   It's been a long, long time.
[28]     Q.   When is the last time you saw any doctor?

Page 24

[1]     Q.   Only Dr. Richley?
[2]     A.   Richley and Randy.
[3]     Q.   Okay. And the last time you saw Dr. Richley,
[4] was that more than six months ago?
[5]     A.   I don't really know.
[6]     Q.   What did Dr. Richley do the last time you saw
[7] him?
[8]     A.   Suggested that I needed a new prosthesis.
[9]     Q.   Did he tell you anything more than that?
[10]     A.   Yeah, he also suggested that I do therapy.
[11]     Q.   What type of therapy?
[12]     A.   The same kind I did in Hawaii.
[13]     Q.   And what is that?
[14]     A.   Doing walking on the treadmill and doing
[15] bicycle and exercises the foot.
[16]     Q.   Have you seen any medical record that says that
[17] you need therapy?
[18]     A.   No, I have not. What medical record?
[19]     Q.   I don't know. I wondered if you had seen any
[20] medical records that made the recommendation that you
[21] have therapy?
[22]     A.   Nothing.
[23]     Q.   Okay. And Dr. Richley was suggesting that you
[24] have therapy before you got a new prosthesis?
[25]     A.   Yeah.
[26]     THE INTERPRETER:   Could you go over the
[27] question again? I think it was the wrong answer.
[28]     BY MR. WINDES:

## Page 25

[1]  Q.  Did the doctor suggest that you have therapy
[2]  before you got a new prosthesis?
[3]  A.  No.
[4]  Q.  Okay. So he was recommending that you have
[5]  therapy after you get a new prosthesis?
[6]  A.  Yes.
[7]  Q.  Do you know how much the therapy would cost if
[8]  you were to go to therapy then?
[9]  A.  I have no idea.
[10]  Q.  You didn't ask him?
[11]  A.  No, I did not.
[12]  MR. WINDES:  Are there some records that we
[13]  haven't gotten from either Mason or Richley talking
[14]  about therapy? It's a question that I think I need to
[15]  ask while I have Mr. DeBrum here.
[16]  MR. BANNING:  Well, we can go off the record
[17]  and talk about that. But it's been about an hour. Do
[18]  you want to take a break now?
[19]  MR. WINDES:  We can take a break.
[20]  MR. BANNING:  Excuse me?
[21]  MR. WINDES:  We can take a break and then we
[22]  can put whatever we figure out on the record.
[23]  MR. BANNING:  Whatever.
[24]  THE VIDEOGRAPHER:  Off record 10:20.
[25]  (A recess was taken.)
[26]  THE VIDEOGRAPHER:  On record 10:34.
[27]  MR. BANNING:  While off the record we discussed
[28]  the issue of whether there were any writings from Randy

## Page 26

[1]  Mason or Dr. Richley representing therapy, and we've
[2]  asked our office to check on that.
[3]  But for the record, Dr. Smith, the defense
[4]  medical examiner, told Mr. DeBrum that he needed therapy
[5]  currently.
[6]  And we – you know, we, again, make a
[7]  make-and-secure demand of the ship owner dating back
[8]  to – I guess it's May of 2001, I guess it is. I will
[9]  have to double-check, but dating back to when he last
[10]  was seen by Dr. Moromoto, and I have to discuss that off
[11]  the record but –
[12]  MR. WINDES:  I'm not sure this is the right
[13]  time to make speeches, and I will avoid making one, but
[14]  I will point out that because we have not gotten any
[15]  records suggesting – recommending asking for therapy at
[16]  any time, that hasn't been an issue. So –
[17]  MR. BANNING:  Well, your own doctor, Dr. Smith,
[18]  says he needs therapy. And I assume you communicate
[19]  with your own doctor.
[20]  MR. WINDES:  I don't know that you're the right
[21]  person to say what the doctor says. As I understand it,
[22]  you weren't there.
[23]  MR. BANNING:  We have a record of it.
[24]  MR. WINDES:  Okay.
[25]  BY MR. WINDES:
[26]  Q.  I asked you –
[27]  MR. BANNING:  Mark that, would you, please?
[28]  BY MR. WINDES:

## Page 27

[1]  Q.  I asked you earlier what your daily activities
[2]  normally were, and you said that you sit and watch T.V.
[3]  Do you typically do anything else in the daytime?
[4]  A.  No.
[5]  Q.  Okay. So for the last year or so, your typical
[6]  day is to spend the day watching T.V.; is that right?
[7]  A.  Yes.
[8]  Q.  Have you tried to find a job in San Diego?
[9]  A.  No, I have not.
[10]  Q.  Have you asked anyone who might be able to find
[11]  you a job?
[12]  A.  No, I have not.
[13]  Q.  Have you tried to prepare yourself to be able
[14]  to have a job?
[15]  A.  No, I have not.
[16]  Q.  Why not?
[17]  A.  I still have problem with my leg. I still have
[18]  pain.
[19]  Q.  Have you looked for any jobs that you don't
[20]  have to stand or walk for long time?
[21]  A.  No, I have not.
[22]  Q.  Why not?
[23]  A.  I just want to finish on with my leg first
[24]  before I can search.
[25]  Q.  What do you mean "finish on" with your leg?
[26]  A.  As far as I know, my foot or leg is not really
[27]  complete, so I need to complete it first.
[28]  Q.  Why?

## Page 28

[1]  A.  There are other adjustment that need to be
[2]  done.
[3]  Q.  I'm sorry, what?
[4]  A.  There are other adjustment that need to be done
[5]  to my prosthesis.
[6]  Q.  How many hours a day do you typically watch
[7]  T.V.?
[8]  A.  About four.
[9]  Q.  Okay. And about four hours a day?
[10]  A.  Yes, sometime more.
[11]  Q.  Sometimes as much as ten hours?
[12]  A.  Yes.
[13]  Q.  Okay. And on those days when you only watch
[14]  T.V. for four hours, what do you typically do for the
[15]  rest of the day?
[16]  A.  Nothing. Just sit around.
[17]  Q.  Have you – what type of T.V. shows do you like
[18]  to watch?
[19]  A.  Most everything.
[20]  Q.  Do you watch programs on T.V. that are speaking
[21]  English or Marshallese?
[22]  A.  English.
[23]  Q.  And do you understand the T.V.?
[24]  A.  A little.
[25]  Q.  Does Ina speak Marshallese?
[26]  A.  No, she doesn't.
[27]  Q.  And what language do you speak with her in?
[28]  A.  English.

## Page 29

[1] Q. Does Firmin Ferreira speak Marshallese, to your
[2] knowledge?
[3] Firmin, this is Firmin Ferreira.
[4] A. No.
[5] Q. And what language have you spoken with Firmin?
[6] A. English.
[7] Q. So for 12 years you worked under Firmin and you
[8] spoke English on the job; is that right?
[9] A. Yes.
[10] Q. Did Firmin visit you in the hospital when you
[11] were in Hawaii?
[12] A. Yes.
[13] Q. How many times did he visit you in Honolulu?
[14] A. Two. Two times.
[15] Q. When was the other time? He visited you once
[16] in the hospital and where were you when he visited you
[17] the next time?
[18] A. At Mana Mana apartment.
[19] Q. And that was the apartment that the KOORALE
[20] people were paying for for you to stay?
[21] A. I don't know.
[22] Q. Do you remember that -- when you were visited
[23] by Firmin at the apartment that you told Firmin that he
[24] would be your best man when you married Ina?
[25] A. No, I don't.
[26] Q. Did you tell Firmin that you wanted to get
[27] married to Ina on the KOORALE?
[28] A. Yes.

## Page 30

[1] Q. Okay. Why did you want to get married on the
[2] KOORALE?
[3] A. Well, I think it was important to me seeing as
[4] I'm a fisherman.
[5] Q. Did you talk to Firmin at all about who your
[6] best man would be at the wedding?
[7] A. Firmin told me he would be the best man, and I
[8] said, yes, that's a good idea.
[9] Q. Okay. Did you think it was a good idea?
[10] A. Yes, he was my captain.
[11] Q. Do you remember Firmin telling you after the
[12] accident that he wanted you to come back to work on the
[13] KOORALE?
[14] A. Yes.
[15] Q. When was that?
[16] A. When he visited me at the hospital.
[17] Q. And did Firmin tell you that he would modify
[18] the job so that you could do the job?
[19] A. I don't understand what you mean by modify.
[20] Q. In other words, did Firmin explain to you that
[21] he would give you a job on the boat that you could do
[22] with your prosthetic leg?
[23] A. Yes. He said that I could serve as a galley
[24] boy.
[25] THE INTERPRETER: What is that?
[26] BY MR. WINDES:
[27] Q. And did he also tell you that -- that if you
[28] returned to work on the KOORALE doing what jobs you

## Page 31

[1] could, that you would get the same pay as you got before
[2] the accident?
[3] A. I don't recall hearing him say that.
[4] Q. Did you talk to Firmin about working on the
[5] KOORALE again more than one time?
[6] THE INTERPRETER: Could you repeat that one
[7] more time?
[8] BY MR. WINDES:
[9] Q. Yeah. How many times did you talk to Firmin
[10] about the possibility of going to work again on the
[11] KOORALE?
[12] A. Nothing. I had not asked. I did not ask.
[13] Q. Let me try the question again.
[14] First of all, you said that you spoke with
[15] Firmin in the hospital about going back to work on the
[16] KOORALE, right?
[17] A. No, I did not ask, but Mr. Firmin told me that
[18] any time that I will be well, then I can go back and
[19] work.
[20] Q. And what did you say when he said that?
[21] A. I said smile and nodded my head.
[22] Q. I'm sorry, I couldn't hear.
[23] A. I just smiled and nodded my head.
[24] Q. Nodded your head as to say yes?
[25] A. I think that's what I had in mind. That's what
[26] I was thinking about.
[27] Q. Did you ever talk to Anthony Ferreira about
[28] coming back to work on the KOORALE?

## Page 32

[1] A. No.
[2] Q. Do you have a plan to ask Firmin Ferreira for a
[3] job on the KOORALE?
[4] A. No.
[5] Q. Why not?
[6] A. Every time I look at the boat, I don't want to
[7] remind myself of what happened to me.
[8] Q. You said that you wanted to get married on the
[9] KOORALE, right?
[10] A. Yes.
[11] Q. So the reason that you don't want to work on
[12] the KOORALE is because you don't want to be reminded of
[13] what happened; is that right?
[14] MR. BANNING: Objection; vague and ambiguous.
[15] Assumes facts.
[16] THE WITNESS: Yes.
[17] MR. BANNING: And compound.
[18] BY MR. WINDES:
[19] Q. When did you agree that Mr. Banning would be
[20] your lawyer?
[21] A. 2001.
[22] Q. Do you recall what month in 2001?
[23] A. About February or March.
[24] Q. What did he say? He said something after you
[25] translated.
[26] A. If I can remember it right, it was either
[27] February or March.
[28] Q. Okay. In April of 2001, you and your

## Page 33

[1] brother-in-law Ingrahm were trying to negotiate a
[2] settlement, right?
[3]    MR. BANNING:    Objection; compound. Assumes
[4] facts.
[5]    THE WITNESS:    I didn't do any settlement.
[6]    MR. WINDES:    Okay. Let me break it down.
[7] BY MR. WINDES:
[8]    Q.    Between January and April, your brother-in-law
[9] Ingrahm was trying to negotiate a settlement, right?
[10]    A.    Yes.
[11]    Q.    And after Ingrahm stopped trying to settle the
[12] case, was that when you hired Mr. Banning?
[13]    A.    Would you repeat that one more time.
[14]    Q.    And after Ingrahm stopped trying to negotiate
[15] the settlement, is that when you hired Mr. Banning?
[16]    A.    No. I did hire him while the negotiating was
[17] going on.
[18]    Q.    When you hired Mr. Banning at that time, did
[19] you sign an agreement with Mr. Banning?
[20]    A.    Yes.
[21]    Q.    That was the beginning of him being your
[22] lawyer; is that right?
[23]    A.    Yes.
[24]    Q.    Okay. So if we find out when that agreement
[25] was signed, that would be the day that you hired
[26] Mr. Banning; is that right?
[27]    THE INTERPRETER:    Could you start all over
[28] again?

## Page 34

[1]    BY MR. WINDES:
[2]    Q.    So if we find out when that agreement was
[3] signed with Mr. Banning, that would be the day that you
[4] hired Mr. Banning; is that right?
[5]    A.    Yes.
[6]    MR. WINDES:    Okay. Would you mark this as
[7] Exhibit 4, please.
[8]    (Defendants' Exhibit 4 was marked.)
[9] BY MR. WINDES:
[10]    Q.    Do you recognize that document?
[11]    A.    What are these documents?
[12]    Q.    Have you seen them before?
[13]    A.    Yeah. I think I've seen them.
[14]    Q.    Turn to Page 3. Is that your signature?
[15]    A.    That's not my signature.
[16]    THE INTERPRETER:    Is that the correct page that
[17] we're looking at?
[18]    MR. WINDES:    Yes.
[19]    THE WITNESS:    No, that's not my signature.
[20]    BY MR. WINDES:
[21]    Q.    Do you know who signed that?
[22]    A.    This is my signature.
[23]    Q.    So the third page of Exhibit 4 is your
[24] signature?
[25]    THE INTERPRETER:    Second page.
[26]    MR. WINDES:    Let me see this.
[27]    MR. BANNING:    Well, the page with the No. 2 on
[28] the right-hand side.

## Page 35

[1]    BY MR. WINDES:
[2]    Q.    One page, two page. The page numbered two is
[3] your signature.
[4]    And do you remember reviewing this with your
[5] translator before you signed it?
[6]    A.    Yes. He explained to me.
[7]    Q.    And it was true – this document was true and,
[8] therefore, you signed it, right?
[9]    A.    Yes.
[10]    Q.    Okay. Now, looking at the last page of
[11] Exhibit 4, what is that?
[12]    A.    I don't exactly know what it –
[13]    THE INTERPRETER:    Off the record he wants me to
[14] read it.
[15]    BY MR. WINDES:
[16]    Q.    Okay. That's fair enough.
[17] Let me ask you first of all before you read it
[18] to go back to the page that you signed.
[19] And Paragraph 10, could you translate that for
[20] Mr. DeBrum.
[21]    (Interpreter reading document to witness.)
[22]    THE INTERPRETER:    Continue on all the way
[23] through Exhibit I?
[24]    MR. WINDES:    Yes.
[25]    (Interpreter reading document to witness.)
[26]    BY MR. WINDES:
[27]    Q.    Does that paragraph state the truth?
[28]    A.    Yes.

## Page 36

[1]    Q.    And that paragraph refers to this letter which
[2] is the last page, right?
[3]    A.    Yes. Yes.
[4]    Q.    So this letter, which is Exhibit 4, Page 5 or
[5] the last page of Exhibit 4, was a letter that you and
[6] Mr. Ingrahm prepared together?
[7]    A.    How – we, who we? Repeat that question again.
[8]    Q.    So this letter here which is the last page of
[9] Exhibit 4, was a letter that you and Mr. Ingrahm
[10] prepared together; is that right?
[11]    A.    Yes.
[12]    Q.    Okay. Does Mr. Ingrahm speak Marshallese?
[13]    A.    No, he doesn't.
[14]    Q.    Did he explain to you what was in the letter?
[15]    A.    Yes.
[16]    Q.    And why did you write this – first of all, is
[17] this your handwriting?
[18]    A.    No, it's not.
[19]    Q.    Whose handwriting is it?
[20]    A.    My brother-in-law Carl.
[21]    Q.    Ingrahm. Carl Ingrahm?
[22]    A.    Yes.
[23]    Q.    And did you watch him make this letter?
[24]    A.    Yes.
[25]    Q.    Where were you at the time?
[26]    A.    I don't really recall the place, but I saw the
[27] letter and I was with him at the time.
[28]    Q.    Was Mr. Ingrahm acting as your lawyer at that

## Page 37

[1] time?

[2] A. No.

[3] Q. Is Mr. Ingrahm a lawyer?

[4] A. Yes.

[5] Q. And was he the person that was helping you deal

[6] with the claim at that time?

[7] A. Yes.

[8] Q. Did you sign this letter?

[9] A. Yes.

[10] Q. And when you signed it, you thought you

[11] understood what it said; is that right?

[12] A. Yes.

[13] Q. Okay. What was your understanding of what the

[14] $50,000 was for?

[15] A. It's money to compensate me while I'm not

[16] working.

[17] Q. So was it an advance of money against what the

[18] vessel owner owed?

[19] A. I really don't know.

[20] Q. Okay. Well, was it your understanding that the

[21] $50,000 was to settle some part of your claim?

[22] A. No. It was just to cover me while I'm not

[23] working.

[24] Q. Okay. Did you understand that it would -- it

[25] would count towards whatever the boat owner owed you?

[26] A. No, I did not.

[27] Q. Did you think it was a gift that --

[28] A. Yes, I really thought it was just money from

## Page 38

[1] the boat.

[2] Q. You thought it was a gift?

[3] A. To help out.

[4] Q. Did you think it was a gift or did you think it

[5] was to pay part of what the boat owed you?

[6] A. I thought it was just for more like a gift to

[7] help out.

[8] Q. Okay. Now, did you go over each word with Carl

[9] Ingrahm?

[10] A. Yes.

[11] Q. And after you did that, you were willing to

[12] sign the letter, right?

[13] A. Yes.

[14] Q. Okay. After you signed an agreement with

[15] Mr. Banning for him to represent you, did Mr. Ingrahm

[16] still negotiate with the vessel owner?

[17] A. No.

[18] Q. Had you hired Mr. Banning before this letter

[19] was sent?

[20] A. After, afterwards.

[21] Q. After what?

[22] A. Afterward.

[23] Q. Afterwards.

[24] When is the first time you ever spoke with

[25] Mr. Banning?

[26] A. When I was in Hawaii.

[27] Q. What month was that?

[28] A. I don't really know.

## Page 39

[1] Q. Did you talk with someone from Mr. Banning's

[2] office before you talked to Mr. Banning?

[3] A. Nobody.

[4] Q. When is the first time you talked to John

[5] Lopez?

[6] A. When I was in Hawaii.

[7] Q. Did you talk to Mr. Banning first or Mr. Lopez

[8] first?

[9] A. Mr. Lopez.

[10] Q. Did you call Mr. Lopez or did Mr. Lopez call

[11] you?

[12] A. He came to me.

[13] Q. Where were you when he came to you?

[14] A. Hawaii.

[15] Q. Where in Hawaii? Were you in the hospital?

[16] A. Hospital.

[17] Q. And what did he tell you was the reason that he

[18] was coming to see you?

[19] MR. BANNING: Objection; attorney-client.

[20] Instruct the witness not to answer.

[21] BY MR. WINDES:

[22] Q. When Mr. Lopez first came to you in the

[23] hospital, how long after that did you sign the agreement

[24] with Mr. Banning?

[25] A. It was quite long.

[26] Q. Several months?

[27] A. Yeah. It was quite a long, about several

[28] months.

## Page 40

[1] Q. Did Mr. Lopez tell you that he wanted to

[2] represent you as his lawyer -- as your lawyer?

[3] MR. BANNING: Objection; attorney-client

[4] privilege. Instruct the witness not to answer.

[5] MR. WINDES: Let's get a clarification on that.

[6] Are you saying before there was any agreement that your

[7] firm would represent Mr. DeBrum, that there is still an

[8] attorney-client privilege?

[9] MR. BANNING: Sure. Hornbook law. Even before

[10] you sign the agreement, it's attorney-client privilege.

[11] MR. WINDES: So any conversations that you had

[12] at any point in time with Mr. DeBrum is, in your view,

[13] privileged?

[14] MR. BANNING: Correct.

[15] MR. WINDES: And you will instruct the witness

[16] not to answer any question along those lines --

[17] MR. BANNING: Correct.

[18] MR. WINDES: -- as to what was said between he

[19] and you or anyone in your office?

[20] MR. BANNING: Correct.

[21] And we'll stipulate that he'll follow my

[22] instruction, and you don't have to go through the

[23] exercise of getting him to agree to follow my

[24] instruction.

[25] BY MR. WINDES:

[26] Q. Did you meet with anyone from Mr. Banning's

[27] office while you were -- strike that.

[28] When did you first meet Zeca Rodriguez?

## Page 41

[1] A. Zeca?

[2] MR. BANNING: Z-E-C-A.

[3] MR. WINDES: Is that how it's pronounced?

[4] MR. BANNING: Or Maria.

[5] THE WITNESS: When I came here.

[6] BY MR. WINDES:

[7] Q. To San Diego?

[8] A. Yes.

[9] Q. Did you talk to her before you came to

[10] San Diego?

[11] A. No.

[12] Q. When you were in Hawaii, did you have any

[13] meetings with Tom Houghton?

[14] A. Tom Houghton?

[15] Q. Houghton. H-O-U-G-H-T-O-N.

[16] A. No.

[17] Q. Did you talk with Tom Houghton while you were

[18] in Hawaii?

[19] A. Yes.

[20] Q. What did you talk to him about?

[21] A. We were just conversing on my leg.

[22] Q. Was he there in Hawaii at the time, or was it

[23] on the telephone?

[24] A. He was in Hawaii.

[25] Q. Why was he in Hawaii?

[26] MR. BANNING: Objection; calls for speculation.

[27] THE WITNESS: He came to visit me seeing as he

[28] heard that I was in the hospital.

## Page 42

[1] BY MR. WINDES:

[2] Q. Did he tell you that he was – that he had a

[3] claim and that Mr. Banning was his lawyer?

[4] A. Yes.

[5] Q. Was Mr. Banning present when you were talking

[6] to Tom Houghton?

[7] A. No, he wasn't.

[8] Q. Did Tom Houghton suggest that you should hire

[9] Mr. Banning as your lawyer?

[10] A. No.

[11] Q. Did Mr. Houghton give you the telephone number

[12] for Mr. Banning?

[13] A. No.

[14] Q. Do you know a person by the name of Paranise

[15] Leota.

[16] A. Nobody. Who's Bernice?

[17] Q. A crew member from the Hornet 3.

[18] A. Nobody by the name Bernice.

[19] Q. Do you know any crew members from the Hornet 3?

[20] A. Nobody.

[21] Q. Did you have any discussions with Anthony

[22] Ferreira about settling your claim?

[23] A. No.

[24] Q. Did you ever tell Anthony Ferreira how much

[25] money you would agree to settle for?

[26] A. No.

[27] Q. Did you have any conversations with Mike Krill

[28] about how much you would settle for?

## Page 43

[1] A. No.

[2] Q. Did you have any discussions with anyone other

[3] than Ingrahm about what you would settle for, settle

[4] your claim for, before you hired Mr. Banning?

[5] A. Nobody.

[6] Q. Did you authorize Mr. Ingrahm to speak for you

[7] on settlement?

[8] MR. BANNING: Objection; vague and ambiguous.

[9] THE WITNESS: No.

[10] BY MR. WINDES:

[11] Q. When Mr. Ingrahm was negotiating settlement,

[12] was he doing that on his own, or did you authorize him

[13] to do that?

[14] MR. BANNING: Objection; vague and ambiguous.

[15] Compound.

[16] THE WITNESS: He's my brother-in-law, and I ask

[17] him to help me.

[18] BY MR. WINDES:

[19] Q. Did you ask him to negotiate a settlement for

[20] your claim?

[21] MR. BANNING: Objection; vague and ambiguous.

[22] THE WITNESS: No.

[23] BY MR. WINDES:

[24] Q. So when Mr. Ingrahm was speaking to the KOORALE

[25] people, you didn't tell him he could do that?

[26] A. Yeah, he was talking on my behalf.

[27] Q. Okay. And you told him he could do that?

[28] A. He can. He can talk.

## Page 44

[1] Q. For – on your behalf?

[2] A. Yes.

[3] MR. BANNING: Objection; vague and ambiguous.

[4] BY MR. WINDES:

[5] Q. When is the last time you talked to Tile?

[6] A. It's been years.

[7] Q. Did you know he gave a deposition in your case?

[8] THE INTERPRETER: If I can explain what a

[9] deposition is to him?

[10] BY MR. WINDES:

[11] Q. This is a deposition.

[12] A. Yes, I think I remembered.

[13] Q. Did you speak with him after he gave his

[14] deposition?

[15] A. No, I have not.

[16] Q. Did you speak with Tile before he gave his

[17] deposition and ask him to give a deposition?

[18] A. Yes.

[19] Q. And did you tell Tile that if he did that, he

[20] could get some money later?

[21] A. No.

[22] Q. Do you know where Tile lives now?

[23] A. Samoa.

[24] Q. How do you know?

[25] A. He's from Samoa.

[26] Q. Did he move from Samoa?

[27] A. I don't know.

[28] Q. Did Tile ever tell you that he was planning on

## Page 45

[1] moving out of Samoa?

[2]   A.   No, I don't know.

[3]   Q.   You went to Pago Pago and inspected the KOORALE

[4] with your lawyer, right?

[5]   A.   Yes.

[6]   Q.   During that trip, did you talk to Tiie?

[7]   A.   No.

[8]   Q.   Who is Pepe Cruz.

[9] THE INTERPRETER:   Who?

[10] BY MR. WINDES:

[11]   Q.   Who is Pepe Cruz?

[12] THE INTERPRETER:   What is that, skid man?

[13] BY MR. WINDES:

[14]   A.   Skiffman.

[15]   A.   Skiffman.

[16]   Q.   And when is the last time you talked to Pepe?

[17]   A.   I haven't been spoken with him for a long, long

[18] time, years and years.

[19]   Q.   Have you spoken to Pepe since your accident?

[20]   A.   No, I have not.

[21]   Q.   Isn't it true, Mr. DeBrum, that you called

[22] Mr. Cruz in Peru within the last few months?

[23]   A.   No.

[24]   Q.   Do you know anyone who has called Mr. Cruz in

[25] Peru?

[26]   A.   No, I don't know.

[27]   Q.   When was the last time you talked to John

[28] Alves – Alves?

## Page 46

[1]   A.   Before Christmas.

[2]   Q.   Have you met with Mr. Alves at Mr. Banning's

[3] office?

[4]   A.   Yes.

[5]   Q.   How many times?

[6]   A.   Well, three times.

[7]   Q.   For what purpose?

[8]   A.   Sometime when I go to make a call, I see him at

[9] the office.

[10]   Q.   Have you had any meetings where you and

[11] Mr. Alves and someone from Banning's office met together

[12] and talked about things?

[13]   A.   No.

[14]   Q.   When is the last time that you spoke to Tom

[15] Houghton?

[16]   A.   About four months ago.

[17]   Q.   For what purpose was that?

[18]   A.   Just conversation.

[19] MR. WINDES:   Do you want to take a break now

[20] and for the tape?

[21] THE VIDEOGRAPHER:   This is the end of Tape

[22] No. 1. Off record 11:33.

[23]   (A recess was taken.)

[24] THE VIDEOGRAPHER:   This is the beginning of

[25] Tape No. 2 in the continuing video deposition of

[26] Mel DeBrum. It's Thursday, January 9th, 2003. On

[27] record 11:54 a.m.

[28] BY MR. WINDES:

## Page 47

[1]   Q.   Okay. Your job at the time of the accident was

[2] to be the assistant skiffman, right?

[3]   A.   Yes.

[4]   Q.   And what were your responsibilities in the

[5] skiff during the set?

[6]   A.   What do you mean by responsibility?

[7]   Q.   What job did you do as the assistant skiffman

[8] when you were in the skiff?

[9]   A.   Just mechanical maintenance, check the splice

[10] cable, and make sure all the lines are clear for

[11] landing.

[12]   Q.   All what lines?

[13]   A.   The line when you're approaching the dock.

[14]   Q.   Approeching the dock?

[15]   A.   The skiff line that you use to tie the –

[16] THE INTERPRETER:   Hang on a minute. Rephrase

[17] the question again, please.

[18] BY MR. WINDES:

[19]   Q.   Okay. What I'm trying to find out is what jobs

[20] you did as the assistant skiffman while you were in the

[21] skiff.

[22]   A.   Check the oil. Check the engine. Make sure

[23] that it's sufficient water in the radiator. Check the

[24] hydraulic oil. Check all the cables. And make sure all

[25] the lines – the skiff lines – that's where I don't

[26] understand what that word is.

[27]   Q.   Let's understand that.

[28]   A.   The lines – the skiff line. The skiff line.

## Page 48

[1]   Q.   What do you do with the lines?

[2]   A.   To keep clear of the line from tangling.

[3]   Q.   Which lines?

[4]   A.   All lines.

[5]   Q.   Well, for example, you give the pulling line to

[6] the KOORALE, right?

[7]   A.   Yes.

[8]   Q.   Okay. Is that one of the lines that you say

[9] that you're trying to keep clear of?

[10]   A.   Yes.

[11]   Q.   What other lines are you trying to keep clear

[12] of?

[13]   A.   Boat line from the stern and the boat.

[14]   Q.   And how long are you – were you usually in the

[15] skiff during the set, how much time?

[16] THE INTERPRETER:   Say that again?

[17] BY MR. WINDES:

[18]   Q.   How much time were you usually in the skiff

[19] during the net set?

[20]   A.   I can't really tell.

[21]   Q.   More than 15 minutes?

[22]   A.   Probably 15, 20.

[23]   Q.   And during that 15 or 20 minutes while the net

[24] is being set, you are checking the oil and the water and

[25] the cables for the engine?

[26]   A.   Yes.

[27]   Q.   That's your job. That's your – your

[28] understanding of what your job was?

Page 49

[1]  A.  Yes.
[2]  Q.  Why didn't you check the oil and the water and
[3]  the cables at other times before or after the set?
[4]  A.  We checked before.
[5]  Q.  You checked before, and then you checked during
[6]  the 15 or 20 minutes that you set?
[7]  A.  Yes.
[8]  Q.  How do you check the oil when the skiff is
[9]  actually setting the net?
[10]  A.  Just check the oil tip, look at it, put it
[11]  back.
[12]  Q.  And you would check it before you did the set,
[13]  and then you'd check it again in the middle of the set
[14]  to be sure that the oil didn't disappear?
[15]  A.  Yes.
[16]  Q.  Okay. And same with the water. You would
[17]  check the water before the set, and then you would check
[18]  it again during the set to make sure it didn't
[19]  disappear?
[20]  A.  Yes.
[21]  Q.  And you would check the cables before the set,
[22]  but then you would check them again during the set to
[23]  make sure they didn't become disconnected?
[24]  A.  Yes.
[25]  Q.  Okay. And did you usually – did you usually
[26]  wait for the light boat to pick you up or did you
[27]  usually get off at the starboard ladder?
[28]  A.  I jumped to the ladder. I usually jumped to

Page 50

[1]  the ladder.
[2]  Q.  Always? Did you always get off the skiff at
[3]  the starboard ladder?
[4]  A.  I usually jumped to the ladder.
[5]  Q.  You sometimes wait for the light boat to
[6]  pick you up?
[7]  A.  No.
[8]  Q.  You never did?
[9]  A.  Never.
[10]  Q.  Did you ever get off the skiff any other way
[11]  other than at the starboard ladder?
[12]  A.  No.
[13]  MR. BANNING:  Objection; vague and ambiguous.
[14]  MR. WINDES:  If you'd explain, maybe I could
[15]  have a better question.
[16]  MR. BANNING:  Well, you're not referencing
[17]  time, what they're doing, et cetera, et cetera.
[18]  BY MR. WINDES:
[19]  Q.  Okay. You were on the KOORALE for 12 years,
[20]  right?
[21]  A.  Yes.
[22]  Q.  During that 12 years, did you ever get off the
[23]  skiff during a set other than at the starboard ladder?
[24]  A.  No.
[25]  Q.  At what point in time did you get off on the
[26]  ladder? In other words, at what point in the set did
[27]  you get off at the ladder?
[28]  THE INTERPRETER:  Can you rephrase that

Page 51

[1]  question?
[2]  MR. WINDES:  Yeah, let's try it.
[3]  BY MR. WINDES:
[4]  Q.  Did you always get off the skiff before the net
[5]  was pursed? Do you know –
[6]  THE INTERPRETER:  Off the record.
[7]  MR. WINDES:  Do you know what the word purse
[8]  means?
[9]  THE INTERPRETER:  No.
[10]  MR. WINDES:  That's what I thought.
[11]  THE INTERPRETER:  Is to furl or unfurl the net?
[12]  MR. WINDES:  There's an opening for the net,
[13]  and there's a cable that goes around inside rings, and
[14]  when they pull the line, the net collapses. It's called
[15]  pursing the line. It draws together the end, the
[16]  opening for the net. That word doesn't translate.
[17]  MR. FERREIRA:  He knows what purse means.
[18]  MR. WINDES:  Do you know what purse means?
[19]  THE WITNESS:  Yeah.
[20]  MR. WINDES:  Use the word purse. He says he
[21]  understands that word.
[22]  THE INTERPRETER:  Okay. Repeat the question
[23]  again.
[24]  BY MR. WINDES:
[25]  Q.  Did you always get off the skiff before the net
[26]  was pursed?
[27]  A.  About the same time.
[28]  Q.  Did you always get off the skiff after you

Page 52

[1]  passed the pulling line to the KOORALE?
[2]  A.  Can you go over that again one more time.
[3]  Q.  Do you know what I mean by the pulling line?
[4]  A.  That was a pulling line.
[5]  Q.  The line that the skiff pulls the KOORALE with
[6]  is the pulling line. Do you understand?
[7]  THE INTERPRETER:  Could you repeat that again?
[8]  Yes, he understands that.
[9]  MR. FERREIRA:  He understands that.
[10]  BY MR. WINDES:
[11]  Q.  Do you understand the word pulling line now?
[12]  THE INTERPRETER:  Yes, but it was my
[13]  translation. I was talking about pursing line. That's
[14]  why he didn't understand it.
[15]  MR. BANNING:  I would ask that Mr. Ferreira
[16]  cease making comments for the record saying things like
[17]  "he knows this" or "he knows that." Okay?
[18]  MR. WINDES:  He's talking to me.
[19]  MR. BANNING:  Well, this is a videotaped
[20]  deposition, and we certainly don't need any prompting or
[21]  intimidation by Mr. Ferreira, so –
[22]  MR. WINDES:  Prompting and intimidation of the
[23]  witness? Is that what you're accusing him of?
[24]  MR. BANNING:  The record speaks for itself. Go
[25]  on.
[26]  BY MR. WINDES:
[27]  Q.  Do you understand what a – do you understand
[28]  what I mean when I say pulling line?

Page 53

[1]   A.   Yes, I understand.

[2]   Q.   We agree it's the line that the skiff pulls the

[3]   KOORALE with?

[4]   A.   Yes.

[5]   Q.   Okay. And you give the pulling line to the

[6]   crew members on the KOORALE, right?

[7]   A.   No.

[8]   Q.   Who passes the pulling line to the crew?

[9]   A.   The skiffman.

[10]   Q.   Does he pass the pulling line to the crew

[11]   before or after you get off?

[12]   A.   Then I get off and pass the line.

[13]   MR. WINDES:   I'm sorry, the answer is that

[14]   after Mr. DeBrum got off, then the skiffman would pass

[15]   the pulling line to the crew?

[16]   THE INTERPRETER:   That's correct.

[17]   BY MR. WINDES:

[18]   Q.   Okay. Was that always the way it was done?

[19]   A.   Yes.

[20]   Q.   And at the time of your accident on the

[21]   KOORALE, where was the pulling line?

[22]   THE INTERPRETER:   Let me get a better

[23]   understanding of what he meant to me. Can I?

[24]   MR. WINDES:   Is there an objection to that?

[25]   THE INTERPRETER:   Because he said he's behind

[26]   him. Because when he said "behind," I don't know what

[27]   he means behind. Is it toward the boat or toward the –

[28]   MR. BANNING:   You have to rephrase the

Page 54

[1]   question.

[2]   THE INTERPRETER:   Yeah.

[3]   MR. WINDES:   All right.

[4]   BY MR. WINDES:

[5]   Q.   When you got off the – strike that.

[6]   At the time of your accident, had the crew been

[7]   given the pulling line?

[8]   A.   No. The line is not passed to the crew get.

[9]   Q.   Why didn't you – why wasn't it your practice

[10]   to pass the pulling line to the crew before you got off?

[11]   A.   That was not my job.

[12]   Q.   Who told you that was not your job?

[13]   A.   Myself.

[14]   Q.   What is the – tell me what you did during the

[15]   last five minutes before the accident.

[16]   A.   I was standing.

[17]   Q.   Did you help pass the 'orso' to the KOORALE,

[18]   the net, the end of the net to the KOORALE?

[19]   A.   No.

[20]   Q.   How was that done? Who did that?

[21]   A.   I don't quite understand. What net? What are

[22]   you talking about net?

[23]   Q.   Okay. Let's start from the beginning. When

[24]   the skiff left the KOORALE that morning, tell me

[25]   everything that you did until you got off the boat.

[26]   A.   When you say KOORALE left, from where?

[27]   Q.   When the Koor – sorry – when the skiff left

[28]   the KOORALE that morning, tell me everything that you

Page 55

[1]   did after that.

[2]   THE INTERPRETER:   Hang on a minute. What is a

[3]   skiff? I think that's a –

[4]   MR. WINDES:   A skiff is a kind of boat. It's

[5]   a –

[6]   THE INTERPRETER:   A small boat?

[7]   THE WITNESS:   Was during fishing time or –

[8]   BY MR. WINDES:

[9]   Q.   On the morning of the accident, tell me what

[10]   you did from the time that the skiff left the KOORALE to

[11]   set the net until the time of your accident.

[12]   A.   I have said before earlier, check oil, check,

[13]   make sure all the lines are clear. Do the routine that

[14]   I usually do.

[15]   Q.   Okay. So during the 15 or 20 minutes before

[16]   the accident, the only thing you did was to check the

[17]   oil and check the water and check the cables and watch

[18]   out for the lines that were in the water; is that right?

[19]   A.   Yes.

[20]   Q.   What was your job after you got off the skiff

[21]   usually?

[22]   A.   Just keep an eye on the lines, make sure

[23]   they're not tangled. Because if they're okay, then

[24]   there's nothing to do.

[25]   Q.   After you get off of the skiff to the KOORALE,

[26]   your job then was to watch the lines; is that right?

[27]   A.   No. We checked the pursing cable. There is

[28]   also other individuals that are – check the line cable.

Page 56

[1]   Q.   How many people were checking the pursing

[2]   cable?

[3]   A.   Two.

[4]   Q.   And did it – are you saying that you would get

[5]   off and you would help those two people check the

[6]   pursing line, pursing cable?

[7]   A.   No, it's not. I will get out of the way

[8]   because somebody else is checking the cable, so I will

[9]   just wait around.

[10]   Q.   Okay. So normally when you got off the skiff

[11]   onto the KOORALE, you didn't have a job to do; is that

[12]   right?

[13]   A.   Nothing.

[14]   Q.   When is the next time after you got off the

[15]   skiff that you had a job to do?

[16]   A.   When the net is about to be rolled in.

[17]   Q.   Okay. And usually how long was that after you

[18]   got off the skiff?

[19]   A.   About 30, 45 minutes.

[20]   Q.   Okay. So about 45 minutes after you got off

[21]   the skiff, you didn't have a job, right?

[22]   A.   Nothing.

[23]   Q.   He agrees. Is that the –

[24]   THE INTERPRETER:   Yes, he doesn't do anything.

[25]   BY MR. WINDES:

[26]   Q.   And about 45 minutes after you get off the

[27]   skiff, your job then is to help stack the net?

[28]   A.   Yes.

Case 1:03-cv-00004   Document 27   Filed 02/21/2003   Page 1 of 1   PETERSON & ASSOC. COURT REPORTING, INC.

Page 53 to Page 56                                          800-649-6353

## Page 57

[1]  Q.  Okay. And before the net is stacked, is the
[2]  light boat or at the time that the net is first stacked,
[3]  is the light boat on the KOORALE or off the KOORALE?
[4]  A.  He's on deck.
[5]  Q.  Okay. So before you start your job, the light
[6]  boat is pulled up onto the KOORALE, right?
[7]  A.  Yes.
[8]  Q.  How long after you normally got off the skiff
[9]  did the skiffman pass the pull line to the KOORALE?
[10]  A.  About five minutes.
[11]  Q.  And what normally did the skiffman do with the
[12]  skiff during the five minutes after you got off the
[13]  skiff and before he gave the pulling line to the
[14]  KOORALE?
[15]  THE INTERPRETER:  Could you repeat that again?
[16]  MR. WINDES:  I know.
[17]  BY MR. WINDES:
[18]  Q.  During that five minutes, what would the
[19]  skiffman do?
[20]  A.  He's throwing the heaving line.
[21]  MR. BANNING:  H-E-A-V-I-N-G, I think.
[22]  BY MR. WINDES:
[23]  Q.  And you didn't help him with that?
[24]  A.  Me and another guy are pulling it.
[25]  Q.  How was it decided when the set would start?
[26]  A.  Firmin.
[27]  Q.  Do you know whether Firmin usually waited for
[28]  the first light of the sun to break the horizon?

## Page 58

[1]  A.  Yeah. It's still dark.
[2]  Q.  But do you agree that usually the set would
[3]  start at first light from the sun?
[4]  A.  No.
[5]  Q.  Mr. DeBrum, do you know if Firmin Ferreira has
[6]  ever smoked marijuana on the boat?
[7]  A.  Yeah.
[8]  Q.  Yeah what?
[9]  A.  Yeah, he smoke it.
[10]  Q.  When?
[11]  A.  He smoking on deck.
[12]  Q.  When? All the time?
[13]  A.  Yeah. And also sometime I smell his cabin when
[14]  I walk by.
[15]  Q.  Are you saying that you would see Firmin
[16]  Ferreira smoking marijuana on the deck in front of the
[17]  crew?
[18]  A.  No.
[19]  Q.  Well, you said he smoked on deck, didn't you?
[20]  A.  Yes.
[21]  Q.  When did he smoke on deck?
[22]  A.  One day when we were out in New Zealand fishing
[23]  or when we were at the New Zealand shipyard. And also
[24]  when I was in Hawaii and he visited me. Him and Jake.
[25]  Q.  Him and Jake what?
[26]  A.  Jake Armstrong.
[27]  Q.  Did what?
[28]  A.  They came to my room and smoked.

## Page 59

[1]  Q.  In the room?
[2]  A.  In my room.
[3]  Q.  Did you smoke with them?
[4]  A.  No.
[5]  Q.  So Jake Armstrong came to your apartment in
[6]  Hawaii with Firmin Ferreira, and they sat in your house
[7]  and smoked marijuana – I'm sorry – sat in your
[8]  apartment and smoked marijuana; is that right?
[9]  A.  Yes.
[10]  Q.  And the other time that you said was in a New
[11]  Zealand shipyard, right? When was that?
[12]  MR. BANNING:  That misstates his testimony. He
[13]  said that he always saw him smoking or knew he was
[14]  smoking – and I'm looking at the testimony. And that's
[15]  not what he said. You misstated the answer.
[16]  MR. WINDES:  I think the witness is supposed to
[17]  do that, not you, Mr. Banning.
[18]  MR. BANNING:  Well, lawyer's tricks tend to try
[19]  to get witnesses to say things that are not so.
[20]  MR. WINDES:  Right.
[21]  MR. BANNING:  And the record is clear;
[22]  misstates the testimony.
[23]  BY MR. WINDES:
[24]  Q.  Okay. Now, you said that you saw Firmin
[25]  Ferreira smoking marijuana in a shipyard in New Zealand,
[26]  right?
[27]  A.  Yes.
[28]  Q.  And where was he? Was he on the ship or was he

## Page 60

[1]  off the ship?
[2]  A.  One on the ship and one during our party.
[3]  Q.  I just didn't understand you.
[4]  A.  One time he was smoking on the ship. The other
[5]  time it was during a party.
[6]  Q.  And did you actually see him smoke marijuana on
[7]  the ship when it was in New Zealand?
[8]  A.  Yes. He called out me and then blew the smoke
[9]  in my face.
[10]  Q.  Where were you at the time?
[11]  A.  I was about the same spot while I was looking.
[12]  He was smoking it there.
[13]  Q.  Was he on the wheel house or on deck or where?
[14]  A.  On deck.
[15]  Q.  Did anybody else see it?
[16]  MR. BANNING:  Objection; calls for speculation.
[17]  THE WITNESS:  I don't know.
[18]  BY MR. WINDES:
[19]  Q.  Was anyone else there at the time?
[20]  A.  Yes, there were people around, but there was
[21]  nobody in particular at the same spot that I was at.
[22]  Q.  Do you know whether anyone else was able to see
[23]  this marijuana that Mr. Ferreira was smoking?
[24]  MR. BANNING:  Objection; calls for speculation.
[25]  THE WITNESS:  I – I don't know.
[26]  BY MR. WINDES:
[27]  Q.  Had you seen Firmin Ferreira smoke marijuana at
[28]  any other time other than this time or these two times

## Page 61

[1]  in New Zealand and at your apartment?
[2]      A.    Yes.
[3]      Q.    Where and when?
[4]      A.    A few nights before, right before the accident,
[5]  I saw them smoking, but they didn't see me.
[6]      Q.    Saw who smoking?
[7]      THE INTERPRETER:    Jake and Mr. Firmin.
[8]  BY MR. WINDES:
[9]      Q.    Where were they?
[10]     A.    Outside the pilot house.
[11]     Q.    Was anyone else there?
[12]     A.    No.
[13]     Q.    And do you know if anyone else saw them doing
[14]  it then?
[15]     A.    Yes.
[16]     Q.    Who?
[17]     A.    Some of the crew members.
[18]     Q.    Which crew members?
[19]     A.    Tile and Zuware (phonetic), Martino, and
[20]  others.
[21]     Q.    What others?
[22]     A.    Henry.
[23]     Q.    Sorry?
[24]     THE INTERPRETER:    I think the name is Henry.
[25]     BY MR. WINDES:
[26]     Q.    How do you know these people saw the marijuana?
[27]     THE INTERPRETER:    Saw what?
[28]     BY MR. WINDES:

## Page 62

[1]      Q.    The marijuana being smoked by Firmin and Jake.
[2]      A.    They told me they saw them smoking, Jake and
[3]  Mr. Firmin.
[4]      Q.    All of the crew members that you just named
[5]  told you that they saw him – saw them smoking?
[6]      A.    Yes, what they told me.
[7]      Q.    Okay.
[8]      A.    They saw them.
[9]      Q.    Did you ever see Firmin Ferreira smoking
[10]  marijuana other than that time and the two times in
[11]  New Zealand shipyard – and, I'm sorry, two times in
[12]  New Zealand and the one time in your apartment?
[13]     A.    When we were out fishing.
[14]     Q.    What?
[15]     A.    Yes, when we were out fishing.
[16]     Q.    How many times?
[17]     A.    It was about before – right before my
[18]  accident.
[19]     Q.    Four times right before your accident?
[20]     THE INTERPRETER:    Yes.
[21]     MR. WINDES:    He didn't say yes.
[22]     THE WITNESS:    Actually it's more than four that
[23]  I have seen and I have smelled.
[24]     BY MR. WINDES:
[25]     Q.    More than four times on the trip of your
[26]  accident or more than four times during the 12 years you
[27]  worked on the boat?
[28]     A.    More than four times during my accident, the

## Page 63

[1]  trip.
[2]      Q.    And where did you see Firmin smoking?
[3]      A.    At the pilot house.
[4]      Q.    And who was he smoking with, if anyone?
[5]      A.    Jake.
[6]      Q.    Anyone else?
[7]      A.    No one else.
[8]      Q.    What other times have you seen Firmin or Jake
[9]  smoking other than the times that you told me about?
[10]     A.    The very last time I saw him smoking is when
[11]  they visited me in Hawaii.
[12]     Q.    Before – strike that.
[13]  When did you see Firmin smoking in New Zealand,
[14]  what year was that?
[15]     A.    '99, if I remember right.
[16]     Q.    Do you know of other crew members that
[17]  told you that they saw Firmin and Jake smoking
[18]  marijuana?
[19]     A.    I already mentioned them earlier.
[20]     Q.    Is that the only time that someone else told
[21]  you that they had seen Firmin and Jake smoking
[22]  marijuana?
[23]     A.    No.
[24]     Q.    What other times and who?
[25]     A.    More than one time before the accident they
[26]  told me they have seen them smoking. And the night the
[27]  accident happened.
[28]     Q.    Tell me about the night the accident happened.

## Page 64

[1]      A.    I smelled the scent of marijuana coming from
[2]  him that night.
[3]      Q.    Where?
[4]      A.    In the galley while he was fixing himself a cup
[5]  of coffee.
[6]      Q.    Was he smoking in the galley?
[7]      A.    No.
[8]      Q.    And you smelled marijuana on him at that time?
[9]  Is that what you are saying?
[10]     A.    Yes.
[11]     Q.    Did you ever talk to Firmin about smoking
[12]  marijuana – about his smoking marijuana?
[13]     A.    No.
[14]     Q.    Did you ever talk to Jake about his smoking
[15]  marijuana?
[16]     A.    No.
[17]     Q.    Did you ever talk to Olo about Firmin or Jake
[18]  smoking marijuana?
[19]     A.    Yes. And also Olo told me that too.
[20]     Q.    When did he tell you that?
[21]     A.    Before the accident.
[22]     Q.    How long before the accident?
[23]     A.    About two days prior to the accident.
[24]     Q.    What did he tell you?
[25]     A.    He said that he saw them puffing out smoke,
[26]  marijuana, outside the pilot house.
[27]     Q.    When did you first observe either Firmin or
[28]  Jake smoking marijuana?

#### Page 65

[1]   THE INTERPRETER:   I missed the question.

[2]   BY MR. WINDES:

[3]   Q.   When did you first see Firmin or Jake smoking

[4]   marijuana?

[5]   A.   It was a long time.

[6]   Q.   How many years?

[7]   A.   About five years.

[8]   Q.   Five years before the accident?

[9]   A.   Yes.

[10]   Q.   Did you ever tell anyone that Firmin and Jake

[11]   smoked marijuana, other than the crew, on the KOORALE?

[12]   A.   No, nobody.

[13]   MR. BANNING:   Assuming you mean other than the

[14]   lawyers, but –

[15]   MR. WINDES:   Oh, yeah.

[16]   MR. BANNING:   But non-lawyers?

[17]   MR. WINDES:   Right.

[18]   I think we better take a little break here.

[19]   MR. BANNING:   Take lunch now. Is that okay?

[20]   MR. WINDES:   Yeah.

[21]   THE VIDEOGRAPHER:   Off record 12:44.

[22]   (A recess was taken.)

[23]   THE VIDEOGRAPHER:   On record 1:38.

[24]   BY MR. WINDES:

[25]   Q.   Okay. Mr. DeBrum, have you smoked marijuana in

[26]   the last ten years?

[27]   MR. BANNING:   Objection. Instruct the witness

[28]   not to answer. Invasion of privacy. If you want to

#### Page 66

[1]   limit it to a relevant time period, I will permit the

[2]   question.

[3]   MR. WINDES:   The witness has worked on the

[4]   KOORALE for ten years and – I'm sorry. What are your

[5]   parameters on relevance?

[6]   MR. BANNING:   Well, if you want to ask him if

[7]   he smoked marijuana on the trip in which the accident

[8]   occurred or whether he smoked marijuana since the

[9]   accident to the present, I will permit that, but to go

[10]   back ten years, I don't think you can do that in

[11]   general. I mean it's an invasion of privacy, and we

[12]   have a right to limit the question to a reasonable scope

[13]   and reasonable relevance.

[14]   MR. WINDES:   Well, you have submitted expert

[15]   testimony in this case that long-term smoking of

[16]   marijuana can impair one's judgment and motor skills and

[17]   decision processes and all sorts of things.

[18]   And your expert has made it relevant that if

[19]   Mr. DeBrum was engaged in long-term smoking of marijuana

[20]   while he worked on the KOORALE, then that could be

[21]   relevant to the cause of this accident.

[22]   MR. BANNING:   Long term is not ten years. Long

[23]   term – we're talking – I think he said in his

[24]   declaration 30 days. And the boat was out to sea for,

[25]   what, four months.

[26]   I mean, if you want to ask him – you know,

[27]   give me a reasonable scope in terms of time.

[28]   MR. WINDES:   The point that you're making is

#### Page 67

[1]   that there's an invasion of privacy in asking Mr. DeBrum

[2]   whether or not he was smoking marijuana during his

[3]   employment on the KOORALE?

[4]   MR. BANNING:   I'm saying for ten years, that is

[5]   too overly broad, and it's an invasion of privacy and

[6]   has nothing to do with this case; it's irrelevant.

[7]   MR. WINDES:   Let's try this.

[8]   BY MR. WINDES:

[9]   Q.   Mr. DeBrum, did you smoke marijuana during the

[10]   three years immediately prior to your accident?

[11]   MR. BANNING:   Objection; too overly broad.

[12]   Instruct the witness not to answer. Invasion of

[13]   privacy.

[14]   MR. WINDES:   And –

[15]   What does three years have to do

[16]   with this?

[17]   MR. WINDES:   Your witness – your expert

[18]   witness has submitted expert opinions that long-term

[19]   smoking for years, as a matter of fact, can impair

[20]   various cognitive abilities.

[21]   MR. BANNING:   I don't know that's what he said.

[22]   MR. WINDES:   Well, I know that's what he said.

[23]   MR. BANNING:   And his use of marijuana is not

[24]   in issue.

[25]   MR. WINDES:   Well, it is if, in fact, it was a

[26]   cause of his accident. If he had his cognitive thinking

[27]   impaired as a result of smoking pot.

[28]   MR. BANNING:   I said I will let you ask him

#### Page 68

[1]   about the trip in question and some reasonable time

[2]   before that, but I'm not going to have you go back into

[3]   antiquity.

[4]   MR. WINDES:   In other words, it's invasion of

[5]   privacy to ask it – for a period more than a month, but

[6]   it's not an invasion of privacy to ask if it's within

[7]   the month?

[8]   MR. BANNING:   I didn't say a month. I said –

[9]   you know, I forget what date the trip started. When did

[10]   the trip start? Like three months. Why don't you

[11]   start –

[12]   MR. WINDES:   You have your expert report here,

[13]   the doctor that you offered on long-term pot smoking, it

[14]   does specifically refer to years of smoking and the

[15]   effect of cognitive ability.

[16]   MR. BANNING:   Well, I'm just telling you that

[17]   what we can limit it to is a reasonable scope of time.

[18]   I don't have the report here with me. If you want to

[19]   limit it to, say, a year before the accident, I will let

[20]   him answer that question. I think that's reasonable.

[21]   BY MR. WINDES:

[22]   Q.   Let's try that one for starts.

[23]   During the year before the accident, did you

[24]   smoke marijuana at any time, Mr. DeBrum?

[25]   A.   No.

[26]   Q.   Have you smoked marijuana at any time since the

[27]   accident?

[28]   A.   No.

## Page 69

[1] Q. Mr. DeBrum, if Firmin Ferreira was willing, in
[2] the presence of your lawyer, to have a drug test done in
[3] the next few days, would you be willing to do the same?
[4] MR. BANNING: Objection. That is a totally
[5] improper question. And just – if you want to make a
[6] motion to the court for a physical examination, drug
[7] test, you can certainly do that, but to ask the witness
[8] stuff like that is – it's an invasion of privacy.
[9] MR. WINDES: Well, Mr. Banning, I'm offering it
[10] not only to the witness, your client, I'm offering it to
[11] you as well.
[12] MR. BANNING: I should take a drug test?
[13] MR. WINDES: We have got an evidentiary issue.
[14] Well, that might be a good idea but actually
[15] that's not what I meant.
[16] The question is whether or not to try to sort
[17] through –
[18] MR. BANNING: Make a motion.
[19] MR. WINDES: – who may be lying or not in
[20] this.
[21] MR. BANNING: Make the motion.
[22] It's well documented Mr. Ferreira is a
[23] long-term marijuana user. Everybody knows it in the
[24] fleet. It's common knowledge, so come on. You can't –
[25] you can't change the facts of what the facts are. You
[26] know it; I know it; he knows it, and so let's just get
[27] on with the case. Okay?
[28] MR. WINDES: Mr. Banning, I think that what you

## Page 70

[1] just said is so slanderous that I think you better be
[2] real careful.
[3] MR. BANNING: We have declarations from –
[4] MR. WINDES: What your witness may say –
[5] MR. BANNING: We have declarations from
[6] witnesses totally unassociated with us confirming the
[7] fact of Mr. Ferreira smoking pot on the boat, you know,
[8] and the fact is that don't try some lawyer's trick. The
[9] fact is if you want to make a motion – if you want to
[10] make a motion to have a physical examination or drug
[11] test, make your motion.
[12] MR. WINDES: By the time that the motion was
[13] completed and the court decided, any residuals of
[14] marijuana would no longer be picked up by drug test.
[15] And so –
[16] MR. BANNING: Make your –
[17] MR. WINDES: So what you're offering now –
[18] MR. BANNING: Okay. Make your motion. Make
[19] your motion.
[20] MR. WINDES: – right here and now, during the
[21] next few working days, to have both of these people,
[22] Mr. Ferreira and Mr. DeBrum, tested in order to
[23] determine whether or not Mr. DeBrum is perjuring himself
[24] or whether or not Mr. Ferreira will be.
[25] MR. BANNING: It's a lawyer's trick and make
[26] your motion. Make a motion. If you want to make a
[27] motion, make a motion.
[28] MR. WINDES: No. The lawyer's trick is to say

## Page 71

[1] make a motion –
[2] MR. BANNING: Make a motion.
[3] MR. WINDES: – and then have it take so long
[4] that the testing is no longer –
[5] MR. BANNING: Is the deposition over?
[6] MR. WINDES: No, the deposition is not over.
[7] MR. BANNING: Then ask questions. I'm not
[8] being deposed.
[9] MR. WINDES: And the question is whether or not
[10] Mr. DeBrum would be willing to take a drug test in the
[11] next few working days.
[12] MR. BANNING: I'm not going to let him respond
[13] to that because that's harassment. If you want to stop
[14] the deposition now, fine. If you want to go forward
[15] with the questions, if you want to make a motion asking
[16] the court to order him to take a drug test, do so.
[17] MR. WINDES: I think we've made a record for
[18] the fact that we made the offer, and Mr. DeBrum and his
[19] lawyer have declined.
[20] MR. BANNING: The testimony is what the
[21] testimony is. And the record is that he did not
[22] decline. The record is that I instructed him not to
[23] answer because it's harassment, invasion of privacy, and
[24] has – and is not something relevant to anything here.
[25] If you have any evidence whatsoever, you know,
[26] tell me what your evidence is. Do you have any
[27] evidence?
[28] MR. WINDES: Well, I –

## Page 72

[1] MR. BANNING: Do you have any evidence?
[2] MR. WINDES: If I have evidence that Mr. DeBrum
[3] is a long-term frequent smoker of marijuana, would that
[4] satisfy you to get –
[5] MR. BANNING: Do you have any evidence that –
[6] that he's been smoking pot today, this week, whatever?
[7] MR. WINDES: The offer is made.
[8] MR. BANNING: You can try to turn this around
[9] as much as you can, but the fact is the Coast Guard
[10] requires them to not be smoking marijuana on the boat.
[11] The fact that they were smoking marijuana on the boat,
[12] that's a violation of the Coast Guard regulations and
[13] that's a violation of the law.
[14] MR. WINDES: Except for fact that it didn't
[15] occur and what we're trying to do is deal with the
[16] credibility of your client versus my client.
[17] MR. BANNING: That's what we have a trial for.
[18] If you put your witnesses up, we'll put our witnesses
[19] up, and we'll see what the jury believes.
[20] MR. WINDES: A drug test will go a long way to
[21] sort this out.
[22] MR. BANNING: No, it won't. That accident was
[23] how many years ago? Two years ago?
[24] MR. WINDES: It could also establish whether or
[25] not your client is perjuring himself here in this
[26] deposition.
[27] MR. BANNING: Well, nonsense.
[28] MR. WINDES: Okay.

Page 73

[1]     MR. BANNING:   You know, a good question is why
[2] didn't they go in as required by the Coast Guard after
[3] the accident and do the mandatory drug testing they're
[4] supposed to have? Why not that? Explain that.
[5]     MR. WINDES:   It's an offer made to determine
[6] who is lying here and who isn't on drug use.
[7]     MR. BANNING:   It's just a lawyer's trick. Go
[8] ahead. Ask questions.
[9]     (Discussion held off the record.)
[10]    MR. WINDES:   About a 60-second break. Can we
[11] make it that short?
[12]    MR. BANNING:   Whatever. Off the record.
[13]    THE VIDEOGRAPHER:   Off record 1:48.
[14]    (A recess was taken.)
[15]    THE VIDEOGRAPHER:   On record 1:48.
[16] BY MR. WINDES:
[17]    Q.   Why, Mr. DeBrum, did you choose to get off of
[18] the skiff during each set before the pulling line was
[19] given to the KOORALE?
[20]    A.   Firmin always asked me to do it.
[21]    Q.   Did Firmin explain to you why he wanted you on
[22] the boat for 45 minutes without a job?
[23]    THE INTERPRETER:   Could you repeat that,
[24] please?
[25] BY MR. WINDES:
[26]    Q.   Did Firmin explain to you why he wanted you on
[27] the KOORALE for 45 minutes with no job rather than on
[28] the skiff?

Page 74

[1]    A.   No.
[2]    Q.   If the – did you ever ask anyone on the
[3] KOORALE if the light boat could be used to bring you in
[4] from the skiff to the KOORALE?
[5]    A.   Yes.
[6]    Q.   Who?
[7]    A.   My deck boss.
[8]    Q.   John Alves?
[9]    A.   Yes.
[10]    Q.   The same John Alves that's represented by your
[11] lawyer?
[12]    A.   Yes.
[13]    Q.   What did John Alves say?
[14]    A.   Nothing.
[15]    Q.   He didn't answer you?
[16]    A.   No, he couldn't, because Firmin always tell him
[17] to take me to the boat.
[18]    Q.   But John Alves didn't give you an answer; is
[19] that right?
[20]    THE INTERPRETER:   And what?
[21] BY MR. WINDES:
[22]    Q.   John Alves did not answer your question as to
[23] whether or not you could get the light boat to pick you
[24] up?
[25]    A.   Just tell me to ask Firmin.
[26]    Q.   Did you ask Firmin?
[27]    A.   No.
[28]    Q.   Why not?

Page 75

[1]    A.   Because he always scold at us when we try to
[2] ask him. Once – he said once he wanted you to do
[3] something, you have to do it.
[4]    Q.   How many times did you ask John Alves if you
[5] could have the light boat pick you up?
[6]    A.   There were many times.
[7]    Q.   And each time he didn't answer you?
[8]    MR. BANNING:   That misstates the testimony.
[9]    THE WITNESS:   No.
[10]    MR. BANNING:   Argumentative.
[11] BY MR. WINDES:
[12]    Q.   During the 12 years that you worked on the
[13] KOORALE, what was the light that you depended on to
[14] transfer from the skiff to the KOORALE?
[15]    THE INTERPRETER:   Where was the light?
[16]    MR. WINDES:   Yes.
[17]    THE INTERPRETER:   As light as in a flashlight
[18] or –
[19]    MR. WINDES:   Any light to be able to see.
[20]    THE INTERPRETER:   Okay.
[21]    THE WITNESS:   And used it on the KOORALE or –
[22]    MR. WINDES:   Maybe I should ask the question
[23] again because we've kind of mixed it up a little bit.
[24]    THE INTERPRETER:   Could you, please.
[25] BY MR. WINDES:
[26]    Q.   During the 12 years that you worked on the
[27] KOORALE, what light source did you depend on to be able
[28] to see to transfer from the skiff to the KOORALE?

Page 76

[1]    A.   Small flashlight.
[2]    Q.   Which small flashlight?
[3]    A.   It was a tiny one with two batteries.
[4]    Q.   Whose flashlight?
[5]    A.   Mine.
[6]    Q.   So when you were about to transfer from the
[7] skiff to the KOORALE, you would use your flashlight, a
[8] small flashlight, to shine on the steps of the KOORALE?
[9]    A.   No.
[10]    Q.   I asked you what light you depended on when you
[11] transferred from the skiff to the KOORALE, and you said
[12] a flashlight that was yours, right?
[13]    A.   Yes.
[14]    Q.   And would you use your flashlight – what would
[15] you point your flashlight at?
[16]    A.   I point it at the stairway before I go to the
[17] boat.
[18]    Q.   Can you describe that flashlight for me,
[19] please.
[20]    A.   It's about this long, two batteries.
[21]    Q.   And did you have it attached to your arm? How
[22] did you hold it?
[23]    A.   I'm holding in my hand.
[24]    Q.   Did you find that that was enough light for
[25] you?
[26]    MR. BANNING:   Objection; vague and ambiguous.
[27]    THE WITNESS:   No, it's not enough.
[28]    BY MR. WINDES:

Page 77

[1]   Q.   Did you talk to anyone about that?
[2]   A.   Nobody.
[3]   Q.   The skiff – the skiffman had a flashlight
[4] also, right?
[5]   A.   Yes.
[6]   Q.   And did he point the flashlight at the stairs
[7] for you to see?
[8]   A.   No.
[9]   Q.   Why not?
[10]  A.   Because I have a flashlight with me, plus there
[11] is always a big flashlight from Firmin that is shining
[12] down.
[13]  Q.   I'm sorry. The two reasons are that you had a
[14] flashlight and Firmin had a flashlight; is that right?
[15]  A.   Yes.
[16]  Q.   And so for that reason you didn't ask the
[17] skiffman to point his flashlight?
[18]  A.   No.
[19]  Q.   I think we – because you had a flashlight and
[20] Firmin had a spotlight, is that the reasons that you
[21] didn't ask the skiffman to shine his flashlight?
[22]  A.   That was not a job to shine the stairway for
[23] me. I have a flashlight, but Mr. Firmin has one.
[24] Besides his flashlight is weak.
[25]  Q.   For 12 years the skiffman's flashlight was
[26] weak.
[27]  A.   Not really, but it is kind of not bright enough
[28] for the distance from here to there, about there.

Page 78

[1]   Q.   Did you talk to anyone about that, that the
[2] skiffman's flashlight was not strong enough?
[3]   A.   No.
[4]   Q.   Why not?
[5]   A.   Like I said, at the time we ask Firmin
[6] something he always scold at us.
[7]   Q.   So the reason you didn't ask for more light was
[8] you were afraid of Firmin?
[9]   A.   No. But my flashlight was bright enough to do
[10] the job.
[11]  Q.   Okay.
[12]  A.   Firmin's flashlight had more light than mine.
[13] There was no reason for me to ask, because there was
[14] enough light, mine combined with Mr. Firmin's
[15] flashlight.
[16]  Q.   Did you use the same two-battery flashlight for
[17] 12 years?
[18]  A.   Yes.
[19]  Q.   Did you consider getting a bigger flashlight
[20] for yourself?
[21]  A.   No.
[22]  Q.   Now, Firmin was always in the crow's nest,
[23] right?
[24] THE INTERPRETER. Crow's nest?
[25]  THE WITNESS:   Yes.
[26] BY MR. WINDES:
[27]  Q.   When you were transferring from the skiff to
[28] the KOORALE?

Page 79

[1]   A.   Yes.
[2]   Q.   And the crow's nest is in the center of the
[3] deck of the KOORALE, right?
[4]   A.   Yes.
[5]   Q.   And a spotlight shining from the crow's nest
[6] cannot put light on the ladder, right?
[7]   A.   Not so directly, but you can – with the shine
[8] you can see still see the stairway.
[9]   Q.   You're saying that the flash or the light
[10] coming from the spotlight from the crow's nest would
[11] make it lighter on the side of the ship?
[12]  A.   Yes. That's powerful enough.
[13]  Q.   When you were trans- – during the 12 years
[14] that you were on the KOORALE, when you were transferring
[15] from the skiff to the KOORALE, how did you decide when
[16] to jump from the skiff to the KOORALE?
[17]  MR. BANNING:   Objection; argumentative. Asked
[18] and answered. You've already asked him this question
[19] the first session of the deposition.
[20]  MR. WINDES:   Is that an instruction?
[21]  MR. BANNING:   Huh?
[22]  MR. WINDES:   Is that an instruction or just for
[23] my information?
[24]  MR. BANNING:   Well, are you acknowledging
[25] you've already asked this question?
[26]  MR. WINDES:   Can we hold off on the dialogue
[27] for the deposition to finish?
[28]  MR. BANNING:   No. If there's some reason that

Page 80

[1] you have to ask the same question again, I would like to
[2] know it. I mean, if you're saying it was some change
[3] from the prior testimony, or something like that, okay,
[4] but if you have some reason to ask the question again,
[5] I'd like to know it.
[6]  MR. WINDES:   Well, what you would like
[7] notwithstanding, are you instructing the witness not to
[8] answer?
[9]  MR. BANNING:   No, but I could stop the
[10] deposition and seek an order, but I'm just asking you as
[11] a meet-and-confer if you're willing to tell me some
[12] reason why you're asking the same question again, I'm
[13] more than reasonable to listen to it.
[14]  MR. WINDES:   I'd like the witness to go ahead
[15] and answer the question. I don't want to have dialogue
[16] with you at this moment.
[17]  MR. BANNING:   I'm just telling you if you keep
[18] asking the same questions time and time again, we'll
[19] have to seek a protective order from the Court. And you
[20] can go forward with this one.
[21]  MR. WINDES:   Did you translate the question?
[22]  THE INTERPRETER:   No.
[23] BY MR. WINDES:
[24]  Q.   I will try it again.
[25] During the 12 years that you worked on the
[26] KOORALE, how did you decide when to jump from the skiff
[27] to the ladder on the KOORALE?
[28]  MR. BANNING:   Objection; argumentative. He

Page 81

[1] wasn't working 12 years straight on the KOORALE.
[2] Incomplete hypothetical. Vague and ambiguous as to
[3] time. And go ahead.
[4]    THE WITNESS:    Whenever that I see that is easy
[5] and comfortable for me and convenient, then I will jump.
[6]    BY MR. WINDES:
[7]    Q.    How do you determine when it's safe to jump
[8] from the skiff to the KOORALE?
[9]    MR. BANNING:    Objection; assumes facts that it
[10] is safe to jump from the skiff to the KOORALE.
[11] Incomplete hypothetical. Vague and ambiguous.
[12]    THE INTERPRETER:    Shall I go ahead?
[13]    MR. WINDES:    Uh-huh.
[14]    THE WITNESS:    That is not a single safe time in
[15] terms of safety. The only time he said Firmin has to
[16] take him to the boat – take him – use the boat to
[17] bring him out.
[18]    MR. WINDES:    I'm sorry, I didn't understand
[19] that answer. Could the court reporter read back the
[20] answer as you have it.
[21]    (Answer read.)
[22]    BY MR. WINDES:
[23]    Q.    Okay. When you are standing on the skiff and
[24] you're making a decision when to step to the ladder on
[25] the KOORALE, how do you decide when to take that step?
[26]    MR. BANNING:    Objection; vague and ambiguous.
[27] Incomplete hypothetical.
[28]    THE WITNESS:    Like I said, I use my own

Page 82

[1] judgment. If I think it's safe for me to jump, I will
[2] jump. Not safe, but if it's good, if it's convenient.
[3]    BY MR. WINDES:
[4]    Q.    Convenient. So you don't care if it's safe,
[5] just convenient?
[6]    MR. BANNING:    Objection; argumentative. Vague
[7] and ambiguous. The witness had already said that it's
[8] not safe.
[9]    MR. WINDES:    Go ahead.
[10]    THE INTERPRETER:    What was that?
[11]    MR. WINDES:    You were supposed to translate my
[12] question. I know Mr. Banning's objections are
[13] interfering with it but let's – subject to the same
[14] objections by Mr. Banning that he doesn't need to
[15] restate, you mean, you would determine when to jump
[16] based on what was convenient rather than what was safe?
[17]    MR. BANNING:    Argumentative.
[18]    THE WITNESS:    Whenever I feel that is good time
[19] for me to climb up, I will climb up.
[20]    BY MR. WINDES:
[21]    Q.    And how do you determine what's a good time to
[22] jump?
[23]    A.    Whenever I see that I can jump and grab the
[24] ladder and climb, then I will.
[25]    Q.    Do you try to go from the skiff to the ladder
[26] when it's the safest time to do that?
[27]    MR. BANNING:    Objection; argumentative.
[28] Incomplete hypothetical. Vague and ambiguous.

Page 83

[1]    Again, you're asking the same questions that
[2]    were asked in the first session of the deposition, and I
[3]    ask that you not ask the same questions that were asked
[4]    in the same first deposition.
[5]    THE INTERPRETER:    I think I completely lost
[6]    that.
[7]    MR. WINDES:    Yeah, I know. That's what
[8]    happened last time in the deposition when these
[9]    questions were asked is the objections were so long and
[10]    bothersome to both the interpreter and the witness that
[11]    we almost didn't get it out.
[12]    BY MR. WINDES:
[13]    Q.    Now –
[14]    MR. BANNING:    Why don't you ask better
[15]    questions and then we'll be in better shape.
[16]    MR. WINDES:    Thanks.
[17]    BY MR. WINDES:
[18]    Q.    Subject to the same objections by Mr. Banning,
[19]    did you try to go from the skiff to the ladder at the
[20]    time that it seemed to be the safest time for you to do
[21]    it?
[22]    A.    Like I have said earlier, there's no safe time
[23]    when you are out in the ocean because it's so much wave,
[24]    but I will determine that by looking at the safe, when I
[25]    will presently know when it's time, it's good for me to
[26]    jump.
[27]    Q.    And is it good for you when it appears to be
[28]    safe to jump?

Page 84

[1]    MR. BANNING:    Objection; argumentative.
[2]    Incomplete hypothetical. Vague and ambiguous.
[3]    THE WITNESS:    When I see that I can climb fast,
[4]    I will jump.
[5]    BY MR. WINDES:
[6]    Q.    How do you know when you can climb fast?
[7]    A.    Whenever I feel the stairway is within reach,
[8]    then I will jump.
[9]    Q.    Do you try to jump when the skiff is at the
[10]    highest point in the wave?
[11]    A.    No.
[12]    Q.    Why not?
[13]    A.    Because I will crash the boat, the speedboat.
[14]    Q.    Did you try to jump when the speedboat – I'm
[15]    sorry. Did you try to jump when the skiff was going
[16]    down into the water when it was coming up from the
[17]    water?
[18]    MR. BANNING:    Objection; vague and ambiguous.
[19]    Incomplete hypothetical.
[20]    THE WITNESS:    I'm going to repeat the answer to
[21]    the same question. Or would you please repeat me the
[22]    same question again.
[23]    MR. WINDES:    Would you do it for me.
[24]    (Question read.)
[25]    MR. BANNING:    Compound.
[26]    THE WITNESS:    When it's about right in the
[27]    middle.
[28]    BY MR. WINDES:

## Page 85

[1]  Q.  In the middle of what?

[2]  A.  When I see that I cannot crash into the

[3]  speedboat I will jump.

[4]  Q.  Did you sometimes go from the skiff to the

[5]  ladder when the skiff was at the low point in the water?

[6]  A.  No.

[7]  Q.  Why not?

[8]  A.  Because once it's going down, when the

[9]  speedboat is going down and I jump to the stairway,

[10]  you – once it comes out, it's going to hit me.

[11]  Q.  And you knew that?

[12]  A.  Yes.

[13]  Q.  All right. So did you know that the higher

[14]  that you jumped, the safer it was?

[15]  MR. BANNING:  Objection; vague and ambiguous.

[16]  Incomplete hypothetical.

[17]  THE WITNESS:  All I know that if my head can

[18]  clear the stairway, that is what I determined to jump.

[19]  If it's on the top, I cannot jump because I'm going to

[20]  hit the speedboat.

[21]  MR. WINDES:  Mark that as Exhibit 5.

[22]  (Defendants' Exhibit 5 was marked.)

[23]  BY MR. WINDES:

[24]  Q.  Does that – do those two pictures show where

[25]  you were at the time that the skiff hit your leg?

[26]  A.  No, it doesn't.

[27]  Q.  Were you higher than that or lower than that?

[28]  A.  Higher than that.

## Page 86

[1]  MR. BANNING:  What exhibit is that? Is that

[2]  Exhibit No. 5?

[3]  BY MR. WINDES:

[4]  Q.  And which steps did you have your feet in at

[5]  the time?

[6]  MR. BANNING:  Assumes facts, if any. Vague and

[7]  ambiguous.

[8]  BY MR. WINDES:

[9]  Q.  Did you have your feet inside one of the steps

[10]  on the ladder?

[11]  A.  Yes.

[12]  Q.  Which steps?

[13]  A.  I cannot really tell which one, but all I know

[14]  is one of my foot was on – on one of them.

[15]  MR. BANNING:  I'm sorry, on what?

[16]  THE INTERPRETER:  It was on the step.

[17]  THE WITNESS:  Deck.

[18]  MR. BANNING:  Deck, not the step.

[19]  THE INTERPRETER:  Oh, correction. One of my

[20]  foot was on the deck and the other one was outside.

[21]  BY MR. WINDES:

[22]  Q.  So the rail was in your crotch?

[23]  A.  Yes.

[24]  Q.  When you stepped from the skiff to the KOORALE

[25]  at the time of your accident, did you step when the

[26]  skiff was going up in the waves or going down in the

[27]  waves?

[28]  MR. BANNING:  Again, I object. This area was

## Page 87

[1]  fully covered in the first deposition. I don't think

[2]  there's any change in the testimony about this part of

[3]  the testimony. I would ask that you not ask the same

[4]  questions again.

[5]  Have the court reporter mark that.

[6]  BY MR. WINDES:

[7]  Q.  Go ahead.

[8]  MR. BANNING:  It's bordering on harassment to

[9]  keep asking the same questions again.

[10]  THE WITNESS:  When he was in the middle.

[11]  BY MR. WINDES:

[12]  Q.  Was the skiff going down or was it coming up?

[13]  A.  Way down. On the way down.

[14]  Q.  Did you climb up any of the steps before your

[15]  accident?

[16]  A.  Yes.

[17]  Q.  When you stepped from the skiff onto the ladder

[18]  at that time, were you higher or lower on the ladder

[19]  than the man in Exhibit 5?

[20]  A.  I cannot remember.

[21]  Q.  How many steps did you climb up before the

[22]  accident?

[23]  A.  I can't remember.

[24]  Q.  Do you know if it was more than two steps?

[25]  A.  I can't really tell. I can't remember.

[26]  Q.  The rail on the front of the skiff, you said

[27]  that that was coming up in the water to about the same

[28]  height as the rail on the KOORALE?

## Page 88

[1]  THE INTERPRETER:  Could you repeat that again.

[2]  BY MR. WINDES:

[3]  Q.  Did you say that the rail on the front of the

[4]  skiff was coming up to about the same height as the rail

[5]  on the KOORALE?

[6]  MR. BANNING:  Objection; vague and ambiguous.

[7]  THE WITNESS:  Which railing are you talking

[8]  about, the high one or the –

[9]  BY MR. WINDES:

[10]  Q.  Say it again, please.

[11]  A.  Which rail are you talking about on this boat?

[12]  Q.  On the KOORALE?

[13]  A.  Yes.

[14]  Q.  The top rail.

[15]  A.  Yes.

[16]  Q.  Okay. Why didn't you step into the boat on the

[17]  KOORALE rather than step to the side of the boat?

[18]  MR. BANNING:  Are you talking about the

[19]  speedboat or the KOORALE itself?

[20]  Objection; vague and ambiguous. When you say

[21]  why didn't you step into the boat, do you mean why

[22]  didn't he step into the speedboat or why didn't he step

[23]  into the KOORALE?

[24]  BY MR. WINDES:

[25]  Q.  Why didn't you step into the KOORALE over the

[26]  top rail rather than step to the ladder?

[27]  A.  Because I cannot jump to the boat because the

[28]  speedboat blocked.

Page 89

[1]   Q.   The speedboat was about four feet higher than
[2]  the KOORALE rail, right?
[3]     MR. BANNING:   Objection. Vague and ambiguous.
[4]     MR. WINDES:   Sorry.
[5]     THE WITNESS:   No.
[6]   BY MR. WINDES:
[7]   Q.   How high was it above the rail?
[8]   A.   All I can say is when we sit on the rail, your
[9]  head can lean against it.
[10]    MR. BANNING:   Can we take a quick
[11]  glass-of-water break, please?
[12]    THE VIDEOGRAPHER:   This is the end of Tape
[13]  No. 2. Off record at 2:30.
[14]    (A recess was taken.)
[15]    THE VIDEOGRAPHER:   This is the beginning of
[16]  Tape No. 3 in the continuing video deposition of Mel
[17]  DeBrum. It's Thursday, January 9th, 2003. On record
[18]  239.
[19]    MR. BANNING:   For the record, under the Federal
[20]  Rules, you get seven hours of deposition for a witness.
[21]  I think we've been about seven hours now, but because of
[22]  the difficulties with the interpreter, you know, I'm not
[23]  going to say stop, but I just want you to keep that in
[24]  mind.
[25]    MR. WINDES:   Thanks.
[26]   BY MR. WINDES:
[27]   Q.   When the – when you stepped from the skiff to
[28]  the KOORALE ladder, at the time of your accident, the

Page 90

[1]  skiff was at an angle to the KOORALE about 45 degrees,
[2]  right?
[3]   A.   Yeah, that's about right.
[4]   Q.   Okay. And the – mark that, please.
[5]    (Defendants' Exhibit 6 was marked.)
[6]   BY MR. WINDES:
[7]   Q.   Showing you some pictures marked Exhibit 6 in
[8]  the deposition, let me ask you, do you recognize the
[9]  speedboat there in those pictures?
[10]  A.   Yes.
[11]  Q.   And does that – does it appear that the
[12]  speedboat is in the approximate location that it was at
[13]  the time of your accident?
[14]  A.   No.
[15]  Q.   What was different?
[16]  A.   It's much higher in the picture.
[17]  Q.   Well, it's the same davit that it's on, right.
[18]   THE INTERPRETER:   Could you –
[19]  BY MR. WINDES:
[20]  Q.   Davit. He knows what davit is. Do you know
[21]  what davit is?
[22]  A.   Yeah.
[23]  The answer is no.
[24]  Q.   There are two davits, right?
[25]  A.   Yes.
[26]  Q.   One is more forward than the other?
[27]  A.   Yes.
[28]  Q.   And at the time of your accident, the speedboat

Page 91

[1]  was on the forward davit or the aft davit?
[2]   A.   The forward.
[3]   Q.   And what davit is it on in that picture?
[4]   A.   That's the one in the front, forward.
[5]   Q.   So it's on the same davit as it was at the time
[6]  of your accident, right?
[7]   A.   Yes.
[8]   Q.   Okay.
[9]  Sorry. Go ahead. So what is different?
[10]  A.   The speedboat is much higher in the picture,
[11]  but it's the same davit.
[12]  Q.   How can it be higher if it's the same davit?
[13]  A.   Usually the line that holds the speedboat are
[14]  much higher, but you cannot tell because it's at the
[15]  bottom, the speedboat is up. It's much higher than what
[16]  it used to be.
[17]  Q.   Because of the line that the – that holds the
[18]  speedboat? Can you show me what you're referring to?
[19]  A.   The side wedge that is hold by the rope,
[20]  usually it's right lying on top of rail, not at the
[21]  bottom. That's an indication that the top is much
[22]  higher than what it supposed to be down here.
[23]  In this picture I could have jumped without any
[24]  problem, but when it was lower, I couldn't.
[25]  Q.   You're saying that this strap here – what do
[26]  you call this? What is that? What is this piece right
[27]  here?
[28]  A.   I don't know what they call that. But it's the

Page 92

[1]  ways the speedboat hold it.
[2]   Q.   And you're saying that this – this part here
[3]  was attached to the rail of the speedboat?
[4]   A.   Yes. Usually the tip is sticking out from the
[5]  rail of the boat.
[6]   Q.   Do you recognize the person there in that
[7]  picture?
[8]   A.   Oio.
[9]   Q.   Oio was on the boat at the time of your
[10]  accident?
[11]  A.   Yes.
[12]  Q.   And he became the deck boss after Mr. Alves
[13]  left the boat?
[14]  A.   Yes.
[15]  Q.   And Oio would have known how the speedboat was
[16]  attached or where it was attached?
[17]    MR. BANNING:   Objection; argumentative. Calls
[18]  for speculation.
[19]  BY MR. WINDES:
[20]  Q.   During the time of your – time around your
[21]  accident, time –
[22]    MR. BANNING:   Well, objection. Calls for
[23]  speculation. Argumentative.
[24]    THE WITNESS:   Yes.
[25]  BY MR. WINDES:
[26]  Q.   Looking at the picture in the upper left-hand
[27]  corner of Exhibit 6, you see the speedboat again, right?
[28]  A.   Yes.

Page 93

[1]    Q.    And the speedboat is hanging outside of the
[2]  KOORALE, right?
[3]    A.    Yes.
[4]    Q.    And it was the same at the time of your
[5]  accident, right?
[6]    MR. BANNING:    Objection; vague and ambiguous,
[7]  meaning that it was hanging outside at the time of the
[8]  accident? Is that what you're saying?
[9]    MR. WINDES:    The same as shown in that picture
[10]  there.
[11]    MR. BANNING:    Objection; vague and ambiguous
[12]  what you're talking about, what "the same" means.
[13]    THE WITNESS:    Yes. But it was lower than what
[14]  it seems the picture now -- what it looks like on the
[15]  picture now.
[16]    BY MR. WINDES:
[17]    Q.    In terms of it being outside of the boat,
[18]  outside of the KOORALE, rather than hanging directly
[19]  over it, does it look the same?
[20]    MR. BANNING:    Objection; vague and ambiguous.
[21]  Incomplete hypothetical.
[22]    THE WITNESS:    Yes.
[23]    BY MR. WINDES:
[24]    Q.    Let me see.
[25]  Okay. On the day of your accident, did you
[26]  talk to anyone about the speedboat being above the
[27]  ladder?
[28]    A.    Nobody.

Page 94

[1]    Q.    Had you ever talked to anyone about the
[2]  speedboat being a problem before?
[3]    A.    Yes.
[4]    Q.    With who?
[5]    A.    With my deck boss.
[6]    Q.    When?
[7]    A.    We usually discussed that whenever that is a
[8]  high-wave condition, the boat shouldn't be hanging on
[9]  the side.
[10]    Q.    Who discussed that?
[11]    A.    Some of the crew member as well as deck boss.
[12]    Q.    Who did you hear discussing that?
[13]    A.    Myself, Oio, and the deck boss and the other
[14]  guys.
[15]    Q.    When you say "the deck boss," you mean John
[16]  Alves, Mr. Banning's other client?
[17]    A.    Yes.
[18]    Q.    At the time of your accident, where was the
[19]  wind coming from?
[20]    A.    It's pointing right where they say where it
[21]  was, the step, the ladder.
[22]    Q.    Isn't it true that you always set where the
[23]  portside of the boat to the wind?
[24]    THE INTERPRETER. Excuse me, boat side of the
[25]  boat?
[26]    MR. WINDES:    Portside of the boat. Port.
[27]    THE INTERPRETER:    Yes.
[28]  Can you go over that again one more time?

Page 95

[1]    BY MR. WINDES:
[2]    Q.    The net is always set on the side of the boat
[3]  that the wind is coming from, right?
[4]    MR. BANNING:    Objection; vague and ambiguous.
[5]    THE WITNESS:    No.
[6]    BY MR. WINDES:
[7]    Q.    It does not matter? In your experience, that
[8]  was not the case on the KOORALE?
[9]    A.    I really don't know. All I know is during the
[10]  time of my accident, the wind blowing from the direction
[11]  where the accident occurred.
[12]    Q.    Well, you were on the starboard side of the
[13]  boat at the time of your accident, right?
[14]    THE INTERPRETER:    On the starboard?
[15]    MR. WINDES:    Yes.
[16]    THE INTERPRETER:    On the starboard side? What
[17]  is that? I'm sorry.
[18]    BY MR. WINDES:
[19]    Q.    The right side of a boat.
[20]    A.    Yes.
[21]    Q.    And the net was set on the portside of the
[22]  boat, right?
[23]    A.    Yes.
[24]    Q.    And isn't it true that they -- that the KOORALE
[25]  would always put the KOORALE in a position where the
[26]  KOORALE would be pushed away from the net?
[27]    A.    I really don't know.
[28]    Q.    Did you have any plans to go to American Samoa

Page 96

[1]  in the next month?
[2]    A.    I haven't really made up my mind.
[3]    Q.    Are you planning to go next week to American
[4]  Samoa?
[5]    A.    I haven't decided yet.
[6]    Q.    You may go or you may not go; is that right?
[7]    A.    I haven't decided yet.
[8]    Q.    Is it possible that you will go tomorrow?
[9]    A.    If you buy your ticket.
[10]    Q.    Do you have a plan to maybe go tomorrow?
[11]    A.    No.
[12]    Q.    If you go, it will be Monday?
[13]    A.    Sure. If you buy me a ticket.
[14]    Q.    Do you have -- are you trying to make a
[15]  decision whether or not to go on Monday?
[16]    A.    No.
[17]    Q.    When you gave your deposition last time, you
[18]  said that you were definitely going to go back to the
[19]  Marshall Islands to live. Do you remember that?
[20]    THE INTERPRETER:    Marshall Islands did you say?
[21]    THE WITNESS:    Yes.
[22]    BY MR. WINDES:
[23]    Q.    And you have recently said to the Court that
[24]  you instead are going to stay in San Diego, right?
[25]    A.    Yes.
[26]    Q.    And when did you change your mind?
[27]    A.    Now. Lately.
[28]    Q.    Within the last month?

### Page 97

[1]   A.   Yeah.
[2]   Q.   And what caused you to change your mind?
[3]   A.   For medical reason.
[4]   Q.   Did some doctor tell you that you should stay
[5] in San Diego?
[6]   A.   Nobody.
[7]   Q.   What medical decision did you make?
[8]   A.   Our hospital and medical facility back on the
[9] island is not sufficient for me to stay there. That's
[10] the reason why I stay here so I stay close to all these
[11] medical and – medical equipment.
[12]   Q.   Does the hospitals in Majuro, do they have a
[13] prosthetist working there?
[14]   MR. BANNING:   Prosthetist you mean?
[15]   MR. WINDES:   If that's how you pronounce it, I
[16] will go with that.
[17]   MR. BANNING:   Maybe I mispronounce it, but I –
[18]   THE WITNESS:   Nothing.
[19]   BY MR. WINDES:
[20]   Q.   How do you know?
[21]   A.   I know because I'm a Marshallese.
[22]   Q.   Well, did you ask the hospitals in Majuro
[23] whether or not they had a prosthetist that worked there?
[24]   A.   No, I did not.
[25]   Q.   How do you know they don't have one?
[26]   A.   Because I've seen a lot of Marshallese travel
[27] to Hawaii to put on prosthesis.
[28]   Q.   What Marshallese have you seen travel outside

### Page 98

[1] of Marshall Islands to see a prosthetist?
[2]   A.   There are a few.
[3]   Q.   When – who are they?
[4]   A.   I don't know.
[5]   Q.   Do you have the names?
[6]   A.   I don't know.
[7]   Q.   When did you talk to these people?
[8]   A.   When I was hospitalized in Hawaii.
[9]   Q.   And did you ask them whether or not there was a
[10] prosthetist – prosthetist – how do you say it, Bill?
[11]   MR. BANNING:   I think it's
[12] P-R-O-S-T-H-E-T-I-S-T.
[13]   BY MR. WINDES:
[14]   Q.   Did you ask those people whether there was a
[15] prosthe- –
[16]   MR. BANNING:   Prosthetist.
[17]   BY MR. WINDES:
[18]   Q.   – prosthetist in Marshall Islands?
[19]   A.   Yes, I did ask them.
[20]   Q.   And they said no?
[21]   A.   Yes.
[22]   Q.   And that's all you have done is to ask those
[23] people? Do you have any other information from any
[24] other source?
[25]   A.   Yes.
[26]   Q.   What information?
[27]   THE INTERPRETER:   Yes. From them – the
[28] information that he got from them was talking to those

### Page 99

[1] people that came to him.
[2]   BY MR. WINDES:
[3]   Q.   Do you have any other information from any
[4] other source other than those people who were at the
[5] hospital in Honolulu? Have you asked any doctors
[6] whether or not there are prosthetists in Majuro?
[7]   A.   No, I did not ask anybody, any doctor.
[8]   Q.   When you gave your deposition last time, you
[9] had already spoken to these people at the hospital in
[10] Honolulu, right?
[11]   A.   Yes.
[12]   Q.   Yet, you were certain at the time of your
[13] deposition that you were going to return to the Marshall
[14] Islands?
[15]   MR. WINDES:   Objection; argumentative.
[16]   BY MR. WINDES:
[17]   Q.   So what changed?
[18]   A.   For the same reason, I want to stay close to
[19] the fine doctor here in the State, as I'm getting old.
[20]   Q.   What kind of doctor do you need because you are
[21] getting old?
[22]   A.   For my foot.
[23]   Q.   Do you know if there are any orthopedic
[24] surgeons in Majuro?
[25]   A.   I don't know.
[26]   Q.   And what is it that you think a doctor can do
[27] in San Diego that a doctor can't do in Majuro?
[28]   A.   I understand as I grow older, the body

### Page 100

[1] condition changing from time to time. I may get fatter.
[2] I maybe get smaller. And those cannot be adjusted by
[3] those doctors on the islands.
[4]   Q.   What is your understanding of how often you
[5] need to see a prosthetist in the future?
[6]   A.   According to the orthopedic, whoever that was
[7] who installed the artificial leg, they said that you
[8] need to make an appointment every year, once a year.
[9]   Q.   Okay. And Mr. Mason told you that, Randy
[10] Mason?
[11]   A.   Yes.
[12]   Q.   Okay. Did you consider the possibility that
[13] you could live in Majuro and take an airplane flight to
[14] Honolulu once a year to see a prosthetist?
[15]   THE INTERPRETER:   I don't think he answered my
[16] question.
[17]   MR. WINDES:   I think the rules that the Banning
[18] firm likes to play with is answer it the way he did
[19] anyway.
[20]   THE INTERPRETER:   Okay.
[21]   THE WITNESS:   Yes, if I know – if I know there
[22] is somebody will take care of my foot.
[23]   BY MR. WINDES:
[24]   Q.   So if you knew that there was a person to take
[25] care of your prosthetic device in Honolulu, then you
[26] would consider moving back to the Marshall Islands and
[27] visiting Honolulu once a year; is that right?
[28]   A.   Yes.

## Page 101

[1]    Q.   Have you looked into that? Have you asked
[2] anyone whether or not there is someone who can take a
[3] look at your prosthetic device once a year in Honolulu?
[4]    A.   No, I have not.
[5]    Q.   But, nevertheless, you decided to live
[6] permanently in San Diego rather than Majuro to be near a
[7] prosthetist that you can see once per year, right?
[8]    A.   Would you repeat that again?
[9]    Q.   Would you?
[10]   (Question read.)
[11]  THE WITNESS:   Yes.
[12]  BY MR. WINDES:
[13]    Q.   What are your plans to become employed again in
[14] the future?
[15]    A.   I haven't really decided.
[16]    Q.   Are you going to look for work at some time in
[17] the future?
[18]    A.   Yeah, once I completed my therapy on my -- on
[19] my prosthesis leg and doctor keep me okay to do that,
[20] then I will.
[21]    Q.   And what type of work have you considered?
[22]    A.   I haven't really thought it out.
[23]    Q.   Have you thought about some types of work that
[24] you would like to do?
[25]    A.   I've not thought that out yet. That means I'm
[26] only concerned about my leg, my foot. I want to get it
[27] over with first before I can think of looking for a job.
[28]    Q.   That's not my question. My question is whether

## Page 102

[1] or not you have considered different types of jobs that
[2] you might want to do in the future that you think you
[3] can do?
[4]  MR. BANNING:   I think he answered that the
[5] first time but --
[6]  THE WITNESS:   I don't really know.
[7]  BY MR. WINDES:
[8]    Q.   Is there anything that you want to do for a job
[9] in the future?
[10]    A.   Yes.
[11]    Q.   What is that?
[12]    A.   Anything I can do that will be light enough for
[13] my foot to carry or to accommodate.
[14]    Q.   Anything?
[15]    A.   Anything I can.
[16]  MR. WINDES:   I'm just about done. If I could
[17] take less than five-minute break and we should be done
[18] within another ten minutes after that.
[19]  THE VIDEOGRAPHER:   Off record 3:13 p.m.
[20]  (A recess was taken.)
[21]  THE VIDEOGRAPHER:   On record 3:30 p.m.
[22]  BY MR. WINDES:
[23]    Q.   Mr. DeBrum, do you have any appointments
[24] scheduled with either Mr. Mason or your doctor?
[25]    A.   Yes.
[26]    Q.   When is that?
[27]    A.   Tomorrow.
[28]    Q.   What's it for?

## Page 103

[1]    A.   To get tests my prosthesis.
[2]    Q.   It's with Mr. Mason, Randy?
[3]    A.   Yes.
[4]    Q.   Do you know whether Pepe Cruz is coming to the
[5] United States next week?
[6]    A.   No.
[7]    Q.   Have you seen any statements that were made
[8] with Pepe Cruz?
[9]    A.   No.
[10]    Q.   Do you have know Darrin Correia?
[11]  C-O-R-R-E-I-A.
[12]    A.   No, I don't.
[13]    Q.   Okay.
[14]    A.   What's the name?
[15]    Q.   Darrin Correia?
[16]    A.   I don't know who that is. Is there any other
[17] names?
[18]    Q.   Since you last came back from American Samoa,
[19] have you talked to anyone who worked on the KOORALE
[20] other than John Alves?
[21]  THE INTERPRETER:   What's the name of the
[22] person?
[23]  MR. WINDES:   John Alves.
[24]  THE WITNESS:   No.
[25]  BY MR. WINDES:
[26]    Q.   Do you have plans to bring Ina to the United
[27] States soon?
[28]    A.   Yes.

## Page 104

[1]    Q.   When?
[2]    A.   If I complete all my medical problem.
[3]    Q.   When are you told that you will complete your
[4] medical problem?
[5]    A.   They have not tell me anything yet.
[6]    Q.   Do you plan to bring your children to the
[7] United States?
[8]    A.   Yes.
[9]    Q.   When?
[10]    A.   Like I said, once I'm through with all my
[11] medical condition.
[12]    Q.   Is it your plan to bring all of your children
[13] here to live?
[14]    A.   Yes.
[15]    Q.   And has your ex-wife agreed with that?
[16]    A.   Yes.
[17]    Q.   And what is the name that she uses now?
[18]    A.   Clora.
[19]    Q.   How do you spell that?
[20]    A.   C-L-O-R-A.
[21]    Q.   What is her first name?
[22]    A.   That's her first name.
[23]    Q.   What's her last name?
[24]    A.   Jally.
[25]    Q.   How do you spell that?
[26]    A.   C-A-L-L-Y.
[27]    Q.   Is she still living in Guam?
[28]    A.   Correct.

Page 105

[1]  J-A-L-L-Y, not C.
[2]  Q.  Is she still living in Guam?
[3]  A.  Yes.
[4]  Q.  Does she plan to stay there in Guam and send
[5]  the kids here?
[6]  A.  I don't know her plans, if she's thinking of
[7]  staying over there or not.
[8]  Q.  And you say that she wants to give the kids to
[9]  you?
[10]  A.  Yes.
[11]  Q.  Are all five children in Guam right now?
[12]  A.  Three of them.
[13]  Q.  Which ones? What ages?
[14]  A.  Two boys and one girl. One of them is 18 – I
[15]  mean one of them is 12. The others are 17 and 18.
[16]  Q.  Those three are the ones that are living with
[17]  your ex-wife now?
[18]  A.  Yes.
[19]  Q.  And where are the other two living?
[20]  A.  On Majuro.
[21]  Q.  With who?
[22]  A.  With my sister Camilla.
[23]  Q.  And how old are they?
[24]  A.  Fifteen and 21.
[25]  Q.  And they also are planning to come to the
[26]  United States to live with you?
[27]  A.  Yes.
[28]  Q.  Have you talked to any specialist on what type

Page 106

[1]  of training you may get to be employed again?
[2]  A.  No, I have not.
[3]  Q.  Your lawyer has hired a woman by the name of
[4]  Highland. Do you know her?
[5]  A.  Yeah, I know her.
[6]  Q.  Have you talked to her about what you may be
[7]  able to do in the future?
[8]  A.  I just told her that whatever I can and I may
[9]  be able to do.
[10]  Q.  Did she give you any help in terms of how you
[11]  may be able to make yourself better employable in the
[12]  future?
[13]  A.  No, she did not.
[14]  Q.  Did she give you any advice at all to try to
[15]  help you get a job in the future?
[16]  A.  No.
[17]  Q.  Did you ask her for help to figure out what you
[18]  can do to work?
[19]  A.  No.
[20]  Q.  Why not?
[21]  A.  Well, like I have always said, let me worry
[22]  about my foot first and then.
[23]  Q.  Do you know of any crew members who have worked
[24]  on tuna boats in a tuna fleet in Samoa who have an
[25]  amputation of the leg like you do?
[26]  A.  Nobody.
[27]  Q.  Did you know of a man by the name of George –
[28]  first name George who had an amputation of the leg just

Page 107

[1]  below the knee just like you?
[2]  A.  I don't know who that is, George.
[3]  Q.  Do you know anything that Firmin Ferreira did
[4]  that was because he was smoking marijuana?
[5]  A.  Yes.
[6]  Q.  What's that?
[7]  A.  I think that that's the reason that I had the
[8]  accident is because of his smoking.
[9]  Q.  And why do you say that?
[10]  A.  Because I could smell the marijuana that
[11]  morning.
[12]  Q.  But what did he do or not do that you attribute
[13]  to marijuana?
[14]  A.  I don't understand. Could you repeat that one
[15]  more time.
[16]  MR. WINDES:   Could you, please.
[17]  (Question read.)
[18]  THE WITNESS:   Every time he smoking marijuana,
[19]  he's always loud and yelling, scream at everybody. But
[20]  once he doesn't, you know that he's quiet. Because
[21]  that's Firmin.
[22]  MR. WINDES:   Let me try the question again.
[23]  BY MR. WINDES:
[24]  Q.  Did Firmin do something or not do something at
[25]  the time of your accident that you attribute to his
[26]  smoking marijuana?
[27]  THE INTERPRETER:   He's asking what you mean by
[28]  do or not do.

Page 108

[1]  BY MR. WINDES:
[2]  Q.  Did Firmin Ferreira do something wrong to cause
[3]  your accident that you say is because he was smoking
[4]  marijuana?
[5]  MR. BANNING:   Objection; vague and ambiguous as
[6]  to the meaning of wrong. You mean like intentionally or
[7]  negligently? I think that's the confusion. Morally
[8]  wrong?
[9]  MR. WINDES:   All right. We'll try it the other
[10]  way again.
[11]  BY MR. WINDES:
[12]  Q.  Do you believe that Firmin Ferreira did
[13]  something to cause your accident or failed to do
[14]  something that caused your accident?
[15]  MR. BANNING:   Objection; compound.
[16]  BY MR. WINDES:
[17]  Q.  And you believe that it's because he was
[18]  smoking marijuana?
[19]  A.  Yes.
[20]  Q.  What?
[21]  A.  That morning the sea was very rough, but he
[22]  hurried him up to get on to the boat and –
[23]  THE INTERPRETER:   Continue.
[24]  THE WITNESS:   But I should have stayed on the
[25]  skiff and have him call one of the boats to come pick me
[26]  up instead.
[27]  MR. WINDES:   Would you repeat that.
[28]  (Answer read.)

**Page 109**

[1] BY MR. WINDES:
[2] Q. You have said that Firmin never sent one of the
[3] boats to pick you up in the 12 years that you worked on
[4] the KOORALE, right?
[5] A. Yes.
[6] Q. Then why do you believe that on this day, the
[7] reason he didn't send the boat to pick you up was
[8] because of marijuana?
[9] A. Because he yelled at me to jump to the boat
[10] from the boat to the stair – or to the trolley or
[11] whatever that is the name of the boat.
[12] Q. KOORALE.
[13] MR. FERREIRA: KOORALE. That's a Marshallese
[14] word, KOORALE.
[15] THE INTERPRETER: I should have known.
[16] BY MR. WINDES:
[17] Q. So your testimony now is that Firmin told you
[18] verbally to jump?
[19] A. Yes.
[20] Q. When?
[21] A. When the boat took me to the KOORALE.
[22] Q. How long before you jumped – how much time
[23] before you jumped did Firmin yell at you to jump?
[24] A. I couldn't really tell, but once we are close
[25] enough to the KOORALE, usually tell us to jump. And
[26] shine a spotlight to the stairway.
[27] Q. And what exactly did Firmin Ferreira say to
[28] you?

**Page 110**

[1] A. Jump to the boat. I mean to KOORALE.
[2] Q. Was that more than ten seconds before you
[3] jumped?
[4] A. I can't really tell exact length of time.
[5] However, I know that the boat was close enough for me to
[6] jump.
[7] Q. Okay. And did you jump when he told you to
[8] jump?
[9] A. The first time I didn't because the boat was
[10] going too fast.
[11] Q. He yelled at you twice?
[12] A. No, no.
[13] Q. Did he yell at you to jump before the first
[14] time or before the second time?
[15] A. The first time.
[16] Q. And why do you believe that he yelled at that
[17] time because of the marijuana?
[18] A. Because you can hear it on the P.A. system that
[19] he was screaming at everybody.
[20] Q. Who else was he screaming at?
[21] A. Those on board the –
[22] Q. I'm sorry?
[23] A. Those on board the KOORALE.
[24] Q. Who?
[25] A. The crew.
[26] Q. Which ones?
[27] A. All of them.
[28] Q. And what was he yelling at the crew about?

**Page 111**

[1] A. I couldn't really tell, but you can hear him.
[2] You can hear him on the B.A.
[3] MR. WINDES: P.A.
[4] THE INTERPRETER: P.A. What is that? Oh, the
[5] P.A. system.
[6] MR. WINDES: I have no further questions then.
[7] Thank you.
[8] MR. BANNING: No questions.
[9] Do you want to offer a stipulation as to how we
[10] handle the deposition?
[11] Do you want to go off the record and then we'll
[12] go back on for the stip? You don't need to film this.
[13] MR. WINDES: How we handle what deposition.
[14] MR. BANNING: The transcript.
[15] MR. WINDES: What about it? I think we should
[16] put it on the record if we're talking about this
[17] transcript here.
[18] MR. BANNING: Right, but I'm saying let's
[19] figure out the stipulation and go on the record and say
[20] what it is rather than talk about it for five minutes on
[21] the record.
[22] MR. WINDES: Okay.
[23] THE VIDEOGRAPHER: Off record 3:56.
[24] (Discussion held off the record.)
[25] THE VIDEOGRAPHER: On record 4:02.
[26] MR. WINDES: When we were off the record, we
[27] agreed to stipulate that the originals can be kept by
[28] the lawyers who noted the deposition and that the

**Page 112**

[1] lawyers would be obliged to bring the transcripts to
[2] trial.
[3] If the originals were not available for some
[4] reason at trial, then the copy prepared by the court
[5] reporter could be used instead of the original.
[6] On reading and signing the transcript on the
[7] basis that both Mr. Banning and the Marshallese
[8] interpreter expert that came here today both agree that
[9] they were unaware of any translation problems that
[10] occurred today, we're I think less likely to have the
[11] problem we had last time and, therefore, I would go
[12] ahead and stipulate that Mr. DeBrum have 30 days to read
[13] and sign not in the presence of the court reporter.
[14] MR. BANNING: I would say that we reserve our
[15] right to make changes under the Federal Rules and
[16] that – so you're saying you want to keep – the person
[17] who notices the deposition will keep the originals and
[18] bring them to trial?
[19] MR. WINDES: Yes.
[20] MR. BANNING: So Mr. Ferreira's deposition, I
[21] will keep the original when I notice it?
[22] MR. WINDES: Uh-oh. I hadn't really thought
[23] about it in those terms.
[24] MR. BANNING: Is that what you want to do or
[25] you want to so that other than the party
[26] witnesses – however you want to do it. Other than
[27] party witnesses –
[28] MR. WINDES: Whoever noted the dep keeps the

## Page 113

[1] original and brings it to trial.
[2]     MR. BANNING:     Whatever is noted in the
[3] deposition.
[4]     MR. WINDES:     No, whoever noted dep.
[5]     MR. BANNING:     That's fine.
[6]     MR. WINDES:     I noted your client's dep; you
[7] noted my client's dep.
[8]     MR. BANNING:     Right. Whoever noticed the
[9] deposition will keep the originals.
[10] So I guess what we'll do, then, if any changes
[11] are made, we'll notify the court reporter and – within
[12] I guess 30 days of receipt.
[13] How long do you think it will take to get the
[14] transcript done?
[15]     THE COURT REPORTER:     It is generally eight to
[16] ten business days.
[17] I do have a question though. Is the original
[18] going to you and he is going to review a certified copy
[19] or vice versa?
[20]     MR. BANNING:     I guess what you can do is we can
[21] have the original go to the witness, read, correct, and
[22] sign it and then send it back to you and then you can
[23] forward it on to the lawyer who noticed it.
[24] Is that okay?
[25]     MR. WINDES:     The original goes to me and the
[26] certified copy is signed off by the witness.
[27]     MR. BANNING:     But you want him to sign off on
[28] the certified copy as opposed to the original?

## Page 114

[1]     MR. WINDES:     You said that works that way,
[2] doesn't it?
[3]     THE COURT REPORTER:     Whatever way you guys want
[4] to work it. If you want to keep the original, have him
[5] sign the certs, that's –
[6]     MR. BANNING:     I would recommend sending the
[7] original to my office, and we'll, you know, present it
[8] have him read, correct, and sign it. And then we can
[9] either return it directly to you and you can notify the
[10] party of the changes and then sent it on to –
[11]     MR. WINDES:     I will go with that as long as we
[12] get a copy of the original at the same time as they
[13] get the original so I have the same thing that they have
[14] at that point in time.
[15]     MR. BANNING:     That's fine. We have enough
[16] time. The trial isn't until the middle of March.
[17]     MR. WINDES:     We might need the transcript a
[18] little sooner than trial but –
[19] This doesn't need to be on the record.
[20]     THE VIDEOGRAPHER:     Off record 4:06.
[21]     (Discussion held off the record.)
[22]     THE VIDEOGRAPHER:     On record 4:07.
[23] Then this will end today's deposition. This is
[24] also the end of Tape No. 3. Off record 4:07.
[25]     (Whereupon, the deposition was adjourned at
[26] 4:07 p.m.)
[27]
[28]

## Page 115

[1] I, MEL DeBRUM, declare under penalty of perjury under
[2] the laws of the State of California that the foregoing
[3] is true and correct; that I have read my deposition and
[4] have made the necessary corrections, additions or
[5] changes to my answers I deem necessary.
[6]
[7] Executed on this          day of
[8] 2003.
[9]
       MEL DeBRUM
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
[26]
[27]
[28]

## Page 116

[1] I, BRIDGET L. MASTROBATTISTA, Certified Shorthand
[2] Reporter for the State of California, do hereby certify:
[3]
[4] That the witness in the foregoing deposition was by me
[5] first duly sworn to testify to the truth, the whole
[6] truth and nothing but the truth in the foregoing cause;
[7] that the deposition was taken by me in machine shorthand
[8] and later transcribed into typewriting, under my
[9] direction, and that the foregoing contains a true record
[10] of the testimony of the witness.
[11]
[12] Dated: This 12th day of January, 2003, at San Diego,
[13] California.
[14]
[15]
[16]
[17] BRIDGET L. MASTROBATTISTA
[18] C.S.R. NO. 7715
[19]
[20]
[21]
[22]
[23]
[24]
[25]
[26]
[27]
[28]

**Look-See Concordance Report**

- - -

UNIQUE WORDS: 1,294
TOTAL OCCURRENCES: 6,276
NOISE WORDS: 384
TOTAL WORDS IN FILE: 20,383

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 4

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

IGNORES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

> > DATES < <

April [1]
 33:8
April of 2001 [1]
 32:28
December [1]
 22:3
February [2]
 32:23, 27
January [1]
 33:8
January, 2003 [1]
 116:12
January 9th, 2003 [2]
 46:26; 89:17
January the 9th, 2003 [1]
 6:4
March [3]
 32:23, 27; 114:16
May of 2001 [1]
 26:8
November [1]
 10:27

> > $ < <

$300 [1]
 16:17
$40 [2]
 17:23; 18:3
$50,000 [2]
 37:14, 21
$500 [6]
 16:24; 17:3, 6, 11, 13, 16
$600 [1]
 10:1

> > 0 < <

01-05403 [1]
 6:6

> > 1 < <

10:20 [1]
 25:24
10:34 [1]
 25:26
11:33 [1]
 46:22
11:54 [1]
 46:27
12:44 [1]
 65:21
12th [1]
 116:12
1:38 [1]
 65:23
1:48 [2]
 73:13, 15

> > 2 < <

2:30 [1]
 89:13

> > 3 < <

32nd [1]
 7:18
3:13 [1]
 102:19
3:30 [1]
 102:21
3:56 [1]
 111:23

> > 4 < <

4:02 [1]
 111:25
4:06 [1]
 114:20
4:07 [3]
 114:22, 24, 26

> > 6 < <

60-second [1]
 73:10

> > 9 < <

9:28 [1]
 6:15
9th [3]
 6:4; 46:26; 89:17

> > A < <

a.m. [2]
 6:15; 46:27
abilities [1]
 67:20
ability [1]
 68:15
able [6]
 27:10, 13; 60:22; 75:19, 27; 106:7, 9, 11
accident [57]
 13:5, 16, 20, 27; 30:12; 31:2; 45:19; 47:1; 53:20; 54:6, 15;

55:9, 11, 16; 61:4; 62:18, 19, 26, 28; 63:25, 27, 28; 64:21, 22, 23; 65:8; 66:7, 9, 21; 67:10, 26; 68:19, 23, 27; 72:22; 73:3; 86:25; 87:15, 22; 89:28; 90:13, 28; 91:6; 92:10, 21; 93:5, 8, 25; 94:18; 95:10, 11, 13; 107:8, 25; 108:3, 13, 14
accommodate [1]
 19:26; 102:13
According [1]
 100:6
accusing [1]
 52:23
acknowledging [1]
 79:24
acting [1]
 36:28
activities [1]
 27:1
additions [1]
 115:4
address [1]
 7:17
adjourned [1]
 114:25
adjusted [1]
 100:2
adjustment [2]
 28:1, 4
administer [1]
 7:2
advance [1]
 37:17
advice [1]
 106:14
afraid [1]
 78:8
aft [1]
 91:1
Afterward [1]
 38:22
Afterwards [1]
 38:23
afterwards [2]
 15:12; 38:20
ages [1]
 105:13
agree [8]
 6:14; 15:27; 32:19; 40:23; 42:25; 53:2; 58:2; 112:8
agreed [2]
 104:15; 111:27
agreement [8]
 8:1; 33:19, 24; 34:2; 38:14; 39:23; 40:6, 10
agrees [1]
 56:23
airplane [1]
 100:13
al [1]
 6:5
ALCANTARA [2]
 6:27; 15:7
Alcantara [1]
 6:27
Alik [1]
 6:28
Alves [14]
 45:28; 46:2, 11; 74:8, 10, 13,

18, 22; 75:4; 92:12; 94:16; 103:20, 23
ambiguous [25]
 16:3; 32:14; 43:8, 14, 21; 44:3; 50:13; 78:26; 81:2, 11, 26; 82:7, 28; 84:2, 18; 85:15; 86:7; 88:6, 20; 89:3; 93:6, 11, 20; 95:4; 108:5
American [3]
 95:28; 96:3; 103:18
amount [2]
 8:9; 16:19
amputation [2]
 106:25, 28
angle [1]
 90:1
ankle [6]
 19:27, 28; 20:1, 8, 10, 12
ANSWER [1]
 5:1
Answer [2]
 81:21; 108:28
answer [33]
 8:28; 9:20, 22; 10:9, 17; 15:26; 16:3, 4, 6, 8; 17:22; 21:12; 24:27; 39:20; 40:4, 16; 53:13; 59:15; 65:28; 67:12; 68:20; 71:23; 74:15, 18, 22; 75:7; 80:8, 15; 81:19, 20; 84:20; 90:23; 100:18
answered [4]
 8:26; 79:18; 100:15; 102:4
answers [1]
 115:5
Anthony [3]
 31:27; 42:21, 24
antiquity [1]
 68:3
anybody [2]
 60:15; 99:7
anyway [1]
 100:19
Apartment [3]
 7:18; 15:7, 8
apartment [29]
 7:19, 23, 25; 8:2, 7; 9:15; 10:20, 23, 26; 11:11, 19, 25; 12:5, 12, 15, 25; 13:15, 19, 26; 16:10, 13; 17:7; 29:18, 19, 23; 59:5, 8; 61:1; 62:12
appear [1]
 90:11
appears [1]
 83:27
applied [1]
 19:22
apply [1]
 17:14
appointment [1]
 100:8
appointments [1]
 102:23
Approaching [1]
 47:14
approaching [1]
 47:13
approximate [1]
 90:12
approximately [2]
 14:11; 22:22
April [2]
 From **April** to **April**

32:28; 33:8

area [1]
86:28

Argumentative [3]
75:10; 82:17; 92:23

argumentative [7]
79:17; 80:28; 82:6, 27; 84:1;
92:17; 99:15

arm [1]
76:21

Armstrong [2]
58:26; 59:5

artificial [1]
100:7

asking [12]
9:10; 20:28; 21:1; 26:15;
67:1; 71:15; 80:10, 12, 18;
83:1; 87:9; 107:27

asks [1]
15:20

assessment [1]
23:2

assigned [1]
75:2

assistant [3]
47:2, 7, 20

Associates [2]
6:9, 17

assume [1]
26:18

Assumes [3]
32:15; 33:3; 86:6

assumes [1]
81:9

Assuming [1]
65:13

attached [4]
76:21; 92:3, 16

attorney-client [4]
39:19; 40:3, 8, 10

attribute [2]
107:12, 25

audio [1]
6:11

authorize [2]
43:6, 12

available [1]
112:3

avoid [1]
26:13

aware [1]
6:11


> > B < <


B.A. [1]
111:2

BANNING [143]
6:22; 8:25; 9:17; 11:12;
14:15; 15:9, 16, 20; 16:1;
23:12, 15; 25:16, 20, 23, 27;
26:17, 23, 27; 32:14, 17;
33:3; 34:27; 39:19; 40:3, 9,
14, 17, 20; 41:2, 4, 26; 43:8,
14, 21; 44:3; 50:13, 16;
52:15, 19, 24; 53:28; 57:21;
59:12, 18, 21; 60:16, 24;
65:13, 16, 19, 27; 66:6, 22;
67:4, 11, 15, 21, 23, 28; 68:8,
16; 69:4, 12, 18, 21; 70:3, 5,

16, 18, 25; 71:2, 5, 7, 12, 20;
72:1, 5, 8, 17, 22, 27; 73:1, 7,
12; 75:8, 10; 76:26; 79:17,
21, 24, 28; 80:9, 17, 28; 81:9,
26; 82:6, 17, 27; 83:14; 84:1,
18, 25; 85:15; 86:1, 6, 15, 18,
28; 87:8; 88:6, 18; 89:3, 10,
19; 92:17, 22; 93:6, 11, 20;
95:4; 97:14, 17; 98:11, 16;
99:15; 102:4; 108:5, 15;
111:3, 8, 14, 18; 112:14, 20,
24; 113:2, 5, 8, 20, 27; 114:6,
15

Banning [28]
6:22; 9:6; 32:19; 33:12, 15,
18, 19, 26; 34:3, 4; 38:15, 18,
25; 39:2, 7, 24; 42:3, 5, 9, 12;
43:4; 59:17; 69:9, 28; 82:14;
83:18; 100:17; 112:7

Banning's [6]
39:1; 40:26; 46:2, 11; 82:12;
94:16

based [1]
82:16

basis [1]
112:7

bathrooms [1]
12:22

batteries [2]
76:3, 20

bedroom [2]
12:3, 24

bedrooms [3]
11:21, 22; 12:12

behalf [1]
43:26; 44:1

behind [3]
53:25, 26, 27

believe [4]
108:12, 17; 109:6; 110:16

believes [1]
72:19

bend [2]
19:24, 26

Bernice [2]
42:16, 18

Besides [1]
77:24

bicycle [2]
22:13; 24:15

bigger [2]
14:24; 78:19

Bill [1]
98:10

bill [1]
18:3

bit [1]
75:23

blew [1]
60:8

blocked [1]
88:28

blocks [1]
18:21

blowing [1]
95:10

board [2]
110:21, 23

Boat [1]
48:13

boat [57]

30:21; 32:6; 37:25; 38:1, 5;
48:13; 49:26; 50:5; 53:27;
54:25; 55:4, 6; 57:2, 3, 6;
58:6; 62:27; 66:24; 70:7;
72:10, 11; 73:22; 74:3, 17,
23; 75:5; 76:17; 81:16; 84:13;
88:11, 16, 17, 21, 27; 92:5, 9,
13; 93:17; 94:8, 23, 24, 25,
26; 95:2, 13, 19, 22; 108:22;
109:7, 9, 10, 11, 21; 110:1, 5,
9

boats [3]
106:24; 108:25; 109:3

body [1]
99:26

bordering [1]
87:8

boss [6]
74:7; 92:12; 94:5, 11, 13, 15

bothersome [1]
83:10

boy [1]
30:24

boys [1]
105:14

break [10]
25:18, 19, 21; 33:6; 46:19;
57:28; 65:18; 73:10; 89:11;
102:17

BRIDGET [2]
116:1, 17

Bridget [1]
6:16

bright [2]
77:27; 78:9

brings [1]
113:1

broad [2]
67:5, 11

brother-in-law [4]
33:1, 8; 36:20; 43:16

business [1]
113:16

buy [2]
96:9, 13


> > C < <


C-A-L-L-Y [1]
104:26

C-L-O-R-A [1]
104:20

C-O-R-R-E-I-A [1]
103:11

C.S.R. [1]
116:18

cabin [1]
58:13

cable [7]
47:10; 51:13; 55:27, 28; 56:2,
6, 8

cables [5]
47:24; 48:25; 49:3, 21; 55:17

California [7]
6:3, 7, 10; 7:18; 115:2; 116:2,
13

call [8]
12:19; 23:8; 39:10; 46:8;
91:26, 28; 108:25

Calls [2]

92:17, 22

calls [4]
11:12; 41:26; 60:16, 24

Camilla [1]
105:22

captain [1]
30:10

care [3]
82:4; 100:22, 25

careful [1]
70:2

Carl [3]
36:20, 21; 38:8

Carrie [1]
6:28

carry [1]
102:13

Case [1]
6:6

case [8]
7:20; 17:13; 33:12; 44:7;
66:15; 67:6; 69:27; 95:8

caused [2]
97:2; 108:14

cease [1]
52:16

center [1]
79:2

Certified [1]
116:1

certified [3]
113:18, 26, 28

certify [1]
116:2

certs [1]
114:5

cetera [1]
50:17

change [5]
69:25; 80:2; 87:2; 96:26; 97:2

changed [1]
99:17

changes [4]
112:15; 113:10; 114:10;
115:5

changing [1]
100:1

Check [4]
47:22, 23, 24

check [18]
26:2; 47:9; 49:2, 8, 10, 12,
13, 17, 21, 22; 55:12, 16, 17,
28; 56:5

checked [4]
49:4, 5; 55:27

checking [3]
48:24; 56:1, 8

children [2]
104:6, 12; 105:11

choose [1]
73:17

Christmas [1]
46:1

City [1]
11:17

claim [6]
37:6, 21; 42:3, 22; 43:4, 20

clarification [1]
40:5

clear [7]
47:10; 48:2, 9, 11; 55:13;

59:21; 85:18

clearer [1]
23:23

client [7]
11:6, 9; 69:10; 72:16, 25;
94:16

client's [2]
113:6, 7

climb [7]
82:19, 24; 84:3, 6; 87:14, 21

Clora [1]
104:18

Co [1]
6:25

Coast [3]
72:9, 12; 73:2

coffee [1]
64:5

cognitive [3]
67:20, 26; 68:15

collapses [1]
51:14

combined [1]
78:14

comfortable [1]
81:5

comfortably [2]
19:17, 23

coming [11]
31:28; 39:18; 64:1; 79:10;
84:16; 87:12, 27; 88:4; 94:19;
95:3; 103:4

commencing [1]
6:15

comments [1]
52:16

common [1]
69:24

communicate [1]
26:18

Company [1]
6:5

compared [1]
19:18

compensate [1]
37:15

complete [4]
27:27; 104:2, 3

completed [2]
70:13; 101:18

completely [1]
83:5

Compound [2]
43:15; 84:25

compound [3]
32:17; 33:3; 108:15

concerned [1]
101:26

condition [3]
94:8; 100:1; 104:11

confirming [1]
70:6

confused [1]
9:10

confusion [1]
108:7

consider [3]
78:19; 100:12, 26

considered [2]
101:21; 102:1

constitute [1]

15:6

contains [1]
116:9

context [1]
16:4

Continue [2]
35:22; 108:23

continuing [2]
46:25; 89:16

contributed [1]
16:24

Convenient [1]
82:4

convenient [4]
81:5; 82:2, 5, 16

conversation [1]
46:18

conversations [2]
40:11; 42:27

conversing [1]
41:21

copy [5]
112:4; 113:18, 26, 28; 114:12

corner [1]
92:27

correction [1]
86:19

corrections [1]
115:4

Correia [2]
103:10, 15

cost [4]
8:2, 6; 9:15; 25:7

costs [2]
17:22, 23

COUNSEL [1]
5:9

counsel [1]
6:13

count [1]
37:25

COURT [2]
113:15; 114:3

Court [3]
6:7; 80:19; 96:23

court [10]
6:16; 7:1; 69:6; 70:13; 71:16;
81:19; 87:5; 112:4, 13;
113:11

cover [1]
37:22

covered [1]
87:1

crash [2]
84:13; 85:2

credibility [1]
72:16

crew [19]
42:17, 19; 53:6, 8, 10, 15;
54:6, 8, 10; 58:17; 61:17, 18;
62:4; 63:16; 65:11; 94:11;
106:23; 110:25, 28

crotch [1]
86:22

Crow's [1]
78:24

crow's [4]
78:22; 79:2, 5, 10

Cruz [6]
45:8, 11, 22, 24; 103:4, 8

cup [1]

64:4

currently [1]
26:5

> > D < <

daily [1]
27:1

dark [1]
58:1

Darrin [2]
103:10, 15

date [1]
68:9

Dated [1]
116:12

dating [2]
26:7, 9

Davit [1]
90:20

davit [9]
90:17, 20, 21; 91:1, 3, 5, 11,
12

davits [1]
90:24

day [13]
20:14; 27:6; 28:6, 9, 15;
33:25; 34:3; 58:22; 93:25;
109:6; 115:7; 116:12

days [10]
5:6; 28:13; 64:23; 66:24;
69:3; 70:21; 71:11; 112:12;
113:12, 16

daytime [1]
27:3

ddp [1]
6:6

deal [2]
37:5; 72:15

DEBRUM [2]
7:7, 9

DeBRUM [2]
115:1, 9

DeBrum [30]
5:3; 6:2, 5, 20; 7:16; 10:21;
25:15; 26:4; 35:20; 40:7, 12;
45:21; 46:26; 53:14; 58:5;
65:25; 66:19; 67:1, 9; 68:24;
69:1; 70:22, 23; 71:10, 18;
72:2; 73:17; 89:17; 102:23;
112:12

December [1]
22:3

decide [1]
79:15; 80:26; 81:25

decided [5]
57:25; 70:13; 96:5; 101:5, 15

decision [2]
66:17; 81:24; 96:15; 97:7

Deck [2]
86:17, 18

deck [15]
57:4; 58:11, 16, 19, 21;
60:13, 14; 74:7; 79:3; 86:20;
92:12; 94:5, 11, 13, 15

declaration [1]
66:24

declarations [2]
70:3, 5

declare [1]

115:1

decline [1]
71:22

declined [1]
71:19

deem [1]
115:5

Defendants [4]
14:3; 34:8; 85:22; 90:5

defense [2]
23:13; 26:3

define [1]
12:8

definitely [1]
96:18

degrees [1]
90:1

demand [1]
26:7

dep [4]
112:28; 113:4, 6, 7

depend [1]
75:27

depended [2]
75:13; 76:10

deposed [1]
71:8

deposition [41]
6:2, 13, 15; 7:20; 44:7, 9, 11,
14, 17; 46:25; 52:20; 71:5, 6,
14; 72:26; 79:19, 27; 80:10;
83:2, 4, 8; 87:1; 89:16, 20;
90:8; 96:17; 99:8, 13; 111:10,
13, 28; 112:17, 20; 113:3, 9;
114:23, 25; 115:3; 116:4, 7

describe [1]
76:18

determine [6]
70:23; 73:5; 81:7; 82:15, 21;
83:24

determined [1]
85:18

device [2]
100:25; 101:3

dialogue [2]
79:26; 80:15

Diego [12]
6:3, 10; 7:18; 13:13; 27:8;
41:7, 10; 96:24; 97:5; 99:27;
101:6; 116:12

difficulties [1]
89:22

direction [2]
95:10; 116:9

disappear [3]
49:14, 19

disconnected [1]
49:23

discuss [1]
26:10

discussed [3]
25:27; 94:7, 10

discussing [1]
94:12

Discussion [3]
73:9; 111:24; 114:21

discussions [2]
42:21; 43:2

distance [1]
77:28

District [2]

6:6, 7
dock [2]
47:13, 14
doctor [23]
20:20; 21:3, 7, 18; 22:24, 28;
23:7, 8, 10, 21; 25:1; 26:17,
19, 21; 68:13; 97:4; 99:7, 19,
20, 26, 27; 101:19; 102:24
doctors [3]
23:26; 99:5; 100:3
document [6]
15:4, 23; 34:10; 35:7, 21, 25
documented [1]
69:22
documents [1]
34:11
doesn't [11]
8:27; 9:18; 28:26; 36:13;
51:16; 56:24; 82:14; 85:26;
107:20; 114:2, 19
door [1]
12:10
double-check [1]
26:9
Doug [1]
23:19
Dr [15]
22:15, 25; 23:13, 19, 20, 28;
24:1, 3, 6, 23; 26:1, 3, 10, 17
draws [1]
51:15
drug [11]
5:5; 69:2, 6, 12; 70:10, 14;
71:10, 16; 72:20; 73:3, 6
duly [3]
7:5, 10; 116:5

> > E < <

easily [1]
19:18
easy [1]
81:4
effect [1]
68:15
eight [1]
113:15
employable [1]
106:11
employed [2]
101:13; 106:1
employment [1]
67:3
end [8]
14:27; 15:1; 46:21; 51:15;
54:18; 89:12; 114:23, 24
engaged [3]
13:1, 3; 66:19
engine [2]
47:22; 48:25
English [7]
7:5, 6; 28:21, 22, 28; 29:6, 8
equal [1]
19:25
equipment [1]
97:11
establish [1]
72:24
et [3]
6:5; 50:17

Everybody [1]
69:23
everybody [2]
107:19; 110:19
evidence [6]
71:25, 26, 27; 72:1, 2, 5
evidentiary [1]
69:13
ex-wife [2]
104:15; 105:17
exact [1]
110:4
exactly [4]
20:5; 21:13; 35:12; 109:27
exam [1]
23:13
EXAMINATION [1]
7:13
examination [2]
69:6; 70:10
examiner [1]
26:4
example [2]
19:20; 48:5
Except [1]
72:14
Excuse [3]
13:22; 25:20; 94:24
Executed [1]
115:7
exercise [1]
40:23
exercises [2]
22:14; 24:15
Exhibit [18]
14:1, 3, 5; 34:7, 8, 23; 35:11,
23; 36:4, 5, 9; 85:21, 22;
86:2; 87:19; 90:5, 7; 92:27
exhibit [1]
86:1
experience [1]
95:7
expert [6]
66:14, 18; 67:17, 18; 68:12;
112:8
Explain [1]
73:4
explain [11]
19:7, 14, 28; 20:2; 22:9;
30:20; 36:14; 44:8; 50:14;
73:21, 26
explained [1]
35:6
eye [1]
55:22

> > F < <

face [1]
60:9
facility [1]
97:8
fact [9]
67:19, 25; 70:7, 8, 9; 71:18;
72:9, 11, 14
facts [6]
32:15; 33:4; 69:25; 81:9; 86:6
failed [1]
108:13
fair [1]

35:16
fast [3]
84:3, 6; 110:10
fatter [1]
100:1
February [2]
32:23, 27
Federal [2]
89:19; 112:15
feel [5]
18:13, 15, 20, 21; 82:18; 84:7
feet [3]
86:4, 9; 89:1
FERREIRA [3]
6:26; 52:9; 109:13
Ferreira [26]
5:3; 6:26; 29:1, 3; 31:27;
32:2; 42:22, 24; 52:15, 21;
58:5, 16; 59:6, 25; 60:23, 27;
62:9; 69:1, 22; 70:7, 22, 24;
107:3; 108:2, 12; 109:27
Ferreira's [1]
112:20
FERRIERA [1]
51:17
Fifteen [1]
105:24
figure [3]
25:22; 106:17; 111:19
film [1]
111:12
find [6]
27:8, 10; 33:24; 34:2; 47:19;
76:24
fine [4]
71:14; 99:19; 113:5; 114:15
finish [4]
15:16; 27:23, 25; 79:27
firm [2]
40:7; 100:18
Firmin [66]
5:3; 6:26; 29:1, 3, 5, 7, 10,
23, 26; 30:5, 7, 11, 17, 20;
31:4, 9, 15, 17; 32:2; 57:26,
27; 58:5, 15; 59:6, 24; 60:27;
61:7; 62:1, 3, 9; 63:2, 8, 13,
17, 21; 64:11, 17, 27; 65:3,
10; 69:1; 73:20, 21, 26;
74:16, 25, 26; 77:11, 14, 20,
23; 78:5, 8, 22; 81:15; 107:3,
21, 24; 108:2, 12; 109:2, 17,
23, 27
Firmin's [2]
78:12, 14
First [2]
20:27; 31:14
first [42]
7:5, 10; 9:1; 11:2; 13:14;
14:6, 9; 18:13, 27; 19:16, 23;
21:28; 22:7; 27:23, 27; 35:17;
36:16; 38:24; 39:4, 7, 8, 22;
40:28; 57:2, 28; 58:3; 64:27;
65:3; 79:19; 83:2, 4; 87:1;
101:27; 102:5; 104:21, 22;
106:22, 28; 110:9, 13, 15;
116:5
fisherman [1]
30:4
Fishing [2]
6:5, 25
fishing [5]

17:1; 55:7; 58:22; 62:13, 15
Five [1]
65:8
five [7]
54:15; 57:10, 12, 18; 65:7;
105:11; 111:20
five-minute [1]
102:17
fixing [1]
64:4
flash [1]
79:9
flashlight [28]
75:17; 76:1, 2, 4, 7, 8, 12, 14,
15, 18; 77:3, 6, 10, 11, 14,
17, 19, 21, 23, 24, 25; 78:2,
9, 12, 15, 16, 19
flat [1]
15:5
fleet [2]
69:24; 106:24
flex [1]
19:24
flexibility [1]
19:9
flexible [3]
19:6, 7, 15
flight [1]
100:13
floor [9]
19:5, 8, 9, 17, 20, 22, 24, 25,
26
follow [2]
40:21, 23
follows [1]
7:11
food [3]
10:4; 16:25; 17:11
foot [11]
19:22; 21:17; 24:15; 27:26;
86:14, 20; 99:22; 100:22;
101:26; 102:13; 106:22
foregoing [4]
115:2; 116:4, 6, 9
forget [1]
68:9
forgot [4]
21:21; 22:2, 4, 8
forward [7]
71:14; 80:20; 90:26; 91:1, 2,
4; 113:23
Four [1]
62:19
four [11]
16:22; 28:8, 9, 14; 46:16;
62:22, 25, 26, 28; 66:25; 89:1
frequent [1]
72:3
front [4]
58:16; 87:26; 88:3; 91:4
fully [1]
87:1
furl [1]
51:11
future [8]
100:5; 101:14, 17; 102:2, 9;
106:7, 12, 15

> > G < <

galley [3]
    30:23; 64:4, 6
gave [7]
    15:27; 44:7, 13, 16; 57:13;
    96:17; 99:8
gentleman [1]
    21:16
George [3]
    106:27, 28; 107:2
gift [4]
    37:27; 38:2, 4, 6
girl [1]
    105:14
girlfriend [1]
    12:27
give [14]
    16:5; 17:3, 13; 19:20; 30:21;
    42:11; 44:17; 48:5; 53:5;
    66:27; 74:18; 105:8; 106:10,
    14
given [4]
    8:9; 19:18; 54:7; 73:19
giving [1]
    7:20
glass-of-water [1]
    89:11
God [1]
    19:18
goes [2]
    51:13; 113:25
gotten [2]
    25:13; 26:14
grab [1]
    82:23
GRAHAM [1]
    7:4
Graham [1]
    6:21
grow [1]
    99:28
Guam [4]
    104:27; 105:2, 4, 11
Guard [3]
    72:9, 12; 73:2
guess [5]
    26:8; 113:10, 12, 20
guy [1]
    57:24
guys [2]
    94:14; 114:3

        > >H< <

H-E-A-V-I-N-G [1]
    57:21
H-O-U-G-H-T-O-N-N [1]
    41:15
hadn't [1]
    112:22
hand [1]
    76:23
handle [2]
    111:10, 13
handwriting [2]
    36:17, 19
Hang [2]
    47:16; 55:2
hanging [4]
    93:1, 7, 18; 94:8
happens [1]

harassment [4]
    9:1; 71:13, 23; 87:8
hasn't [1]
    26:16
haven't [7]
    16:1; 25:13; 45:17; 96:2, 5;
    101:15, 22
Hawaii [16]
    24:12; 29:11; 38:26; 39:6, 14,
    15; 41:12, 18, 22, 24, 25;
    58:24; 59:6; 63:11; 97:27;
    98:8
he'll [1]
    40:21
He's [6]
    43:16; 44:25; 52:18; 57:4, 20;
    107:27
he's [8]
    12:9; 20:25, 26; 23:8; 53:25;
    72:6; 107:19, 20
head [5]
    31:21, 23, 24; 85:17; 89:9
hear [6]
    14:21; 31:22; 94:12; 110:18;
    111:1, 2
heard [1]
    41:28
hearing [1]
    31:3
heaving [1]
    57:20
height [2]
    87:28; 88:4
held [3]
    73:9; 111:24; 114:21
help [10]
    38:3, 7; 43:17; 54:17; 56:5,
    27; 57:23; 106:10, 15, 17
helping [1]
    37:5
Henry [2]
    61:22, 24
here's [1]
    21:1
hereby [1]
    116:2
high [2]
    88:8; 89:7
high-wave [1]
    94:8
Higher [1]
    85:28
higher [10]
    85:13, 27; 87:18; 89:1; 90:16;
    91:10, 12, 14, 15, 22
highest [1]
    84:10
Highland [1]
    106:4
hire [2]
    33:16; 42:8
hired [8]
    33:12, 15, 18, 25; 34:4;
    38:16; 43:4; 106:3
hit [3]
    85:10, 20, 25
hold [5]
    19:1; 76:22; 79:26; 91:19;
    92:1
holding [1]

76:23
holds [2]
    91:13, 17
home [3]
    11:13, 15; 20:16
Honolulu [7]
    29:13; 99:5, 10; 100:14, 25,
    27; 101:3
horizon [1]
    57:28
Hornbook [1]
    40:9
Hornet [2]
    42:17, 19
Hospital [1]
    39:16
hospital [10]
    29:10, 16; 30:16; 31:15;
    39:15, 23; 41:28; 97:8; 99:5,
    9
hospitalized [1]
    98:8
hospitals [2]
    97:12, 22
Houghton [8]
    41:13, 14, 15, 17; 42:6, 8, 11;
    46:15
hour [1]
    25:17
hours [6]
    28:6, 9, 11, 14; 89:20, 21
house [5]
    59:6; 60:13; 61:10; 63:3;
    64:26
Huh [1]
    79:21
hurried [1]
    108:22
hydraulic [1]
    47:24
hypothetical [8]
    81:2, 11, 27; 82:28; 84:2, 19;
    85:16; 93:21

        > >I< <

I'd [2]
    80:5, 14
I've [3]
    34:13; 97:26; 101:25
idea [4]
    25:9; 30:8, 9; 69:14
identify [1]
    6:18
immediately [1]
    67:10
impair [2]
    66:16; 67:19
impaired [1]
    67:27
important [1]
    30:3
impossible [1]
    16:3
improper [1]
    69:5
Ina [9]
    12:27; 13:26, 27; 16:13; 17:3;
    28:25; 29:24, 27; 103:26
Inc [1]

6:25
incidentals [2]
    16:25; 17:12
income [1]
    9:25
Incomplete [8]
    81:2, 11, 27; 82:28; 84:2, 19;
    85:16; 93:21
indication [1]
    91:21
individuals [1]
    55:28
information [2]
    79:23; 98:23, 26, 28; 99:3
Ingrahm [17]
    33:1, 9, 11, 14; 36:6, 9, 12,
    21, 28; 37:3; 38:9, 15; 43:3,
    6, 11, 24
inside [2]
    51:13; 86:9
inspected [1]
    45:3
installed [3]
    21:18, 28; 100:7
installing [1]
    23:8
Instruct [4]
    39:20; 40:4; 65:27; 67:12
instruct [1]
    40:15
INSTRUCTED [1]
    5:1
instructed [1]
    71:22
instructing [1]
    80:7
instruction [4]
    40:22, 24; 79:20, 22
insurance [7]
    8:11, 20, 22; 9:11; 20:23, 28;
    21:6
intentionally [1]
    108:6
interfering [1]
    82:13
INTERPRETER [82]
    6:21; 9:4; 9, 21, 23; 10:10,
    18; 11:7; 13:22; 15:1, 5, 14,
    19, 24; 20:2, 6, 11, 24; 21:9,
    13; 23:24; 24:26; 30:25; 31:6;
    33:27; 34:16, 25; 35:13, 22;
    44:8; 45:9, 12; 47:16; 48:16;
    50:28; 51:6, 9, 11, 22; 52:7,
    12; 53:16, 22, 25; 54:2; 55:2,
    6; 56:24; 57:15; 61:7, 24, 27;
    62:20; 65:1; 73:23; 74:20;
    75:15, 17, 20, 24; 78:24;
    80:22; 81:12; 82:10; 83:5;
    86:16, 19; 88:1; 90:18; 94:24,
    27; 95:14, 16; 96:20; 98:27;
    100:15, 20; 103:21; 107:27;
    108:23; 109:15; 111:4
Interpreter [4]
    15:4, 23; 35:21, 25
interpreter [4]
    7:11; 83:10; 89:22; 112:8
intimidation [2]
    52:21, 22
Invasion [2]
    65:28; 67:12
invasion [7]

66:11; 67:1, 5; 68:4, 6; 69:8;
71:23
irrelevant [1]
67:6
island [1]
97:9
Islands [6]
96:19, 20; 98:1, 18; 99:14;
100:26
islands [1]
100:3
issue [4]
25:28; 26:16; 67:24; 69:13

> > J < <

J-A-L-L-Y [1]
105:1
Jake [16]
58:24, 25, 26; 59:5; 61:7;
62:1, 2; 63:5, 8, 17, 21;
64:14, 17, 28; 65:3, 10
Jally [1]
104:24
James [1]
6:27
January [5]
6:4; 33:8; 46:26; 89:17;
116:12
job [28]
27:8, 11, 14; 29:8; 30:18, 21;
32:3; 47:1, 7; 48:27, 28;
54:11, 12; 55:20, 26; 56:11,
15, 21, 27; 57:5; 73:22, 27;
77:22; 78:10; 101:27; 102:8;
106:15
jobs [4]
27:19; 30:28; 47:19; 102:1
John [11]
39:4; 45:27; 74:8, 10, 13, 18,
22; 75:4; 94:15; 103:20, 23
judgment [2]
66:16; 82:1
Jump [1]
110:1
jump [30]
79:16; 80:26; 81:5, 7, 10;
82:1, 2, 15, 22, 23; 83:26, 28;
84:4, 8, 9, 14, 15; 85:3, 9, 18,
19; 88:27; 109:9, 18, 23, 25;
110:6, 7, 8, 13
jumped [5]
49:28; 50:4; 85:14; 91:23;
109:22, 23; 110:3
jury [1]
72:19

> > K < <

keep [13]
48:2, 9, 11; 55:22; 80:17;
87:9; 89:23; 101:19; 112:16,
17, 21; 113:9; 114:4
keeps [1]
112:28
kept [1]
111:27
kids [2]
105:5, 8
Kitchen [1]

12:18
kitchen [5]
11:27; 12:3, 5, 10, 15
knee [3]
20:1, 8; 107:1
knees [4]
19:26, 27; 20:10, 11
knowledge [2]
29:2; 69:24
Koor [1]
54:27
KOORALE [89]
16:28; 17:4; 29:19, 27; 30:2,
13, 28; 31:5, 11, 16, 28; 32:3,
9, 12; 43:24; 45:3; 48:6;
50:19; 52:1, 5; 53:3, 6, 21;
54:17, 18, 24, 26, 28; 55:10,
25; 56:11; 57:3, 6, 9, 14;
65:11; 66:4, 20; 67:3; 73:19,
27; 74:3, 4; 75:13, 14, 21, 27,
28; 76:7, 8, 11; 78:28; 79:3,
14, 15, 16; 80:26, 27; 81:1, 8,
10, 25; 86:24; 87:28; 88:5,
12, 17, 19, 23, 25; 89:2, 28;
90:1; 93:2, 18; 95:8, 24, 25,
26; 103:19; 109:4, 12, 13, 14,
21, 25; 110:1, 23
Krill [1]
42:27

> > L < <

ladder [23]
49:27, 28; 50:1, 3, 4, 11, 23,
26, 27; 79:6; 80:27; 81:24;
82:24, 25; 83:19; 85:5; 86:10;
87:17, 18; 88:26; 89:28;
93:27; 94:21
landing [1]
47:11
language [2]
28:27; 29:5
Last [2]
10:27; 23:1
last [33]
7:20; 10:25; 11:4; 18:9;
20:15; 22:15, 22, 28; 23:10,
26; 24:3, 6; 26:9; 27:5; 35:10;
36:2, 5, 8; 44:5; 45:16, 22,
27; 46:14; 54:15; 63:10;
65:26; 83:8; 96:17, 28; 99:8;
103:18; 104:23; 112:11
laundry [2]
17:22, 23
law [2]
40:9; 72:13
laws [1]
115:2
lawsuit [6]
8:12, 16, 23; 9:8, 16; 10:14
lawyer [24]
5:4; 7:28; 8:2, 5, 6; 9:26;
10:1; 11:6, 9; 15:27; 32:20;
33:22; 36:28; 37:3; 40:2;
42:3, 9; 45:4; 49:2; 71:19;
74:11; 106:3; 113:23
lawyer's [5]
59:18; 70:8, 25, 28; 73:7
lawyers [5]
9:14; 10:6; 65:14; 111:28;

112:1
lean [1]
89:9
leave [1]
11:11
leaving [2]
17:1, 4
left-hand [1]
92:26
leg [17]
18:27, 28; 19:16; 21:18; 23:9;
27:17, 23, 25, 26; 30:22;
41:21; 85:25; 100:7; 101:19,
26; 106:25, 28
length [1]
110:4
Leota [1]
42:15
Let's [7]
19:13; 23:24; 40:5; 47:27;
54:23; 67:7; 68:22
let's [4]
51:2; 69:26; 82:13; 111:18
letter [11]
36:1, 4, 5, 8, 9, 14, 23, 27;
37:8; 38:12, 18
light [23]
49:26; 50:5; 57:2, 3, 5, 28;
58:3; 74:3, 23; 75:5, 13, 15,
17, 19, 27; 76:10, 24; 78:7,
12, 14; 79:6, 9; 102:12
lighter [1]
79:11
likes [1]
100:18
limit [4]
66:1, 12; 68:17, 19
LINE [2]
5:2, 10
line [36]
14:9; 47:13, 15, 28; 48:2, 5,
13; 51:14, 15; 52:1, 3, 4, 5, 6,
11, 13, 28; 53:2, 5, 8, 10, 12,
15, 21; 54:7, 8, 10; 55:28;
56:6; 57:9, 13, 20; 73:18;
91:13, 17
lines [15]
40:16; 47:10, 12, 25, 28;
48:1, 3, 4, 8, 11; 55:13, 18,
22, 26
listen [1]
80:13
literally [1]
15:11
live [10]
7:16; 10:23; 13:15, 19, 26;
96:19; 100:13; 101:5; 104:13;
105:26
lived [5]
7:19; 10:25; 13:16, 20, 27
lives [2]
10:20; 44:22
living [9]
12:11, 17, 18, 20; 13:7;
104:27; 105:2, 16, 19
located [1]
6:9
location [1]
90:12
long-term [6]
66:15, 19; 67:18; 68:13;

69:23; 72:3
looks [1]
93:14
Lopez [8]
39:5, 7, 9, 10, 22; 40:1
lost [1]
83:5
lot [2]
18:10; 97:26
loud [1]
107:19
low [1]
85:5
lower [4]
85:27; 87:18; 91:24; 93:13
lunch [1]
65:19
lying [3]
69:19; 73:6; 91:20

> > M < <

machine [1]
116:7
maintenance [1]
47:9
Majuro [8]
97:12, 22; 99:6, 24, 27;
100:13; 101:6; 105:20
make-and-secure [1]
26:7
man [6]
29:24; 30:6, 7; 45:12; 87:19;
106:27
Mana [2]
29:18
mandatory [1]
73:3
March [3]
32:23, 27; 114:16
Marla [1]
41:4
marijuana [47]
58:6, 16; 59:7, 8, 25; 60:6,
23, 27; 61:26; 62:1, 10;
63:18, 22; 64:1, 8, 12, 15, 18,
26, 28; 65:4, 11, 25; 66:7, 8,
16, 19; 67:2, 9, 23; 68:24, 26;
69:23; 70:14; 72:3, 10, 11;
107:4, 10, 13, 18, 26; 108:4;
18; 109:8; 110:17
Mark [2]
26:27; 85:21
mark [4]
14:1; 34:6; 87:5; 90:4
MARKED [1]
5:9
marked [5]
14:3; 34:8; 85:22; 90:5, 7
married [4]
29:24, 27; 30:1; 32:8
Marshall [6]
96:19, 20; 98:1, 18; 99:13;
100:26
Marshallese [11]
7:6; 28:21, 25; 29:1; 36:12;
97:21, 26, 28; 109:13; 112:7
Martino [1]
61:19
Mason [12]

21:20, 22, 24; 22:9; 23:7, 11;
25:13; 26:1; 100:9, 10;
102:24; 103:2
MASTROBATTISTA [2]
116:1, 17
Mastrobattista [1]
6:17
matter [3]
6:4; 67:19; 95:7
May [1]
26:8
meals [1]
17:7
mean [28]
8:12; 9:10; 12:8; 14:15;
15:20; 16:27; 18:14; 19:7, 15;
20:1; 23:12; 27:25; 30:19;
47:6; 52:3, 28; 65:13; 66:11,
26; 80:2; 82:15; 88:21; 94:15;
97:14; 105:15; 107:27; 108:6;
110:1
meaning [2]
93:7; 108:6
means [6]
51:8, 17, 18; 53:27; 93:12;
101:25
meant [2]
53:23; 69:15
mechanical [1]
47:9
medical [12]
24:16, 18, 20; 26:4; 97:3, 7,
8, 11; 104:2, 4, 11
meet [2]
40:26, 28
meet-and-confer [1]
80:11
meetings [2]
41:13; 46:10
MEL [4]
7:7, 9; 115:1, 9
Mel [8]
6:2, 5, 20; 15:12, 17, 22;
46:26; 89:16
member [2]
42:17; 94:11
members [7]
42:19; 53:6; 61:17, 18; 62:4;
63:16; 106:23
mentioned [1]
63:19
middle [5]
49:13; 84:27; 85:1; 87:10;
114:16
Mike [1]
42:27
mind [5]
31:25; 89:24; 96:2, 26; 97:2
Mine [1]
76:5
mine [2]
78:12, 14
minute [2]
47:16; 55:2
minutes [15]
48:21, 23; 49:6; 54:15; 55:15;
56:19, 20, 26; 57:10, 12, 18;
73:22, 27; 102:18; 111:20
mispronounce [1]
97:17
missed [1]

65:1
misstated [1]
59:15
misstates [3]
59:12, 22; 75:8
mistranslated [1]
13:23
mixed [1]
75:23
modify [2]
30:17, 19
moment [1]
80:16
Monday [2]
96:12, 15
money [28]
8:8, 10, 11, 12, 13, 15, 18,
23, 24; 9:7, 11, 16; 10:5, 7,
11, 13; 13:9; 17:3, 14, 20;
18:1, 4; 37:15, 17, 28; 42:25;
44:20
month [20]
9:28; 10:1; 16:17, 20; 17:11,
23; 18:3; 20:15; 22:2, 4, 7, 8;
23:1; 32:22; 38:27; 68:5, 7, 8;
96:1, 28
months [7]
24:4; 39:26, 28; 45:22; 46:16;
66:25; 68:10
Morally [1]
108:7
morning [6]
6:1; 54:24, 28; 55:9; 107:11;
108:21
Moromoto [1]
26:10
motion [16]
69:6, 18, 21; 70:9, 10, 11, 12,
18, 19, 26, 27; 71:1, 2, 15
motor [1]
66:16
Move [1]
8:21
move [2]
20:27; 44:26
moved [1]
12:24
moving [2]
45:1; 100:26
MR [400]
6:22, 24, 26, 27; 7:14; 8:25;
9:2, 5, 12, 13, 17, 20, 22, 24;
10:12, 19; 11:8, 12, 14;
13:24, 25; 14:1, 4, 15, 16, 18,
26; 15:2, 7, 8, 9, 16, 20, 25;
16:1, 7; 20:4, 7, 13, 27; 21:2,
11, 15, 19; 23:12, 14, 15, 16,
18, 25; 24:28; 25:12, 16, 19,
20, 21, 23, 27; 26:12, 17, 20,
23, 24, 25, 27, 28; 30:26;
31:8; 32:14, 17, 18; 33:3, 6,
7; 34:1, 6, 9, 18, 20, 26, 27;
35:1, 15, 24, 26; 39:19, 21;
40:3, 5, 9, 11, 14, 15, 17, 18,
20, 25; 41:2, 3, 4, 6, 26; 42:1;
43:8, 10, 14, 18, 21, 23; 44:3,
4, 10; 45:10, 13; 46:19, 28;
47:18; 48:17; 50:13, 14, 16,
18; 51:2, 3, 7, 10, 12, 17, 18,
20, 24; 52:9, 10, 15, 18, 19,
22, 24, 26; 53:13, 17, 24, 28;

54:3, 4; 55:4, 8; 56:25; 57:16,
17, 21, 22; 59:12, 16, 18, 20,
21, 23; 60:16, 18, 24, 26;
61:8, 25, 28; 62:21, 24; 65:2,
13, 15, 16, 17, 19, 20, 24, 27;
66:3; 6, 14, 22, 28; 67:4, 7, 8,
11, 14, 15, 17, 21, 22, 23, 25,
28; 68:4, 8, 12, 16, 21; 69:4,
9, 12, 13, 18, 19, 21, 28;
70:3; 4, 5, 12, 16, 17, 18, 20,
25, 28; 71:2, 3, 5, 6, 7, 9, 12,
17, 20, 28; 72:1, 2, 5, 7, 8,
14, 17, 20, 22, 24, 27, 28;
73:1, 5, 7, 10, 12, 16, 25;
74:21; 75:8, 10, 11, 16, 19,
22, 25; 76:26, 28; 78:26;
79:17, 20, 21, 22, 24, 26, 28;
80:6, 9, 14, 17, 21, 23, 28;
81:6, 9, 13, 18, 22, 26; 82:3,
6, 9, 11, 17, 20, 27; 83:7, 12,
14, 16, 17; 84:1, 5, 18, 23,
25, 28; 85:15, 21, 23; 86:1, 3,
6, 8, 15, 18, 21, 28; 87:6, 8,
11; 88:2, 6, 9, 18, 24; 89:3, 4,
6, 10, 19, 25, 26; 90:6, 19;
92:17, 19, 22, 25; 93:6, 9, 11,
16, 20, 23; 94:26; 95:1, 4, 6,
15, 18; 96:22; 97:14, 15, 17,
19; 98:11, 13, 16, 17; 99:2,
15, 16; 100:17, 23; 101:12;
102:4, 7, 16, 22; 103:23, 25;
107:16, 22, 23; 108:1, 5, 9,
11, 15, 16, 27; 109:1, 13, 16;
111:3, 6, 8, 13, 14, 15, 18,
22, 26; 112:14, 19, 20, 22,
24, 28; 113:2, 4, 5, 6, 8, 20,
25, 27; 114:1, 6, 11, 15, 17
Mr [98]
5:3; 7:16; 9:6; 10:21; 15:10,
21; 21:20; 22:9; 23:6; 25:15;
26:4; 31:17; 32:19; 33:12, 15,
18, 19, 26; 34:3, 4; 35:20;
36:6, 9, 12, 28; 37:3; 38:15,
18, 25; 39:1, 2, 7, 9, 10, 22,
24; 40:1, 7, 12, 26; 42:3, 5, 9,
11, 12; 43:4, 6, 11, 24; 45:21,
22, 24; 46:2, 11; 52:15, 21;
53:14; 58:5; 59:17; 60:23;
61:7; 62:3; 65:25; 66:19;
67:1, 9; 68:24; 69:1, 9, 22,
28; 70:7, 22, 23, 24; 71:10,
18; 72:2; 73:17; 77:23; 78:14;
82:12, 14; 83:18; 92:12;
94:16; 100:9; 102:23, 24;
103:2; 112:7, 12, 20
Myself [3]
10:22; 54:13; 94:13
myself [1]
32:7

> > N < <

name [18]
6:8, 19; 11:2, 4; 21:21; 42:14,
18; 61:24; 103:14, 21;
104:17, 21, 22, 23; 106:3, 27,
28; 109:11
named [1]
62:4
names [2]

98:5; 103:17
necessities [1]
10:4
necessity [1]
17:15
needs [1]
26:18
negligently [1]
108:7
negotiate [5]
33:1, 9, 14; 38:16; 43:19
negotiating [2]
33:16; 43:11
nest [5]
78:22, 24; 79:2, 5, 10
net [21]
48:19, 23; 49:9; 51:4, 11, 12,
14, 16, 25; 54:18, 21, 22;
55:11; 56:16, 27; 57:1, 2;
95:2, 21, 26
night [3]
63:26, 28; 64:2
nights [1]
61:4
Nobody [9]
39:3; 42:16, 18, 20; 43:5;
77:2; 93:28; 97:6; 106:26
nobody [2]
60:21; 65:12
Nodded [1]
31:24
nodded [2]
31:21, 23
non-lawyers [1]
65:16
nonresponsive [1]
20:28
nonsense [1]
72:27
normally [5]
20:14; 27:2; 56:10; 57:8, 11
noted [6]
111:28; 112:28; 113:2, 4, 6, 7
notice [1]
112:21
noticed [2]
113:8, 23
notices [1]
112:17
notify [2]
113:11; 114:9
notwithstanding [1]
80:7
November [1]
10:27
number [1]
42:11
numbered [1]
35:2

> > O < <

oath [1]
7:2
object [1]
86:28
Objection [39]
8:25; 11:12; 16:1; 32:14;
33:3; 39:19; 40:3; 41:26;
43:8, 14, 21; 44:3; 50:13;

60:16, 24; 65:27; 67:11; 69:4;
76:26; 79:17; 80:28; 81:9, 26;
82:6, 27; 84:1, 18; 85:15;
88:6, 20; 89:3; 92:17; 93:6,
11, 20; 95:4; 99:15; 108:5, 15
objection [4]
9:5, 17; 53:24; 92:22
objections [4]
82:12, 14; 83:9, 18
obliged [1]
112:1
observe [1]
64:27
occur [1]
72:15
occurred [3]
66:8; 95:11; 112:10
ocean [1]
83:23
offer [4]
71:18; 72:7; 73:5; 111:9
offered [1]
68:13
offering [3]
69:9, 10; 70:17
office [8]
26:2; 39:2; 40:19, 27; 46:3, 9,
11; 114:7
Oh [3]
65:15; 86:19; 111:4
oh [1]
19:27
oil [9]
47:22, 24; 48:24; 49:2, 8, 10,
14; 55:12, 17
Okay [80]
7:16; 12:5, 22; 13:24; 14:19;
15:19, 26; 16:16, 22, 24;
17:2, 10, 16, 19, 22; 18:6;
19:3; 20:9, 14; 21:15, 24;
23:10; 24:3, 23; 25:4; 26:24;
27:5; 28:9, 13; 30:1, 9; 32:28;
33:6, 24; 34:6; 35:10, 16;
36:12; 37:13, 20, 24; 38:8,
14; 43:27; 47:1, 19; 48:8;
49:16, 25; 50:19; 51:22;
52:17; 53:5, 18; 54:23; 55:15;
56:10, 17, 20; 57:1, 5; 59:24;
62:7; 65:25; 69:27; 70:18;
72:28; 75:20; 78:11; 81:23;
88:16; 90:4; 91:8; 93:25;
100:9, 12, 20; 103:13; 110:7;
111:22
okay [5]
55:23; 65:19; 80:3; 101:19;
113:24
old [3]
99:19, 21; 105:23
older [1]
99:28
Olo [6]
64:17, 19; 92:8, 9, 15; 94:13
one's [1]
66:16
ones [3]
105:13, 16; 110:26
opening [2]
51:12, 16
opinions [1]
67:18
opposed [2]

23:13; 113:28
order [4]
70:22; 71:16; 80:10, 19
original [11]
112:5, 21; 113:1, 17, 21, 25,
28; 114:4, 7, 12, 13
originals [4]
111:27; 112:3, 17; 113:9
orso [1]
54:17
orthopedic [2]
99:23; 100:6
Outside [1]
61:10
outside [7]
64:26; 86:20; 93:1, 7, 17, 18;
97:28
overly [2]
67:5, 11
owed [3]
37:18, 25; 38:5
owner [4]
26:7; 37:18, 25; 38:16


> >P< <

P-R-O-S-T-H-E-T-I-S-T [1]
98:12
P.A. [4]
110:18; 111:3, 4, 5
p.m. [3]
102:19, 21; 114:26
PAGE [2]
5:2, 10
Page [2]
34:14; 36:4
page [13]
14:7; 34:16, 23, 25, 27; 35:2,
10, 18; 36:2, 5, 8
Pago [2]
45:3
paid [3]
16:19; 17:8, 20
pain [2]
16:22; 27:18
Panama [3]
11:16, 17
Paragraph [1]
35:19
paragraph [6]
14:7, 13, 28; 15:3; 35:27;
36:1
parameters [1]
66:5
Paranise [1]
42:14
part [5]
17:8; 37:21; 38:5; 87:2; 92:2
party [5]
60:2, 5; 112:25, 27; 114:10
pass [6]
53:10, 12, 14; 54:10, 17; 57:9
passed [2]
52:1; 54:8
passes [1]
53:8
pay [12]
7:22, 25, 27; 8:6; 17:2, 6, 10,
14, 27; 18:4; 31:1; 38:5
paying [1]

29:20
pays [1]
10:1
penalty [1]
115:1
pending [1]
15:10
people [16]
20:23; 21:1; 23:22; 29:20;
43:25; 58:1, 5; 60:20; 61:26;
70:21; 98:7, 14, 23; 99:1, 4, 9
Pepe [2]
45:8, 11, 16, 19; 103:4, 8
period [2]
66:1; 68:5
perjuring [2]
70:23; 72:25
perjury [1]
115:1
permanently [1]
101:6
permit [2]
66:1, 9
person [7]
26:21; 37:5; 42:14; 92:6;
100:24; 103:22; 112:16
persons [1]
6:18
Peru [2]
45:22, 25
Peterson [2]
6:8, 17
phonetic [1]
61:19
physical [2]
69:6; 70:10
pick [7]
49:26; 50:6; 74:23; 75:5;
108:25; 109:3, 7
picked [1]
70:14
picture [9]
90:16; 91:3, 10, 23; 92:7, 26;
93:9, 14, 15
pictures [3]
85:24; 90:7, 9
piece [1]
91:26
pilot [3]
61:10; 63:3; 64:26
place [4]
6:12; 11:17; 19:2; 36:26
plaintiff [1]
6:23
Plaintiff's [1]
14:10
plan [5]
32:2; 96:10; 104:6, 12; 105:4
planning [1]
44:28; 96:3; 105:25
plans [4]
95:28; 101:13; 103:26; 105:6
play [1]
100:18
Please [1]
6:11
please [14]
6:18; 9:4; 14:2; 26:27; 34:7;
47:17; 73:24; 75:24; 76:19;
84:21; 88:10; 89:11; 90:4;
107:16

plus [1]
77:10
point [12]
26:14; 40:12; 50:25, 26;
66:28; 76:15, 16; 77:6, 17;
84:10; 85:5; 114:14
pointing [1]
94:20
Port [1]
94:26
PORTIONS [1]
5:9
Portside [1]
94:26
portside [2]
94:23; 95:21
position [1]
95:25
possibility [2]
31:10; 100:12
pot [4]
67:27; 68:13; 70:7; 72:6
powerful [1]
79:12
practice [1]
54:9
prepare [1]
27:13
prepared [3]
36:6, 10; 112:4
presence [3]
5:4; 69:2; 112:13
present [4]
6:18; 42:5; 66:9; 114:7
presently [2]
7:16; 83:25
previous [1]
14:10
prior [3]
64:23; 67:10; 80:3
privacy [9]
65:28; 66:11; 67:1, 5, 13;
68:5, 6; 69:8; 71:23
privilege [3]
40:4, 8, 10
privileged [1]
40:13
problem [6]
27:17; 91:24; 94:2; 104:2, 4;
112:11
problems [1]
112:9
processes [1]
66:17
programs [1]
28:20
Prompting [1]
52:22
prompting [1]
52:20
pronounce [1]
97:15
pronounced [1]
41:3
prosthe [1]
98:15
prosthesis [19]
18:6; 9, 23; 19:3; 20:17;
21:28; 22:5, 6, 19, 21; 23:2;
24:8, 24; 25:2, 5; 28:5; 97:27;
101:19; 103:1

Case 1:03-cv-00004  Document 27  Filed 09/29/2004  Page 230 of 234

objection to prosthesis  800-649-6353 PETERSON & ASSOC. COURT REPORTING, INC.

prosthetic [3]
30:22; 100:25; 101:3
Prosthetist [2]
97:14; 98:16
prosthetist [9]
97:13, 23; 98:1, 10, 18;
100:5, 14; 101:7
prosthetists [1]
99:6
protective [1]
80:19
prothesis [2]
18:19; 23:3
puffing [1]
64:25
pull [2]
51:14; 57:9
pulled [1]
57:6
pulling [17]
48:5; 52:1, 3, 4, 6, 11, 28;
53:5, 8, 10, 15, 21; 54:7, 10;
57:13, 24; 73:18
pulls [2]
52:5; 53:2
purpose [2]
46:7, 17
purse [4]
51:7, 17, 18, 20
pursed [2]
51:5, 26
pursing [6]
51:15; 52:13; 55:27; 56:1, 6
pushed [1]
95:26


> > Q < <


QUESTION [1]
5:1
Question [3]
84:24; 101:10; 107:17
question [53]
8:22, 26, 27; 9:3, 6, 12;
15:10, 12, 20; 16:2, 5; 19:14;
21:1, 9, 10, 12; 23:16; 24:27;
25:14; 31:13; 36:7; 40:16;
47:17; 50:15; 51:1, 22; 54:1;
65:1; 66:2, 12; 68:1, 20; 69:5,
16; 71:9; 73:1; 74:22; 75:22;
79:18, 25; 80:1, 4, 12, 15, 21;
82:12; 84:21, 22; 100:16;
101:28; 107:22; 113:17
questioning [1]
15:22
questions [13]
15:17; 71:7, 15; 73:8; 80:18;
83:1, 3, 9, 15; 87:4, 9; 111:6,
8
quick [1]
89:10
quiet [1]
107:20


> > R < <


radiator [1]
47:23
rail [14]
86:22; 87:26, 28; 88:3, 4, 11,

14, 26; 89:2, 7, 8; 91:20;
92:3, 5
railing [1]
88:7
Randy [10]
21:21, 22, 24; 23:6, 7, 11;
24:2; 25:28; 100:9; 103:2
reach [1]
84:7
Read [1]
14:15
read [18]
14:6, 13, 20, 21, 23; 15:28;
35:14, 17; 81:19, 21; 84:24;
101:10; 107:17; 108:28;
112:12; 113:21; 114:8; 115:3
reading [5]
15:4, 23; 35:21, 25; 112:6
real [1]
70:2
reask [1]
23:16
reason [14]
32:11; 39:17; 77:16; 78:7, 13;
79:28; 80:4, 12; 97:3, 10;
99:18; 107:7; 109:7; 112:4
reasonable [7]
66:12, 13, 27; 68:1, 17, 20;
80:13
reasons [2]
77:13, 20
recall [3]
31:3; 32:22; 36:26
receipt [1]
113:12
recently [1]
96:23
recess [6]
25:25; 46:23; 65:22; 73:14;
89:14; 102:20
recognize [3]
34:10; 90:8; 92:6
recommend [1]
114:6
recommendation [1]
24:20
recommending [2]
25:4; 26:15
record [48]
6:14; 15:9; 20:3; 24:16, 18;
25:16, 22, 24, 26, 27; 26:3,
11, 23; 35:13; 46:22, 27;
51:6; 52:16, 24; 59:21; 65:21,
23; 71:17, 21, 22; 73:9, 12,
13, 15; 89:13, 17, 19; 102:19,
21; 111:11, 16, 19, 21, 23,
24, 25, 26; 114:19, 20, 21,
22, 24; 116:9
recording [1]
6:12
records [3]
24:20; 25:12; 26:15
refer [1]
68:14
referencing [1]
50:16
referring [1]
91:18
refers [3]
16:10; 17:22; 36:1
regulations [1]

72:12
relevance [2]
66:5, 13
relevant [4]
66:1, 18, 21; 71:24
remember [11]
9:3; 22:6; 29:22; 30:11;
32:26; 35:4; 63:15; 87:20, 23,
25; 96:19
remembered [1]
44:12
remind [1]
32:7
reminded [1]
32:12
rent [13]
7:22, 25, 27; 8:24; 9:7, 15;
16:16, 20; 17:9, 10, 14, 16,
20
rental [1]
9:10
repay [7]
8:1, 5, 18, 24; 9:7, 14; 10:5
Repeat [4]
11:7; 20:6; 36:7; 51:22
repeat [14]
9:4; 13:17, 22; 31:6; 33:13;
52:7; 57:15; 73:23; 84:20, 21;
88:1; 101:8; 107:14; 108:27
Rephrase [1]
47:16
rephrase [2]
50:28; 53:28
report [2]
68:12, 18
REPORTER [2]
113:15; 114:3
Reporter [1]
116:2
reporter [7]
6:16; 7:1; 81:19; 87:5; 112:5,
13; 113:11
represent [3]
38:15; 40:2, 7
represented [1]
74:10
representing [1]
26:1
REQUESTED [1]
5:9
required [1]
73:2
requires [1]
72:10
reserve [1]
112:14
residuals [1]
70:13
respond [1]
71:12
responding [1]
16:2
response [1]
14:10
responsibilities [1]
47:4
responsibility [1]
47:6
responsive [2]
8:28; 16:6
rest [1]

28:15
restate [1]
82:15
result [1]
67:27
return [4]
10:15, 16; 99:13; 114:9
returned [1]
30:28
review [2]
16:8; 113:18
reviewing [1]
35:4
Richley [10]
22:15, 25; 23:28; 24:1, 2, 3,
6, 23; 25:13; 26:1
RICK [1]
7:4
Rick [1]
6:21
Right [5]
15:2; 59:20; 65:17; 111:18;
113:8
right [88]
12:1, 12, 13, 15; 15:14;
16:14, 25; 17:12, 17; 21:10,
22, 25; 22:7; 23:7, 19; 26:12,
20; 27:6; 29:8; 31:16; 32:9,
13, 26; 33:2, 9, 22, 26; 34:4;
35:8; 36:2, 10; 37:11; 38:12;
45:4; 47:2; 48:6; 50:20; 53:6;
54:3; 55:18, 26; 56:12, 21;
57:6; 59:8, 11, 26; 61:4;
62:17, 19; 63:15; 66:12;
70:20; 74:19; 76:12; 77:4, 14;
78:23; 79:3, 6; 84:26; 85:13;
89:2; 90:2, 3, 17, 24; 91:6,
20, 26; 92:21, 27; 93:2, 5;
94:20; 95:3, 13, 19, 22; 96:6,
24; 99:10; 100:27; 101:7;
105:11; 108:9; 109:4; 112:15
right-hand [1]
34:28
rings [1]
51:13
Robert [1]
6:24
Roberto [2]
11:1, 11
Rodriguez [1]
40:28
rolled [1]
56:16
room [14]
12:9, 10, 11, 17, 18, 19, 20,
21; 58:28; 59:1, 2
rooms [6]
11:19, 21, 23, 25; 12:1, 7, 8,
19
rope [1]
91:19
rough [1]
108:21
routine [1]
55:13
Rules [2]
89:20; 112:15
rules [1]
100:17


> > S < <

From prosthetic to rules

safe [11]
81:7, 10, 14; 82:1, 2, 4, 8, 16; 83:22, 24, 28
safer [1]
85:14
safest [2]
82:26; 83:20
safety [1]
81:15
Salina [2]
11:5, 11
Samoa [11]
12:28; 13:7; 16:12; 44:23, 25, 26; 45:1; 95:28; 96:4; 103:18; 106:24
San [12]
6:3, 10; 7:18; 13:13; 27:8; 41:7, 10; 96:24; 97:5; 99:27; 101:6; 116:12
sat [2]
59:6, 7
satisfy [1]
72:4
saying [17]
15:18; 19:11; 20:7; 21:14; 40:6; 52:16; 56:4; 58:15; 64:9; 67:4; 79:9; 80:2; 91:25; 92:2; 93:6; 111:18; 112:16
scent [1]
64:1
scheduled [1]
102:24
scold [2]
75:1; 78:6
scope [3]
66:12, 27; 68:17
scream [1]
107:19
screaming [2]
110:19, 20
sea [2]
66:24; 108:21
search [1]
27:24
Second [1]
34:25
second [2]
8:26; 110:14
seconds [1]
110:2
seek [2]
80:10, 19
send [4]
13:9; 105:4; 109:7; 113:22
sending [1]
114:6
sense [1]
21:14
serve [1]
30:23
session [2]
79:19; 83:2
setting [1]
49:9
settle [6]
33:11; 37:21; 42:25, 28; 43:3
settlement [7]
33:2, 5, 9, 15; 43:7, 11, 19
settling [1]
42:22
seven [2]

shake [2]
18:27, 28
shape [1]
83:15
shared [1]
16:13
she's [1]
105:6
shine [5]
76:8; 77:21, 22; 79:7; 109:26
shining [2]
77:11; 79:5
ship [7]
26:7; 59:28; 60:1, 2, 4, 7; 79:11
shipyard [4]
58:23; 59:11, 25; 62:11
shorted [1]
14:20
Shorthand [1]
116:1
shorthand [1]
116:7
show [2]
85:24; 91:18
Showing [2]
14:5; 90:7
shows [1]
28:17
sign [10]
33:19; 37:8; 38:12; 39:23; 40:10; 112:13; 113:22, 27; 114:5, 8
signature [6]
34:14, 15, 19, 22, 24; 35:3
signed [9]
33:25; 34:3, 21; 35:5, 8, 18; 37:10; 38:14; 113:26
signing [1]
112:6
single [1]
81:14
sister [1]
105:22
sit [3]
27:2; 28:16; 89:8
six [1]
24:4
skid [1]
45:12
skiff [64]
47:5, 8, 15, 21, 25, 28; 48:15, 18; 49:8; 50:2, 10, 23; 51:4, 25, 28; 52:5; 53:2; 54:24, 27; 55:3, 4, 10, 20, 25; 56:10, 15, 18, 21, 27; 57:8, 12, 13; 73:18, 28; 74:4; 75:14, 28; 76:7, 11; 77:3; 78:27; 79:15, 16; 80:26; 81:8, 10, 23; 82:25; 83:19; 84:9, 15; 85:4, 5, 25; 86:24, 26; 87:12, 17, 26; 88:4; 89:27; 90:1; 108:25
Skiffman [2]
45:14, 15
skiffman [11]
47:2, 7, 20; 53:9, 14; 57:9, 11, 19; 77:3, 17, 21
skiffman's [2]
77:25; 78:2
skills [1]

66:16
slanderous [1]
70:1
smaller [1]
100:2
smell [2]
58:13; 107:10
smelled [3]
62:23; 64:1, 8
smile [1]
31:21
smiled [1]
31:23
Smith [6]
23:13, 19, 20; 26:3, 17
smoke [9]
58:9, 21; 59:3; 60:6, 8, 27; 64:25; 67:9; 68:24
smoked [11]
58:6, 19, 28; 59:7, 8; 62:1; 65:11, 25; 66:7, 9; 68:26
smoker [1]
72:3
smoking [45]
58:11, 16; 59:13, 14, 25; 60:4, 12, 23; 61:5, 6; 62:2, 5, 9; 63:2, 4, 9, 10, 13, 17, 21, 26; 64:6, 11, 12, 14, 18, 28; 65:3; 66:15, 19; 67:2, 19, 27; 68:13, 14; 70:7; 72:6, 10, 11; 107:4, 8, 18, 26; 108:3, 18
somebody [2]
56:8; 100:22
someone [5]
10:25; 39:1; 46:11; 63:20; 101:2
sooner [1]
114:18
soreness [3]
18:13, 16, 20
Sorry [3]
61:23; 89:4; 91:9
sorry [18]
9:9, 20; 10:9; 14:21; 21:11; 28:3; 31:22; 53:13; 54:27; 59:7; 62:11; 66:4; 77:13; 81:18; 84:15; 86:15; 95:17; 110:22
sort [4]
21:4; 22:14; 69:16; 72:21
sorts [1]
66:17
source [3]
75:27; 98:24; 99:4
speak [7]
28:25, 27; 29:1; 36:12; 43:6; 44:13, 16
speaking [2]
28:20; 43:24
speaks [1]
52:24
specialist [1]
105:28
specifically [2]
6:13; 68:14
speculation [6]
11:12; 41:26; 60:16, 24; 92:18, 23
speeches [1]
26:13
speedboat [23]

84:13, 14; 85:3, 9, 20; 88:19, 22, 28; 89:1; 90:9, 12, 28; 91:10, 13, 15, 18; 92:1, 3, 15, 27; 93:1, 26; 94:2
spell [2]
104:19, 25
spelling [1]
14:24
spend [1]
27:6
splice [1]
47:9
spoke [4]
29:8; 31:14; 38:24; 46:14
spoken [4]
29:5; 45:17, 19; 99:9
spot [2]
60:11, 21
spotlight [1]
77:20; 79:5, 10; 109:26
stack [1]
56:27
stacked [2]
57:1, 2
stair [1]
109:10
stairs [1]
77:6
stairway [7]
76:16; 77:22; 79:8; 84:7; 85:9, 18; 109:26
stand [2]
18:27; 19:23; 27:20
standing [2]
54:16; 81:23
starboard [7]
49:27; 50:3, 11, 23; 95:12, 14, 16
start [8]
19:13; 33:27; 54:23; 57:5, 25; 58:3; 68:10, 11
started [1]
68:9
starts [1]
68:22
State [3]
99:19; 115:2; 116:2
state [2]
16:4; 35:27
statements [1]
103:7
States [5]
6:6; 103:5, 27; 104:7; 105:26
Stay [1]
20:16
stay [8]
29:20; 96:24; 97:4, 9, 10; 99:18; 105:4
stayed [1]
108:24
staying [1]
105:7
step [15]
9:1; 19:8; 81:24, 25; 86:16, 18, 25; 88:16, 17, 21, 22, 25, 26; 94:21
stepped [3]
86:24; 87:17; 89:27
steps
76:8; 86:4, 9, 12; 87:14, 21, 24

stern [1]
48:13
stick [1]
20:4
sticking [1]
92:4
stip [1]
111:12
stipulate [3]
40:21; 111:27; 112:12
stipulation [1]
111:9, 19
stop [3]
71:13; 80:9; 89:23
stopped [2]
33:11, 14
straight [1]
81:1
strap [1]
91:25
Street [2]
6:3, 9
strike [5]
8:21; 20:28; 40:27; 54:5;
63:12
strong [1]
78:2
stuff [1]
69:8
Subject [2]
9:5; 83:18
subject [1]
82:13
submitted [2]
66:14; 67:18
sufficient [2]
47:23; 97:9
suggest [2]
25:1; 42:8
Suggested [1]
24:8
suggested [4]
20:20; 21:3, 16; 24:10
suggesting [3]
22:10; 24:23; 26:15
Suite [2]
6:3, 9
sun [2]
57:28; 58:3
Supplementing [1]
14:10
supplementing [2]
14:14, 27
supposed [5]
20:26; 59:16; 73:4; 82:11;
91:22
surgeons [1]
99:24
suspenders [1]
19:1
sworn [3]
7:5, 10; 116:5
system [2]
110:18; 111:5

> > T < <

T.V. [8]
20:16; 27:2, 6; 28:7, 14, 17,
20, 23

talk [20]
25:17; 30:5; 31:4, 9, 27; 39:1,
7; 41:9, 17, 20; 43:28; 45:6;
64:11, 14, 17; 77:1; 78:1;
93:26; 98:7; 111:20
talked [10]
39:2, 4; 44:5; 45:16, 27;
46:12; 94:1; 103:19; 105:28;
106:6
talking [20]
12:9, 19; 16:11; 19:21; 20:9,
25; 22:25; 25:13; 42:5; 43:26;
52:13, 18; 54:22; 66:23; 88:7,
11, 18; 93:12; 98:28; 111:16
tangled [1]
55:23
tangling [1]
48:2
Tape [5]
46:21, 25; 89:12, 16; 114:24
tape [1]
46:20
Taylor [1]
6:8
telephone [3]
18:3; 41:23; 42:11
telling [3]
30:11; 68:16; 80:17
ten [9]
28:11; 65:26; 66:4, 10, 22;
67:4; 102:18; 110:2; 113:16
tend [1]
59:18
term [3]
14:24; 66:22, 23
terms [6]
14:25; 66:27; 81:15; 93:17;
106:10; 112:23
Terry [1]
6:8
test [9]
5:5; 69:2, 7, 12; 70:11, 14;
71:10, 16; 72:20
tested [1]
70:22
testified [1]
7:10
testify [1]
116:5
testimony [13]
7:6; 59:12, 14, 22; 66:15;
71:20, 21; 75:8; 80:3; 87:2, 3;
109:17; 116:10
testing [2]
71:4; 73:3
tests [1]
103:1
Thank [1]
111:7
Thanks [2]
83:16; 89:25
therapy [23]
20:16, 18, 21; 21:4, 8, 17, 25;
22:9; 24:10, 11, 17, 21, 24;
25:1, 5, 7, 8, 14; 26:1, 4, 15,
18; 101:19
There's [1]
51:12
there's [7]
15:9; 51:13; 55:24; 67:1;
79:28; 83:22; 87:2

they're [4]
50:17; 55:23; 73;3
thinking [3]
31:26; 67:26; 105:6
third [1]
34:23
Three [1]
105:12
three [8]
12:1, 7; 18:21; 46:6; 67:10,
15; 68:10; 105:16
throwing [1]
57:20
Thursday [2]
6:4; 46:26; 89:17
ticket [1]
96:9, 13
tie [1]
47:15
Tile [7]
44:5, 16, 19, 22, 28; 45:6;
61:19
times [20]
6:12; 29:13, 14; 31:9; 46:5, 6;
49:3; 60:28; 62:10, 11, 16,
19, 25, 26, 28; 63:8, 9, 24;
75:4, 6
tiny [1]
76:3
tip [2]
49:10; 92:4
today's [1]
114:23
Tom [6]
41:13, 14, 17; 42:6, 8; 46:14
Tomorrow [1]
102:27
tomorrow [2]
96:8, 10
total [2]
11:21, 23
totally [2]
69:4; 70:6
towards [2]
9:1; 37:25
training [1]
106:1
trans [1]
79:13
transcribed [1]
116:8
TRANSCRIPT [1]
5:9
transcript [5]
111:14, 17; 112:6; 113:14;
114:17
transcripts [1]
112:1
transfer [3]
75:14, 28; 76:6
transferred [1]
76:11
transferring [2]
78:27; 79:14
translate [12]
7:5; 14:26; 15:11, 13, 18, 21;
21:13; 23:15; 35:19; 51:16;
80:21; 82:11
translated [1]
32:25
translating [1]

15:16
translation [2]
52:13; 112:9
TRANSLATOR [1]
6:28
translator [1]
35:5
travel [2]
97:26, 28
Treadmill [2]
22:12, 13
treadmill [3]
22:11, 13; 24:14
treat [1]
21:5
treatment [1]
23:12
trial [7]
72:17; 112:2, 4, 18; 113:1;
114:16, 18
trick [4]
70:8, 25, 28; 73:7
tricks [1]
59:18
trip [11]
16:25, 27, 28; 17:1; 45:6;
62:25; 63:1; 66:7; 68:1, 9, 10
trolley [1]
109:10
true [7]
35:7; 45:21; 94:22; 95:24;
115:3; 116:9
truth [4]
35:27; 116:5, 6
tuna [2]
106:24
twice [1]
110:11
two-battery [1]
78:16
type [5]
22:9; 24:11; 28:17; 101:21;
105:28
types [2]
101:23; 102:1
typewriting [1]
116:8
typical [1]
27:5
typically [3]
27:3; 28:6, 14

> > U < <

Uh-huh [1]
81:13
Uh-oh [1]
112:22
unassociated [1]
70:6
unaware [1]
112:9
understand [26]
10:9; 13:17; 16:19; 17:2;
18:6; 21:10, 11, 12; 22:16;
26:21; 28:23; 30:19; 37:24;
47:26, 27; 52:6, 11, 14, 27;
53:1; 54:21; 60:3; 81:18;
99:28; 107:14
understanding [5]

37:13, 20; 48:28; 53:23;
100:4
understands [3]
51:21; 52:8, 9
understood [1]
37:11
Uneven [1]
19:22
uneven [5]
19:5, 8, 16, 20, 24
unfurl [1]
51:11
United [5]
6:6; 103:5, 26; 104:7; 105:26
unresponsive [1]
8:21
upper [1]
92:26
user [1]
69:23
uses [1]
104:17


> > V < <

Vague [7]
81:2, 11; 82:6, 28; 84:2; 86:6;
89:3
vague [18]
16:3; 32:14; 43:8, 14, 21;
44:3; 50:13; 76:26; 81:26;
84:18; 85:15; 88:6, 20; 93:6,
11, 20; 95:4; 108:5
verbally [1]
109:18
versa [1]
113:19
versus [2]
6:5; 72:16
vessel [2]
37:18; 38:16
vice [1]
113:19
video [3]
6:11; 46:25; 89:16
VIDEOGRAPHER [18]
6:1; 7:1; 25:24, 26; 46:21, 24;
65:21, 23; 73:13, 15; 89:12,
15; 102:19, 21; 111:23, 25;
114:20, 22
videotaped [2]
6:2; 52:19
view [1]
40:12
violation [2]
72:12, 13
visit [1]
13:13; 29:10, 13; 41:27
visited [6]
29:15, 16, 22; 30:16; 58:24;
63:11
visiting [1]
100:27


> > W < <

wait [3]
49:26; 50:5; 56:9
waited [1]
57:27

walk [10]
18:14, 19, 21; 19:5, 10, 16,
17, 19; 27:20; 58:14
walking [1]
24:14
wanted [6]
29:26; 30:12; 32:8; 40:1;
73:21, 26
wants [3]
15:10; 35:13; 105:8
watch [9]
20:16; 27:2; 28:6, 13, 18, 20;
36:23; 55:17, 26
watching [1]
27:6
water [11]
47:23; 48:24; 49:2, 16, 17;
55:17, 18; 84:16, 17; 85:5;
87:27
wave [2]
83:23; 84:10
waves [2]
86:26, 27
ways [3]
18:12, 23, 26; 19:3; 92:1
We'll [1]
108:9
we'll [9]
40:21; 72:18, 19; 80:18;
83:15; 111:11; 113:10, 11;
114:7
we're [6]
34:17; 66:23; 70:17; 72:15;
111:16; 112:10
we've [3]
26:1; 71:17; 75:23; 89:21
weak [2]
77:24, 26
wedding [1]
30:6
wedge [1]
91:19
week [3]
72:6; 96:3; 103:5
weren't [1]
26:22
Western [1]
12:28; 13:7
What's [1]
11:4; 102:28; 103:14, 21;
104:23; 107:6
what's [1]
82:21
whatsoever [1]
71:25
wheel [1]
60:13
Whenever [4]
81:4; 82:18, 23; 84:7
whenever [1]
94:7
whereas [2]
19:23; 20:26
Whereupon [1]
114:25
Who's [1]
42:16
Whoever [2]
112:28; 113:8
whoever [2]
100:6; 113:4

William [1]
6:22
willing [7]
5:4, 6; 38:11; 69:1, 3; 71:10;
80:11
wind [4]
94:19, 23; 95:3, 10
WINDES [251]
6:24; 7:14; 9:2, 5, 12, 13, 20,
22, 24; 10:12, 19; 11:8, 14;
13:24, 25; 14:1, 4, 16, 18, 26;
15:2, 8, 25; 16:7; 20:4, 7, 13,
27; 21:2, 11, 15, 19; 23:14,
16, 18, 25; 24:28; 25:12, 19,
21; 26:12, 20, 24, 25, 28;
30:26; 31:8; 32:18; 33:6, 7;
34:1, 6, 9, 18, 20, 26; 35:1,
15, 24, 26; 39:21; 40:5, 11,
15, 18, 25; 41:3, 6; 42:1;
43:10, 18, 23; 44:4, 10;
45:10, 13; 46:19, 28; 47:18;
48:17; 50:14, 18; 51:2, 3, 7,
10, 12, 18, 20, 24; 52:10, 18,
22, 26; 53:13, 17, 24; 54:3, 4;
55:4, 8; 56:25; 57:16, 17, 22;
59:16, 20, 23; 60:18, 26;
61:8, 25, 28; 62:21, 24; 65:2,
15, 17, 20, 24; 66:3, 14, 28;
67:7, 8, 14, 17, 22, 25; 68:4,
12, 21; 69:9, 13, 19, 28; 70:4,
12, 17, 20, 28; 71:3, 6, 9, 17,
28; 72:2, 7, 14, 20, 24, 28;
73:5, 10, 16, 25; 74:21;
75:11, 16, 19, 22, 25; 76:28;
78:26; 79:20, 22, 26; 80:6,
14, 21, 23; 81:6, 13, 18, 22;
82:3, 9, 11, 20; 83:7, 12, 16,
17; 84:5, 23, 28; 85:21, 23;
86:3, 8, 21; 87:6, 11; 88:2, 9,
24; 89:4, 6, 25, 26; 90:6, 19;
92:19, 25; 93:9, 16, 23;
94:26; 95:1, 6, 15, 18; 96:22;
97:15, 19; 98:13, 17; 99:2,
16; 100:17, 23; 101:12;
102:7, 16, 22; 103:23, 25;
107:16, 22, 23; 108:1, 9, 11,
16, 27; 109:1, 16; 111:6, 13,
15, 22, 26; 112:19, 22, 28;
113:4, 6, 25; 114:1, 11, 17
Windes [3]
6:24; 15:10, 21
WITNESS [48]
5:1; 6:20; 9:19; 11:13; 14:17;
20:9; 21:16; 32:16; 33:5;
34:19; 41:5, 27; 43:9, 16, 22;
51:19; 55:7; 60:17, 25; 62:22;
75:9, 21; 76:27; 78:25; 81:4,
14, 28; 82:18; 84:3, 20, 26;
85:17; 86:17; 87:10; 88:7;
89:5; 92:24; 93:13, 22; 95:5;
96:21; 97:18; 100:21; 101:11;
102:6; 103:24; 107:18;
108:24
witness [31]
6:19; 7:2; 8:25; 9:1, 17; 15:4,
23; 35:21, 25; 39:20; 40:4,
15; 52:23; 59:16; 65:27; 66:3;
67:12, 17, 18; 69:7, 10; 70:4;
80:7, 14; 82:7; 83:10; 89:20;
113:21, 26; 116:4, 10
witnesses [6]

59:19; 70:6; 72:18; 112:26,
27
woman [1]
106:3
won't [2]
21:14; 72:22
wondered [1]
24:19
word [13]
14:14, 20, 23, 27; 20:24;
38:8; 47:26; 51:7, 16, 20, 21;
52:11; 109:14
words [5]
10:13; 14:23; 30:20; 50:26;
68:4
work [12]
30:12, 28; 31:10, 15, 19, 28;
32:11; 110:16, 21, 23;
106:18; 114:4
worked [11]
29:7; 62:27; 66:3, 20; 75:12,
26; 80:25; 97:23; 103:19;
106:23; 109:3
working [7]
31:4; 37:16, 23; 70:21; 71:11;
81:1; 97:13
works [1]
114:1
worry [1]
106:21
write [1]
36:16
writings [1]
25:28
wrong [4]
24:27; 108:2, 6, 8


> > Y < <

Yeah [25]
14:16; 18:10; 19:8; 21:23;
24:10, 25; 31:9; 34:13; 39:27;
43:26; 51:2, 19; 54:2; 58:1, 7,
8, 9, 13; 65:20; 83:7; 90:3,
22; 97:1; 101:18; 108:5
yeah [1]
65:15
year [11]
23:27; 27:5; 63:14; 68:19, 23;
100:8, 14, 27; 101:3, 7
years [30]
16:22; 29:7; 44:6; 45:18;
50:19, 22; 62:26; 65:6, 7, 8,
26; 66:4, 10, 22; 67:4, 10, 15,
19; 68:14; 72:23; 75:12, 26;
77:25; 78:17; 79:13; 80:25;
81:1; 109:3
yell [2]
109:23; 110:13
yelled [2]
109:9; 110:11, 16
yelling [2]
107:19; 110:28
you'd [2]
49:13; 50:14
You've [1]
79:18
you've [2]
8:26; 79:25
yours [1]

76:12
yourself [3]
   27:13; 78:20; 106:11


         > > Z < <

Z-E-C-A [1]
   41:2
Zealand [9]
   58:22, 23; 59:11, 25; 60:7;
   61:1; 62:11, 12; 63:13
Zeca [2]
   40:28; 41:1
Zuware [1]
   61:19